MICHAEL BAILEY
United States Attorney
District of Arizona

TODD M. ALLISON
Arizona State Bar No. 026936
DAVID A. PIMSNER
Arizona State Bar No. 007480
RACHEL C. HERNANDEZ
Arizona State Bar No. 016543
DIMITRA H. SAMPSON
Arizona State Bar No. 019133
Assistant United States Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: Todd.Allison@usdoj.gov
Email: David.Pimsner@usdoj.gov
Email: Rachel.Hernandez@usdoj.gov
Email: Dimitra.Sampson@usdoj.gov
Attorneys for the United States

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In the Matter of the Extradition of Ali Yousif Ahmed Al-Nouri a/k/a Ali Youssef Ahmed Al-Nouri, Ali Ahmed, Ali Yousif Ahmed Al Noori, Ali Yousif Ahmed Nouri, Ali Al-Daleme, Ali Yousif Ahmed Al-Mahmadi, Ali Yousif Ahmed, and Ali Yousif Nouri. | Case No. 20-8033MJ-MTM<br><br>**MEMORANDUM OF EXTRADITION LAW AND REQUEST FOR DETENTION PENDING EXTRADITION HEARING** |

The United States, in fulfilling its treaty obligations to the Republic of Iraq, respectfully requests that the fugitive in this case, Ali Yousif Ahmed Al-Nouri ("Ahmed"),[1] be held without bond pending the hearing on the certification of his extradition pursuant to 18 U.S.C. §§ 3181 *et seq.* Ahmed is wanted on charges of committing two violent,

---

[1] Ahmed is referred to in translated documents provided by the government of Iraq as "Ali Yousif Ahmed Al-Nouri," "Ali Youssef Ahmed Al-Nouri," "Ali Ahmed," "Ali Yousif Ahmed Al Noori," "Ali Yousif Ahmed Nouri," "Ali Al-Daleme," "Ali Yousif Ahmed Al-Mahmadi," "Ali Yousif Ahmed," and "Ali Yousif Nouri."

premeditated murders of police officers in Fallujah, Iraq in 2006, on behalf of a group of individuals associated with Al-Qaeda in Iraq ("AQI"), a designated foreign terrorist organization. As discussed herein, international extradition proceedings are unique proceedings that are not criminal proceedings. As a result, the Bail Reform Act does not apply to a fugitive facing an extradition proceeding. Instead, all international extradition proceedings are governed by a strong presumption against bail. Here, Ahmed cannot meet his difficult burden of showing that he is not a flight risk or danger to the community as well as showing that special circumstances exist to warrant his release.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On January 28, 2020, the United States filed a Complaint Pursuant to 18 U.S.C. § 3184 against Ahmed ("Extradition Complaint"). (Doc. 3.) Attached to the Extradition Complaint on the public docket is a redacted copy of the extradition request sent from Iraq to the United States ("Extradition Request"). *See* Exhibit B (Parts 1 and 2), attached to the Extradition Complaint, Docs. 3-3 and 3-4. The next day, the Court issued an arrest warrant for Ahmed. On January 30, 2020, Ahmed was arrested. (Doc. 11.) On January 31, 2020, the Court held Ahmed's initial appearance. (Doc. 7.) A status hearing on detention and the extradition hearing was held on February 4, 2020. Ahmed's detention hearing is set for April 7, 2020. (Doc. 33.) After interviewing Ahmed in the presence of counsel, the United States Pretrial Services officer assigned to the case recommended that Ahmed be detained as a flight risk and as a danger to the community. (Doc. 14.)

Ahmed was born in Iraq, but left Iraq to travel to Syria in approximately January 2007. While in Syria, Ahmed applied to United States immigration authorities for admission to the United States, and his application was approved on or about January 26, 2009. Shortly thereafter, Ahmed entered the United States, and on June 9, 2015, he became a naturalized United States citizen. (Doc. 14.)

Iraq has requested that Ahmed be extradited pursuant to its extradition treaty with the United States, the Extradition Treaty Between the United States of America and Iraq,

U.S.-Iraq, June 7, 1934, 49 Stat. 3380 (the "Treaty"). According to the Extradition Complaint and the Extradition Request,[2] Iraq seeks the extradition of Ahmed to stand trial on two charges of premeditated murder, in violation of Article 406(1)(A) of the Iraqi Penal Code No. 111 for the year 1969 Amended. Extrad. Req. at 00018–00026. Judge Jabbar Hussein of the Magistrate Court of Al-Karkh issued a warrant for Ahmed's arrest on May 12, 2019. Extrad. Req. at 00048–00052.

According to the information provided by the government of Iraq, Ahmed served as a member and a leader ("Emir") of a group of AQI terrorists in Fallujah, Iraq. In 2006, the group planned and successfully executed two separate operations to kill Iraqi police officers. The first operation involved the murder of Issam Ahmed Hussein ("Issam"), a First Lieutenant in the Fallujah Police Directorate. On or about June 1, 2006, Issam was sitting with another individual ("Eyewitness 1"), near a store on Street 40 in Fallujah when two cars with masked and armed individuals pulled up. Six men got out of the cars and approached Issam and Eyewitness 1. One of the men held a gun to Eyewitness 1's head and told him/her not to move. Another of the men started to shoot at Issam, but his handgun malfunctioned. According to Eyewitness 1, Ahmed, who was not wearing a mask at that time, approached, pulled out a gun, and said, "leave him, this is 1st Lieutenant Issam and he serves as a policeman." One of the other masked men told Ahmed to step back,[3] and another man shot Issam multiple times with an AK-47, killing him. Ahmed and the other armed men fled from the scene. Eyewitness 1 identified Ahmed as the leader/Emir of the group of armed, masked men that carried out the shooting. *See* Extrad. Req. at 00018,

---

[2] Citations herein to the redacted Extradition Request (Docs. 3-3 and 3-4) will include "Extrad. Req." along with a reference to the Bates-stamped page numbers at the bottom of each page.

[3] The documents submitted with the Extradition Request contain two translated reports of Eyewitness 1's testimony. In one of the reports, Eyewitness 1 testified that the masked man responded to Ahmed by stating, "[S]tep back and don't interfere with this matter." *See* Extrad. Req. at 00104. The other report includes Eyewitness 1's testimony that the masked man responded to Ahmed by stating, "Ali step back, it is not your business." *See* Extrad. Req. at 00105.

