JON M. SANDS
Federal Public Defender
District of Arizona
850 W. Adams, Suite 201
Phoenix, Arizona 85007
Telephone: 602-382-2700

JAMI JOHNSON
New York State Bar # 4823373
DANIEL L. KAPLAN, #021158
Asst. Federal Public Defenders
Attorney for Defendant
jami_johnson@fd.org
dan_kaplan@fd.org

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>  vs.<br><br>Ali Yousif Ahmed Al-Nouri,<br><br>    Defendant. | No. MJ-20-08033-PHX-MTM<br><br>DETENTION MEMORANDUM |

Defendant Ali Yousif Ahmed Al-Nouri ("Mr. Ahmed"), through undersigned counsel, hereby submits the following detention memorandum explaining that Mr. Ahmed should be released under the Fifth Amendment to the Constitution and also because special circumstances exist that warrant his release.

**I.    Background**

Mr. Ahmed is a 42 year old married United States citizen and father to a newborn baby boy. He was born in Iraq, but after suffering terribly during the prolonged armed conflict within that country, he ultimately fled to Syria where he lived for a number of years as a refugee before finally, in January 2009, being resettled to the United States.

Like virtually all refugees, Mr. Ahmed had no control over what country he was resettled to. He did not choose the United States (or any other country); it was chosen for him by the resettlement organization. Mr. Ahmed was nevertheless thrilled to be given the opportunity to rebuild his life away from the violence and turmoil that plagued his home country. Mr. Ahmed boarded a plane in Damascus and, after planes in Paris, arrived in arrived in the United States January 26, 2009. He was 31 years old. He knew no one, spoke no English, and had difficulty reading or writing in any language. Moreover, as is common with refugees, he was significantly traumatized by his experiences in his home country, his displacement, and his loss of his family friends and community. He also suffered numerous health problems as a result of his past experiences. Some of these physical problems persist to this day. *See* Exhibit 1, letter from Mr. Ahmed's wife (discussing, *inter alia*, Mr. Ahmed's health problems).

Mr. Ahmed settled in Phoenix, where his first few years were difficult. He was unable to work because of his disabilities, and he struggled to learn English. He suffered from depression and anxiety and sometimes found it difficult to leave the home. What ultimately restored Mr. Ahmed to better physical and mental health was volunteering with the sizeable immigrant and refugee community in Phoenix. Mr. Ahmed received substantial assistance from refugee organizations and volunteers when he arrived. They helped him secure housing and navigate the unfamiliar city. At first, Mr. Ahmed's motives in volunteering were simply to give back to a community that had given much to him, but in volunteering he found a purpose in life that motivated him to leave his apartment, to find work, to learn English, and to rebuild his life.

Mr. Ahmed slowly learned English and ultimately became a licensed security guard. Exhibit 2, copy of security guard license. He also became, in 2015, a United States citizen. Through his volunteer work in the refugee community, Mr. Ahmed learned that one of the most common obstacles that recent immigrants and refugees faced in acclimating to the United States was not knowing how to drive. Mr. Ahmed did know how to drive, so he took it upon himself to volunteer to teach others, often using his own car and charging nothing. *See* Exhibit 3, letters regarding driving lessons.

Mr. Ahmed also gave back to the community in other ways. He became a blood donor. *See* Exhibit 4. In or around 2015 and 2016 Mr. Ahmed also applied and was accepted for a job as a cultural advisor to the United States military. Exhibit 5, letter from Colonel P.J. Nugent, United States Marine Corps. In his role as cultural advisor, Mr. Ahmed traveled to military bases out of state and worked directly with the United States military who were preparing to deploy to the Middle East to fight ISIS. In his role as a role player and cultural advisor, Mr. Ahmed assisted the military in identifying and understanding the cultural issues that they would need to successfully navigate in order to ensure the success of their mission. Mr. Ahmed was commended for his work by Colonel Nugent, commander of the Al Asad Task force charged with fighting ISIS in Iraq. Mr. Ahmed accepted this position because he supports the United States and its military mission and would like to see ISIS permanently removed from Iraq.

