MICHAEL BAILEY
United States Attorney
District of Arizona

TODD M. ALLISON
Arizona State Bar No. 026936
DAVID A. PIMSNER
Arizona State Bar No. 007480
RACHEL C. HERNANDEZ
Arizona State Bar No. 016543
DIMITRA H. SAMPSON
Arizona State Bar No. 019133
Assistant United States Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: Todd.Allison@usdoj.gov
Email: David.Pimsner@usdoj.gov
Email: Rachel.Hernandez@usdoj.gov
Email: Dimitra.Sampson@usdoj.gov
Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In the Matter of the Extradition of Ali Yousif Ahmed Al-Nouri a/k/a Ali Youssef Ahmed Al-Nouri, Ali Ahmed, Ali Yousif Ahmed Al Noori, Ali Yousif Ahmed Nouri, Ali Al-Daleme, Ali Yousif Ahmed Al-Mahmadi, Ali Yousif Ahmed, and Ali Yousif Nouri. | Case No. 20-8033MJ-MTM<br><br>**UNITED STATES' RESPONSE TO MAY 11, 2020 SUPPLEMENT TO DETENTION MEMORANDUM** |

The United States, by and through undersigned counsel, hereby responds to the May 11, 2020, Supplement to Detention Memorandum filed by Ali Yousif Ahmed Al-Nouri (hereafter, "Ahmed") (Doc. 74). In his Supplement, Ahmed refers to his medical conditions, cites a number of news articles in support of his argument that the current pandemic justifies his pre-extradition-hearing release, and incorporates a declaration from a civil lawsuit attacking CoreCivic's implementation of their policies and procedures. However, as detailed herein, Ahmed's arguments are unavailing. First, multiple courts

have determined that the presence of COVID-19 in a detention facility, or the threat of COVID-19 to a detention facility, does not constitute a special circumstance for fugitives facing extradition who have alleged that they suffer from serious medical conditions. Second, Ahmed has failed to meet his burden of demonstrating that his own medical conditions, even in light of the threat of COVID-19, rise to the level of special circumstances. Third, Ahmed cannot demonstrate that CoreCivic has failed to implement, and follow, sufficient health and safety protocols to protect Ahmed and other inmates and to prevent the spread of COVID-19. Lastly, despite the difficulties with international travel due to COVID-19, Ahmed has not provided the Court with sufficient evidence as to why such international travel is necessary to prepare a defense to the issues to be addressed at Ahmed's extradition hearing before this Court. Because Ahmed has not overcome the high bar to release in the extradition setting, he should be detained.

**I. Courts Have Determined that the Threat of COVID-19 in Federal Detention Facilities Is Not a Special Circumstance Warranting Bail in Extradition Cases.**

In support of his argument that the threat of COVID-19 is a special circumstance for purposes of bail in an extradition hearing, Ahmed relies in his original detention memorandum primarily on *Matter of Extradition of Toledo Manrique*, No. 19-mj-71055-MAG-1(TSH), 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020), in which the court found that the 74-year-old fugitive was a "vulnerable person" at risk for contracting COVID-19. (Doc. 52, at 13.) Although *Manrique* is distinguishable from Ahmed's case for many reasons (i.e. Ahmed is 42 years old, much younger than the fugitive in *Manrique*; Ahmed is charged with the murder of two police officers, making him both a danger to the community and a risk of flight, while the fugitive in *Manrique* faced money laundering charges, and thus was only deemed a flight risk), the United States contends that *Manrique* is an outlier.

In *Risner v. Fowler*, No. 3:19-cv-03078-N(BT), 2020 WL 2110579 (N.D. Tex. May 1, 2020), the court determined that a fugitive facing extradition had failed to demonstrate

