UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

In Re the Matter of the    )
                           )
Extradition of:            )
                           )      2:20-mj-8033-MTM
                           )
                           )      Phoenix, Arizona
                           )      May 15, 2020
Ali Yousif Ahmed Al-Nouri. )         1:06 p.m.
                           )
_____)


 BEFORE:  THE HONORABLE MICHAEL T. MORRISSEY, MAGISTRATE JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

DETENTION HEARING (CONTINUED)

Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CCR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
1                    A P P E A R A N C E S

2

3    For the Government:

4                    U.S. Attorney's Office
                     By: TODD M. ALLISON, ESQ.
5                        DAVID A. PIMSNER, ESQ.
                         DIMITRA HOTIS SAMPSON, ESQ.
6                    40 North Central Avenue, Suite 1200
                     Phoenix, AZ  85004
7
     For the Defendant Ali Yousif Ahmed Al-Nouri:
8
                     Federal Public Defender's Office
9                    By: JAMI SUZANNE JOHNSON, ESQ.
                     850 W. Adams Street, Suite 201
10                   Phoenix, AZ  85007

11

12   ALSO PRESENT:  Interpreter Deenatra Younan

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**INDEX**

**SUMMARY OF COURT PROCEEDINGS**                                    **PAGE:**

Argument by Mr. Allison                                            62

Argument by Ms. Sampson                                           86

Further Argument by Mr. Allison                                   100

Argument by Ms. Johnson                                           121

**INDEX OF WITNESSES**

| **WITNESSES FOR THE GOVERNMENT:** | **Direct** | **Cross** | **Redirect** |
| --- | --- | --- | --- |

* * * * * No Witnesses Called * * * * *

**INDEX OF EXHIBITS**

**EXHIBIT NO.:**          **DESCRIPTION:**                      **RECEIVED:**

* * * * * No Exhibits Received * * * * *

**UNITED STATES DISTRICT COURT**

```
 1                    P R O C E E D I N G S

 2          (Court was called to order by the courtroom deputy.)

 3         (Defendant is present, in custody, via video conference.)

 4         (The proceedings were interpreted by Deenatra Younan.)

 5              (All counsel are present in the courtroom.)

 6                   (Proceedings resume at 1:06 p.m.)

 7              THE COURT:  Please be seated.

 8              COURTROOM DEPUTY:  We are on the record in MJ20-8033,

 9    Ali Yousif Ahmed Al-Nouri, before the Court for a continued

10    detention hearing.

11              MR. ALLISON:  Good afternoon, Your Honor.

12              Todd Allison, Dimitra Sampson, and Dave Pimsner for

13    the United States.

14              THE COURT:  Good afternoon to all the government

15    lawyers.

16              MS. JOHNSON:  Good afternoon, Your Honor.

17              Jami Johnson for Ali Yousif Ahmed Al-Nouri, who is

18    participating via video link from the jail, and is being

19    assisted by an Arabic language interpreter.

20              THE COURT:  Good afternoon, Ms. Johnson, and to your

21    client.

22              And I understand that today we have simultaneous

23    translation?

24              MS. JOHNSON:  I spoke with the interpreter before

25    Court began.  It is my understanding that he will do
```

1    simultaneous interpretation, but he requests that we all please

2    speak slowly.  And he has been told to interrupt if he falls

3    behind or needs us to slow down.

4         THE COURT:  All right.  And if the interpreter, I

5    guess, would raise his hand and signal when -- if we get too

6    far ahead of ourselves.

7         All right.  Mr. Allison, is the government ready to

8    proceed?

9         MR. ALLISON:  Yes, Your Honor.

10         THE COURT:  I have from last week the government's

11    exhibit notebook.  I assume that Ms. Johnson has them for the

12    defense as well.

13         MR. ALLISON:  The exhibits from last week, yes, Your

14    Honor, we've provided to her.

15         THE COURT:  Okay.  And have we marked them; has the

16    Court marked them?

17         MS. JOHNSON:  Yes.

18         THE COURT:  We're all set.  Okay.  Thank you.

19         MR. ALLISON:  Your Honor, before I get started with

20    argument, just a couple clarification points for what we plan

21    to do today.

22         The first thing is, we are going to split our -- the

23    government is going to split up our argument slightly today.  I

24    plan to discuss the legal standard, most of the special

25    circumstances raised by Ms. Johnson.  I will then allow my

1    colleague, Ms. Sampson, to come up here and address the single

2    special circumstances issue of the threat of COVID-19 to

3    Mr. Ahmed.  And then I will plan to continue with a discussion

4    of danger and flight risk, if the Court is okay with that.

5              THE COURT:  That's fine.

6              MR. ALLISON:  A couple other points, Your Honor.

7              You mentioned exhibits, the Government's Exhibits.  We

8    did bring documents last week to present as exhibits.  I

9    believe Ms. Johnson and I have an agreement that the documents

10   attached to our detention memos are going to be treated as part

11   of the record, so I did not intend to move in exhibits.  They

12   are all attached to detention memos.

13             THE COURT:  That's fine.

14             Ms. Johnson, you're nodding your head, so that is

15   accurate?

16             MS. JOHNSON:  Yes, Your Honor.

17             THE COURT:  And maybe -- well, I don't want to get

18   ahead of myself -- but when we do have the extradition hearing,

19   one of the issues is authentication and foundation.  Can we

20   assume that any document that has been admitted for purposes of

21   this detention hearing is also considered properly

22   authenticated for purposes of an extradition hearing, or are

23   the parties not ready to go there yet?

24             MS. JOHNSON:  No, Your Honor.  We are not prepared to

25   stipulate to the authenticity or foundation of -- of any of

1    these documents at this time.

2         THE COURT:  Okay.  Thanks.

3         MR. ALLISON:  And the government's fine with the

4    defense's position on that, Your Honor.

5         THE COURT:  All right.

6         MR. ALLISON:  The last point, Your Honor, is just, as

7    Your Honor knows, we filed our detention memos at the same time

8    at the end of March.  There was some supplemental briefing that

9    was permitted by Your Honor last Friday.  But other than that,

10   we have not responded in writing to our arguments.

11        For the most part today, I intend to rely on cases

12   that are cited somewhere in our briefs, and I will discuss that

13   with Your Honor and -- and defense counsel today.

14        There are a couple of cases that may come up, Your

15   Honor, that have not been cited, and I will alert Ms. Johnson

16   and Your Honor to those cases today if I plan to talk about

17   those, and I'm happy to file some sort of supplement to put

18   those cases in the record, if Your Honor permits.

19        THE COURT:  Sure.  Most important thing is, we're just

20   going to need the cites to the -- to those cases so that

21   everybody understands.  If that's the type of pleading you're

22   discussing, that would be great.

23        MR. ALLISON:  Yes.  And I have the cites here today as

24   well, Your Honor, so I can provide those today, or in writing,

25   whatever you prefer.

1          So, Your Honor, as you know, we are here today on

2     Mr. Ahmed's detention hearing.  The United States opposes

3     Mr. Ahmed being released on bail.  The United States believes

4     that he has failed to meet his burden of proving special

5     circumstances, and we also believe that he has failed to meet

6     his burden to prove that he is not a flight risk and not a

7     danger to the community.

8          I want to briefly talk about the legal standard, Your

9     Honor.  I don't want to just go over everything in the briefs,

10     but it did come up last Friday.

11          I just want to emphasize that the parties both agree

12     the Bail Reform Act does not apply.  There is a presumption

13     against bail in extradition cases, and courts that we've cited

14     in our briefs have explained that that is to avoid any

15     diplomatic embarrassment of a fugitive absconding once the

16     United States has him in custody -- him or her in custody for

17     an extradition.

18          Defendants facing extradition have the burden at all

19     times.  The defendant has -- or the fugitive has the burden of

20     proving special circumstances under the law.  The fugitive also

21     has the burden of proving he's not a flight risk or a danger to

22     the community.  That is either, Your Honor, a burden that is

23     necessary for clear and convincing evidence, or at the very

24     least, a preponderance of the evidence.

25          We've cited cases in our brief, Your Honor, that we

1    believe clearly support there's a basis for the requirement of

2    clear and convincing evidence; in particular the Patel case

3    from Oregon, the Snyder case from Arizona which is filed in our

4    supplement on page 6, and other cases, as well.

5            We also acknowledge, however, that in -- courts in the

6    Ninth Circuit, Your Honor, have decided that a preponderance of

7    evidence is the standard, and we think under either standard

8    Mr. Ahmed has not met his burden here, and we'll talk about

9    why.

10           But it's important to understand throughout this whole

11   discussion today that the burden is with Mr. Ahmed at all

12   times.

13           I want to start just briefly, Your Honor, on the Fifth

14   Amendment argument that Ms. Johnson raised in her pleadings and

15   discussed last Friday, and the Parretti case.  I don't want to

16   spend a lot of time on it.

17           Your Honor asked Ms. Johnson if she had any other

18   cases that followed Parretti, which appears to the government

19   to sort of shift the burden to the government to -- to show

20   something under the due process and Fifth Amendment standard.

21           Your Honor, we would agree that Parretti is withdrawn.

22   It is no longer good law.  And we would agree that there's no

23   case in our circuit that has followed Parretti -- or the

24   holding of Parretti, the prior holding of Parretti.  In fact, a

25   Westlaw cases -- Westlaw search of cases citing Parretti, the

1    government has gone through those, and we've found one that did

2    follow that particular holding of Parretti.  It was the

3    Southern District of California case from April of 1998 called

4    Campillo-Valles.  That case, however, was issued in 1998 before

5    the withdrawing of Parretti.

6           So other than that case, the United States has not

7    found a single case that has followed that holding that

8    Ms. Johnson asked you to follow in Parretti.  In fact, Your

9    Honor, there is a couple cases more recently that have,

10   although not citing to Parretti, shot down that same due

11   process argument.

12          The first one is cited in our briefs called

13   Antonowicz -- or Antonowicz, a Northern District of California

14   case from 2017.

15          And the case that is not cited in our pleadings, Your

16   Honor, is Johnson, a 2012 Western District of Pennsylvania

17   case, and the cite is 2012 WL 3929811.

18          Both of those cases, Your Honor, shot down the idea

19   that there was a separate due process standard or requirement

20   for extradition cases, and we would ask you to -- to consider

21   that.

22          So briefly I want to move into -- well, not briefly --

23   I want to move into the discussion of special circumstances,

24   and I want to talk just quickly about what is a special

25   circumstance under the law.

1          Defendant's memo acknowledges that special

2     circumstances are not things that are applicable to all

3     defendants facing extradition.  And, in fact, the case law has

4     said they need to be extraordinary things.  And that -- that is

5     cited, among other cases, in the Smith case from the Ninth --

6     Ninth Circuit, 1992.

7          I think the parties agree that the determination of

8     what is a special circumstance is less -- left within the

9     discretion of Your Honor.

10         The parties seem to disagree on when you have a whole

11    bunch of issues that are alleged to be special circumstances,

12    whether all of them coming together can be a special

13    circumstance.  I believe Ms. Johnson has said some stuff in her

14    filings about all of this together can be considered.  She --

15    she's raised a number of issues that she alleges are special

16    circumstances.

17         United States takes the position that if you don't

18    have one special circumstance, you can't put a whole bunch of

19    stuff together that's not a special circumstance and make it a

20    special circumstance collectively.

21         And I would also for that proposition, Your Honor, I

22    would cite again to the Antonowicz case I just cited from the

23    Central District of California, 2017, which talks about that

24    exact issue.

25         So Mr. Ahmed appears from his detention memo to allege

1    four different categories of special circumstances:  The

2    anticipated length of this proceeding; the probability that he

3    will be found non-extraditable by Your Honor; his work on

4    behalf of the U.S. military in the past; and the risk of him

5    contracting coronavirus, or COVID-19, in CoreCivic, combined

6    with his alleged medical -- medical conditions.

7            We're going to touch on a little bit of each of those

8    today.

9            I'll start with the -- the sort of what I would call

10   the "high probability of success" argument.  Ms. Johnson has

11   said in her filing that Mr. Ahmed has both a factual and legal

12   high probability of success of not being extradited at the

13   extradition hearing.  She cites two cases:  Salerno and

14   Gonzalez.

15           From our read of Salerno, there is no discussion of

16   this applied factually.  It is simply a, this is one idea of a

17   special circumstance that the courts can look at.

18           In Gonzalez, which is her cite for when something

19   is -- when the facts do not appear that the fugitive will be

20   extradited at the extradition hearing.  However, in Gonzalez,

21   Your Honor, there is a big difference.  In Gonzalez, the Court

22   went through pages and pages of discussion of the specific

23   factual problems of an identification of the fugitive as well

24   as -- as well as specific factual alibi evidence that was

25   intended to be raised at the -- the extradition hearing.

1          In Gonzalez, the Court looked at that and after

2   analyzing those very detailed facts, determined that there was

3   a likelihood that on the facts in the extradition packet, that

4   fugitive had a high probability of success.

5          I'll start with the factual argument first, Your

6   Honor.

7          Ms. Johnson has not raised any specific facts as to

8   why Mr. Ahmed will be factually successful at the extradition

9   hearing.  I didn't see anything in her memo talking about the

10  specific facts of these two incidents that he's charged with in

11  Iraq, I did not see any specific facts pertaining to an alleged

12  alibi or other defense that he intends to argue at the

13  extradition hearing.

