JON M. SANDS
Federal Public Defender
District of Arizona
850 W. Adams, Suite 201
Phoenix, Arizona 85007
Telephone: 602-382-2700

JAMI JOHNSON
New York State Bar # 4823373
DANIEL L. KAPLAN, #021158
Asst. Federal Public Defenders
Attorney for Defendant
jami_johnson@fd.org
dan_kaplan@fd.org

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In the Matter of the Extradition of<br><br>Ali Yousif Ahmed Al-Nouri,<br><br>Defendant. | No. MJ-20-08033-PHX-MTM<br><br>Motion to Compel Discovery |

Defendant Ali Yousif Ahmed Al-Nouri ("Mr. Ahmed"), through undersigned counsel, hereby moves this Court to compel discovery of the information and documents listed in Exhibit 1. These discovery requests, which are aimed at eliciting exculpatory material in the possession, custody or control of the United States, are narrowly tailored to ensure that the government's extradition request comports with Due Process. Production of these documents is necessary to allow Mr. Ahmed to properly defend himself at the upcoming extradition hearing. Counsel for Mr. Ahmed has conferred with the government regarding these requests, and the government has declined to provide the materials requested.

In the alternative, this Court should order that the government produce such materials for *in camera* review so that it can determine the nature and extent of the government's involvement in the investigation of this case, and the contents of the materials in question, before ruling on their discoverability.

**MEMORANDUM**

### I. Background

The Complaint in this matter alleges that Mr. Ahmed committed various actions in U.S.-controlled Fallujah in U.S.-occupied Iraq in 2006. This case appears to represent only the second time in the 87-year history of the extradition treaty with Iraq that a request for extradition has been made. The request for extradition in this case followed immediately after the revelation in *The New Yorker* that the *first* such request—a request for the extradition of Omar Ameen—was the result not of an indigenous Iraqi investigation into the conduct of Mr. Ameen, but rather of an incompetent, ill-conceived, FBI investigation in Iraq that relied virtually exclusively on one seriously mentally ill teenage witness who was compensated by the FBI for his false testimony against Mr. Ameen. *See* Doc. 60-8 (*New Yorker* article chronicling the history of the Ameen case). The FBI then laundered its own allegations against Mr. Ameen through the Iraqi court system and helped Iraq draft an extradition request. *Id.* Significantly, that extradition request bears no trace of the FBI's involvement, and is presented to the court as though it were simply an ordinary Iraqi criminal case and the extradition request was made solely at the behest of the Iraqi government. *Id.*

The allegations in Mr. Ameen's case are strikingly similar to the ones in this case—targeted killings as a result of an involvement with a terrorist group—and

even include similar, patently implausible, evidentiary claims, such as that while the group wore masks, an eyewitness was able to recognize Mr. Ameen/Ahmed because he was the only one not wearing a mask and/or his mask "fell off." In addition, recent revelations have demonstrated conclusively that Mr. Ameen was not even in the country at the time he was allegedly personally participating in the targeted killing, and that cell phone records indicate he was making or receiving calls on his cell phone in Turkey—where he had been living as a refugee for more than two years—on the day of the killings. Ben Taub, *Omar Ameen's Cell-Phone Records Reveal that he Was Framed*, The New Yorker (Jan. 13, 2021) (attached hereto as Exhibit 2). Significantly, the Department of Justice knew of the existence of these cell phone records for over eight months before disclosing that information to Mr. Ameen's defense team, despite a court order that the government assist the defense in acquiring the records. *Id.*; *see also* Ben Taub *The Evidence that Could Save Omar Ameen's Life*, The New Yorker (Jan. 27, 2020) (attached hereto as Exhibit 3).

However, it is not merely the similarity of the allegations in the two cases, the timing of the filing of the government's extradition request in this case, and the similarity between the immigration histories of Mr. Ameen and Mr. Ahmed that raise significant questions regarding the extent of the United States government involvement in investigating Mr. Ahmed and in causing the extradition request to be made. The Iraqi "arrest and investigation warrant" in this case was issued on May 12, 2019 (Doc. 3-3 at 49). The FBI interviewed Mr. Ahmed in September 2017, June 2018, and September 2018, and asked questions about the allegations in the Complaint. This time period significantly overlaps with the time during which the FBI was conducting its investigation of Mr. Ameen (Doc. 60-8) and pre-

dates the issuance of an investigation warrant by the Iraqi court in this case. The FBI interviews of Mr. Ahmed also pre-date many of the "witness" statements in the extradition packet that specifically name Mr. Ahmed, many of which were given in 2019. *See, e.g.*, Doc. 3-3 at 61, 75 ("I recognized [Ahmed] after his mask fell off his face"), 94.

In short, the documents, timing, and circumstances of this case strongly suggest that the United States has been involved in the investigation of this case and that it may have information regarding the allegations outside of the information contained in the extradition packet.

