# EXHIBIT 2

NEWS DESK

# OMAR AMEEN'S CELL-PHONE RECORDS REVEAL THAT HE WAS FRAMED

By Ben Taub
January 13, 2021



*The special bureaucratic cruelty of the case was that the U.S. government never charged Ameen with a crime.* Photograph by Mark Mahaney for The New Yorker

Less than two hundred hours remain in Donald Trump's Presidency, and finally the people closest to him are reckoning with what they've enabled. Orders stemming from the White House have embodied "malevolence tempered by incompetence," as Benjamin Wittes, the editor-in-chief of Lawfare, put it. But, further down the chain of command, career officials within the federal bureaucracy have spent the past four years grappling with and competently executing troubling orders from above. Their reconciliations with this era may be quieter—played out, in some cases, with a mixture of relief that it is over and horror at what they have done.

Among the candidates for self-reflection are a couple of dozen officials at the Departments of Justice, State, Homeland Security, and the F.B.I. who participated in a campaign to extradite an innocent man to almost certain death. As I wrote in *The New Yorker*,

last January, one of Trump's campaign lies—that terrorists had infiltrated the refugee stream, and so admitting Muslims to the United States "could be one of the great Trojan horses ever, since the original"—led to these departments falsely maligning an Iraqi refugee as an ISIS commander and effectively framing him for a murder that he couldn't possibly have committed. Omar Ameen, the government said, had led an ISIS hit squad to his home town in the Anbar desert and killed an Iraqi police officer before immigrating to the United States, where he lived in Sacramento with his family and worked as an Uber and delivery driver. The evidence against him was largely collected with the help of a colonel in a local militia who held a longstanding grudge against Ameen's family. It included forged signatures; altered and later recanted witness statements; and obvious fictions conjured by a traumatized Iraqi teen-ager, who suffers from memory loss, delusions of grandeur, and, by his own description, a "psychological condition" that makes him violent and unstable.

The special bureaucratic cruelty of the case was that the U.S. government never charged Ameen with a crime. Instead, it filtered everything through the Iraqi justice system and helped to draft an extradition request. In August, 2018, lawyers at the Department of Justice submitted the documents to the Eastern District of California, presenting the extradition request as if it had been the brainchild of the Iraqi government. Under the terms of extradition law, the prosecutors never had to prove a single allegation, and Ameen had no right to a meaningful defense. Contradictory evidence was "inadmissible," and the contents of the Iraqi extradition packet, prosecutors wrote, had to be "taken as true." Unless Ameen could "obliterate" the premise of the case, the proper venue for litigating the evidence would be a terrorism court in Baghdad.

But Ameen was not in Iraq on the day of the crime. He had fled the country more than two years earlier, and was living as a refugee and working as a day laborer in Mersin, in southern Turkey. By the time of the murder, on June 22, 2014, Ameen had already been granted permission to move to the U.S., with his wife and young children. Each Thursday, he signed in at the local refugee office. The Turkish government held his passport, and he was prohibited from leaving Mersin without permission from the police. Other refugees testified that, after arriving in Turkey, he never left. The murder took place more than six hundred miles away, across international borders and territory controlled by several competing armed groups. The victim's final text messages listed the names of the men in the ISIS convoy, and Ameen was not among them. The victim's family members testified that Ameen was not involved and pleaded for his release. Nevertheless, after this evidence was presented in court, Audrey Hemesath, the lead prosecutor, insisted that the extradition move forward. "None of the evidence that the defense has amassed in the approximately fifteen months of investigation is reasonably clear-cut or obliterating of probable cause," she told the judge, Edmund Brennan, at a hearing in December, 2019.

There was one piece of evidence that the defense team had never been able to obtain: Ameen's Turkish cell-phone records, which could establish his location on the day of the crime. "We've tried to get Mr. Ameen's records, as the court knows," one of Ameen's federal defenders, Rachelle Barbour, said at that hearing. "I think I just have to give up on the Turkish government on this one."

My article was published on January 20, 2020—shortly before Judge Brennan was supposed to announce his decision on whether or not to certify extradition. Three days later, an attorney at the State Department forwarded to Ameen's defense team a letter from the Turkish government saying that it had the cell-phone records and would provide them if requested through the proper bureaucratic channels. As I wrote in a later piece, the Justice Department had received the Turkish letter eight months earlier but had never disclosed its existence to the court or to the defense.

Brennan ordered the government to help the defense team acquire Ameen's cell-phone records. Months passed; COVID slowed the courts. Prosecutors filed a document that portrayed Ameen as a sectarian extremist; the defense team filed a rebuttal showing that

his remarks had been taken wildly out of context. Ameen took a polygraph; the examiner concluded that he was telling the truth. Every few months, the defense team presented the court with updates on the hunt for the Turkish records. Ameen came down with symptoms of COVID in jail but remained optimistic that the documents would exonerate him.

On Christmas Eve, Barbour called me. The cell-phone records had arrived, eleven months after she had learned of their existence. Ameen had made or received two phone calls on the day of the murder and more than twenty between his sign-in at the local refugee office that week and the next. Every single call pinged off of cell-phone towers in Mersin.

Ameen remained in Turkey until his departure to the United States, in November, 2014. His phone pinged towers in Istanbul when he made two visits required by the U.S. consulate there, in the months preceding and following the murder. Otherwise, he was in Mersin, speaking mostly to other refugees and caseworkers, and to his employers at local construction sites. Shortly before he arrived in America, he interacted with a Facebook meme that quoted Voltaire: "If we believe absurdities, we shall commit atrocities."

In the past year, prosecutors have repeatedly asked Brennan to certify extradition, on the basis that the cell-phone records could, at most, prove that Ameen's phone was in Turkey on the day of the murder—but not that he was anywhere near it. But Brennan's responses grew increasingly stern. "The court has already rejected the government's argument that the cell data—no matter what it shows—would amount only to contradictory or non-obliterative evidence," he wrote, last summer. Now, as Ameen's lawyers prepare to submit translations and formal analysis of the Turkish documents, they hope that Brennan will stick to this line.



*Ben Taub, a staff writer, is the recipient of the 2020 Pulitzer Prize for feature writing. His 2018 reporting on Iraq won a National Magazine Award and a George Polk Award.*

More:   Trump Administration   Refugees   Justice Department   Extradition