JON M. SANDS
Federal Public Defender
District of Arizona
850 W. Adams, Suite 201
Phoenix, Arizona  85007
Telephone: 602-382-2700

JAMI JOHNSON
New York State Bar # 4823373
DANIEL L. KAPLAN, #021158
Asst. Federal Public Defenders
Attorney for Defendant
jami_johnson@fd.org
dan_kaplan@fd.org

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In the Matter of the Extradition of<br><br>Ali Yousif Ahmed Al-Nouri,<br><br>Defendant. | No. MJ-20-08033-PHX-MTM<br><br>Motion to Revoke Detention Order |

Defendant Ali Yousif Ahmed Al-Nouri ("Mr. Ahmed"), through undersigned counsel, hereby moves the district court for *de novo* review the magistrate judge's order ordering Mr. Ahmed detained pending conclusion of his extradition proceeding (Doc. 110) and from the magistrate judge's order denying Mr. Ahmed's motion to reopen the detention hearing (Doc. 179). The district court has jurisdiction to review these orders *de novo* pursuant to *United States v. Al-Nouri*, 983 F.3d 1096, 1098 (9th Cir. 2020).

Respectfully submitted: March 5, 2021.

JON M. SANDS
Federal Public Defender

 *s/Jami Johnson*
JAMI JOHNSON
DANIEL L. KAPLAN
Asst. Federal Public Defenders

**MEMORANDUM**

**I.     Background**

Ali Yousif Ahmed Al-Nouri is a 43-year-old married United States citizen and father of a toddler. He was born in Iraq, but after suffering during the prolonged armed conflict within that country, fled to Syria. After he had spent years in that country, a refugee agency arranged to resettle Mr. Ahmed in the United States. He arrived in this country in 2009, at the age of 31, with no friends or contacts, and speaking no English. Despite these challenges, together with persistent depression, anxiety, and serious medical issues, he built an admirable life and a circle of loyal and supportive friends. He settled in Phoenix, Arizona, where he set to work learning English and volunteering to help fellow refugees. He became a licensed security guard. He gave fellow refugees rides, and driving lessons—often for free and using his own car. Eventually he opening a driving school. He served as a cultural advisor to the United States Marine Corps, helping to prepare Marines who were heading to the Middle East to fight ISIS. In 2015, he became a United States citizen.

Around this time Mr. Ahmed met his wife, Noor. They married in 2018 and moved into a house in remote Surprise, Arizona, surrounded by pets and livestock. Mr. Ahmed became close friends with his U.S. Navy-veteran neighbor, often inviting him for meals, loaning him equipment, and giving him eggs from his chickens.

Beginning in 2017, Mr. Ahmed was approached numerous times by federal law enforcement officials who asked him about his experiences in Iraq and Syria and about his feelings with regard to Al Qaeda and ISIS. Mr. Ahmed spoke voluntarily and at length with the officials, explaining that he detested Al Qaeda and ISIS, and had supported the U.S. military while he was in Iraq.

In late January of 2020, to the great shock of Mr. Ahmed and his family and friends, the government filed a complaint for extradition against him. The complaint

2

demanded Mr. Ahmed's extradition to Iraq to face charges that he had been the leader of a group affiliated with Al Qaeda in Iraq, and in that capacity, had been involved in the killing of two police officers in Fallujah in 2006.

The government sought Mr. Ahmed's detention pending the adjudication of his extraditability. After receiving briefing from the parties and conducting a hearing, the magistrate judge ordered Mr. Ahmed detained. Subsequent to the magistrate judge's order ordering Mr. Ahmed detained, Mr. Ahmed—who has numerous health conditions that place him at unusually high risk for suffering a severe case COVID-19—moved to reopen the issue of detention on grounds that he had contracted COVID-19 while incarcerated and was received inadequate medical care and was at serious risk of death or serious illness. That motion was denied. Mr. Ahmed now moves for review of both orders.

