1  PAUL ANTHONY MARTIN
   Acting United States Attorney
2  District of Arizona

3  TODD M. ALLISON
   Arizona State Bar No. 026936
4  DAVID A. PIMSNER
   Arizona State Bar No. 007480
5  RACHEL C. HERNANDEZ
   Arizona State Bar No. 016543
6  DIMITRA H. SAMPSON
   Arizona State Bar No. 019133
7  Assistant United States Attorneys
   Two Renaissance Square
8  40 N. Central Ave., Suite 1800
   Phoenix, Arizona 85004
9  Telephone:  602-514-7500
   Email: Todd.Allison@usdoj.gov
10 Email: David.Pimsner@usdoj.gov
   Email: Rachel.Hernandez@usdoj.gov
11 Email: Dimitra.Sampson@usdoj.gov
   Attorneys for the United States

12

13            IN THE UNITED STATES DISTRICT COURT

14              FOR THE DISTRICT OF ARIZONA

15

| | |
|---|---|
| In the Matter of the Extradition of Ali Yousif Ahmed Al-Nouri a/k/a Ali Youssef Ahmed Al-Nouri, Ali Ahmed, Ali Yousif Ahmed Al Noori, Ali Yousif Ahmed Nouri, Ali Al-Daleme, Ali Yousif Ahmed Al-Mahmadi, Ali Yousif Ahmed, and Ali Yousif Nouri. | No. 20-8033MJ **UNITED STATES' MEMORANDUM IN SUPPORT OF EXTRADITION** |

20        On January 28, 2020, the United States filed a complaint for the extradition of Ali

21 Yousif Ahmed Al-Nouri ("Ahmed" or the "fugitive"), at the request of the Government of

22 Iraq pursuant to the Extradition Treaty between the United States and the Government of

23 Iraq (the "Treaty").[1]  In support of its request for Ahmed's extradition, Iraq has submitted

24 the appropriate documents to the United States Department of State.  (*See* Doc. 3.)  By

25 statute, this Court must hold a hearing to consider the evidence of criminality presented by

26

27 _____

28        [1] Extradition Treaty Between the United States of America and Iraq, U.S.-Iraq, June 7, 1934, 49 Stat. 3380. (Extrad. Req. 00005-00012.)

Iraq and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184.

The United States respectfully submits this memorandum to set forth the procedural and factual background of the case and to explain the legal standards and protocols that govern extradition proceedings under 18 U.S.C. § 3184. As detailed herein, the evidence submitted by Iraq fulfills the relevant Treaty requirements. The Court should therefore "certify the same" to the Secretary of State, who will decide whether to surrender the fugitive "according to the treaty." *Id.*[2]

## I.   BACKGROUND

### A.   Procedural Background

Ahmed is wanted by Iraq to stand trial for two counts of premeditated murder in violation of Article 406(1)(A) of the Iraqi Penal Code No. 111 of 1969. (Extrad. Req. at 00018–00026.)[3] Judge Jabbar Hussein of the Magistrate Court of Al-Karkh in Iraq issued a warrant for Ahmed's arrest on May 12, 2019. (Extrad. Req. at 00048–00052.) At that time, Ahmed was living in the United States, after having come here in 2009 and having become a naturalized U.S. citizen in 2015. (Doc. 14.) Accordingly, on October 17, 2019, the Government of Iraq submitted its request for Ahmed's extradition. (Docs. 3-3 and 3-4.)

Ahmed was arrested on January 30, 2020, in Phoenix, Arizona, on the basis of Iraq's request for his extradition. (Doc. 11.) On May 8, 2020, and May 15, 2020, the Court held a detention hearing for Ahmed. (Docs. 72, 86.) On September 21, 2020, the Court issued

---

[2] After the Court has completed its "limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender." *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 829 (11th Cir. 1993). "The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations, which the extradition magistrate may not." *Id.*

[3] Attached to the Extradition Complaint on the public docket is a redacted copy of Iraq's Extradition Request. (*See* Docs. 3-3 and 3-4.) The facts herein are drawn from the Extradition Request and will be cited as "Extrad. Req." followed by the Bates-stamped page numbers found at the bottom of each page.

an order detaining Ahmed until his extradition hearing.  (Doc. 110.)  Ahmed is currently detained.[4]

On February 26, 2021, Ahmed moved to compel the production of six categories of documents, including any exculpatory information.  (Doc. 180.)  The government opposed Ahmed's motion, while also noting that it was not in possession of certain requested exculpatory information.  (Doc. 184.)  The Court denied Ahmed's motion except as it related to any such exculpatory materials.  (Doc. 191.)

The Court has set an extradition hearing to be held on May 25, 2021.

## B.    Factual Background

According to the information provided by the government of Iraq, Ahmed served as the leader/Emir of a group of Al-Qaeda terrorists in Fallujah, Iraq.  In 2006, the group planned and successfully executed two separate operations to kill Iraqi police officers:  the first, to kill Issam Ahmed Hussein ("Issam"), a First Lieutenant in the Fallujah Police Directorate, and the second, to kill Khalid Ibrahim Mohammad ("Khalid"), a police officer in the Fallujah Police Directorate.

On or about June 1, 2006, Issam was sitting with another individual ("Eyewitness 1"), near a store on Street 40 in Fallujah when two cars with masked and armed individuals pulled up.  Six men got out of the cars and approached Issam and Eyewitness 1.  One of the men held a gun to Eyewitness 1's head and told him not to move.  Another of the men started to shoot at Issam, but his handgun malfunctioned.  According to Eyewitness 1, Ahmed, who was not wearing a mask at that time, approached, pulled out a gun, and said, "leave him, this is 1st Lieutenant Issam and he serves as a policeman."  One of the other

---

[4] Ahmed filed an appeal of the detention order with the Ninth Circuit, which was dismissed for a lack of jurisdiction. *United States v. Al-Nouri*, 983 F.3d 1096, 1098 (9th Cir. 2020).  While the appeal was pending, Ahmed filed an Emergency Motion to Reopen Detention.  (Doc. 127.)  After extensive briefing (Docs. 132, 141, 146, 149, 152, and 161), the Court denied the motion.  (Doc. 179.)  Ahmed has appealed the original detention order, as well as the denial of his motion to reopen detention, to the District Court.  (Doc. 182.)  The government has opposed his motion, which remains pending.  (Doc. 188.)

masked men told Ahmed to step back[5], and another man shot Issam multiple times with an AK-47, killing him. Ahmed and the other armed men fled from the scene. Eyewitness 1 identified Ahmed as the Emir of the group of armed, masked men that conducted the shooting. (*See* Extrad. Req. at 00087, 00101-00105.)

On or about October 3, 2006, Khalid was sitting outside a store on Street 40 in Fallujah with two other people when Ahmed and other individuals, who were wearing masks and carrying various weapons, drove up in a car and began shooting at Khalid. Ahmed and the other men shot and killed Khalid, as well as the other two individuals with whom Khalid had been sitting, and then fled the scene. (*See* Extrad. Req. at 00054, 00058, 00061-00064, 00072-00081.)

A local resident ("Eyewitness 2") witnessed Khalid's murder. Eyewitness 2 lived near Ahmed and identified him as a carpenter in Fallujah who was known for conducting assassination operations on members of the police force. Eyewitness 2 was sitting across the street from Khalid at the time of the murder. Eyewitness 2 witnessed a group of armed men pull up in a vehicle—an Opel—and open fire at Khalid. Eyewitness 2 recognized Ahmed among the assailants when his mask fell off and later identified him in a multi-photograph line-up. Eyewitness 2 saw Ahmed get out of the car and shoot Khalid. (*See* Extrad. Req. at 00072, 00074.)

Another local resident ("Eyewitness 3") was standing near the location where the shooting took place and witnessed Khalid's murder. Eyewitness 3 knew Ahmed as a local carpenter in Fallujah who was known for conducting assassination operations on members of the police force. Eyewitness 3 recognized Ahmed during the shooting when his mask fell off. Eyewitness 3 later identified Ahmed in a multi-photograph line-up. (*See* Extrad.

---

[5] The documents submitted with the Extradition Request contain two translated reports of Eyewitness 1's testimony. In one of the reports, Eyewitness 1 testified that the masked man responded to Ahmed by stating, "[S]tep back and don't interfere with this matter." (*See* Extrad. Req. at 00104.) The other report includes Eyewitness 1's testimony that the masked man responded to Ahmed by stating, "Ali step back, it is not your business." (*See* Extrad. Req. at 00105.)

Req. 00072, 00075.)

Subsequently in 2006, one of the members of Ahmed's group ("Cooperator 1"), was captured by coalition forces and turned over to the Iraqi police. Cooperator 1 admitted to being part of an Al-Qaeda group, of which Ahmed was the Emir. Cooperator 1 confessed to working with Ahmed and other members of the group to kill police officers. (*See* Extrad. Req. at 00072-00073, 00077-00081, 00084-00085, 00106-00110.)

Cooperator 1 admitted to being involved in planning the operation to kill Khalid. Cooperator 1 and the rest of the group conducted surveillance of Khalid prior to the shooting. Cooperator 1 was present on the day of Khalid's murder and served a supporting role in that operation by driving one of the cars involved and was present where the shooting occurred. Cooperator 1 testified that Ahmed took part in the operation. Cooperator 1 also testified that he received payment for his participation in this murder. (*See* Extrad. Req. 00072-00073, 00077-00081, 00084-00085, 00106-00110.)

Cooperator 1 told police that s/he was present when Ahmed and other members of the group planned to kill Issam. Cooperator 1 said that s/he went to the murder location in a separate vehicle to conduct surveillance but did not get out of his/her car and did not participate in the shooting. Later, Ahmed told Cooperator 1 that Ahmed had executed the operation to kill Issam with Ahmed's 9mm handgun. (*See* Extrad. Req. at 00072-00073, 00077-00081, 00084-00085, 00106-00110.)

