JON M. SANDS
Federal Public Defender
District of Arizona
850 W. Adams, Suite 201
Phoenix, Arizona 85007
Telephone: 602-382-2700

JAMI JOHNSON
New York State Bar # 4823373
DANIEL L. KAPLAN
Arizona Bar #021158
Assistant Federal Public Defenders
Attorneys for Defendant
jami_johnson@fd.org
dan_kaplan@fd.org

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In the Matter of the Extradition of | No. MJ-20-08033-PHX-MTM |
| Ali Yousif Ahmed Al-Nouri, | **Defendant's Extradition Brief** |
| Defendant. | |

Defendant Ali Yousif Ahmed Al-Nouri ("Ahmed"), through undersigned counsel, hereby presents his extradition brief, in compliance with this Court's order of January 29, 2021 (Doc. 177).

## I. Introduction

In 2006, a Sunni insurgency was raging in Iraq. (April 7, 2021 Expert Report of Craig Whiteside ("*Whiteside Rpt.*" (Ex. A)) at 4–12; March 2021 Expert Report of Haider Ala Hamoudi ("*Hamoudi Rpt.*" (Ex. B)) at 25–34.) Three

years earlier the United States had invaded, removed Saddam Hussein's Sunni-dominated government from power, and installed a new, Shi'a-dominated government in Baghdad. (*Hamoudi Rpt.* at 26.)

The Sunni insurgency followed, spurred by Iraqi Sunnis' revanchism and resentment over the loss of access to the power structures of Iraqi society. (*Whiteside Rpt.* at 9; *Hamoudi Rpt.* at 26.) The insurgency was especially active in Sunni-dominated areas – particularly Fallujah, in Anbar Province. (*Whiteside Rpt.* at 1; *Hamoudi Rpt.* at 26–27.) While the insurgency drew in an array of different groups, these groups shared a fundamental desire to undermine and replace the new Shi'a-dominated, U.S.-backed government. (*Whiteside Rpt.* at 9; *Hamoudi Rpt.* at 2.) A popular tactic of the insurgents toward this end was the assassination of police officers – a method designed to warn the local population of the consequences of collaborating with the new government, and thereby to undermine its foundation. (*Whiteside Rpt.* at 11; *Hamoudi Rpt.* at 29.)

This matter relates to two such police assassinations that allegedly took place in Fallujah in June and October of 2006. According to the investigative materials that Iraq submitted with its extradition request, each of these incidents involved small groups of masked and armed men who drove up to police officers sitting on a Fallujah street and fatally shot them. Some witnesses, including one identified as one of the attackers turned cooperator, indicated that the attackers were affiliated with Al-Qaeda in Iraq ("AQI") – an insurgent group made up of Iraqis and sympathetic outsiders that became involved with, and at one point unsuccessfully sought to dominate, the insurgency. (*Whiteside Rpt.* at 4; *Hamoudi Rpt.* at 30.) Witness statements assert that Ahmed, a native Fallujan carpenter who came to the United States as a refugee years after the events outlined in the

complaint and has lived openly and peacefully in this country for a dozen years, was one of the attackers. Fifteen years after these killings, Iraq presented the United States with its "Extremely Urgent" request for Ahmed's extradition. (Doc. 3-3 at 6.)

In January of 2020, the government filed its complaint for Ahmed's extradition in this Court. (Doc. 3.) That same month the World Health Organization declared a Public Health Emergency,[1] and just over a month later it declared a pandemic.[2] Travel to Iraq to conduct an investigation has been, and remains, an impossibility. (Doc. 142; Doc. 194.) Months ago the Court granted a continuance that, it was hoped, would provide adequate time for the pandemic to abate and an investigation to become possible. Unfortunately, that has not happened. Yesterday Ahmed filed a motion seeking a further continuance. (Doc. 194.) In the meantime, Ahmed hereby complies, to the extent possible, with the existing deadline for the parties to file their extradition briefs. (Doc. 177.)

## II.    The Court should decline to enter a certificate of extraditability.

### A.    Ahmed has not had a meaningful opportunity to demonstrate that probable cause to believe him guilty of the charged offenses is lacking.

The U.S.-Iraq extradition treaty requires the party seeking a person's extradition to produce "sufficient evidence, according to the laws of the country where that person is found, to justify his apprehension and commitment for trial if the crime had been there committed." (Doc. 3-3 at 8.) United States courts have interpreted such language as requiring a showing that there is probable cause to

---

[1] https://www.who.int/publications/m/item/covid-19-public-health-emergency-of-international-concern-(pheic)-global-research-and-innovation-forum.
[2] https://time.com/5791661/who-coronavirus-pandemic-declaration/.

3

believe that the accused committed the charged offense. *Quinn v. Robinson*, 783 F.2d 776, 783 (9th Cir. 1986). Relators seeking to overcome this showing may conduct an investigation to collect and introduce evidence that explains away the appearance of probable cause, as well as evidence showing that statements submitted in support of the probable cause showing do not qualify as competent evidence because they are the product of coercion or torture. *Santos v. Thomas*, 830 F.3d 987 (9th Cir. 2016) (en banc).

Because of the global pandemic that has almost exactly tracked the course of this litigation, Ahmed has not been able to conduct any such investigation into events that allegedly took place fifteen years ago in Fallujah. And while the complaint on its face contains a number of contradictions, suspicious circumstances, and implausibilities, any effort to refute the probable cause showing without being able to conduct such an investigation would amount to a meaningless and misleading charade.

Ahmed therefore declines to make any such effort here, instead noting only that the Court may examine the complaint to determine whether it is so "internally inconsistent" and "patently unreliable" as to obliterate probable cause "all on its own." *In re Mazur*, No. 06 M 295, 2007 WL 2122401, at *27 (N.D. Ill. July 20, 2007). At the same time, because Ahmed's extradition must be denied for reasons he can demonstrate without the need to conduct an investigation, he identifies those reasons below.

**B.    The charged offenses are non-extraditable political offenses pursuant to Article III of the U.S.-Iraq extradition treaty.**

**(1)    Article III incorporates the political offense exception into the treaty.**

**(a)    The political offense exception**

Article III of the U.S.-Iraq extradition treaty provides that "crimes of a political character," as well as connected "acts," are non-extraditable:

> The provisions of this Treaty shall not import claim of extradition for crimes of a political character nor for acts connected with such crimes[.]

(Doc. 3-3 at 10.) This provision enshrines in the treaty the well-established principle that extradition shall not be granted for a "political offense." The leading Ninth Circuit precedent governing the application of this principle is *Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986).

The facts of *Quinn* are substantially analogous to the present case. The case involved William Joseph Quinn, an American citizen who was living in the San Francisco Bay area when he was arrested at the behest of the United Kingdom ("U.K."). *Id*. at 783. The U.K. sought Quinn's extradition on charges that he was a member of the Irish Republican Army ("IRA") and that he had murdered a police officer in London, and conspired to cause explosions in London, several years earlier. *Id*. at 781.

The U.K. produced evidence indicating that Quinn's fingerprints were identified on six bombs that had been either delivered to prominent religious, governmental, or press figures, or left in public areas. *Id*. at 783–84. The murder charge related to an incident that occurred when a police constable questioned Quinn at a London bus stop, after noticing him engaging in suspicious behavior. *Id*. at 784. Quinn fled from the constable, and a chase ensued. *Id*. While making his escape, Quinn fatally shot a constable in civilian clothes who tried to apprehend him. *Id*. Police later found the apparent murder weapon in a raid on an apartment occupied by Quinn's alleged co-conspirators, who were identified as

5

members of the Provisional Irish Republican Army, "a more violent offshoot of the IRA." *Id*. at 784–85.

In his extradition hearing before a magistrate judge, Quinn argued that the murder and conspiracy charges were non-extraditable pursuant to the U.S.-U.K. extradition treaty's political offense article, which specified that an offense "'regarded by the requested party as one of a political character'" was non-extraditable. *Id*. at 783 (quoting the treaty). The magistrate judge rejected his argument and certified his extradition, and Quinn filed a petition for habeas corpus. *Id*. at 785–86. The district court granted his petition, holding that the charged crimes were non-extraditable political offenses. *Id*. at 786. The Ninth Circuit heard the government's appeal from that judgment.

The Ninth Circuit noted that the political offense principle developed from the "concept of justified political resistance" that emerged from the French and American revolutions. *Id*. at 792. The principle is "grounded in a belief that individuals have a right to resort to political activism to foster political change." *Id*. at 793 (internal quotation marks omitted). It "reflects a concern that individuals – particularly unsuccessful rebels – should not be returned to countries where they may be subjected to unfair trials and punishments because of their political opinions." *Id*. And it "comports with the notion that governments – and certainly their nonpolitical branches – should not intervene in the internal political struggles of other nations." *Id*. The exception is "now almost universally accepted in extradition law," and is a standard term in international extradition treaties. *Id*. at 792. This Court has the power and duty to address the application of the political offense exception, in view of its obligation to "assess

whether any applicable treaty provisions bar extradition of the [relator] for any of the charged offenses." *Barapind v. Reno*, 225 F.3d 1100, 1105 (9th Cir. 2000).

The political offense principle applies not only to "pure" political offenses such as treason, sedition, and espionage, but also to "relative" political offenses – *i.e.*, "otherwise common crimes committed in connection with a political act." *Quinn*, 783 F.2d at 793–94 (internal quotation marks omitted). With respect to this latter category of political offenses – the type at issue here and in *Quinn* – the court applies a two-part "'incidence' test." *Id*. at 794.

### (b)    The "incidence test"

The incidence test provides that a charged crime is a non-extraditable political offense when (1) there was an uprising or other violent political disturbance underway at the time of the offense, and (2) the offense was "incidental to," "in the course of," or "in furtherance of" the uprising. *Id*. at 797.

In order to qualify as an uprising, there must have been a "certain level of violence," in connection with "a revolt by indigenous people against their own government or an occupying power," and the violence must have occurred "within the country or territory in which those rising up reside." *Id*. at 807. "[A]cts occurring in other lands" are not covered. *Id*.

Once an uprising is found, courts are "rather liberal" in finding a charged act to be "incidental to" it. *Id*. at 797. This "liberal nexus standard" does not require proof of the act's potential or actual effectiveness in achieving the uprising's political ends, nor does it require proof of the accused's motive, and neither the "hierarchy of the uprising group" nor "the accused's membership in any such group" is "determinative." *Id*. at 809. But if there is evidence showing membership in an uprising group, similarity of the charged offense to other acts

7

committed by the group, or control over the accused's acts by a hierarchy within the group, such evidence may support an "incidental to" finding. *Id*. at 809–10. The test is "ideologically neutral" – *i.e.*, a court may not allow its assessment to be colored by "qualitative judgments" about the validity or tactics of the uprising in question. *Id*. at 804. "It is the *fact* that the insurgents are seeking to change their governments that makes the political offense exception applicable, not their reasons for wishing to do so or the nature of the acts by which they hope to accomplish that goal." *Id*. at 804–05 (emphasis added).

