JON M. SANDS
Federal Public Defender
District of Arizona
850 W. Adams, Suite 201
Phoenix, Arizona 85007
Telephone: 602-382-2700

JAMI JOHNSON
New York State Bar # 4823373
DANIEL L. KAPLAN, #021158
Asst. Federal Public Defenders
Attorney for Defendant
jami_johnson@fd.org
dan_kaplan@fd.org

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In the Matter of the Extradition of<br><br>Ali Yousif Ahmed Al-Nouri,<br><br>Defendant. | No. MJ-20-08033-PHX-MTM<br><br>Reply to Response to Motion to Revoke Detention Order |

Defendant Ali Yousif Ahmed Al-Nouri ("Mr. Ahmed"), through undersigned counsel, hereby replies to the government's response to Mr. Ahmed's motion to revoke detention order (Doc. 184). As explained further herein, Mr. Ahmed should be released because continued detention violates his due process rights, special circumstances exist warranting release, and he has provided overwhelming evidence that he is neither a flight risk nor a danger to the community.

Respectfully submitted:  March 5, 2021.

JON M. SANDS
Federal Public Defender

*s/Jami Johnson*
JAMI JOHNSON
DANIEL L. KAPLAN
Asst. Federal Public Defenders

## MEMORANDUM

**I.    The Government's Inflammatory, Unsupported Recitation of the "Facts" Relevant to the Disposition of this Appeal Should Be Disregarded as Lacking any Indicia of Reliability.**

As the court is no doubt aware, the parties remain far apart on their view of the merits of the government's extradition request. One thing parties do agree upon however is that the legal system of Iraq is hopelessly corrupt and routinely uses false accusations of terrorism as a means of punishing disadvantaged persons or of advancing a corrupt, internal political agenda. *See generally*, 2019 State Dep't. Rep. on Human Rights Practices in Iraq (hereinafter "State Department Report"), *available at* https://www.state.gov/reports/2019-country-reports-on-human-rightspractices/ iraq/. Despite that it is the official position of the United States Department of State—which is the agency seeking extradition here—that "evidence" gathered by the government of Iraq is unreliable, that Iraq routinely levels false accusations of terrorism-related conduct, that confessions and other evidence are often extracted through torture or coercion, and that rampant corruption exists at all levels of the legal system, the government in this case has chosen in its response to uncritically present as true the internally inconsistent, utterly illogical, and patently absurd allegations against Mr. Ahmed that underlie this extradition request. The government has done so despite knowing not only that the Iraqi legal system is corrupt in general but that Iraq has a present and ongoing history of seeking extradition of Iraqi refugees living in the United States based on false "terrorism" accusations. In light of these facts, the government's recitation of the "facts" of Mr. Ahmed's time in Iraq, which are based solely on the non-credible word of a corrupt government, should simply be disregarded.

As the government is aware, Mr. Ahmed has been unable, owing to the COVID-19 pandemic and attendant political unrest, to travel to Iraq for the purpose of interviewing witnesses and gathering evidence to show how the specific false allegations in his case came about. Based however on a review of publicly available information, the most relevant facts of this case appear to be as follows. During the 2016 presidential election campaign, then-candidate Donald Trump made a series of factually incorrect allegations that the United States' refugee resettlement program was allowing "terrorists" to enter the country. State Department and National Security officials were aghast at the misinformation. Indeed, since the passage of the Refugee Act of 1980, more than three million refugees have entered the United States, and no one has ever died as a result of an act of terrorism perpetrated by one of these refugees.[1] Nevertheless, in February 2017, then-newly appointed Attorney General Jeff Sessions specifically directed the F.B.I. to begin counterterrorism investigations into refugees, claiming—without support that anyone working in the field appears to have been able to identify—that some 300 refugees, mostly from majority-Muslim countries, were under investigation for "terrorism."[2] Shortly after Sessions' puzzling announcement, in summer 2017, F.B.I. agents traveled to Iraq to investigate an Iraqi refugee named Omar Ameen. Around that same time, law enforcement detained Mr. Ahmed at the airport as he traveled back to the United States from a trip to visit his brother overseas and then later came to his home and arranged meetings with him at various locations to ask him about his time in Iraq.

