JON M. SANDS
Federal Public Defender
District of Arizona
850 W. Adams, Suite 201
Phoenix, Arizona 85007
Telephone: 602-382-2700

JAMI JOHNSON
New York State Bar # 4823373
DANIEL L. KAPLAN, #021158
Asst. Federal Public Defenders
Attorney for Defendant
jami_johnson@fd.org
dan_kaplan@fd.org

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In the Matter of the Extradition of<br><br>Ali Yousif Ahmed Al-Nouri,<br><br>       Defendant. | No. MJ-20-08033-PHX-MTM<br><br>**Response to United States'<br>Memorandum in Support of<br>Extradition** |

      Defendant Ali Yousif Ahmed Al-Nouri ("Mr. Ahmed"), through

undersigned counsel, respectfully responds to the government's memorandum in

support of extradition. (Doc. 199.). The government's memorandum

misapprehends the fundamental legal principles that govern this proceeding, fails

to establish that the government has met the requirements for certification, and

fails to establish that the political offense exception does not apply. The Court

should therefore decline to certify the government's request.

**I.**      **The government misapprehends the fundamental legal principles**
          **that govern this proceeding.**

      The government asserts in its extradition brief that the documentary

evidence it has submitted with its complaint is "[a]lone [s]ufficient" for the Court

to certify Ahmed's extraditability. (Doc. 199 at 11 (boldface removed).) The government is mistaken because, as Ahmed demonstrated in his brief and will discuss further below, the evidence on the record effectively confirms that he *cannot* be extradited, among other reasons because the charged crimes are political offenses for which his extradition is barred by Article III of the treaty.

But even if the government's statement is assessed solely with respect to its burden of demonstrating probable cause of Ahmed's guilt, its logic is fundamentally flawed. The government overlooks the essential fact that this is an *adversary* proceeding. While there are limitations on the types of defensive evidence a relator may produce, these limitations do not transform this Court into a "rubber stamp," nor do they eradicate Ahmed's legal right to present evidence that explains away, or demonstrates the incompetency of, the government's proffered evidence. *Santos v. Thomas*, 830 F.3d 987, 1006, 1008 (9th Cir. 2016) (en banc) (internal quotation marks omitted). Indeed, the potential importance of such evidence was recently highlighted by the magistrate judge's refusal to certify the relator's extraditability in the highly similar case of *Matter of Extradition of Ameen*, No. 2:18-mj-152-EFB, 2021 WL 1564520 (E.D. Cal. Apr. 21, 2021). In that case the magistrate judge, relying on numerous exhibits generated by the relator's investigation, found that the evidence failed to establish probable cause to believe the relator was guilty. *See id*. at *1–*6.

In light of these facts, the government's assertion that the existing evidence is "[a]lone [s]ufficient" to show probable cause is akin to asserting that a defendant in a murder trial need not be provided with an attorney, or given an opportunity to present a defense, because the prosecution's evidence is "alone sufficient" to prove his guilt. The government fails to recognize that in an adversary system of adjudication, the evidence can never be "sufficient" until the

2

defendant has been provided with a meaningful opportunity to exercise whatever right to a defense he may have.

The government's assertion that "[o]ther than the sufficiency of the evidence, all matters that may be raised by the fugitive as defenses to extradition are to be considered by the Secretary of State, not by this Court" is equally misguided. (Doc. 199 at 13.) In fact, this Court has the power and duty to review numerous other matters, including whether the purported treaty is in full force and effect, *Karnuth v. United States*, 279 U.S. 231 (1929); whether, in cases involving a U.S. citizen relator, the treaty authorizes the extradition of a citizen, *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5 (1936); whether the request for extradition satisfies all requirements set forth in the treaty, *Matter of Extradition of Ferriolo*, 126 F. Supp. 3d 1297, 1305 (M.D. Fla. 2015); whether the charged offenses fall within the terms of the treaty, *Quinn v. Robinson*, 783 F.2d 776, 809, 817 n.41 (9th Cir. 1986); "whether any applicable treaty provisions bar extradition of the [relator] for any of the charged offenses," *Barapind v. Reno*, 225 F.3d 1100, 1105 (9th Cir. 2000); whether the requesting country's legal system is entirely "antipathetic to a federal court's sense of decency," *Mainero v. Gregg*, 164 F.3d 1199, 1210 (9th Cir. 1999) (internal quotation marks omitted); and whether extradition would otherwise breach the relator's statutory or constitutional rights, *Quinn*, 783 F.2d at 809, 817 n.41.

In short, the government fundamentally misapprehends the basic legal principles governing this proceeding. When those principles are properly recognized and applied, they clearly establish that the extradition request must be denied.

## II. The government fails to carry its burden of showing that the charged crimes are not "political offenses" for which Ahmed's extradition is barred by Article III of the treaty.

Ahmed showed in his extradition brief that the facts agreed upon by both parties' experts establish that the charged offenses fall within Article III of the treaty, which bars his extradition for "crimes of a political character." (Doc. 3-3 at 10; Doc. 200 at 4–23.) The government's extradition brief adds to this consensus by expressly conceding facts that confirm the applicability of the political offense exception. Yet the government simultaneously seeks to resist the exception's clear applicability, by asking the Court to carve out new exceptions in political offense doctrine that are inconsistent with the history of the doctrine and contradict binding precedent. The Court should decline the government's invitation, accept the clear consensus of both experts, the Defense Department, and the government itself, and find Ahmed's extradition barred by Article III of the treaty.

Ahmed has shown that the evidence before the Court establishes that the two police assassinations he is charged with having participated in – assuming *arguendo* they took place in the manner alleged – are "political offenses" for which extradition is barred by Article III of the treaty. As permitted by Ninth Circuit precedent, Ahmed claims protection under the political offense exception even though he "did not commit the offense[s]." *Quinn*, 783 F.2d at 809. Needless to say, any statements in his extradition brief or this reply discussing his alleged actions are hypothetical only, taking the allegations as true for this limited purpose. *Cf. id.* at 785 (noting that Quinn "did not testify at the hearing or otherwise offer any evidence of his own motivation for his alleged participation in the charged crimes"). These allegations, together with the essential facts upon

which both parties' experts and the government itself agree, establish that the charged offenses fall within Article III of the treaty.

Both experts, as well as the Defense Department, agree that a Sunni insurgency directed against the Shi'a-dominated, U.S.-backed Iraqi government was raging in Iraq – and especially in Fallujah – in 2006. (*Whiteside Rpt.* at 4, 5, 10, 11, 12; *Hamoudi Rpt.* at 2–3, 25–33; *Stability & Sec. Report (Nov. 2006)* at 17.) The experts agree that this insurgency arose from Iraqi Sunnis' anger and resentment at the upending of the power structure within Iraq that resulted from the United States' invasion and replacement of Saddam Hussein's Sunni-dominated government with a new, Shi'a-dominated government. (*Whiteside Rpt.* at 9; *Hamoudi Rpt.* at 26.) The experts and the Defense Department agree that Al Qaeda in Iraq ("AQI") – which allegedly was involved in the attacks – was at the time participating in this insurgency. (*Whiteside Rpt.* at 4, 5, 9; *Hamoudi Rpt.* at 2, 3; *Stability & Sec. Rpt.* at 18.) The experts and the Defense Department agree that the assassination of police officers was a common tactic that the insurgents used to undermine the Iraqi government. (*Whiteside Rpt.* at 10–11; *Hamoudi Rpt.* at 3; *Stability & Sec. Rpt.* at 3, 21.) The Iraqi government signaled its understanding of the political nature of the charged offenses by accusing Ahmed of being part of an "armed terrorist group" working to "disturb[] the security and stability of the country," and by assigning the investigation to a court that specializes in terrorism cases. (Doc. 3-3 at 6, 53.) And the only information contained in the extradition packet suggesting that Ahmed had any personal connection to either of the victims indicates that he attempted to *prevent* that victim's assassination. (Doc. 3-4 at 6.) The government has not alleged, and therefore has waived, any argument that commission of the acts was motivated by

personal animus, revenge, or any other non-ideological motive stemming from a personal relationship between Ahmed and either of the alleged victims.