00070, 00101–00105.

The second operation involved the murder of Khalid Ibrahim Mohammad ("Khalid"), a police officer in the Fallujah Police Directorate. Again, Ahmed and his AQI-associated group found the victim near a store on Street 40 in Fallujah. On or about October 3, 2006, Khalid was sitting outside a store on Street 40 in Fallujah with two other people when Ahmed and other individuals, who were wearing masks and carrying various weapons, drove up in a car and began shooting at Khalid. Ahmed and the other men shot and killed Khalid, as well as the other two individuals with whom Khalid had been sitting, and then fled the scene. *See* Extrad. Req. at 00018, 00054, 00072–00082.

A local resident ("Eyewitness 2") was an eyewitness to Khalid's murder. Eyewitness 2 lived near Ahmed and identified Ahmed as a local carpenter in Fallujah who was known for conducting assassination operations on members of the police force. Eyewitness 2 was sitting across the street from Khalid at the time of the murder. Eyewitness 2 witnessed a group of armed men pull up in a vehicle—an Opel—and start to open fire at Khalid. Eyewitness 2 recognized Ahmed among the assailants and later identified Ahmed in a multi-photograph line-up. During the murder, Eyewitness 2 saw Ahmed get out of the car and shoot Khalid. *See* Extrad. Req. at 00072, 00075.

Another local resident ("Eyewitness 3") was standing near the location where the shooting took place and was an eyewitness to Khalid's murder. Eyewitness 3 knew Ahmed and recognized him during the shooting when Ahmed's mask fell off. According to Eyewitness 3, Ahmed was one of the individuals who fired shots at Khalid. *See* Extrad. Req. at 00072, 00074.

Subsequently in 2006, one of the members of Ahmed's group ("Cooperator 1") was captured by coalition forces and turned over to the Iraqi police. Cooperator 1 admitted to being part of an Al-Qaeda group, of which Ahmed was the leader/Emir. Cooperator 1 confessed to working with Ahmed and other members of the group to kill police officers. *See* Extrad. Req. at 00072–00073, 00077–00081, 00084–00085, 00106–00110.

Cooperator 1 admitted to being involved in planning the operation to kill Khalid. Cooperator 1 and the rest of the group conducted surveillance of Khalid prior to the shooting. Cooperator 1 was present on the day of Khalid's murder and served a supporting role in that operation by driving one of the cars involved and was present where the shooting occurred. Cooperator 1 testified that Ahmed took part in the operation. *See* Extrad. Req. at 00072–00073, 00077–00081, 00084–00085, 00106–00110.

Cooperator 1 also told the police that he/she was present when Ahmed and other members of the group planned to kill Issam. Cooperator 1 said that he/she went to the murder location in a separate vehicle to conduct surveillance, but did not get out and participate in the shooting. Later, Ahmed reported to Cooperator 1 that Ahmed had executed the operation to kill Issam with Ahmed's 9mm handgun. *See* Extrad. Req. at 00072–00073, 00077–00081, 00084–00085, 00106–00110.

## II. <u>ARGUMENT</u>

### A. LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

#### 1. The Limited Role of the Court in Extradition Proceedings.

The extradition process is *sui generis*. Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see, e.g.*, *United States v. Knotek*, 925 F.3d 1118, 1124 (9th Cir. 2019) ("As we have stated on many occasions, '[e]xtradition is a matter of foreign policy,' a diplomatic process over which the judiciary provides 'limited' review.") (citation omitted). The Secretary of State, and not the Court, then decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Prasoprat v. Benov*, 421 F.3d 1009, 1012 (9th Cir. 2005). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate

questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of the fugitive's extradition—as defined in the applicable extradition treaty, statutes, and case law—have been established. *See Quinn v. Robinson*, 783 F.2d 776, 786 n.3 (9th Cir. 1986) (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)) (analogizing extradition hearing to a preliminary hearing in a criminal case). If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary of State's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006); *Barapind v. Reno*, 225 F.3d 1100, 1105 (9th Cir. 2000).

## 2. The Requirements for Certification.

The Court should certify a fugitive's extradition to the Secretary of State when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *See Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008). The following sections briefly discuss each of those requirements.

### a. Authority over the extradition proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18

U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," but rather acts in a "non-institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate judges and district court judges may render a certification under Section 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993). Here, Rule 57.6(d)(15) of the Local Rules of Criminal Procedure expressly delegates to magistrate judges the authority to handle extradition matters.

b. <u>Jurisdiction over the fugitive</u>

The Court has jurisdiction over a fugitive, such as Ahmed, who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged."). Ahmed was found in Phoenix, Arizona, and arrested there on January 30, 2020.

c. <u>Treaty in full force and effect</u>

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See id.*; *see also Then v. Melendez*, 92 F.3d 851, 853 (9th Cir. 1996) (noting that "the executive branch does not have the power to extradite alleged criminals absent a valid extradition treaty"). The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and Iraq. *See* Extrad Req. at 00001–00003. The Court must defer to the Department of State's determination in that regard. *Then*, 92 F.3d at 854.

d. <u>Crimes covered by the treaty</u>

Extradition treaties create an obligation for the United States to surrender fugitives

under the circumstances defined in the treaty. Article I of the applicable treaty in this case provides for the return of fugitives charged with, or convicted of, any of the crimes specified in Article II of the Treaty. In assessing whether the crimes for which extradition is requested are covered by the Treaty, the Court should examine the description of criminal conduct provided by Iraq in support of its charges, and decide whether that conduct constitutes an offense among those listed in Article II. *Factor v. Laubenheimer*, 290 U.S. 276, 299-300 (1933); *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) (treaty that listed "murder" as extraditable encompassed offenses charged as "war crimes"). In determining whether the conduct constitutes an enumerated offense, "a narrow and restricted construction is to be avoided." *Factor*, 290 U.S. at 293-94.