In or around 2016 or 2017, Mr. Ahmed decided to turn his love of teaching recent arrivals to the United States how to drive into a business and opened a driving school. While the driving school was an ongoing commercial enterprise and accepted payment for its services, Mr. Ahmed continued regularly to donate

3

his services to individuals who could not pay and frequently gave lessons or transportation for free to individuals who could not afford his services. *See generally* Exhibit 6, letters of recommendation. He would also allow some clients to simply pay what they were able if they found themselves unable to afford his services on an ongoing basis. *Id.*

Around the time he was opening his driving school, Mr. Ahmed met his now wife. *See* Exhibit 1. The married in December 2018 and in January 2019 moved into a home they purchased in Surprise, Arizona. Mr. Ahmed and his wife love animals, and on their property they have both pets and livestock. In January of this year, Mr. Ahmed and his wife welcomed their first child, a newborn who Mr. Ahmed has not seen since his arrest.

As is evident from the numerous character letters submitted concurrently herewith, *see* Exs. 1, 3, 5, 6, Mr. Ahmed is a beloved and well-regarded member of his community who gives generously to others. He is kind, outgoing, and well-liked and respected by friends, neighbors, and coworkers alike.

**II. Legal Standard**

Because a relator in an extradition case in which a foreign state seeks the extradition of an individual from the United States is not charged with a crime against the United States, the Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.*, does not apply. *In the Matter of the Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1213 (D. Nev. 1993). (The term "relator" is traditionally used to refer to the individual sought to be extradited. *Munaf v. Geren*, 128 S. Ct. 2207, 2225 (2008) (*quoting* M. Bassiouni, *International Extradition: United States Law and Practice* 921 (5th ed. 2007) (hereinafter "*Bassiouni*").) Nevertheless, the Supreme Court established 106 years ago in *Wright v. Henkel*, 190 U.S. 40 (1903), that district

courts may release relators on bail provided that "special circumstances" are present. *Id.* at 63; *see also* Robert Iraola, *The Federal Common Law of Bail in International Extradition Proceedings*, 17 Ind. Int'l & Comp. L. Rev. 29, 29 (2007) (noting that *Wright v. Henkel* had "spawned the development of a federal common law on the question of bail in international extradition proceedings").

Although it may not treat circumstances that are "applicable to all defendants facing extradition" as "special" (*Nacif-Borge*, 829 F. Supp. at 1216), the Court is generally free to consider any other circumstances that it deems pertinent. *In the Matter of the Extradition of Gonzalez*, 52 F. Supp. 2d 725, 736 (W.D. La. 1999) ("The list of potential 'special circumstances' is not limited to those previously recognized in published decisions."). The question of which factors to consider, and how much weight to give them, is left to this Court's "sound discretion." *Beaulieu v. Hartigan*, 554 F.2d 1, 1 (1st Cir. 1977).

In addition, the Ninth Circuit has previously held that in *Parretti v. United States*, 122 F.3d 758 (9th Cir. 1997), *withdrawn*, 143 F.3d 508 (9th Cir. 1998) (*en banc*), a relator in an extradition case may invoke his rights under the Fifth Amendment's Due Process Clause to demand that he be released on bail unless the government can articulate a justification for holding him in custody that is sufficiently compelling to overcome his "'strong interest in liberty.'" *Parretti*, 122 F.3d at 780 (*quoting United States v. Salerno*, 481 U.S. 739, 750 (1987)). The government's bare assertion of its generalized "interest in avoiding all risk of flight pending an extradition hearing" is *not* a sufficiently compelling reason to overcome a relator's Fifth Amendment liberty interest, particularly in a case in which the risk of flight of is minimal. *Id.* at 779–80. Although *Parretti* was ultimately withdrawn and is therefore not binding on this Court, the withdrawal was on unrelated

grounds, and the reasoning of *Parretti* has never been rejected by the Ninth Circuit.