that the threat of contracting COVID-19 was sufficient to constitute a special circumstance warranting release. In that case, a fugitive confined at FCI-Seagoville facing extradition to Columbia for aggravated homicide charges sought to be released pending the outcome of his proceeding. *Id.* at *1. The fugitive argued that special circumstances existed because, based on his advanced age and medical conditions, he "is particularly vulnerable" to succumbing to COVID-19. *Id.* at *1. Specifically, the fugitive stated that he was 76 years old and suffered from the following medical conditions: (1) "elevated prostate markers"; (2) "Parkinson-like tremors causing uncontrolled shaking at times"; (3) "Hypothyroidism, which causes problems with his heart rate and body temperature"; (4) "suffered a stroke at some point in the past"; (5) "suffered from an atrial fibrillation, which is an abnormal heart rhythm (arrhythmia)" fifteen years ago; (6) had surgery to "repair a hole in his heart" 16 years ago; (7) "High blood pressure for which [he] takes medication"; and (8) "Diverticulosis, which is where pockets develop in the lining of his digestive tract, and when they get infected or inflamed, he suffers from diverticulitis and experiences considerable pain." *Id.* at *4-*5.

The fugitive relied on the CDC's website to support his argument that his age and medical conditions caused him to be "especially vulnerable" to COVID-19. *Id.* at *5. In finding that the threat of COVID-19 did not constitute a special circumstance, the court emphasized that the fugitive's "general concern that he may contract COVID-19 while incarcerated" was not a special circumstance. *Id.* at *7. The court noted that, at the time of the court's order, BOP's website showed that FCI-Seagoville had one inmate who had tested positive for COVID-19, but found that the fugitive failed to "allege he has been exposed to the virus while incarcerated, or that anyone he is in contact with has been exposed." *Id.* at *7.

In another case, *Valentino v. United States Marshal*, 2020 WL 1950765, at *2 (S.D. Tex. Apr. 15, 2020), the court found that an individual facing extradition to the Netherlands could not establish special circumstances for bail purposes based on his 74 years of age

and his medical issues with hypertension. Although the court noted that, as of the date of its order there were not any inmates at the fugitive's facility who had tested positive for COVID-19, the court acknowledged the fugitive's arguments related to rapidly rising infection rates for federal inmates, that many inmates may be untested, and that the risk of COVID-19 in detention facilities is especially high. *Id.* at \*1-\*2.

Nonetheless, the court explained, the fugitive did "not identify any actual deterioration in his health or any serious medical need that cannot be met at his facility during the pandemic. His general arguments based on the pandemic, without any specific identified risks to him, do not suffice as a "special circumstance" under the authorities cited above. Put simply, there is no evidence of immediate danger to [the fugitive] at FDC Houston. If his age and hypertension were sufficient to warrant a special circumstance, without any specific identified risk, then such circumstances would be generally available to all senior inmates, and would not require an "extraordinary" showing." *Id.* at \*2.

Based on *Risner* and *Valentino*, it is clear that the mere presence of COVID-19 in, or the impending threat of COVID-19 to, federal detention facilities is insufficient to constitute a special circumstance justifying release, even in situations where a fugitive is of an elderly age or suffering from serious medical conditions that do not rise to the level of extraordinary.

**II. Ahmed Has Failed to Meet His Burden of Demonstrating that He Has a Serious Medical Condition that Constitutes a Special Circumstance.**

Ahmed claims that his medical condition, when combined with the fact that he could potentially contract COVID-19 while detained in CoreCivic's CAFCC (hereafter, "CAFCC") facility, is a special circumstance for purposes of bail pending an extradition proceeding. (Doc. 74, at 5-6.) Ahmed alleges his prior heart valve replacement and two prior incidences of pneumonia—one in August 2018 and one in June 2019— "place him at heightened risk of severe illness were he to contract [COVID-19]." (Doc. 74, at 6.) In support of this argument, Ahmed attaches (1) a declaration from a physician provided in a

civil lawsuit that does not mention anything specific about Ahmed's medical condition, (2) a single medical progress note regarding Ahmed from CoreCivic's medical staff, and (3) two pages of medical records related to Ahmed's August 2018 and June 2019 hospitalizations at Deer Valley Medical Center. (Doc. 74.) Ahmed has failed to demonstrate that he has a serious medical condition that rises to the level of a special circumstance. He has not established that he has been exposed to the virus while incarcerated nor has he provided evidence of immediate danger. Ahmed has not met his burden and should be detained.