14         And more importantly, the defense's brief seems to

15  rely almost entirely on a separate case out of California,

16  which we discussed last Friday, the Ameen case.  And without

17  getting into all the facts of that case right now, Your Honor,

18  we would argue, number one, that that's an entirely separate

19  case.  The crime charged against Mr. Ameen in California is

20  entirely separate.

21              (Defendant speaks to interpreter.)

22         THE INTERPRETER:  He asked me to raise my voice so he

23  can hear.

24         THE COURT:  Okay.  Hold on, Mr. Allison.  And is the

25  interpreter -- are you able to raise your voice?

1          THE INTERPRETER:  Yes.

2          THE COURT:  And can we get confirmation from

3     Ms. Johnson's client that he can hear now?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Okay.  Go ahead, Mr. Allison.

6          MR. ALLISON:  As I was saying, the crime charged in

7     Mr. Ameen's case is entirely separate factually than the crime

8     charged here in Mr. Ahmed's case.  There are no allegations

9     that these two cases, for purposes of the factual charges, are

10    related.  They're different times, they're different locations.

11         Ms. Johnson talked a lot about the Ameen case and

12    said, well, he raised this alibi defense that's being litigated

13    in California quite heavily, as one of the things Your Honor

14    should look at for why Mr. Ahmed will be factually successful.

15         But, Your Honor, we clearly don't have an alibi --

16    well, I'll say a clear alibi defense here in this case, because

17    in multiple documents that we filed with Your Honor as part of

18    our detention memo, and discussed in our detention memo,

19    Mr. Ahmed has admitted to being in Iraq at the time of the

20    charged murders, he's admitted to being in Fallujah at the time

21    of the charged murders.  And the immigration documents that

22    we've also provided to Your Honor show apparently that he was

23    in Iraq and didn't leave the country until after those charged

24    murders as well.

25         He also has talked quite a lot, as outlined in our

1    memo, about being shot in Iraq.  And as we've discussed in our

2    memorandum and supplied Your Honor with attached reports, we

3    believe the timing and the details of how Mr. Ahmed says he was

4    shot are particularly interesting in that they seem to be very

5    similar in facts and dates and locations and settings, as at

6    least the second charged murder in this case in October of

7    2006.

8        So, Your Honor, I would submit that the factual

9    success of probability Mr. Ahmed has not met his burden on.

10       THE COURT:  Ms. Johnson, let me ask.  You raised the

11   defense's reliance on the Ameen case from California.  Where is

12   the Ameen case in terms of how far along in its adjudication?

13       MS. JOHNSON:  Your Honor, it is my understanding that

14   they have had two extradition hearings now.  I believe the case

15   was brought in July of 2018.  There was an initial extradition

16   hearing -- I believe it was more than six months after the

17   charge was originally brought, but I don't have the date off

18   the top of my head -- and I believe that the second extradition

19   hearing, or a continuation of the first, was held in late 2019,

20   maybe December.  And there has not yet been a ruling issued.

21   That is my understanding of the procedural posture of that

22   case.

23       THE COURT:  Mr. Allison, have you found any order on

24   extradition in the Ameen case from the Court?

25       MR. ALLISON:  No, I have not, Your Honor.  And I --

1    I -- without double-checking the docket, I would generally

2    agree with Ms. Johnson that there has been, I believe, a

3    two-part extradition hearing, and there has been an order for

4    certain evidence -- to see if certain evidence in that case is

5    available.  And I believe the case has somewhat been -- I don't

6    know if "stay" is the correct word -- but it's been sort of

7    continued, and there has not been an order out yet.

8              THE COURT:  Okay.  Thanks.

9              MR. ALLISON:  Moving to the argument about the legal

10   probability of success, Ms. Johnson brings up the political

11   offense exception, and she cites to Quinn v. Robinson, a 1986

12   case, 34-year-old case from the Ninth Circuit, which, as far as

13   we can tell, is still good law.  And Ms. Johnson did file a

14   supplement within the last couple days that I have read.  I

15   have read back through the Quinn v. Robinson case as well, Your

16   Honor.  And having two days of looking at this issue after

17   Ms. Johnson's filing, I would say I generally -- generally

18   agree with how she has characterized Quinn v. Robinson.  I

19   believe Quinn v. Robinson does -- and I'll address this point

20   first, Your Honor, because you asked about this last Friday.  I

21   believe from the language of Quinn v. Robinson that there does

22   appear to be this sort of concept that the Court came up with

23   in Quinn v. Robinson that a fugitive does not have to

24   necessarily admit to the offense.

25              THE COURT:  Okay.  Two things on that.  One, the

1  argument last week was that the political offense doctrine is a

2  pure doctrine of law, and Quinn at page 791 actually says the

3  political offense doctrine is a mixed question of law in fact.

4  Then Quinn at page 786, note 4, notes that by the time of the

5  appeal, that Quinn then conceded that there was sufficient

6  evidence to find probable cause to believe that he engaged in

7  the conspiracy to cause explosions.

8          So I'm puzzled trying to follow the extent of your

9  agreement with Ms. Johnson's memorandum.  I took that quotation

10  from Quinn that she quoted as to membership in an organization.

11  That's not the Court's question.  The Court's question is, do

12  you have to acknowledge factually that you engaged in acts in

13  order to take advantage of a concept that says that your acts

14  were political?

15          MR. ALLISON:  Your Honor, I -- let me just couch this

16  first with, if this is an issue that Your Honor wants to be

17  briefed at this stage in this extradition process, I would ask

18  for the government be -- to be allowed to respond only

19  because --

20          THE COURT:  Absolutely.

21          MR. ALLISON:  Only --

22          THE COURT:  How much time do you need?  Because you're

23  right, that was filed last week, and it is appropriate to give

24  you time.  Would five days be acceptable?

25          MR. ALLISON:  I think that's -- that would be fine,

1    Your Honor.

2         THE COURT:  Okay.  And then we'll give Ms. Johnson,

3    how about, three days to reply after that, and then we'll

4    consider at least that limited point fully briefed.

5         MR. ALLISON:  Your Honor, thank you.

6         The only reason I raise that is, I do see statements

7    in Quinn v. Robinson that create questions as -- as to how that

8    language that Ms. Johnson has put in her supplement, how that

9    has sort of developed since 1986.  And I will tell you there's

10   other cases from other circuits that talk about that this is a

11   factual and legal analysis.  And I think Your Honor is right:

12   I do not think it's an entirely legal analysis.  I think it's a

13   factual analysis and a legal analysis.  I -- the question I

14   would like to pin down for Your Honor is whether that factual

15   analysis is simply from the face of the extradition packet and

16   what's in the extradition versus what the defendant actually

17   has to affirmatively admit factually.  I want to understand

18   sort of the interplay between the combined questions of law and

19   fact.

20        I will --

21        THE COURT:  Ms. Johnson, I think I'm tracking you.  So

22   your point there is, the government, having filed the complaint

23   making factual allegations of two -- participation in two

24   killings, that the defense can say, assume that to be true, and

25   we are invoking the political offense doctrine.

1          MR. ALLISON:  Correct, Your Honor.  Not only the

2     complaint, but also all the documents from the requesting

3     country.

4          THE COURT:  Okay.  And -- and then I believe the

5     defense's argument -- and there is, I think, some support for

6     this in Quinn, that further inquiry beyond the factual

7     allegations in the complaint would then implicate -- implicate

8     Mr. Ahmed's Fifth Amendment concerns.

9          MR. ALLISON:  Correct, Your Honor.

10          And Quinn also says that if the fugitive so chooses,

11     he or she can admit certain facts and certain membership to

12     help his position.  So if there is allegations in a complaint

13     that a particular group or a particular act is a political

14     offense, and in order -- because, again, Your Honor, let me

15     step back.  The political offense exception is also the

16     fugitive's burden.  So if in proving that at the extradition

17     hearing the fugitive wants to say absolutely, I was a part of

18     this group, this was our mission, this is what we were doing,

19     then that may assist that particular fugitive in proving to the

20     Court that the political offense exception applies.

21          But so far without further briefing it, Your Honor, my

22     understanding is under the language from 1986, that Ms. Johnson

23     could and Mr. Ahmed could both deny probable cause and

24     alternatively raise the political offense exception based on

25     the facts as charged and as brought in the extradition request.

1          THE COURT:  Mr. Allison, do you agree that this might

2    end up getting argued twice in the sense that it's been offered

3    now as relevant to the detention determination, but facts can

4    change and it can also arise in the context of the actual

5    extradition hearing?

6          MR. ALLISON:  I absolutely agree with Your Honor, and

7    this is why my proposal is you don't even have to reach this

8    particular point about the political offense exception, which

9    I'm going to move into, as far as what's going on with our

10   extradition packet right now.  I don't think you have to even

11   reach this issue for detention, Your Honor, because there's a

12   couple things in our extradition packet that show that

13   Mr. Ahmed has not met his burden of showing that he will be

14   highly -- that there's a high rate of success for him to argue

15   this at his extradition hearing.

16          The first thing, Your Honor, is he does -- to meet his

17   burden, he does have to provide something to Your Honor.  He

18   cannot rely on mere assurance that the crime had a political

19   purpose.  And there's cases that discuss that.  And one of

20   those is the same Antonowicz case I brought up earlier from the

21   Central District of California.

22          But more importantly, Your Honor, let's look at our

23   case so far:

24          First, there's no evidence in this extradition

25   complaint or the packet that this was a political offense.  I'm

1    not going to spend a lot of time on the political uprising in

2    Iraq because I think that's something that is going to take a

3    lot of expert knowledge that I'm not prepared to provide to

4    Your Honor.  I believe that's going to require some sort of an

5    expert at some point if that becomes an issue.  But I am going

6    to discuss the incident tied to the alleged insurgency.

7          First, Your Honor, there's nothing in this packet that

8    explains that Mr. Ahmed was -- if -- if he did commit these

9    offenses, committed these offenses under -- in a way that would

10   fall under the political offense exception.

11         We have a couple different facts raised in the packet:

12         The first one is, one witness says one of the murders,

13   he knew Mr. Ahmed as part of an armed group that targeted

14   police.  The United States would submit that that is not enough

15   for Mr. Ahmed to prove that if he committed these murders, they

16   were part of a political offense:  Killing police officers.

17         Another witness, Your Honor, says -- and this is the

18   cooperator -- says that the group was related to al-Qaeda.

19   And, Your Honor, we would submit that even that alone does not

20   meet the burden that this was a political offense tied to an

21   insurgency in a country.  Al-Qaeda is a terrorist organization,

22   and -- and I think it's important to point out, Your Honor,

23   that in Quinn v. Robinson, with all the stuff we're talking

24   about, there is one thing that is very thing clear in Quinn v.

25   Robinson, that this is not -- this exception is not meant to

1   house international or members of terrorist organizations.

2   That's a long discussion in that case.

3           And at best if Ms. Johnson tells you that because the

4   face of the extradition packet mentions that this killing --

5   this killing might have been related to al-Qaeda, the United

6   States doesn't believe that that has met Mr. Ahmed's burden

7   that this incident is tied to any insurgency going on in Iraq.

8           The most important fact, I think, Your Honor, that

9   I -- I would point you to as to why you can find, again, that

10  Mr. Ahmed has not met his burden at the detention stage of

11  showing he will be highly -- high -- high chance of success at

12  his extradition hearing is there's evidence in the extradition

13  packet that Mr. Ahmed and his coconspirators were paid for one

14  of these murders.  One of the witnesses talks about, in the

15  extradition packet, that the group received and split up 50,000

16  Iraqi Dinars after one of the murders.

17          Quinn clearly talks about that the reasoning behind

18  certain offenses is important, and I believe there's talk in

19  there about mercenaries, and mercenaries not being the type of

20  people that can fall under the political offense exception.

21  This is a fact in the extradition packet that has not been

22  rebutted.

23          So between the facts in the extradition packet, Your

24  Honor, that do not in the United States' view meet the

25  evidentiary standard on the face of the packet for showing that

1    these particular incidents were tied to a political insurgency,

2    we don't believe -- and I will say combined with Quinn's strong

3    language that this is not meant to protect terrorist acts --

4    the United States does not believe Mr. Ahmed has met his burden

5    on that special circumstance.

6         THE COURT:  Mr. Allison, let me ask you.  For one

7    thing, your argument, I believe, has been that the Court

8    doesn't even get to special circumstances if it finds that

9    Mr. Ahmed is a flight risk.  Do I understand that part of your

10   argument correctly?

11        MR. ALLISON:  Absolutely, Your Honor.

12        THE COURT:  Okay.  We had discussion last week about

13   the passport card.  Does the government have the passport card?

14        MR. ALLISON:  We do not.

15        THE COURT:  Ms. Johnson?

16        MS. JOHNSON:  Your Honor, Mr. Ahmed's wife has the

17   passport card.  It is here.

18        I apologize.  The reason that I believed that the

19   government had the card is because Mr. Ahmed had it on him when

20   he was arrested.

21        THE COURT:  Okay.

22        MS. JOHNSON:  So they did have it, but then they gave

23   it back to her.

24        THE COURT:  Okay.

25        MS. JOHNSON:  And she has brought it in.  It is

1    sitting right there.

2            THE COURT:  Okay.  That part is not my concern.

3    That's actually where we were last week when, I believe, the

4    reference was it was in court.

5            Right now, the record is there's a passport card and

6    the government doesn't have it.  If the parties take steps to

7    change that, then -- no, Ms. Johnson.  It's Mr. Allison's

8    time -- so we'll deal with that.

9            Mr. Allison, further -- Ms. Johnson?

10           Thanks.

11           Your papers for your memorandum on page 25, I believe,

12   makes a point that as of November 2006, that a cooperator had

13   identified Mr. Ahmed as potentially involved in these -- in

14   these matters, in these -- in these killings.