## II. Legal Authority.

It is within the magistrate's power and discretion to order discovery as requested "as law and justice require." *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1407 (9th Cir. 1988); *In re Extradition of Kraiselburd*, 786 F.2d 776, 817 n.41 (9th Cir. 1986) (*citing Jhirad v. Ferrandina*, 377 F. Supp. 34, 37 (S.D.NY. 1974)); *Lopez-Smith v. Hood*, 951 F. Supp. 908, 911 (D. Ariz. 1996) (*quoting Quinn v. Robinson*, 783 F.2d 776, 817 n.41 (9th Cir. 1986)). A magistrate judge may order requested discovery to the extent it is relevant to the question of whether extradition is proper and whether there is sufficient probable cause tying the defendant to the crime and that a crime was committed. *Oen Yin-Choy,* 858 F.2d at 1407. Although the courts have held that "[e]xtradition proceedings are not to be converted into a dress rehearsal for trial," the magistrate court may order the production of discovery when the requested materials would "appreciably advance[]" . . ."the resolution of the contested issue." *See Quinn*, 783 F.2d at 817 n.41. "Explanatory" evidence is moreover generally admissible within the context of an extradition

hearing to show the context in which statements were made. *Santos v. Thomas*, 830 F.3d 987, 1005 (9th Cir. 2016).

The Fifth Amendment specifies that "No person . . . . shall be deprived of life, liberty, or property without due process of law." In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment. . . ." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In *Jencks v. United States*, 353 U.S. 657 (1957), the Court held that criminal defendants were entitled to obtain, for impeachment purposes, statements which had been made by government witnesses during the investigatory stage.

While *Brady* does not uniformly apply in extradition hearings because they are not criminal in nature, courts have not hesitated to apply the logic underlying *Brady* in the context of extradition proceedings where exculpatory information was in the possession, custody or control of the United States government by virtue of its involvement in the investigation of the alleged conduct:

> The question before the court is whether attorneys in the Office of Special Investigations (OSI), a unit within the Criminal Division of the Department of Justice, engaged in prosecutorial misconduct by failing to disclose to the courts and to the petitioner exculpatory information in their possession during litigating culminating in extradition proceedings, which led to the petitioner's forced departure from the United States and trial on capital charges in the State of Israel. For the reasons stated herein, we conclude the OSI did so engage in prosecutorial misconduct that seriously misled the court.

*Demjanjuk v. Petrovsky*, 10 F.3d 338, 339 (6th Cir. 1993).

### III. Basis for Specific Discovery Requests

Mr. Ahmed has narrowly tailored his discovery requests to discovery of materials in the possession, custody or control of the United States government that

would tend to exculpate him of the charged conduct or to explain evidence submitted in the extradition packet. Explanatory information, such as information that a witness was provided a benefit for his statement, is squarely admissible at an extradition hearing. *Santos*, 830 F.3d at 1005. It should therefore be produced.

The production of exculpatory evidence in the possession, custody, or control of the United States is, on the other hand, necessary to safeguard the integrity of these proceedings and to allow this Court to exercise effective oversight over the extradition process and to protect Mr. Ahmed's right to due process. The facts and circumstances surrounding the investigation and charging of Mr. Ahmed strongly suggest that the United States has, at a minimum, played a role in the investigation of the acts alleged in the indictment. In 1993, the Sixth Circuit found that the government had committed prosecutorial misconduct when it withheld exculpatory material from a relator in an extradition hearing, resulting in that relator's extradition to Israel to face the death penalty for crimes he had not committed. *Demjanjuk*, 10 F.3d at 354. Mr. Demjanjuk's life was ultimately spared only through intervention of Russia—which provided the exculpatory evidence that the United States had withheld—and through the sound functioning of the Israeli legal system, which vacated his conviction. *Id.* at 355.

Courts have not uniformly followed *Demjanjuk*'s reasoning, but those that have rejected its reasoning have generally done so because they found that in the specific case at hand, the role of the United States in a particular extradition case had been merely "ministerial," *i.e.* processing a request from a foreign country without conducting independent investigation. *See, e.g.*, *In re Drayer*, 190 F.3d 410, 414–15 (6th Cir. 1999) ("[I]n *Demjanjuk*, the United States had conducted its own investigation of the offense underlying the request for extradition and

uncovered exculpatory material in the course of the effort. No such investigation occurred here; rather, the involvement of the United States can only be characterized as ministerial in the sense that it merely received factual information developed by Canadian authorities. Moreover, all documents received by the United States from Canadian authorities were, in fact, turned over to counsel for petitioner."). Here, all reasonable inferences suggest that the United States has conducted its own investigation of the charged offenses, and should therefore be required to turn over any and all of the requested materials that are in its possession, custody, or control.

At a minimum, the government should be required to submit such materials to this Court for *in camera* review so that the Court can determine 1) the scope of the involvement of the United States in the investigation, which is relevant, *inter alia*, to the issue of discovery, and 2) which of the materials must be produced to Mr. Ahmed.

### IV. Conclusion

Wherefore, Mr. Ahmed requests that this Court order production to Mr. Ahmed of the materials requested in Exhibit 1. In the alternative, Mr. Ahmed requests that the Court order that the government produce such materials for *in camera* review, after which this Court if appropriate order them produced

Respectfully submitted: February 26, 2021.

JON M. SANDS
Federal Public Defender

 *s/Jami Johnson*
JAMI JOHNSON
DANIEL L. KAPLAN
Asst. Federal Public Defenders