## II.     Legal Standard

In *Parretti v. United States*, the Ninth Circuit explained why a relator who invokes his Fifth Amendment right to due process cannot be required to show "special circumstances" to avoid being detained pending the adjudication of his extraditability. Although the court later withdrew the *Parretti* opinion, it has never rejected the opinion's constitutional analysis. Nevertheless, when Mr. Ahmed invoked his due process right and cited *Parretti*, the magistrate judge categorically refused to consider the argument, solely because the *Parretti* opinion is not the law of the circuit.

This was error. The Ninth Circuit withdrew *Parretti*, but it did not withdraw the Fifth Amendment. The magistrate judge should have considered, and recognized the merit in, Mr. Ahmed's argument.

Assuming that the "special circumstances" requirement is legitimate, the magistrate judge erred in finding that no such circumstances are present here. Mr. Ahmed identified five such circumstances, but the magistrate judge refused, without compelling justifications, to consider any of them. And the magistrate judge's conclusory finding that Mr. Ahmed would present a danger and a flight risk if released is baseless. Because

3

compelling "special circumstances" are present, and Mr. Ahmed is neither a danger nor a flight risk, he should be released, with any necessary and appropriate conditions, pending the adjudication of his extraditability.

### III. Argument

#### A. The *Parretti* opinion explains why a relator's due process rights preclude any requirement that he show "special circumstances" to preserve his liberty pending an adjudication of his extraditability.

Because a relator in an international extradition matter is not charged with a crime against the United States, the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq*., does not apply. *In the Matter of the Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1213 (D. Nev. 1993). (The term "relator" is traditionally used to refer to the individual sought to be extradited. *Munaf v. Geren*, 553 U.S. 674, 700 (2008).) In addressing whether a relator should be released from custody pending an adjudication of his extraditability, courts have generally looked to the Supreme Court's brief comment in *Wright v. Henkel*, 190 U.S. 40 (1903), suggesting that release may be appropriate when "special circumstances" are present. *Id*. at 63.

The Ninth Circuit's opinion in *Parretti v. United States*, 122 F.3d 758 (9th Cir. 1997), *withdrawn on reh'g en banc*, 143 F.3d 508 (9th Cir. 1998) (en banc), however, found the "special circumstances" requirement unconstitutional. The court stressed that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Id*. at 778 (internal quotation marks omitted). The "special circumstances" requirement, the court found, amounted to a purported blanket exception to this principle in extradition cases, based on the assumption that the government's "interest in fulfilling its treaty obligations is so compelling that it justifies detention pending *every* extradition hearing regardless of how negligible the risk of flight." *Id*. The court refused to carve out such an exception, holding that "until such time as an individual is found to be extraditable, his or her Fifth Amendment liberty interest trumps the government's treaty interest unless the government proves to the satisfaction of the

4

district court that he or she is a flight risk." *Id*. at 780.

Judge Reinhardt filed a concurrence in which he joined the majority opinion and added observations as to how the "special circumstances" doctrine had sprung from a misinterpretation of a cursory dictum in *Wright*. *Id*. at 781-87 (Reinhardt, J., concurring). Judge Pregerson filed a dissent arguing that because the relator had fled the country while the case was pending, the panel should have dismissed the appeal pursuant to the "fugitive disentitlement" doctrine. *Id*. at 787 (Pregerson, J., dissenting). Judge Pregerson's view eventually prevailed, when the en banc court withdrew the opinion and dismissed the relator's appeal on fugitive disentitlement grounds. *Parretti v. United States*, 143 F.3d 508 (9th Cir. 1998) (en banc).

Mr. Ahmed invoked his Fifth Amendment due process right before the magistrate judge, citing the *Parretti* opinion for its persuasive value. (Doc. 52 at 5.) But the magistrate judge categorically refused to consider Mr. Ahmed's argument, reasoning that "[b]ecause *Parretti* was withdrawn it is not the law of this circuit, and no other circuit authority has adopted its analysis." (Doc. 110 at 7.)