## II. THIS COURT SHOULD CERTIFY AHMED AS EXTRADITABLE BECAUSE ALL OF THE CERTIFICATION REQUIREMENTS HAVE BEEN MET.

### A. General Principles of Extradition

Extradition is primarily an executive responsibility with a specially defined role for a judicial officer, who is authorized by statute to determine whether to certify to the Secretary of State that the submitted evidence is "sufficient to sustain the charge." 18 U.S.C. § 3184. That judicial function is carried out by conducting the hearing pursuant to 18 U.S.C. § 3184. At the hearing, the Court should consider the evidence presented on

behalf of the requesting country and determine whether the legal requirements for certification, as defined in the treaty, statutes, and case law, have been established. If any evidence is offered by the fugitive, the Court rules on its admissibility. Once the evidentiary record is complete, the Court should make written findings of fact and conclusions of law as to each of the elements for certification, including separate findings for each offense as to which extradition is sought. *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973). Once the Court issues its certification, the Secretary of State then decides whether to surrender the fugitive to the requesting country.

In fulfilling its function under Section 3184, the Court should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 14 (1936); *Factor v. Laubenheimer*, 290 U.S. 276, 301 (1933); *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 n.3 (9th Cir. 1981) ("[T]reaties should be construed to enlarge the rights of the parties."). Accordingly, the Treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure." *Factor*, 290 U.S. at 298. The United States does not expect foreign governments to be versed in our criminal laws and procedures. *Grin v. Shine*, 187 U.S. 181, 184 (1902). Thus, "[f]orm is not to be insisted upon beyond the requirements of safety and justice," *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925), and objections that "savor of technicality" do not find favor in court, *Bingham v. Bradley*, 241 U.S. 511, 517-18 (1916).

**B.  The Requirements for Certification Are Satisfied.**

A court must certify a fugitive as extraditable where: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the applicable treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought. *See, e.g.*, *Fernandez*, 268 U.S. 311; *Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008). Each of these elements has been met in this case.

### 1.  This Court Has Authority Over the Proceedings.

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State."  18 U.S.C. § 3184.  Here, Rule 57.6(d)(15) of the Local Rules of Criminal Procedure expressly delegates to magistrate judges the authority to handle extradition matters.  This Court is therefore authorized to conduct the hearing in this case.

### 2.  This Court Has Jurisdiction Over Ahmed.

It is also well settled that the Court has jurisdiction over a fugitive found within its jurisdictional boundaries.  18 U.S.C. § 3184 (a court "may, upon complaint made under oath, charging any person found within his jurisdiction, . . . . issue [its] warrant for the apprehension of the person so charged"); *Grin*, 187 U.S. 181 (1902).  Ahmed was arrested in Phoenix, within the District of Arizona.  Accordingly, this Court has jurisdiction over him.

### 3.  The Relevant Treaty Is in Full Force and Effect.

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state.  *See* 18 U.S.C. § 3184; *see also Then v. Melendez*, 92 F.3d 851, 854 (9th Cir. 1996) (dismissing *habeas* petition challenging certification of extradition because, among other reasons, district court did not err in determining extradition treaty to be valid).  Here, an attorney in the Office of the Legal Adviser for the U.S. Department of State has provided a declaration attesting to the fact that there is a treaty in full force and effect between the United States and Iraq.  (*See* Extrad. Req. at 00001.)  The Court must defer to the Department of State's determination in that regard.  *Then*, 92 F.3d at 854; *see also, e.g.*, *Arias Leiva v. Warden*, 928 F.3d 1281, 1288-1292 (11th Cir. 2019); *In re Extradition of Martinelli Berrocal*, No. 17-22197-Civ-TORRES, 2017 WL 3776953, at *11 (S.D. Fla. Aug. 31, 2017) (noting that "every Circuit Court, including our own, has deferred to the executive branch" as to whether an extradition treaty is in force) (collecting cases).

### 4.    The Crimes Are Covered by the Treaty.

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. Article I of the Treaty provides for the return of fugitives charged with, or convicted of, any of the crimes specified in Article II of the Treaty and committed within the jurisdiction of the requesting country. In assessing whether the crimes for which extradition is requested are covered by the Treaty, the Court should examine the description of criminal conduct provided by Iraq in support of its charges and decide whether it constitutes an offense among those listed in Article II. *See Factor*, 290 U.S. at 299-300. In determining whether an offense for which extradition is requested is among those listed in the relevant treaty, "a narrow and restricted construction is to be avoided . . . . For that reason, if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." *Id.* at 293-94; *see also, e.g.*, *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) (treaty that listed "murder" as extraditable encompassed offenses charged as "war crimes"). Item 1 in Article II lists "murder," with which the Government of Iraq has charged Ahmed, as an extraditable offense.

Article II of the Treaty further defines the listed offenses as extraditable if they are "punishable by the laws" of both the United States and Iraq. In assessing whether the crimes for which extradition is requested meet that requirement, the Court should examine the description of criminal conduct provided by Iraq in support of its charges and decide whether that conduct, if it had been committed here, would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See, e.g.*, *Knotek*, 925 F.3d 118, 1128-29 & n.10 (9th Cir. 2019); *Cucuzzella*, 638 F.2d at 107-08.

A requesting country need not establish that its crimes are identical to ours. *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998) ("The primary focus of dual criminality has always been on the conduct charged; the elements of the analogous offenses need not be identical."). Rather, "the court looks at whether 'the essential character of the transaction

is the same, and made criminal by both statutes.'" *Knotek*, 925 F.3d at 1131 (quoting *Wright v. Henkel*, 190 U.S. 40, 62 (1903)) (brackets omitted).  Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).  Here, the alleged conduct underlying the Iraqi charges against Ahmed would be punishable under U.S. law as, for example, murder in violation of 18 U.S.C. § 1111 or Arizona Revised Statutes § 13-1105(A)(1) or (3).

5.　　The Evidence Establishes Probable Cause that Ahmed Committed the Charged Murders.

The standard of proof to find the evidence "sufficient to sustain the charge" pursuant to Section 3184 is the familiar domestic requirement of probable cause.  The Court must conclude there is probable cause to believe that the crimes charged by Iraq were committed and that the person before the Court committed them.  *Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006); *Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2005) (en banc).

The evidence is sufficient, and probable cause is satisfied, if a person of ordinary prudence and caution can conscientiously entertain a reasonable belief in the probable guilt of the accused.  *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975).  The Supreme Court stated in *Benson v. McMahon*, 127 U.S. 457, 463 (1888), that:

> the proceeding before the commissioner is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him, but rather of the character of those preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused, either by imprisonment or under bail, to ultimately answer to an indictment, or other proceeding, in which he shall be finally tried upon the charge made against him.

*See also Collins*, 259 U.S. at 316 ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial,

and not to determine whether the evidence is sufficient to justify a conviction."); *Fernandez*, 268 U.S. at 312 ("Competent evidence to establish reasonable grounds is not necessarily competent evidence to convict."); *Barapind*, 400 F.3d at 752 ("While these facts alone might not be sufficient to prove beyond a reasonable doubt that Barapind shared his accomplices' intent to murder Kulwant, they do provide competent evidence for finding probable cause of Barapind's guilt as an accomplice or co-conspirator."); *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) ("Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict."). The extradition judge's probable cause determination is "'not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 (9th Cir. 1981)).

All types of foreign evidence can be offered in support of extradition requests, including police or prosecutor summaries, hearsay accounts dictated to investigators, and crime reports. *See, e.g.*, *Collins*, 259 U.S. at 317 ("unsworn statements of absent witnesses" may support an extradition court's finding of probable cause); *Zanazanian v. United States*, 729 F.2d 624, 625-27 (9th Cir. 1984) (rejecting fugitive's argument that "multiple hearsay does not constitute competent evidence"). The type of evidence Iraq submitted here in support of its extradition request is among the most probative: it includes the first-hand accounts of three eyewitnesses and one co-conspirator, each of whom had personal knowledge of the events described in their statements, which were provided under oath before the investigating judge. *See, e.g.*, *Zanazanian*, 729 F.2d at 627 (identifying signed witness statements as being particularly reliable).

Iraqi law criminalizes "willfully kill[ing] another" where "such killing was premeditated." (Extrad. Req. at 00021 (Article 406(1)(A) of the Iraqi Penal Code No. 111 of 1969).) The evidence provided by Iraq includes statements from an eyewitness who saw Ahmed among the group of armed men who murdered Issam, two eyewitnesses who saw

Ahmed murder Khalid, and a co-conspirator-turned-cooperator who detailed Ahmed's involvement in both murders as Emir of a terrorist group that assassinated police officers. Additionally, the co-conspirator, who admitted to conducting surveillance both before and during the murders, detailed how the crimes were planned in advance. Accordingly, Iraq's request for Ahmed's extradition establishes probable cause that he committed the murders of Issam and Khalid in violation of Article 406(1)(A) of the Iraqi Penal Code No. 111 of 1969 on June 1, 2006, and October 3, 2006, respectively.

**C. The Documentary Evidence Submitted by Iraq Is Alone Sufficient for Certification.**

The extradition hearing prescribed by 18 U.S.C. § 3184 is unique and limited in its nature. *See, e.g.*, *Martin*, 993 F.2d at 828. Unlike a criminal proceeding, its purpose is to decide the sufficiency of the charge under the treaty, not guilt or innocence—that is for the foreign court. *Neely v. Henkel*, 180 U.S. 109, 123 (1901); *Benson*, 127 U.S. at 463 (1888); *Barapind*, 400 F.3d at 752. Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition hearings. *See* Fed. R. Crim. P. 1(a)(5) (stating that "extradition and rendition of a fugitive" are not governed by rules); Fed. R. Evid. 1101(d)(3) (evidence rules are inapplicable to "miscellaneous proceedings such as . . . extradition or rendition"); *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406 (9th Cir. 1988). Rather, "unique rules of wide latitude govern reception of evidence" in extradition hearings. *Sayne v. Shipley*, 418 F.2d 679, 685 (5th Cir. 1969) (citation and internal quotation marks omitted). Among these rules are the following:

**1. Written Submissions Are Sufficient; No Live Witnesses Are Required.**

Extradition treaties do not contemplate the introduction of live witness testimony at extradition proceedings because to do so "would defeat the whole object of the treaty." *Bingham*, 241 U.S. at 517. Thus, hearsay evidence is admissible at extradition hearings and may properly support a finding of extraditability. *See id.* (rejecting fugitive's claim that *ex parte* witness affidavits submitted in support of his extradition to Canada should

not be considered because he had not had the opportunity to cross-examine those witnesses); *see also Collins*, 259 U.S. at 317; *Zanazanian*, 729 F.2d at 626-27 (unsworn written statements may properly form the basis for extradition); *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir. 1980) (same). Accordingly, a finding of extraditability may be, and typically is, based entirely on the authenticated documentary evidence and information provided by the requesting government. *See, e.g.*, *Bovio v. United States*, 989 F.2d 255, 259-61 (7th Cir. 1993) (Swedish investigator's statement sufficient to establish probable cause); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433-34 (S.D. Fla. 1993) (documents and statements sufficient for extradition to Honduras), *aff'd*, 28 F.3d 116 (11th Cir. 1994).