The relator carries the "initial burden" of "establish[ing] the essential elements of the political offense exception." *United States v. Pitawanakwat*, 120 F. Supp. 2d 921, 928 (D. Or. 2000) (*cited in Vo v. Benov*, 447 F.3d 1235, 1242 n.7 (9th Cir. 2006)). Once this initial burden has been met, "the burden shifts to the demanding government to prove that the crime charged in the Complaint was *not* of a political character." *Id*. at 928 (emphasis added; internal quotation marks omitted).

Applying these principles to the evidence proffered against Quinn, the court noted that the charged offenses occurred at a time when the Provisional IRA was engaged in a campaign of violence by which it "sought to change the structure of the government in [Northern Ireland], the country in which [its members] lived." *Quinn*, 783 F.2d at 813. Thus, "[c]riminal activity in Northern Ireland connected with this uprising would clearly fall within the political offense exception." *Id*. However, the charged offenses took place in England, rather than Northern Ireland – and while the Provisional IRA's attacks in England may have served the same goal as its attacks in Northern Ireland, there was no uprising

underway in England. *Id*. For this reason, the court found the political offense exception inapplicable. *Id*.

Judges Duniway and (Betty) Fletcher each filed separate opinions. Both believed that the fact that the charged offenses took place in England, rather than Northern Ireland, should not bar the application of the political offense exception. *Id*. at 818 (Duniway, J., concurring in the judgment) ("genuinely revolutionary activities can take place outside the geographic boundaries of the requesting state"); *id*. at 820 (Fletcher, J., concurring and dissenting) ("I find persuasive the magistrate's and district court's findings that a severe political uprising existed in the United Kingdom, including England, at the time the acts of which Quinn is accused took place."). Judge Duniway nevertheless supported the judgment, on the rationale that the exception should not apply to attacks on civilians or "murder[s] to escape arrest." *Id*. at 819 (Duniway, J., concurring in the judgment). Judge Fletcher dissented, concluding that the charged offenses "*are* protected under the political offense exception." *Id*. at 820 (Fletcher, J., concurring and dissenting) (emphasis added). Judge Fletcher would have remanded the case for an inquiry into whether, as an American citizen, Quinn had sufficient connections to Northern Ireland to justify the exception's application. *Id*. at 821 (Fletcher, J., concurring and dissenting).

Because the attacks at issue here did not target civilians, were not murders to escape arrest, and did not occur while Ahmed was a United States citizen, neither of these separate opinions affects *Quinn*'s application here.

     **(2)**    **The application of the "incidence test" to the charges against Ahmed confirms that these charges describe non-extraditable political offenses.**

The application of the "incidence test" to the record here leaves no doubt that the crimes with which Ahmed is charged are non-extraditable political offenses. Indeed, the Court need not resolve any "battle of the experts" to confirm this, as the parties' experts are in agreement on all of the essential facts.

(a) **At the time of the charged offenses, there was an insurgency against the Iraqi government by Iraqi Sunnis.**

Both parties' experts agree that there was an insurgency against the government of Iraq in 2006, when the charged offenses took place. The government's expert, U.S. Naval War College Professor Craig Whiteside, makes numerous references to the "insurgency" raging in Iraq in 2006. (*Whiteside Rpt.* at 4, 5, 10, 11, 12.) Ahmed's expert, University of Pittsburgh Law Professor Haider Ala Hamoudi, likewise describes the insurgency that "raged throughout the geographic parts of Iraq where Sunni Arabs predominate" from April 2003 through the spring of 2007. (*Hamoudi Rpt.* at 2.)

The experts agree that the insurgency was triggered in substantial measure by the fact that the American-led invasion toppled Iraq's Sunni-dominated government and replaced it with a Shi'a-dominated government, provoking anger and resentment among Iraqi Sunnis. (*Whiteside Rpt.* at 9 (describing "Sunni revanchism and the loss of access to the elite power structures in Iraqi society" following American invasion); *Hamoudi Rpt.* at 26 (noting that American invasion "resulted in hundreds of thousands of highly organized and well trained members of a once privileged elite losing their jobs and their salaries").)

The experts further agree that while the insurgency drew in a broad array of groups with diverse philosophies and tactics, the insurgents were united in their immediate goal of toppling the new U.S.-backed government of Iraq. (*Whiteside*

*Rpt.* at 9 (describing AQI as "one of dozens in the Sunni universe of militant groups opposed to the new Iraqi government, U.S. and allied forces, or both"); *Hamoudi Rpt.* at 2 (noting that Sunni insurgency "sought to challenge violently the new political order that the American intervention brought to Iraq").

The experts' conclusions are confirmed by official government reporting. The Defense Department stated in a November 2006 report to Congress that Al Qaeda was among the Sunni organizations involved in "a Sunni insurgency and terrorist campaigns directed against the majority-Shi'a Government of Iraq and the Coalition forces that are supporting it." Dep't of Def., DTIC ADA474491, Measuring Stability and Security in Iraq: Report to Congress In Accordance with the Department of Defense Appropriations Act 2007 (Section 9010, Public Law 109-289) 17–18 ("*Stability & Sec. Report (Nov. 2006)*") (Ex. C)[3]. The report further confirmed that this insurgency involved a very high level of violence, exceeding 40 attacks per day in Anbar Province alone, which includes Fallujah, between August 12, 2006 and November 10, 2006. *Id*. at 21. Between May 20, 2006 and November 10, 2006, daily casualties numbered well over 100 – including over 30 casualties per day among Iraqi security forces. *Id*. at 22.

This official government report is a proper subject of judicial notice (*Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069–70 (9th Cir. 1995)), which courts commonly employ in finding the uprising prong of the incidence test satisfied. *Quinn*, 783 F.2d at 797 n.18 ("American courts generally will take judicial notice of a state of uprising.") (citing examples). Ahmed hereby requests that the Court take judicial notice of this report. *See* Fed. R. Evid. 201.

---

[3] https://archive.defense.gov/pubs/pdfs/9010Quarterly-Report-20061216.pdf.

The experts' opinions and this government report describe a level of violence that meets and exceeds the threshold required to satisfy the uprising prong of the incidence test. Indeed, this level of violence far exceeds the level of Provisional IRA violence in Northern Ireland in the 1970s, which the *Quinn* court identified as sufficient to satisfy the uprising prong. *Quinn*, 783 F.2d at 813; *see generally* Michael McKeown, *Post-Mortem: An examination of the patterns of politically associated violence in Northern Ireland during the years 1969–2001 as reflected in the fatality figures for those years (Conflict Archive on the Internet 2009)*[4]; *see also Vo*, 447 F.3d at 1242 (noting that "continuing clash between indigenous people and police in northern Canada" had been deemed to satisfy uprising prong) (*citing Pitawanakwat*, 120 F. Supp. 2d at 935).

### (b) The charged offenses were "incidental to" the Sunni insurgency.

The standard for finding that the offenses with which an accused is charged were "incidental to" a recognized insurgency is "rather liberal." *Quinn*, 783 F.2d at 809. The accused can satisfy this prong of the test by pointing to evidence of the "circumstances surrounding the commission of the crime[s]," and the Court should examine "all of the[se] circumstances" in determining whether the test is met. *Id*.

In this case, the circumstances strongly support the conclusion that the charged acts were incidental to the Sunni insurgency. These circumstances include the following:

- Ahmed's purported "membership in an uprising group" (*id*. at 809–10) – specifically a local cell affiliated with AQI, which the Defense Department

---

[4] https://cain.ulster.ac.uk/victims/mckeown/mckeown01.pdf.

identified as supporting the Sunni uprising (*Stability & Sec. Report (Nov. 2006)* at 18);

- the "similarity of the charged offense[s] to other acts committed by the uprising group" (*Quinn*, 783 F.2d at 810), as confirmed by the widespread use by Sunni insurgents of attacks on police – a "classic feature[] of the Sunni insurgency" designed to destabilize the government and undermine the population's loyalty to it by "show[ing] Iraqis that the new institutions couldn't protect them" (*Hamoudi Rpt.* at 29 (*quoting* George Packer, *The Assassin's Gate* (Farrar, Straus and Giroux 2005) at 305), 33); *accord Whiteside Rpt.* at 11 (motive for targeting police was to "terrorize the local population and to warn it about the consequences of collaborating with the Iraqi government"); *Stability & Sec. Report (Nov. 2006)* at 3, 21 (noting that Iraqi Security Forces (which includes soldiers and police) and civilians "suffered the majority of casualties" in attacks during preceding three months);

- the "degree of control over [Ahmed's alleged] acts by some hierarchy within the group" (*Quinn*, 783 F.2d at 810), as evidenced by the co-conspirators' accounts of following up the assassinations by reporting to an operative's home, "where the operation planning took place," where they were paid 50,000 Iraqi Dinars and "tasked" to carry out additional attacks (Doc. 3-3 at 78–82);

- the selection of Iraqi police officers as the victims, *see Barapind v. Enomoto*, 400 F.3d 744, 753 (9th Cir. 2005) (noting that selection of government-affiliated victims supported conclusion that attacks were incidental to uprising);

- the fact that Iraqi authorities described the charged offenses as "acts of killing with an armed terrorist group" and assigned them to the Al-Karkh Inquiry Court – a court "which specializes in terrorism cases" (Doc. 3-3 at 6); *see Barapind*, 400 F.3d at 753 (noting that requesting nation's decision to charge offenses under "Terrorist and Disruptive Activities Act" supported conclusion that attacks were incidental to uprising); and

- the fact that Iraqi authorities described Ahmed as a member of an "armed terrorist group[] working on disturbing the security and stability of the country" (Doc. 3-3 at 53); *see Hamoudi Rpt.* at 3 (noting that by assassinating police officers, "the insurgency sought to destabilize a regime it viewed as illegitimate").