---

[1] https://www.cato.org/sites/cato.org/files/pubs/pdf/pa798_2.pdf

[2] https://www.bbc.com/news/world-us-canada-39187668

The result of the F.B.I.'s trip to Iraq to investigate Mr. Ameen was that a local Iraqi informant whose family had a historical feud with Mr. Ameen's family arranged for the filing in an Iraqi court of false allegations alleging that Mr. Ameen participated in the assassination of a policeman in 2014 part of his role as an "emir" of ISIS. The local informant secured three alleged "witnesses," one of whom supposedly recognized Mr. Ameen because, inexplicably, he was the only one in the masked, armed terrorist squad who was not wearing a mask. The fantastical details of this imaginary attack are recited in further detail in the complaint against Mr. Ameen, available at 2:18-mj-00152-EFB (E.D. Cal.).

Among the significant problems with the allegations against Mr. Ameen was that Mr. Ameen had left Iraq for good in 2012—some two years before the alleged murder—and had resided continually in Turkey since that time. Nevertheless, with the assistance of the United States, the Iraqi government filed an extradition request seeking the return of Mr. Ameen to Iraq to stand trial for the first degree murder of this policeman. Mr. Ameen was arrested in Sacramento in August 2018 on the warrant that resulted from the request, and he has remained in jail ever since.

After the F.B.I. visited Mr. Ahmed at his home in 2017 and 2018, two long-dormant Iraqi murder investigations, which named not Mr. Ahmed but rather someone named variously "Ali Yousif Al-Mahmadi" or simply "Ali Yousef" as a participant in the killing of two policemen in Fallujah in 2006, mysteriously came to life. At the time the FBI began its hunt for terrorist refugees, the murder files for the victims in this case consisted principally of a statement by an Iraqi prisoner and alleged co-conspirator ostensibly dated from November 5, 2006 claiming that about "a month and a half" prior to the making

of the statement, the co-conspirator had become involved with a group that included someone named "Ali Yousif Al-Mahmadi" that had resulted in the killing of Khalid Ibrahim (Doc. 3-3 at 78.) and a contradictory June 6, 2010 statement by the same co-conspirator allegedly in which he told authorities that he was personally present when an agreement among Al-Mahmadi and others was hatched to kill Lt. Issam Hussein despite the fact that Lt. Issam had been killed June 1, 2006—several months before this co-conspirator allegedly met Mahmadi and the others. (Doc. 3-3 at 85.) The only other item of note in the case file prior to the FBI's involvement was a January 11, 2009 statement by a police officer who was with Lt. Issam when he was killed that exonerates "Ali Yousef" by stating that he attempted to intervene to prevent the murder.

Suddenly, after the FBI began to take an interest in Mr. Ahmed in 2017, the case sprung back to life with new, entirely incredible, evidence added. A full treatment of the problems with the allegations would be excessively lengthy and beyond this scope of this reply. Nevertheless, a sampling of the absurdity is provided below:

- Multiple witnesses allege that after the June 1, 2006 killing of Lt. Issam, "Ali Yousef" and others were captured and gave recorded confessions. (Docs. 3-3 at 96, 97; 3-4 at 5.). Yet these recordings, which would presumably be powerfully inculpatory evidence, are mysteriously absent from the file that has been produced to Mr. Ahmed. To credit that they exist and that Mr. Ahmed is "Ali Yousef" would require the court to believe that after confessing to first degree murder of an Iraqi police officer, Mr. Al-Nouri was simply released to street and left free to return to

his role as "emir" of Al-Qaeda, where h continued killing other police officers.

- The January 11, 2009 exculpatory statement of the police officer who was present when Lt. Issam was killed is mysteriously reproduced a second time in the case file but without the signature of the original police officer witness and with no date denoting when the statement was amended to add bizarre and logically inconsistent statements that "Ali Yousef Nouri" is a "criminal" and "emir" of the group that killed Lt. Issam—accusations utterly at odds with the contents of the statement itself. (Doc. 3-4 at 5.)

- In February 2019—approximately 18 months after the F.B.I. inexplicably took an interest in Mr. Ahmed—"witnesses" suddenly started coming forward from nowhere to report on these long-dormant murders. On February 18, 2019, one "witness" gave a very brief statement, vaguely alleging that he saw Ali Yousef Ahmed Al-Nouri and other armed gunmen kill Khalid Ibrahim Mohammed and recognized him because his mask fell off." (Doc. 3-3 at 75.) The mask that "fell off" has, of course, suspicious parallels with the case of Mr. Ameen, who was falsely identified by a witness who claimed that he recognized Mr. Ameen because he alone among the terrorists was not wearing a mask. The witness was not asked and provided no information regarding why he waited 13 years to tell anyone what he allegedly saw.