In short, the evidence before the Court, together with the consensus of the parties' experts and the Defense Department, shows that both prongs of the "incidence test" are satisfied. Because this showing is more than adequate to satisfy Ahmed's "initial burden" of "establish[ing] the essential elements of the political offense exception," the government now carries the burden of "prov[ing] that the crime charged in the Complaint was *not* of a political character." *United States v. Pitawanakwat*, 120 F. Supp. 2d 921, 928 (D. Or. 2000) (emphasis added, internal quotation marks omitted) (*cited in Vo v. Benov*, 447 F.3d 1235, 1242 & n.7 (9th Cir. 2006)). The government fails to carry this burden.

**A.    The government fails to show that the uprising prong of the incidence test is not satisfied.**

**1.    The government's own concessions refute its attempt to deny the existence of an "indigenous uprising" in Iraq in 2006.**

The Ninth Circuit has explained that the "uprising prong" of the incidence test is satisfied by evidence and/or noticeable facts establishing that, at the time and place of the offenses for which the relator's extradition is sought, there was "substantial violence" (*Barapind v. Enomoto*, 400 F.3d 744, 750 (9th Cir. 2005) (en banc)) in connection with "a revolt by indigenous people against their own government or an occupying power." *Quinn*, 783 F.2d at 797 n.18, 807.

At some points in its brief, the government asserts that no indigenous uprising was taking place in Iraq in 2006 (Doc. 199 at 18, 25) – which would be news to both parties' experts and the Defense Department, as well as anyone who read or watched the news that year. *See*, *e.g.*, Ann Scott Tyson, *Pentagon*

*Weighing Report on Anbar*, Wash. Post, Sept. 12, 2006.[1] In fact, upon close examination, the government's remarkable assertion is refuted by its own concessions.

The government concedes that at the time of the charged offenses, "members of the local Iraqi Sunni population and related Iraqi-based resistance groups" were conducting an "armed insurgency against the Iraqi government in power and the American Coalition forces." (Doc. 199 at 18; *see also id*. at 19 ("local Iraqi resistance groups were engaging in violent activity to take back their local government"); *id*. at 21 ("There is little dispute that, in the time period leading up to 2006, Iraqi nationals conducted violent acts to try to expel the American Coalition forces and the Iraqi government that was in place."); *id*. at 21–22 (noting that "local Iraqis" "were upset with the coalition forces and wanted to alter the Iraqi form of government"); *id*. at 29 ("many local Iraqi insurgent groups committed violent acts to expel the American Coalition forces . . . to alter the form and structure of the local Iraqi government").) Thus, the government actually – and repeatedly – concedes that at the pertinent time and place there *was* "a revolt by indigenous people against their own government or an occupying power." *Quinn*, 783 F.2d at 807.

Having made that concession, the only way the government could continue to maintain that there was no "indigenous insurgency" would be to show that this "revolt by indigenous people" did not involve "substantial violence." *Barapind*, 400 F.3d at 750. But the government does not attempt to make this showing, and any such attempt would be frivolous. The experts and official government reporting confirm that the level of violence exceeded – by orders of magnitude –

---

[1] *Available at* https://www.washingtonpost.com/wp-dyn/content/article/2006/09/11/AR2006091101005_pf.html (last visited Apr. 23, 2021).

what has been held sufficient to establish an uprising in prior cases. (Doc. 200 at 11.)

The government's own concessions thus conclusively establish that the "uprising prong" of the "incidence test" is met.

The government's focus on AQI's participation in the uprising does not nullify the fatal effect of its concessions. As an initial matter, AQI is itself an indigenous Iraqi organization. Although non-Iraqis occupied some positions within AQI, "'the great bulk of members of the resistance were Iraqi, almost all Sunni Arabs, combining Salafism and patriotism, often belonging to different groups but united against the occupation.'" (*Hamoudi Rpt.* at 33 (*quoting* Patrick Cockburn, *The Occupation: War and Resistance in Iraq* (Verso 2006) at 120.) But even if it were assumed that AQI was *not* an indigenous Iraqi organization, its involvement still would not nullify the existence of an indigenous insurgency, because the government does not suggest that the "local Iraqi resistance groups" laid down their arms the moment AQI became involved. To the contrary, the government acknowledges that AQI members "*participate[d]* in the fight against the American forces," alongside "dozens" of fellow insurgent groups "opposed to the American Coalition forces and the sitting Iraqi government." (Doc. 199 at 18–19, 21 (emphasis added).)

Nor does the government suggest that, after subtracting the violence attributable to AQI, the remainder of the insurgent violence would not qualify as "substantial." *Barapind*, 400 F.3d at 750. Any such assertion would be implausible, as the government concedes that "dozens" of groups were involved in the insurgency (Doc. 199 at 21), and Defense Department reporting confirms that attacks at the time exceeded 40 *per day* in Anbar Province alone. (*Stability & Sec. Report (Nov. 2006)* at 21–22.) *Cf. Pitawanakwat*, 120 F. Supp. 2d at 924–38

8

(holding that series of clashes and standoffs between native people and police in Canada, involving several exchanges of gunfire and a single fatality, qualified as an uprising sufficient to invoke the political offense principle).

In sum, none of the government's assertions regarding AQI's characteristics and agenda can overcome its own statements effectively conceding that there *was* an indigenous uprising in Iraq in 2006.

### 2. AQI's involvement did not nullify the uprising.

Even if the government had not conceded away the issue, its efforts to show that there was no indigenous uprising in Iraq in 2006 would remain unconvincing. The government's proffered rationale for this assertion is that the "local Iraqi resistance groups [that] were engaging in violent activity to take back their local government" (Doc. 199 at 19) were effectively nullified by AQI's participation in the insurgency, because AQI (i) "in some ways, dominated" the uprising, (ii) was led by and included non-Iraqis, (iii) had the goal of creating a "transnational caliphate," and (iv) engaged in acts of international terrorism. (*Id.* at 22, 25.) These arguments are misguided.

### (i) Even assuming it was not an indigenous Iraqi organization, the involvement of AQI among "dozens" of insurgent groups could not nullify the uprising.

Assuming *arguendo* that it was not an indigenous Iraqi organization, AQI's involvement in the Sunni uprising in Iraq could not nullify the existence of an uprising because AQI did not start, lead, or control the uprising that was raging in that country in 2006. Both experts agree that the uprising developed out of resentment among Iraqi Sunnis – not foreign jihadists – about the U.S. invasion's upending of their formerly privileged place in Iraqi society. (*Whiteside Rpt.* at 9; *Hamoudi Rpt.* at 26.) And while AQI later "participate[d]" in the uprising, the government concedes that it did so as "*just one of dozens* of militant groups

9

opposed to the American Coalition forces and the sitting Iraqi government."
(Doc. 199 at 18–19, 21 (emphasis added); *accord Whiteside Rpt.* at 10 (emphasis added); *see also Hamoudi Rpt.* at 30 (AQI was "part of" the insurgency).) No evidence supports the government's self-contradictory assertion that AQI "in some ways, dominated" the uprising (Doc. 199 at 25), and in fact its own expert refutes this claim, noting that AQI did not even "*attempt* to dominate the insurgency" until the end of 2006 – after both of the attacks at issue here – and that attempt failed. (*Whiteside Rpt.* at 5.)

Thus, whatever AQI's particular characteristics or ambitions may have been, they could not nullify the clear and conceded existence of an indigenous uprising in Iraq in 2006.

### (ii) The involvement of non-indigenous people in AQI did not nullify the uprising.

The presence of non-Iraqis in AQI's leadership and membership, and its purported evolution from a group initially founded outside of Iraq, is not inconsistent with the existence of an indigenous uprising in Iraq in 2006. The government does not suggest that AQI was not *primarily* comprised of indigenous Iraqis – and even if it did, the government does not suggest that the "dozens" of *other* groups participating in the Sunni insurgency were led or populated by non-Iraqis. (Doc. 199 at 21.) To the contrary, the government expressly acknowledges that the other insurgent groups were "members of the local Iraqi Sunni population and related Iraqi-based resistance groups." (*Id*. at 18, 21.) The government identifies no authority for the proposition that an uprising ceases to be an uprising the moment a single non-indigenous person – or a single group including non-indigenous members – joins it. And this notion is fundamentally implausible, because as Ahmed noted in his brief, uprisings have never been hermetically sealed off from the rest of the world; to the contrary, the participation of non-

native people in uprisings has been commonplace. (Doc. 200 at 20–21.) This notably includes the American Revolution – one of the conflicts that inspired the political offense exception (*Quinn*, 783 F.2d at 804) – in which a Frenchman commanded colonial American troops, and French naval forces played a decisive role in the climactic battle. Thomas H. Lee, *"Natural Born Citizen,"* 67 Am. U. L. Rev. 327, 356 (2017) (discussing role of Marquis de Lafayette at battle of Yorktown); David H. Moore, *United States Courts and Imperialism*, 73 Wash. & Lee L. Rev. Online 338, 344 (2016) (noting importance of French naval forces at battle of Yorktown).