Article II of the Treaty defines the listed offenses as extraditable if they are punishable under the laws of both the United States and Iraq. In assessing whether the crimes for which extradition is requested meet that requirement, the Court examines the description of criminal conduct provided by Iraq in support of its charges and decides whether that conduct, if it had been committed here, would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See, e.g.*, *Knotek*, 925 F.3d at 1128-29 & n.10; *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107-08 (9th Cir. 1981). A requesting country need not establish that its crimes are identical to ours. *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998) ("The primary focus of dual criminality has always been on the conduct charged; the elements of the analogous offenses need not be identical."). Rather, "the court looks at whether 'the essential character of the transaction is the same, and made criminal by both statutes.'" *Knotek*, 925 F.3d at 1131 (quoting *Wright v. Henkel*, 190 U.S. 40, 62 (1903)) (brackets omitted). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

In fulfilling its function under Section 3184, the Court should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *Factor*, 290 U.S. at 298-300; *see also, e.g.*, *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"); *In re Extradition of Mathison*, 974 F. Supp. 2d 1296, 1305 (D. Or. 2013). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

### e. Probable cause that the fugitive has committed the offenses

To certify the evidence to the Secretary of State, the Court must conclude that there is probable cause to believe that the crimes charged by Iraq were committed by the person before the Court. *Vo*, 447 F.3d at 1237. The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted). The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based." *Quinn*, 783 F.2d at 791 (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981)).

### 3. An Extradition Hearing Follows Unique Procedures.

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court. *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901).

Accordingly, an extradition hearing is not a criminal proceeding. *See, e.g.*, *Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir. 1984); *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828 (11th Cir. 1993).

Extradition proceedings are governed by "the general extradition law of the United States and the provisions of the Treaty." *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987). The Federal Rules of Evidence do not apply to extradition proceedings. Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *Then*, 92 F.3d at 855. Indeed, hearsay evidence is admissible at an extradition hearing; moreover, a certification of extraditability is properly based exclusively on the authenticated documentary evidence and information provided by the requesting government. *See, e.g.*, *Collins*, 259 U.S. at 317; *Artukovic*, 784 F.2d at 1356. Nothing more is required, and typically nothing more is provided. *See, e.g.*, *Zanazanian v. United States*, 729 F.2d 624, 627-28 (9th Cir. 1984) (police report describing witness statements is competent evidence); *In re Extradition of Mainero*, 990 F. Supp. 1208, 1212-13 & 1226-29 (S.D. Cal. 1997) (statements of co-conspirators and other witnesses sufficient in extradition to Mexico). Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing. Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *see also, e.g.*, *Zanazanian*, 729 F.2d at 626-27.

The Federal Rules of Criminal Procedure also do not apply to extradition proceedings. Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); *Mathison*, 974 F. Supp. 2d at 1304. A fugitive has no right to discovery. *See, e.g.*, *Prasoprat*, 421 F.3d at 1014. Furthermore, many constitutional protections applicable in criminal cases do not apply. For example, a fugitive has no right to cross-examine witnesses who might testify at the hearing, *see, e.g.*, *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406-07 (9th Cir. 1988); there is no Sixth

Amendment right to a speedy trial, *see, e.g.*, *In re Extradition of Kraiselburd*, 786 F.2d 1395, 1398 (9th Cir. 1986); the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see, e.g.*, *In re Extradition of Powell*, 4 F. Supp. 2d 945, 951 (S.D. Cal. 1998) (citing *Collins*, 262 U.S. at 429); the exclusionary rule is not applicable, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517.

Relatedly, a fugitive's right to present evidence is severely constrained. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but rather may only introduce evidence explaining the submitted evidence. *See Charlton*, 229 U.S. at 461-62. A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)). The admission of explanatory evidence is largely within the discretion of the Court. *See Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir. 1978).

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *Hooker*, 573 F.2d at 1368 (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as insanity"). These issues, which require determinations of fact or credibility, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

### 4. The Rule of Non-Inquiry.

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court. 18 U.S.C. §§ 3184, 3186. For example, the Secretary of State should address a

fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *Prasoprat*, 421 F.3d at 1016 (humanitarian objections); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state); *Quinn*, 783 F.2d at 789-90 (political crime) (citation omitted). This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *See In re Kaine*, 55 U.S. 103, 110 (1852).

**B.     AHMED SHOULD BE DETAINED.**

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*. The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.[4] *Kamrin*, 725 F.2d at 1228; *Martin*, 993 F.2d at 828. Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

**1.     Applicable Law on Detention in an Extradition Proceeding.**

a.     A strong presumption against bail governs in an international extradition proceeding.

Unlike in domestic criminal cases, "[t]here is a presumption against bail in an extradition case." *Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989); *see also Martin*, 993 F.2d at 827; *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280,

---

[4]     The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2). Here, Ahmed is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with offenses committed in violation of the law of the requesting state, Iraq.

1294 (S.D. Fla. 2017) ("[A]ny release of a detainee awaiting extradition is largely antithetical to the entire process."). The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling. When, as here, a requesting country meets the conditions of the Treaty, the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive. *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See Martinelli Berrocal*, 263 F. Supp. 3d at 1306 ("[O]ur Executive Branch has a vested interest in enforcing our own treaty obligations for fear that other treaty partners will refrain from doing so in the future. And a difficult but necessary measure in carrying out that responsibility is to secure a wanted individual and surrender him or her to the foreign jurisdiction.").

     **b.**    <u>Bail must be denied unless a fugitive demonstrates that there is no risk of flight, no danger to the community, and "special circumstances" exist.</u>

In light of the strong presumption against bail established in *Wright*, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant their release. *See, e.g.*, *In re Extradition of Kirby*, 106 F.3d 855, 862-63 (9th Cir. 1996); *Leitner*, 784 F.2d at 160-61; *In re Extradition of Antonowitz*, 244 F. Supp. 3d 1066, 1068 (C.D. Cal. 2017); *In re Extradition of Mainero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996).[5] "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re the Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense. *See, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1304; *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk); *In re Extradition of Patel*, 08-430–MJ–HUBEL, 2008 WL 941628,

---

[5]    Several courts in this Circuit have required fugitives to meet this burden with clear and convincing evidence, reasoning that the presumption against bail in extradition cases justifies a heightened standard of proof, *see, e.g.*, *In re Extradition of Patel*, 08-430–MJ–HUBEL, 2008 WL 941628, at *1 (D. Or. Apr. 4, 2008); *Mainero*, 950 F. Supp. at 294; others have applied a preponderance of the evidence standard, *see, e.g.*, *In re Extradition of Santos*, 473 F. Supp. 2d 1030, 1035 n.4 (C.D. Cal. 2006). Other courts have found it unnecessary to resolve the issue because of the difficulty of satisfying either standard. *See, e.g.*, *In re Extradition of Perez-Cueva*, No. 16-0233M, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7, 2016).