**III.    Argument**

**A. Mr. Ahmed Merits Release Under the Fifth Amendment.**

The Supreme Court has recognized that "in our society liberty is the norm, and detention prior to trial is the carefully limited exception." *Salerno*, 481 U.S. at 749. The Bail Reform Act does not apply to extradition proceedings, but the principles animating the Bail Reform Act, *i.e.* protecting against a serious risk of flight or of harm to the community, apply in equal force to extradition proceedings insofar as they are the only interests courts have found substantial enough to justify restriction of an individual's liberty interests prior to an adjudication of guilt. *See Parretti*, 122 F.3d at 778–81 (rejecting the government's argument that government interest in fulfilling treaty obligations is weightier than the government's interest in enforcing its own laws and finding the Due Process analysis to be similar in both contexts). Mr. Ahmed is neither a risk of flight nor a danger to the community.

**1.    Mr. Ahmed Is Not a Risk of Flight.**

Mr. Ahmed is not a risk of flight. Mr. Ahmed's history and personal characteristics, explained more fully at Section I, *supra*, support a finding that Mr. Ahmed is not a risk of flight. Mr. Ahmed is a citizen of the United States, the husband of a citizen of the United States, and the father of a United States citizen child. He owns a house and a business. He has resided in the United States continuously for over 11 years and has been a citizen for almost five years. As is evident from the numerous character letters attached to this detention memorandum, Mr. Ahmed has strong ties to the community and enjoys tremendous community support.

Mr. Ahmed's conduct to date moreover evinces no inclination to flee. Mr. Ahmed has been aware of an investigation of him by or involving the FBI since no later than October 2017, when FBI agents showed up at his home to question him. Mr. Ahmed has been interviewed by law enforcement on numerous occasions since then. On at least two occasions, Mr. Ahmed voluntarily presented himself for interviews with the FBI and traveled to meet them at locations of their choosing. In the time period during which he knew that he was under investigation, Mr. Ahmed voluntarily departed from and returned to the United States at least three times, to go to Mexico to have dental work performed. He also bought a home, got married, and had a child—actions inconsistent with a desire or intention to leave the jurisdiction. Throughout the entirety of the investigation, Mr. Ahmed has been cooperative, has never declined to meet with law enforcement, and has taken no actions from which an intention to flee could reasonably be inferred.

Mr. Ahmed is moreover effectively disabled from flight as a result of the current international public health crisis. Borders are closed, flights are canceled, and international travel is all but impossible, particularly for individuals arriving from the United States, who are subject to mandatory quarantine in a number of jurisdictions. At least one court has already recognized that the global pandemic mitigates the risk of flight in the context of an extradition proceeding. *In the Matter of the Extradition of Alejandro Toledo Manrique*, Case No. 19-mj-71055-MAG-1 (TSH), 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020). In releasing Alejandro Toledo, the former president of Peru who has been in custody in the United States awaiting extradition on corruption charges, Magistrate Judge Hixson, who had previously ruled that Toledo presented an unreasonable risk of flight, noted that "international travel is hard now." *Id.* at 1. Judge Hixson specifically found that the

7

practical difficulties involved with fleeing the country mitigated the risk of flight sufficient that Toledo could now be released on conditions. *Id.* That finding applies with equal force here. Mr. Ahmed, were he inclined to flee—which he is not—would find flight difficult.

Moreover, Mr. Ahmed has nowhere to go. He had never been outside Iraq before 2006, when he fled violence in that country. He then spent approximately three years in a refugee camp in Syria before coming to the United States. Mr. Ahmed cannot return to Iraq, or he will almost certainly be killed. Indeed, Mr. Ahmed is litigating his extradition precisely because he does not want to return to Iraq, where, as the United States concedes, corruption in the legal system is pervasive and endemic, and where there is no reasonably possibility that Mr. Ahmed will be afforded a fair trial. *See generally*, 2019 State Dep't. Rep. on Human Rights Practices in Iraq (hereinafter "State Department Report"), *available at* https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/iraq/ (describing corruption among, *inter alia*, police officers, prison guards, defense lawyers, judges, and elected officials, particularly in cases involving accusations of terrorism). Mr. Ahmed has no ties to Syria, a country which is, as a practical matter, war-ravaged and unsafe.

Mr. Ahmed has no motive or ability to leave the United States, and he is not a risk of flight.

### 2. Mr. Ahmed Is Not a Danger to the Community.

The record is bereft of any indication whatsoever that Mr. Ahmed is a danger to the community. In the eleven years he has resided in the United States, Mr. Ahmed has not been charged with so much as a traffic violation. He has never been arrested, charged, or convicted of any crime. As is evident from the many character

letters submitted with this memorandum, Mr. Ahmed is a trusted and valued member of his community.