Although serious medical conditions *may* constitute special circumstances, not all serious medical conditions rise to the level of special circumstances due to the rarity of bail in extradition matters. *Cf. Matter of Extradition of Garcia*, 761 F. Supp. 2d 468, 481 (S.D. Tex. 2010) ("[I]f most health problems constituted special circumstances serving as a basis for release, both genuine and fabricated illnesses could potentially empty federal prisons"); *Matter of Extradition of Hamilton-Byrne*, 831 F Supp. 287, 290-91 (S.D.N.Y. 1993) (requiring more than "serious" health problems to constitute special circumstances because "[w]ere health problems a basis for release, both actual and feigned illnesses could rapidly empty custodial facilities").

A fugitive facing extradition is required to show much more than the existence of a serious medical condition. Courts have generally found that a fugitive must demonstrate that (1) the fugitive's specific medical condition is life-threatening or debilitating, (2) the fugitive's medical condition has deteriorated while incarcerated, or (3) that the federal authorities cannot properly care for the fugitive's medical condition. Ahmed has not demonstrated any of these conditions.

In finding the fugitive had not established a special circumstance justifying release in an extradition matter, the Ninth Circuit acknowledged that "a serious deterioration of health while incarcerated" may constitute a special circumstance. *Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989). District Courts have held similarly. In *United States v.*

*Bowman*, No. 19-MJ-05089, 2020 WL 835342, at *3 (S.D. Cal. Feb. 20, 2020), the court recognized that, "serious medical issues that cannot be addressed in custody can constitute 'special circumstances.'" However, the court found that the 70-year-old fugitive who was facing extradition for charges of rape could not establish "special circumstances" despite his serious health issues for which he was taking medication and due to the lack of evidence that his health problems were being exacerbated in custody. *Id.* In *United States v. Snyder*, No. 13-7082-MJ, 2013 WL 1364275, at *8 (D. Ariz. Apr. 3, 2013), the district court found that a fugitive's history of cancer and reports of recently vomiting blood did not constitute special circumstances warranting release because the fugitive "failed to prove a serious deterioration of health" and has not "indicat[ed] that no acceptable treatment would be available to her." Where fugitives cannot establish that the jail facility is incapable of meeting his serious medical needs, special circumstances do not exist. *See Nezirovic v. Holt*, 990 F. Supp. 2d 594, 601-02 (W.D. Va. 2013); *Garcia*, 761 F. Supp. 2d at 481; *United States v. Latulippe*, No. 08-mj-59-1-JM, 2008 WL 2704230, at *1 (D.N.H. Jul. 3, 2008); *Matter of Extradition of Rouvier*, 839 F. Supp. 537, 541-42 (N.D. Ill. 1993).[1]

Here, Ahmed has failed to demonstrate that his medical conditions rise to the level of special circumstances.

<u>First</u>, Ahmed has not demonstrated that his medical conditions are life-threatening or debilitating. Although the United States does not dispute that Ahmed had a prior heart valve replacement surgery in 2010 or that he has had two prior hospitalizations involving pneumonia—Ahmed has not provided any evidence that these conditions are currently life-threatening or debilitating. He has not alleged that he needs an additional surgery or procedure to correct any significant issue relating to his heart. In fact, his request to visit a cardiologist while incarcerated was merely for a routine follow-up, and not for any serious

---

[1] The United States disputes Ahmed's previous characterization of his prior encounters with pneumonia as "chronic pneumonia." (Doc. 52, at 12.) Notably, the two medical records attached to Ahmed's Supplement (Exhibits 2 and 3) do not appear to diagnose Ahmed with a "chronic" condition.

matter. *See* Declaration of K. Ivens, M.D., F.A.C.C.P. (and CV), attached here to as Exhibit A, at ¶ 34. Moreover, Ahmed has not provided any evidence or documentation that he currently suffers from any lung condition that is of a significant or serious nature. There is no evidence to suggest that Ahmed has had any lingering medical concerns related to his lungs while incarcerated or that as a result of his prior hospitalizations he currently faces any serious medical condition.