15           One point that Salerno makes in terms of inquiries

16   that can affect whether or not there should be pretrial release

17   is delay.  From November 2006 until January 2020 is -- is a

18   very, very long time.  Can you address that, please?

19           MR. ALLISON:  You're moving me through my outline,

20   Your Honor.

21           THE COURT:  Sorry.

22           MR. ALLISON:  I will move to that, which is the second

23   special circumstance that Ms. Johnson alleges, which is sort of

24   multiple theories for the delay and why that should result in

25   Mr. Ahmed being released.

1          For the issue Your Honor is talking about, the delay

2     from the time of the incident to the extradition packet being

3     received or the arrest of the fugitive or the extradition,

4     Ms. Johnson relies on the Wroclawski case out of this district

5     from 2009.  And in that case, Your Honor, the Court did, among

6     multiple issues that the Court decided were independent special

7     circumstances, this was one of them.  And in that case, the

8     Court talked about the fugitive was charged in 1994, and the

9     country, I believe, was Poland, did not seek extradition from

10    the United States until 2006.

11         The United States -- the United States sees this case

12    as different, and I can explain all the different reasons why.

13    But one of the reasons why is from the extradition packet.

14    Mr. Ahmed was charged in May of 2019.  Now, as Your Honor

15    points out, the crimes were believed to be committed back in

16    2006.  So what happened between 2000 -- or, I'm sorry -- yes,

17    2006 and 2019.  What happened?

18         Let me tell you a few things that happened.

19         First, a significant witness came forward in March of

20    2019 and identified Mr. Ahmed from recent social media

21    photographs.  That is on pages X -- and our base labels are

22    XNouri, and then a number.  So I will just cite to the number.

23    But that is on pages 38 and 75.

24         Your Honor, various plaintiffs came forward.  And

25    without getting into the Iraqi judicial system at this point,

1    which I'm not prepared to do, but you can see from the

2    extradition packet that various plaintiffs either related to or

3    bringing up the murders in that case, the victims in that case,

4    brought those to the Court in 2019 as well.  And that is on

5    page 60 in the packet.

6          There are various things in the packet that happened

7    in 2009.  In January of 2009 on page 99, the Fallujah Court

8    issued an arrest warrant for Mr. Ahmed which seems to show that

9    from at least from 2006 to 2009 there was an investigation

10   going on.

11         THE COURT:  I'm sorry, Mr. Allison.  Where is that in

12   your pleading?

13         MR. ALLISON:  Oh, I'm sorry.  That's on page 99, Your

14   Honor.

15         In January of 2099(sic), a separate witness came

16   forward with a statement, and that is on pages -- page 104.

17         Let me just check my notes, Your Honor.

18         There is one other witness, a third witness, that

19   seems to have provided a statement in February of 2019, and

20   that is on page 74.

21         And, Your Honor, there is -- when we talk about the

22   cooperator in this case, there are various things that the

23   cooperator appears to be doing since 2006.  I would agree with

24   Your Honor, and we put it in our filings, that as early as

25   November of 2006, the cooperator used Mr. Ahmed's name as

1   someone who was involved.  But a review of the extradition

2   packet shows that the cooperator gave multiple stories and

3   talked about this multiple times, and even gave a walk-through

4   of the scene at one point.  And those were all later in 2006.

5           So, Your Honor, the United States would submit that

6   there's enough in the face of this extradition request that

7   there was investigation going on.  This isn't something where

8   you can tell from the face of the extradition packet that

9   November 2006 Mr. Ahmed's name was dropped and we were -- and

10  the government of Iraq was ready to charge.

11          Again, this is Mr. Ahmed's burden, so it's his burden

12  to show that there was somehow some delay in the country

13  seeking the charges and -- and requesting extradition from the

14  United States.

15          Your Honor, this -- Ms. Johnson makes another argument

16  about delay, and this sort of came up last Friday.  Ms. Johnson

17  argues that a special circumstance is also that this

18  extradition hearing in front of Your Honor, these proceedings,

19  are going to take a long time and are very complicated.  She

20  cites to the Williams case.

21          I reviewed Williams, and I don't see any discussion of

22  this.  I see a mention that it's possible that delay can be a

23  special circumstance.

24          But more importantly, Your Honor, for that, Williams

25  cites to McNamara, which is a 1912 case from the Southern

1   District of New York.  And McNamara makes clear that what that

2   Court meant was when the complainant delays the proceeding; in

3   other words, the United States or the requesting country, once

4   the fugitive is in custody.  That is not happening here.

5           Your Honor asked last Friday whether the United States

6   would be ready to proceed in three months, and we would be

7   ready.  We can be ready to proceed as soon as Your Honor wants

8   to set the extradition hearing.  There is nothing that

9   Mr. Ahmed has put forth in this record that says the

10  complainant has delayed the proceedings since taking him into

11  custody.

12          I want to cite Your Honor to the Drumm case, which is

13  cited in our briefs on page -- in our initial brief on page 29,

14  which is a District of Massachusetts case from 2015.  It sort

15  of talks about both of these issues.  In Drumm, it's an Irish

16  bank fraud case, and the conduct occurred in 2009 and the

17  charges were sought in 2014.  So admittedly, a shorter time

18  period than we have here.  But in that case, the Court talked

19  about both of these issues raised by Ms. Johnson.

20          The first thing the Court said is, quote:  Not all

21  delays in prosecution show a lack of diplomatic necessity.  And

22  in that case, the Court found that between 2009 and 2014, the

23  country of Ireland had been engaging in things that was part of

24  their investigation to make sure they had their case put

25  together.  We would submit that even though the time period in

1    our case is longer between the offenses and -- and the charges

2    charged by the country of Iraq, that there's sufficient

3    evidence in the record that Iraq was continuing to put its

4    investigation together.

5         And I will just say, Your Honor, if you look at what

6    was going on in Iraq between 2006 and 2019, it's a little bit

7    different than Ireland.  If -- if Ireland had a five-year

8    delay, Iraq's government was in a series of changes at that

9    time.  And I -- I think that is worth something.  I don't have

10   anything in the record on that, but I would just proffer that

11   to Your Honor.

12        THE COURT:  Well, I don't know that I can take it on

13   just a proffered --

14        MR. ALLISON:  Okay.

15        THE COURT:   -- basis, but I -- I understand your --

16   the point you have raised distinguishing this case from the

17   discussion in Drumm.

18        MR. ALLISON:  And -- and, Your Honor, just finishing

19   my point up on Drumm, Drumm talked about the same things that

20   Ms. Johnson asked for last Friday, which is the need for the

21   fugitive to sort of have to kick this extradition hearing down

22   the road to do a full-scale investigation.  And Drumm talked

23   about that that's insufficient because that's, number one, not

24   appropriate in extradition, which we will get to; but number

25   two, that's not tied to one of the issues Your Honor has to

1    face at the extradition hearing, which is the existence of a

2    valid treaty, whether the crime that's charged is covered in

3    the treaty, and whether there's probable cause on the face of

4    the extradition packet that the defendant committed the crime.

5         THE COURT:  But doesn't the case law allow the

6    defense, if possible, to obliterate probable cause?  I believe

7    that's the word in the cases.

8         MR. ALLISON:  Yes, Your Honor.  And I was going to

9    talk about that more when I talk about danger because that is

10   sort of -- my understanding is that is sort of the way

11   Ms. Johnson has raised this idea that -- that she needs time to

12   do this.  But I -- I can address that now.

13        THE COURT:  That's all right.  You can follow your --

14   your outline.  That's fine.

15        MR. ALLISON:  I'm happy to talk about it too.  But we

16   have put some cases in our supplement, and I will -- I will get

17   back to that, Your Honor.

18        So the Drumm case is what we would submit to Your

19   Honor is the case to sort of look at as far as both issues that

20   she's raised.

21        Unless Your Honor has any additional questions on that

22   special circumstance, I'll turn to the third, and then I'll

23   turn it over briefly to my colleague, Ms. Sampson, for the

24   fourth special circumstance.

25        The third special circumstance is Ms. Johnson asks you

1    to find that because of Mr. Ahmed's historical work for the

2    U.S. military, that this is a special circumstance that would

3    allow for his release.

4         Your Honor, the single thing that Ms. Johnson attaches

5    for Mr. -- to meet Mr. Ahmed's burden is a single letter dated

6    February 2016 from a U.S. Marine Colonel, and in that letter he

7    says that Mr. Ahmed did work for a unit training exercise at 29

8    Palms, California.  Again, dated February 2016.

9         The United States doesn't dispute that Mr. Ahmed

10   participated in that training exercise at 29 Palms, but the

11   United States would submit that that does not rise to the level

12   of the Wroclawski case, which is cited by Ms. Johnson as a

13   basis for that special circumstance.

14        In that case, Your Honor, the fugitive had active --

15   first of all, he had numerous witnesses coming in and

16   testifying at the detention hearing about what he was doing to

17   help the military and law enforcement actively with

18   hand-to-hand combat techniques, things like that, because in

19   that case, the fugitive was some expert in Greco-Roman

20   wrestling.  In fact, the Court characterized the defendant's

21   work as specific and unequaled assistance.  And, Your Honor,

22   the United States would submit that the single letter provided

23   by Ms. Johnson is not enough to meet the burden of proving that

24   that February 2016 letter establishes a special circumstance.

25        So unless Your Honor has any questions about those

1    special circumstances, I will turn it over briefly to my
2    colleague, and then I'll talk to you in a few minutes.
3            MS. SAMPSON:  Good afternoon, Your Honor.
4            THE COURT:  Good afternoon.
5            MS. SAMPSON:  So I'm going to be addressing
6    specifically the COVID-related arguments as a special
7    circumstance.  And to give Your Honor a very brief roadmap of
8    how I intend to address this, I'm going to start with other
9    cases that have talked about COVID-19 not being a special
10   circumstance in the context of an extradition.
11           To the extent that the defense is arguing that
12   Mr. Ahmed's underlying health conditions are a special
13   circumstance, they cannot meet that heavy burden, even in light
14   of COVID.
15           Second thing that I intend to address is talking about
16   CoreCivic and the protocols and measures that they have
17   undertaken to mitigate the risk of infection and spread of
18   COVID-19, and also address some of Ms. Johnson's arguments from
19   both her memoranda and her arguments in court last week in that
20   regard.
21           As part of that argument, we will talk about
22   Mr. Ahmed's status in administrative segregation as it relates
23   to those arguments.
24           And -- and finally, Your Honor, and I will only spend
25   a couple of minutes on this, by analogy there are a number of

1    cases that have been decided in this district under the Bail

2    Reform Act, analyzing COVID-19 and what interplay that has in

3    the matter of detention.  The only reason I -- I raise that by

4    analogy is clearly in the shortened time period that we have

5    been dealing with COVID-19, there are some, but not a plethora,

6    of cases in the extradition context.

7           Okay.  So I'm going to start with the first argument

8    having to do with COVID-19 as a special circumstance, and it is

9    not here, Your Honor.  Other courts that are cited in our

10   supplemental brief have considered this exact argument and

11   rejected it in the extradition context.  And in those cases,

12   arguably the fugitives had much more serious risk factors and

13   additional risk factors than Mr. Ahmed.

14          I'll start with the Risner case briefly.  And I don't

15   want to just repeat everything in our memoranda.  But for

16   purposes of argument, that fugitive was 76 years old, there was

17   an entire list in the case of a multitude of different

18   underlying health conditions, including high blood pressure and

19   a history of prior heart surgery.  The Court found in that case

20   that while COVID had been identified in that facility, this

21   specific fugitive had not made any allegations that he had been

22   exposed.  And therefore, his general concern that he might get

23   COVID was not enough.

24          In this case, Mr. Ahmed is much younger than the

25   fugitive in Risner.  He does not have the multitude of

1    underlying health conditions, although he does have some.  And

2    as I'll discuss in more detail later, Mr. Ahmed is currently

3    housed in administrative segregation.  And according to the

4    declarations that we have provided, he has no physical contact

5    with other inmates and has had zero exposure to anyone who has

6    tested positive or been suspected of having COVID-19.

7              The next case --

8              THE COURT:  May -- you raise the Risner case.  If I

9    read Risner correctly, one of the things it says is in the

10   analysis of flight risk, that you -- that the Court should not

11   take COVID into account; that whether -- that it is a serious

12   public health issue, but it does not -- should not factor into

13   the analysis of flight risk.

14             Am I reading Risner correctly?

15             MS. SAMPSON:  Your Honor, that's my understanding as

16   well.  And my arguments right now address only whether this is

17   a special circumstance for the Court to consider.  This should

18   not -- this is a separate and distinct argument, which

19   Mr. Allison will address, regarding flight.

20             THE COURT:  I'm tracking you.  Okay.  Let's stay with

21   special circumstances in this.

22             MS. SAMPSON:  Okay.

23             All right.  Thank you.

24             And then Valentino, Your Honor, similarly I won't

25   spend a lot of time.  That fugitive was a 74-year-old with

UNITED STATES DISTRICT COURT

1    hypertension.  The Court similarly conducted an analysis and

2    found that the fugitive had not alleged or demonstrated any

3    deterioration of his condition while in custody, or that his

4    medical needs had not been met while in custody, and that

5    general arguments surrounding the pandemic without identifying

6    a specific risk to himself is not a special circumstance.

7         The same is true for Mr. Ahmed for many of the reasons

8    that I have already stated.  He is not able to articulate any

9    specified or individualized risks related to him.