This reasoning was, in effect, no reasoning at all. The court withdrew the *Parretti* opinion, but it did not withdraw the Fifth Amendment's Due Process Clause. Mr. Ahmed's constitutional argument merited the judge's consideration, notwithstanding the fact that it is not the binding law of the circuit. The magistrate judge should have considered, and recognized the merit in, Mr. Ahmed's opposition to the "special circumstances" requirement.

> **B. The magistrate judge erred in finding that the pertinent factors justify Mr. Ahmed's detention pending the adjudication of his extraditability.**
>> **1. The magistrate judge erred in finding that no "special circumstances" are present.**

Assuming, *arguendo*, that he correctly applied the "special circumstances" requirement to the detention issue, the magistrate judge's ruling remains fatally flawed.

5

Although it may not treat circumstances that are "applicable to all defendants facing extradition" as "special" (*Nacif-Borge*, 829 F. Supp. at 1216), an extradition court is generally free to consider any other pertinent circumstances. *In the Matter of the Extradition of Gonzalez*, 52 F. Supp. 2d 725, 736 (W.D. La. 1999). The question of which factors to consider, and how much weight to give them, is left to the court's "sound discretion" (*Beaulieu v. Hartigan*, 554 F.2d 1, 1 (1st Cir. 1977)), but the court must consider any such circumstances in the aggregate, as well as individually. *Wroclawski v. United States*, 634 F. Supp. 2d 1003, 1009 (D. Ariz. 2009).

Mr. Ahmed demonstrated that five "special circumstances" are present.

### (1) Iraq's Fourteen-Year Delay in Filing its "Extremely Urgent" Request for Mr. Ahmed's Extradition

The charges against Mr. Ahmed relate to shootings of police officers that allegedly occurred in June and October of 2006, in the open, in front of witnesses, on commercial streets in Fallujah, Iraq. (Doc. 59 at 2.) Documents submitted by the Iraqi government indicate that law enforcement authorities began criminal investigations immediately after each incident. (Doc. 59 at 4–5.) Mr. Ahmed, meanwhile, remained in Iraq until 2007, when he went to Syria, and then in January of 2009 entered the United States, where he has lived openly under his own name ever since. During that time, Mr. Ahmed has started a company, been extensively involved in his community, and maintained a social media presence. Yet it was not until mid-October of 2019—thirteen years after the alleged crimes—that the Iraqi government submitted its "Extremely Urgent" extradition request. (Doc. 3-3 at 12.)

Courts have recognized that a requesting country's failure to "ma[k]e prosecution of th[e alleged] offense a priority" may constitute a "special circumstance." *In re Extradition of Chapman*, 459 F. Supp. 2d 1024, 1027 (D. Haw. 2006). And such a lack of "priority" has been found on the basis of delays briefer than Iraq's thirteen-year delay here. *See, e.g.*, *Wroclawski*, 634 F. Supp. 2d at 1008 (eleven-year delay); *Chapman*, 459

F. Supp. 2d at 1027 (three-year delay).

The magistrate judge, however, refused to consider this a "special circumstance," reasoning that the Iraqi government delayed only five months between its issuance of an arrest warrant and its request for Mr. Ahmed's extradition. (Doc. 110 4–5.) But this overlooks the Iraqi government's twelve-year delay in issuing an arrest warrant. The magistrate judge posits that Iraq was "actively investigating" the case during the intervening years. *Id. at 4.* But the documents that the Iraqi government produced with its extradition request tell a different story. They indicate that a cooperating witness claiming to be Mr. Ahmed's accomplice implicated him in 2006—while he was still in Iraq. (Doc. 59 at 4–5.) Iraqi investigators inexplicably waited to have the cooperator walk them through the crime scene until 2010, at which point they collected additional witness statements, then let the investigation languish for nine years before issuing an arrest warrant—all while Mr. Ahmed was living "openly and notoriously" in Arizona. *Chapman*, 459 F. Supp. 2d at 1027. (Doc. 3-3 at 55–9, 79–80, 91–92.) Iraq plainly failed to make a "priority" of bringing Mr. Ahmed to justice.