The Treaty and other federal law govern both the nature of, and the admissibility of, the evidence at an extradition hearing. Article XI of the Treaty lists the required submissions by the Government of Iraq. In particular, it requires that "a duly authenticated copy of the warrant of arrest in the country where the crime was committed, and copies of the depositions upon which such warrant may have been issued, shall be produced, with such other evidence or proof as may be deemed competent in this case." Section 3190 of Title 18 of the U.S. Code provides that "properly and legally authenticated" documentary evidence including "depositions, warrants, or other papers or copies thereof *shall be admitted*." 18 U.S.C. § 3190 (emphasis added); *see Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164 (11th Cir. 2005), *cert. denied*, 546 U.S. 993 (2005); *see also Collins*, 259 U.S. at 313. Proof that the authentication is proper and legal exists if the documents are accompanied by the certificate of an appropriate U.S. diplomatic or consular officer in the requesting country attesting that the documents would be admissible for similar purposes in that country. 18 U.S.C. § 3190. The documents filed in this case at Doc. 3-3 and 3-4 are accompanied by a certification of David Ian Hopper, Consul General of the United States Embassy in Baghdad, Iraq, attesting to the authenticity of the foreign official's signature and, therefore, are admissible in these proceedings. (*See* Extrad. Req. at 00014.)

2.    Ahmed's Ability to Enter Evidence is Significantly Limited.

Ahmed's opportunity to challenge the evidence introduced against him in the

extradition proceeding is heavily circumscribed. He may not introduce evidence that contradicts the evidence submitted on behalf of Iraq, attempt to establish an alibi, or present a defense. *See Santos v. Thomas*, 830 F.3d 987, 992 (9th Cir. 2016); (*see also* Doc. 110, at 5-6 (quoting *Santos*, 830 F.3d at 993)). Moreover, procedural defenses are not permitted. *See Bingham*, 241 U.S. at 517; *Glucksman v. Henkel*, 221 U.S. 508, 513-14 (1911).

Instead, a fugitive's right to controvert the evidence introduced against him is "limited to testimony which explains rather than contradicts the demanding country's proof." *United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963); *see also Collins*, 259 U.S. at 315-17; *Barapind*, 400 F.3d at 749. In general, "explanatory evidence is evidence that explains away or completely obliterates probable cause, whereas contradictory evidence is that which merely controverts the existence of probable cause, or raises a defense . . . [or] evidence the credibility of which could not be assessed without a trial." *Santos*, 830 F.3d at 992-93 (internal quotation marks and citations omitted). The allowance of "explanatory evidence" and prohibition on "contradictory evidence" at an extradition hearing is rooted in the fact that an extradition judge may not weigh conflicting evidence and determine what to credit, "but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." *Quinn*, 783 F.2d at 815. Issues requiring factual or credibility determinations are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

3.  Matters Other Than Sufficiency of the Evidence Are Left to the Secretary of State; Rule of Non-Inquiry

Other than the sufficiency of the evidence, all matters that may be raised by the fugitive as defenses to extradition are to be considered by the Secretary of State, not by this Court. *See* 18 U.S.C. §§ 3184, 3186. In making extradition determinations, "[t]he Secretary exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations—factors that may be beyond the scope of the magistrate judge's review." *Sidali v. I.N.S.*, 107 F.3d 191, 195 n.7 (3d Cir. 1997), *cert.*

*denied*, 522 U.S. 1089 (1998); *see also Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005) (extradition judge does not have authority to consider humanitarian objections to extradition); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state is a matter for consideration by the executive branch); *Quinn*, 783 F.2d at 789-90 (noting that "the Secretary of State has sole discretion to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a political crime, or to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive") (citation omitted). The Secretary takes into account humanitarian claims and applicable laws or policies regarding appropriate treatment in the receiving country. *See Ntakirutimana v. Reno*, 184 F.3d 419, 430 (5th Cir. 1999); *Martin*, 993 F.2d at 830 n.10 ("humanitarian considerations are properly reviewed by the Department of State"). This is consistent with the long-held understanding that surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State," within the Executive's "powers to conduct foreign affairs." *See In re Kaine*, 55 U.S. 103, 110 (1852).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of the fugitive's extradition—as defined in the applicable extradition treaty, statutes, and case law—have been established. *See Quinn*, 783 F.2d at 786 n.3 (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)) (analogizing extradition hearing to a preliminary hearing in a criminal case). If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary of State's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see Vo*, 447 F.3d at 1237; *Barapind v. Reno*, 225 F.3d 1100, 1105 (9th Cir. 2000).

**III. AHMED'S EXTRADITION IS NOT BARRED BY THE POLITICAL-OFFENSE EXCEPTION SET FORTH IN THE TREATY.**

**A.    Background on the Political-Offense Exception and the "Incidence" Test**

Article III of the Treaty provides, "The provisions of this Treaty shall not import claim of extradition for crimes of a political character nor for acts connected with such crimes." (Extrad. Req. 00009.) This provision of the Treaty allows for the so-called "political offense exception" to extradition, which is common in the United States' international extradition treaties.

Like many extradition treaties that include the political-offense exception, the Treaty does not define what constitutes a "political" offense. As a result, the Court may look to judicial interpretation of similar treaty language in other cases. The political-offense exception "prohibits the extradition of a person accused of offenses that are political in nature." *Nezirovic v. Holt*, 779 F.3d 233, 240 (4th Cir. 2015). Although the Court's role in certifying a fugitive's extradition is limited, *see Manta*, 518 F.3d at 1140, in this case, the Court has the ability to analyze the political-offense exception as part of the determination of whether the offense charged against the fugitive is within the terms of the governing treaty. *See, e.g.*, *Vo*, 447 F.3d at 1237-38; *Quinn*, 783 F.2d at 787, 791.

United States federal courts analyzing the political-offense exception have recognized two types of political offenses: "pure" political offenses and "relative" political offenses. *See, e.g.*, *Venckiene v. United States*, 929 F.3d 843, 854 (7th Cir. 2019); *Nezirovic*, 779 F.3d at 240; *Vo*, 447 F.3d at 1240; *Quinn*, 783 F.2d at 793. "Pure" political offenses are crimes such as treason and espionage that involve "acts directed against the state but which contain none of the elements of ordinary crime." *Venckiene*, 929 F.3d at 854; *see also Vo*, 447 F.3d at 140; *Quinn*, 783 F.2d at 793. "Relative" political offenses, on the other hand, are "otherwise common crimes committed in connection with a 'political act,' or 'common crimes . . . committed for political motives or in a political context." *Quinn*, 783 F.2d at 794; *see also Vo*, 447 F.3d at 140.

To determine whether a charged offense is a "relative" political offense, this Court

applies the two-prong "incidence" test. *See, e.g.*, *Vo*, 447 F.3d at 1240-41; *Barapind*, 400 at 751. The "incidence" test has two requirements: (1) the occurrence of an uprising or other violent political disturbance at the time of the charged offense, and (2) a charged offense that is "incidental to," "in the course of," or "in furtherance of" the uprising. *See, e.g.*, *Vo*, 447 F.3d at 1240-41; *Barapind*, 400 F.3d at 751; *Quinn*, 783 F.2d at 797.

The first requirement, the existence of an "uprising," requires evidence of "a revolt by indigenous people against their own government or an occupying power." *Quinn*, 783 F.2d at 807. For purposes of the political-offense exception, an "uprising" "cannot extend beyond the borders of the country or territory in which a group of citizens or residents is seeking to change their particular government or governmental structure." *Quinn*, 783 F.2d at 807.[6] An "uprising" is limited to "people rising up, in their own land, against the government of that land" and "does not cover terrorism or other criminal conduct exported to other locations." *Quinn*, 783 F.2d at 813-14.

The second requirement, the "incidental to" component, requires that the fugitive establish a "factual nexus between the crime and the political goal." *Barapind*, 400 F.3d at 751; *see also Quinn*, 783 F.2d at 809 ("The act must be causally or ideologically related to the uprising."); *Venckiene*, 929 F.3d at 856 (finding that the "incidental to" component requires "a direct link between the perpetrator [of the offenses], a political organization's political goals, and the specific act[s]") (quoting *Eain v. Wilkes*, 641 F.2d 504, 521 (7th Cir. 1981)); *In re Extradition of Suarez-Mason*, 694 F. Supp. 676, 707 (N.D. Cal. 1988) (offenses were not political where "there is absolutely nothing in the record which would support a finding of a rational nexus between the [offenses] and any uprising which may have been occurring").

To demonstrate the required nexus, the "incidental to" component requires the fugitive to show more than that a common crime was committed during a political uprising,

---

[6] The *Quinn* Court questioned whether the protections of the political-offense exception should be available, and whether the "incidence" test should apply, to acts committed in the course of "violent conflicts between nations that transcend national boundaries." 783 F.2d at 808 n.33.