The Court may also consider 'negative' evidence, including the absence of evidence that Ahmed joined in the attacks out of any personal or otherwise non-political motive. *Quinn*, 783 F.2d at 811 ("There is no evidence that [Quinn] was involved in the conspiracy for other than political reasons[.]"). It is thus significant that there is no evidence that Ahmed had any "personal grudge" against either of the two victims. *Id*. at 795. In fact, the evidence suggests the opposite, indicating that while Ahmed knew one of the two victims, he tried to *prevent* that victim's killing, saying, "leave him, this is 1st Lieutenant Issam and he serves as a policeman." (Doc. 3-4 at 6.) There is evidence indicating that the members of Ahmed's group were paid 50,000 Iraqi Dinars following the killing of Officer Mohammad (Doc. 3-3 at 78, 81) – but this evidence tends to refute, rather than to support, the notion that the motive for the attacks was non-political. Private assassins hired to conduct a murder-for-hire would obviously demand

more than this token amount – equivalent to around 35 U.S. dollars[5] – to carry out a "hit" on a police officer on a public street. Notably, neither party's expert suggests that this *de minimis* payment, rather than a political objective, was the motivation for the attacks.

In fact, the experts agree on all of the essential facts relating to the "incidental to" finding, just as they do with respect to the insurgency finding.

The experts agree that AQI was one of the groups involved in the Sunni insurgency against the government of Iraq at the time of the charged offenses. (*Whiteside Rpt.* at 4 (describing AQI as having a competitive edge "among the diverse Sunni resistance to the presence of U.S. and allied forces"); *id*. at 5 (describing AQI as "heavily investing in the insurgency in Iraq"); *id*. at 9 (describing AQI as part of "the wider Sunni resistance to the presence of U.S. and allied forces and the Iraqi government"); *Hamoudi Rpt.* at 2 ("[AQI] was part of the popular, domestic insurgency"); *id*. at 3 (noting that operatives within AQI "coordinated with the other insurgent groups" to plan operations "tied to the aims of the insurgency").)

The experts also agree that AQI carried out attacks on police officers in support of the insurgency's goal of toppling the Iraqi government. (*Whiteside Rpt.* at 7 (stating that local AQI amirs in Fallujah followed AQI operative's "directives to kill Iraqi policemen."); *id*. at 9 (noting that AQI targeted "Iraqis who joined police, military, or government jobs"); *id*. at 11 (noting that AQI's purpose in targeting police was to "inspire fear and terror and to dissuade locals from joining the government"); *Hamoudi Rpt.* at 3 (noting that targeting of police officers was

---

[5] Molly Hennessy-Fiske, *Iraqi dinar builds steam ahead of nation's chaos*, L.A. Times Dec. 11, 2006, *available at* https://www.latimes.com/archives/la-xpm-2006-dec-11-fi-dinar11-story.html (last accessed Apr. 16, 2021).

"entirely characteristic of the insurgency" and was intended to "destabilize a regime it viewed as illegitimate, and thereby demonstrate to the Iraqi people that the new order could not protect them"). In fact, Professor Whiteside specifically notes that it is "almost certain" that the victims were Sunni, and thus "sectarianism was *not* a motive in the killings." (*Whiteside Rpt.* at 11 (emphasis added).)

In sum, the experts agree that the proffered evidence describes two police assassinations involving Ahmed, a native Iraqi (Doc. 3-3 at 29) and AQI, a Sunni insurgent group, in furtherance of the Sunni insurgency's goal of "bringing down or changing" the government of Iraq. *Quinn*, 783 F.2d at 810. These facts place the charges firmly in the category of non-extraditable political offenses.

> **(3)  Professor Whiteside's assertions that AQI was not "focused" on overthrowing any one government and had foreigners in some of its leadership positions have no bearing on the political offense analysis.**

Professor Whiteside's assertions that AQI was "not focused on overthrowing the government in any one country" and could not "in any level of accuracy be described as an 'indigenous group'" may be intended to undercut the applicability of the political offense exception. (*Whiteside Rpt.* at 6.) If so, they are unsuccessful, because these assertions have no bearing on the political offense analysis.

> **(a)  AQI's purported post-insurgency goal of creating a regional caliphate does not impair the application of the political offense exception.**

Read in isolation, Professor Whiteside's assertion that AQI was "not focused on overthrowing the government in any one country" (*id*.) might be thought to suggest that AQI was not participating in the insurgency attempting to

16

overthrow the Iraqi government. But that clearly is not Professor Whiteside's position, because he repeatedly confirms that AQI *was* part of the insurgency seeking to overthrow the Iraqi government. *See supra* at Sections II.B.2.(a)–(b). Indeed, Professor Whiteside identifies AQI's goal as "destroying" the Iraqi government and "replacing it with a Salafi-influenced state, run according to the 'Prophetic method'" (*Whiteside Rpt.* at 3) – and he even confirms that AQI's presumptive purpose in carrying out the two police assassinations at issue here was to advance this goal by "dissuad[ing] locals from joining" the government. (*Id*. at 11.)

In context, then, the actual meaning of Professor Whiteside's assertion appears to be that AQI was not focused *solely* on overthrowing the Iraqi government, because *after* doing so it aspired to absorb Iraq's territory into a "caliphate" that would reach beyond Iraq's borders. (*Id*. at 4.) But AQI's purported future aspiration to create a regional caliphate does not render the political offense exception inapplicable, for either or both of two independently sufficient reasons.

### (i)    AQI's post-insurgency aspiration does not displace its goal of changing Iraq's government.

First, assuming that the government provided evidence to support the conclusion that the local, street-level actors who carried out these two assassinations shared the AQI leadership's "caliphate" ambition, this would not transform these attacks into anything other than insurgent acts carried out by Iraqis seeking to "change their government[]." *Quinn*, 783 F.2d at 804. The Ninth Circuit has made plain that "[i]t is the *fact* that the insurgents are seeking to change their governments that makes the political offense exception applicable,

not their *reasons* for wishing to do so[.]" *Id*. at 804-05 (emphases added). The assertion that AQI's *reason* for wanting to overthrow the Iraqi government was to "prepar[e] the groundwork" for a regional caliphate (*Whiteside Rpt.* at 4) is thus immaterial.

*Quinn*'s discussion of the Provisional IRA confirms this point. The *Quinn* court recognized that the IRA's eventual goal – to be pursued *after* throwing off British rule in Northern Ireland – was to "reunit[e] the northern and southern parts of Ireland" into a single, predominantly Catholic, nation. *Quinn*, 783 F.2d at 812. The court nevertheless stated that Provisional IRA violence within Northern Ireland during the insurrection "would clearly fall within the political offense exception." *Id*. at 813. Thus, the court plainly did not believe that the IRA's post-insurgency ambition served to exclude acts committed in the course of the Northern Ireland insurgency from the protections of the treaty's political offense article.

**(ii)** **There is no evidence that Ahmed or his alleged co-conspirators acted in furtherance of any "caliphate" scheme.**

Second, there is no evidence to suggest that Ahmed or the others who fired at the two police officers on Street 40 in Fallujah acted in furtherance of any grand scheme to create a "cross-boundary caliphate." (*Whiteside Rpt.* at 12.) The record simply shows two police assassinations, carried out by a small group of indigenous individuals, in the same local area, within the span of four months, at the apparent direction of a superior who paid them a token amount afterward. (Doc. 3-3 at 78, 81.) As shown above, all of the evidence – including the Iraqi authorities' own characterization of the attacks as efforts to "disturb[] the security and stability of the country" (*id*. at 53) – point toward assassinations intended

simply to advance the Sunni insurgency's goal of dislodging the U.S.-supported government from power.

The notion that the charged offenses were motivated by the "caliphate" scheme thus amounts to speculation – and speculation, like a witness's coerced statement, "is not competent evidence" in an extradition proceeding. *Santos*, 830 F.3d at 1001; *cf. Advanced Flexible Circuits, Inc. v. GE Sensing & Insp. Techs. GmbH*, 781 F.3d 510, 516 (1st Cir. 2015) (nonmovant must present "competent evidence" rather than "unsupported speculation" to defeat summary judgment motion). Nor may an expert's opinion transform speculation into competent evidence. An expert may base his opinion on the application of specialized knowledge to the evidence, but that opinion is not entitled to consideration unless "[t]he evidence the expert relies on [provides] an adequate foundation for [his] opinion." *United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993) (expert may not rely on "subjective belief or unsupported speculation").

Indeed, reliance on mere speculation to justify a refusal to extend Ahmed the protection of the political offense exception – particularly in a case involving a potential death sentence – would constitute an egregious violation of his Fifth Amendment right to due process. *Cf. Langston v. Smith*, 630 F.3d 310, 319 n.12 (2d Cir. 2011) (noting that conviction based on "speculation and surmise" would violate Due Process Clause); *see also Quinn*, 783 F.2d at 809 (acknowledging relator's "Fifth Amendment rights" in extradition proceeding).

In sum, Professor Whiteside's assertion that AQI leadership had the long-term, post-insurgency ambition of creating a regional "caliphate" has no bearing on the applicability of the political offense exception.

19

### (b) The presence of some non-Iraqis in AQI leadership positions does not render the political offense exception inapplicable.

Professor Whiteside's claim that AQI "cannot in any level of accuracy be described as an 'indigenous group'" rests on his assertion that non-Iraqis occupied some of the organization's upper-level positions. (*Whiteside Rpt.* at 6–7.) But Professor Whiteside does not dispute the fact that Ahmed and the others who allegedly carried out these attacks were native Iraqis – "indigenous people" acting "against their own government." *Quinn*, 783 F.2d at 807. Nor does Professor Whiteside suggest that the Sunni insurgency of which these attacks were a part was begun, led, or controlled by AQI. To the contrary, Professor Whiteside describes a "diverse" and broad-based insurgency, involving "dozens" of groups in a "Sunni universe of militant groups" that fought to overturn the Iraqi government. (*Whiteside Rpt.* at 4, 9.) Professor Whiteside acknowledges that AQI merely joined in this indigenous insurgency – and while at one point it did "attempt to dominate the insurgency," that effort failed, sparking "a backlash from Anbar tribes and splinters of resistance groups." (*Id.* at 4.) Once again, Professor Hamoudi agrees. (*Hamoudi Rpt.* at 30 ("AQI was part of the insurgency."); *id.* at 33 (noting that over time, more of the insurgency may have fallen "under the broader umbrella of AQI").)

In short, it is undisputed that the attacks at issue here were carried out by native Iraqis, as part of a broad-based uprising of Iraqi Sunnis against the new Iraqi government. Professor Whiteside's assertion that some of the higher-ups in AQI were non-Iraqis does not undermine the "indigenous" nature of either the group that carried out the attacks, or the broader Sunni insurgency raging across the country. And the fact that some non-indigenous people join in an insurgency

does not transform it into something other than an insurgency. After all, insurgencies have never been hermetically sealed off from the rest of the world. To the contrary, it has been commonplace for people to join – and often to play important roles in – insurgencies raging in countries other than their own. Notable examples include the French Marquis de Lafayette, Prussian Friedrich Wilhelm von Steuben, and Polish Tadeusz Kosciuszko in the American Revolution; Americans Samuel Gridley Howe and George Jarvis in the Greek Revolution; Italian Giuseppe Garibaldi in the 1910 Mexican Revolution; and Argentine Ernesto "Che" Guevara in the Cuban Revolution.