- On March 20, 2019, a second "witness" miraculously came forward to claim he saw Mr. Ahmed murder Khalid Ibrahim Mohammed. (Doc. 3-3 at 76.) This witness claimed, absurdly, that he recognized Mr. Ahmed from 40 yards away on a crowded street and that he knew Mr. Ahmed because

6

Mr. Ahmed was at that time in Fallujah—one of the most heavily guarded and intensely monitored cities in the entire world owing to intense civil unrest and the overwhelming presence of American military—both working as a carpenter and also openly notoriously cavorting as a police assassin "well known" to the entire community for his violent escapades. These are but a small portion of the illogical inconsistencies contained in the extradition packet.

On January 20, 2020, the New Yorker magazine published a lengthy feature about Omar Ameen that exposed significant corruption that led to the false charges against Mr. Ameen.[3] The story brought national attention to Mr. Ameen's case and placed political pressure on both Iraq and the United States to dismiss the case. Nine days after the story on Mr. Ameen was published, Mr. Ahmed was arrested in Phoenix. The charges against Mr. Ahmed are utterly without merit. Mr. Ahmed has voluntarily submitted to a polygraph examination that has confirmed that he had no involvement either in the specific murders with which he was charged or in police killings, more generally. Ex. 1, polygraph exam results. The government nevertheless persists in repeating as fact the unreliable, untrustworthy, and highly dubious allegations in the complaint in support of its request to detain Mr. Ahmed. These allegations should however be disregarded because they lack any reasonable indicia of reliability.

---

[3] Ben Taub, *The Fight to Save an Innocent Refugee from Almost Certain Death*, The New Yorker (Jan. 20, 2020), available at https://www.newyorker.com/magazine/2020/01/27/the-fight-to-save-an-innocent-refugee-from-almost-certain-death. (last accessed Apr. 20, 2021).

**II.    The Response Fails to Establish that Mr. Ahmed Is Not Entitled to Release as a Matter of Due Process.**

The government's response provides no substantive response to Mr. Ahmed's argument that he has due process rights with regard to his continued detention. Rather than respond to Mr. Ahmed's argument that the "special circumstances" test is unconstitutional, the government merely cites a laundry list of non-precedential opinions applying the "special circumstances test." (Response at 7–9.) Mr. Ahmed does not however deny and never has denied that many district courts have applied a "special circumstances" test in considering relators for release. Rather, he has argued and continues to urge that this test is unconstitutional under *United States v. Salerno*, 481 U.S. 739 (1987) and progeny. The response makes no attempt at substantive engagement with this argument. Thus, for the reasons stated in Mr. Ahmed's motion, this Court should find that Mr. Ahmed has a due process right to be released while his extradition proceeding is pending.

**III.    The Government Has Failed to Establish that no "Special Circumstances" Exist in this Case.**

**A. The Government Fails to Show that the Delay in Seeking Extradition is not a "Special Circumstance."**

The government also fails to respond substantively to Mr. Ahmed's allegations that the Iraqi government engaged in undue delay in the filing of charges and failed to make investigation of the murders of Khalid and Lt. Issam a priority until approximately 2018 or 2019, after the F.B.I. began involving itself in investigation of Iraqi refugees. Instead, the government relies almost exclusively on the findings of the magistrate judge—to which Mr. Ahmed has objected and from which he is entitled to *de novo* review—to support its argument that here has been no unusual delay in this case. In relying on the findings of the magistrate judge however the government commits the same errors to which Mr. Ahmed has already objected. It fails, for example, to explain how years of dormancy during which time apparently no activity at all was taking place

on this case constitutes diligent investigation. The government also fails to offer facts from which this court could reasonably infer that the government of Iraq "made prosecution . . . a priority." *In re Extradition of Chapman*, 459 F. Supp. 2d 1024, 1027 (D. Haw. 2006). The government suggests that the investigation in Iraq was ongoing during all these many years but offers no explanation for why, if the Iraqi government possesses and has possessed since 2006 a recorded confession from Mr. Al-Nouri—albeit a confession it has inexplicably chosen not to share with the United States or with Mr. Al-Nouri—these charges could not through the exercise of reasonable diligence have been brought before 2019.