In sum, the participation of one organization with some non-Iraqi supporters among the "dozens" of indigenous groups involved in the Sunni uprising did not nullify the existence of an indigenous uprising in Iraq in 2006. (Doc. 199 at 21.)

**(iii)    AQI's supposed "caliphate" ambition would not nullify the uprising.**

AQI's alleged goal of creating a "transnational caliphate" also would not nullify the existence of an indigenous uprising in Iraq in 2006. (Doc. 200 at 16–19.) The government notably does not suggest that this "caliphate" ambition was shared by AQI's "dozens" of fellow insurgent groups. (Doc. 199 at 21.) But even if *all* of the insurgents dreamed of creating a "transnational caliphate," this would not undermine the existence of an uprising. "It is the *fact* that the insurgents are seeking to change their governments that makes the political offense exception applicable, not their *reasons* for wishing to do so[.]" *Quinn*, 783 F.2d at 804–05 (emphases added). Thus, assuming that AQI's *reason* for seeking to undermine the Iraqi government was to "prepar[e] the groundwork" for an eventual regional caliphate (*Whiteside Rpt.* at 4), this would not obscure the *fact* that its immediate goal was to topple the existing government. Indeed, the government's own expert

11

acknowledges that, while other insurgent groups envisioned a "power sharing" agreement between themselves and the existing government, AQI envisioned a more radical change involving the wholesale "replac[ement]" of the existing government with a new, "Salafi-influenced" one. (*Id*. at 3.) Both of these ambitions qualify as "seeking to change their government[]" (*Quinn*, 783 F.2d at 804), but the fact that AQI pursued the more radical change brings its actions even *more* firmly within *Quinn*'s description of an "uprising."

Ninth Circuit precedent further refutes the government's reliance on AQI's purported "caliphate" ambition. In fact, in *Quinn* and *Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2005), the Ninth Circuit confirmed that an insurgent group's goal of creating a religion-based nation that would not respect existing national borders is fully consistent with the applicability of the political offense exception. In *Quinn*, the IRA's ambition of creating a united, predominantly Catholic, Ireland did not stop the court from finding that, but for the location of the attacks, the charged crimes would qualify as political offenses. *Quinn*, 783 F.2d at 812, 813. And in *Barapind*, the relator was "a prominent leader of the All India Sikh Student Federation," which had the goal of creating an "independent sovereign Sikh nation" that would take control of a portion of India, and perhaps eventually part of Pakistan as well. *Id*. at 747, 754 (Rymer, J., concurring the judgment in part and dissenting in part); David L. Hudson Jr., *No Deportation for Sikh Activists: 9th Circuit Decision Could Affect Anti-Terror Cases*, ABA J. E-Report, December 12 2003, at 4. Far from finding that the Federation's Sikh-"caliphate" ambition rendered the political offense exception inapplicable, the court noted that the evidence tended to *support* the application of the exception. *Barapind*, 400 F.3d at 752–53.

In sum, the participation of one organization whose ultimate goal might have been to eventually create a "transnational caliphate" among the "dozens" of insurgent groups involved in the Sunni insurgency did not nullify the existence of an indigenous uprising in Iraq in 2006. (Doc. 199 at 19, 21.)

### (iv) AQI's acts of international terrorism did not nullify the uprising.

The fact that, in addition to participating in the Iraqi Sunni insurgency, AQI is believed to have carried out international terror attacks (*Whiteside Rpt.* at 5 & nn. 18–20) does not nullify the existence of an indigenous uprising in Iraq in 2006.

It should be noted that the alleged acts of international terrorism at issue did not take place within any time frame relevant to the crimes charged in the extradition request, and/or could not have been conducted by AQI. The international attacks discussed by Professor Whiteside involved bombings committed in Turkey in 2003 (*id*. at 5 & n.20) – before AQI even existed; a single attack directed at Israel in August 2005 (*id.* at 5 & n. 19); and another single attack in Jordan in November 2005 (*id.* at 5 & n. 18). Professor Whiteside acknowledges that after this last incident, Zarqawi was ordered to cease foreign activities and focus on Iraq, and because no international attacks are alleged to have occurred after that time, it appears that he followed those instructions. The earliest alleged acts associated with the charges against Ahmed took place in June of 2006 – approximately 7 months after AQI ceased international activities.

In any case, even if AQI were alleged to have been conducting international attacks at a time pertinent to the charges at issue here, this would not serve to nullify the indigenous uprising in Iraq, for two reasons. First, the government does not suggest that the "dozens" of *other* groups involved in the Sunni uprising carried out international terror attacks. (Doc. 199 at 21.) Second,

the fact that AQI had in years prior to the only time period at issue in this case carried out international terror attacks does not cause everything it did thereafter to become an international terror attack. Honeywell makes fighter jet avionics as well as household climate-control components,[2] but this does not mean that every purchase of a Honeywell thermostat at a local hardware store qualifies as an international arms deal.

The record in this case confirms the point, because the charged offenses – two assassinations of Iraqi police officers, by fellow Iraqis, on a Fallujah street, in the course of an insurgency – bear no resemblance to international terror attacks. The government's attempt to analogize these alleged attacks to *Quinn*'s discussion of a PLO native of the West Bank who planted a bomb in Israel is thus misguided. (Doc. 199 at 24 (*quoting Quinn*, 783 F.2d at 807).) The PLO member's action did not qualify for the political offense exception because there was no indigenous uprising in Israel for his crime to be "incidental" to, and because, unlike Ahmed, he was not a native of the country in which the charged offense took place. The crime was "international" because the perpetrator literally *crossed a national border* to commit it. Here, by contrast, the charged attacks took place during an insurgency, and were committed by indigenous individuals who did not have to leave their native country – or even their native *city* – to commit them. Thus, both of the crucial factors that prevent the political offense exception from applying in the PLO terrorist scenario are absent here.

The government posits that "there would be no 'uprising' had non-Iraqi members of AQI committed violent acts in Iraq, including the murders of Iraqi police officers, with the objective of destroying Iraq as a state, even if committed

---

[2] https://www.honeywell.com/us/en/industries/overview (last visited Apr. 23, 2021).

14

at the same time that local indigenous Iraqis were fighting to take back their local government." (Doc. 199 at 24–25.) This statement is plainly incorrect, because there *would* be an "uprising" in these circumstances, as long as the Iraqis' fight to "take back their local government" generated "substantial violence." *Barapind*, 400 F.3d at 750. If the government's intended point is that the *individual* non-Iraqi attackers would not be protected by the political offense exception in this scenario (an argument that pertains to the "incidental to" prong, rather than the "uprising" prong), that is an issue that *Quinn* expressly declined to resolve (*id*. at 808) – and that the Court need not address here, because it is undisputed that Ahmed was a native and citizen of Iraq at the time of the alleged attacks. And if the government's intended point is instead that the attackers' objective of "destroying Iraq as a state" to prepare the groundwork for a regional "caliphate" is what renders the exception inapplicable, it is mistaken for the reasons set forth in Section II.B.(1)(c) above.

In sum, the participation of an organization that is also believed to have in the past conducted occasional international terror attacks among the "dozens" of insurgent groups participating in the Sunni insurgency does not nullify the existence of an indigenous uprising in Iraq in 2006. (Doc. 199 at 21.)

For all of these reasons, it is plain that the involvement of a single organization with AQI's purported characteristics and agenda, among the "dozens" of Iraqi insurgent groups participating in the uprising, does not nullify the existence of an indigenous uprising in Iraq in 2006. (*Id*.) For this reason, along with those set forth in Ahmed's brief, the "uprising prong" of the incidence test is clearly satisfied.