In a December 11, 2017 Order, a separate division of this Court (Magistrate Judge Boyle) acknowledged the strong presumption against bail in extradition cases as well as the requirement that the fugitive demonstrate "special circumstances" in order to justify release pending the extradition hearing. *See United States v. Erick Salvador Enriquez*, Case No. 17-mj-8283-01-JZB (Doc. 18).

at *2 (D. Or. Apr. 4, 2008) (considering the fact that a fugitive, a physician, had "more than sufficient assets available with which to flee"). Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. *See, e.g.*, *In re Extradition of Perez-Cueva*, No. 16-0233M, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7, 2016) (special circumstances must exist in addition to absence of risk of flight). "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also Salerno*, 878 F.2d at 317-18 (lack of flight risk "is not a criteria for release in an extradition case"). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances. *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995).

"Special circumstances must be extraordinary and not factors applicable to all defendants facing extradition." *Mainero*, 950 F. Supp. at 294 (citing *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992)). Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996);

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *Smyth*, 976 F.2d at 1535-36;

- The fugitive's character, background, and/or ties to the community, *see, e.g.*, *In re Extradition of Noeller*, No. 17 CR 664, 2017 WL 6462358, at *5 (N.D. Ill. Dec. 19, 2017); *Beresford-Redman*, 753 F. Supp. 2d at 1089; *In re Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994);

- The fact that the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *In re Extradition of Noeller*, 2017 WL

- 15 -

6462358, at *8-9; *Martinelli Berrocal*, 263 F. Supp. 3d at 1301-02; *In re the Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *Antonowitz*, 244 F. Supp. 3d at 1072; *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Salerno*, 878 F.2d at 318; *Antonowicz*, 244 F. Supp. 3d at 1070; and

- The availability of bail for the same offense in the requesting country, *see, e.g.*, *Antonowicz*, 244 F. Supp. 3d at 1070; *Kyung Joon Kim*, 2004 WL 5782517, at *2; *Siegmund*, 887 F. Supp. at 1386-87.

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

### 2. Ahmed is a Danger to the Community and a Flight Risk.

The Court should detain Ahmed because he cannot demonstrate that he is not a danger to the community and not a flight risk.

### a. Ahmed is accused of participating in two brutal murders of Iraqi police officers in Fallujah, Iraq, in 2006, for which he faces serious penalties if convicted.

Based on the allegations and evidence in the Extradition Request as well as the nature and circumstances of the crimes charged by Iraq, Ahmed is a danger to the

- 16 -

community and a flight risk.

Iraq has charged Ahmed with participating in two different premeditated, brutal murders of Iraqi police officers in public settings. According to the documents contained in the Extradition Request, if convicted of the charged crimes in Iraq, Ahmed could be sentenced to life in prison or sentenced to death. Extrad. Req. at 00021, 00050. Although the murders occurred in Iraq nearly 14 years ago, in June and October 2006, Ahmed's alleged involvement is extremely concerning and significant to the issue of detention. Not only does the evidence of these crimes presented in the Extradition Request amply demonstrate Ahmed's dangerousness, but the potential national security implications of the release of an alleged AQI member are also patent.

According to the Extradition Request, on October 3, 2006, multiple witnesses observed Khalid, an Iraqi police officer, with a group of people in front of a store on Street 40 in Fallujah, and watched as a group of armed men approached in a vehicle and started shooting at Khalid and the others. Extrad. Req. at 00075. The witnesses have identified Ahmed as one of the individuals in the armed group who fired shots at Khalid. Extrad. Req. at 00074 (Eyewitness 3); Extrad. Req. at 00075 (Eyewitness 2); Extrad. Req. at 00079 and 00084 (Cooperator 1). The information from the witnesses indicates that Khalid was not the only victim of the incident, as two other people nearby were also killed as a result of "the intensity of the shots." Extrad. Req. at 00080; *see also* Extrad. Req. at 00072, 00107. One of the eyewitnesses (Eyewitness 2) testified that, after many of the armed men had already fired at Khalid from a vehicle, Ahmed got out of the car and continued to fire on Khalid. Extrad. Req. at 00075.

The Extradition Request also contains information tying Ahmed to the June 1, 2006, murder of another policeman, Issam. Two eyewitnesses testified that Issam was killed as he sat at a cigarette shop on Street 40 in Fallujah, which is near the al-Shurta neighborhood. Extrad. Req. at 00079, 00085, 00108 (Cooperator 1); Extrad. Req. at 00105 (Eyewitness 1). Similar to the murder of Khalid, the extradition packet contains details describing how

two vehicles of armed, masked men pulled up near where Issam was sitting, and the men shot and killed Issam.  Extrad. Req. at 00105 (Eyewitness 1).  Although Eyewitness 1's testimony does not include any observation that Ahmed actually shot Issam, *see supra* note 3, Eyewitness 1 testified that Ahmed was present at the murder and was one of the "accomplices."  Extrad. Req. at 00104.  Cooperator 1 testified that Ahmed told him he "executed" the murder, and that Ahmed had "stepped out of the car and fired shots at the victim using his 9mm hand gun and killed [Issam]."  Extrad. Req. at 00106, 00109.

Not only do the witnesses identify Ahmed as being directly involved in the murders of the two police officers, but they testify that they knew Ahmed in Fallujah as a member, or even a leader, of a group who assassinated police officers.  Extrad. Req. at 00075 (Eyewitness 2 identifying Ahmed as "well known in the area for conducting assassination operations on most members of the Police force."); Extrad Req. at 00077 (Cooperator 1 explaining that Ahmed was one of the "leader[s]" of a group who "were working on killing police members."); Extrad. Req. at 00104 (Eyewitness 1 identifying Ahmed as "the Emir of the[] group" that conducted the killing on June 1, 2006).  Cooperator 1 admitted to Iraqi authorities that this group, in which Cooperator 1 participated along with Ahmed, was directly associated with AQI, a terrorist organization.  Extrad. Req. at 00079, 00106.