The charges in the extradition petition are of course serious in themselves, but these allegations should be afforded no weight in this Court's determination of whether Mr. Ahmed poses a risk to the public, given that they originate from a judicial system where, as the United States concedes, "corruption in arrest procedures" is "prevalen[t]," guilt is often presumed based on mere "presence or geographic proximity to activities of [a] terrorist group," and judicial officials attempt to dispose of terrorism-related cases quickly, including through mass trials. State Department Report.

Nor does the fact that the United States State Department approved the extradition request lend any weight to the credibility of the accusations. Indeed, the United States continues to pursue extradition of Omar Ameen, an Iraqi refugee in Sacramento, to face charges very similar to the ones against Mr. Ahmed despite overwhelming evidence that the charges in the Iraqi complaint are false and that Mr. Ameen was not even in Iraq when the acts charged in the complaint are alleged to have occurred. *See*, Ben Taub, *The Fight to Save an Innocent Refugee from Almost Certain Death*, The New Yorker (Jan. 27, 2020) (attached hereto as Exhibit 7.)

There is, simply put, no credible evidence that Mr. Ahmed is or ever has been a threat to the community. On or around January 30, 2020, the date of Mr. Ahmed's arrest, law enforcement conducted a search of Mr. Ahmed's home. Agents seized numerous documents, computers, and other electronic devices. The seizure of electronic devices and business records was so extensive that it has in fact crippled Mr. Ahmed's business. In the more than two months since that seizure

took place, the government has no doubt searched these items thoroughly and has given no indication that any items uncovered in the search reveal any information indicating that Mr. Ahmed poses a threat to the community. And he does not.

### B. Special Circumstances Exist that Warrant Release.

The Supreme Court established in *Wright v. Henkel*, 190 U.S. 40 (1903), that district courts may release relators provided that "special circumstances" are present. *Id*. at 63. Moreover, a court may not find any one particular special circumstance, but can conclude that a number of factors, cumulatively, constitute a "special circumstance." *In re Extradition of Mainero*, 950 F. Supp. 290 (S.D. Cal. 1996). In the present case, numerous "special circumstances" exist that merit release.

### 1. The Current International Pandemic is a "Special Circumstance" Warranting Release.

As the Court is aware, as of March 31, 2020, the new strain of coronavirus that causes COVID-19 has infected more than 815,000 people and killed over 40,000.[1] Governor Ducey[2] has issued a stay-at-home order to begin at 5:00 p.m. on Tuesday, March 31, 2020, which orders that all but essential business close their doors. As has sadly been repeatedly demonstrated throughout the course of this pandemic, conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[3] Inmates cycle in and out of CoreCivic pretrial facilities from all over the world and the country, and people who work in the

---

[1] *Coronavirus Map: Tracking the Global Outbreak*, N.Y. Times, https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (last visited Mar. 31, 2020).
[2] *Arizona Governor Issues "Stay-at-Home Order*," Ariz. Republic, https://www.azcentral.com/story/news/local/arizona-health/2020/03/30/arizona-coronavirus-stay-home-order-issued-gov-doug-ducey/5088109002/ (last visited Mar. 31, 2020).
[3] Joseph A. Bick, Infection Control in Jails and Prisons, Clinical Infectious Diseases 45(8):1047-1055 (2007), *available at* https://doi.org/10.1086/521910.

facilities leave and return daily. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in federal pretrial detention centers.[4] Infection reduction measures, such as frequent hand washing and keeping a safe distance from others, are not possible in a detained setting: CoreCivic inmates live in two-man cells with shared toilets and sinks, and eat meals and have recreation in large groups. As one expert put it, "[i]f you think a cruise ship is a dangerous place to be during a pandemic, consider America's jails and prisons."[5]

Significantly, the immutable characteristics of jails and prisons that render them unsafe from a public health perspective cannot be blunted by even the most careful adherence to CDC guidance. As Dr. Ross Macdonald, chief doctor at the Riker's Island Jail explained, CDC guidelines are insufficient to halt the spread of coronavirus once it reaches a prison.[6] Specifically, Dr. Macdonald notes that Rikers Island, New York City's pretrial holding center, "had been following guidelines from the Centers for Disease Control and Prevention long before the outbreak happened and while it approached but . . . following the guidelines had not been nearly enough to stop it." *Id.* Once it arrives, the virus spreads quickly. In the mere

---

[4] Laura M. Maruschak et al., Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12, NCJ 248491, Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics (2015), *available at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[5] Amanda Klonsky, An Epicenter of the Pandemic Will Be Jails & Prisons, If Inaction Continues, N.Y. Times (Mar. 16, 2020), https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html.