Second, Ahmed cannot show that his health has deteriorated while in custody. CoreCivic's Chief Medical Officer Dr. Ivens reports that Ahmed's "medical records indicate that he is not having any issues with his heart [and] his blood pressure is normal." Exhibit A, at ¶ 34. In fact, Dr. Ivens states, Ahmed "is healthier now than when he entered the facility." *Id.*

Rather than meeting his burden of demonstrating that he currently has a life-threatening or debilitating medical condition, Ahmed relies on his speculation that should he contract COVID-19 in CAFCC, he would be at an "elevated risk." (Doc. 74, at 6.) Mere speculation is not enough; it is the fugitive's burden to provide the court with evidence from which the court can determine that the severity of the medical condition rises to the level of a special circumstance. *See, e.g.*, *Garcia*, 761 F. Supp. 2d at 481 (finding that the fugitive failed to provide sufficient detail to show that his medical condition is a special circumstance and instead "his exhibits simply support his assertions that he has received medical treatment and has been referred to specialists by other physicians"); *Rouvier*, 839 F. Supp. at 542 (declining to find that a fugitive's heart condition was a special circumstance where the fugitive characterized the condition as "potentially" serious and acknowledged that it could be controlled by medication).

Although the United States acknowledges that CoreCivic has designated Ahmed under the facility's policies as "high risk" with respect to contracting the COVID-19 virus, this designation has been to his benefit and has had the effect of diminishing his risk of contracting the virus. Inmates who are designated "high risk" are routinely monitored and

receive prompt medical attention. *See* Declaration of Warden K. Kline, attached hereto as Exhibit B, at ¶ 53. None of the higher-risk detainees have been exposed to, or have been suspected of being exposed to, COVID-19, and none have tested positive for the virus. Exhibit B, at ¶ 56.

Third, Ahmed has failed to meet his burden of showing that CoreCivic cannot properly care for his medical conditions. Although Ahmed claims that CoreCivic's COVID-19 protocols "are preventing [him] from seeing a cardiologist for his ongoing heart problems," (Doc. 74, at 6), he has failed to demonstrate that he has unmet medical needs. In fact, CoreCivic determined that Ahmed's request to see a cardiologist was "not medically necessary, or advisable," at this time for multiple reasons:

> First, routine outside consults have been halted during the course of this pandemic. This is because specialists, such as cardiologists, are not seeing any patients, except on an emergent basis, during this pandemic. Second, sending Mr. Ahmed for an outside consult would unnecessarily expose him to the COVID-19 virus. Third, Mr. Ahmed was unable to provide the facility medical providers with the correct name of his treating cardiologist, making it extremely difficult to obtain his prior records, something a cardiologist would want to review prior to seeing him as a patient.

Exhibit A, at ¶ 34.

### III. COVID-19 at the CoreCivic CAFCC Detention Center

#### A. Statistics Related to COVID-19 at CoreCivic CAFCC.

CAFCC currently houses approximately 3090 total inmates. Exhibit B, at ¶ 13. As of May 13, 2020, 15 inmates have tested positive for COVID-19 at the CoreCivic facility in which Ahmed is housed. Exhibit B, at ¶ 15.[2] Although Ahmed emphasizes that "[h]undreds of other inmates are in quarantine as a result of COVID-19 exposure at the

---

[2] Although Dr. Ivens' Declaration references that there are 13 inmates who have tested positive for COVID-19, he was referencing statistics from earlier this week. Warden Kline's Declaration, referencing 15 inmates who have tested positive for COVID-19 is up-to-date as of May 13, 2020.

facility," his complaint ignores the fact that CoreCivic aggressively implements quarantine procedures to prevent the spread of COVID-19 and protect the other inmates. *See* Exhibit A, at ¶¶ 16, 20, 22-23; Exhibit B, ¶¶ 31-49.

Ahmed provided the Court with numerous statistics and news articles about the spread of COVID-19 through other facilities; however, those are irrelevant here. At CAFCC, less than .5% of the inmates have tested positive. All but one of the 15 cases of COVID-19 detected at CAFCC were diagnosed upon entry into the facility, suggesting that there is no spread of infection in the facility. Exhibit B, ¶ 61.