10        For an underlying health condition to be considered a

11   special circumstance, Your Honor, as we have laid out in our

12   memo, the fugitive carries a heavy burden, and that is to show:

13   One, his condition is life-threatening or debilitating; two,

14   that his condition is deteriorating while in custody; and

15   three, that the facility in which he is housed cannot properly

16   care for his condition.

17        Mr. Ahmed has not only not argued any of these points,

18   he certainly cannot with the evidence in the record establish

19   his burden supporting any of these points.

20        There's no evidence in the record that his condition

21   is life-threatening, there's no evidence in the record that his

22   condition is deteriorating while in custody, and there's no

23   evidence in the record that the facility cannot properly care

24   for his condition.  In fact -- oh.  Go ahead, Your Honor.

25        THE COURT:  What do you understand his condition to

1     be?  Because I think that's a little bit in dispute.

2          MS. SAMPSON:  Your Honor, what is in the record is

3     that Mr. Ahmed underwent a heart valve replacement in 2010.

4     According to the couple of pages of records that have been

5     attached to the defense memoranda, he has been hospitalized for

6     pneumonia or alleged pneumonia, once in 2019 and once in 2018.

7          THE COURT:  Okay.  And so -- so does the -- I -- as I

8     understand the government's response to the supplement, the

9     government concedes he's in the higher risk category, but I'm

10    not really hearing an agreement from the government that

11    there's any particular condition that he suffers from.

12         MS. SAMPSON:  We have no reason to dispute -- I think

13    that's correct.  Let me -- let me just first answer your --

14    your point.

15         We do not disagree that the records indicate he had a

16    heart valve replacement 10 years ago.  We do not disagree that

17    the facility has identified him as high risk because of that

18    fact.

19         Having said that, we are unaware, and the record does

20    not support, that he is currently suffering any illness or

21    symptoms related to his underlying health conditions.  This is

22    more a history of his conditions that may place him at high

23    risk, not that he is currently suffering any illness.

24         In fact, the declarations that we have provided

25    attached to our memoranda have -- or memorandum supplementally

1   have talked about how his condition has actually not been an

2   issue:  His alleged visit to the cardiologist was a non-urgent

3   routine follow-up for somebody who previously underwent heart

4   valve replacement, and that's why that appointment was

5   canceled.  That alone does not establish any of the three

6   things that the defense would have to prove to argue that his

7   medical history somehow renders a certain special circumstance

8   in this case.

9          One important distinguish -- distinguishing factor,

10  too, that I want to draw, Your Honor, is that the defense

11  arguments about Mr. Ahmed's high-risk status has to do with

12  what happens if he contracts COVID-19.  There is nothing in the

13  record that shows that he is more susceptible somehow to

14  contracting the disease, simply by his medical history.  And I

15  think that that is an important distinction specifically in

16  light of the fact that he is currently on the high-risk status

17  for CCA, he is currently in administrative segregation, and

18  both of those things provide double layer assurances that he is

19  not even being exposed to COVID-19 at this point.  And in fact,

20  the declaration demonstrates that he has, in fact, not been

21  exposed to anybody with this disease.

22          THE COURT:  Ms. Sampson, the argument as I understand

23  and as you've stated is that Mr. Ahmed's medical history, in

24  your view, does not make him more likely to fall prey to COVID.

25  But the second argument is that the location of where he is,

1   which is CoreCivic, does make it more likely for him to

2   contract COVID.  And you're saying, based on your -- your

3   pleadings, that you disagree with that.

4           MS. SAMPSON:  I do.  And I'll address this more fully

5   when I talk about the protocols and the measures in place at

6   CCA or CAFCC, and I do want to address some of the arguments

7   Ms. Johnson made in that regard.  But that is correct

8   generally.

9           The final point I wanted to make on the COVID-19 case

10  law with respect to special circumstances in extradition

11  matters, there is one case that Ms. Johnson cited in her

12  original memorandum that she also discussed on the record last

13  week, so I do want to address it.  And that is the Manrique

14  case involving the 74-year-old former Peruvian president.

15          In that case, it is true that the Court found that his

16  age and the COVID-19 pandemic constituted a special

17  circumstance, and that that overrode his flight risk, and he

18  was, in fact, released.  But that case is clearly distinguished

19  from this case in a number of different ways.

20          Additionally, in light of the other cases we've cited,

21  that decision seems to be an outlier.

22          THE COURT:  In that case, wasn't there a substantial

23  bail package, as well?

24          MS. SAMPSON:  There was.

25          So, Your Honor, he was 74, much older than Mr. Ahmed.

1    It was never argued nor was it ever found that he was a danger,

2    only a flight risk.  That's distinguishable from this case.  He

3    was charged with financial crimes versus Mr. Ahmed, who is

4    charged with two murders.  And as Your Honor has pointed out,

5    there was a substantial bail package with sureties in place

6    that do not exist here.

7            So we believe that that decision is distinguished, and

8    the other cases that we have cited support our argument that

9    COVID-19 is not a special circumstance based on his health.

10           Finally -- actually, not finally -- this is my second

11   argument.

12           Regarding the protocols and the measures that CAFCC

13   has undertaken.  And again, there have been numerous assertions

14   Ms. Johnson has laid out, both in her memoranda as well in her

15   arguments and last week I would like to address.

16           She talks about the immutable characteristics of the

17   jail and prison setting rendering them unsafe, regardless of

18   compliance with CDC guidelines.  To support her argument, she

19   talks about a number of articles from other states, other

20   facilities, statistics that apply to federal inmates in

21   general.  Respectfully, Your Honor, I think that our discussion

22   should be reduced to the facility in which Mr. Ahmed is

23   currently housed.  That is really the only relevant data or

24   information for this Court's ruling here today.

25           She cites a greater than 3 percent positive COVID rate

1     among federal inmates, yet at CAFCC that number is less

2     than .5 percent.  So a stark and drastic difference.

3            As other courts in this district have noted, there are

4     no circumstances, protocols, or measures that can guarantee

5     that COVID is not going to spread, but certainly adequate and

6     reasonable measures have been put in place to try to mitigate

7     that spread.  And despite the fact that there are positive

8     cases in CAFCC, in light of the fact that we have been dealing

9     with this pandemic for months now, they've actually -- these

10    measures have worked, and they've actually done a good job at

11    slowing the spread of this disease.

12           With respect to Mr. Ahmed, again, I can't repeat this

13    enough.  The fact that he is in administrative segregation

14    means that he is not exposed.  So even our general discussions

15    about detainees in the facility to some extent do not apply to

16    Mr. Ahmed because he is situated entirely differently.

17           One argument Ms. Johnson made regarding the

18    characteristics of the jail and specific to CAFCC is that

19    inmates are constantly cycled in and out of the facility at a

20    rapid rate.

21           As the Court can see from our declarations, that's

22    simply inaccurate.  All social visits have been canceled; all

23    transport has been canceled to and from court; all transports

24    for non-emergency medical appointments have been canceled.  And

25    to the extent that any emergency appointments are undertaken,

1    the inmates are put back through the initial screening process

2    as if they were coming in for the first time.

3            Extensive measures have been taken to reduce the

4    population and have, in fact, reduced the population at CAFCC,

5    and they are currently operating at a 62 percent capacity which

6    has allowed for the social distancing that is required and that

7    they have strongly recommended and urged within their facility.

8            Where CAFCC used to have a 100 inmates come in, arrive

9    at the facility on a daily basis, that number is down to an

10   average of five.  That significant reduction alone, and the

11   allowance for social distancing, means that this particular

12   facility is able to comply with CDC guidance provided for

13   corrections and detention facilities.

14           When Ms. Johnson argues in her memorandum that social

15   distancing is not possible and a declaration is submitted by

16   Dr. Goldenson -- I believe the declarations that we've provided

17   actually address Dr. Goldenson's argument, so I won't go into

18   each one of them since they are in the record.  But it is clear

19   that Dr. Goldenson has not visited the facility and is citing

20   protocols and measures that should be taking place that are, in

21   fact, taking place at CAFCC.  Any allegations that he raises

22   that the facility is not following those measures seem to only

23   be supported by inmate complaints in the context of a civil

24   lawsuit and not by any data that he has derived directly from

25   the facility itself.

1          Again, that declaration from Dr. Goldenson doesn't

2    address the fact that Mr. Ahmed is in segregation.  So let's

3    talk a little bit more about that.

4          It means he has his own cell, he is not housed with

5    anybody else; he has his own toilet, he has his own sink, he

6    has his own shower.  He does meals by himself; he engages in

7    recreation by himself.  He is completely isolated and

8    segregated from all other inmates at all times.

9          Another thing that I've all -- already touched on

10   briefly is the allegation that once COVID hits the jail

11   setting, it spreads quickly.  Again, while it is true that it

12   can spread quickly in any context, CAFCC has taken adequate

13   measures to try to reduce that.  They are set forth in detail,

14   especially in Warden Kline's declaration, that talks about the

15   quarantining and the cohorting methods that are taken before

16   anybody is released to general population, so that in the event

17   anybody is exhibiting symptoms or anybody is testing positive,

18   that group of inmates are being kept with one another and not

19   being released into general population until there is not one

20   person who is exhibiting a symptom or has tested positive for a

21   certain specified period of time.

22         And that's crucial if we're talking about the general

23   inmate population at CAFCC.  But again, I reiterate, that does

24   not apply to Mr. Ahmed because he is not housed there.

25         Your Honor, lastly I just want to mention a couple of

**UNITED STATES DISTRICT COURT**

the cases we cited and that we included as an exhibit to the detention memorandum on local district cases addressing the Bail Reform Act.  And again, understanding that the Bail Reform Act does not apply in the extradition context, by analogy the fact that the District Court here has addressed the current pandemic in the context of detention -- I think by analogy is important -- and I wanted to just raise a couple of points from those cases.  I won't spend much time on them.  I know Mr. Allison has more to cover.

Judge Tuchi specifically in the Caddo case talked about the specific protocols and measures that had been undertaken by CCA to mitigate any risk of the infection and spreading of the infection.  In fact, Judge Tuchi did not see to be impressed at the time that there has been no cases at the -- at the point when he issued his order.  He was more concerned about process and more impressed with the fact that the processes were in place, such that, consistent with other Court findings, inmates and CCA may very well be as safe if not safer than they would be in a halfway house or in the community in general, particularly now as Arizona today lifts its stay-at-home order.

Mr. Ahmed has not presented any evidence to this Court to show that he would actually be safer out of custody than he is in administrative segregation at this point.

Judge Rayes similarly denied release.  And what's

1    important about that decision is that that was -- while the

2    case involving Judge Tuchi had alleged she had underlying

3    medical conditions, Judge Rayes actually acknowledged in the

4    Bachler -- Bachler case, sorry -- that that defendant did have

5    underlying health conditions, including asthma, chronic asthma,

6    bronchitis, recurring pneumonia.  Nevertheless, Judge Rayes

7    found that while certainly he's at -- at risk if exposed to

8    COVID-19, the protocols and measures in place at CCA certainly

9    mitigate any such risks.

10           Finally, I'm going to address Judge Soto's opinion in

11   Tucson in the Enos case.  I will note that that's one of the

12   defendants that's actually a party to the civil lawsuit

13   identified in Ms. Johnson's supplemental memorandum.

14           Judge Soto also denied Mr. Enos' motion for release.

15   That was another individual with high-risk factors, including

16   hypertension, asthma, morbid obesity.

17           Judge Soto again focused on the measures that CCA had

18   in place and called them comparable, if not superior, to those

19   that are in place outside of the detention setting.  Judge Soto

20   found that the defendant was unable to show that CCA could not

21   deal with his medical needs or that they couldn't treat him,

22   quite frankly, if infected with the disease.

23           Another noteworthy comment in that order is the fact

24   that releasing the defendant would also place other entities

25   potentially at risk, not the least of which would be Pretrial

1    Services if they had to set up location monitoring or GPS

2    monitoring for the defendant.

3        Your Honor, there are a couple of other cases from

4    other judges we also cited.  I won't go into any of them in

5    detail.

6        At the end of the day, the argument on the analysis in

7    that case was recognizing COVID is an issue, recognizing that

8    certain defendants may be at high risk, that does not answer

9    the question.  There is more to be determined.  And those

10   factors still have to be weighed against the individual risks

11   that the defendants present to the community in terms of their

12   flight risk and in terms of their danger.  That was the

13   analysis that was conducted in each of those cases.

14       Similarly here where the defendant, the fugitive,

15   Mr. Ahmed, carries a very heavy burden, the special

16   circumstance doesn't answer the question here.

17       So in sum, we don't believe that COVID is a special

18   circumstance to be considered.  Even if it was, it does not

19   change the other circumstances in this case, or his flight risk

20   or danger.

21       THE COURT:  So your argument is that COVID generally

22   does not qualify as a special circumstance; is that correct?

23       MS. SAMPSON:  COVID generally does not apply, but one

24   step further.  It does not apply even with his underlying

25   health conditions.  Taking both of those arguments together, it

1   still is not a special circumstance because he has not met his

2   burden to show that he is currently in immediate danger, or

3   that the facility cannot take care of his medical needs.

4           THE COURT:  If he were to test positive for COVID?

5           MS. SAMPSON:  No, to contract the disease.  Certainly

6   nobody can anticipate once somebody gets the disease what is

7   going to happen to them.  Everybody looking at statistics can

8   talk about those who are more at risk for being severely ill

9   from the disease.  He's been placed in that category, at least

10  by CAFCC definition, to put additional protections in place to

11  make sure that he's not exposed.  That's in addition to his

12  segregation status.  But my argument is that those -- those

13  things, unless he can show that he is in immediate danger, that

14  his health is in immediate danger, which he has not shown, it

15  should not be a special circumstance in this case.