**(2)  The Likelihood that Mr. Ahmed will be Found Non-Extraditable**

A relator's likelihood of success in quashing an extradition request may constitute a "special circumstance." *Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989). Mr. Ahmed demonstrated before the magistrate judge that his likelihood of success in the instant case is substantial. Aside from the facts that the U.S.-Iraq extradition treaty has never been employed to extradite an individual from this country to Iraq, or that the U.S. Department of State describes the Iraqi criminal justice system as hopelessly corrupt,[1] or that Iraq's legal system denies criminal defendants fundamental fairness according to recognized human rights standards, *id.*, there is the fact that Article III of the treaty bars the extradition of an individual "for crimes of a political character." (Doc. 3-3 16.) This

---

[1] https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/iraq/.

provision codifies the well-established "political offense exception" to extradition. *Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986).

This Ninth Circuit applies a two-prong test to determine whether a charged crime falls within the political offense exception. *Quinn*, 783 F.2d at 806. The first prong, the "'uprising' requirement," requires that at the time and place of the charged offense "there be an 'uprising,' 'rebellion,' or 'revolution'"—*i.e.*, a "revolt by indigenous people against their own government or an occupying power." *Id*. at 806–7. The second prong, the "'incidental to' requirement," requires that the charged conduct be "in the course of," "connected to" or "in furtherance of" the uprising. *Id*. at 809. The Ninth Circuit applies a "liberal construction" to this prong, requiring only that there be "a nexus between the act and the uprising." *Id*. Assuming, *arguendo*, the truth of the allegations set forth in the complaint, the record supports the applicability of both prongs of the "political offense" test here.

<u>Uprising</u>. In 2006, when the charged homicides took place, there was an active "uprising" or "rebellion" against the "occupying power" in Iraq—*i.e.*, American and coalition forces—as well as the Iraqi government that the insurrectionists saw as beholden to it. *Id*. at 806–7; M.J. Kirdar, *Al Qaeda in Iraq* (Center for Strategic & Int'l Studies 2011) (*Kirdar*).[2] This uprising, which was designed "to defeat the American-led coalition," included the strategy of "deter[ring] Iraqi cooperation with the transition process by targeting police stations, recruitment centers, and Iraqi politicians." *Id*. at 3–4.

<u>Incidental to</u>. The accusations leveled against Mr. Ahmed describe conduct bearing a clear nexus to this uprising. Indeed, the government charges Mr. Ahmed with acting as the "leader ('Emir') of a group of [Al Qaeda in Iraq] terrorists" to deliberately

---

[2] https://csis-website-prod.s3.amazonaws.com/s3fs-public/legacy_files/files/publication/110614_Kirdar_AlQaedaIraq_Web.pdf.

plan and execute attacks on Iraqi police officers in the course of the uprising. (Doc. 59 at 3.) The allegations make plain that the victims were deliberately chosen because they were police officers: The government cites statements to the effect that Mr. Ahmed was "known for conducting assassination operations on members of the police force," and asserts that one of his accomplices confessed to "working with Ahmed and other members of the group to kill police officers." *Id.* at 4.

In short, the allegations in the complaint describe Mr. Ahmed as an indigenous insurrectionist "strugg[ling] to displace an occupying power." *Quinn*, 783 F.2d at 807. Yet the magistrate judge deemed the likelihood that Mr. Ahmed's extradition will be barred by Article III of the treaty "not relevant to the detention issue" because Mr. Ahmed is expected to supplement his "political offense" argument as the case proceeds. (Doc. 110 at 6.) This makes no sense. As with all doctrines calling upon a court to assess a party's "likelihood" of success on a claim, this component of the "special circumstances" doctrine required the magistrate judge to make a *preliminary* assessment of Mr. Ahmed's *eventual* likelihood of success. Such assessments by their nature rely on not-yet-fully-developed records and arguments, and yet courts routinely conduct them. *See, e.g.*, *Gonzalez*, 52 F. Supp. 2d at 737-38. The magistrate judge had a duty to do so here.