*see, e.g.*, *Quinn*, 783 F.2d at 809 (holding that the "incidental to" requirement "is not satisfied by any connection, however feeble, between a common crime and a political disturbance"); *Barapind v. Amador*, No. 1:01-CV-06215 OWW, 2005 WL 2810540, at *10 (E.D. Cal. Oct. 24, 2005) (evidence simply that the offense for which extradition is sought "took place during [an] uprising is not sufficient"); *In re Extradition of Nezirovic*, No. 7:12MC39, 2013 WL 5202420, at *18 (W.D. Va. Sep. 16, 2013) (finding that, "the fact [the fugitive] was in an organized military unit during a political disturbance does not mean that every act he committed is covered by the political offense exception"), or that the fugitive subjectively sees the crime as having had some political purpose or motivation behind it, *see, e.g.*, *Barapind*, 400 F.3d at 751 ("[A] court may not rely on a fugitive's mere assurance that a crime had some political purpose").

Instead, the political-offense exception requires "a direct link between the perpetrator of the offenses, a political organization's political goals, and the specific acts." *Venckiene*, 929 F.3d at 856 (quoting *Eain*, 641 F.2d at 521) (internal alterations omitted); *see also In re Extradition of Koskotas*, 127 F.R.D. 13, 21 (D. Mass. 1989) ("Moreover, isolated acts of social violence, even if politically motivated and occurring during a time of political upheaval, are not sufficient to support a claim under the political offense exception."). Factors that weigh in favor of a finding that a crime may have been committed incident to a political uprising include "membership in an uprising group," "similarity of the charged offense to other acts committed by the uprising group," and "the degree of control over the accused's acts by some hierarchy within the group." *Quinn*, 782 F.2d at 810.

The Court's determination of whether an offense charged against a fugitive falls within the political-offense exception is a mixed question of law and fact. *See, e.g.*, *Vo*, 447 F.3d at 1240; *Quinn*, 783 F.2d at 791. Because the application of the political-offense exception is based on specific facts pertaining to the evidence presented, the context of the fugitive's specific charged offenses, and the motivation behind those offenses, courts have found the analysis of the political-offense exception to be "primarily a question of fact."

*Nezirovic*, 779 F.3d at 240; *see also Venckiene*, 929 F.3d at 850, 854 ("In applying political offense exceptions to extradition treaties, factual details matter . . . ."); *Ordinola v. Hackman*, 478 F.3d 588, 598 (4th Cir. 2007) (The political offense question is "a mixed question of law and fact, but mostly of fact.").

**B.   The Fugitive Bears the Burden of Proving the Applicability of the Political-Offense Exception Because It Is an Affirmative Defense.**

The political-offense exception is "an affirmative defense to extradition." *Vo*, 447 F.3d at 1242.   As the party presenting an affirmative defense, the fugitive bears "[t]he initial burden of proof . . . to establish the essential elements of the political offense exception." *Id.* at 1242 n.7.   The fugitive has the burden of demonstrating both prongs of the "incidence" test—the existence of an "uprising" and the "incidental to" nexus. *Cf. In re Extradition of Ang*, 486 F. Supp. 2d 1193, 1196, 1197 (D. Nev. 2006) (noting that the burden of proving the existence of an uprising as well as the burden of proving how the alleged criminal conduct itself was related to the uprising are both on the fugitive seeking the affirmative defense to extradition).   The fugitive's burden requires, at a minimum, a preponderance of the evidence. *See Ahmad v. Wigen*, 726 F. Supp. 389, 408 (E.D.N.Y. 1989).   Only after the fugitive meets his initial burden does the burden shift to the Government to point to evidence that the charged crime was not of a political character.

**C.   Although Iraq Endured an Insurgency in 2006, the Significant Involvement of al Qaeda in Iraq, a Transnational Terrorist Organization, Precludes a Legal Finding that an Indigenous Uprising Existed.**

During the time of the murders charged against Ahmed—June and October 2006—Iraq was experiencing an armed insurgency against the Iraqi government in power and the American Coalition forces.   As both Ahmed's expert, Professor Haider Ala Hamoudi, and the Government's expert, Professor Craig Whiteside, have explained, this insurgency was conducted not only by members of the local Iraqi Sunni population and related Iraqi-based resistance groups, but also by al Qaeda in Iraq ("AQI"), a transnational terrorist militant group involving local Iraqis as well as foreign fighters who came from outside Iraq to

participate in the fight against the American forces.[7]  While local Iraqi resistance groups were engaging in violent activity to take back their local government, AQI was engaging in similar violence to expel the American Coalition forces in order to take over Iraqi land to develop a transnational caliphate.[8]  Because of the significant role AQI played in the insurgency, the events in Iraq in 2006 cannot be considered an indigenous uprising for purposes of applying the political-offense exception.

In *Quinn*, the Ninth Circuit limited the definition of an "uprising" for purposes of the political-offense exception to "a revolt by indigenous people against their own government or an occupying power."  783 F.2d at 807.  Further, the court explained that, for purposes of finding that an "uprising" existed at the time of the charged offenses, the indigenous revolt "cannot extend beyond the borders of the country or territory in which a group of citizens or residents is seeking to change their particular government or governmental structure."  *Id.*  The *Quinn* court found that an uprising existed in Northern Ireland in 1974-75 because Provisional Irish Republican Army (PIRA) members conducted violent acts against the British forces in Northern Ireland and "sought to change the

---

[7] The United States hereby attaches as Exhibit 1 the 42-page Expert Report (without accompanying exhibits) of Ahmed's noticed expert, Haider Ala Hamoudi.  Ahmed provided the United States with the Expert Report on March 8, 2021.  The United States will cite to Professor Hamoudi's Report as "Hamoudi" followed by the relevant paragraph number(s) in the Report. The government reserves the right to file a motion in limine to exclude evidence offered by Professor Hamoudi before the Court-ordered deadline of April 30, 2021.

The United States also attaches as Exhibit 2 the 12-page rebuttal Expert Report of the United States' noticed rebuttal expert, Professor Craig Whiteside.  The United States provided the rebuttal Expert Report to Ahmed on April 7, 2021.  The United States will cite to Professor Whiteside's Report as "Whiteside" followed by the relevant page number(s).  Professor Whiteside's curriculum vitae was previously provided to the Court and Ahmed as Attachment A to the United States' Notice of Rebuttal Expert Witness. (Doc. 128-1.)

[8] In fact, by 2006, AQI had been designated a foreign terrorist organization ("FTO") by the United States.  On October 15, 2004, the United States Secretary of State designated Jam'at al Tawhid wa'al-Jihad as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.  On December 15, 2004, the Deputy Secretary of State added numerous aliases to the Jam'at al Tawhid wa'al-Jihad FTO designation, including the alias al-Qaida in Iraq.

structure of the government in that country, the country in which they lived." *Id.* at 813. However, based on the limited nature of an "uprising," the court found that the uprising did not extend to the same violent acts conducted by PIRA members in England, the home country of the occupying power. *Id.* Since *Quinn*, the Ninth Circuit has reiterated that an "uprising" requires that "[s]ubstantial violence was taking place, and the persons engaged in the violence were pursuing specific political objectives." *Barapind*, 400 F.3d at 747, 750-51 (finding that an uprising existed where Sikh nationalists and residents of India clashed with Indian government officers and sympathizers in India in the hopes of establishing an independent Sikh nation).

Importantly, in *Quinn*, the court warned that it did not intend for the political-offense exception to be used as a shield to international terrorists seeking refuge in the United States. *Quinn*, 783 F.2d at 805 ("The desire to exclude international terrorists from the coverage of the political offense exception is a legitimate one."); *id.* ("The application of the political offense exception to acts of domestic political violence comports in every respect with both the original justifications for the exception and the traditional requirements of the incidence test. The application of that exception to acts of international terrorism would comport with neither."). The *Quinn* court emphasized that the requirement that an "uprising" only "refers to a people rising up, in their own land, against the government of that land," precludes the political-offense exception from protecting international terrorism. *Id.* at 813-14.

In Ahmed's case, at the time of the charged murders, he was a citizen of Iraq who committed violent crimes within his own home country. However, rather than fighting alongside indigenous Iraqis who aimed to change the political structure of the Iraqi government, the Extradition Request shows that Ahmed conducted violent acts on behalf of AQI, a transnational terrorist organization with the primary goal of expelling American Coalition forces in order to take over Iraqi land and establish a caliphate extending beyond the Iraqi borders. (Whiteside, at 4.) Ahmed's conduct on behalf of AQI is supported by multiple witness accounts in the Extradition Request. (*See* Extrad. Req. 00079, 00104,

00106.)[9]

There is little dispute that, in the time period leading up to 2006, Iraqi nationals conducted violent acts to try to expel the American Coalition forces and the Iraqi government that was in place. (Hamoudi, at ¶¶ 96-106; Whiteside, at 9-10.) Moreover, there is no question that, in the time period leading up to the charged murders, AQI was just one of dozens of militant groups opposed to the American Coalition forces and the sitting Iraqi government. (Hamoudi, at ¶¶ 111-119; Whiteside, at 9-10.) As Professor Whiteside points out, however, around the time of the charged offenses, AQI had "a competitive edge" over Sunni resistance groups based in part on "[e]xternal funding from al-Qaeda and the presence of experienced foreign jihadists from the region." (Whiteside, at 4.) AQI conducted a significant number of suicide attacks in Iraq in 2006, and was considered "more dangerous" than other decentralized Iraqi insurgency groups because of AQI's experience, strategic effectiveness, and other resources. (Whiteside, at 4, 9-10.) As a result, at the time of the charged murders, AQI was one of the more dominant forces behind insurgent activities occurring within the country of Iraq. (*Id*.) Because AQI played a significant role in the insurgent activities in 2006, at the time Ahmed committed the charged acts, those activities do not fall within *Quinn*'s limited definition of an "uprising." The insurgency in Iraq cannot accurately be characterized solely as "a group of citizens or residents . . . seeking to change their particular government or governmental structure." *Quinn*, 783 F.2d at 807.