Any suggestion that the mere presence of these non-indigenous people caused the conflicts they joined to lose the character of insurgencies would be baseless. And the suggestion would be no more compelling at the level of the individual operation: When Continental Army troops followed Frenchman Lafayette's orders to fire at General Cornwallis's troops at Yorktown, they were participating in an insurgency – just as Ahmed would have been if (as Professor Whiteside suggests) he followed Syrian Jarrah al-Shami's orders to fire at policemen in Fallujah. (*Whiteside Rpt.* at 7.) The non-indigenous nationality of the individual who gives an order in the course of an insurgency does not turn it into anything other than an insurgency.

In sum, the record and binding precedent establish that the offenses with which Ahmed is charged are non-extraditable political offenses pursuant to Article III of the treaty. Ahmed recognizes that this fact operates to frustrate Iraq's effort to secure the return of an individual it purportedly considers a terrorist. But this is precisely what Iraq agreed to when it entered into a treaty incorporating the political offense exception, and it is precisely what the treaty

would require an Iraqi court to hold if the United States sought to extradite a citizen of that country to face trial for political offenses. Political offense articles in extradition treaties are enforced as written, even when – in fact, *especially* when – the requesting country labels the relator a "terrorist." *See*, *e.g.*, *Barapind*, 400 F.3d at 753 (noting that requesting country's decision to charge offense as violation of its "Terrorist and Disruptive Activities Act" supported application of political offense exception).

Indeed, in the 1970s and '80s several courts refused to permit the extradition of accused IRA members pursuant to the U.S.-U.K. extradition treaty's political offense article – "anger[ing] the British Government, which viewed [these decisions] as condoning violent terrorist conduct." *Matter of Requested Extradition of Smyth*, 61 F.3d 711, 714 (9th Cir. 1995), *amended*, 73 F.3d 887 (9th Cir. 1995) (*citing In re McMullen*, No. 3-78-1899 M.G. (N.D. Cal. 1979); *In re Mackin*, No. 86 Cr. Misl., *appeal denied*, 668 F.2d 122 (2d Cir. 1981); *and In re Doherty*, 599 F. Supp. 270 (S.D.N.Y. 1984)). This dissatisfaction led to the adoption of a Supplementary Treaty between the U.S. and the U.K. that enumerated crimes to which the political offense exception would not apply, while adding a term providing a "means by which fugitives sought for extradition on such offenses could nonetheless challenge their extradition." *Id*. at 715.

No such supplement has been added to the U.S.-Iraq extradition treaty. Indeed, that treaty has not been modified since it was executed 86 years ago. (Doc. 3-3 at 13.) The parties are of course free to attempt to negotiate such a supplement, but they cannot ask this Court to pretend that they have already done so. Because the charged offenses are non-extraditable political offenses pursuant

to Article III of the treaty, the Court must decline to enter a certificate of extraditability.

### C. Ahmed cannot be extradited because he has not been "charged" with an enumerated crime as required by the treaty.

Article I of the U.S.-Iraq extradition treaty binds the parties to deliver up "any person charged with or convicted of any of" 25 offenses enumerated in Article II of the treaty. (*Id*. at 8–10.) The treaty therefore by its terms limits extradition to those people who have been "charged with" or "convicted of" a limited number of crimes. (*Id*.) But as Professor Hamoudi explains, the documentation submitted by the government of Iraq conclusively establishes that Ahmed has been neither charged with nor convicted of any crime in that country. (*Hamoudi Rpt.* at 11–16.) Instead, Ahmed is subject merely to an investigative warrant, which means that he is simply wanted for questioning by an investigative court in connection with various possible offenses, any one (or none) of which might someday be charged. (*Id*. at 12–14.) As explained further below, requests for rendition in service of a mere investigation are not cognizable under the treaty, and extradition must therefore be denied.

#### (1) The treaty requires that Ahmed have been "charged with" a crime.

Treaties are agreements that govern when and under what circumstances a signatory state may request extradition. *See Quinn*, 783 F.2d at 782 ("no branch of the United States government has any authority to surrender an accused to a foreign government except as provided for by statute or treaty."). Absent provision under the treaty for extradition, rendition of a person located in the United States to a requesting country is unlawful. *Id*.

When interpreting a treaty, the plain language governs. *United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992) (when interpreting a treaty, courts "first look to its terms to determine its meaning."). Here, the United States and Iraq negotiated for and entered into an agreement whose plain language makes clear that only individuals "charged with" or "convicted of" a crime are subject to extradition. (Doc. 3-3 at 8.) The language "charged with" is unambiguous and plainly mandates that formal criminal charges exist in the requesting nation. *See Black's Law Dict.* (5th ed. 1983) (defining "criminal charges" as "[a]n accusation of crime, formulated in a written complaint, information, or indictment, and taking shape in prosecution," and defining "charged" as "[a]ccusation of crime by complaint, indictment, or information."). Where no such criminal charges exist in the requesting nation, the court must decline to enter a certificate of extraditability. *See Matter of Extradition of Chapman*, Nos. 07-00365 SOM/BMK *et al.*, 2007 WL 3254880, at *2 (D. Haw. Nov. 5, 2007) (granting relator's motion to dismiss because "the government has failed to meet its burden of showing the existence of any pending criminal action against the Chapmans in Mexico" under the applicable treaty).

The lack of ambiguity with respect to the requirement of a formal charge is made further evident when Article I is read in harmony with Articles II and IV. Article II specifies that a relator may be extradited if and only if he has been charged with or convicted of one of 25 specifically enumerated offenses. (Doc. 3-3 at 9–10.) Article IV adds that "[n]o person surrendered shall be tried for any crime other than that for which he was surrendered without the consent of the surrendering High Contracting Party[.]" (*Id.* at 11.) Treaties are contracts, and courts are bound by the "fundamental canon requiring courts to construe contract

terms in harmony, where possible." *Int'l Bhd. of Teamsters, Local 396 v. NASA Servs.*, 957 F.3d 1038, 1045 (9th Cir. 2020). An interpretation permitting extradition on a mere investigative warrant, rather than a formal charge, would render Articles II and IV at best unenforceable and at worst surplusage, because there would be no way for the extraditing nation to ensure that the as-yet-undetermined and not-yet-charged crime qualifies as one of the enumerated extraditable offenses under the terms of the treaty. The negotiated-for limitations on extradition would accordingly be rendered inoperable.

The lack of ambiguity in the U.S.-Iraq extradition treaty regarding the requirement of a formal charge is further illustrated by contrasting that treaty with the treaty that was at issue in *Emami v. United States District Court for the Northern District of California*, 834 F.2d 1444 (9th Cir. 1987). In *Emami*, the Ninth Circuit interpreted a 1980 extradition treaty with Germany as not requiring the filing of a formal charge. *Id*. at 1448–49. The treaty at issue in *Emami* however, unlike the treaty with Iraq, did not require that a relator have been "charged with or convicted of" any specific, enumerated offense, but rather provided for extradition broadly "for prosecution" for any offense whatsoever as long as the conduct alleged "is punishable under the laws of both Contracting Parties by deprivation of liberty for a maximum period exceeding one year." *Treaty between the United States of America and the Federal Republic of Germany Concerning Extradition*, art. 2(2)(a), June 20, 1978, 32 U.S.T. 1485 ("*U.S.-Germany Treaty*"); *see also Emami*, 834 F.2d at 1449 ("article 2(2)(a) of the Treaty specifies that extradition shall be granted '[f]or prosecution . . .' . . . . The German government has stated that Emami is wanted for prosecution both in its request for Emami's provisional arrest and in its request for Emami's

extradition. These statements of intention on the part of the German government satisfy the requirements of article 2(2)(a).").

The *Emami* treaty moreover – again, unlike the treaty with Iraq – does not require that the requesting country have committed itself to prosecution of any specific offense prior to the filing of the request, but rather expressly contemplates that charges may be added, modified, or altered after a relator is received by the requesting country, as long as the specific offense ultimately prosecuted is based on the same general course of conduct alleged in the original extradition request: "If the offense for which the person sought was extradited is legally altered in the course of proceedings, he shall be prosecuted or sentenced provided the offense under its new legal description is . . . [b]ased on the same set of facts contained in the extradition request and supporting documents" and does not carry a penalty higher than the offense for which extradition was sought. *U.S.-Germany Treaty* art. 22(3).

The *Emami* treaty thus demonstrates that the United States can and does enter into treaties less restrictive than the one that it bargained for with Iraq – treaties that provide for extradition for prosecution of generally illegal conduct, the precise charges for which may not be firmly determined until the relator arrives in the receiving country. The United States has not, however, entered into such a treaty with Iraq. Instead, it has bargained for a treaty that requires that a relator have been already "charged with" one of a finite list of crimes, and does not permit the receiving country to alter these charges after the relator has been remitted to the receiving nation.

### (2) Ahmed has not been "charged with" any crime in Iraq.

As explained in the apparently unrebutted report of Professor Hamoudi, Ahmed has not been "charged with" any crime in Iraq. (*Hamoudi Rpt.* at 11–16.)

Iraq, unlike the United States, provides that arrest warrants may be issued by specialized investigative courts solely for the purpose of obtaining testimony from a suspect in furtherance of an investigation. (*Id*. at 11–13.) Investigative courts, which have no analogue in the American system, are not trial courts but rather function in a role comparable to that of the police or prosecutors in the American system. (*Id*. at 3, 13–14, 34.) These investigative courts are charged with taking testimony, gathering evidence, and ultimately determining whether a formal charge is to be filed. (*Id*. at 11–15.) If and only if a formal charge is ultimately filed as a result of the investigation by the investigative court is the case transferred to the trial court for further proceedings. (*Id*. at 14–15.)

It is the unrebutted opinion of Professor Hamoudi that no formal charge has yet been filed in this case: "The investigative court has not issued a decision transferring the case to trial in the Defendant's case." (*Id*. at 15 (italics removed).) The investigative court has merely issued an arrest warrant pursuant to its power to carry on investigations of as-yet-uncharged crimes. (*Id*.) Such an arrest warrant is not and must not be construed as a criminal "charge." (*Id*.) Indeed, the investigative court issuing such a warrant has not yet committed itself to prosecute, as "[i]t is both possible as a matter of law and not uncommon as a matter of fact that [the investigative court will ultimately conclude] that there is insufficient evidence to carry forward to trial, in which the investigative judge ends the investigation without prejudice." (*Id*. at 13.)