The government makes a feeble, non-meritorious attempt to blame Mr. Ahmed for the delay in prosecution by suggesting—incorrectly—that Mr. Ahmed "deci[ded] . . . to come to the United States" (Resp. at 11) and insinuating without support in the record that Mr. Ahmed's absence from Iraq may somehow have contributed to the delay in prosecuting him. Neither of these suggestions should however be taken seriously. First, the government's insinuation that Mr. Ahmed voluntarily absented himself from Iraq and then made a "decision" to come to the United States is demonstrably false. As the government also knows, Mr. Ahmed left Iraq because he was shot and seriously injured in a violent terrorist attack, which resulted in his transfer by medical authorities to a hospital Syria for medical treatment. While in Syria, Mr. Ahmed was classified by the UNHCR as a refugee and was later resettled to the United States by the UNHCR. As the government is also aware, Mr. Ahmed, like all other refuges resettled by the United Nations, had no input whatsoever into what country was selected for him; he was "assigned" to the United States by that organization. Thus, neither Mr. Ahmed's departure from Iraq, nor his entry to the United States were "decisions" that Mr. Ahmed "made."

Second, the government's suggestion that Mr. Ahmed's absence from Iraq somehow delayed investigation or prosecution finds no support in the record, which shows no efforts at all on the part of the government of Iraq to locate Mr. Ahmed or to

contact him prior to the issuance of the warrant for his arrest in 2019. Any argument that Mr. Ahmed contributed to any delay in processing this case is pure speculation and should be disregarded as such.

### B. The Government Fails to Show that Mr. Ahmed Is not Likely to Prevail on the Political Offense Defense.

In his motion to revoke, Mr. Ahmed demonstrated that he is likely to be found non-extraditable pursuant to Article III of the U.S.-Iraq extradition treaty, which bars the extradition of an individual for "crimes of a political character." (Mtn. at 7-9.) Mr. Ahmed showed that, on the evidence before the Court, both prongs of the well-established "incidence test" described in *Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986), are satisfied. First, at the time of the offenses there was an active uprising against the new, U.S.-installed government and the American "occupiers" who supported it. Second, assuming *arguendo* that they took place as described in the extradition materials, the two attacks with which Mr. Ahmed is charged bear a clear nexus to that uprising, because they allegedly involved both Al Qaeda in Iraq ("AQI"), a group known to have been active in the insurgency, and the strategy of targeting police officers, a tactic known to have been popular among the insurgents. The government's response fails to undermine this showing.

Much of the government's response is focused on irrelevancies. The government asserts that Mr. Ahmed has "done nothing more" than to "raise his intention" to develop a political offense argument. (Resp. at 12.) In fact, Mr. Ahmed laid out the complete legal test, and demonstrated that he satisfied it – but in any event the assertion is irrelevant now, because on April 16, 2021 Mr. Ahmed filed an extradition brief that includes a 19-page explanation of why his extradition is barred by Article III of the treaty. (Doc. 200 at 4-23.) Mr. Ahmed hereby incorporates that discussion by this reference. The government also claims that the magistrate judge actually did, contrary to Mr. Ahmed's assertion, make a preliminary assessment of Mr. Ahmed's political offense claim. (Resp. at 12-13.) Ahmed disagrees, but in any event the question is

10

irrelevant, because the Ninth Circuit has held that this Court's review of the magistrate judge's decision is de novo. *United States v. Al-Nouri*, 983 F.3d 1096, 1098 (9th Cir. 2020). What the magistrate judge did or failed to do can therefore have no effect on this Court's decision.

Most of the remainder of the government's political offense discussion consists of a series of string-cites. (Resp. at 13–16.) When it does briefly present a substantive argument, the government makes two assertions: (1) AQI's involvement precludes the application of the political offense exception because a crime committed "on behalf of a terrorist organization" cannot constitute a political offense, and (2) evidence suggesting that the attackers received 50,000 Iraqi dinars after one of the attacks precludes the application of the political offense exception. (*Id*. at 16-17.)