**B.** **The government fails to show that the "incidental to" prong of the incidence test is not satisfied.**

Once the existence of an insurgency is established, the standard for finding a charged offense "incidental to" it is "rather liberal." *Quinn*, 783 F.2d at 809. The government fails to carry its burden of showing that this "rather liberal" standard is not met here.

1. **Because AQI was an "uprising group," evidence of its involvement supports, rather than undermining, the "incidental to" finding.**

The government asserts that evidence suggesting that the charged offenses were committed "on behalf of AQI" tends to undermine the "incidental to" finding. (Doc. 199 at 28.) The government has the matter exactly backwards. Both parties' experts agree that AQI was *part* of the Sunni uprising against the government of Iraq. (*Whiteside Rpt.* at 4, 5, 9; *Hamoudi Rpt.* at 2–3). The government itself concedes that AQI "participate[d]" in that uprising. (Doc. 199 at 18–19.) And as the Ninth Circuit has made plain, a relator's purported "membership in an uprising group" *supports*, rather than undermining, the applicability of the political offense exception. *Quinn*, 783 F.2d at 809–10.

Presumably because it recognizes this fact, the government attempts to obscure the experts' consensus that AQI was part of the Sunni insurgency. But its efforts, consisting of misleading paraphrase and illusory distinctions, are unconvincing.

Professor Whiteside describes AQI as having had a "competitive edge *among* the diverse Sunni resistance" – confirming that AQI was *part* of the Sunni resistance. (*Whiteside Rpt.* at 5 (emphasis added).) The government misleadingly rephrases this passage as "'a competitive edge' *over* Sunni resistance groups," suggesting that Professor Whiteside excluded AQI from the category of Sunni

resistance groups – the opposite of his actual meaning. (Doc. 199 at 21 (emphasis added).) Indeed, Professor Whiteside also described AQI as "heavily investing in the insurgency in Iraq," and as in some respects an anomaly "*in* the wider Sunni resistance to the presence of U.S. and allied forces and the Iraqi government." (*Whiteside Rpt.* at 5, 9 (emphasis added).) Professor Hamoudi likewise describes AQI as "*part of* the popular, domestic insurgency." (*Hamoudi Rpt.* at 2 (emphasis added).)

The government also refers to a paragraph in Professor Whiteside's report that discusses criticisms leveled against AQI by its fellow insurgent groups. (Doc. 199 at 29.) But the government fails to acknowledge that the critics asserted that AQI had "'dishonored the insurgency'" by killing Iraqis. (*Whiteside Rpt.* at 7 (quoting statement of Ramadi Shura Council).) Of course, AQI could not "dishonor" the insurgency unless it was *part of* the insurgency – just as a wayward individual would not be said to "dishonor" a family unless he was *part of* that family.

The government suggests that there is a crucial distinction between the insurgency's goal of "alter[ing] the form and structure" of the Iraqi government, and AQI's goal of "expel[ing] the American Coalition forces" and "tak[ing] over Iraqi land." (Doc. 199 at 29.) But this purported distinction is illusory, because the latter phrasing obviously entails "alter[ing] the form and structure" of the Iraqi government, and thus falls within the "change the structure of government" language of *Quinn*, 783 F.2d at 813. The same goes for the government's attempt to draw a distinction between the insurgent strategy of targeting police officers in order to "undermine the Iraqi government," and AQI's strategy of targeting police officers to "terrorize the local population and warn of the consequences of supporting the American Coalition forces or local Iraqi government." (Doc. 199

17

at 31–32.) Terrorizing Iraqis by showing them that "the new order could not protect them" (*Hamoudi Rpt.* at 4), and "warn[ing]" them against supporting the Iraqi government, are obviously both means of "undermin[ing] the Iraqi government."

The government also appears to believe that descriptions of the group that carried out the charged attacks as "terrorists" tend to undermine the applicability of the political offense exception. (Doc. 199 at 26–27.) Once again, the government has the matter exactly backwards. Crimes committed for *non-*political reasons are seldom labeled "terrorism," but governments challenged by insurgencies commonly do describe the insurgents as "terrorists." This is why the Ninth Circuit in *Barapind* noted that the Indian government's decision to prosecute the charged offenses under its "Terrorist and Disruptive Activities Act" *supported* the application of the political offense exception. *Barapind*, 400 F.3d at 753; *see also Matter of Requested Extradition of Smyth*, 61 F.3d 711, 714 (9th Cir. 1995), *amended*, 73 F.3d 887 (9th Cir. 1995) (noting that several courts had applied the political offense exception to deny extradition of accused Irish Republican Army members whom the British government considered terrorists). It is not crimes labeled "terrorism" that *Quinn* excluded from the political offense exception, but rather crimes of "*international* terrorism," such as a non-Israeli PLO-member's attack within Israel. *Quinn*, 783 F.2d at 807 (emphasis added). And as Ahmed has shown above in Section II.B.(1)(b)(iv), the offenses charged here clearly do not fall within that category.

In short, the government's suggestion that AQI's purported involvement in the alleged attacks weighs against the "incidental to" finding is mistaken. In fact, evidence of AQI's involvement weighs heavily *in favor* of that finding.

**2.    Evidence that the attackers received a 50,000-dinar payment after one of the attacks likewise supports, rather than undermines, the "incidental to" finding.**

The government argues that evidence of a 50,000-dinar payment made to the attackers after one of the assassinations shows that the charged offenses were committed for "personal monetary gain," rather than for political reasons, and that the attackers were "mercenaries." (Doc. 199 at 27–28.) This argument is flawed for any of three independently sufficient reasons.

First, being paid is not inconsistent with being an insurgent. The soldiers who fought in the Continental Army during the American Revolution were paid. Kurt T. Lash, *Power and the Subject of Religion*, 59 Ohio St. L.J. 1069, 1113 n.155 (1998). In fact, in *Quinn* the Ninth Circuit identified insurgencies fought by "organized, clearly identifiable, armed forces" – *i.e.*, the type that pay their soldiers – as the classic type of insurgency for which the political offense exception was created. *Quinn*, 783 F.2d at 804; *see also Matter of Extradition of La Salvia*, No. 84 Cr. Misc. 1., 1986 WL 1436, at *11 (S.D.N.Y. Jan. 31, 1986) (noting that seizure of funds from bank to pay army of "soon-to-be toppled" military ruler of El Salvador was held political offense in *In re Ezeta*, 62 F. 972, 1003 (N.D. Cal. 1894)). It was the subsequent emergence of insurgencies carried out by less formal "networks of individuals joined only by a common interest in opposing those in power" that represented new terrain for the political offense principle. *Quinn*, 783 F.2d at 804. Moreover, restricting the political offense exception to insurgencies that rely solely on unpaid fighters would render the exception ineffectual, because insurgencies run on those principles would have little to no chance of toppling a government. Thus, evidence that a payment was made in connection with one of the attacks tends to bring the charged offenses closer to, rather than further from, the heartland of the political offense exception.

Second, the mere fact of being paid in connection with fighting does not make one a "mercenary." If it did, the entire United States armed forces would be comprised of "mercenaries." Of course it is not, because a "mercenary" is a soldier who "serves *merely* for wages"[3] – as typically evidenced by the fact that he has no "tangible and substantial connections" to the nation in which he fights. *Quinn*, 783 F.2d at 820 (Fletcher, J., concurring and dissenting). Thus, the colonial Americans who fought in the Revolution were insurgents, while the Hessians the British government hired and shipped to North America to fight them were "mercenaries." Gable F. Hackman, *Slipping Through the Cracks: Can We Hold Private Security Contractors Accountable for Their Actions Abroad?*, 9 Loy. J. Pub. Int'l L. 251, 252 (2008).

By the same token, the attackers described by the charging documents here – a group of native Iraqis employing classic insurgent tactics in an effort to change their government – do not remotely resemble "mercenaries." Indeed, the government itself urges the Court to find that the attacks were conducted, not for money, but to advance a scheme to "take over Iraqi land to develop a transnational caliphate." (Doc. 199 at 19.) The government's simultaneous attempt to analogize this case to *Ornelas v. Ruiz*, 161 U.S. 502 (1896) – which involved a group of "bandits" with no apparent connection to any "uprising group" who crossed into Mexico, plundered a Mexican army encampment, then recrossed into Texas with their "booty" (*id*. at 510–11) – is thus unconvincing. (Doc. 199 at 28.)