The Extradition Request also includes testimony from Cooperator 1 that Ahmed participated in the premeditation of these murders.  According to Cooperator 1, Ahmed and the rest of the group agreed in advance specifically to target Khalid and prepared for the murder by "monitor[ing] the policeman before killing him."  Extrad. Req. at 00077; *see also* Extrad. Req. at 00080, 00084.  Additionally, Cooperator 1 testified that Ahmed and the group were paid to murder Khalid, describing how after the incident, the group "received the amount of 50,000 [Iraqi Dinars]."  Extrad. Req. at 00080.  Cooperator 1 explained that Ahmed and the group similarly premeditated the murder of Issam.  According to Cooperator 1, Ahmed and the other members of the group agreed in advance to murder Issam, and specifically, met to discuss the murder of Issam at a carpentry store

operated by Ahmed. Extrad. Req. at 00106.

As outlined in the Extradition Request from Iraq, the offenses with which Ahmed is charged are punishable by life in prison or death. Extrad. Req. at 00005, 00020–00026. The seriousness of these offenses renders Ahmed a significant flight risk. *See, e.g.*, *Perez-Cueva*, 2016 WL 884877, at *3 (seriousness of allegations against fugitive "militates against release on bail"). In comparison, even if the Bail Reform Act applied, had Ahmed committed similar crimes in the United States, *i.e.*, using firearms to kill a police officer on behalf of a terrorist organization, the seriousness of such offenses would have likely created a rebuttable presumption that Ahmed should be detained as a danger to the community and a flight risk. *See* 18 U.S.C. § 3142(e)(3)(B) (applying a rebuttable presumption to a charged crime under 18 U.S.C. § 924(c), using or carrying a firearm in furtherance of a crime of violence); 18 U.S.C. §§ 3142(e)(3)(C), 2332b(g)(5)(B) (applying a rebuttable presumption to various "federal crimes of terrorism" for which the defendant faces a maximum crime of 10 years or more in prison).

The seriousness of Ahmed's alleged crimes, the details surrounding his roles in those crimes, and the penalties that he faces should he be convicted in Iraq all support that Ahmed is a danger to the community as well as a flight risk.

b. The weight of the evidence contained in the Extradition Request is strong, and Ahmed has corroborated some important details.

Not only is Ahmed accused of committing two different premeditated murders of police officers, but the weight of the evidence provided by Iraq in the Extradition Request is significant, especially when coupled with the fact that this Court's certification of extradition is based on a probable-cause finding, and not a finding of guilt.

The Extradition Request includes sworn statements from four different eyewitnesses: Eyewitness 1, Eyewitness 2, Eyewitness 3, and Cooperator 1, all of whom identify Ahmed by name or photograph as a participant in at least one of the two murders. *See* Extrad. Req. at 00104 (Eyewitness 1 recognizing "Ali Yousif Nouri" as "the Emir of

the[] group"); Extrad. Req. at 00038, 00075 (Eyewitness 2 stating that "Ali Yousif Ahmed Nouri" was one of the assailants and identifying Ahmed through a photograph lineup); Extrad. Req. at 00074 (Eyewitness 3 recognizing "Ali Yousif Ahmed Nouri" as one of the assailants); Extrad. Req. 00077, 00106 (Cooperator 1 referring to Ahmed as "Ali Yousif" and "Ali Yousif Al-Mahmadi"). Given the weight of the evidence set forth in the Extradition Request, if Ahmed is released pending the extradition hearing, he has ample reason to flee the United States, so as to avoid the serious possibility of being returned to Iraq.

Moreover, as explained further below, although Ahmed has denied his involvement in the murders and his association with any terrorist group, Ahmed himself has corroborated, in both verbal and written statements, many of the details in the Extradition Request related to his identity as well as his presence in, and familiarity with, the neighborhoods in which the two murders occurred.

According to the Extradition Request, the murder of Issam occurred on June 1, 2006, at a cigarette shop on Street 40 in Fallujah, which witnesses have explained is near the Hay al-Shurta neighborhood. Extrad. Req. at 00079, 00085, 00108 (Cooperator 1); Extrad. Req. at 00105 (Eyewitness 1). The murder of Khalid occurred on October 3, 2006, in front of a store off of the same street. Extrad. Req. at 00069, 00075. According to the witnesses, Ahmed was living in Fallujah during these murders and working as a carpenter in his carpentry store off of Street 40. Extrad. Req. at 00075 (Eyewitness 2); Extrad. Req. at 00084, 00106 (Cooperator 1).

Since coming to the United States in January 2009, Ahmed has had many encounters and conversations with United States law enforcement, including agents with the Federal Bureau of Investigation ("FBI") and Customs and Border Protection ("CBP"). Additionally, throughout his immigration process, Ahmed submitted multiple sworn

statements to become a naturalized United States citizen.[6]  Through Ahmed's various immigration filings as well as his conversations with United States law enforcement, he has provided significant details regarding his background that corroborate some of what is contained in the Extradition Request.  For example, Ahmed has admitted to being in Fallujah, Iraq, in 2006 up until he traveled to Syria in approximately January 2007—demonstrating that he was in Fallujah at the time of both of the murders.  *See, e.g.*, Immigration Application by Ahmed, at AHMED00006, AHMED00008, filed as Attachment A under seal.[7]  He has admitted that, when he lived in Iraq, he primarily lived in the Hay al-Shurta neighborhood in Fallujah, Iraq—the same neighborhood where both murders occurred.  *See id.*; *see also* FBI Report regarding September 5, 2018 Interview of Ahmed, at AHMED00081, filed as Attachment B under seal.  Ahmed has also admitted that his family owned a carpentry shop in Fallujah, Iraq, where Ahmed worked in the past as a carpenter—the same description that Cooperator 1 gave regarding the location where one of the murders was planned.  *See id.*  Additionally, even prior to the United States' receipt of the Extradition Request from Iraq, Ahmed mentioned that he was aware that rumors existed that he had killed police officers in Iraq, even though he has maintained that such rumors are not true.  *See, e.g.*, CBP Report regarding August 11, 2018 Interview of Ahmed, at AHMED00116, filed as Attachment C under seal; FBI Report regarding September 5, 2018 Interview of Ahmed, at AHMED00083, filed as Attachment B under seal.