[6] Megan Flynn, *Top Doctor at Rikers Island Calls the Jail "A Public Health Disaster Unfolding Before Our Eyes,"* Wash. Post, Mar. 31, 2020. https://www.washingtonpost.com/nation/2020/03/31/rikers-island-coronavirus-spread/

11

twelve days since COVID-19 first appeared at Rikers Island, more than 167 inmates and 137 staff members have tested positive for the virus.[7]

Upon information and belief, a corrections officer who is part of the federal pretrial detention system in Arizona has now tested positive for coronavirus. COVID-19 is in our jail system, and there is no reason to believe it will behave any differently in the CoreCivic complex than it has in other prison systems. Measures supposedly taken by CoreCivic to reduce the risk of a COVID-19 outbreak include screening new admissions by taking their temperatures and asking about symptoms, educating inmates about proper sanitation, and planning to quarantine inmates as needed. These measures do not adequately mitigate the risks posed to Mr. Ahmed or other inmates. For one thing, it is now well accepted that the virus can be spread by people without symptoms.[8] Defendants continue to be arrested and admitted in large numbers to the CoreCivic facility in Florence where Mr. Ahmed is being held, and guards and other employees enter and exit every day. Furthermore, social distancing and proper hygiene are, by definition, not possible in the custodial setting, which is why "[j]ails and prisons are sites of disproportionate infectious disease rates."[9]

More importantly, COVID-19 poses a grave threat to Mr. Ahmed's health, personally. Mr. Ahmed is 42 years old and suffers from chronic pneumonia, a

---

[7] Jan Ransom and Alan Feuer, *"We're Left for Dead": Fears of Virus Catastrophe at Rikers Jail*, N.Y. Times (Mar. 31, 2020) https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html.
[8] *See* Coronavirus Resource Ctr., Harvard Medical School, https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center#Prevention (last visited Mar. 24, 2020) ("[A]ny infected person, with or without symptoms, could spread the virus by touching a surface.").
[9] Sandhya Kajeepeta & Seth J. Prins, *Why Coronavirus in Jails Should Concern All of Us*, The Appeal (Mar. 24, 2020), https://theappeal.org/coronavirus-jails-public-health/#.XnpLyfLt5Zs.twitter.

serious heart condition, and high blood pressure. Ex. 1. He is therefore a "high risk" individual under relevant CDC guidelines, as he possesses both heart and lung problems.[10] As noted by his wife, Mr. Ahmed has been hospitalized multiple times for pneumonia in the recent past even absent infection with the deadly coronavirus. He might well not survive a bout with COVID-19.

As noted above, Section III.A.1, *supra*, at least one judge has already ruled in the context of an extradition proceeding that COVID-19 is a "special circumstance" warranting release. *In the Matter of the Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109. Notably, the judge in that case so held even though, unlike here, there was no evidence that COVID-19 was yet present among staff or inmates at the jail where the relator was being held. *Id.* at *1; *cf. Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to imates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.") (Eighth Amendment analysis). The court explained, "The Court is glad to hear that there are currently no reported cases of COVID-19 at Maguire, but is unsure what that means if people are not being tested. And, as the management plan itself acknowledges, symptoms of COVID-19 can begin to appear 2–14 day after exposure, so screening people based on observable symptoms is just a game of catch up. That's why the Bay Area is on lockdown. We don't know who's infected. Accordingly, the government's suggestion that Toledo should wait until there is a confirmed outbreak of COVID-19 in Maguire before seeking release . . . is impractical. By then it may be too late." *Id.* Notably, the judge in *Toledo* released the relator despite a finding that he was a

---

[10] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed Mar. 31, 2020).