B. CoreCivic's Precautionary Measures to Combat COVID-19.

Contrary to Ahmed's arguments, CoreCivic has implemented detailed protocols and measures, in compliance with the CDC's Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities, to mitigate the risk of COVID-19 and its spread. First, the dramatic reduction in the CAFCC population allows for social distancing. Exhibit A, ¶ 17. Unlike the facilities referred to in his pleading, the facility where Ahmed is housed is currently operating at only 62% capacity. Exhibit A, ¶ 17. The average number of detainees entering the facility each day has decreased from approximately 100 per day to five per day, with a total reduction of approximately 1300 inmates since March 19, 2020. Exhibit B, at ¶ 14. This population reduction alleviates many of the concerns raised by Dr. Goldenson in his declaration filed with Ahmed's supplemental memorandum.

Second, CAFCC has taken steps to prevent exposure to COVID-19 by limiting outside contacts. Specifically, employees are required to wear masks and are screened prior to reporting for work each day. Exhibit A, at ¶ 15. Employees are not permitted to enter the facility if they have symptoms of COVID-19. Exhibit A, at ¶ ¶ 15-16. Additionally, the United States Marshals Service is no longer transporting inmates to and from court, or for non-emergency medical appointments. Exhibit A, at ¶ 19; Exhibit B, at ¶ 67. Further, CAFCC suspended social visits beginning in March 2020. Exhibit A, at ¶ 19; Exhibit B,

1 at ¶ 62.

To the extent the defense also argues that CAFCC is not following its own protocols, there is simply no support in the record for such a proposition. *See* Exhibits A, B. In fact, the attached declarations of Dr. Ivens and Warden Kline make clear that CoreCivic has national guidelines in place and CAFCC is following those during this pandemic. Furthermore, most of the protocols recommended by Goldenson have been instituted at CAFCC. *Compare* Goldenson Declaration with Exhibits A and B. The assertions made by Dr. Goldenson are unpersuasive as they do not relate to CAFCC or Ahmed in particular.

**IV.	COVID-19 and Ahmed's Custody Status**

Ahmed fails to mention that his current housing status – administrative segregation where he is physically separated from all other inmates – greatly limits his exposure to COVID-19. *See* Exhibit A, ¶ 34, Exhibit B, at ¶¶ 124-132. Given the nature of the charges against Ahmed, and the press coverage his case has received, he is currently in administrative segregation, and has been in segregation since before any inmate tested positive for COVID-19. Exhibit B, at ¶¶ 124-132. He has his own cell and shower and visits the recreation yard by himself. *See* Exhibit A, at ¶ 34. He does not come into contact with other inmates. *See* Exhibit A, ¶ 34. Ahmed's arguments about CoreCivic and its "immutable characteristics" in the detention context are inapplicable to his situation.

Due to Ahmed's segregation status and the degree of COVID-19 spread in Arizona, he cannot show that he would be at any lesser risk out of custody. In fact, Dr. Ivens opined, "he is less likely to encounter individuals with COVID-19 in his current housing situation than if he was released from the facility and was exposed to the general public." Exhibit A, at ¶ 34. The news articles relied on by Ahmed which discuss Arizona's stay-at-home order as support for his release are unpersuasive. The order is due to expire on the date of Ahmed's hearing, May 15, 2020, and many businesses have already been permitted to re-open.

## V. Courts in the District of Arizona Have Routinely Rejected Motions for Release Premised on COVID-19.

Unlike in criminal cases, extradition cases carry a strong presumption in favor of detention and the Bail Reform Act is not applicable. *See, e.g.*, *Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989); *Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir. 1984). However, even in cases where other divisions of this Court have considered release premised on COVID-19 without extradition's strong presumption, the courts have routinely rejected release requests premised on the risk presented by COVID-19.