16          THE COURT:  All right.  Thank you.

17          MS. SAMPSON:  Thank you.

18          I'll turn it back over to Mr. Allison.

19          MR. ALLISON:  Your Honor, I -- I'm going to go back to

20  your question when I was up here earlier about the obliteration

21  of probable cause.  I steered away from that question, and I

22  think you brought it up at the right time.  So I apologize for

23  trying to -- to punt that.  I think I said it had to do with

24  another part of Ms. Johnson's argument, but I do think it is

25  most relevant to her argument that there is a special

1    circumstance from the delay that she says is going to be needed

2    in this proceeding.  So let me just touch on that briefly and

3    then I'll move to the danger-of-flight-risk analysis.

4         Your Honor, as we've submitted in our supplement

5    yesterday on pages, I believe, 12 through 14, we wholeheartedly

6    agree with Your Honor that the evidence Ms. Johnson can bring

7    up at the extradition hearing is either limited to evidence

8    that can explain away the probable cause in the packet in the

9    evidence submitted by the requesting country, or completely

10   obliterate probable cause.

11        The case law -- and we've cited a number of cases, and

12   there's more as well, but the cases we've cited in our

13   supplement are Charlton, Santos, and Mainero, M-A-I-N-E-R-O.

14        As we've written in our supplement, we don't believe

15   there's any room for evidence that goes to credibility, we

16   don't believe there's any room for putting on a mini trial on

17   the merits.  We believe the evidence that -- that can be put

18   forth by Mr. Ahmed at -- at the extradition hearing is limited

19   to those -- to those exceptions.

20        And so we would incorporate that in my statements

21   earlier, which is there's really no need for this extended

22   extradition proceeding that Ms. Johnson has asked for and used

23   to -- to support her argument for a special circumstance.

24        THE COURT:  At a scheduled extradition hearing, would

25   the government be proceeding with live witnesses or would the

1    government rely on proffer and the exhibits already in the

2    record?

3         MR. ALLISON:  I hesitate to answer that definitively,

4    Your Honor.  I can see either.

5         THE COURT:  Okay.

6         MR. ALLISON:  And I can get back to Your Honor, but I

7    just don't want to lock us in at this point on that -- an

8    answer.

9         So -- so let's -- let's switch gears here.  Let's talk

10   about -- we've discussed all these special circumstances, and

11   then we've talked about how we disagree with Ms. Johnson on all

12   of them.

13        But even if you find one, even if you find that

14   Mr. Ahmed has met his burden on one of them, he still should be

15   detained because we believe that he has not -- he's also not

16   met his significant burden on showing he's not a danger to the

17   community or a flight risk.

18        And I'll start with just noting -- again, this is

19   different than a lot of cases.  The Bail Reform Act is not

20   applicable here.  But Pretrial Services has advised you that

21   they believe he's both a danger and a flight risk, and that was

22   filed in both the original filing by Pretrial Services as well

23   as the supplement.

24        And I think that's helpful because when we talk about

25   danger and flight risk, although the Bail Reform Act doesn't

1    apply, we can certainly look at the factors that are used in

2    that analysis when we talk about whether Mr. Ahmed has met his

3    burden.  And so I'm going to talk about some of those factors,

4    Your Honor.

5         Let's start with danger.

6         The United States agrees with Ms. Johnson that since

7    Mr. Ahmed has been in the United States, he has no arrests or

8    convictions.  However, we don't agree that he has no criminal

9    history.  As we've stated in our memo, it is pretty clear,

10   based on Mr. Ahmed's own admissions, that he has spent time in

11   prison.  He's spent time in a Syrian prison.  He's told law

12   enforcement that numerous time.  And we don't know why.  We

13   know what Mr. Ahmed has told law enforcement for the reason

14   he's been in prison, but we don't know for sure why he was in

15   prison.  And we see that as criminal history that Your Honor

16   can take into account.

17        THE COURT:  Mr. Allison, let me see if I understand.

18        You want to label as criminal history activities that

19   you're not sure what they were but that they resulted in

20   imprisonment in Syria in 2009?

21        MR. ALLISON:  I think that's correct, Your Honor.  I

22   think we can argue that Mr. Ahmed has some level of criminal

23   history.

24        If you disagree, respectfully, that's --

25        THE COURT:  Well, I thought your argument was that

1  there were inconsistencies in his statements about his history,

2  and that that was a relevant consideration.  Are you -- is that

3  an argument you're making?

4         MR. ALLISON:  That is an argument, Your Honor, and

5  I'll address that because I don't want to punt from your

6  questions.

7         I see that more as a flight risk argument.  But as

8  we've said in our filings, we believe we have provided Your

9  Honor with evidence that Mr. Ahmed has lied about his time in

10  Syrian prison, and the reason we think that is relevant is

11  because it goes to flight risk.  I think that that shows that

12  Mr. Ahmed has already established a history of lying under

13  oath, I think that establishes that Mr. Ahmed has already

14  established a history of lying to the government when he was

15  trying to come to the United States.  And so I think that goes

16  to his -- to the factors of flight risk, which is he's already

17  shown that he's willing to lie to get where he needs to be.

18  And this lie, Your Honor, in my view, is more important than

19  the other lies that the government would submit to Your Honor,

20  which is -- at this stage, because we believe he's also lied

21  about his involvement in violent conduct in the past.  But we

22  understand that's under dispute, and that's the purpose of this

23  extradition hearing.  And so if Your Honor wants to discount

24  those lies about whether he's been involved in violent activity

25  in the past, so be it.

1           But Mr. Ahmed has admitted to one lie, and we believe

2      this lie is significant because more than likely if Mr. Ahmed

3      had been truthful about his time in prison, he may have not

4      been able to flee the country that he is now facing having to

5      go back to.

6           So I would submit that the prison -- the time in

7      Syrian prison, because Mr. Ahmed has admitted it, goes to both

8      danger and flight risk, but I definitely think it goes to

9      flight risk.

10          THE COURT:  And you agree with Ms. Johnson that -- I

11     believe you do, but let's get it on the record -- that

12     Mr. Ahmed has been aware of at least some level of law

13     enforcement investigation into him since approximately

14     October 2017?

15          MR. ALLISON:  I -- I want to talk about that one a

16     little bit, Your Honor.

17          I agree that since approximately October '17, maybe

18     even before -- I believe we've submitted a -- one of the

19     reports that we submitted, Your Honor, under seal goes back

20     maybe to July of 2017, that Mr. Ahmed has had numerous

21     encounters with law enforcement where various topics have come

22     up.  And some of those topics have been whether he's ever been

23     involved with any terrorist organizations.

24          However, I think it's a bit of a stretch to say that

25     this supports that he is not a flight risk because he clearly

1    has not known the extent of what he is facing when he's been

2    talking to law enforcement.

3         Law enforcement has gone and spoken to Mr. Ahmed on

4    numerous occasions.  And Ms. Johnson's correct:  Mr. Ahmed has

5    spoken with law enforcement when they've approached him, and he

6    didn't have to do that.

7         But, Your Honor, the -- the key here -- and I'm going

8    to cite a case here in a minute for you -- but the key here is

9    that a lot has changed.  A lot has changed since he was meeting

10   with law enforcement and now.  Now he's aware that there's a

11   country that's criminally charged him, and now he's aware that

12   he's in extradition proceedings.  And now he's likely aware at

13   the process and what is going to occur over the next couple of

14   months.

15        And, Your Honor, before when FBI and Customs & Border

16   Protection at the port were talking to Mr. Ahmed, there's no

17   indication that law enforcement said to Mr. Ahmed:  This is

18   what we know about what you've done.  We know details about a

19   June 2006 murder.  We know details about an October 2006

20   murder.  We have received information from the country of Iraq

21   that there's four witnesses who have provided sworn statements

22   that you were involved.

23        That's what's changed.

24        So I -- I would submit, Your Honor, that that has not

25   reached the level of establishing a flight risk.  And the case

1    that I will cite to you is -- well, a couple different cases.

2    The first one is actually the Manrique Toledo case that we've

3    been talking about in terms of -- of COVID, and that case

4    actually talks about a lot has changed.  In that case, the

5    president of Peru was aware of the charges, but the Court

6    says -- and remember, in Manrique, even though they found COVID

7    to be special circumstances, the Court did find the fugitive to

8    be a flight risk.  And part of that analysis was saying, yeah,

9    he knew about what was going on in Peru, but a lot has changed

10   now because now he's been charged.

11          The other case I would cite to Your Honor is cited in

12   our briefs is the Martinelli Berrocal case from the Southern

13   District of Florida, 2017.

14          So if I might, going back to danger, let's -- let's

15   move on past criminal history then, and let's move to the

16   nature and circumstances of the offense and the weight of the

17   evidence.

18          Your Honor, I would submit that under both these

19   factors, Mr. Ahmed is a danger to the community.  The first is

20   the nature of the offense as outlined in the extradition

21   packet.  We can tell from the extradition packet that Mr. Ahmed

22   has been charged, albeit from 2006, but has been charged with

23   two different murders of Iraqi police officers.  We can tell at

24   least from -- that one of the witnesses in that packet, that

25   those were premeditated murders, that those were planned, that

1    surveillance was conducted, and Mr. Ahmed was actually involved

2    in that premeditation, according to that -- that witness

3    statement.

4            There's evidence that this might have been tied to a

5    terrorist organization, al-Qaeda.  And I'll cite for you the

6    Leitner case from the Second Circuit from 1986 which talks

7    about the importance of terrorism cases and the need to deny

8    bail specifically.  Now, Mr. Ahmed has been charged with these

9    two murders, but I think it -- I think it is still an

10   applicable case.

11           And I think also, Your Honor, according to the

12   extradition packet, the facts provided, Mr. Ahmed's alleged

13   participation is important.  When you read the stories provided

14   by those witnesses, he played a role.  He played a significant

15   role.  At least in the October 2006 incident, there's a witness

16   who testifies on page 75 that he was the one that got out of

17   the car and fired a few additional shots into the victim after

18   they had -- the group had already fired at the victim.

19           And there's also talk that it wasn't just these two

20   officers that were killed, there were innocent bystanders

21   killed in those incidents as well, which I think goes to

22   danger.  And that's on page 80 of the extradition packet.

23           And when we talk about Mr. Ahmed's involvement

24   according to the facts in the extradition packet, there's talk

25   that they met at his family's carpenter shop to discuss one of

1    these murders.  And that's on -- I'll have to get you the page

2    cite for that, Your Honor, but that -- there is talk by the

3    cooperator in one of his reports, one of his statements, that

4    they met at Mr. Ahmed's shop to premeditate one of these

5    murders.

6        THE COURT:  Mr. Allison, the complaint makes reference

7    to charges for the murder of police officers.  Have -- it does

8    not appear to the Court that one -- that a basis for the

9    request for extradition is the death of any civilians.

10       Am I correct in reading that?

11       MR. ALLISON:  I think -- I think that's correct for

12   the charged crimes, Your Honor.  I would just add that the

13   facts go to the danger analysis.

14       Lastly on the danger analysis, Your Honor, again, kind

15   of a theme here today, although the Bail Reform Act doesn't

16   apply, as we pointed out in our briefs, I think it's important

17   that if this were a Bail Reform Act case, there's likely a

18   presumption based on the charges that Mr. Ahmed could have

19   faced for this type of conduct, if it had been committed in the

20   United States or, frankly, if it had been charged in the United

21   States.

22       That's the nature of the offense, Your Honor.  I'd

23   like to move to the weight of the evidence.

24       Now, Ms. Johnson on Friday told you you should

25   discount everything.  And I think that was brought up in the

1    danger context.  She said:  Given the state of affairs in Iraq,

2    Your Honor should discount all the evidence for purposes of

3    this detention analysis and disregard the evidence for the

4    danger finding.  I believe that -- that was her argument.

5         I would like to start with why we disagree with that.

6         The first reason is, the rule of non-inquiry, which is

7    cited in our detention memo that we filed back at the end of

8    March.  The rule of non-inquiry is based on the principle that

9    this Court is not ever going to have to face the issue of

10   diving into the issues of what's going on in the requesting

11   country's judicial system.  That's an analysis for the

12   Department of State.

13        Extradition is a two-part process.  Your Honor looks

14   at the -- the valid treaty, whether this crime is under a

15   treaty -- under a valid treaty, and the probable cause

16   analysis.  Your Honor is not in the business under the case law

17   of analyzing the civil rights or the system of the requesting

18   country.  That's the Department of State, if Your Honor was to

19   certify the extradition.

20        All of the things that Ms. Johnson brought up in the

21   first few minutes of her argument on Friday pertain to the

22   country of Iraq.  And, Your Honor, we would propose that at

23   least for the detention analysis, if not for the extradition

24   hearing, none of that is relevant.  And I will cite a case,

25   Prasoprat v. Benov, a Ninth Circuit case from 2005.  In that

1  case, it was a U.S. citizen --

2      THE COURT:  Is that cite already in your papers?

3      MR. ALLISON:  Yes, it is, Your Honor.

4      In that -- in that case, there was a U.S. citizen

5  facing extradition for drug crimes to Thailand.  And they

6  wanted to do a bunch of discovery on how he would be treated if

7  he was sent over there facing drug crimes if he was sent to

8  Thailand.  And the Court said:  The extradition magistrate's

9  authority has been constrained by statute and case law to a

10  narrow inquiry such that the magistrate does not have any

11  discretion to exercise.  Once the magistrate judge determines

12  that the crime is extraditable and there is probable cause to

13  sustain -- sustain the charge, it is the Secretary of State

14  representing the executive branch who determines whether to

15  surrender the fugi -- fugitive.