### (3) Mr. Ahmed's Assistance to the United States Military

Mr. Ahmed demonstrated that he had rendered valuable service to the United States military, serving as a cultural advisor and participating in role-playing exercises in support of U.S. Marines preparing to deploy to the Middle East. (Doc. 60 at 18.) In fact, Mr. Ahmed's work earned him a letter of commendation from the Commander of the Al Asad Task Force, which was charged with routing ISIS from Iraq. *Id.* at 18, 31. Similar work supporting the military has been deemed a "special circumstance." *Wroclawski*, 634 F. Supp. 2d at 1007–08.

The magistrate judge acknowledged that Mr. Ahmed's support of the military was "commendable," but nevertheless refused to give it any weight in his "special

9

circumstances" analysis, reasoning that Mr. Ahmed "did not rely on unique skills," and that his support was less extensive than that provided in *Wroclawski*. (Doc. 110 at 7.)

This reasoning is not compelling. Mr. Ahmed's service was plainly valuable to the Marines, regardless of how "unique" his skills may be, and the fact that another relator provided more extensive assistance does not render Mr. Ahmed's contribution worthless. Even a factor that does not justify a relator's release viewed in isolation may, when considered together with other "special circumstances," contribute to a finding that release is appropriate. *Wroclawski*, 634 F. Supp. 2d at 1009.

### (4) The Likely Protracted Duration of the Litigation

The fact that the litigation of the extradition matter is likely to continue for a protracted period of time may be a "special circumstance." *Kirby*, 106 F.3d at 863. That is plainly the case here.

Mr. Ahmed demonstrated that it is effectively impossible for him to conduct an adequate investigation until the COVID-19 crisis in Iraq has at least somewhat abated. (Doc. 142-2, Doc. 97 at 45–46, Doc. 88 at 77–78). Mr. Ahmed recognizes that an extradition hearing is "not a minitrial of the issue of guilt; rather, its function is the more limited one of determining whether probable cause exists to hold the accused for trial." *Santos v. Thomas*, 830 F.3d 987, 991 (9th Cir. 2016) (en banc) (internal quotation marks omitted). But at the same time, an extradition judge is not "expected to wield a rubber stamp," and Mr. Ahmed is entitled to uncover and introduce evidence that "explains away or completely obliterates probable cause." *Id*. at 992, 1006 (internal quotation marks omitted).

Such evidence could, for example, show that the accusations against him were procured through torture or coercion (*id*. at 990); that Iraqi authorities used inappropriately suggestive investigative methods (*In re Rodriguez Ortiz*, 444 F. Supp. 2d 876, 890 (N.D. Ill. 2006)); or that there were innocuous explanations for his presence at or near the scene of the alleged offenses, his association with his alleged criminal

associates, or his purported receipt of money allegedly connected to the offenses. Jacques Semmelman, *The Rule of Non-Contradiction in International Extradition Proceedings: A Proposed Approach to the Admission of Exculpatory Evidence*, 23 Fordham Int'l L.J. 1295, 1297 n.14 (1999) (citing cases). (In light of the U.S. Department of State's observations regarding the corruption and abuses endemic to the Iraqi judicial system, the prospect of coerced or otherwise seriously tainted accusations is far from speculative.) This is presumably why Congress vested an indigent relator like Mr. Ahmed with the right to subpoenas, and government financial support, for the production of "witnesses whose evidence is material to his defense" (18 U.S.C. § 3191): Congress recognized that an investigation and the production of evidence are essential components of an extradition defense.

Moreover, Mr. Ahmed is entitled to introduce evidence showing that the complaint describes non-extraditable "crimes of a political character." (Doc. 3-3 at 16.) As the magistrate judge acknowledged, the applicability of the "political offense" exception is a "mixed question of law and fact." (Doc. 110 at 6.) *Quinn*, 783 F.2d at 791. It follows that facts about the circumstances of the charged offenses may be introduced and considered in assessing whether Mr. Ahmed's extradition is barred by Article III of the treaty. *Cf. Barapind v. Enomoto*, 400 F.3d 744, 752-53 (9th Cir. 2005) (en banc) (remanding case to district court because "some evidence" supported applicability of "political offense" exception).