As discussed in Professor Whiteside's report, AQI, during the times of the charged murders, was anything but a local insurgency group focused on overthrowing the Iraqi government to change the political structure within the country of Iraq. Unlike local Iraqis

---

[9] One of the witnesses recognized Ahmed as the "Emir of the[] group" that conducted the murder of Issam and referenced the group's association with the "Islamic State" rather than AQI. In his testimony, the witness explained that the "militants" who conducted the murder "claimed to be in the Islamic State." (Extrad. Req. 00104.) As explained by Professor Whiteside, in and around October 2006, the group known as AQI ultimately developed into the entity referred to as the Islamic State of Iraq. (Whiteside, at 4.) Because the witness's statement is dated January 11, 2009, it is understandable as to why he referred to the group as the "Islamic State."

who were upset with the coalition forces and wanted to alter the Iraqi form of government, AQI had an entirely different objective. From October 2004 to October 2006, AQI "would operate in the region as an official al-Qaeda franchise." (Whiteside, at 4.) The group had a global agenda that included conducting terrorist attacks in surrounding areas. (Whiteside, at 5-6.) In the time period leading up to 2006, AQI conducted violent acts in furtherance of its objectives in Iraq, but also continued to conduct transnational terrorist operations in surrounding countries such as Jordan, Israel, and Turkey. (Whiteside, at 5.)

Although AQI continued to maintain involvement in international terrorist attacks, the group remained heavily focused on violent activity inside of Iraq; however, such involvement was not aimed at changing the composition of the internal Iraqi government or any commitment to "nationalism," but rather with an eye towards taking over Iraqi lands to establish a Salafi caliphate that would span throughout Iraq as well as into territories belonging to "Iraq's neighboring 'apstate' governments." (Whiteside, at 4, 8-9.) As Professor Whiteside points out, the group that the United States and international media referred to as "Al Qaeda in Iraq" referred to themselves as al-Qaeda's Base of Jihad in the Land of Two Rivers, a name that did not make any reference to being limited to the country of Iraq or Iraqis. Instead, the group's name referred to the larger geographic area of the land near the Tigris and Euphrates Rivers. (Whiteside, at 8.) The name of the group was purposeful because the group had no intention of limiting its command and control to the geographic confines of the country of Iraq. Instead, throughout the insurgency, AQI's focus was on "establish[ing] a caliphate in the Levant region, which includes parts of Iraq, Kuwait, Syria, and Turkey." (Whiteside, at 8.)

Moreover, far from being a group of "indigenous" Iraqi people, AQI had a history of being led by non-Iraqi foreign terrorists as well as having significant numbers of members in Iraq who were non-Iraqi foreign fighters. First, AQI was not formed by Iraqis in Iraq. As Professor Whiteside explains, AQI arose out of the Islamic State movement, which was started in Afghanistan in the late 1990s, by a Jordanian jihadist, Abu Musab al-Zarqawi. (Whiteside, at 2.) After U.S. forces in Afghanistan ejected Zarqawi and his group

from Afghanistan in 2002, Zarqawi led the group (then called *Tawhid wal-Jihad*) into northern Iraq. (*Id.*) Once in Iraq, Zarqawi pledged allegiance to Osama Bin Laden and changed the name of the group from *Tawhid wal-Jihad* to al-Qaeda's Base of Jihad in the Land of Two Rivers. (*Id.* at 4.) Second, AQI was never led by indigenous Iraqis. (*Id.* at 6.) Zarqawi led the group until his death in June 2006, at which time Abu Hamza al-Muhajir, an Egyptian, took over the leadership of the group. At the time of the charged murders, AQI's leader of the Anbar province, where Fallujah was located, was Jarrah al-Shami, a Syrian foreign fighter. (*Id.* at 7.) Third, during the time period of the charged offenses, documented records show that hundreds of foreign fighters entered Iraq to fight for AQI. (*Id.* at 6.)

In an attempt to separate AQI's activities in Iraq from a foreign, non-Iraqi, terrorist leader, Professor Hamoudi opines that the common belief that the Jordanian al-Zarqawi was the "strategic mastermind" behind AQI is "extremely misleading" and was exaggerated by the United States and Iraqi governments (Hamoudi, at ¶¶ 121-126); however, this opinion appears to be based on outdated materials, (*see* Whiteside, at 12), is undercut by AQI/ISIS's own words, (*see id.*), and contradicted by other materials cited in Ahmed's appellate brief appealing the detention order in this case.[10] The more accurate conclusion is that AQI's leadership and membership were not akin to an indigenous group

---

[10] In Ahmed's Detention Memorandum, he argued that the likelihood that he would be found non-extraditable based on the political-offense exception was a special circumstance warranting release. (Doc. 60, at 17.) In doing so, Ahmed offered a 2011 case study article from the Center for Strategic & International Studies entitled, *Al Qaeda in Iraq*. (*Id.* at 17 & n.11.) Ahmed continued to rely on this article in his FRAP 9(a) appellate brief filed in the Ninth Circuit on October 19, 2020, appealing the Court's detention order. (C.A. No. 20-10317, Doc. 3-1, at 15 & n.34.) That article refutes Professor Hamoudi's theories as to the role al-Zarqawi played in AQI as well as AQI's foreign-fighter membership in Iraq. *See, e.g.*, Kirdar, M.J., *Al Qaeda in Iraq*, at 2 (Ctr. for Strategic & Int'l Studies Jun. 2011), *available at* https://csis-website-prod.s3.amazonaws.com/s3fs-public/legacy_files/files/publication/110614_Kirdar_AlQaedaIraq_Web.pdf ("Zarqawi created, directed, and propelled the creation and rise of the group that would eventually become AQI. The loyalty his charismatic persona engendered among recruits and his instinctive organizational, operational, and strategic skills were instrumental to the group's emergence."); *id.* at 4 (referencing AQI as "his [Zarqawi's] group"); *id.* at 6 (Zarqawi "developed a support network that fueled his control over the flow of foreign fighters into Iraq").

fighting to take back a local government.

During the *Quinn* court's discussion of the "uprising" prong of the political-offense exception, the court emphasized that, "an 'uprising' can exist only when the turmoil that warrants that characterization is created by nationals of the land in which the disturbances are occurring." 783 F.2d at 807. The court then discussed what constitutes an "uprising" in the context of a previous case from the Seventh Circuit, *Eain v. Wilkes*, 641 F.2d 504 (7th Cir. 1981). In *Eain*, the Seventh Circuit rejected the applicability of the political-offense exception where a resident of the occupied West Bank who was a member of the Palestinian Liberation Organization ("PLO") was sought for extradition by Israel for setting a bomb that exploded in Israel, killing and injuring numerous people. *Id.* at 507. Although the Ninth Circuit in *Quinn* concluded that the Seventh Circuit had improperly applied the incidence test in *Eain*, the Ninth Circuit provided helpful guidance in the context of *Eain* as to what constitutes an "uprising." The Ninth Circuit explained:

> When PLO members enter Israel and commit unlawful acts, there is simply no uprising for the acts to be incidental to. The plain fact is that the Israelis are not engaged in revolutionary activity directed against their own government. They are not seeking to change its form, structure, or composition through violent means. That the PLO members who commit crimes are seeking to destroy Israel as a state does not help bring them within the political offense exception. In the absence of an uprising, the violence engaged in by PLO members in Israel and elsewhere does not meet the incidence test and is not covered by the political offense exception. To the contrary, the PLO's worldwide campaign of violence, including the crimes its members commit in the state of Israel, clearly constitutes "international terrorism."

*Quinn*, 783 F.2d at 807.

It is clear from the *Quinn* court's discussion of the *Eain* case that an "uprising" does not include violent activity conducted within a country by outside terrorist groups who are not residents of the country but have entered the country to commit the violent acts. As a result, in Ahmed's case, there would be no "uprising" had non-Iraqi members of AQI committed violent acts in Iraq, including the murders of Iraqi police officers, with the

objective of destroying Iraq as a state, even if committed at the same time that local indigenous Iraqis were fighting to take back their local government  The Ninth Circuit in *Quinn* could not have intended an opposite conclusion where a local Iraqi decided to conduct such violent acts in Iraq, not for purely political reasons, but on behalf of AQI in furtherance of AQI's global agenda to control Iraqi territory and develop a caliphate. Moreover, given that AQI played a significant role in the violence during the Iraqi insurgency, and in some ways, dominated the insurgency through its financial resources, association with international terrorists, strategic effectiveness, coordinated and experienced foreign fighters, and efforts to terrorize the local Iraqi population, the situation in Iraq in 2006 was not the sort of indigenous local uprising that the Ninth Circuit contemplated in *Quinn*.

As a result, this Court should find that, although Iraq weathered a violent insurgency at the time of Ahmed's charged murders, the insurgency cannot be characterized as an "uprising" for purposes of the political-offense exception.

### D. Ahmed Fails to Meet His Burden of Demonstrating that the Charged Murders Were Incidental to Any Indigenous Uprising in Iraq.

If the Court decides that, despite AQI's significant role in the violent insurgency occurring in Iraq at the time of the charged murders, there still existed an "uprising" for purposes of the political-offense exception because indigenous Iraqis simultaneously revolted, then Ahmed's argument still fails because he cannot meet his burden of showing that the charged murders were incidental to that uprising.

> 1. Based on the Evidence in the Extradition Request, Ahmed and His Associates Committed the Charged Crimes for Monetary Gain and in Furtherance of AQI's Objectives.

For Ahmed to meet his burden that the charged murders were incidental to the indigenous uprising, he must show that a "factual nexus" exists between the charged crime and the specific political goal of the uprising. *See Barapind*, 400 F.3d at 751.  Generally, the crime of murder is not considered a political crime, but rather a common crime. *See,*

*e.g.*, *Meza v. Attorney General*, 693 F.3d 1350, 1359 (11th Cir. 2012). Ahmed cannot simply rely on the fact that the charged murders may have been committed during the time of an indigenous uprising. *See, e.g.*, *Quinn*, 783 F.2d at 809 (holding that the "incidental to" requirement "is not satisfied by any connection, however feeble, between a common crime and a political disturbance"); *Barapind*, 2005 WL 2810540, at *10 (mere evidence that the offense for which extradition is sought "took place during [an] uprising is not sufficient"). Rather, Ahmed must demonstrate a "direct link" between himself, the charged murders, and the political objectives of the indigenous uprising. *See, e.g.*, *Venckiene*, 929 F.3d at 856.