Thus, because Ahmed has not been "charged with" a crime as required by Article I of the treaty, the Court must decline to enter a certificate of extraditability.

**D.    The extradition request does not comply with the basic documentary requirements of the treaty.**

Article II of the treaty provides that "[p]ersons shall be delivered up according to the provisions of this Treaty, who shall have been charged with or convicted of" any one of 25 specifically enumerated criminal offenses. (Doc. 3-3 at 9–10.) Because it enumerates the specific offenses for which an individual may be extradited, the treaty is one that is, in common treaty parlance, referred to as a "list treaty." 7 Foreign Affairs Manual ("FAM") 1613.3(b) (2018). The inclusion of a list of extraditable offenses marks the treaty as somewhat antiquated because "[t]he modern trend in extradition treaties is the use of dual criminality as the basis of extradition rather than a list of specific offenses." *Id*. 1613.3(c). "Dual criminality" treaties are treaties – like the 1978 treaty with Germany that was at issue in *Emami*, *see supra* Section II.C.(1) – that require only that the crime for which extradition is sought be one that is illegal in both jurisdictions and do not limit extradition to any specific group of negotiated-for and agreed-upon offenses. *Id*. 1613.3(a). The benefits of dual criminality treaties are that they allow for extradition for offenses – like terrorism – that may not have been recognized by both parties as crimes until after the treaty took effect. *Id*. 1613.3(c).

Article IV of the U.S.-Iraq extradition treaty reinforces the centrality of the offense list to the legality of the extradition by providing, "[n]o person surrendered shall be tried for any crime other than that for which he was surrendered without the consent of the surrendering High Contracting Party" unless certain circumstances not applicable to this case be present. (Doc. 3-3 at 11.) That is to say, the treaty expressly and specifically provides that the criminal action(s) pending against a relator may not be modified, augmented, or expanded after the relator is rendered to the nation that is seeking his return.

Iraq has however failed to supply the documentation necessary for this Court to confirm that Ahmed is charged with one or more of the 25 extraditable offenses and with no other offense whatsoever, as required by the treaty, because Iraq apparently has yet to determine what, if anything, Ahmed will be charged with. As explained above in Section II.C.(2), Iraq has yet to "charge" Ahmed with any crime. Indeed, as Professor Hamoudi explains, the case file is "positively schizophrenic on what Defendant is being charged with." (*Hamoudi Rpt.* at 18.) Professor Hamoudi explains that the documents "seem[] to suggest that perhaps the Iraqi government does not wish to charge [Ahmed] with premeditated murder, which it seems unconcerned with proving, and instead with a crime connected to terrorism, which it repeatedly emphasizes." (*Id*. at 19.) Neither general acts of terrorism, nor "acts of killing with an armed terrorist group," nor "Organized murder by an armed terrorists group" (*sic*), each of which is a crime under Iraqi law and each of which is referenced in the complaint (Doc. 3-3 at 6, 51), is cognizable under the treaty.

When a requesting party fails to provide the required documentation, an extradition complaint should be dismissed. *See Matter of Extradition of Ferriolo*, 126 F. Supp. 3d 1297, 1305 (M.D. Fla. 2015). A formal charge identifying the specific crime with which Ahmed has been charged is necessary for this court to certify that the extradition request complies with the plain language of the treaty. Without a formal charge and formal charging document, Ahmed could be extradited on a mere investigatory warrant, to later be charged with crimes not specified under the treaty, either in lieu of or in addition to those enumerated in Article II – which would defy the negotiated-for protections of both Article II and Article IV. Because Iraq has failed to provide documents confirming that Ahmed

is charged with a crime listed in the treaty – and with no other(s) – extradition must be denied.

**E.    Ahmed cannot be extradited because he is exempt from punishment for the one treaty-enumerated crime mentioned in the complaint.**

Article V of the U.S.-Iraq extradition treaty provides that "[a] fugitive criminal shall not be surrendered under the provisions of this Treaty, when from lapse of time or other lawful cause, according the laws of the place within the jurisdiction of which the crime was committed, the criminal is exempt from prosecution or punishment for the crime for which the surrender is asked." (Doc. 3-3 at 11.) As noted above, *surpa* Section II.D, it is entirely unclear from the complaint what crime Iraq seeks to charge Ahmed with – or even whether Iraq has finally resolved to charge him at all. Nevertheless, it is noteworthy that the only theoretically extradition-eligible crime that is actually mentioned anywhere in the extradition packet is premeditated murder – and Ahmed cannot be punished for that crime.

As explained by Professor Hamoudi, the imposition of the death penalty for a premeditated murder committed in Iraq in 2006 would violate ex post facto principles enshrined in Article 19(2) of the Iraqi constitution. (*Hamoudi Rpt.* at 21–24.) Specifically, the Iraqi constitution provides – consistent with international human rights laws and similar to United States ex post facto principles – that "a harsher punishment than the applicable punishment at the time of the offense may not be imposed." (*Id*. at 24.) As Professor Hamoudi explains, at the time the offenses were allegedly committed, Iraq had no procedural mechanism for implementing the death penalty, and this failure of procedure renders the death penalty invalid as a legal form of punishment for any crime

committed during that period. (*Id*. at 23–24.) Ahmed is therefore legally exempt from imposition of the death penalty for a 2006 premeditated murder as a matter of Iraqi law.

Notwithstanding this legal exemption from imposition of the death penalty, the complaint at some points suggests that Iraq seeks Ahmed's surrender for premediated murder – a crime for which the only available punishment is death. (Doc. 3-3 at 22 ("Any person who willfully kills another is punishable by death . . . [i]f such killing was premeditated.").) Pursuant to the unambiguous terms of the treaty, the United States may not deliver up Ahmed to face prosecution for a crime for which he is exempt from punishment as a matter of Iraqi law. Ahmed therefore may not be surrendered for prosecution for any premeditated murders allegedly committed in 2006.

### F. The invalidity of the arrest warrant submitted by Iraq requires that its request for Ahmed's extradition be denied.

Article XI of the U.S.-Iraq extradition treaty specifies the documentation that must be provided by the requesting party where – as here – the relator has not been convicted of the crime for which his extradition is sought:

> If, however, the fugitive criminal is merely charged with crime, a duly authenticated copy of the warrant of arrest in the country where the crime was committed, and copies of the depositions upon which such warrant may have been issued, shall be produced, with such other evidence or proof as may be deemed competent in the case.

(Doc. 3-3 at 12.) Iraq has sought to comply with this requirement by producing an "Arrest and Investigation Warrant" issued by the Magistrate Court of Al-Karkh. (*Id*. at 49.) In light of the case's procedural history, however, this document cannot satisfy the treaty.

In *Sacirbey v. Guccione*, 589 F.3d 52 (2d Cir. 2009), the Second Circuit reviewed an extradition request submitted by Bosnia pursuant to a treaty that, similarly to the U.S.-Iraq extradition treaty, required the requesting party to produce "'a duly authenticated copy of the warrant of arrest in the country where the crime has been committed.'" *Id*. at 57 (quoting the treaty). Also like the U.S.-Iraq treaty, the U.S.-Bosnia treaty further provided that the relator must have been "'charged with or convicted of'" an offense enumerated in a list included in the treaty. *Id*. (quoting the treaty).

The Second Circuit noted that, based on this language, "the proof required under the Treaty to establish that an individual has been 'charged' with a crime is a valid arrest warrant and the evidence submitted in order to obtain that warrant." *Id*. at 67. But the court observed that after issuing the warrant, the "Cantonal Court in Sarajevo" had been divested of jurisdiction over the case by legal reforms in Bosnia. *Id*. at 59, 67. The court found this fact fatal to Bosnia's extradition request, because a warrant "issued by a court ousted of jurisdiction and no longer able to enforce it" could not "satisfy the Treaty's requirement that Bosnia demonstrate a 'charge' by producing a valid arrest warrant." *Id*. The court further noted that the documentation submitted in support of the request showed that "nothing more than a criminal investigation of [the relator] is now pending in Bosnia." *Id*. at 68. The court accordingly reversed the district court's denial of the relator's habeas corpus petition. *Id*. at 70.

The same flaw that invalidated the extradition request in *Sacirbey* is present in the instant case, albeit for different reasons. As Professor Hamoudi explains, Ahmed's case was subjected to a "series of jurisdictional transfers" from one investigative court to another that "constitute[d] a brazen violation of

Iraqi criminal process and the Iraqi Criminal Procedure Code." (*Hamoudi Rpt.* at 1.) The case was initiated, consistently with the Code, in the investigatory courts of Fallujah, where the crimes allegedly took place. (*Id*. at 20–21.) Then "without explanation" it was transferred to the investigative court in Ramadi, after which it somehow found its way to the "specialized terrorism investigative court of Karkh" in Baghdad. (*Id*. at 21.)

This game of jurisdictional pinball constituted a "violation of Iraqi criminal procedure law," which sets precise conditions on the transfer of cases between courts. (*Id*.) In view of these flaws, and the resulting invalidity of the proffered warrant for Ahmed's arrest, Iraq's extradition request must be denied. *Sacirbey*, 589 F.3d at 70.

> **G. The Court should decline to certify Ahmed's extradition in light of the abusive and arbitrary procedures he would face in the Iraqi criminal justice system.**

Although the "rule of non-inquiry" generally precludes the Court from considering the relator's likely treatment in the requesting country in determining whether to certify his extradition, an exception to the rule has been said to apply in "'situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of [the general principle upholding extradition].'" *Mainero v. Gregg*, 164 F.3d 1199, 1210 (9th Cir. 1999) (*quoting Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960)); *accord* M. Cherif Bassiouni, *International Extradition: United States Law and Practice* at 657 (6th ed. 2014) (suggesting exception where requesting country's "legal system denies an accused fundamental fairness as established by international human rights standards"). Professor Hamoudi's opinion shows that that is the case here.

Based on his personal experience working with and observing the Iraqi judicial system, as well as his extensive review of pertinent materials, Professor Hamoudi describes a system "that strips defendants of rights that are deemed fundamental in most modern justice systems, including the United States." (*Hamoudi Rpt.* at 3.) Rights generally deemed fundamental to a fair trial, such as cross-examination and confrontation, are commonly denied in the court's broad discretion, with little explanation. (*Id.* at 4, 35–36.) Trials consist of "no more than the reading of the investigative court charge, the *pro forma* delivery of testimony from witnesses, uninterrupted, brief remarks from attorneys, and the delivery of a verdict." (*Id.* at 4, *see also id.* at 37.) "[S]entencing one or even several people to the death penalty after a trial that lasts no more than a day is by no means out of the ordinary." (*Id.* at 4; *see also id.* at 37, 39 (*citing* Belkis Wille, *Executions in Iraq Not Real Justice for Speicher Massacre*, Human Rights Watch (August 23, 2016)).) In one documented case, the death penalty was imposed following a trial that lasted only ten minutes. (*Id.* at 40.)