These assertions are meritless. In fact, the Ninth Circuit has held that a requesting country's labeling of the charged offense as an act of "terrorism" affirmatively *supports* the application of the political offense exception. *Barapind v. Enomoto*, 400 F.3d 744, 752-53 (9th Cir. 2005) (en banc) (noting that requesting country's decision to prosecute charged offenses under its "Terrorist and Disruptive Activities Act" supported the application of the political offense exception); *see also Matter of Requested Extradition of Smyth*, 61 F.3d 711, 714 (9th Cir. 1995), *amended*, 73 F.3d 887 (9th Cir. 1995) (noting that British government had objected to application of political offense exception to alleged Irish Republican Army members it believed were guilty of "violent terrorist conduct"). The Ninth Circuit has recognized that the "terrorism" label is commonly applied to acts of violence committed in pursuit of political ends, as distinguished from offenses committed for purely personal reasons. The government characterizes AQI as an "international" terrorist organization (Resp. at 16) – but this characterization has no relevance here, as the crimes charged against Mr. Ahmed involved a native Iraqi acting within Iraq in the course of an insurgency. *See*

*Quinn*, 783 F.2d at 807-08 (contrasting act committed by indigenous person in uprising with act of international terrorism committed by foreigner in absence of uprising).

Contrary to the government's suggestion, the evidence of a 50,000-dinar payment does not preclude the application of the political offense exception. To the contrary, this evidence *supports* the application of the exception. The value of the alleged payment amounted to approximately 35 U.S. dollars,[4] and the absurdity of suggesting that private assassins would carry out a "hit" on a police officer on a public street, in front of witnesses, for such a trivial sum confirms that the impetus for the charged attacks was not financial but political.

In sum, the government's efforts to undermine Mr. Ahmed's showing that he is likely to succeed in showing that his extradition is barred by Article III of the treaty are unconvincing.

### C. The Government Fails to Show that Mr. Ahmed's Service to the United States Military Does Not Constitute a "Special Circumstance."

The response acknowledges that Mr. Ahmed performed work for the United States Marine Corps but denigrate his service by claiming that his efforts in leaving his home, traveling to a military base in a different state, and working diligently on behalf of the United States military were somehow trivial or inconsequential. The response also incorrectly states that Mr. Ahmed was not subject to any background check for this position, citing as evidence an FBI 302 from Mr. Ahmed's former manager that clearly states that while contractor employees are not subject to background checks by the contracting company, "[e]mployees [like Mr. Ahmed] that conduct training with the United States Marine Corps are subject to the Marine Admin Threat Screening Policy

---

[4] Molly Hennessy-Fiske, *Iraqi dinar builds steam ahead of nation's chaos*, L.A. Times Dec. 11, 2006, *available at* https://www.latimes.com/archives/la-xpm-2006-dec-11-fi-dinar11-story.html (last accessed Apr. 16, 2021).

from 2015 which requires role players and others with access [to] the USMC facilities to undergo their specific background check requirements." (Resp. at Ex. 1.) That is to say, Mr. Ahmed was given a background check by the United States Marines rather than by the staffing company. Thus, the government's own documents establish that it is untrue that individuals like Mr. Ahmed are "a dime a dozen." Rather, they establish that the role required specific, valuable skills, such as fluency in Arabic and presumably to a degree in English, specialized knowledge of the culture of the target region, and the ability to pass a military-grade background check.

This special assistance rendered to the United States Marine Corps constitutes a "special circumstance" warranting release.

### D. The Government Fails to Show that the Anticipated Length of the Proceedings Is not a "Special Circumstance."

The response spills substantial ink in attempting to distinguish this case from *United States v. Kirby*, 106 F.3d 855 (9th Cir. 1996), in which the Ninth Circuit found that anticipated length of those proceedings constituted a "special circumstance." Resp. at 18–22. That there would be significant factual differences between the cases is unsurprising since the foundation of the "special circumstances" doctrine is that circumstances must be "special," and therefore cannot be facts that commonly occur in extradition proceedings. It is difficult however to conceive of a circumstance more "special" than a global, worldwide pandemic that has overrun hospital systems worldwide, halted international travel, and forced much of the world—including Iraq—into lockdown for long periods of time, thereby delaying Mr. Ahmed's ability to prepare his defense. Mr. Ahmed did not cause the pandemic, nor is he responsible for the delays in his case that it has occasioned, specifically the delays in investigation occasioned by the inability of investigators to travel safely to Iraq to interview witnesses and gather evidence. (Docs. 142-2; 194-1.) Such an investigation is crucial where, as here, the allegations are serious, the likely penalty death, the circumstances and evidence strongly suggest that Mr. Ahmed did not convict the charged offenses, and all parties concede that

the receiving country routinely and as a matter of standard practice fails to provide criminal defendants with fair process. (Doc. 142-1.)