Third, the actual value of a 50,000-dinar payment in October of 2006 amounted to less than 35 U.S. dollars. *See* Treasury Reporting Rates of Exchange

---

[3] Merriam-Webster ("mercenary"), *available at* https://www.merriam-webster.com/dictionary/mercenary (last visited May 14, 2021) (emphasis added).

as of Sep. 30, 2006.[4] (Ahmed requests that the Court take judicial notice of this official government report. *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069–70 (9th Cir. 1995).) As Ahmed noted in his brief, it is patently implausible that private assassins would conduct a "hit" on a police officer on a public street in exchange for such an inconsequential sum. (Doc. 200 at 14–15.)

In short, both the evidence of AQI's involvement, and the evidence of a payment in connection with one of the attacks, *support* the conclusion that the "rather liberal" test for finding that a charged offense was "incidental to" an insurgency is satisfied. *Quinn*, 783 F.2d at 809.

The government's remaining arguments address irrelevancies. The government asserts that Ahmed has not "disclosed to the Government" any "direct evidence" supporting the conclusion that the charged crimes were incidental to the Sunni insurgency. (Doc. 199 at 30.) But as the discussion above and in his brief makes clear, Ahmed does not *need* to produce additional evidence, because the evidence already on the record firmly establishes that the charged crimes are non-extraditable political offenses. *Cf. Quinn*, 783 F.2d at 785 (noting that Quinn "did not testify at the hearing or otherwise offer any evidence of his own motivation for his alleged participation in the charged crimes"); *see also Ramos v. Diaz*, 179 F. Supp. 459, 463 (S.D. Fla. 1959) ("American authority indicates clearly that when evidence offered before the Court tends to show that the offenses charged against the accused are of a political character, the burden rests upon the demanding government to prove to the contrary."). The government also expends considerable effort challenging Professor Hamoudi's observation that the charged offenses might have been connected with an

---

[4] *Available at* https://www.fiscal.treasury.gov/files/reports-statements/treasury-reporting-rates-exchange/0906.pdf (last visited Apr. 22, 2021).

insurgent group other than AQI, such as the Army of Omar. (Doc. 199 at 30–34.) This issue is irrelevant, because as Ahmed has demonstrated above and in his brief, AQI's involvement in these offenses actually supports the applicability of the political offense exception.

In sum, the government has failed to carry its burden of showing that the charged offenses were not incidental to the Sunni insurgency that was raging in Iraq in 2006. Pursuant to Article III of the treaty, this Court should therefore decline to enter a certificate of extraditability and dismiss the complaint. *Ramos*, 179 F. Supp. at 463–64.

### III. The Government has failed to establish that the crimes for which extradition is sought are covered by the treaty.

The government has failed to establish that the crimes for which extradition is sought are covered by the treaty. (Doc. 199 at 8–9.) Indeed, as Professor Hamoudi points out, not only has Ahmed not been charged with *any* crime in Iraq, but the documents provided by Iraq fail to identify for which crimes, specifically, he is wanted for questioning. *Hamoudi Rpt.* at 1, 11–20. In arguing that the crimes for which extradition is sought are covered by the treaty, the government fundamentally misapprehends the role of the court in interpreting treaties, which is to examine the specific terms of the specific treaty in question and to interpret that treaty in accordance with those terms. *See United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992). Case law interpreting entirely different treaties – particularly treaties with dramatically different terms from the treaty at issue in this case – is thus of limited value to this Court's analysis.

As Ahmed noted in his brief, the U.S.-Iraq extradition treaty is a "list" treaty which, unlike more expansive "dual criminality" treaties, specifically and expressly limits the power of the executive to extradite individuals by specifying that it may do so only if the relator is "charged with or convicted of" one of 25

enumerated offenses. (Doc. 200 at 28–29.) As also explained in Ahmed's brief, the U.S.-Iraq extradition treaty further provides that if extradited, Ahmed may not be prosecuted for any offense other than the offense of extradition. *Id.* The government's suggestion that the Court adopt a flexible, conduct-based analysis of whether the conduct described generally in the documents submitted would constitute one of the enumerated offenses, in order to determine whether the crime for which extradition is sought is covered by the treaty, is at odds with the plain language of the treaty and is not supported by either of the cases the government cites. In *Factor v. Laubenheimer*, 290 U.S. 276, 299–300 (1933), the Supreme Court held that the mere fact that a relator may have happened to land in a jurisdiction within the receiving nation where a treaty-enumerated offense – in that case, receipt of stolen funds – happens not to be illegal, though it is illegal in most jurisdictions within the United States, will not save the relator from extradition. *Factor* offers no support for the government's position that the Court must look to the conduct described in order to determine whether it is among the enumerated offenses. (Doc. 199 at 8.) *Artukovic v. Rinson*, 784 F.2d 1354, 1356 (9th Cir. 1986), on the other hand, is simply an order denying a stay of extradition during the pendency of an appeal of the denial of a writ of habeas corpus, in a case where Andrija Artukovic – the highest ranking Nazi war criminal ever located in the United States, responsible for killing more than 700,000 Jews and others – had been fighting removal from the United States to Yugoslavia for over 35 years. That case demonstrably does not hold that broad and vague allegations of "war crimes" are, as a matter of law, sufficiently analogous to murder to comport with the terms of a list treaty, much less the specific list treaty at issue in this case.

23

The government's reliance on citations to cases involving broader "dual criminality" treaties to support its argument that the Court should look to the conduct alleged generally, rather than to specific charges, in determining whether the extradition packet complies with the terms of the treaty is similarly misplaced. (Doc. 199 at 8.) *United States v. Knotek*, 925 F.3d 1118 (9th Cir. 2019) concerned an extradition treaty with Czechoslovakia that not only was not a list treaty but had specifically been amended by Congress in 2006 to replace a list of enumerated offenses with a simple "dual criminality" requirement. *Compare* Treaty Concerning the Mutual Extradition of Fugitive Criminals, U.S.-Czech. July 2, 2015, 44 Stat. 2367, U.S.T. Mar. 29, 1926 *with* Instrument Amending the Treaty of July 2, 1925 as Amended by the Supplementary Treaty of April 29, 1935, U.S.-Slovak Republic, Feb. 6, 2006, T.I.A.S. 10-201.5. Indeed, *Cucuzzella v. Keliikoa*, 638 F.2d 105 (9th Cir. 1981), which interprets a 1971 list treaty with Canada, holds that where a treaty limits extradition to enumerated offenses and prohibits prosecution for any other offense upon arrival in the receiving nation (as the treaty at issue in this case also does), "we must look to the extraditability of each *offense* and not just each *act*." *Id.* at 107 (emphases added).

It is moreover unclear, because Ahmed has not yet been charged, what the Iraqi government ultimately intends to accuse him of, or whether that crime is covered by the treaty. *Hamoudi Rpt.* at 18. It is entirely unclear, for example, whether the Iraqi government accuses Ahmed of murder (an enumerated offense) or instead of the crime identified in the arrest warrant, which is "organized murder by an armed terrorists group" (*sic*), whose definition is not clear because (as Professor Hamoudi explains) it is not a crime defined or even mentioned under the relevant Article of the Iraqi penal code, and which is in any event not a crime enumerated within the treaty. *Hamoudi Rpt.* at 16–17. References to the

undefined crime of "organized murder" may reasonably be read to suggest liability under a theory of conspiracy, which also is not an enumerated offense under the treaty.

As explained above, the government's urging of the Court to look merely to the general facts alleged in order to determine whether a qualifying crime has been committed is at odds with the terms of the treaty and relies largely on inapposite case law interpreting treaties with conduct-based (as opposed to offense-based) terms. But even if the Court were to look solely to the facts alleged in the extradition paperwork, it is unclear even under that inappropriately expansive view of this treaty that the government has met its burden of showing that Ahmed is alleged to have committed "premeditated murder," rather than some other non-covered offense, because it is not clear that Ahmed is alleged to have been the murderer of the two victims, as opposed to being guilty only by virtue of some sort of secondary, derivative, or organizational liability that is not a qualifying offense under the treaty. With respect to the murder of Khalid, for example, the Iraqi government has submitted several absurd, contradictory, and utterly non-credible "witness statements," the majority of which fail to identify Ahmed as the actual murderer of Khalid but suggest that he was at most merely present as member of the group responsible, and some of which affirmatively identify someone else as the shooter. Indeed, the witness identified by the government as a cooperating co-conspirator reports that Ahmed didn't even get out the car Ahmed was driving, which was providing surveillance and protection to the car containing the shooters. (Doc 3-3 at 78.)