More importantly, Ahmed has at least partially corroborated the eyewitness

---

[6]    Pursuant to the Court's Order (Doc. 21) requiring the parties to disclose new information/exhibits to be used at the detention hearing, the United States has provided Ahmed with copies of law enforcement reports pertaining to Ahmed's conversations with FBI and CBP, an audio and visual recording of Ahmed's post-*Miranda* interview on January 30, 2020, and selected immigration applications and filings submitted by Ahmed in this case, Bates labeled AHMED00001–AHMED00122.

[7]    Attachments F, G, and J are attached to, and filed together with, the United States' Memorandum.  Attachments A, B, C, D, E, H, I, and K are filed separately under seal.

accounts in the Extradition Request through his own description of how he himself suffered gunshot wounds in Iraq on or about October 4, 2006—just one day after Khalid's murder as alleged in the Extradition Request. Ahmed has admitted that he suffered gunshot wounds in Fallujah, Iraq, during an incident that occurred on or around October 4, 2006, during Ramadan. *See* CBP Report regarding August 11, 2018 Interview of Ahmed, at AHMED00114–AHMED00115, filed as Attachment C under seal. He has discussed this incident with United States law enforcement on numerous occasions. *See, e.g.*, FBI Report regarding September 5, 2018 Interview of Ahmed, at AHMED00082–AHMED00083, filed as Attachment B under seal; CBP Report regarding August 11, 2018 Interview of Ahmed, at AHMED00114–AHMED00115, filed as Attachment C under seal.

Each time that Ahmed has discussed with FBI and CBP how he was shot in October 2006, he has explained that he was at a market in Fallujah when two vehicles—one of which was an Opel[8]—pulled up with at least seven or eight armed, masked men. According to Ahmed, the masked men exited one of the vehicles and began shooting at Ahmed, hitting him in both legs, the shoulder, the hip, the back, and the mouth. Ahmed also said that, in the process, the masked men shot and killed a bystander. Ahmed has admitted that he regularly carried weapons in Fallujah, including an AK-47 and handguns, and that on the date of the attack, he was able to return fire to the assailants. Despite being hit, Ahmed claims that he was able to escape and was taken to the hospital. *See, e.g.*, FBI Report regarding September 5, 2018 Interview of Ahmed, at AHMED00082–AHMED00083, filed as Attachment B under seal; CBP Report regarding August 11, 2018 Interview of Ahmed, at AHMED00114–AHMED00115, filed as Attachment B under seal. Ahmed's story of how he suffered gun shot wounds appears to match the description provided by the witnesses in the extradition packet as to the October 3, 2006 murder of

---

[8]    Notably, both Eyewitness 2 and Cooperator 1 identified Ahmed as getting out of an Opel vehicle and shooting Khalid during the October 3, 2006 murder. Extrad. Req. at 00075 (Eyewitness 2), 00079 (Cooperator 1).

Khalid in material ways—including the date and the general location of the incident—except that, in Ahmed's version, he was the victim rather than an assailant.[9]

It is notable, however, that during the process in which Ahmed sought to come to the United States from Syria between January 2007 and January 2009, Ahmed told a completely different story of how he suffered the gunshot wounds. During that process, Ahmed told the U.S. Department of State that he suffered gunshot wounds on October 4, 2006, when he returned to his parents' and siblings' residence. *See* U.S. Department of State, Biodata Form for Ahmed, Case No. SY-102772, dated April 2008, at AHMED00069–AHMED00070, filed as Attachment D under seal. According to Ahmed's story that he provided to the U.S. Department of State, his parents and his siblings were in their residence when six armed, unknown assailants raided their house and beat up Ahmed's brother. Ahmed claimed that when he arrived at the residence, the attackers saw him and opened fire in his direction, hitting him with twelve bullets all over his body.

These two stories of how Ahmed was shot are irreconcilable. Ahmed advised FBI as recently as his January 30, 2020, post-*Miranda* interview that he was shot on only one occasion, and, thus, both versions of events cannot be true. At a minimum, these drastically different stories show that Ahmed has been untruthful. Regardless, the Court can and should infer that Ahmed was on Street 40, near the Hay al-Shurta neighborhood in Fallujah the day Khalid was murdered.

      c.    <u>Ahmed spent time in a Syrian prison in 2009, and the United States has been so far unable to confirm the reason for Ahmed's detention.</u>

According to the Pretrial Services Bail Report, Ahmed has no criminal history in

---

[9] Based on the information in the Extradition Request, there appears to be an alternate explanation for how Ahmed may have come to suffer gunshot wounds. Cooperator 1 testified that, at some point after the murder of Khalid on October 3, 2006, Ahmed and the group agreed to "attack the police check point located on . . . the highway." Extrad. Req. at 00075; *see also* Extrad. Req. at 00081. Cooperator 1 described that the group "got up to one of the residential roof[s] and fired shots toward the check point," but that "police patrols returned fire and we withdrew." Extrad. Req. at 00078.

the United States. (Doc. 14.) Despite the lack of criminal history in the United States, however, Ahmed himself has admitted to law enforcement on multiple occasions (between late 2017 to the time of Ahmed's arrest in this matter) that he was detained for approximately five months in a Syrian prison in 2009. *See, e.g.*, FBI Report regarding June 1, 2018 Interview of Ahmed, at AHMED00075, filed as Attachment E under seal; CBP Report regarding August 11, 2018 Interview of Ahmed, at AHMED00115–AHMED00116, filed as Attachment C under seal; FBI Report regarding September 5, 2018 Interview of Ahmed, at AHMED00084, filed as Attachment B under seal. Throughout Ahmed's prior discussions with United States law enforcement, he attempted to explain the reasons behind his imprisonment in Syria. *See id.* Other than Ahmed's narratives, the United States has not been able to confirm the actual reason behind his prior detention.