13

flight risk, a finding that as explained above, Section III.A.1, *supra*, is not warranted here. *Id.*

This Court should similarly find that the thread of COVID-19 constitutes a "special circumstance" that warrants Mr. Ahmed's release.

### 2. The Anticipated Length of the Proceedings and of Detention Are a "Special Circumstance" that Merits Release.

Courts have recognized that "undue delay," either in bringing the extradition petition, or that results in a relator's remaining in custody for a prolonged period of time prior to the conclusion of the proceedings, may constitute a "special circumstance" that warrants release. *See, e.g.*, *Wroclawski v. United States*, 634 F. Supp. 2d 1003, 1008 (D. Ariz. 2009) (eleven year delay in seeking extradition was a "special circumstance" warranting release); *United States v. Williams*, 611 F.2d 914, 915 (1st Cir. 1979) (delay in extradition hearing may constitute a "special circumstance.")

Here, Mr. Ahmed is presented with an Iraqi complaint alleging he committed crimes nearly fifteen years ago. Supporting documentation attached to the complaint suggests that the Iraqi court could have, but chose not to, bring this case as many as ten years ago. The delay in bringing the charges is therefore a "special circumstance" that warrants release.

The improbability, through no fault of Mr. Ahmed, of holding an extradition hearing any time in the near future is another special circumstance warranting release. Mr. Ahmed has a right, and counsel has a duty, to investigate the charged acts with an eye to preparing a defense. The charged acts allegedly occurred, and most evidence relevant to them, will be found, in Iraq. Travel to and

communications with Iraq are difficult under the best of circumstances. The Omar Ameen extradition proceeding has, for example, been pending since July of 2018.

In the present circumstances, however, an investigation that would have been merely difficult has been rendered virtually impossible at the present time in light of the current global public health crisis. International travel is impossible, and many countries have closed their borders to travelers arriving from the United States. It is uncertain when this situation may change, but it seems unlikely that there will be an improvement on a global scale within the next six months. It goes without saying that Mr. Ahmed did not create the global pandemic, nor is it a factor within his control, and it is unreasonable that he be held in custody for an undetermined length of time awaiting an improvement in international public health that will allow his case to proceed.

### 3. The Probability of Mr. Ahmed's Being Found Non-Extraditable Is a "Special Circumstance" Warranting Release.

Various courts have held that a likelihood that a relator will prevail in challenging his extradition is a "special circumstance" that merits release. *See, e.g.*, *Salerno v. United States*, 878 F.2d 317 (9th Cir 1989); *In Extradition of Gonzalez*, 52 F. Supp. 725, 737 (W.D. La. 1999). Mr. Ahmed has substantial both factual and legal defenses to his extradition. While this is not the appropriate forum to relate all defenses to the petition, such defenses are indeed numerous. As an initial matter, upon information and belief, the United States has *never* successfully extradited anyone to Iraq in the over eighty years in which the bilateral extradition treaty has been in force.

As the United States acknowledges, the criminal justice system in Iraq does not function well, and corruption and misconduct in bringing and resolving

15

criminal charges, particularly charges related to terrorism, is pervasive. As noted above, Section II.A.2, *supra*, the only other extradition request by the Iraqi government currently pending in the United States involves allegations that appear—unsurprisingly given the conceded state of the Iraqi criminal justice system—to be demonstrably untrue. There is no reason to believe that the charges in *this* petition are any more meritorious.

In addition to factual defenses, Mr. Ahmed also has numerous legal defenses to extradition. For example, Article III of the Extradition Treaty between the United States and Iraq states: "The provisions of this Treaty shall not import claim of extradition for crimes of a political character nor for acts connected with such crimes; and no person surrendered by or to either of the High Contracting Parties in virtue of this Treaty shall be tried or punished for a political crime." (Doc. 3-3 at 10.) This provision codifies the well-established "political offense exception" to extradition. *Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986). Mr. Ahmed intends to raise the "political offense exeption," and this Court will have the authority and "responsibility" to determine whether the doctrine applies to bar his extradition. *Id*. at 786–90. In view of the applicable law and the nature of the allegations against Mr. Ahmed, there is a substantial probability that the Court will find that it does.