For example, the district court denied release and acceleration of a disposition hearing where the defendant claimed she had health issues and was medically vulnerable. *United States v. Caddo*, CR 18-08341-JJT (Filed 03/23/20) (Doc. 174), attached as Exhibit C.[3] The Court found that "the protocols for warning sign monitoring, examination, quarantining, isolation and other health procedures [CoreCivic has] in place are comparable, if not superior, to what Defendant would face out of custody." *Id.*

Similarly, where defendant had a history of chronic asthma, bronchitis, and recurrent pneumonia, the district court denied defendant's motion to reopen detention based on potential exposure to COVID-19. *United States v. Bachler*, CR 19-00333-DLR (Filed 04/13/20) (Doc. 116), attached as Exhibit C. There, the court held that while CoreCivic's protocols do not eliminate the risks of COVID-19 transmission, they are reasonable under the circumstances, and if followed, they should substantially mitigate those risks. *Id.* Further, the court noted there was no allegation that the defendant's current medical needs were not being met nor that he had any needs that could not be met currently while in custody. *Id.*

In *United States v. Enos*, CR 19-2041-JAS-DTF (Filed 04/30/20) (Doc. 67), attached as Exhibit C, the district court recognized that the defendant's hypertension,

---

[3] All of the District of Arizona orders discussed in this section of the United States' Response are attached collectively hereto as Exhibit C.

asthma, morbid obesity, and borderline intellectual functioning put him at higher risk of severe illness were he to contract COVID-19. Nevertheless it found that in light of CoreCivic's implementation of numerous measures with respect to "prevention, identification, treatment, surveillance, isolation, testing and protecting inmates and staff," the health risk to the defendant did not outweigh his danger to the community. *Id.* Holding that CoreCivic protocols are comparable, "if not superior," to what a defendant faces out of custody, the court noted that the defendant was unable to show that CoreCivic was not prepared to care for someone who became infected with the virus. *Id.* Finally, the Court noted that the defendant's proposed release plan places others at increased risk, such as Pretrial Services and any law enforcement who may have to re-apprehend the defendant if he violates the terms of his release or flees. *Id.*; *see also United States v. Martinez-Castro*, CR 20-50004-DJH (Filed 03/31/20) (Doc. 13), attached as Exhibit C (denying motion to reopen detention, finding current pandemic did not outweigh the defendant's risk of flight and danger); *United States v. Caruso*, CR 20-00165-JJT (Filed 04/08/20) (Doc. 50), attached as Exhibit C (denying defendant's motion to reopen detention based on COVID-19, citing the precautionary measures taken by CoreCivic and the defendant's continued risk of flight and danger).

**VI.  COVID-19 and International Travel.**

Lastly, Ahmed claims that travel to Iraq is "necessary for the investigation of and defense against extradition," and that as a result of the COVID-19 pandemic, "meaningful investigation" has been disabled for the foreseeable future. (Doc. 74, at 7-8.) Beside this generalized assertion, Ahmed fails to provide any information about the nature and extent of the investigation his counsel intends to conduct so the Court can determine whether the information sought is even appropriate in the context of an extradition hearing, much less whether it rises to the level of a special circumstance.

As an initial matter, an extradition hearing is not a trial on the merits of the allegations in the requesting country's criminal charges. *See, e.g.*, *Collins v. Loisel*, 259

U.S. 309, 316 (1922); *Santos v. Thomas*, 830 F.3d 987, 991-92 (9th Cir. 2016). At the extradition hearing, this Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of the fugitive's extradition—as defined in the applicable extradition treaty, statutes, and case law—have been established. *See Quinn v. Robinson*, 783 F.2d 776, 786 n.3 (9th Cir. 1986) (*citing Charlton v. Kelly*, 229 U.S. 447, 461 (1913)) (analogizing extradition hearing to a preliminary hearing in a criminal case). Notwithstanding the COVID-19 pandemic, there is no basis to believe that the extradition hearing could not be conducted in the foreseeable future because "the Court's inquiry at that hearing will be limited to a narrow set of issues: (1) whether a valid treaty exists; (2) whether the crime charged is covered by the relevant treaty; and (3) whether there is probable cause to believe that the defendant committed the crimes alleged." *Matter of Extradition of Drumm*, 150 F. Supp. 3d 92, 99 (2015) (*citing Skaftouros v. United States*, 667 F.3d 144, 154–55 (2nd Cir.2011); *United States v. Kin–Hong*, 110 F.3d 103, 110 (1st Cir.1997)).