16      And they specifically take about some of the

17  humanitarian grounds that Ms. Johnson raised on Friday that she

18  says is a reason you should discount the danger analysis, the

19  evidence in the packet for the danger analysis.

20      Your Honor, more importantly, Mr. Ahmed has not met

21  his burden on showing he's not a danger to the community,

22  because there are four different sworn statements in the

23  extradition packet.  Ms. Johnson argued that this corruption in

24  Iraq can -- all the different things that are wrong with the

25  judicial system, and hinted that you shouldn't look at any of

1    the evidence in there in determining danger.  There's four

2    individual witnesses who have provided statements in this case

3    that accuse Mr. Ahmed of these murders, and the government

4    thinks that is important.

5            Additionally, as we've discussed in our memo, we think

6    Mr. Ahmed has corroborated parts of this.  We think, as I've

7    mentioned earlier, that there will not be a way to have an

8    alibi defense brought up, given that he said he was in the

9    country at the time of these murders, that he said he was in

10   Fallujah pretty much on the day the murder in October was

11   committed.  And more importantly, Your Honor, as we've gone

12   into detail in our memo, he sort of talked about being there,

13   in a way.  He's provided a story of how he was shot that is

14   very similar to some of the facts in the extradition packet

15   before anyone even had the extradition packet.  He's provided

16   statements to various law enforcement about how he was shot

17   that seems similar.  There's a similar location.  He was -- he

18   said he was shot on Street 40 in Fallujah.  That matches the

19   extradition packet.  He said he was sitting outside a market

20   when he -- when he was shot by a group of armed men that pulled

21   up in a car.  That somewhat matches the statements in the

22   extradition packet.

23           He talks about the date.  In fact, we provided Your

24   Honor with the sealed -- and Ms. Johnson with the sealed video

25   recorded interview of Mr. Ahmed back on January 30th.  And in

1    that interview, he talks about the date he was shot.  And I

2    believe it was right around the beginning of October 2006.

3            THE COURT:  It's Mr. Ahmed's theory though, in his

4    version, that he was defending himself against violent acts

5    rather than initiating violent acts.

6            MR. ALLISON:  That's correct.  He says he was the

7    victim rather than being involved in the offense.

8            I only bring it up, Your Honor, because I think it

9    goes to the weight of the evidence.  It -- it's at least going

10    to discount any sort of alibi defense, and it at least puts him

11    there at the location that these witnesses say that he was at

12    the time they say he was.

13            Your Honor, with that I will move to flight risk and

14    discuss that briefly, and then I will be done, unless Your

15    Honor has any questions.

16            In addition to danger, the government would submit

17    that Mr. Ahmed has not met his burden of proving to you that he

18    is not a flight risk.  And the first thing I will bring is what

19    we've already talked about here today, which are the -- his

20    prior representations about being in a Syrian prison and

21    getting immigration status and coming to the United States.

22            As we said in our memo, Your Honor, we would submit

23    that that evidence is a historical -- that evidence is

24    Mr. Ahmed's historical pattern of -- of fleeing law enforcement

25    and fleeing the country to get away from that.  He crossed over

1    into Syria in January 2007.  The -- this second offense was

2    committed in October 2006.  He applied to become a refugee to

3    get out of that part of the world.  He lied on his U.S.

4    immigration paperwork about being -- at least about being in a

5    Syrian prison, which he's later admitted.  And so we think he's

6    already shown Your Honor that he's willing to do what it takes

7    to get away from what he needs to get away from.

8         THE COURT:  Would you agree with Ms. Johnson's

9    statement -- I think in court, but definitely in her

10   pleadings -- that Mr. Ahmed did not choose the United States as

11   the country to which he would be sent by the refugee -- refugee

12   organization?

13        MR. ALLISON:  I have no reason to dispute that right

14   now, Your Honor.  Yes.

15        THE COURT:  But your point is, whatever country he was

16   going to, that there's a -- there's a significance to the lies,

17   in your view, as to whether or not he was in a Syrian prison.

18        MR. ALLISON:  I think so, Your Honor, because that's

19   the lie -- the other lies we would argue to Your Honor that he

20   made are about being tied to a terrorist organization or a

21   violent act.  These are clearly lies based on the act -- or the

22   crime charged, and that's disputed between the two parties.

23        The reason I keep going back to the Syrian prison is

24   that's something Mr. Ahmed admits -- admits on multiple

25   occasions, that he has been in a Syrian prison.  That's clearly

1    something we can establish as a lie, based on his admissions.

2            THE COURT:  All right.

3            MR. ALLISON:  I'll turn to travel and Mr. Ahmed's ties

4    with family and otherwise around the world.

5            First, Your Honor, we think it's important for a

6    flight risk analysis that he has family in multiple countries

7    around the world.  He has family in Austria, Turkey, Ukraine,

8    and Iraq, which Ms. Johnson has said there's no way he will go

9    back to.  But he does still have family in various countries

10   around the world.

11           He has shown that since he's been in the United

12   States, he can travel internationally.  He traveled

13   internationally, I believe, to Ukraine in 2009 and then to

14   Turkey in 2017.  He has family that according to his interviews

15   with law enforcement, he said in his 2017 trip he met with

16   family in Turkey, and family came from Iraq or Syria and other

17   countries to meet him there.  He has family that's willing and

18   able to travel, at least at that point.

19           We believe that there's evidence in the record that he

20   has family that would be able to help him travel.  A couple of

21   the witnesses Ms. Johnson brought up last Friday that -- one of

22   the witnesses said, I believe, that he thought Mr. Ahmed's

23   financial condition was good.  When asked by Mr. Pimsner if he

24   was wealthy, I believe the answer was:  It's good.

25           One of the witnesses talked about that his brother in

1    Iraq, when the witness went over to Iraq and was talking about

2    getting the dental implants to bring back to Mr. Ahmed, that

3    witness, I believe I read in the transcript, said that his

4    brother's office was in a high-class neighborhood Iraq.

5         We don't think Mr. Ahmed has established and met his

6    burden that he wouldn't be able to find the assets to travel

7    if -- if he had an ability to do -- or if he had an opportunity

8    to do so.

9         And I want to talk about two more things on the travel

10   front, Your Honor.  The first one is the Risner case you asked

11   Ms. Sampson about.

12        The United States would agree with you that Risner

13   establishes that COVID-19 is not enough to meet the burden of

14   proving that Mr. Ahmed wouldn't be a flight risk.  In that

15   case, the Court specifically talks about he can still travel

16   domestically, he can still somewhat travel internationally.

17   You know, in that case they talk about that -- that he had not

18   met his burden of showing he could not flee in any way possible

19   if he was released.

20        And, Your Honor, I want to move to the talk about

21   traveling to Mexico and the passport card.

22        We have put in our filing that we don't have the

23   passport card.  It appears that Ms. Johnson is willing to

24   provide the government the passport card.

25        The United States would submit that that still would

1    not stop Mr. Ahmed from driving into Mexico, even right now,

2    with all the travel restrictions.  The border is not shut down.

3    You don't need identification to travel into Mexico.  The

4    passport card is a way for Mr. Ahmed to get back in the United

5    States, if he didn't have his passport.  So that -- although

6    that's significant, we don't think it ends the analysis if

7    Mr. Ahmed provides the passport card here today or in the near

8    future.

9         And also more importantly, Your Honor, as detailed in

10   his travel history, as we provided to Your Honor, he's familiar

11   with Mexico.  He's been there numerous times in the past few

12   years.  He's traveled back and forth, as indicated in that

13   travel history.  He knows how to do that.  We would submit that

14   that is evidence of potential flight that goes to him not being

15   able to meet his burden that he couldn't flee if he wanted to.

16        My last point, Your Honor, is that Mr. Ahmed has

17   already made it clear to you that he has an incentive to flee.

18   He has told you, through Ms. Johnson's filings, as well as in

19   court on Friday, that he believes he cannot go back to Iraq

20   because he will be killed.  I think that's said in both his

21   filing, as well as Ms. Johnson's statement on Friday.  And

22   whether or not that particular statement is accurate, what it

23   does show you is that's his belief.  He believes he cannot go

24   back or he will be killed.  And, Your Honor, that heavily

25   weighs in favor of finding that he has the incentive to flee.

1          I want to talk to you about a couple cases that I can

2    cite you to that talk about this particular fact as -- as

3    weighing heavily in favor of -- of flight risk.  The first is

4    the Martinelli Berrocal case, Southern District of Florida,

5    2017.  It is cited in our briefs, I think for a different

6    purpose.  But that had to do with the former president of

7    Panama facing a 21-year sentence on an extradition back to

8    Panama.

9          I want to read you a quote from that case.  The Court

10   found:  The defendant believes that the judicial sentence --

11   I'm sorry -- the judicial proceeding in Panama is a witch hunt

12   initiated by his political adversaries.  He questions the

13   possibility of a fair trial in Panama.  He certainly denies the

14   factual basis of the charges.  The difficulty the Court faces

15   is that these strongly held beliefs may also prove to be

16   tempting rationales to avoid prosecution altogether, regardless

17   of the cost to him and his family.

18          Your Honor, I think that's an important quote and

19   applicable to what Ms. Johnson has been here arguing.  I can

20   cite you to a couple more cases on -- on this particular issue.

21   The first one is called the Beresford-Redman case from the --

22          THE COURT:  Is that in your papers?

23          MR. ALLISON:  I believe so, Your Honor.

24          THE COURT:  Well, tell you what.  Just go ahead and

25   give me the cite.

1          MR. ALLISON:  It is, Your Honor.

2     Your Honor, the cite is 753 F. Supp. 2d 1078.

3          Another case is the Patel case, which is also cited in

4     our pleadings, from the District of Oregon.  And that citation

5     is 2008 WL 941628.  Again, that case was about the defendant

6     not believing he would get a fair trial based on the

7     motivations of the requesting country for manslaughter charges.

8          The Drumm case from Massachusetts that we've already

9     talked about today, that also talks about the incentive to flee

10    from not thinking that the fugitive is going to get a fair

11    trial.

12         And the last one, Your Honor, is cited in our

13    supplement that we filed yesterday but not cited in our

14    briefing.  So let me just pull the cite here for you.

15         It is the Garcia case from the Southern District of

16    Texas.  761 F. Supp. 2d 468.  And again, this one was about a

17    naturalized U.S. citizen facing extradition to Mexico for

18    homicide, and he argued that he wasn't going to get a fair

19    trial; in fact, he could be killed by the Mexican authorities

20    because he had been an informant.  And the fugitive there was

21    worried about getting fair treatment in Mexico.  And the

22    government -- the Court talked about this desire to avoid

23    prosecution in this country and the fear of it gives this

24    fugitive -- I think it says gives him -- a strong reason to

25    flee to avoid the extradition.

1           THE COURT:  Ms. Johnson, give me -- give me one

2     second.

3               (Discussion was had off the record.)

4           THE COURT:  I just want to check how long the

5     interpreter can go before we need a break.  Are you all right,

6     or would you like a break now, or how are we doing?

7           THE INTERPRETER:  I'm fine.

8           THE COURT:  It's hard to hear you.

9           THE INTERPRETER:  Your Honor, I'm fine.  We can go.

10          THE COURT:  Okay.  Then as long as the parties are

11    okay, let's continue.

12          MR. ALLISON:  Sure, Your Honor.  And I can make this

13    easy.

14          Unless the Court has any questions on anything I've

15    said, it's for all the reasons that me and Ms. Sampson have

16    talked about that we believe that Mr. Ahmed has not met his

17    burdens to show either a special circumstance that is

18    sufficient, as well as that he is not a danger to the community

19    or a flight risk.  And it is his burden, and we do to the

20    believe he's met it.

21          THE COURT:  Thank you.

22          Ms. Johnson?

23          MS. JOHNSON:  Yes, Your Honor.

24          May I have a moment to retrieve my client's passport

25    card?

1          THE COURT:  Sure.

2                    (Pause in proceedings.)

3          MS. JOHNSON:  Your Honor, may the record now reflect

4     that Mr. Allison is in possession of my client's passport card?

5          THE COURT:  Yes.

6          MS. JOHNSON:  Thank you.

7          And if it's okay with the Court, so as to avoid

8     sharing microphones, is it okay if I present from here?

9          THE COURT:  Yes, it is.

10         MS. JOHNSON:  Thank you.

11         And I will remain seated because I think it's easier

12    to hear me, with the Court's permission.

13         THE COURT:  I also agree with that, yes.

14         MS. JOHNSON:  Your Honor, I -- I just wanted to

15    respond to some of the points raised by Mr. Allison.  And I

16    will do them more or less in the order that Mr. Allison

17    followed, and Ms. Sampson.

18         First, with respect to the probability of success, I

19    do agree -- and I apologize if last week I sounded like I was

20    saying something else -- that the political question doctrine

21    is a mixed question of law and fact.  But I do believe that the

22    facts are -- would be facts asserted in the complaint as well

23    as supplemented by expert testimony regarding country

24    conditions and political organizations, and that Mr. Ahmed does

25    not individually bear the burden of coming forward with

1      evidence that he committed these acts or that he was a member

2      of a group, and that his failure to do so does not legally

3      foreclose him from asserting a political question defense.