None of this evidence can be expected to gather itself together in Iraq, catch a plane to Arizona, and knock on Mr. Ahmed's counsel's door. Uncovering it will require an investigation. But as Mr. Ahmed informed the magistrate judge, the pandemic has stymied his ability to launch an investigation. (Doc 142-2.) For months, Iraq suspended all international flights, and banned travel between provinces. *Id.* While restrictions have changed over time, as of the date of this filing, Iraq has restricted travel from, *inter alia*, the United Kingdom and United States, and has imposed a full curfew on Friday through

Sunday and 8 p.m. to 5 a.m. curfew on Monday through Thursday.[3] These restrictions have effectively precluded Mr. Ahmed from making substantial progress in his investigation.

Moreover, it is not solely the delays expected through the magistrate judge's possible certification of extraditability that are pertinent, but also the delays expected through the entire anticipated course of the litigation, including "'the actual extradition proceedings themselves and the appeals therefrom.'" *Chapman*, 459 F. Supp. 2d at 1026 (*quoting Kirby*, 106 F.3d at 863). When the facts and issues involved in an extradition matter are especially complex, this factor may weigh heavily in the "special circumstances" calculus. *United States v. Taitz*, 130 F.R.D. 442, 445–46 (S.D. Cal. 1990).

This case—involving the alleged killing of two police officers, fourteen years ago, by a purported subsidiary of Al Qaeda, in a region of Iraq then under United States military occupation, arguably in the course of a domestic political uprising, followed by Mr. Ahmed's incarceration in Syria (which even the government acknowledges it does not understand (Doc. 59 at 23–24), followed by inexplicable lengthy delays in the Iraqi government's request for Mr. Ahmed's extradition, followed by the government's attempt to invoke an extradition treaty that has never in its 86-year history been employed to extradite an individual from the United States to Iraq—has complexity in spades. These byzantine allegations and issues can be expected to take a substantial amount of time for the magistrate judge to resolve.

And even after he has finished, the litigation process may be expected to continue a good deal longer. Because Mr. Ahmed faces a possible death sentence, he cannot reasonably be expected to forego his right to (if necessary) pursue habeas corpus relief in the district court, and (if that fails) an appeal to the Ninth Circuit. In a substantially less-complex extradition case (involving allegations of minor financial crimes committed in

---

[3] US Embassy in Iraq Covid-19 information, https://iq.usembassy.gov/covid-19-information/

Poland) that was litigated in the District of Arizona several years ago, the post-certification stages of the litigation lasted three-and-a-half years, even though at the appeal stage the case was expedited and the parties obtained only a single, 14-day extension. *Wroclawski v. United States*, No. 09-977 (D. Ariz.); *Wroclawski v. Clinton*, et al., No. 12-15113 (9th Cir.).

Despite these facts, the magistrate judge refused to consider the anticipated duration of the litigation a "special circumstance." Although he did not dispute Mr. Ahmed's showing that the pandemic had rendered it impossible for him to conduct an investigation, he reasoned that this did not constitute a "special circumstance" because extradition proceedings are "limited" and do not call upon the court to "determine whether the evidence is sufficient to justify a conviction" (internal quotation marks omitted). (Doc. 110 at 5–6.)

This is a non-sequitur. The fact that Mr. Ahmed may introduce only explanatory, probable-cause-obliterating, and political-offense-supporting evidence does not change the fact that he cannot produce *any* such evidence unless he can conduct an investigation. Nor does it nullify the ample reasons to expect this litigation to continue for a substantial period of time, even after a possible certification of extraditability is entered.

In short, the magistrate judge erred in finding that no "special circumstances" weighed in favor of Mr. Ahmed's release pending the adjudication of his extraditability.