The evidence presented in the Extradition Request shows that Ahmed and his associates committed both of the charged murders on behalf of AQI, and also did so for personal monetary benefit. The Extradition Request includes the following evidence:

- During the time of the charged crimes, multiple Iraqi witnesses and plaintiffs provided information and/or sworn statements that Ahmed was known in Fallujah, Iraq, as being a member, and possibly even the leader, of an armed militant group known for assassinating police officers. (Extrad. Req. 00060, 00062, 00075, 00077, 00093, 00104, 00106.)

- Iraqi witnesses and plaintiffs described Ahmed and his group as "terrorists." (Extrad. Req. 00061, 00062, 00093.)

- The Iraqi Security Service has assessed Ahmed "additional members of his group" as being "members of the terrorist organization Al-Qaeda." (Extrad. Req. 00028.)

- The investigative judge in Iraq assigned to Ahmed's case provided a statement that, "Based on the conducted investigations, the available evidence indicates that the [murders of Khalid and Issam] were committed by [Ahmed] and his group of Al-Qaeda organization in Iraq." (Extrad. Req. 00018.) Additionally, the investigative judge has advised that he has reviewed "Intelligence Reports received by this court of law" that have provided "important information

- 26 -

regarding the work of [Ahmed] and his inclusion in armed terrorist groups . . . ." (Extrad. Req. 00052.)

- One of the eyewitnesses to Issam's murder provided testimony that Ahmed's group "claimed to be in the Islamic State." (Extrad. Req. 00104.)

- One of Ahmed's associates who joined Ahmed's group and participated in the two charged murders with Ahmed ("Cooperator 1") identified the group as "working on killing police members" (Extrad. Req. 00077.)

- Cooperator 1 identified Ahmed's group as an armed militant group in the "Al-Qaeda organization" (Extrad. Req. 00079, 00106.)

- Cooperator 1 identified Ahmed as the "Emir," or leader, of the group. (Extrad. Req. 00106, 00109.)

- Cooperator 1 provided information that the individuals who participated in the murder of Khalid received 50,000 Iraqi Dinars for the murder. (Extrad. Req. 00077, 00080.)

The evidence in the Extradition Request supports that Ahmed committed the two charged murders on behalf of AQI and committed at least one of the charged murders, in part, for personal financial gain. Based on this evidence, the charged crimes are not incidental to any indigenous uprising occurring in Iraq at the time.

The fact that the Extradition Request includes evidence that Ahmed and his criminal associates were paid to commit at least one of the charged murders is sufficient to preclude a finding that the crime was purely of a political nature. Under the political-offense exception, a crime cannot be political in nature if it is committed for personal reasons. *Quinn*, 783 F.2d at 810 (internal citation omitted) ("[E]vidence that an act was 'committed for purely personal reasons such as vengeance or vindictiveness' may serve to rebut any presumption that a nexus exists."); *see also In re Doherty*, 599 F. Supp. 270, 277 n.7 (S.D.N.Y. 1984) (an otherwise political act can be deprived of its political character if committed for "purely personal reasons"). As the *Quinn* court emphasized, the political-offense exception "is not designed to protect mercenaries or others acting for nonpolitical

motives." *Quinn*, 783 F.2d at 810.

The idea that evidence of a crime committed for personal monetary gain, even if committed during an uprising, negates the applicability of the political-offense exception has been adopted by the United States Supreme Court. In *Ornelas v. Ruiz*, 161 U.S. 502 (1896), the only occasion in which the Court has addressed the political-offense exception, Mexico sought the extradition of individuals for murder, arson, robbery, and kidnapping after they took part in a violent raid on Mexican soldiers in a Mexican border town. *Id.* at 510. The fugitives claimed that the raid was part of a political movement to overthrow the existing government in Mexico and the offenses were purely political offenses. *Id.* The Court noted that there was sufficient evidence of revolutionary activity on the border, but rejected the applicability of the political-offense exception and found that based on the available evidence it was not convinced that the crimes were committed "in aid of a political revolt, an insurrection, or a civil war." *Id.* at 511. The Court noted that the "[i]dea that these acts were perpetrated with bona fide political or revolutionary designs" was negated by the facts available to the Court, namely that after the crimes were committed the individuals failed to continue into Mexico to further the revolutionary activity and instead crossed back into the United States with the money and property they had stolen. *Id.* at 511.

Similar to *Ornelas*, here, even if Ahmed's crimes were committed during an indigenous uprising in Iraq, any argument that the charged murders were committed incidental to the indigenous uprising is negated by the fact asserted in the Extradition Request that Ahmed and his accomplices committed at least one of the murders for monetary payment.

Even absent any evidence that Ahmed committed one of the murders as a mercenary for monetary gain, there is additional evidence that the two charged murders were not committed incidental to any indigenous Iraqi uprising based on the evidence that Ahmed and his group committed the murders on behalf of AQI. As explained above, AQI engaged in violent acts across Iraq during the time of the charged offenses; however, AQI did not

share the same goals and objectives as the indigenous Iraqi resistance groups.  While many local Iraqi insurgent groups committed violent acts to expel the American Coalition forces, they did so to alter the form and structure of the local Iraqi government.  Although AQI conducted similar violent attacks, AQI did not have goals aligned with the indigenous Iraqi uprising.  AQI's goal was to expel the American Coalition forces in order to take over Iraqi land to establish a transnational Salafi caliphate.  This contrast between AQI and local Iraqi resistance groups is further evidenced by a 2007 public criticism by an Iraqi resistance coalition against AQI.  (Whiteside, at 7.)  As such, if an indigenous uprising did exist at the time, *i.e.*, a revolt by indigenous Iraqi people against their own government or the occupying power, any crime committed on behalf of AQI was not done in furtherance of the indigenous uprising.

Even Professor Hamoudi recognizes the divergence between the objectives of local Iraqi resistance groups and AQI.  Professor Hamoudi acknowledges that AQI was involved in the insurgency in Iraq and "in some ways, AQI also extended beyond the limited confines of the insurgency."  (Hamoudi, at ¶ 111.)  Additionally, Professor Hamoudi admits that AQI's interest in fighting against the American Coalition forces in Iraq was not to focus on a change to the existing government of Iraq, but to ultimately establish an Islamic State, or caliphate.  (Hamoudi, at ¶ 117.)  With such a difference in the objectives of AQI versus the indigenous Iraqi groups, Ahmed's crimes on behalf of AQI could not be incidental to the indigenous uprising taking place.

In addition to the discrepancies between the strategic objectives of AQI as compared to the political goals of indigenous Iraqi resistance groups, AQI's leadership, membership, and global agenda do not support that they were acting in furtherance of any indigenous uprising in Iraq that occurred at the time.  AQI's ongoing terrorist attacks in outside of Iraq, growing membership of foreign fighters pouring into Iraq to further AQI's mission, multiple levels of foreign leadership, and allegiance to the international terrorist organization, al Qaeda, operated by Osama Bin Laden, all undercut the argument that any criminal act Ahmed and his associates conducted in Iraq on AQI's behalf was incidental to

the local Iraqi resistance.

Based on all of this, if the Court determines that an indigenous uprising existed at the time of the charged murders based on the actions of local Iraqi resistance groups, the evidence in the Extradition Request undercuts any argument that Ahmed committed the charged murders incidental to such an uprising.

### 2. Ahmed Has Failed to Provide Any Evidence that Sufficiently Undercuts the Facts in the Extradition Request.

Despite Ahmed having the burden of proving the applicability of the political-offense exception, Ahmed has so far not disclosed to the Government any direct evidence that he intends to offer to the Court in support of his argument that the charged crimes were incidental to any Iraqi indigenous uprising. The United States believes that because Ahmed is unable to provide any actual evidence that the murders were committed incidental to any indigenous uprising in Iraq, Ahmed will likely rely entirely on the opinion of Professor Hamoudi.

In his report, Professor Hamoudi essentially asks this Court to disregard any evidence in the Extradition Request that specifically aligns Ahmed and his accomplices with AQI, and instead directs the Court to focus solely on the act of conducting targeted killings of police officers in Iraq. According to Professor Hamoudi, such killings are categorically political in nature because they were "a classic tactic of the popular, domestic Sunni insurgency against the rising, Shi'a dominated government of Iraq that the United States was creating." (Hamoudi, at ¶ 88.) However, Professor Hamoudi's opinions fall short of assisting Ahmed in meeting his burden of proof for a number of reasons.

*First*, Hamoudi's opinion requires that the Court disregard the specific evidence in the Extradition Request that Ahmed and his group were aligned with AQI and instead engage in unsupported speculation that Ahmed may have been aligned with a local Iraqi insurgency group.

Apparently recognizing that the charged crimes cannot be found to be incidental to the Iraqi indigenous uprising if committed directly on behalf of AQI, Professor Hamoudi

opines that (1) targeted assassinations of local police officers were "classic" tactics of the Sunni insurgency, and (2) Zarqawi and international terrorists did not engage in the targeted killings of Iraqi police officers because they did not have the "skill set, the experience, nor the capacity as non-Iraqis to gather the necessary intelligence to design, plan, or carry out such operations." (Hamoudi, at ¶¶ 128-129.) However, Professor Hamoudi's opinion misses the mark.

Were the Court to follow Professor Hamoudi's recommendation—that the killing of any local police officer in Fallujah around the relevant time period was on behalf of an indigenous Iraqi insurgency group, not AQI—the Court would have to completely disregard contrary facts contained in the Extradition Request. Doing so would obviate the well-established view that the political-offense exception is a mixed question of law and fact, with an emphasis on the specific facts submitted by the requesting country, the context of the charged offenses, and the motivation behind those offenses. *See, e.g.*, *Nezirovic*, 779 F.3d at 240; *see also Venckiene*, 929 F.3d at 850, 854; *Ordinola*, 478 F.3d at 598. Professor Hamoudi's opinion suggests that the Court should disregard the specific witness statements in the Extradition Request from a local Iraqi eyewitness who was familiar with Ahmed and his group as well as from one of Ahmed's criminal associates that Ahmed's group conducted the killings on behalf of AQI. Although Professor Hamoudi suggests that possibly the crimes "were misattributed to AQI," (Hamoudi, at ¶ 130), surely, an individual living in Fallujah familiar with Ahmed's group's reputation and Ahmed's criminal associate who was involved in the same group and committing the same crimes know better than outside observers the group's association with AQI.