Even in capital cases, courts appoint lawyers for indigent defendants "on the day of the trial itself," choosing from "among the lawyers who happen to be present in the courthouse," and often deny them the opportunity to speak with the defendant. (*Id.* at 38 (*citing* Bureau of Democracy, Human Rights and Labor, U.S. Dept. of State, *2019 Country Reports on Human Rights Practices (Iraq) (March 11, 2020)* at 13).) The use of "[b]asic forensics such as fingerprinting" is "entirely absent." (*Id.*) Instead, "the system depends on confessions" – creating "obvious incentives" to extract confessions through coercion – and yet judges routinely dismiss defendants' assertions that their confessions were coerced. (*Id.* at 38–39 (*citing* U.N. Assistant Mission for Iraq and Office of the High

Commissioner for Human Rights, *Iraq: UN report on ISIL trials recognizes efforts and raises concerns* (Baghdad: January 2020)).) In one notable case, the evidence of guilt was so meager, and the evidence that the confession was extracted through torture so significant, that the *prosecutor* requested an acquittal – and still the court refused, instead convicting the defendant and sentencing him to life imprisonment. (*Id*. at 39 (*citing* United Nations Assistance Mission for Iraq and Office of the High Commissioner for Human Rights, *Report on the Judicial Response to Allegations of Torture in Iraq*, at 4 (Baghdad: February 2015)).)

Moreover, the system suffers from "poor recordkeeping," "opaque process," "overcrowded dockets," a "near total incapacity to process and make use of forensic evidence," and a "heavy resulting reliance on confessions, often forced, in order to secure convictions." (*Id*. at 4.) These problems are "particularly acute" in Iraq's specialized terrorism courts, such as the Al-Karkh Investigative court that is overseeing the case against Ahmed. (*Id*.; Doc. 3-3 at 6.) Indeed, these courts have faced "significant criticisms" from the Department of State and international human rights groups, but the Iraqi government has been "entirely unwilling" to address their concerns. (*Hamoudi Rpt.* at 4.)

The materials included with Iraq's extradition request confirm that this case is no exception to these arbitrary, chaotic, and unfair procedures. These materials show that the Al-Karkh court has already prejudged Ahmed's guilt – not only of the charged crimes, but also "many murders against innocent citizens." (Doc. 3-3 at 31; *Hamoudi Rpt.* at 40.) The evidence on which the court relies consists of generic statements by people who only heard about the attacks, statements of purported witnesses who bizarrely all happened to recognize Ahmed out of

35

Fallujah's quarter-million residents (and to remember precisely the same details), and the likely coerced "confessions" of Ahmed's alleged co-conspirators. (Doc. 3-3 at 61–100; Doc. 3-4 at 1–12; *Hamoudi Rpt.* at 40–41.) "[A]ll that remains," following Ahmed's extradition to Iraq, "is for him to confess to it, as other criminal defendants do." (*Hamoudi Rpt.* at 41.) Assuming he is coerced into "confessing," as defendants commonly are, the court will presumably dismiss his plea to have his confession discounted on this ground, as Iraqi courts commonly do. (*Id.* at 38–40.)

Notably, Professor Whiteside's "rebuttal" opinion makes no effort – zero – to dispute Professor Hamoudi's observations regarding the nature and quality of criminal justice in Iraq. This Court should accordingly treat these observations as established fact. *See United States v. Robins*, 967 F.2d 1387, 1389 (9th Cir. 1992) (relying on "undisputed expert testimony" of expert witness). It is therefore established that Ahmed's extradition would place him into a legal system that is so "antipathetic to a federal court's sense of decency" as to forestall the application of the rule of non-inquiry. *Mainero*, 164 F.3d at 1210 (internal quotation marks omitted). Rather than ratify this outcome, the Court should decline to certify Ahmed's extraditability.

Any suggestion that this course is barred by *Prasoprat v. Benov*, 421 F.3d 1009 (9th Cir. 2005), would be meritless. The *Prasoprat* panel agreed with the statement that "[a]n extradition magistrate lacks discretion to inquire into the conditions that might await a fugitive upon return to the requesting country." *Id.* at 1016 (internal quotation marks omitted). But a close examination of *Prasoprat* reveals that it does not actually foreclose a humanitarian exception claim, for two reasons.

First, in discussing the Ninth Circuit's precedent addressing the possible application of a humanitarian exception to the rule of non-inquiry, *Prasoprat* cited decisions in which prior panels had declined to reach the question of whether such an exception exists – either because the humanitarian concerns presented to them would not have justified its application in any event, *Mainero*, 164 F.3d at 1210 ("Assuming that the possibility [of a humanitarian exception to extradition] exists in the abstract, this is not the sort of situation . . . for which an exception might be justified."); *Lopez-Smith v. Hood*, 121 F.3d 1322, 1326 (9th Cir. 1997) (finding the facts "not so egregious as to invoke" a humanitarian exception), or because the panel found an alternative basis for its ruling. *Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1010 (9th Cir. 2000), *overruled on other grounds by Trinidad y Garcia v. Thomas*, 683 F.3d 952 (9th Cir. 2012) (en banc) ("because we base our decision on legislation implementing the Torture Convention, we need not consider the [humanitarian] exception's viability here"); *Prasoprat*, 421 F.3d at 1016. The *Prasoprat* panel then noted that it "therefore" agreed with the district court's conclusion that an extradition magistrate "lacks discretion to inquire into the conditions that might await a fugitive upon return to the requesting country." *Id*. Read in context, the *Prasoprat* panel's statement indicates that the panel was following these prior opinions in holding that the particular facts did not justify the application of the humanitarian exception – rather than leaping beyond them to hold that the exception may never apply under *any* circumstances, no matter how egregiously they may breach "a federal court's sense of decency." *Mainero*, 164 F.3d at 1210 (internal quotation marks omitted).

*Prasoprat* thus leaves open the possibility of the humanitarian exception applying in a case presenting more egregious facts than these prior cases. And

Professor Hamoudi's unrefuted account confirms that this is such a case. *Compare Hamoudi Rpt.* at 3–5, 34–41 *with Lopez-Smith*, 121 F.3d at 1327 (relator asserted that a public official in Mexico had attempted to extort money from his sisters in exchange for the dismissal of the charges); *Mainero*, 164 F.3d at 1210 (relators asserted that if extradited they would be coerced into making statements implicating suspected fellow drug cartel members); *Prasoprat* Op. Br., No. 03-57253, 2004 WL 546131, at *27–*34 (9th Cir. Jan. 29, 2004) (asserting that in Thailand relator would face possible cruel and unusual death sentence for drug offense, and that Thai police "occasionally" beat suspects to extract confessions).

Second, the *Prasoprat* panel also relied on language in the U.S.-Thailand extradition treaty that "repeatedly place[d] the decision to extradite a person from the United States within the authority of the executive branch." *Prasoprat*, 421 F.3d at 1016–17 (""[i]n a case in which the United States of America is the Requested State, the Executive Authority shall have the power to extradite its nationals if, in its discretion, it is deemed proper to do so . . . [when requests for extradition are made by several states,] the decision . . . shall be made by the Executive Authority in the United States of America[]'") (*quoting* U.S.-Thailand extradition treaty). Similar statements do not appear in the U.S.-Iraq treaty. *Compare* Doc. 3-3 at 11 ("If a fugitive criminal claimed by one of the High Contracting Parties shall be also claimed by one or more powers pursuant to Treaty provisions, on account of crime committed within their jurisdiction, such criminal shall be delivered to that state whose demand is first received unless that state shall have abandoned its claim . . . Under the stipulations of this Treaty,

neither of the High contracting Parties shall be bound to deliver up its own citizens.").

In sum, *Prasoprat* does not bar this Court from applying the humanitarian exception to the rule of non-inquiry here. In light of the undisputed evidence that Ahmed would face egregiously abusive and arbitrary procedures if extradited, the Court should find that the humanitarian exception to the rule of non-inquiry bars his extradition to Iraq.

**H.    Ahmed's extradition would violate the Convention Against Torture.**

The United States is a party to the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), which provides in Part 1, Article 3 that, "No State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Although the treaty is not self-executing, Congress has codified CAT Article 3 rights at Section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, Div. G (*codified at* 8 U.S.C. § 1231 note). FARRA § 2242 provides that "It shall be the policy of the United States not to . . . extradite . . . any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture" and that "the appropriate agencies shall prescribe regulations to implement the obligations of the United States under Article 3 of the United Nations Convention Against Torture." 8 U.S.C. § 1231 note. The implementing regulations require the Secretary of State to consider the question of whether a person facing extradition from the United States "'is more likely than not' to be

tortured in the State requesting extradition when appropriate in making this determination." 22 C.F.R. § 95.2.

Torture is defined by the FARRA regulation as "[a]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 22 C.F.R. § 95.1(b)(1). This definition is almost identical to the regulations promulgated for purposes of CAT claims in immigration proceedings. 8 C.F.R. § 1208.18(a)(1). Given the similarities between the immigration regulations and the FARRA regulations, it is instructive to refer to the substantial CAT jurisprudence developed by the Ninth Circuit.

For example, the Ninth Circuit has held that an adjudicator must consider "the aggregate risk of torture from all sources" when determining the likelihood of torture. *Quijada-Aguilar v. Lynch*, 799 F.3d 1303, 1308 (9th Cir. 2015). Similarly, "[w]idespread mistreatment of a certain group of people" is probative of the likelihood of torture upon return. *Wakkary v. Holder*, 558 F.3d 1049, 1068 (9th Cir. 2009). With respect to the specific intent to torture, detention conditions can be so clearly deplorable that they support an inference that officials intended the torturous conditions for purposes prohibited by the CAT (*i.e.* punishment, intimidation, coercion, or discrimination). *Ridore v. Holder*, 696 F.3d 907, 917 (9th Cir. 2012). Finally, the official infliction/acquiescence prong of CAT is

satisfied if the individual likely to inflict harm is a public official. *Barajas-Romero v. Lynch*, 846 F.3d 351, 362 (9th Cir. 2017). This is true even if these individuals are arguably "rogue officials" acting outside the scope of their official duties. *Id*.