The government response lists all of the various forms of evidence that might be uncovered in Iraq that it does not believe will be admissible. (Resp. at 20.) What it fails to do however is to refute Mr. Ahmed's contention that there are categories of information, such as information that evidence against Mr. Ahmed was procured through torture or coercion, which would be squarely admissible under binding circuit precedent and that can only be discovered by an in-country investigation. *Santos v Thomas*, 830 F.3d 987, 990 (9th Cir. 2016) (en banc). Nor does the government appear to dispute Mr. Ahmed's contention that Iraq routinely gathers "evidence" through such methods, or suggest that it is unlikely that such evidence will ultimately be uncovered.

Instead, the response lays blame for the delay in this case on Mr. Ahmed and in doing so disregards that while he is the party seeking additional time, Mr. Ahmed seeks this time not because he has been dilatory, or because he needs only the amount of time an ordinary relator would need to engage in a standard investigation. Instead, Mr. Ahmed has been a victim of the global pandemic, which has produced and continues to produce extreme delays that constitute a "special circumstance."

### E. The Government Fails to Establish that Mr. Ahmed's Heath Conditions Are not a "Special Circumstance."

The government's response does not dispute, nor can it, that Mr. Ahmed suffers from serious health conditions that place him at unusually high risk for suffering a severe version of COVID-19. Nor does the government dispute that despite having previously asserted, contrary to all available public health authorities as well as common sense, that Mr. Ahmed was somehow safer from COVID-19 in jail than he would be at his semi-rural detached freestanding home (Doc. 81 at 10), CoreCivic demonstrably failed to protect Mr. Ahmed from contracting COVID-19. It does however attempt to minimize the severity of his illness, discounting his extended stay in medical isolation and trip to the hospital. (Docs. 152, 182 at 14.)

14

Mr. Ahmed still has not been vaccinated for COVID-19, despite being one of only a small number of inmates at CoreCivic who the facility has designated as "high risk." Moreover, upon information and belief, the only vaccine that was being given at CoreCivic was the Johnson & Johnson vaccine whose distribution has now been suspended. It is therefore unlikely that Mr. Ahmed will be vaccinated any time in the near future, and for the reasons stated in his motion, he remains vulnerable to reinfection, particularly as variants become more widespread in the United States.

In considering whether Mr. Ahmed's medical conditions constitute a "special circumstance," this Court should moreover consider not only the risk to Mr. Ahmed specifically from COVID-19 but also the collateral consequences to his health of CoreCivic's ongoing denial of routine medical care owing to the pandemic. The government's response fails to rebut, and therefore concedes, that Mr. Ahmed is not receiving routine care for, *inter alia*, his very serious heart condition as a result of the suspension of all "non-emergency" medical services. No information has been provided about when such services will resume, and as long as they remain suspended, Mr. Ahmed remains at risk for suffering significant adverse health consequences as a result of his incarceration and consequent lack of access to necessary health services.

### IV.    Mr. Ahmed Is Neither a Flight Risk nor a Danger to the Community.

The entirety of the government's argument that Mr. Ahmed is a flight risk or a danger to the community rests on repeating uncritically the unfounded, absurd allegations of the admittedly untrustworthy Iraqi government. As explained above, Section I, *supra*, those allegations should be given no weight in this Court's analysis because they have no indicia of reliability and originate from a source that all parties agree is corrupt and known to make false terrorism accusations against innocent parties in service of a political agenda.

What this Court can and should rely on is the uncontradicted record that Mr. Ahmed has had more than a decade of exemplary conduct in this country. He has a wife who is a United States citizen and a son who was barely 1 month old at the time of his

15

arrest and who he has not seen since he was arrested. He owns a house and a business. He has the support of the Iraqi community in Phoenix, many of them themselves refuges from precisely the kind of violence Mr. Ahmed is alleged to have perpetrated and who have therefore no motive to harbor a terrorist in their midst in the United States. Mr. Ahmed made no attempt to flee upon learning that the FBI was investigating him and indeed has nowhere to go. He is neither a flight risk nor a danger to the community.

## V.    Conclusion

For the reasons stated in Mr. Ahmed's motion to revoke the detention order and as further supported herein, this Court should revoke the detention order in this case and order Mr. Ahmed released, with any necessary and appropriate conditions, pending the adjudication of his extraditability.