With respect to the murder of Issam, the police officer who reported sitting next to Issam when he was killed stated that not only was Ahmed not the shooter, but in fact Ahmed attempted unsuccessfully to intervene in order to prevent the

25

murder. (Doc. 3-4 at 5 & 6.) The only individual who reports that Ahmed was the person who actually killed Issam is a cooperating co-conspirator who claims – contrary to the statements of the police officer witness – that he personally saw Ahmed kill Issam while providing "surveillance and support" to the operation (Doc. 3-4 at 10–11); but this witness also claims that he didn't meet Ahmed or become involved in his alleged group until months after the murder of Issam took place. (Doc. 3-3 at 78). The government deals with these inconsistencies and incoherences by simply ignoring them, urging the Court to look only to "evidence" that supports its preferred theory of criminal liability while disregarding evidence of equal or greater value that contradicts its preferred narrative. In short, the facts recited by the supposed "witnesses" to the complained-of acts are so illogical, incoherent, internally contradictory, and absurd that even under the government's inappropriately expansive view of the treaty requirements, they fail to establish that Ahmed committed or is accused of committing an offense enumerated in the treaty.

**IV.     The Government has failed to establish that Ahmed has been "charged with" the offenses for which extradition has been requested.**

The government's argument that Ahmed has been "charged with" the offenses for which extradition is sought (Doc. 199 at 34–38) suffers from the same errors in legal reasoning that pervade its discussion of whether the crimes for which extradition is sought are covered by the treaty (Doc. 199 at 8–9). Specifically, it relies on irrelevant case law interpreting entirely different and unrelated treaties with wholly different terms to urge an interpretation of this treaty that would be contrary to its plain language. (Doc. 200 at 23–27.) The interpretation of the U.S.-Iraq extradition treaty is properly governed by

interpretation of its own terms and not by interpretations of other treaties with entirely different terms. *United States v. Alvarez-Machain*, 504 U.S. at 663.

The unsupported opinion of State Department official Tom Heinemann should be furthermore be disregarded for the reasons set forth in Ahmed's motion in limine to strike that declaration (Doc. 212), and also because the U.S.-Iraq extradition treaty is unambiguous and the opinion of the State Department on its meaning is therefore irrelevant. *See Aguasvivas v. Pompeo*, 984 F.3d 1047, 1058 (1st Cir. 2021) (citing *Alvarez-Machain* in holding that deference to the United States in interpretation of a treaty is warranted only where the treaty's text is ambiguous).

### A.    The U.S.-Iraq Extradition Treaty requires a formal charge.

For the reasons explained in Ahmed's brief, the U.S.-Iraq extradition treaty requires that a formal charge have been filed. (Doc. 200 at 23–26.) The cases cited by the government ostensibly in support of the argument that charges are not required are inapposite. For example, as explained in Ahmed's brief, the markedly different – and broader – construction of the treaty at issue in *Emami v. United States District Court for the Northern District of California*, 834 F.2d 1444 (9th Cir. 1987) supports rather than undercuts a finding that a charge is required pursuant to the terms of *this* treaty. (Doc. 200 at 25–26). The 1978 treaty with Mexico at issue in *Causbie Gullers v. Bejarano*, No. 07-55137, 293 Fed. App'x 488 (9th Cir. Sept. 16, 2008) is – like the treaty in *Emami* – a dual criminality treaty and also allows for prosecution to be had in the receiving jurisdiction on an offense different from the one for which the relator was originally extradited provided the general group of facts underlying the new charges remain the same. Extradition Treaty, U.S.-Mex., May 4, 1978, 31 U.S.T. 5059. That is to say, the treaty specifically envisions that extradition will be based

on complained-of *conduct* and not limited to particular charged *offenses*. The treaty at issue in *Theron v. United States Marshal*, 832 F.2d 492 (9th Cir. 1987) is much more similar to the U.S.-Iraq extradition treaty, and the relator in that case accordingly *had already been indicted* prior to the extradition request, so that case is not instructive with regard to whether a formal charge is required under the terms of this treaty. *Id.* at 499; Extradition Treaty, U.S.-S. Afr., Dec. 18, 1947, 2 U.S.T. 844.

Cases cited by the government interpreting other, differently drafted, extradition treaties with other nations as not requiring a formal charge are unavailing, inapposite, or both. *In re Extradition of Manrique*, No. 19-mj-1055-MAG1TSH, 2020 WL 529 1093, at *3 (N.D. Cal. Sept. 4, 2020) supports rather than undermines Ahmed's argument. The treaty at issue in that case was a dual-criminality treaty with Peru. Extradition Treaty, U.S.-Peru, Jul. 26, 2001, T.I.A.S. 03-825. In finding that Manrique had been "charged" within the meaning of the treaty, the court specifically relied on the fact that – unlike here – Peru had submitted not merely an arrest warrant but also a charging document that the court analogized to a criminal complaint. *Id*. at *2–15. The government's claim that Manrique was wanted only for a "preliminary investigation" (Doc. 199 at 37–38) is misleading. The *Manrique* court in fact specifically noted that the Peru's use of the term "preliminary investigation" in its extradition request was misleading to a U.S. audience because it sounded as though no charge had yet been filed, but the court went on to explain that within the Peruvian system, the launching of a "preliminary investigation" was in fact the equivalent of the filing of a criminal complaint in the U.S., and this "complaint" was duly included in the extradition packet. *Id.* at *6–*7 ("It's true that these documents consistently use the term 'preliminary investigation,' which to a U.S. reader does not sound like a

charge . . . . But we have to remember that other countries use different terminology in their legal systems, so we need to look to substance and not get too caught up in words and labels. These Peruvian documents do not in any way correspond to what a U.S. reader thinks a 'preliminary investigation' is. The Prosecutor's Decisions read like criminal complaints, spelling out the accused conduct and charging the named defendants with specific crimes.") No such complaint or other charging document has been presented here.

*In re Extradition of Handanovic*, 829 F. Supp. 979 (D. Ore. 2011) involves a treaty with a country whose local law – unlike the law of Iraq – provided that formal charges could not be filed "if the suspect has not been questioned." *Id.* Thus, the court held that interpreting the treaty as requiring a formal charge would lead to an absurd result that could not have been intended by the parties because it would render the treaty inoperable. *Id.* at 987. *In re Lam*, No. 1:08-MJ-247-GSA, 2009 WL 1313242 (E.D. Cal. May 12, 2009) interpreted a dual criminality treaty with Belgium and found that the documents submitted constituted "a cognizable 'charge' under the laws of Belgium." *Id.* at *9. Here, the documents do not constitute a charge under the laws of Iraq. *Hamoudi Rpt.* at 1, 11–16. *In re Extradition of Lehming*, 951 F. Supp. 505 (D. Del. 1996) involved interpretation of the same treaty with Germany that was at issue in *Emami* and is thus unavailing for the reasons previously stated.

*Borodin v. Ashcroft*, 136 F. Supp. 125 (E.D.N.Y. 2001) is a ruling on a habeas petition seeking review of a denial of bail that merely finds that Borodin's "charge" argument is not a "special circumstance" warranting release pending hearing on the extradition request. *Id.* at 129. *Borodin* moreover involves a Swiss dual criminality treaty with a country where formal charges cannot be issued until a relator physically appears in court. *Id. In re Extradition of Sacirbegovic*, 280 F.

Supp. 2d 81 (S.D.N.Y. 2003) is, like *Borodin*, a bail case in which the court merely found that the relator's "charge" argument was not a "special circumstance" warranting release. *Id.* at 83. Indeed, *Sacirbegovic* was ultimately released and extradition denied because the Second Circuit found that no "charge" existed within the meaning of the treaty because, as the case here, *see* Section V, *infra*, the arrest warrant was issued by a court with no jurisdiction over the relator. *Sacirbey v. Guccione*, 589 F.3d 52, 69 (2d. Cir. 2008).