In particular, Ahmed has identified that he was detained in Fara Falastin, a prison in Damascus, Syria. According to Ahmed, he was never told by the Syrian authorities why he was arrested and detained; however, Ahmed told law enforcement that he believes he was detained by Syrian authorities because he was working with his cousin to sell and transport generators from Syria to Iraq, and in doing so, he had refused to work with a particular Syrian individual. Ahmed told law enforcement that he believes the Syrian individual contacted Syrian authorities and accused Ahmed of being involved in a scheme to illegally transport the generators. During Ahmed's post-*Miranda* interview on January 30, 2020, Ahmed told FBI that most of the other people in the prison with him were ISIS members and that he believed the Syrian individual accused him of conducting suspicious transactions for ISIS members. Ahmed has explained that, after approximately five months, Syrian officials released him from Fara Falastin prison and apologized to him. *See, e.g.*, FBI Report regarding June 1, 2018 Interview of Ahmed, at AHMED00075, filed as Attachment E under seal; CBP Report regarding August 11, 2018 Interview of Ahmed, at AHMED00115–AHMED00116, filed as Attachment C under seal; FBI Report regarding September 5, 2018 Interview of Ahmed, at AHMED00084, filed as Attachment B under

seal.

Ahmed's admission that he spent five months in a Syrian prison along with his explanations for why he was in that prison in 2009—including his own admission that he believes he was suspected of engaging in transactions for ISIS (albeit, wrongly, according to Ahmed)—further support a finding that Ahmed is a danger to the community.

        d.    Ahmed has already demonstrated a propensity to flee and to evade United States immigration and law enforcement detection.

Ahmed is a flight risk based on the fact that he has fled Iraq and appears to have done so to evade prosecution in that country. In general, a fugitive charged with crimes in another country is by definition in flight or deliberately absent from that jurisdiction, and the fact that the fugitive has evaded prosecution in his home country is indicative of his risk of flight in the United States. *Cf. United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution.") (citing *Jhirad v. Ferrandina*, 536 F.2d 478, 483 (2d Cir. 1976)). According to documents in the Extradition Request, by January 2007, Iraqi law enforcement had started to investigate the murders of Khalid and Issam. Extrad. Req. at 00062–00067, 00077–00082, 00094, 00097. Moreover, by November 2006, Cooperator 1 had identified Ahmed as participating in the murders. Extrad. Req. at 00077–00078, 00080–00081. Ahmed's flight from Iraq to Syria in January 2007 supports that he may have been fleeing Iraq, knowing that the murders were under investigation.

Not only did Ahmed flee Iraq, but it appears that in doing so, he made several false statements and misrepresentations to United States immigration and law-enforcement authorities in an attempt to help his flight and to evade detection. Ahmed entered the United States from Syria in approximately January 2009. (Doc. 14.) Throughout the process of applying for an immigration benefit from Syria, he provided sworn statements

to United States immigration authorities in which he denied, under oath and under penalty of perjury, ever being a representative or member of any group "which endorses terrorist activity," ever having committed any crime for which he had not been arrested, engaging or conspiring to engage in any assassination or other form of terrorist activity, or ever providing any support to any person or organization that has engaged in assassination or "other form of terrorist activity." *See* Immigration Application by Ahmed, at AHMED00011–AHMED00013, filed as Attachment A under seal.

Later, when Ahmed applied to adjust his status to a permanent resident of the United States (in April 2010) and then to become a naturalized United States citizen (in July 2014), Ahmed provided additional sworn statements about his past. In these applications, Ahmed continued to deny any involvement in prior crimes for which he had not been arrested, engaging or conspiring to engage in any forms of terrorist activity, being associated with any terrorist organizations, or ever being involved in killing, or trying to kill anyone. *See, e.g.*, I-485 Application to Register for Permanent Residence or Adjust Status, at AHMED00040, attached hereto as Attachment F; N-400 Application for Naturalization, at AHMED00058–AHMED00062, attached hereto as Attachment G. Although Ahmed continues to deny the allegations outlined in Iraq's Extradition Request, Ahmed's prior sworn statements to United States immigration authorities directly contradict the sworn testimony there.

More importantly, however, Ahmed's own recent statements to United States law enforcement about his prior incarceration in a Syrian prison, *see supra* Part II.B.2.c, directly contradict sworn statements he made on his immigration applications. In Ahmed's application to adjust his status to a permanent resident, he denied ever having "been arrested, . . . or imprisoned for breaking or violating any law or ordinance, excluding traffic violations" inside or outside the United States. *See* I-485 Application to Register for Permanent Residence or Adjust Status, at AHMED00040, attached hereto as Attachment F. In Ahmed's application to become a naturalized United States citizen, he denied ever

having "been in jail or prison."  *See* N-400 Application for Naturalization, at AHMED000461, attached hereto as Attachment G.  Despite providing these sworn statements to immigration authorities, as explained above, he admitted to United States law enforcement on numerous occasions having spent approximately five or six months in a Syrian prison.  Ahmed's misrepresentations tend to show that he was purposefully attempting to get to the United States to flee Iraqi law enforcement.

   e.   <u>Ahmed's personal history and prior travel show that he has the ability to leave the United States and has family in multiple locations around the world.</u>

Ahmed's prior travel and extensive family ties around the world also demonstrate that he is a flight risk.  On the one hand, according to the Pretrial Services Bail Report, Ahmed is a naturalized United States citizen, has lived in the United States since 2009, operates a business in Phoenix, Arizona, and has a wife and small child who live with him in Surprise, Arizona.  (Doc. 14.)  On the other hand, however, Ahmed has close ties to family members who live all over the world, has traveled from the United States to visit some of those family members, and has demonstrated a pattern of regularly crossing the United States-Mexico border.

By his own admission, Ahmed has three sisters and ten brothers.  *See, e.g.*, FBI Report regarding September 18, 2017 Interview of Ahmed, at AHMED00071– AHMED00073, filed as Attachment H under seal; FBI Report regarding June 1, 2018 Interview of Ahmed, at AHMED00074–AHMED000077, filed as Attachment E under seal; FBI regarding September 5, 2018 Interview of Ahmed, at AHMED00079– AHMED00081, filed as Attachment B under seal.  Ahmed has at least one sibling in Austria, two siblings in Turkey, and one sibling in the Ukraine.[10]  *See id.*  Ahmed has advised law enforcement in the past that he remains in contact via social media with his siblings, *see, e.g.*, CBP Report regarding April 1, 2018, Interview of Ahmed, at

---

[10]   The United States understands that Ahmed's mother as well as multiple other siblings still reside in Iraq.