In determining whether a charged offense falls within the political offense exception, this Court applies the two-prong "incidence test." *Id*. at 806. The first prong of this test, the "'uprising' requirement," requires that at the time and place of the charged offense "there be an 'uprising,' 'rebellion,' or 'revolution'"—*i.e*., a "revolt by indigenous people against their own government or an occupying power." *Id*. at 806–7. The second prong of this test, the "'incidental to' requirement," requires that the charged conduct be "in the course of," "connected

to" or "in furtherance of" the uprising. *Id*. at 809. The Ninth Circuit applies a "liberal construction" to this prong, requiring only that there be "a nexus between the act and the uprising." *Id*.

There is a substantial probability that the Court will find both prongs of the political offense test satisfied here.

(1) In 2006, when the charged murders took place, there was an active "uprising" or "rebellion" against the "occupying power" in Iraq – *i.e.*, American and coalition forces – as well as the Iraqi government that the insurrectionists saw as beholden to it. *Id*. at 806–7; M.J. Kirdar, *Al Qaeda in Iraq* (Center for Strategic & Int'l Studies 2011).[11] This uprising, which was designed "to defeat the American-led coalition," included the strategy of "deter[ring] Iraqi cooperation with the transition process by targeting police stations, recruitment centers, and Iraqi politicians." *Id*. at 3–4; *see also Vo v. Benov*, 447 F.3d 1235, 1241 (9th Cir. 2006) ("uprising prong" satisfied where there was a "certain level of violence," occurring "within the country or territory in which those rising up reside," the charged offense occurs in that territory, and the accused was seeking to change the form of government under which he lived) (internal quotation marks omitted).

(2) The accusations leveled against Mr. Ahmed clearly describe conduct bearing a "nexus" to this uprising. Indeed, the government expressly charges Mr. Ahmed with acting as the "leader/Emir of a group of Al-Qaeda terrorists" to deliberately plan and execute two attacks of Iraqi police officers in June and October of 2006. (Doc. 3 at 2-3.) The allegations make plain that the victims were deliberately chosen because they were police officers: The government cites statements to the effect that Mr. Ahmed was "known for conducting assassination

---

[11] https://csis-prod.s3.amazonaws.com/s3fs-public/legacy_files/files/publication/110614_Kirdar_AlQaedaIraq_Web.pdf.

operations on members of the local police force," and asserts that one of his accomplices confessed to "working with Ahmed and other members of the group to kill police officers." *Id*. at 3-4. According to the allegations, Mr. Ahmed was not a foreign interloper, but an "indigenous" insurrectionist, born and raised in Iraq (Doc. 3-3 at 29), "strugg[ling] to displace an occupying power." *Quinn*, 783 F.2d at 807.

In light of these facts and allegations, this Court is likely to find the charged offenses to be "political offenses" which are non-extraditable pursuant to Article III of the Treaty.

The improbability of the government's succeeding on the merits of its extradition petition is therefore a further special circumstance warranting release.

### 4. Mr. Ahmed's Work on Behalf of the United States Military Constitutes a "Special Circumstance" Warranting Release.

As explained above, Section I, *supra*, since coming to the United States Mr. Ahmed has served the United States military as a cultural advisor, working on military bases and assisting military deploying to the Middle East with role playing exercises and cultural advice. Mr. Ahmed's work with the military earned him the recommendation of Colonel P.J. Nugent, Commander of the Al Asad Task Force, charged with routing ISIS from Iraq. *See* Exhibit 5.

This district has previously found a relator's "selfless and useful help to our military . . . to be compelling and fully justified to be considered a special circumstance." *Wroclawski v. United States*, 634 F. Supp. 2d at 1003. Mr. Ahmed's service to this country is similarly compelling and warrants a finding of special circumstances that merit release.

18

### IV. Conclusion

For the reasons set forth above, Mr. Ahmed should be released from custody pending ruling on the government's extradition petition.

Respectfully submitted: March 31, 2020.

JON M. SANDS
Federal Public Defender

*s/Jami Johnson*
JAMI JOHNSON
DANIEL L. KAPLAN
Asst. Federal Public Defenders

.