Because of the limited nature of an extradition hearing, a fugitive's right to present evidence is severely constrained. A fugitive may generally not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but rather may only introduce evidence that explains away the requesting country's submitted evidence or "completely obliterates probable cause." *See, e.g.*, *Charlton*, 229 U.S. at 457-58, 461-62; *Santos*, 830 F.3d at 992; *Mainero v. Gregg*, 164 F.3d 1199, 1207 n.7 (9th Cir. 1999), *superseded by statute on other grounds as stated in Cornejo-Barreto v. Seifert*, 218 F.3d 1004 (9th Cir. 2000). A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (*quoting In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)). The admission of explanatory evidence is largely within the discretion of the Court. *See Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir. 1978).

The Ninth Circuit has also cautioned that a fugitive "may not impeach government

witnesses or produce witnesses whose testimony contradicts evidence already offered by the government." *See Santos*, 830 F.3d at 992-93 ("We have also described 'contradictory' evidence as evidence 'the credibility of which could not be assessed without a trial.' In practice, this means that an individual contesting extradition may not, for example, present alibi evidence, facts contradicting the government's proof, or evidence of defenses like insanity, as this tends to call into question the credibility of the government's offer of proof. . . .") (citations omitted); *see also Man–Seok Choe v. Torres*, 525 F.3d 733, 740 (9th Cir. 2008) ("[A] witness-accomplice's 'lack of credibility' is merely a weakness in Korea's case; it does not completely obliterate the evidence of probable cause'").

These issues, which require determinations of fact or credibility, are reserved for the courts in the requesting country to resolve after the fugitive is extradited. *Hoxha v. Levi*, 465 F.3d 554, 562 n.10 (3d Cir. 2006) ("witness statements" that "contain certain inconsistencies" . . . "present credibility issues that should be addressed at trial" in requesting country); *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993) ("issues of credibility are to be determined at trial" and therefore the fugitive "has no right to attack the credibility of [witnesses] at this stage of the proceedings"); *Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir. 1973) ("The judge's refusal to examine the credibility of the testimony and statements included in the translated material was clearly proper, since the declarants were not before him."); *In re Extradition of Mainero*, 990 F. Supp. 1208, 1218 (S.D. Cal. 1997) ("Evidence that conflicts with that submitted on behalf of the demanding party is not permitted, nor is impeachment of the credibility of the demanding country's witnesses."). In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See, e.g.*, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916) (rejecting objections to extradition that "savor of technicality"); *Hooker*, 573 F.2d at 1368 (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as insanity").

Ahmed asks this Court to find that global travel restrictions arising from the

COIVD-19 pandemic constitute a special circumstance because he is "effectively disabled from meaningful investigation of his case" however, Ahmed has failed to provide the Court with any specific information regarding the nature or extent of the intended investigation. Moreover, he has not explained to the Court how the intended investigation is relevant or necessary to any of the issues that are appropriately addressed at the extradition hearing, as opposed to a trial on the merits in the requesting country. Even if Ahmed had provided the Court with some basis for which a limited investigation will be relevant to the extradition hearing, Ahmed fails to explain how the restrictions on global travel impede such an investigation and does not provide any discussion as to whether there are other viable alternatives to individuals traveling from the United States to Iraq to accomplish the goals of any such limited investigation.

**VII. Conclusion.**

Accordingly, Ahmed has failed to meet his burden that COVID-19 creates a special circumstance either as to his health or as to any global travel restrictions warranting his release.

Respectfully submitted this 14th day of May, 2020.

        MICHAEL BAILEY
        United States Attorney
        District of Arizona

        */s/ Todd M. Allison*
        TODD M. ALLISON
        DAVID A. PIMSNER
        RACHEL C. HERNANDEZ
        DIMITRA H. SAMPSON
        Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing documents, and sent the attached document to the following CM/ECF registrant(s):

Jami S. Johnson
Daniel L. Kaplan
Counsel for Ali Yousif Ahmed Al-Nouri

*/s/ Norma Hernandez*
United States Attorney's Office