4              With respect to Quinn v. Robinson, the government has

5      asserted that Quinn v. Robinson makes it impossible for anyone

6      who is accused of a terrorist act to avail themselves of the

7      political -- political act exception.  We disagree.  The Quinn

8      versus Robinson case specifically and at length talks about

9      international terrorism, which would be by definition

10     cross-border terrorism.

11             Mr. Ahmed is accused, as I understand it, of being an

12     Iraqi located in Iraq and belonging to a group that committed

13     crimes against the -- against government officials, police

14     officers, in Iraq.  That is not international terrorism.  That

15     is a domestic crime, it is charged as a domestic crime, and we

16     disagree that the government can simply say:  Well, al-Qaeda is

17     a terrorist organization; therefore, the political act

18     exception can never apply.  And we do not believe that Quinn

19     versus Robinson so holds.

20             I will note, and I'm happy to supply cases -- I'm sure

21     this will be litigated in the extradition context -- that many

22     of these political act cases involve the IRA, which was also

23     designated as a terrorist organization, but was committing acts

24     within the country in which the individuals were located.  And

25     there are cases in which the government has declined to

1    extradite people because -- or magistrate judge has declined to

2    certify the extradition as a result of the political question

3    doctrine when the organization in question was the IRA, which

4    the United States considered to be a terrorist organization.

5           So we have a different reading of Quinn versus

6    Robinson.

7           With respect to the special circumstance of

8    Mr. Ahmed's work for the United States Government, I think that

9    based on the information presented last week, it is fair and

10   there is a record in place to support a -- a finding that

11   Mr. Ahmed has provided unique and valuable services to the

12   United States as a whole, not simply because of his work for

13   the military, but because of his truly unique and extraordinary

14   service to the refugee and immigrant community of the United

15   States, to neighbors, and to individuals who have needed his

16   assistance.

17          We have submitted numerous letters, we heard from

18   numerous witnesses.  Mr. Ahmed has donated generously of his

19   time to the community, and he is well-regarded and

20   well-respected by everyone who has come forward in this case.

21   And the government has not disputed any of that testimony and

22   has not disputed that since Mr. Ahmed has been in the United

23   States, he has performed valuable community service, he has

24   taught immigrants to drive, he has not asked for payment if

25   they were unable to pay.

1       And also that he did this not just for the Iraqi

2    community, not just for people who came from the same place

3    that he did, but for all people in need who he encountered.

4       So I don't think that we have to rely on his work for

5    the government alone, although I think that is one factor to

6    establish that there is a special circumstance with respect to

7    Mr. Ahmed.

8       With respect to the -- the evidence of COVID at the

9    jail, it is -- the government has provided a bunch of cases

10   which -- in which courts have denied release for COVID-related

11   reasons.  There are additionally many cases throughout the

12   country in which individuals have been released for

13   COVID-related reasons.  I can read a long string cite, or I can

14   file it.  It is a case-by-case determination.  There is no per

15   se rule that COVID is or is not a special circumstance.

16      THE COURT:  Ms. Johnson, I -- I agree with you on

17   that.  There are cases on both sides of that issue with respect

18   to COVID.

19      Let me ask, though, that the -- the government in its

20   response to your supplement and Ms. Sampson today made

21   statements regarding the administrative segregation and the

22   significance of that being that Mr. Ahmed has his own cell, his

23   own shower, he visits the recreation yard by himself, and that

24   he does not interact with the other population.

25      Do you agree with those factual assertions?

1          MS. JOHNSON:  No, Your Honor, we do not.  The

2      government initially had provided to us, which they did not

3      file with the Court, an explanation of Mr. Ahmed's housing

4      circumstances that says that while he has no physical contact,

5      he has verbal contact with other inmates.  That means that air

6      droplets can -- that he is close enough to other inmates to

7      speak to them, and that air droplets can travel.

8          But I think probably most significantly, we do not

9      dispute that he is in a single-person cell because of the

10     publicity surrounding his case, not because of anything that he

11     has done while at the facility.

12         Probably his most significant and reliable and regular

13     contact is with the guards, eight of whom have now tested

14     positive.  He cannot move -- and this is a feature of all

15     jails.  I don't think the government disputes this.  He can't

16     go to the recreational yard or to the medical unit by himself.

17     Inmates are not allowed to wander freely about the facility,

18     and that, I believe, was actually explained in the Kline

19     declaration as -- because Mr. Kline thinks that that supports

20     his theory that inmates are kept apart is that people are not

21     allowed to just walk through the halls.  They have to be

22     escorted.

23         I am sure that as Mr. Ahmed sits there in that

24     videoconferencing room, that there is a correctional officer on

25     the other side of that door who walked him to that room.  There

1     was -- there were inmates most likely in that room before him,

2     and there will be inmates in there after him.

3          This idea that Mr. Ahmed is in this hermetically

4     sealed chamber where no one breathes on him or puts respiratory

5     droplets onto him is fantastical and is just not something that

6     is possible within a correctional setting.

7          Ms. Sampson has emphasized that we should not look at

8     any other facility in the entire country, and that the only

9     facility that is relevant to this analysis is the facility

10    where Mr. Ahmed is held now.  I understand why she would make

11    that argument, because the data from other facilities is

12    abysmal, and from other CoreCivic facilities.

13         Mr. Ivens, whose declaration I will talk about a

14    little bit more in a moment, does not state -- Mr. Ivens, who

15    is the CMO of CoreCivic and provided a declaration about the

16    conditions and about the policies in place at CoreCivic to

17    prevent the spread of disease, did not state that the policies

18    in place at CoreCivic in Florence are different from the

19    policies in place in Trousdale, Tennessee, about which we

20    submitted information in our detention memo where more than

21    50 percent of the inmates at that CoreCivic facility have

22    tested positive; the -- he did not state that the facilities

23    at -- in Florence are different from the procedures in place at

24    La Palma in Eloy, which is just down the road, another

25    CoreCivic facility, where the numbers are also abysmal and

1    going up.

2          Mr. -- in the time -- my understanding, and I have

3    submitted the citation to the -- to the news articles, the

4    first inmate at CoreCivic tested positive last Monday, and I

5    can't even keep up with the numbers.  I believe that we are up

6    to 18 -- I think it's at four -- I think that Mr. Ivens said it

7    was 13, and then Mr. Kline said it was 15, and now we're at 18.

8    That's because every day new people are being diagnosed.

9          Mr. Ivens also said, and then the government included

10   in its response memo, a factually incorrect assertion that

11   everyone at CoreCivic with COVID contracted it on the outside,

12   and they were merely diagnosed while they were at CoreCivic.

13         And Mr. Ivens, in fact, uses this information to brag

14   about the safety of the procedures at CoreCivic and says that

15   all of these individuals were diagnosed as part of the intake

16   process.  And then the government told the Court that there's

17   no evidence that COVID is being spread at the facility, in

18   reliance on that statement by Mr. Ivens.

19         I received that filing last night, and I sent the

20   government numerous emails -- and I'm happy to supplement the

21   Court, if the Court would like -- showing, based on information

22   that our office regularly receives from CoreCivic and from the

23   United States Marshals, that almost all of the inmates who have

24   been diagnosed with COVID at CoreCivic had been at CoreCivic

25   for longer than 14 days, which is the outside limit of the

1    incubation period, before they were diagnosed.

2          I guess we're at 18 now, is my understanding.

3          Four of them were pod -- were cellmates.

4          Mr. Ivens also says that there is no COVID in the

5    general population, and that this shows how good CoreCivic is

6    at keeping COVID out of its jail because in addition to an

7    incorrect assertion that there's -- that everyone who

8    contracted it came to the facility already infected, that they

9    haven't had it in general population.  That was already not

10   true by the time the government filed its memorandum.

11          The declaration of Mr. Kline acknowledges that there

12   has now been a general population inmate infected within an

13   entirely different pod from the intake pod.

14          And my understanding as of 10 minutes before this

15   hearing is that of the three people who were diagnosed today,

16   at least two of them are in general population, and are in

17   different pods from the individual who was already diagnosed in

18   general population.  I can file that information with the

19   Court.  I provided the information to the government with names

20   and dates, and asked them to please contact their expert so

21   that he could correct the record since his statement and his

22   declaration appear to be untrue, and that the government had

23   made statements in its filing that I believe are factually

24   untrue.  And the government did not do so, so I am correcting

25   the record.  There are statements in their declaration that I

1     believe are not true and cannot be supported by the evidence.

2              I think that the evidence is that COVID has probably

3     fairly recently infiltrated the facility, and that the numbers

4     are going up very fast.  Even Ms. Sampson's .05 percent number

5     is already out of date because I imagine she did the math

6     yesterday instead of today.  That is the number you would get

7     if you used 15 individuals who were infected instead of 18.

8              THE COURT:  Ms. Johnson --

9              MS. JOHNSON:  Yes.

10             THE COURT:  -- the government did just file that

11    document yesterday.  We can't have a detention hearing every

12    day to take --

13             MS. JOHNSON:  I understand.

14             THE COURT:   -- to take into account the evolving

15    facts.  But I do think that it is fair for you to have a chance

16    to put in the record support for statements that you believe

17    contradict the declarations in Exhibit A and Exhibit B of the

18    government's response to your May 11th supplement.

19             So this is the last filing we're going to have on this

20    particular issue, unless there's some other emergency.  But

21    could you file that by Wednesday?

22             MS. JOHNSON:  Yes, Your Honor.  And if the government

23    would like to correct its own statements, I won't have to file

24    anything at all, but --

25             THE COURT:  Ms.-- Ms. Johnson, my request, or my --

1          MS. JOHNSON:  Yes, Your Honor.

2          THE COURT:   -- my statement to you is whether you

3     want to file it.

4          MS. JOHNSON:  Yes, Your Honor.  I would appreciate

5     that opportunity.

6          THE COURT:  All right.

7          MS. JOHNSON:  So -- but I do think it's relevant to

8     any weight that the government would give the declaration of

9     Mr. Ivens because he seems uninformed about the situation at

10    CoreCivic based on the fact that he doesn't understand how the

11    virus is being spread at that facility.  And so I would ask the

12    Court to take that into consideration in determining what

13    weight to give his declaration and the credibility to assign to

14    that declaration.

15         The government complains that we haven't provided any

16    evidence that Mr. Ahmed is safer out of custody.  That is

17    untrue.  Mr. Klemstine, who lives down the street from

18    Mr. Ahmed, testified Mr. Ahmed lives in a farmland area.  It's

19    a single-standing house.  There are chickens, there are cows.

20    He does not live in a dormitory or a residential reentry

21    center.  He lives in a house with his wife and his child, and

22    plenty of land.

23         We have provided abundant evidence that jails are

24    particularly dangerous with respect to the spread of COVID.

25    The government has provided no evidence that individuals alone

1    in their houses in farmland with a three-person family are

2    similarly at risk of being exposed to COVID.

3           The -- with respect to the length of time that

4    Mr. Ahmed may be in custody as a result of these proceedings

5    and the effect of COVID on them, I understand that the

6    government would very much like for us to have a detention

7    hearing in which we -- we, the defense, were able to present

8    no -- conduct no investigation and present no factual evidence

9    as the Court, I believe, has already observed.  The legal

10   standard does provide an opportunity for us to do that.  That

11   will be briefed in due time.  But I believe even the government

12   concedes that we have an opportunity to obliterate probable

13   cause.  We may have a disagreement about what exactly that

14   means.  But even if it is an extremely high standard, proof

15   beyond a reasonable doubt is also a reasonable -- is also a

16   very high standard, and the response is not:  Well, the

17   government just doesn't get to investigate because you can

18   never prove anything beyond a reasonable doubt.

19          What are we going to find?  You know, the government

20   says, well, they haven't come forward with any evidence that

21   he's not guilty or told you what they're going to find.  We

22   haven't even been able to start.  Mr. Ahmed was charged in

23   January.  International travel has not been possible in the

24   time since this has been pending.  All I can go on is what was

25   found in the Ameen case because it's -- it's the only sort of

1    comparable information that there is out there, and what they

2    found is documents had been forged, witnesses who had signed

3    affidavits had never read the contents of the affidavits and

4    disagreed with them.  This is unsurprising, given what the

5    United States reports of the Iraqi judicial system.

6            I don't know what we are going to find.  But based on

7    what the United States State Department says about criminal

8    charges and the judicial process in Iraq, there is abundant

9    evidence in the record for the Court to find that there is a

10   substantial likelihood that when we get to Iraq, we will find

11   that there are irregularities at a minimum in the documents and

12   the process.

13           We do not know when we are going to be able to do

14   that --

15           THE COURT:  Ms. Johnson --

16           MS. JOHNSON:  Yes.

17           THE COURT:  -- on the travel issue, I'm not sure

18   there's anything in the record that supports that people can't

19   travel internationally.  So I'm not sure the basis of that

20   statement, and something it would be hard to take judicial

21   notice of.  There have been news articles about -- there was an

22   article about the United flight where arguably social

23   distancing was not appropriately observed and it was this

24   packed flight.

25           So I -- I -- I guess I don't know whether there's

UNITED STATES DISTRICT COURT

1    factual support for the idea that you are unable to investigate

2    by going to Iraq, if that's a choice you want to make.