### (5) The COVID-19 Pandemic and Mr. Ahmed's Particular Medical Vulnerabilities

When he filed his initial detention memorandum in early April, Mr. Ahmed noted that the jail environment is especially conducive to the spread of the novel coronavirus, and that the disease had already begun to spread within the federal pretrial detention system in Arizona. (Doc. 60 at 10–12). By the time the briefing was completed, fifteen inmates at the facility where he is detained—the Central Arizona Florence Correctional Complex (CAFCC), run by the private company CoreCivic—had tested positive for

13

COVID-19. (Doc. 91 at 3.) Mr. Ahmed further demonstrated that – contrary to the declaration of CoreCivic's Chief Medical Officer—at least nine of these inmates were infected *after* entering CAFCC. *Id.* at 3–5. (The government conceded that its incorrect assertion that no transmission had occurred within the facility should be "excis[ed]." (Doc. 90 at 3.)) As of early August, 313 detainees at CAFCC—representing over 80% of those tested—tested positive for COVID-19, and at least one had died from the disease.[4] In December 2020, Mr. Ahmed himself contracted COVID-19 at the facility and was extremely ill from the disease and was at one point transported to the hospital for evaluation. (Doc. 152.)

Mr. Ahmed also outlined his particularized vulnerabilities to COVID-19. (Doc. 97 at 41–44.) He suffers from such severe heart trouble that he had to have a heart valve replaced in 2010. (Doc. 110 at 2, Doc. 97 at 34, Doc. 81 at 6.) He has high blood pressure. (Doc. 60 at 12–13.) He has had bouts with pneumonia that have sent him to the hospital multiple times. *Id.* at 13. While incarcerated, he asked to see a cardiologist when he experienced symptoms—chest pain and shortness of breath—consistent with a heart attack. (Doc. 91 at 7.) The jail refused his request, citing its inability to provide any "non-urgent consults" due to COVID-19. (Doc. 74 at 6.) The government acknowledged that CoreCivic has designated Mr. Ahmed a "high risk" from possible COVID-19 infection, (Doc. 110 at 2, Doc. 97 at 32, Doc. 81 at 7), which places him in the top 2.2% of CAFCC inmates in terms of his vulnerability to serious complications from infection. (Doc. 91 at 8.)

Such vulnerabilities have been deemed sufficiently compelling to justify the release from custody even of individuals who have been convicted of crimes. *See*, *e.g.*, *United States v. Robinson*, No. 18-CR-03042-4-SRB, 2020 WL 5200929 (W.D. Mo. July 22, 2020); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008 (E.D. Mich. May

---

[4] *Lucero-Gonzalez et al. v. Kline et al.*, No. 20-cv-00901 (D. Ariz.), Doc. 49-1 at 17.

7, 2020). And at least one court has found that a heightened risk of complications from COVID-19 justifies release of an individual in custody pending a ruling on an international extradition request. *In the Matter of the Extradition of Alejandro Toledo Manrique*, Case No. 19-mj-71055-MAG-1 (TSH), 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020).

Despite these facts, the magistrate judge refused to consider the COVID-19 pandemic a "special circumstance." The judge reasoned that Mr. Ahmed is not at risk because he is "housed in Administrative Segregation," with his own cell sporting a "solid door with a food port and a window," and because CAFCC's assistant warden represented that he "ha[d] not had any contact with any infected staff members." (Doc. 110 at 3.) While these measures are insufficient to protect Mr. Ahmed from COVID-19, they are also no longer in place. In September Mr. Ahmed was removed from segregated housing and transferred to a general population unit, where he remains so this day. (Doc. 130 at 3 n.2.)

Notably, the declarations of CoreCivic officials filed by the government confirm that the screening protocol administered to guards and other employees upon entry is limited to verbal questions and temperature-taking (Doc. 88 at 20, 48)—methods that are ineffective against the spread of the virus by asymptomatic individuals. George Citroner, *20% of Coronavirus Infections Are Asymptomatic but Still Contagious*, Healthline (Sep. 22, 2020).[5]

The fact that Mr. Ahmed was infected with COVID-19 at the facility and ultimately recovered after a significant period of illness does not protect him from future threats to his health on account of the ongoing pandemic both because no one knows how long post-infection immunity will last and also because the emergence of new variants

---

[5] https://www.healthline.com/health-news/20-percent-of-people-with-covid-19-are-asymptomatic-but-can-spread-the-disease.

pose a risk of infection with a different strain. A recent variant first identified in Brazil, for example, appears to re-infect between 25% and 61% of individuals who would have been thought to be immune.[6] Moreover, the medical dangers posed by the virus extend beyond the prospect of Mr. Ahmed being infected with it: As noted above, the strain that the virus has placed on the jail's medical staff has impaired his ability to receive prompt attention for his existing serious ailments.

Mr. Ahmed's medical vulnerability during the COVID-19 pandemic thus constitutes a "special circumstance" weighing in favor of his release.

> **2. The magistrate judge erred in finding that Mr. Ahmed would present an intolerable risk of flight and danger to the community if released pending the adjudication of his extraditability.**

In a single conclusory clause at the end of his order, the magistrate judge found that Mr. Ahmed "does present a flight risk and a danger to the community based on the seriousness of the charges against him, the potential sentence he faces, and his ties to foreign countries." (Doc. 110 at 8.) These assertions do not withstand scrutiny.

**(1)   Risk of Flight**

The magistrate judge posited that Mr. Ahmed is likely to flee if released because of his potential sentence and "ties to foreign countries." *Id.* But while his potential sentence is severe, Mr. Ahmed has been on notice for years that he was under investigation for serious crimes. He was repeatedly interviewed by federal law enforcement agents, who grilled him about matters including his interactions with ISIS and Al Qaeda in Iraq. From this he could readily have intuited that the investigation concerned potentially serious allegations. Indeed, if he were actually *guilty*, he would have understood that the investigation related to the murder of police officers in Fallujah. And yet it is undisputed that he at no time made any effort to flee, relocate, or conceal his

---

[6] https://www.theguardian.com/world/2021/mar/02/brazil-variant-evaded-immunity-previous-covid-cases.

16

identity in any way. Instead, he cooperated with law enforcement, maintained a social media presence, interacted extensively with people in his community, got married, fathered a child, and repeatedly returned from foreign countries he visited—including countries in which his family members lived. (Doc. 59 at 27–28.)

In short, instead of fleeing at the opportune time, Mr. Ahmed stayed put and entrenched himself further into the community. And while he has relatives in other countries, it would be triply impossible for Mr. Ahmed to visit them if released with conditions – first, because the pandemic has largely shut down Americans' ability to visit those countries; second, because he has no passport; (Doc. 88 at 67, Doc. 59 at 28–29) and third, because the conditions would presumably include measures designed to further ensure that he cannot leave the country.

**(2)    Danger to the Community**

Mr. Ahmed has lived in the United States for eleven years without committing so much as a traffic infraction. He has never been charged with, arrested for, or convicted of a single offense in this country. (Doc. 88 at 67, Doc. 59 at 28–29.) In the abundant letters of support submitted to the magistrate judge, people who know Mr. Ahmed attest to his peaceful and law-abiding nature. (Docs. 55, 56, 57.) The charges against him are serious, but these unproven fourteen-year-old allegations are the sole basis for the suggestion that he could present a danger to anyone. Treating them as a sufficient basis for deeming him a danger would be tantamount to declaring him guilty until proven innocent.

In short, the magistrate judge's conclusory assertion that if released Mr. Ahmed would present a danger to the community, and a risk of flight beyond what could be addressed by appropriate release conditions, is insupportable.

**IV.    Conclusion**

This Court should revoke the detention order in this case and order Mr. Ahmed released, with any necessary and appropriate conditions, pending the adjudication of his extraditability.

17