Professor Hamoudi's conclusion that because he believes Zarqawi and "international terrorists" were not capable of targeting local police officers it is more likely that the charged crimes were committed by another group, such as the Army of Omar, is entirely too speculative. It appears that, based on the parties' expert reports, at best, on some level the targeting of local Iraqi police officers was likely conducted by both Iraqi Sunni resistance groups, to undermine the Iraqi government (Hamoudi, at ¶¶ 103-105), as

well as AQI, to terrorize the local population and warn of the consequences of supporting the American Coalition forces or local Iraqi government, (Whiteside, at 10-11). Moreover, Professor Hamoudi's conclusion that Ahmed likely committed the murders on behalf of another group because Zarqawi and foreign fighters were not up to the task ignores the fact that as AQI developed into a dominant force in Iraq, AQI recruited local Iraqis, who joined the group and committed violent acts to further the group's objectives. (Whiteside, at 3.) As Professor Whiteside explains, assassinating local police officers in Iraq furthered AQI's objectives in that, for AQI, such conduct was less about impacting the indigenous insurgency and more about "terrorizing the local population . . . [and] dissuad[ing] locals from joining the government." (Whiteside, at 11.) Contrary to Professor Hamoudi's conclusion, there is no evidence that local Iraqis, such as Ahmed and his associates, who joined AQI would not have engaged in such conduct if called upon by AQI.

*Second*, Professor Hamoudi's suggestion that, for purposes of analyzing the political-offense exception, the Court should focus solely on the acts of killing police officers rather than Ahmed's membership in any particular group disregards the need for the Court to analyze a fugitive's motivation behind a charged crime if such evidence is available.

Professor Hamoudi asks the Court to disregard the witnesses' mentioning of Ahmed's group's association with al Qaeda or the Islamic State because the Court should only focus on the act, "the targeted assassination of police officers" for purposes of the political-offense exception, rather than "who committed it." (Hamoudi, at ¶ 130.)

Although the Ninth Circuit in *Quinn* advised that, for *a fugitive* to meet his burden as to whether a charged crime is incidental to an uprising, he is not required to provide "proof of the motive of the accused" or "the accused's membership in any [particular] group," the court was clear that such evidence, "though not necessary to the nexus determination, may play a part in evaluating the circumstances surrounding the commission of the offense." 783 F.2d at 809. There is no question that when such evidence exists, it is relevant to the court's determination as to whether a crime was incidental to a

particular indigenous uprising. *See, e.g.*, *Barapind*, 400 F.3d at 750 (finding that, in evaluating whether the fugitive has demonstrated the requisite nexus, "extradition courts should focus not on the types of acts alleged, but rather on the motivation for those acts") (citing *Quinn*, 783 F.3d at 809-10); *id.* (rejecting political offense defense where fugitive "provided no evidence at all to explain the motive for [a victim's] murder"); *Ordinola*, 478 F.3d at 600 (concluding that "a claimant whose common crime was not subjectively politically motivated cannot come within the exception regardless of whether the offense itself could be described as an objectively political one").

Often, fugitives introduce evidence of motivation behind a crime or membership in a specific uprising group in order to meet their burden of proving a nexus between the charged offense and the uprising. *See, e.g.*, *Barapind*, 2005 WL 2810540, at *6, *8 (although unsuccessful, fugitive offered various pieces of evidence to demonstrate that the killings were "incidental to" the Sikh uprising in India, including his membership in a militant separatist group that advocated for Sikh separatism); *Pitawanakwat*, 120 F. Supp. 2d at 932 (fugitive successfully established the political-offense exception based in part on his admission that he was a member of the insurgent group that was involved in an armed confrontation with the Royal Canadian Mounted Police); *Nezirovic*, 2013 WL 5202420, at *17-*18 (fugitive failed to establish that the charged offense was of a political nature, but in an effort to do so, admitted to being a member of a Croatian paramilitary group that fought against the Serbian troops in an attempt to argue that the charged offenses were incidental to the violent political uprising in Bosnia).[11]

Professor Hamoudi's suggestion that the Court should solely focus on the act of killing an Iraqi police officer to determine that the charged offenses are political in nature would require the Court to ignore existing evidence in the record that reflects on Ahmed's motivation behind the charged crimes. Instead, Professor Hamoudi's recommendation would mean that any time a crime is committed during an uprising against a political figure,

---

[11] *Cf. Quinn*, 783 F.2d at 811 (fugitive admitted membership in the Irish Republican Army, but not a more violent offshoot thereof, the Provisional Irish Republican Army, which was the specific uprising group at issue).

such as a local police officer, the crime is of a political nature regardless of any available evidence pertaining to the motive of the fugitive or the strategic objective behind the act. Such a conclusion would completely undercut the need for the court to conduct a separate inquiry, upon determining that an uprising exists, into whether the charged crime was incidental to the uprising.

Based on all of this, if the Court determines that an indigenous uprising existed at the time of the charged crimes based on the actions of local Iraqi resistance groups, Ahmed is unable to refute the evidence set forth in the Extradition Request and thus meet his burden of demonstrating that the charged murders were committed incidental to the goals and objectives of the uprising.

## IV. THE REMAINING ARGUMENTS PROFFERED BY AHMED'S PROPOSED EXPERT ARE WITHOUT MERIT.

Ahmed has indicated that he intends to submit further opinions from Professor Hamoudi in support of several additional claims that Ahmed believes bar his extradition. Hamoudi's report claims, *inter alia*, that: (1) Ahmed has not been charged with the crimes for which his extradition is sought, as required under the Treaty; (2) the case against Ahmed was improperly transferred among Iraqi criminal courts; (3) Ahmed cannot be sentenced to death if convicted of the offenses for which his extradition is sought, as the death penalty was suspended at the time of the murders; and (4) a lack of comity exists in that Iraq would not extradite its citizens to the United States. Each of these arguments fails to provide a basis on which this Court could deny extradition.

### A. Ahmed Has Been "Charged with" the Offenses for Which His Extradition Has Been Requested as Required Under the Treaty.

"The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellin v. Texas*, 552 U.S. 491, 506-07 (2008). Article I of the Treaty, similar to most extradition treaties, obligates the parties to extradite "any person charged with or convicted of" any of the crimes specified in Article II. Ahmed qualifies as such a person,

- 34 -

and Professor Hamoudi's overly narrow reading of the Treaty to the contrary should be rejected.

The view of the U.S. Department of State, as set forth in a declaration by an Attorney Adviser in the Office of Law Enforcement and Intelligence, is that Ahmed is "charged" as required under the Treaty. (*See* Declaration of Tom Heinemann, United States Department of State, ¶ 7 (hereinafter, "State Dep't Decl."), attached hereto as Exhibit 3.) Statements by the United States Department of State as to interpretation of treaties should be given great weight by the court. *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 168 (1999); *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184-185 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."). As explained in the declaration submitted in this case, the term "charged with" is not intended to limit the application of the Treaty to persons against whom a formal charging document has been brought. (*See* Exh. 3, State Dep't Decl., ¶ 3.) Instead, it is intended to refer to individuals who are sought for prosecution. (*Id*.) A broader understanding of the phrase "charged with" accommodates differences in criminal justice systems in the requesting and requested countries, particularly those where formal charging documents cannot be brought until a fugitive is returned. (*Id*. ¶ 4.)[12]

Although the view of the U.S. Department of State is alone sufficient to end the inquiry into the meaning of the "charged" requirement, other courts—including the Ninth Circuit—have reached the same conclusion in similar cases. Courts have explained that the term "charged" in an extradition treaty is "used in the generic sense only to indicate 'accused,'" in contrast to "'convicted,'" of certain crimes, and does not implicitly impose

---

[12] Professor Hamoudi states that, in Iraq, a person can only be charged with a crime, after the authorities have interviewed him or her. (Hamoudi, at ¶¶ 31-36.) If this is true, and the extradition treaty requires a formal charging document (of which there is no support for in the Treaty itself), then a person wanted for prosecution could only be extradited if he fled Iraq after he was interviewed but before he was convicted. Longstanding Supreme Court precedent explicitly prohibits such a narrow interpretation of the Treaty. *Factor*, 290 U.S. at 293-94.

any requirement that the fugitive be indicted, as in the U.S. legal system, or that formal "'charges' . . . [otherwise] be filed." *In re Assarsson*, 635 F.2d 1237, 1242-44 (7th Cir. 1980); *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1448 (9th Cir. 1987) (discussing and adopting the reasoning of *Assarsson*). Such an interpretation of "charged" accounts for the fact that foreign countries have different procedures than the United States for instituting criminal prosecutions. *See Causbie Gullers v. Bejarano*, 293 F. App'x 488, 489 (9th Cir. 2008) ("[T]here is no requirement in the Treaty or otherwise that Mexican proceedings must be commenced by an indictment of the type commonly used in criminal proceedings in the United States."). And in any event, "it would be inappropriate to engage in . . . an inquiry into the formal procedure a country uses in instituting prosecution." *Theron v. U.S. Marshal*, 832 F.2d 492, 499-500 (9th Cir. 1987) (rejecting fugitive's argument that South Africa had improperly incorporated an indictment into a superseding indictment), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482 (1997). Construing "charged" broadly thus comports with the general reluctance of U.S. courts to delve into analyzing the requirements of foreign criminal procedure, given their lack of expertise in foreign law, and out of respect for foreign countries' sovereignty. *See, e.g.*, *Emami*, 834 F.2d at 1449; *Assarsson*, 635 F.2d at 1244; *cf. Sainez*, 588 F.3d at 717.

A broad definition of "charged" is further bolstered by the text of the Treaty at issue here. The two categories of covered persons established in Article I of the Treaty—those "charged with or convicted of" an extraditable offense—are further discussed in Article XI of the Treaty, which establishes what documents are required to accompany an extradition request. Where a person is charged with a crime, the requesting country must produce "a duly authenticated copy of the warrant of arrest in the country where the crime was committed, and copies of the depositions upon which such warrant may have been issued, . . . with such other evidence or proof as may be deemed competent in the case." By contrast, where a person is convicted of a crime, the requesting country must produce a duly authenticated "copy of the sentence of the court before which such conviction took

place." The Treaty does not require that the requesting country submit an indictment or a similar charging document. (*See* Treaty, Art. XI; Exh. 3, State Dep't Decl. ¶ 5.)

Here, the extradition request contains a warrant for Ahmed's arrest, which clearly demonstrates that Ahmed is wanted for prosecution for violations of Article 406(1)(A) of the Iraqi Penal Code No. 111 of 1969. (*See* Extrad. Req. at 00048-00051 ("you are authorized to detain him in your custody until he is presented to us to respond to the charges against him").)[13] Nothing further is required. *See, e.g.*, *In re Extradition of Sarellano*, 142 F. Supp. 3d 1182, 1186 n.2 (W.D. Okla. 2015) (foreign arrest warrant provided sufficient evidence that fugitive was "charged," even without evidence of the existence of a formal charging document, because the warrant "identifie[d] the offense in the [foreign] criminal code, set[] out the essential facts of the alleged crime, and detail[ed] the evidentiary basis for the charge"); *Kaiser v. Rutherford*, 827 F. Supp. 832, 834 (D.D.C. 1993) (stating that "[t]he Treaty's requirement that a party be charged with an offense simply requires that a party must be accused of a crime and does not require any particular technical stage of foreign criminal procedure"; and finding that an arrest warrant and prosecutor's statement given before a judge detailing the prosecution's case against the fugitive "are sufficient to charge [him] for purpose of extradition under the terms of the Treaty"); *In re Extradition of Rovelli*, 977 F. Supp. 566, 568 (D. Conn. 1997) (Italian arrest warrant provided sufficient evidence that fugitive was "charged" because it "constitutes a charging document under Italian Law").

Even if, as Professor Hamoudi claims, further investigation is required in Iraq, (Hamoudi, at ¶¶ 29-39), the U.S. Department of State and extradition courts have routinely approved extradition requests in such circumstances. *See* Exh. 3, State Dep't Decl., ¶ 4; *see also Emami*, 834 F.2d at 1448; *In re Extradition of Manrique*, No. 19MJ71055MAG1TSH, 2020 WL 5291903, at *3 (N.D. Cal. Sept. 4, 2020) ("reject[ing] [fugitive's] argument that only formal charges can satisfy the 'charged' requirement in the

---

[13] The documents submitted by Iraq also indicate that the case against Ahmed has been submitted for prosecution. (*See* Extrad. Req. at 00092, 00099, 00111, 00113-00115.)

treaty," even where fugitive was wanted for a "preliminary investigation"); *In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 986 (D. Or. 2011) (rejecting fugitive's argument that he was not "charged" where "[n]o indictment has been issued by [the requesting country] formally charging [the fugitive] with any crime," despite fugitive's claim that he was "merely a suspect wanted for investigation"); *In re Lam*, No. 1:08-MJ-247GSA, 2009 WL 1313242, at *3 (E.D. Cal. May 12, 2009) (rejecting fugitive's argument that he was not "charged" where "although the extradition documents indicate that [he] [wa]s charged with all of these crimes, the government subsequently clarified that [he] [wa]s only wanted for questioning regarding these offenses"); *In re Extradition of Lehming*, 951 F. Supp. 505, 510 (D. Del. 1996) (rejecting fugitive's argument that he was not "charged," where the warrant for his arrest sought his detention only "pending further investigation," given information in the warrant as well as a letter from the prosecutor indicating the requesting country's intent to prosecute him); *see also Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 129-30 (E.D.N.Y. 2001) (rejecting fugitive's argument that Swiss extradition request "did not formally charge him with any crime, but rather rest[ed] only on a 'soupçonné,' or suspicion," where intent to prosecute was established through issuance of arrest warrants and the extradition request containing detailed account of alleged crimes); *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 83-84 (S.D.N.Y. 2003) (rejecting fugitive's argument that no charge had been filed against him where Bosnian court orders issuing an arrest warrant, together with the extradition request describing "good reason" fugitive is suspected of having done the criminal act, sufficiently demonstrated an intent to prosecute fugitive), *rev'd in part on other grounds by Sacirbey v. Guccione*, 589 F.3d 52 (2d Cir. 2009).

### B. Whether or How the Case Against Ahmed Has Been Transferred Within the Iraqi Judicial System Is Irrelevant in These Proceedings.

"Judicial inquiry into foreign criminal procedural issues is limited in the extradition context." *Fejfar v. United States*, 724 F. App'x 621, 622 (9th Cir. 2018); *see also, e.g.*, *Grin*, 187 U.S. at 190 ("[I]t can hardly be expected of us that we should become conversant

with the criminal laws of [the requesting country], or with the forms of warrants of arrest used for the apprehension of criminals."); *Noeller v. Wojdylo*, 922 F.3d 797, 805 (7th Cir. 2019) ("[E]xtradition proceedings are not vehicles for United States federal courts to interpret and opine on foreign law."). Rather, "[a]ny arguments regarding the demanding country's compliance with its own laws . . . are properly reserved for the courts of that country." *Skaftouros v. United States*, 667 F.3d 144, 156, 160 (2d Cir. 2012). U.S. courts thus limit the scope of their review "out of respect for other nations' sovereignty." *Sainez*, 588 F.3d at 717; *see also, e.g.*, *Emami*, 834 F.2d at 1449; *Assarsson*, 635 F.2d at 1244. Accordingly, Professor Hamoudi's argument that Iraqi authorities have transferred the case against Ahmed from court to court in violation of Iraqi law (Hamoudi, at ¶¶ 68-71) is unavailing here. And, in any event, the Treaty does not require that Iraq submit documents detailing the procedural history of the case. (*See* Treaty, Article XI; Extrad. Req. 00011.)

### C. Claims Concerning the Treatment Ahmed May Face in Iraq or the State of the Iraqi Judicial System Are Barred by the Rule of Non-Inquiry.

The question of whether an extradition request should be denied on humanitarian grounds is reserved solely for the Secretary of State pursuant to the rule of non-inquiry. *See, e.g.*, *Lopez-Smith v. Hood*, 121 F.3d 1322, 1327 (9th Cir. 1997) ("[U]nder what is called the 'rule of non-inquiry' in extradition law, courts in this country refrain from examining the penal systems of requesting nations, leaving to the Secretary of State determinations of whether the defendant is likely to be treated humanely"); *Quinn*, 783 F.2d at 789-90 (the Secretary of State has "sole discretion . . . to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive"); *Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990) ("The interests of international comity are ill-served by requiring a foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced . . . It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds." (internal citation omitted)); *United*

*States v. Perez*, No. 1:15-MJ-0074 SKO, 2016 WL 931041, at *6 (E.D. Cal. Mar. 11, 2016) (certifying fugitive's extradition because "[t]he rule of non-inquiry bars consideration of [his] contentions regarding his treatment upon extradition"). Evaluation of any such claims falls outside the Court's delegated role, which is limited to the five findings required for certification. *See Venckiene v. United States*, 929 F.3d 843, 855 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 379 (2019) (the rule of non-inquiry "prevent[s] extradition courts from engaging in improper judgments about other countries' law enforcement and judicial procedures and serves interests of international comity by relegating to political actors the sensitive foreign policy judgments that are often involved in the question of whether to refuse an extradition request") (internal citations omitted); *Prasoprat*, 421 F.3d at 1116 ("We have long adhered to the rule of non-inquiry—that it is the role of the Secretary of State, not the courts, to determine whether extradition should be denied on humanitarian grounds or on account of the treatment that the fugitive is likely to receive upon his return to the requesting state.").

Pursuant to longstanding Supreme Court precedent, this Court is "bound by the existence of an extradition treaty to assume that the trial will be fair." *Glucksman*, 221 U.S. at 512 (1911). Ahmed's claims concerning Iraq's criminal justice system and the potential penalty he may face there (Hamoudi, at ¶¶ 133-163) are therefore not justiciable but rather should be raised before the Secretary of State, should this Court certify Ahmed's extradition.

**D.    Extradition of Citizens Is Within the Discretion of the Requested Party.**

Article VIII of the Treaty provides that "neither of the High Contracting Parties shall be bound to deliver up its own citizens." In other words, it is within the discretion of the United States to decide whether to surrender American citizens to Iraq pursuant to a valid extradition request. In an extradition proceeding, such discretionary matters are reserved for the Secretary of State, not the extradition court. *See* 18 U.S.C. § 3186; *Lopez-Smith*, 121 F.3d 1326 ("Once the certificate [of extraditability] issues, the Secretary may exercise discretion whether to extradite an American national."). Thus, the fact that Ahmed is a

U.S. citizen does not provide a basis for this Court to deny certifying the request for his extradition.  And in any event, the Supreme Court has recognized that the fact that Iraq may not extradite its citizens, as Professor Hamoudi describes (Hamoudi, at ¶¶ 82-87), does not affect the United States' treaty obligations.  *Charlton*, 229 U.S. at 476 (noting that "extradition treaties need not be reciprocal, even in the matter of the surrendering of citizens," in upholding the Department of State's decision to extradite a U.S. national to Italy, even though Italy had refused to extradite Italian nationals to the United States, contrary to the terms of the applicable treaty requiring the extradition of all "persons" charged with or convicted of an extraditable offense).

## V.   **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court, pursuant to 18 U.S.C. § 3184, determine that the documents provided by Iraq are sufficient to sustain the charges of murder under the provisions of the applicable treaty, and certify the extradition of the fugitive for those charges to the Secretary of State for possible surrender to Iraq.

RESPECTFULLY SUBMITTED this 16th day of April, 2021.

PAUL ANTHONY MARTIN
Acting United States Attorney
District of Arizona

*s/ Todd M. Allison*
TODD M. ALLISON
DAVID A. PIMSNER
RACHEL C. HERNANDEZ
DIMITRA H. SAMPSON
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing documents, and sent the attached document to the following registrant(s):

Jami Johnson
Dan Kaplan
*Counsel for Ali Yousif Ahmed Al-Nouri*

*s/ Norma Hernandez*
United States Attorney's Office