On top of the torture to coerce confessions that Professor Hamoudi explains are commonplace in the Iraqi criminal justice system (*Hamoudi Rpt.* at 20, 38–40), suspected AQI fighters are likely to be singled out for torture. Moreover, the infliction of physical pain and life-threatening prison conditions satisfy the "severe pain or suffering" requirement of the CAT. *Ridore*, 696 F.3d at 917. With respect to the "intentional infliction" prong of CAT, the purpose of such ill-treatment is primarily punitive or for purposes of extracting confessions. 22 C.F.R. § 95.1. Finally, because this mistreatment will be taking place in Iraqi prisons, Ahmed has satisfied the official infliction/acquiescence prong of the CAT, even if the Iraqi government officially disapproves of such actions. *Barajas-Romero*, 846 F.3d at 362.

The United States has an obligation under international law not to extradite Ahmed to Iraq given the substantial likelihood that he will be tortured and executed. The magistrate judge recognized as much in *United States v. Porumb*, 420 F. Supp. 3d 517 (W.D. La. 2019), refusing to certify an extradition that would have violated the United States' obligation to abstain from refoulement, codified at 8 U.S.C. § 1158(c)(1). The court held: "Extradition is a return of an individual to his country of nationality. Hence, to extradite one who has been granted asylum back to his native country is to violate a federal statute and the 1967 Protocol and to render the extradition illegal. This Court will not certify an illegal extradition." *Id*. at *524. As an individual who was admitted to this

country as a refugee, Ahmed is entitled to the same protection from refoulement. *See Robleto-Pastora v. Holder*, 591 F.3d 1051, 1061 (9th Cir. 2010) (noting that legislative history of Immigration and Nationality Act's asylum provisions "indicates that [refugees and asylees] were to have essentially 'equivalent status' under the law").

Professor Hamoudi's report demonstrates that it is more likely than not that Ahmed will be tortured if he is returned to Iraq, and that this torture will be inflicted by agents of the government, for the purpose of coercing him into confessing to crimes. (*Hamoudi Rpt.* at 38–41.) Ahmed urges this Court to implement the text, policy, and purpose of the CAT by declining to certify his extraditability.

## I. The U.S.-Iraq extradition treaty has been nullified by the two wars the parties have fought since its ratification.

The U.S.-Iraq extradition treaty was executed in 1934 and ratified in 1936. (Doc. 3-3 at 13, 14.) Since then, the contracting parties have fought two wars – the Gulf War in 1990–91, and the Iraq War in 2003–11. Because either or both of those wars effectively annulled the 1934 treaty, and no new extradition treaty between the parties has been promulgated in the manner required by Article II, section 2 of the Constitution, the government has no power to deliver up Ahmed for extradition to Iraq. *Quinn*, 783 F.2d at 782 ("no branch of the United States government has any authority to surrender an accused to a foreign government except as provided for by statute or treaty"); 18 U.S.C. § 3181(a) ("The provisions of this chapter relating to the surrender of persons who have committed crimes in foreign countries shall continue in force only during the existence of any treaty of extradition with such foreign government.").

The Supreme Court has noted the "commonly accepted" view that "whether the stipulations of a treaty are annulled by war depends upon their intrinsic character." *Karnuth v. United States*, 279 U.S. 231, 236 (1929) (internal quotation marks omitted). Treaty terms that might not be annulled by war include "[s]tipulations in respect of what shall be done in a state of war; treaties of cession, boundary, and the like; provisions giving the right to citizens or subjects of one of the high contracting powers to continue to hold and transmit land in the territory of the other; and, generally, provisions which represent completed acts." *Id*. at 236–37. "On the other hand, treaties of amity, of alliance, and the like, having a political character, the object of which is to promote relations of harmony between nation and nation, are generally regarded as belonging to the class of treaty stipulations that are absolutely annulled by war." *Id*. at 237 (internal quotation marks omitted). Applying these principles to a provision of the Jay Treaty of 1794 that guaranteed free passage of "his Majesty's subjects" into the United States, the Court held that this provision was "brought to an end by the War of 1812." *Id*. at 236, 241; *see also Ex parte Zenzo Arakawa*, 79 F. Supp. 468, 471–72 (E.D. Pa. 1947) (U.S.-Japan Treaty of Commerce and Navigation either "totally abrogated" or suspended by outbreak of war between parties).

Pursuant to these principles, the U.S.-Iraq extradition treaty has likewise been annulled by the wars between the contracting parties. The obligations of this treaty are not "aim[ed] at perpetuity"; they do not deal with rights "vested and permanent in character," nor are they "fixed and continuing, regardless of war or peace." *Karnuth*, 279 U.S. at 239. To the contrary, like the free passage rights in the Jay Treaty, they are commitments "created by the treaty, having no obligatory existence apart from that instrument, dictated by considerations of mutual trust

43

and confidence, and resting upon the presumption that the privilege will not be exercised to unneighborly ends." *Id*. Moreover, the promise to deliver up individuals for extradition to Iraq "necessarily cease[d] to operate in a state of war, since the passing and repassing of citizens or subjects of one sovereignty into the territory of another is inconsistent with a condition of hostility." *Id*. And the treaty's right-of-termination article (Doc. 3-3 at 13) confirms that the parties' intention was that "the treaty was not to be perpetual, but was to continue only at the will of either of [the parties]." *Zenzo Arakawa*, 79 F. Supp. at 472 & n.11.

It follows that the U.S.-Iraq extradition treaty was "brought to an end" by either or both of the two wars between the parties. *Karnuth*, 279 U.S. at 241. Once a treaty has been so annulled, its obligations may be revived only by means of a new treaty, negotiated and ratified pursuant to the mandates of Article II, section 2 of the Constitution. *Then v. Melendez*, 92 F.3d 851, 853 (9th Cir. 1996) ("The advice and consent of the Senate is a constitutional prerequisite to a valid treaty, and the executive branch does not have the power to extradite alleged criminals absent a valid extradition treaty."). Yet here the State Department declaration included in the extradition packet references only the 1934 treaty, describing it in conclusory fashion as "in full force and effect" (Doc. 3-3 at 2), without citing any purported reaffirmation of the treaty following either of the two wars between the parties. *Cf. United States v. Deaton*, 448 F. Supp. 532, 534 (N.D. Ohio 1978) (noting that government official certified that U.S.-Germany extradition treaty was reaffirmed by postwar exchange of notes between the parties in 1955 and 1956). Indeed, at no point in this litigation has the government described or documented any purported postwar reaffirmation of the obligations

of the 1934 treaty. And the government should not be permitted to attempt to do so now, for two reasons.

First, to permit the government to conjure a new purported legal basis for Ahmed's extradition now – fifteen months after filing the complaint and on the eve of the extradition hearing – would amount to an egregious breach of Ahmed's Fifth and Sixth Amendment rights. *See* U.S. Const. amend. V (right not to "be deprived of life, liberty, or property, without due process of law"); *id*. amend. VI (right "to be informed of the nature and cause of the accusation"); *Faretta v. Cal.*, 422 U.S. 806, 818 (1975) ("The rights to notice, confrontation, and compulsory process, when taken together, guarantee that a criminal charge may be answered in a manner now considered fundamental to the fair administration of American justice."); *see also Quinn*, 783 F.2d at 809, 817 n.41 (referencing relator's Fifth Amendment due process rights).

Second, even if a purported postwar reaffirmation of the treaty could be produced, it could have no valid effect where, as here, the treaty was annulled by two wars between the parties. *Karnuth*, 279 U.S. at 241. Under these exceptional circumstances, only a new treaty, negotiated and ratified in compliance with Article II, section 2 of the Constitution, could restore the powers and obligations set forth in the extinguished 1934 treaty. *Then*, 92 F.3d at 853. Because the government cites no such postwar treaty, and the government has no power to deliver up Ahmed for extradition absent a valid, effective extradition treaty, this Court must decline to certify Ahmed's extraditability.

**J.      The U.S.-Iraq extradition treaty does not empower the government to extradite a United States citizen.**

The U.S.-Iraq extradition treaty contains the following term regarding requests for the extradition of a party's citizens:

45

> Under the stipulations of this Treaty, neither of the High contracting Parties shall be bound to deliver up its own citizens.

(Doc. 3-3 at 11.) Although this term might be interpreted to vest the United States with a discretionary power to "deliver up its own citizens" for extradition, that interpretation was rejected by the Supreme Court in *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5 (1936).

In *Valentine*, the Court reviewed a term in the U.S.-France extradition treaty providing: "'Neither of the contracting Parties shall be bound to deliver up its own citizens or subjects under the stipulations of this convention.'" *Id*. at 7 (quoting the treaty). Noting that: (a) this article effectively exempted the parties' citizens from the treaty's separate obligation to deliver up "persons" charged with designated offenses, (b) the Executive's power to extradite a U.S. citizen "must be affirmatively granted" in order to exist, and (c) several other treaties included language specifying that the parties "shall have the power to deliver [their citizens] up if in their discretion it be deemed proper to do so," the Court held that pursuant to the treaty's language, the United States had no power to deliver up a United States citizen for extradition to France. *Id*. at 7–18.

In light of *Valentine*, the government's assertion that the U.S.-Iraq extradition treaty empowers it to deliver Ahmed up for extradition to Iraq, notwithstanding the fact that he is a U.S. citizen (Doc. 59 at 2), is mistaken. The U.S.-Iraq extradition treaty – which contains wording materially identical to the U.S.-France treaty at issue in *Valentine*, creates no such power. *See* 9B Fed. Proc., L. Ed. § 22:2393 (Westlaw, through Mar. 2021 Update) ("if an extradition treaty states that 'neither party shall be bound to deliver up its own citizens,' United States nationals may not be extradited unless the treaty also contains a positive grant of authority to surrender United States citizens"); 31A Am. Jur. 2d

*Extradition* § 34 (Westlaw, through Feb. 2021 Update) ("Under a treaty which provides that neither of the contracting parties 'shall be bound' to deliver up its own citizens, a citizen of the United States may not be surrendered to the government of the other country as a fugitive from justice.").

Although the government's extradition complaint does not attach, quote, or specifically reference 18 U.S.C. § 3196, the government may now seek to rely on that statute as a basis for its purported authority to deliver up Ahmed for extradition to Iraq. Section 3196 provides as follows:

> If the applicable treaty or convention does not obligate the United States to extradite its citizens to a foreign country, the Secretary of State may, nevertheless, order the surrender to that country of a United States citizen whose extradition has been requested by that country if the other requirements of that treaty or convention are met.

18 U.S.C. § 3196. Any attempt by the government to rely on this statute now would be misplaced, for any or all of three independently sufficient reasons.

First, the government has forfeited any ability to rely on Section 3196 by failing to include or specifically reference it in its extradition complaint. Any attempt to shoehorn this statute into this case now – fifteen months after filing the complaint, and on the eve of the extradition hearing – would constitute a blatant violation of Ahmed's Fifth and Sixth Amendment rights. *See* U.S. Const. amend. V (right to due process of law); *id*. amend. VI (right "to be informed of the nature and cause of the accusation"); *Faretta*, 422 U.S. at 818; *see also Quinn*, 783 F.2d at 809, 817 n.41.

Second, assuming Section 3196 could be considered in support of the government's extradition complaint, the statute by its terms applies only "if the other requirements of th[e] treaty or convention are met." 18 U.S.C. § 3196. That is not the case here. As explained above, Iraq has not met the other requirements

47

of the treaty because it has sought Ahmed's extradition (1) for a political offense; (2) despite the fact that he has not been charged with or convicted of any of the enumerated crimes; (3) without producing required documentation; (4) despite the fact that Ahmed is exempt from punishment for the only treaty-enumerated crime mentioned in the complaint. Iraq has also breached its implied duty of good faith and fair dealing, by ratifying and then retaining in its constitution a provision affirmatively barring the extradition of its citizens (*Hamoudi Rpt.* at 24–25) – despite the fact that its contracting partner had over 30 years ago enacted a statute authorizing the Secretary of State to deliver up American citizens for extradition even where the applicable treaty does not create this authority. International Narcotics Control Act of 1990, Pub. L. No. 101-623, § 11(a) (1990) (enacting Section 3196); *see* Doc. 3-3 at 8–13 (describing parties to U.S.-Iraq extradition treaty as the "High Contracting Parties"); Curtis J. Mahoney, *Treaties As Contracts: Textualism, Contract Theory, and the Interpretation of Treaties*, 116 Yale L.J. 824, 826 (2007) ("The Supreme Court has long stated that treaties adopted under Article II of the Constitution are not acts of 'legislation' but rather 'contracts' between sovereign nations."); Restatement (Second) of Contracts § 205 (Westlaw, through Oct. 2020 Update) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."); *3500 Sepulveda, L.L.C. v. Macy's W. Stores, Inc.*, 980 F.3d 1317, 1324 (9th Cir. 2020) ("There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.") (internal quotation marks omitted; referencing California law).

48

Finally, as the Eastern District of Pennsylvania observed in *Gouveia v. Vokes*, 800 F. Supp. 241 (E.D. Pa. 1992), Section 3196 breaches Article II, section 2 of the Constitution, the separation of powers, and the Framers' intent, by purporting to arrogate to Congress the ability to unilaterally exercise the treaty power that the Constitution specifies shall be exercised by the President, with the Senate's concurrence. U.S. Const. art. II, § 2.

Ahmed acknowledges that the Ninth Circuit disagreed with *Gouveia* in *United States v. Knotek*, 925 F.3d 1118, 1125–28 (9th Cir. 2019). However, the treaty at issue in *Knotek* was amended in 2006, well after the 1990 enactment of Section 3196. *Id*. at 1123. Under those circumstances, it was reasonable to interpret the treaty as incorporating the parties' mutual understanding that, pursuant to Section 3196, the United States would be authorized to extradite its citizens. The U.S.-Iraq treaty, by contrast, was executed in June of 1934, ratified by April of 1936, and never amended since. (Doc. 3-3 at 13–14.) At that time, numerous treaties over the prior half-century had added language to their "nationality clause[s]" (*Knotek*, 925 F.3d at 1123 n.1) specifying that the parties "'shall have the power to deliver [their citizens] up if in their discretion it be deemed proper to do so.'" *Valentine*, 299 U.S. at 12 (*quoting* 1886 Japan treaty). Moreover, when the U.S.-Iraq treaty was ratified, Learned Hand's Second Circuit opinion had already foreshadowed the Supreme Court's *Valentine* holding. *United States ex rel. Neidecker v. Valentine*, 81 F.2d 32 (2d Cir. Jan. 13, 1936), *aff'd*, 299 U.S. 5 (1936). Under those circumstances, it is clear that the parties' intent was that the United States would *not* have the power to extradite its citizens. Restatement (Second) of Contracts § 201(1) (West, Westlaw through Oct. 2020 Update) ("Where the parties have attached the same meaning to a

49

promise or agreement or a term thereof, it is interpreted in accordance with that meaning."). Thus, even if Section 3196 may be constitutional as applied to treaties like the one at issue in *Knotek*, it is not constitutional as applied to the U.S.-Iraq treaty, as to which it fundamentally rewrites the bargain reached by the parties. In sum, the U.S.-Iraq extradition treaty does not authorize the Secretary of State to deliver up United States citizens such as Ahmed for extradition.

For any or all of the reasons set forth above, as well as the absence of probable cause that Ahmed intends to demonstrate after he has had the opportunity to conduct an investigation, the Court should decline to enter a certificate of extraditability.

## III. If the Court holds a hearing to inquire into the existence of probable cause, it should decline to apply the "rule of non-contradiction."

As noted above, Ahmed has not yet had the opportunity to conduct the investigation that would be necessary for him to effectively challenge the existence of probable cause, or to demonstrate that statements proffered in support of the probable cause showing do not constitute competent evidence. If the court agrees with any of the arguments set forth above as to why extradition may not be granted, this problem will become moot, as it will be clear that Ahmed may not be extradited regardless of the possible existence of probable cause. But in light of the possibility that the Court will hold a probable cause hearing, Ahmed demonstrates here why the "rule of non-contradiction" should not apply at such a hearing.

The rule of non-contradiction appears nowhere in the extradition statutes, and there is no reference to it in the U.S.-Iraq extradition treaty. Instead, the rule is a judicially created concept that guides the magistrate's "sound discretion" in excluding "evidence of facts contradicting the demanding country's proof."

50

*Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir. 1978). The policy behind the rule is to prevent the requesting country from having to "go into a full trial on the merits in a foreign country." *Collins v. Loisel*, 259 U.S. 309, 316 (1922) (internal quotation marks omitted). The rule also reflects the limited nature of the proceedings, which have been likened to preliminary hearings under Federal Rule of Criminal Procedure 5.1. *Santos*, 830 F.3d at 991.

Useful as the rule may be in guiding the magistrate's discretion, it does not diminish the fact that individuals in extradition proceedings before United States courts are entitled to due process of law by virtue of both the extradition treaties and the Fifth Amendment's Due Process Clause. *Quinn*, 783 F.2d at 817 n.41 (noting that "a habeas court can determine whether the [extradition] magistrate's decision to deny discovery constituted an abuse of discretion that deprived the accused of due process"). Individuals in extradition proceedings are entitled to the protections of the Due Process Clause because the physical act of detaining and extraditing a person to a foreign land impinges on a core liberty interest in the "[f]reedom from imprisonment – from government custody, detention, or other forms of physical restraint." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). By requiring "probable cause" to extradite, United States extradition treaties give rise to a due process expectation because they "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for" the extradition proceeding. *Addington v. Texas*, 441 U.S. 418, 423 (1979) (discussing interplay between standard of proof and due process) (citations omitted).

In addition to the liberty interest inherent to persons facing detention and extradition, persons who have been declared refugees have additional liberty

interests that arise from that declaration, and the attendant right to non-refoulement under United States and international law. *Cf. Bd. of Pardons v. Allen*, 482 U.S. 369, 370–81 (1987). Ahmed has a liberty interest created by the 1967 United Nations Protocol Relating to the Status of Refugees ("1967 Protocol"), to which the United States acceded in 1968. *See* 19 U.S.T. 6223 (1968). The 1967 Protocol imposes the obligation not to "expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion," with certain limited exceptions. This is often referred to as the "non-refoulement" obligation. The Refugee Act of 1980 implements the "non-refoulement" obligation by providing refugees and asylees indefinite residence in the United States, subject to termination or removal in certain defined circumstances, 8 U.S.C. §§ 1157(c)(4), 1227, and by providing withholding of removal to individuals who can show a likely threat to "life or freedom" on account of race, religion, nationality, political opinion, or membership in a particular social group in the proposed country of removal. 8 U.S.C. § 1231(b)(3)(A).

The Supreme Court has recognized that the weighty interests involved in proceedings that may culminate in a person's removal from this country demand correspondingly stringent procedures. *Woodby v. INS*, 385 U.S. 276, 285–86 (1966). In the immigration context, even if removability is established, a grant of withholding of removal (non-refoulement) is mandatory if the relevant conditions are met. *Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001). And while a non-citizen may be excluded from the protections of non-refoulement in cases where there are "serious reasons" to believe he committed a serious nonpolitical crime

52

in his or her country of origin, 8 U.S.C. § 1231(b)(3)(B)(iii), he is entitled to present evidence to rebut such a claim. *See*, *e.g.*, *Pronsivakulchai v. Gonzales*, 461 F.3d 903, 908 (7th Cir. 2006); *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000). These guarantees give rise to a protected liberty interest.

"[T]he question remains what process is due." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (internal quotation marks omitted). In evaluating the sufficiency of procedures under the Due Process Clause, courts generally apply the three-part balancing test of *Mathews v. Eldridge*, 424 U.S. 319 (1976). The *Mathews* test requires a court to (1) consider the private interest affected by the challenged actions; (2) evaluate the risk of erroneous deprivation of rights under the challenged procedures and the value, if any, of additional safeguards; and (3) balance the government's interest, taking into consideration the function involved and the burden imposed by additional safeguards. *Id*. at 335.

Ahmed's liberty interest includes his right to be free from unlawful or erroneous "bodily restraint," and his right to continue to live in the United States free from erroneous refoulement to Iraq, the country from which he fled as a refugee. There is a substantial risk of erroneous deprivation of these liberty interests if this Court applies the rule of non-contradiction to evidence that the charges against him are false. While the governmental interest is not insubstantial, the Court should find that Ahmed's interest in avoiding erroneous extradition to the country of persecution requires that he be permitted to contradict, as well as to "explain," the evidence proffered against him.

## IV.    Conclusion

The Court should decline to enter a certificate of extraditability because the absence of probable cause is evident on the face of the complaint, and/or for any or all of the reasons set forth in Section II above. If the Court conducts a probable cause hearing, it should decline to apply the rule of non-inquiry.

Respectfully submitted:    April 16, 2021.
JON M. SANDS
Federal Public Defender

*s/Jami Johnson*
JAMI JOHNSON
DANIEL L. KAPLAN
*Assistant Federal Public Defender*