**B.    No formal charge has been filed.**

As explained in Ahmed's extradition brief, no formal charge has been filed against Ahmed. (Doc. 200 at 27–28). The government does not appear to dispute that no formal charge has been filed but instead states – inaccurately – that the warrant for Ahmed's arrest "clearly demonstrates that Ahmed is wanted for prosecution for violations of Article 406(1)(A) of the Iraqi Penal Code No. 111 of 1969," and that this fact is sufficient under its unsupported and overbroad interpretation of "charged with" to comply with the terms of the treaty (Doc. 199 at 37). In fact, as Professor Hamoudi notes and as is evident from the face of the document itself, it is entirely unclear from the face of the warrant what specific crime Ahmed is wanted for. *Hamoudi Rpt.* at 16–17; (Doc. 3-3 at 51). The warrant indeed references Article 406(1), but then goes on to identify that crime, *i.e.* the offense proscribed by Article 406(1) as "organized murder by an armed terrorists (*sic*) group," which is not only not a crime enumerated within the terms of the treaty but is also not a crime that even exists within Article 406(1) of the Iraqi Penal Code. *Id.*; (Doc. 3-3 at 22.)

The government's suggestion that it would somehow be inappropriate, unprecedented, or beyond the competency of the Court to determine whether Ahmed has been charged within the meaning of Iraqi law is similarly misguided.

30

(Doc. 199 at 36.) Indeed, the U.S.-Iraq extradition treaty expressly contemplates that a judge in the United States will rule on issues of foreign law in approving extradition. *See* Art. 5 of the U.S.-Iraq Extradition Treaty (Doc. 3-3 at 11) ("[a] fugitive criminal shall not be surrendered under the provisions of this Treaty, when from lapse of time or other lawful cause, *according to the laws of the place within the jurisdiction of which the crime was committed*, the criminal is exempt from prosecution or punishment for the crime for which the surrender is asked.") (emphasis added); *see also Sacirbey v. Guccione*, 589 F.3d at 63–69 (granting habeas relief after interpreting foreign procedural law to hold that relator had not been "charged with" a crime within the meaning of the relevant treaty). It is firmly within the competence of this Court to determine whether Ahmed has been charged with a crime in Iraq, and he has not.

## V. The government fails to acknowledge the invalidity of the arrest warrant submitted by Iraq.

Ahmed showed in his extradition brief that Iraq has failed to comply with Article XI of the treaty, which requires it to support an extradition request with "a duly authenticated copy of the warrant of arrest." (Doc. 3-3 at 12; Doc. 200 at 31–33.) Although Iraq has submitted a purported "Arrest and Investigation Warrant" of the Magistrate Court of Al-Karkh (Doc. 3-3 at 49–53), the game of jurisdictional pinball that the Iraqi judicial system has played with the matter – a "brazen violation of Iraqi criminal process and the Iraqi Criminal Procedure Code" (*Hamoudi Rpt.* at 1) – renders the warrant invalid. And as the Second Circuit recognized in *Sacirbey v. Guccione*, 589 F.3d 52 (2d Cir. 2009), the requesting country's submission of an invalid arrest warrant cannot satisfy its obligations under a treaty containing a warrant requirement.

The government asserts that Professor Hamoudi's observations regarding Iraq's brazen violation of the rules governing Iraqi criminal process is

"unavailing" because "'[j]udicial inquiry into foreign criminal procedural issues is limited in the extradition context.'" (Doc. 199 at 38 (*quoting Fejfar v. United States*, 724 F. App'x 621, 622 (9th Cir. 2018).) But *Sacirbey* – which the government does not acknowledge – confirms that while American courts generally refrain from considering matters pertaining to the requesting country's legal system, they can and must consider those matters when necessary to determine "whether the requirements of the extradition treaty [are] met." *Skaftouros v. United States*, 667 F.3d 144, 160 (2d Cir. 2011) (*discussing Sacirbey*, 589 F.3d at 63). And when, as here and in *Sacirbey*, that consideration leads to the conclusion that the warrant-issuing court lacks jurisdiction over the relator, extradition must be denied. *Sacirbey*, 589 F.3d at 70.

None of the cases that the government cites suggests that an extradition court should turn a blind eye to the warrant-issuing court's lack of jurisdiction under circumstances similar to those presented here. *Grin v. Shine*, 187 U.S. 181, 190–91 (1902) (relator argued that requesting country failed to produce "warrant of arrest or its equivalent;" Court notes that requesting country had in fact produced "equivalent judicial document" to arrest warrant); *Noeller v. Wojdylo*, 922 F.3d 797, 805–07 (7th Cir. 2019) (relator argued that his collateral attack-type action in Mexican court effectively rendered Mexican warrant "invalid"; court noted that relator failed to produce "compelling, reliable evidence" to substantiate his argument); *Skaftouros*, 667 F.3d at 160 (rejecting relator's "technical" assertions that Greek warrant was invalid because it "d[id] not contain the signature of the Clerk or a sufficiently detailed description of his face"); *Sainez v. Venables*, 588 F.3d 713, 715–17 (9th Cir. 2009) (rejecting relator's argument "that the Mexican arrest warrant did not toll the statute of limitations because it is in no way analogous to a United States indictment"); *Emami v. U.S.*

*District Court*, 834 F.2d at 1448–49 (9th Cir. 1987) (rejecting relator's argument that treaty barred his extradition because no formal "charge" had been filed in requesting country's courts); *Matter of Assarsson*, 635 F.2d 1237, 1239–44 (7th Cir. 1980) (same).

In short, the government's arguments do not undermine Ahmed's showing that Iraq failed to produce an arrest warrant issued by a court with jurisdiction to try him. This Court should accordingly decline to certify Ahmed's extradition.

## VI. This Court can and should decline to certify Ahmed's extraditability pursuant to the humanitarian exception to the rule of non-inquiry.

In extensive and undisputed written testimony, Professor Hamoudi has outlined how the Iraqi criminal justice system deprives defendants of rights that are "deemed fundamental in most modern justice systems, including the United States." (*Hamoudi Rpt.* at 3-5, 34–41.) Iraqi courts provide no meaningful right to cross-examine witnesses, confront the evidence, or present any substantial defense. Even in capital cases, judges appoint defense counsel on the day of trial, restrict trials to *pro forma* proceedings that may last no more than ten minutes, and rest convictions and even death sentences on purported confessions while ignoring compelling evidence that the "confessions" were obtained through torture. Ahmed highlighted this evidence in his brief, and demonstrated that it would justify this Court in applying the humanitarian exception to the rule of non-inquiry to decline to certify his extraditability. (Doc. 200 at 33–39.)

The government asserts that the Ninth Circuit's opinions in *Prasoprat v. Benov*, 421 F.3d 1009 (9th Cir. 2005); *Lopez-Smith v. Hood*, 121 F.3d 1322 (9th Cir. 1997); and *Quinn*, 783 F.2d at 789–90, bar this Court from applying the humanitarian exception. (Doc. 199 at 39–40.) The government is mistaken.

As Ahmed showed in his brief, *Prasoprat* and *Lopez-Smith* declined to apply the humanitarian exception, not because the exception does not exist, but

33

because the evidence of deficiencies in the requesting countries' justice systems was not egregious enough to justify its application. *Lopez-Smith*, 121 F.3d at 1327 ("If there is an exception to the rule of non-inquiry based on [humanitarian concerns], as we assume without deciding, nevertheless the facts in this case are not so egregious as to invoke the dictum."); *Prasoprat*, 421 F.3d at 1016 (*citing Lopez-Smith* and other decisions acknowledging but declining to apply the exception, and stating that it "therefore" agreed that the magistrate judge lacked discretion to consider the humanitarian exception). (Doc. 200 at 36–37.)

The deficiencies at issue in *Lopez-Smith* and *Prasoprat* involved attempted extortion by a Mexican official, an assertion that Thai police "occasionally" coerce confessions, and an argument that drug sentences in Thailand are excessive. (*Id*. at 38.) The undisputed evidence in this case establishes that the deficiencies of justice that await Ahmed upon extradition to Iraq are orders of magnitude more egregious than those asserted in *Lopez-Smith* and *Prasoprat*. Moreover, the *Prasoprat* panel also relied on language in the U.S.-Thailand extradition treaty that repeatedly stressed the executive branch's power over the extradition decision (*Prasoprat*, 421 F.3d at 1016–17), while no similar language appears in the U.S.-Iraq extradition treaty. *Lopez-Smith* and *Prasoprat* thus do not preclude the application of the humanitarian exception here.

As for *Quinn*, the government's partial quotation of that opinion is misleading. The government quotes *Quinn* as stating that "the Secretary of State has 'sole discretion . . . to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive.'" (Doc. 199 at 39 (*quoting Quinn*, 783 F.2d at 789).) The quoted passage is part of the court's rejection of the government's argument that the political question doctrine precluded it from addressing the applicability of the political offense exception.

34

*Quinn*, 783 F.2d at 787 ("The government next argues that . . . the judiciary should abstain, under the political question doctrine, from determining whether the political offense exception applies."). The court noted that the assignment to the judiciary of the initial assessment of the political offense exception did not interfere with the executive branch's "ultimate authority to decide whether to extradite the accused *after* a judicial determination that the individual is, in fact, extraditable." *Id*. at 789 (emphasis added). In the passage partially quoted by the government, the court observed that while "the Secretary of State's authority to refuse extradition is presumably constrained by our treaty obligations," the Secretary "[n]evertheless" had the "sole discretion" to refuse to extradite an individual after the judiciary had found him extraditable:

> [I]t is clear that the Secretary of State has sole discretion to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a political crime, or to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive[.]

*Id*. at 789–90 (citations omitted).

Contrary to the government's implication, the court was not suggesting that the Secretary's discretion to consider humanitarian concerns was "sole" in the sense of being exclusive of a *judicial* assessment. This is plain from the fact that the court discussed the humanitarian exception together with the political offense exception, in an opinion in which it *rejected* the government's argument that the judiciary had no power to apply the political offense exception. *Id*. at 790 ("The magistrate properly considered the applicability of the political offense exception to the offenses charged against *Quinn*[.]"). It is further confirmed by the fact that the court has acknowledged the possible applicability of the humanitarian exception in numerous post-*Quinn* opinions, refuting any notion that *Quinn* had

35

closed the door on the exception. *See*, *e.g.*, *Prasoprat*, 421 F.3d at 1016–17; *Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1010 (9th Cir. 2000), *overruled on other grounds by Trinidad y Garcia v. Thomas*, 683 F.3d 952 (9th Cir. 2012) (en banc); *Mainero v. Gregg*, 164 F.3d at 1210; *Lopez-Smith*, 121 F.3d at 1326–27.

The only other decision with precedential force over this Court that the government cites for the purported non-existence of the humanitarian exception is the Supreme Court's 109-year-old opinion in *Glucksman v. Henkel*, 221 U.S. 508 (1911). (Doc. 199 at 40.) But while the Court in *Glucksman* did state in passing that it was "bound by the existence of an extradition treaty to assume that the trial will be fair" (*Glucksman*, 221 U.S. at 512), that statement was dictum, because the sole "ground of the appeal" was "that there [wa]s no sufficient evidence to warrant extradition on the charge." *Id*. at 511. This presumably explains why the Ninth Circuit continues to acknowledge the possible existence of the humanitarian exception a century later.

The government also relies on the unpublished district court decision in *United States v. Perez*, No. 1:15-MJ-0074 SKO, 2016 WL 931041 (E.D. Cal. Mar. 11, 2016), and the out-of-circuit decisions in *Ahmad v. Wigen*, 910 F.2d 1063 (2d Cir. 1990), and *Venckiene v. United States*, 929 F.3d 843 (7th Cir. 2019). In addition to having no precedential force here, these decisions do not hold that there is no humanitarian exception to the rule of non-inquiry.

In *Perez*, although the court does appear at some points to misconstrue *Prasoprat* in the same manner that the government does here, it also states that the application of the humanitarian exception is "unwarranted," signaling that it declined to apply the exception because the particular circumstances of the case did not justify it. *Perez*, 2016 WL 931041, at \*6.

In *Ahmad*, while the Second Circuit stated in dicta that there was "substantial authority" for the proposition that the certifying judicial officer should not consider the procedures that may occur in the requesting country, it was reviewing the denial of a habeas corpus petition, and its holding rested on precedent "dealing with the scope of habeas corpus review." *Ahmad*, 910 F.2d at 1066.

In *Venckiene* the Seventh Circuit, reviewing the district court's denial of the relator's motion to stay his extradition, expressly declined to "decide definitively" whether its precedent allowed extradition to be denied in light of the "atrocious procedures" the relator would face in the requesting country. *Venckiene*, 929 F.3d at 863. The court found it inappropriate to reach this issue because the relator had failed to provide it with "the type of specific and detailed evidence" that it would need in order to assess whether the requesting country's procedures were sufficiently concerning to justify the exception's application. *Id*.

In short, neither the precedential nor the non-precedential authorities upon which the government relies bar this Court from applying the humanitarian exception to the rule of non-inquiry to deny Iraq's extradition request. Accordingly, and in light of the undisputed evidence of the shockingly arbitrary state of criminal justice in Iraq, the Court should decline to certify Ahmed's extradition.

## VII. The government's extradition brief reflects its continuing failure to recognize that the U.S.-Iraq extradition treaty does *not* authorize the extradition of American citizens.

Ahmed showed in his extradition brief that an extradition treaty worded in the manner of the U.S.-Iraq treaty does not authorize the extradition of United States citizens. (Doc. 200 at 45–50.) The treaty states that neither party is "bound to deliver up its own citizens" (Doc. 3-3 at 11), and in *Valentine v. United States*

37

*ex rel. Neidecker*, 299 U.S. 5 (1936), the Supreme Court held that because the power to extradite must be affirmatively granted, a treaty worded in this fashion does not authorize the government to extradite a citizen. *Id*. at 7–18; *accord* 9B Fed. Proc., L. Ed. § 22:2393 (Westlaw, through Mar. 2021 Update) ("if an extradition treaty states that 'neither party shall be bound to deliver up its own citizens,' United States nationals may not be extradited unless the treaty also contains a positive grant of authority to surrender United States citizens").

Ahmed further noted that the government has forfeited any reliance on 18 U.S.C. § 3196, which purports to allow the extradition of American citizens under certain circumstances, and that in any event the statute cannot authorize his extradition because the other requirements of the treaty are not met (as the statute requires), and because the statute purports to unconstitutionally arrogate to Congress the ability to unilaterally exercise the treaty power that the Constitution vests in the President and Senate. U.S. Const. art. II, § 2.

Remarkably, although the government expressly addresses the citizen-extradition question in its brief, it still fails to recognize that the treaty does *not* authorize the extradition of American citizens, and it still fails to cite or reference Section 3196. (Doc. 199 at 40–41.) Instead, clearly unaware of *Valentine*, the government posits that the treaty's citizen-extradition clause places it "within the discretion of the United States to decide whether to surrender American citizens to Iraq." (*Id*. at 40.)

The government's continuing failure to mention Section 3196, the one legal authority that could even arguably authorize Ahmed's extradition, exacerbates the unfairness that would result from permitting the government to shoehorn this statute into the case at the eleventh hour. (Doc. 200 at 47.) Indeed, pursuant to the government's request (Doc. 203), its responsive extradition brief –

which presumably will include its first-ever discussion of Section 3196 – will not be filed until May 14, a mere *eleven days* before the extradition hearing. It would be egregiously unfair to allow the government to make its first substantive reference to the sole purported legal basis for Ahmed's extradition less than two weeks before the extradition hearing.

The Court should accordingly refuse to extradite Ahmed in light of the government's exclusive reliance on a treaty that does not authorize his extradition. Alternatively, should it find that the government has not forfeited any attempted reliance on Section 3196, it should find that the statute cannot authorize Ahmed's extradition because on its terms the statute does not apply, and/or because the statute violates Article II, § 2 of the Constitution.

**VIII.  Conclusion.**

For the reasons set forth above and as stated in Ahmed's April 16, 2021 extradition brief, this Court should decline to certify extradition and order Ahmed released from custody.

Respectfully submitted:   May 14, 2021.

JON M. SANDS
Federal Public Defender

*s/Jami Johnson*
JAMI JOHNSON
DANIEL L. KAPLAN
Asst. Federal Public Defenders