AHMED00099, filed as Attachment I under seal. Additionally, he even told law enforcement on the day of his arrest that he spoke to one of his brothers just three days prior. Not only does Ahmed maintain regular contact with his family, but Ahmed has traveled out of the United States to visit some of those family members in the recent past. Ahmed advised Pretrial Services that he traveled to Ukraine in 2009 to visit his brothers and to Turkey in 2017 to visit family. (Doc. 14.) CBP records demonstrate that Ahmed also traveled to France and the Netherlands, and was out of the United States between July 24, 2017, and September 4, 2017. *See* U.S. Customs and Border Protection, TECS Person Encounter List for Ali Yousif Ahmed, attached hereto as Attachment J. Ahmed himself has admitted that, during this time period, he traveled to Ukraine to visit one of his brothers, as well as to Turkey to meet with three of his siblings and his mother, who traveled from Syria. *See, e.g.*, CBP Report regarding September 4, 2017 Interview of Ahmed, filed as Attachment K under seal, at AHMED00094–AHMED00095; FBI Report regarding September 18, 2017 Interview of Ahmed, at AHMED00071–AHMED000073, filed as Attachment H under seal; CBP Report regarding August 11, 2018 Interview of Ahmed, at AHMED00116, filed as Attachment C under seal. Ahmed's family's travel from Syria to Turkey to meet with him in 2017, a trip that wold have required significant funds, demonstrates that Ahmed's family has the resources and wherewithal to travel and potentially assist Ahmed in traveling.

In addition to Ahmed's family in various countries across the world, Ahmed has also demonstrated that he knows how to cross the United States border into Mexico and has been a regular traveler there in the past few years. During his post-*Miranda* interview, Ahmed advised that he has been to Mexico numerous times in the past to obtain dental work and for social reasons. According to CBP records, Ahmed crossed into, and back from, Mexico at least 15 times between 2015 and the present. *See* U.S. Customs and Border Protection, TECS Person Encounter List for Ali Yousif Ahmed, attached hereto as Attachment J. Although law enforcement seized Ahmed's United States passport on the

day of his arrest, the CBP reports and records show that Ahmed has regularly traveled to Mexico with a United States passport card, which is not in the Government's possession. *See id.*; *see also* CBP Report regarding September 4, 2017 Interview of Ahmed, at AHMED00094, filed as Attachment K under seal. Moreover, although Ahmed voluntarily provided FBI with an Iraqi passport that appeared to have expired on September 11, 2018, the United States has not confirmed whether Ahmed possesses a replacement Iraqi passport. Regardless, as this Court is aware, travel between Arizona and Mexico occurs every day outside of regular crossing sites without the need for a United States passport or identification of any kind. As his crossing history indicates, Ahmed has a familiarity with Mexico that makes him a flight risk.

### 3.   Ahmed Cannot Demonstrate "Special Circumstances."

Because Ahmed is both a risk of flight and a danger to the community, the Court need not consider arguments regarding special circumstances. Nevertheless, Ahmed cannot meet his incredibly difficult burden of showing that "special circumstances" exist that would support his release, as a fugitive, pending his extradition proceedings. At the time of filing this Memorandum, the United States is unaware of any arguments Ahmed intends to make regarding the existence of "special circumstances"; however, "special circumstances" do not exist based on any of the following:

- Ahmed's lack of criminal history in the United States. (Doc. 14.). *See Leitner*, 784 F.2d at 161; *In re Extradition of Headley*, No. 18-mc-81148-UNA, 2018 WL 4938553, at *8 (S.D. Fla. Oct. 10, 2018); *Berrocal*, 263 F. Supp. 3d at, 1300; *In re Extradition of Azizi*, No. 5:14-xr-90282, 2014 WL 1995083, at *2-3 (N.D. Cal. May 13, 2014).

- The potential financial and emotional impact on Ahmed and his family. (Doc. 14.). *See In re Extradition of Russell*, 805 F.2d 1215 (5th Cir. 1986); *In re Extradition of Schumann*, No. 18-cr-283, 2018 WL 4777562, at * 6 (N.D. Ill. Oct. 3, 2018); *Antonowitz*, 244 F. Supp. 3d at 1072; *In re Extradition of Drumm*, 150 F. Supp. 3d 92, 99 (D. Mass. 2015); *Beresford-Redman*, 753 F. Supp. 2d at 1089; *United States v. Hills*, 765 F. Supp. 381, 387 (E.D. Mich. 1991).

- Ahmed's reputation in the community. *See United States v. Risner*, 2018 WL 6809796, at \*19, 22 (N.D. Tex. Dec. 27, 2018); *In re Extradition of Kyung Joon Kim*, 2004 WL 5782517, at \*5, n.6; *Rovelli*, 977 F. Supp. at 568; *In re Extradition of Sutton*, 898 F. Supp. 691, 696 (E.D. Mo. 1995); *Sidali*, 868 F. Supp. at 658.

## III.  CONCLUSION

For the foregoing reasons, the United States requests that Ahmed be detained pending resolution of these extradition proceedings.  Ahmed's risk of flight and danger to the community is alone sufficient for the Court to deny any forthcoming application for bail.  However, even if the Court were satisfied that Ahmed poses neither a flight risk nor a danger to the community, the government is unaware of any "special circumstances" that would justify bail in this case.  Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances."  Moreover, in order to protect the ability of the United States to meet its treaty obligations to the Republic of Iraq, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

Respectfully submitted this 31st day of March, 2020.

MICHAEL BAILEY
United States Attorney
District of Arizona

*/s/ Todd M. Allison*
TODD M. ALLISON
DAVID A. PIMSNER
RACHEL C. HERNANDEZ
DIMITRA H. SAMPSON
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 31, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing documents, and sent the attached document to the following CM/ECF registrant(s):

Jami S. Johnson
Daniel L. Kaplan
Counsel for Ali Yousif Ahmed Al-Nouri


*/s/ Norma Hernandez*
United States Attorney's Office