3           MS. JOHNSON:  Your Honor, we submitted and cited in

4    our -- the May 11 submission about the update on the worldwide

5    COVID situation, citations to the United States Embassy in Iraq

6    stating that there are no flights currently taking place out of

7    Iraq.  Iraq has instituted a ban on travel between provinces

8    within the country of Iraq, and there are no flights.  The

9    United States Embassy has advised any United States citizens

10   currently in Iraq that they will likely have to shelter in

11   place and -- and will be unlikely to be able to leave the

12   country until the -- the situation changes.  And we did cite to

13   those statements from the United States, the opposing party

14   embassy in Iraq, which continues to post information about

15   Americans attempting to travel to and within Iraq.

16          I do believe there's evidence in the record that

17   travel to Iraq is -- and certainly return from Iraq, is not

18   possible at the moment.

19          THE COURT:  All right.  I'll -- I mean, I certainly

20   have your May 11th, 2020, memorandum.

21          MS. JOHNSON:  Okay.

22          THE COURT:  I'll go back over it.

23          MS. JOHNSON:  Okay.  Thank you.

24          With respect to the government's statement that -- or

25   the government's argument about Mr. Ahmed's dangerousness,

1   which appears to rest almost exclusively on the nature of the

2   allegations, the government urged the Court to adopt this rule

3   of non-inquiry.  I'm sure that there will be a lot of briefing

4   in the extradition context about the rule of non-inquiry and

5   how far it extends and what it means, but there is no citation

6   provided by the government of any authority that the rule of

7   non-inquiry extends to detention hearings, that the magistrate

8   can't consider the likelihood that Mr. Ahmed -- that these

9   allegations are true in determining whether Mr. Ahmed is

10  dangerous or not to the United States community.  The

11  government has not provided any support for that proposition.

12  I'm not aware of any.

13          We -- the government was trying to -- or suggested

14  that we were trying to argue that we were going to make -- be

15  able to make arguments about the conditions in Iraq and why the

16  conditions in Iraq meant that he was non-extraditable.  That

17  was not the argument that we were making in the detention

18  context.  The argument was simply that given what we know about

19  the judicial system in Iraq, and given what the United States

20  State Department says about the judicial process in Iraq, there

21  is no reason to believe that any of this is true.  And all that

22  Mr. Allison has been able to point to is he was in Fallujah, as

23  were, I'm sure, hundreds of thousands of other people, and he

24  was in the general area.

25          One of the State Department country conditions report

1    says explicitly about Iraq that there is a history in Iraq of

2    charging people simply for living in an area known to have

3    insurgence without any evidence that they actually personally

4    were involved.

5         Mr. Allison says that the fact that Mr. Ahmed was shot

6    around the same time as the second murder, and that Mr. Allison

7    suggests was shot in the incident involving -- that resulted in

8    the second murder, that this is evidence that Mr. Ahmed was

9    involved.  In all of the statements submitted by the

10   government, not one witness who claims to have been an

11   eyewitness or to have knowledge of what happened mentioned

12   Mr. Ahmed being shot.  In fact, one of them mentioned that they

13   recognized him because his mask fell off.  That individual

14   described a masked gunman coming and shooting this policeman,

15   and then whether in response to a question about how you can

16   recognize somebody with a mask or just on his own, this person

17   appears to have volunteered:  Oh, I recognize him because his

18   mask fell off.

19        I don't know how your mask falls off if you've been

20   shot in the face, and I don't know how nobody mentions that

21   Mr. Ahmed himself is shot if they were, in fact, eyewitnesses

22   to this, and that Mr. Ahmed's shooting somehow means he was --

23   he was involved.  It doesn't add up.

24        Mr. Ahmed is -- so we would ask the Court to simply

25   assign no weight to the allegations in the complaint in its

1    analysis of whether Mr. Ahmed is a danger because Iraqi

2    complaints are not reliable, according to the United States.

3    They're regularly unreliable.

4         I would also note with respect to dangerousness, I

5    received the search warrant returns from the FBI last week.

6    The -- they are probably available to the Court.  I believe

7    they would be filed.  I would note that when Mr. Ahmed was

8    arrested, the FBI seized, I think it was, 18 electronic

9    devices.  Mr. Ahmed had many electronic devices because he's a

10   small business owner, and they have had those devices for four

11   months.  I'm sure the FBI has had ample opportunity to search

12   every one of those devices, every computer, every cell phone.

13   And if any one of those devices had contained so much as the

14   words "al-Qaeda," I'm sure we all would have heard about it.

15        I have not received results of those search warrants,

16   but the absence of any information from the government about

17   information that was found on Mr. Ahmed in 2020 and how that

18   information can be used to support either a flight risk or a

19   his -- or a danger to the community is striking.

20        There were apparently -- there's no evidence that on

21   18 -- these 18 devices that Mr. Ahmed was looking at properties

22   in Mexico, that he was looking for airline tickets, that he was

23   trying to find a way out of the country.  There is no evidence

24   of any of that, despite the fact that the government has had

25   ample opportunity to turn Mr. Ahmed's life inside out.  They

1    have done so, and all they can come up with is the naked

2    allegations in the complaint, combined with some vague

3    statements about how he spent some time in a Syrian prison for

4    we don't know what.

5         I -- I think it overstates the case grossly to say

6    that Mr. Ahmed is familiar with Mexico.  He crossed the border

7    to get some dental work done and have dinner a couple of times.

8    He does not speak Spanish, he does not have family down there.

9    This is a border state.  This behavior is routinely engaged in

10   by many people in the state of Arizona who have no -- who would

11   not identify themselves as having connections to Mexico or even

12   familiarity with Mexico.

13        Your Honor, may I just have a moment to review all of

14   my notes?

15                   (Pause in proceedings.)

16        MS. JOHNSON:  And yes, Your Honor, with respect to the

17   Court's question about the Toledo Manrique case and the

18   availability of a bond or the fact that Mr. Toledo Manrique

19   paid a substantial bond, no bond has been imposed in this case.

20   Mr. Ahmed has not had the opportunity to -- to turn over a

21   bond.

22        We would ask that he be released without bond.  But if

23   the Court is unwilling to release him without bond, if the

24   Court were to impose a bond, Mr. Ahmed has somewhat limited

25   means, especially considering that his business is necessarily

1    closed because of the coronavirus epidemic.  However, I -- I do

2    believe, based on information that Mr. Ahmed and the members of

3    the community who trust Mr. Ahmed and trust him not to flee,

4    who he has helped over time, are willing to contribute to a

5    bond.

6         We again would ask that the Court not impose a bond.

7    But if the Court is only willing to consider release in light

8    of -- or with a bond, we would ask that the Court impose a bond

9    as opposed to simply denying relief outright, and that it would

10   be up to Mr. Ahmed to come forward with the bond or not.

11        THE COURT:  Ms. Johnson, how much more time do you

12   have?  We're going to need to take a break pretty soon.

13        MS. JOHNSON:  I -- that may be my last point, if I

14   could just have 30 seconds to review my notes --

15        THE COURT:  Sure.

16        MS. JOHNSON:   -- I may be done.

17        Yes, Your Honor, and this is my -- my final point.

18        Ms. Sampson on page 5 of the government's memorandum

19   sets forth a -- a standard that she alleges that the -- the

20   government alleges the courts have found that a fugitive must

21   demonstrate:  The condition is life-threatening, deteriorating

22   while incarcerated.  There's no cite for that.  I couldn't find

23   one.  I -- we do not adopt that standard, in absence of a -- in

24   absence of a citation.

25        And we do believe that Mr. Ahmed's lack of access to

1    a -- a -- cardiologist appointments as a result of the

2    coronavirus epidemic is potentially serious.  The government

3    has produced the discovery in this case indicating that he

4    requested the appointment because he was suffering from

5    dizziness and other symptoms that could be consistent with

6    panic attacks.  I mean, this was in the government's discovery.

7    They could be consistent with panic attacks.  But, of course,

8    the symptoms of panic attacks and heart attacks could be very

9    similar, and that's what led Mr. Ahmed to request the

10   appointment in the first place.  And for the government's

11   memorandum, that's their Bates 150.

12          And that is all I have to say.

13          THE COURT:  All right.  I think we've had sufficient

14   argument then.

15          Ms. Johnson, you're going to file something by next

16   Wednesday addressing whatever factual disputes you have.

17          MS. JOHNSON:  Yes, Your Honor.

18          THE COURT:  And likely it's going to focus on Exhibits

19   A and B.

20          MS. JOHNSON:  Yes, Your Honor.

21          THE COURT:  And then the matter will be submitted and

22   taken under advisement.

23          The last thing I want to do today, we do need to set

24   an extradition hearing.  My inclination is to set it for a

25   point in July.

1          And Ms. Johnson, let me note, I do see in your

2     pleading you did deal with the travel to Iraq.  It does say

3     that the suspension of flights is set to expire on May 22nd,

4     but I think that's speculative.  I -- I agree with the point

5     you're making.

6          Nonetheless, we have to set this for an extradition

7     hearing, possibly closer to that date.  If you have specific

8     investigatory issues that you need to raise, maybe you can file

9     a pleading as to that.  But we do need to set this for a

10    hearing.

11         The Court's thought is possibly the week of July 6th,

12    but I wanted to see whether or not the parties were available.

13         MR. ALLISON:  I'd just like to check my calendar.

14         THE COURT:  Sure.

15         (Defendant speaks to interpreter.)

16         THE DEFENDANT:  Am I getting released, be released at

17    this time, Your Honor, on a bond?

18         THE COURT:  Ms. Johnson, maybe you should address that

19    with your client.  That is going to be under advisement.

20         MS. JOHNSON:  So we are not in a confidential setting,

21    but could you call me on the telephone and I -- we can talk

22    about that.

23         MR. ALLISON:  Your Honor?

24         THE COURT:  Yes.

25         MR. ALLISON:  On the date, if the Court would

1    entertain it, could we email the Court on Monday and copy

2    Ms. Johnson with our availability?  I just -- I don't want to

3    speak for my colleagues here who want to check their calendars.

4         THE COURT:  Yeah, and I do realize that July could be

5    a difficult month.

6         So why don't -- why don't the parties get together and

7    trade some dates.  Ms. Johnson, I know you don't want to set a

8    date.  We are going to set a date.  It can be subject to your

9    later motion to -- to change it, but I would encourage you to

10   participate in the process of getting a date set that does meet

11   your calendar.

12        MS. JOHNSON:  Your -- Your Honor, we would request a

13   date in November or December, if the Court feels that a date

14   must be set.

15        THE COURT:  Okay.  Well, I'm not going to set it out

16   that far, but I -- I don't want to prevent the parties from

17   engaging in some dialogue.  So maybe what we'll do is set a

18   status call, which we're not going to schedule right now, for

19   sometime next week to discuss dates for an extradition hearing.

20        With that, I believe -- Ms. Sampson?

21        MS. SAMPSON:  Your Honor, I'm sorry.  Just one

22   question.

23        I anticipate that we may have some response.  I know

24   the Court doesn't want to get into endless briefing, but

25   whatever Ms. Johnson intends to file on Wednesday on the

1  declarations, we would like an opportunity to respond to that.

2           THE COURT:  Well, the difficulty that I see is at some

3  point the briefing on that issue has to end.  And if you file a

4  response, it seems likely that Ms. Johnson will have a contrary

5  view.

6           So -- I'm trying to remember the history.  Both

7  parties addressed -- both parties addressed the issue of COVID

8  as a special circumstance in the briefings.  Maybe -- maybe

9  it's a mistake to keep going one-by-one.  And so how about by

10 next Friday, both parties can simultaneously file whatever they

11 need to to address that current situation.  Would that work?

12          MR. ALLISON:  That sounds fair.  Thank you, Your

13 Honor.

14          MS. JOHNSON:  Yes, Your Honor.

15          THE COURT:  Mr.-- and -- Mr. Allison?

16          MR. ALLISON:  I'm sorry.  One point of clarification,

17 Your Honor.

18          You had mentioned earlier a separate supplemental

19 filing, you'd asked, if we want, on the political exception.

20 Was that Wednesday or Friday?

21          THE COURT:  You can do that by Friday, if you wish.

22          And Ms. Johnson, if you have anything further on -- on

23 that, you can file that as well.  It -- Quinn is a very long

24 case, and so to the extent it's been interpreted and dealt with

25 by other courts, that's relevant.  So -- and that's all the

1    filings we're going to have.

2           So -- all right.  Then unless there's anything

3    further, we are adjourned, and my JA will reach out next week

4    and we'll set a status conference.

5           MS. JOHNSON:  Your Honor, we -- I -- we do have one

6    additional point, which is that I believe we are still awaiting

7    a ruling from the Court on -- on some sealed briefing relevant

8    to the issue or --

9           THE COURT:  The protective order?

10           MS. JOHNSON:  Yes.  And that is material to our

11    investigation in this.  We -- because the government has placed

12    limits on our -- or is seeking to place limits on our use of

13    certain materials, we need some guidance.

14           THE COURT:  I agree with you that there -- there is at

15    least that one matter on the docket, and I'll get to that

16    promptly.

17           MS. JOHNSON:  Thank you.

18           THE COURT:  All right.

19           We are adjourned.  Thank you.

20                (Proceedings in recess at 3:36 p.m.)

21

22

23

24

25

1

## C E R T I F I C A T E

2

3      I, CHARLOTTE A. POWERS, do hereby certify that I am

4  duly appointed and qualified to act as Official Court Reporter

5  for the United States District Court for the District of

6  Arizona.

7      I FURTHER CERTIFY that the foregoing pages constitute

8  a full, true, and accurate transcript of all of that portion of

9  the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control.

12      DATED at Phoenix, Arizona, this 19th day of May, 2020.

13

14                          s/Charlotte A. Powers
                         Charlotte A. Powers, RMR, FCRR
15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT