1   GLENN B. McCORMICK
    Acting United States Attorney
2   District of Arizona

3   TODD M. ALLISON
    Arizona State Bar No. 026936
4   DAVID A. PIMSNER
    Arizona State Bar No. 007480
5   RACHEL C. HERNANDEZ
    Arizona State Bar No. 016543
6   DIMITRA H. SAMPSON
    Arizona State Bar No. 019133
7   Assistant United States Attorneys
    Two Renaissance Square
8   40 N. Central Ave., Suite 1800
    Phoenix, Arizona 85004
9   Telephone: 602-514-7500
    Email: Todd.Allison@usdoj.gov
10  Email: David.Pimsner@usdoj.gov
    Email: Rachel.Hernandez@usdoj.gov
11  Email: Dimitra.Sampson@usdoj.gov
    Attorneys for the United States
12

13              IN THE UNITED STATES DISTRICT COURT

14              FOR THE DISTRICT OF ARIZONA

15

16  | In the Matter of the Extradition of Ali | No. 20-8033MJ |
    Yousif Ahmed Al-Nouri a/k/a Ali Youssef
17  Ahmed Al-Nouri, Ali Ahmed, Ali Yousif     **UNITED STATES' RESPONSE TO**
    Ahmed Al Noori, Ali Yousif Ahmed Nouri,   **ALI YOUSIF AHMED AL-NOURI'S**
18  Ali Al-Daleme, Ali Yousif Ahmed Al-        **EXTRADITION BRIEF**
    Mahmadi, Ali Yousif Ahmed, and Ali
19  Yousif Nouri.

20          The United States of America, by and through the undersigned attorneys, hereby

21  files this memorandum in response to the Extradition Brief filed by Ali Yousif Ahmed Al-

22  Nouri ("Ahmed" or the "fugitive"), (Doc. 200). In his brief, Ahmed challenges only two

23  of the five findings this Court must make to certify Iraq's request for his extradition: (1)

24  whether there is an extradition treaty in force between the United States and the Republic

25  of Iraq, and (2) whether the offenses for which his extradition is sought are extraditable.[1]

26  In particular, he argues that the Extradition Treaty between the United States and the

27  _____

28          [1] Ahmed does not challenge personal or subject-matter jurisdiction, and he does not
    develop an argument challenging probable cause.

Government of Iraq (the "Treaty")[2] is not in force, contrary to the practice of the parties, the view of the U.S. Department of State, and case law providing generally that extradition treaties remain in force following war between the parties. Ahmed also argues that the offenses for which his extradition is sought are not encompassed by the Treaty because they are subject to the political-offense exception set forth in Article III. Ahmed focuses the remainder of his brief on discussing various Treaty provisions—including those establishing a requirement that the fugitive be "charged with" (or convicted of) an offense (Article I), an exception for when the fugitive is "exempt from . . . punishment" in the requesting country (Article V), a requirement that the requesting country provide a copy of the warrant for the fugitive's arrest (Article XI), and discretion for the requested country to extradite its nationals (Article VIII)—which he erroneously claims bar his extradition. In addition, Ahmed raises other issues—those relating to the Iraqi criminal justice system and to the treatment he might face if returned to Iraq—that have no bearing on this Court's determination of his extraditability.

As explained below, Ahmed's arguments are meritless, contradict well-established principles of extradition, and invite the Court to exceed its limited role in this certification proceeding. Accordingly, the Court should reject those arguments and certify Iraq's request for Ahmed's extradition.

## I. THE EXTRADITION TREATY BETWEEN THE UNITED STATES AND IRAQ IS IN FORCE.

Ahmed's claim that wars between the United States and Iraq nullified the Treaty fails for three independent reasons: (1) it is contrary to the action of the two parties to the Treaty, which is conclusive of the Treaty's continuing validity under Supreme Court precedent; (2) it is contrary to the view of the U.S. Department of State that the Treaty currently remains in force; and (3) it is premised on a misapplication of the relevant case law.

---

[2] Extradition Treaty Between the United States of America and Iraq, U.S.-Iraq, June 7, 1934, 49 Stat. 3380. (Extrad. Req. 00005-12.)

*First*, as the Supreme Court has stated, "on the question whether [an extradition] treaty has ever been terminated, governmental action in respect to it must be regarded as of *controlling importance*." *Terlinden v. Ames*, 184 U.S. 270, 285 (1902) (emphasis added). In this case, Iraq requested Ahmed's extradition "in accordance with" the Treaty (Extrad. Req. at 00005),[3] and the United States acted upon that request based on the Treaty (Doc. 3, ¶ 1). In addition, both parties have relied upon the Treaty for other extradition requests postdating U.S.-Iraq hostilities. (*See* May 16, 2021, Declaration of Tom Heinemann, U.S. Department of State, ¶ 5 [hereafter, "State Dep't Decl."], attached hereto as Exhibit 1) (discussing 2014 extradition request made by the United States and 2018 extradition request made by Iraq).)[4] Thus, both parties to the Treaty have acted with the shared understanding that it remains in force, and "the courts ought not to interfere with the conclusions of the political department in that regard." *See Terlinden*, 184 U.S. at 288.[5]

*Second*, every court to have considered whether an extradition treaty is in force has deferred to the view of the U.S. Department of State. *See, e.g.*, *Arias Leiva v. Warden*, 928 F.3d 1281, 1287-88 (11th Cir. 2019) (citing cases). Such deference arises out of the "generally accepted view" that "foreign policy [is] the province and responsibility of the Executive," *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) (citation omitted), authority that derives from Article II of the U.S. Constitution, *see, e.g.*, *Am. Ins. Ass'n v. Garamendi*,

---

[3] Citations herein to the redacted Extradition Request (Docs. 3-3 and 3-4) will include "Extrad. Req." along with a reference to the Bates-stamped page numbers at the bottom of each page.

[4] The United States obtained the May 16, 2021, Declaration of Tom Heinemann to respond to the arguments raised in Ahmed's April 16, 2021, Extradition Brief, (Doc. 200). The United States intends to offer this Declaration at the May 25, 2021 Extradition Hearing and is simultaneously filing an updated Exhibit List reflecting the addition of this document.

[5] This practice of continuing to rely on the Treaty even following hostilities between the parties is consistent with the United States' practice with other extradition treaties. For example, the United States continues to rely on its 1904 extradition treaty with Panama, despite the U.S. invasion of Panama at the end of the last century. State Dep't Decl., ¶ 6; *see also, e.g.*, *Argento v. Horn*, 241 F.2d 258, 262-63 (6th Cir. 1957) (noting "the conduct of the political departments of [the United States and Italy] in the ensuing nine years [following World War II], evidencing their unqualified understanding that the extradition treaty is in full force and effect").

539 U.S. 396, 414 (2003). The Ninth Circuit applied this principle of deference in *Then v. Melendez*, where it held that "[t]he continuing validity of the [U.S.-Singapore] Treaty after Singapore's independence from the United Kingdom presents a political question, and we must defer to the intentions of the State Departments of the two countries." 92 F.3d 851, 854 (9th Cir. 1996). In that case, the court relied on an exchange of diplomatic letters between the United States and the new government of Singapore confirming the continuing applicability of the treaty, and on the fact that the U.S. Department of State listed the treaty in its publication, *Treaties in Force*, which identifies treaties it considers to be currently in force. *Id.* at 853.

The Court should similarly defer to the U.S. Department of State in this case. Here, Tom Heinemann, an Attorney Adviser for the Department of State, has attested that the Treaty was not annulled or otherwise terminated by hostilities between the parties. Exh. 1, State Dep't Decl., ¶ 4. This view is consistent with the fact that the Treaty is listed in the current edition of *Treaties in Force*. *Id.* ¶ 2. Mr. Heinemann explains that, both under the express requirements of Article XIII of the Treaty and under relevant international treaty law and practice as set forth in the Vienna Convention on the Law of Treaties,[6] in order for the Treaty to be terminated, a party must provide notice of termination, and neither the United States nor Iraq has ever provided such notice.[7] *Id.* ¶ 3. Moreover, neither the Treaty nor other international law establishes *ipso facto* that war automatically invalidates the Treaty. *Id.* Accordingly, it is the view of the Department of State that the Treaty remains in force following past hostilities between the United States and Iraq. *Id.* ¶¶ 2, 4. This view is entitled to deference. *See Then*, 92 F.3d at 854; *see also, e.g.*, *Arias Leiva*, 928 F.3d at 1288 (holding that, where Mr. Heinemann attested to the validity of the

---

[6] Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S 331.

[7] Ahmed suggests (Doc. 200, at 45-46) that, for the Treaty to have remained valid, the parties should have exchanged notes affirming as much. However, no such exchange of notes was necessary because the Treaty was never terminated, and the parties continued to act with the understanding that it remained in force. *See* Exh. 1, State Dep't Decl., ¶¶ 4-5.

U.S.-Colombia extradition treaty, there is "no answer but this: the Treaty remains in effect"); *Hoxha v. Levi*, 465 F.3d 554, 562-63 (3d Cir. 2006) (holding that the U.S.-Albania extradition treaty is in force based in part on a "declaration from an Assistant Legal Adviser for Treaty Affairs in the Office of the Legal Advisor for the State Department confirm[ing] that view, and also not[ing] that the treaty is named in the State Department's January 2004 'Treaties in Force' list"); *Sayne v. Shipley*, 418 F.2d 679, 683-84 (5th Cir. 1969) (holding that Article XVI of the extradition treaty with Panama is in effect because "[t]he Assistant Legal Advisor [sic] for Treaty Affairs of the State Department has advised [as much] . . . [and] such advice, while not conclusive on this Court, is entitled to great weight and importance"); *Sabatier v. Dabrowski*, 586 F.2d 866, 868 (1st Cir. 1978) (relying in part on "the official position of the Department of State" that Canada is a party to the Webster-Ashburton Treaty).

To disregard the State Department's view and find that the Treaty is not in force would have significant ramifications. As the Supreme Court has explained:

> A treaty is primarily a compact between independent nations, and depends for the enforcement of its provisions on the honor and the interests of the governments which are parties to it. If these fail, its infraction becomes the subject of international reclamation and negotiation, which may lead to war to enforce them.

*Charlton v. Kelly*, 229 U.S. 447, 474 (1913) (citation and internal quotation marks omitted).

*Third*, every U.S. court to have considered whether war annulled an extradition treaty has concluded that it did not. Almost a century ago, the Supreme Court concluded in *Karnuth v. United States* that war does not "ipso facto annul[] treaties of every kind between the warring nations." 279 U.S. 231, 236 (1929); *see also Clark v. Allen*, 331 U.S. 503, 508 (1947) ("the outbreak of war does not necessarily suspend or abrogate treaty provisions"). Rather, the Court observed a growing trend that, in general, war automatically annulled certain types of treaties, and not others—without any specific discussion of extradition treaties—as follows:

> [A]t least the following treaty obligations remain in force: Stipulations in respect of what shall be done in a state of war; treaties of cession, boundary, and the like; provisions giving the right to citizens or subjects of one of the high contracting powers to continue to hold and transmit land in the territory of the other; and, generally, provisions which represent completed acts. On the other hand, treaties of amity, of alliance, and the like, having a political character, the object of which 'is to promote relations of harmony between nation and nation,' are generally regarded as belonging to the class of treaty stipulations that are absolutely annulled by war.

*Id.* at 236-37. In *Karnuth*, the Court concluded that the War of 1812 annulled Article 3 of the Jay Treaty, U.S.-Great Britain, Nov. 19, 1794, 8 Stat. 116, which concerned U.S. border crossings, in accordance with the view of the U.S. government that the treaty was no longer in force. *Id.* at 236, 241.[8]

When considering whether other treaties have been annulled by war, courts have not always relied on just the two categories identified in *Karnuth*. In fact, courts considering whether extradition treaties have been annulled by wars between the parties have not placed them in either of the *Karnuth* categories. Rather, courts have uniformly found that, while extradition treaties may be suspended during the pendency of war, they are not annulled by it. *See Argento v. Horn*, 241 F.2d 258, 262-63 (6th Cir. 1957); *United States v. Deaton*, 448 F. Supp. 532, 534 (N.D. Ohio 1978); *Gallina v. Fraser*, 177 F. Supp. 856, 863-64 (D. Conn. 1959), *aff'd*, 278 F.2d 77 (2d Cir. 1960); *In re Extradition of D'Amico*, 177 F. Supp. 648, 652-53 (S.D.N.Y. 1959). This Court should likewise affirm that the U.S.-Iraq Treaty remains in force even following hostilities between the parties.

## II. AHMED HAS FAILED TO MEET HIS BURDEN OF ESTABLISHING THE APPLICABILITY OF THE POLITICAL-OFFENSE EXCEPTION.

In his Extradition Brief, Ahmed asks this Court to find that Iraq's charges of premeditated murder are non-extraditable offenses under the Treaty because they are political in nature and subject to the political-offense exception. (Doc. 200, at 4-22.) Ahmed acknowledges that it is his burden to establish the essential elements of the

---

[8] Unlike the U.S. hostilities with Iraq, the war at issue in *Karnuth* was formally declared by Congress.

political-offense exception, (Doc. 200, at 8), but fails to provide any evidence of his own other than the expert report of Professor Haider Hamoudi (Expert Report of Haider Ala Hamoudi [Doc. 199, Exh. 1]) (hereafter, "Hamoudi"). He instead relies solely on the evidence in the Extradition Request to meet his burden.

Despite the evidence in the Extradition Request revealing that (1) Ahmed participated in two violent murders of police officers, one of which resulted in the deaths of at least two civilian bystanders, (2) Ahmed was paid for his role in at least one of the killings, (3) Ahmed conducted the attacks as part of an armed group of coconspirators, and (4) Ahmed committed the attacks on behalf of Al Qaeda in Iraq (AQI), a transnational terrorist group, Ahmed claims that his charged offenses are protected political offenses. For the reasons discussed below and in the United States' Extradition Brief, Ahmed has failed to meet his burden, and alternatively, the United States has successfully rebutted any such argument.

### A. The Events Occurring in Iraq in 2006 Were Not an "Indigenous Uprising" as Required for the Political-Offense Exception to Apply.

Ahmed argues that, because there was a violent insurgency against the government of Iraq in 2006, he has met his burden of demonstrating that an "uprising" existed for purposes of the political-offense exception. (Doc. 200, at 10-12.) As discussed in the United States' Extradition Brief (Doc. 199, at 18-25), however, the significant involvement of AQI—a transnational terrorist organization made up of experienced foreign fighters and conscripted local Iraqis who participated in violent acts in Iraq in furtherance of their goal of taking over Iraqi land to develop a transnational caliphate—undercuts the argument that the insurgency in Iraq in 2006 qualifies as the type of political indigenous "uprising" contemplated by *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986). As a result, the Court should reject Ahmed's argument that the violence occurring in Iraq in 2006 satisfies the "uprising" prong.

The *Quinn* court was very specific as to what it considered an "uprising" for purposes of the political-offense exception. According to the Ninth Circuit in *Quinn*,

analysis of the existence of an "uprising" is of the utmost importance to the political-offense exception because "it is the 'uprising' component that plays the key role in ensuring that the incidence test protects only those activities that the political-offense doctrine was designed to protect." 783 F.2d at 806. The *Quinn* court was very clear as to what was required for an "uprising" to exist sufficient for the political-offense exception: "[A]n 'uprising' can exist only when the turmoil that warrants that characterization *is created by nationals of the land in which the disturbances are occurring*." *Id.* at 807 (emphasis added). Moreover, the *Quinn* court specified that the "uprising" must be "a revolt by indigenous people against their own government or an occupying power." *Id.*; *see also id.* at 813 ("[T]he word 'uprising' means exactly that: it refers to a people *rising up*, in their own land, against the government of that land."). Most importantly, the *Quinn* court emphasized the following about the existence of an "uprising": "It does not cover terrorism or other criminal conduct exported to other locations. Nor can the existence of an uprising be based on violence committed by persons who do not reside in the country or territory in which the violence occurs." *Id.* at 813-14.

Ahmed asks the Court not to look at AQI's motives for conducting violent attacks in Iraq and its goals of taking over Iraqi land to establish a transnational caliphate. Instead, Ahmed states that "AQI's reason for wanting to overthrow the Iraqi government" is immaterial to the political-offense analysis. (Doc. 200, at 16, 18.) Ahmed tries to support his position by quoting from *Quinn*, which provides, "[i]t is the *fact* that the insurgents are seeking to change their governments that makes the political-offense exception applicable, not their *reasons* for wishing to do so." (Doc. 200, at 17-18 [quoting *Quinn*, 783 F.2d at 804-05].) However, the quotation from *Quinn* does not help Ahmed. When the *Quinn* court emphasized that the insurgents' "reasons" were not important to the political-offense analysis, it was emphasizing how a reviewing court should remain "ideologically neutral" when assessing insurgents' political viewpoints, not that an extradition court should refrain from considering the ultimate goal/objective of a terrorist group involved in violent activities during an insurgency. *Quinn*, 783 F.2d at 804.

In contrast to Ahmed's argument, *Quinn* emphasized that the "uprising" prong ensured that the political-offense exception "protect[s] those seeking to change their own government or to oust an occupying power that is asserting sovereignty over them." *Id.* at 808. AQI's primary goal was to take over Iraqi land and form a transnational caliphate. Moreover, AQI was not an "uprising" group made up of indigenous Iraqis fighting to change their particular form of government, but instead was a transnational terrorist group made up of experienced foreign fighters and sympathetic local Iraqis. These important factors preclude the activity in which AQI was involved from being the type of "uprising" contemplated by *Quinn*.

According to Ahmed, an "uprising" still existed, despite AQI's role, because "while the insurgency drew in a broad array of groups with diverse philosophies and tactics, the insurgents were united in their immediate goal of toppling the new U.S.-backed government of Iraq." (Doc. 200, at 10.) In support of his argument, Ahmed attaches a November 2006 U.S. Department of Defense report (hereafter, the "DoD Report"), of which Ahmed asks the Court to take judicial notice. (Doc. 200, at 11.) Although Ahmed argues that the DoD Report supports his conclusion that AQI was just another "Sunni organization involved in 'a Sunni insurgency and terrorist campaigns directed against the majority-Shi'a Government of Iraq and the Coalition Forces that are supporting it," Ahmed significantly mischaracterizes the DoD Report. The DoD Report actually undercuts Ahmed's argument and supports the United States' argument that AQI was in no way akin to local Iraqi insurgency groups.

In the DoD Report's assessment of the "Security Environment" in Iraq, the Report clearly distinguishes between Iraqi Sunni insurgency groups—of the type that Ahmed argues support a finding that an "uprising" existed—and "terrorist campaigns."

In discussing the "Nature of the Conflict," the DoD Report clearly distinguishes between "Terrorists and Foreign Fighters," such as AQI, and "Sunni Rejectionists." (DoD Report, at 18.) The DoD Report defines Sunni Rejectionists as the "Sunni Resistance," which include "groups [who] attack Coalition forces to withdraw and to regain a privileged

status in a Sunni-dominated Iraq." (DoD Report, at 18.) Based on the DoD Report, the Sunni Resistance encompassed groups who were seeking to alter the Iraqi government to allow for a more-prestigious Sunni presence. Alternatively, the DoD Report supports the United States' argument as to AQI's different goals and objectives:

> High-profile terrorist attacks are most often attributed to al-Qaeda in Iraq, whose goals include instigating sectarian violence. Al-Qaeda in Iraq . . . consist[s] of both foreigners and Iraqis motivated by an extremist Sunni Islamist ideology and seek to establish an Islamic Caliphate in Iraq. The emergence of Abu Ayub al-Masri as leader of al-Qaeda in Iraq demonstrated its flexibility and depth, as well as its reliance on non-Iraqis . . . .

(DoD Report, at 18.) The DoD Report thus provides even further support that the events in Iraq in 2006 do not meet the narrow definition of "uprising" contemplated by *Quinn*.

Additionally, in discussing the violence that was ongoing in Anbar in 2006 (the same province in which Ahmed's charged offenses occurred), the DoD Report again clearly distinguishes between the actions of local Sunni insurgency groups—aimed primarily at the Coalition forces—and the actions of terrorist groups such as AQI—aimed at "intimidat[ing] the local population." (DoD Report, at 17.)

Ahmed also contends that AQI's membership of foreign fighters traveling into Iraq to participate in violent acts as well as AQI's foreign leadership do not undercut his claim that the events occurring in Iraq in 2006 can meet *Quinn*'s narrow definition of an "uprising" as "a revolt by indigenous people against their own government or an occupying power." Ahmed offers numerous examples of individual historical figures who traveled to assist in "insurgencies raging in countries other than their own," including Ernesto "Che" Guevara, an Argentinian who traveled to participate in the Cuban Revolution, and the French Marquis de Lafayette, who joined the American Revolutionary forces to fight against the British. (Doc. 200, at 21.) However, there are clear distinctions between all of the individual examples offered by Ahmed and AQI's role in Iraq in 2006.

*First*, all of Ahmed's examples are of individual foreign nationals who traveled to a different country to fight alongside the local indigenous insurgents specifically to help

accomplish the local indigenous insurgents' goal of altering their government.  AQI, on the other hand, had no intention of assisting local Iraqis stand up an Iraqi government different than what the Coalition forces supported.  Instead, AQI wanted to take advantage of Iraq when it was in chaos and disarray by seizing a large portion of Iraq's land so that AQI could create a transnational caliphate.  (Expert Report of Professor Craig Whiteside [Doc. 199, Exh. 2], at 2, 4, 8.) (hereafter, "Whiteside.")

*Second*, all of Ahmed's examples involve foreign nationals who fought alongside the local, indigenous insurgents and did not ultimately end up in an armed backlash between the foreign nationals and the local insurgents.  To the contrary, AQI did not simply fight hand-in-hand with local insurgents.  Instead, AQI was known for brutalizing local Iraqis, conducting attacks on local Iraqi civilian targets, and assassinating local insurgency leaders.  (Whiteside, at 7, 9, 11.)  It was this difference between AQI and the local insurgents that led to an armed backlash between them in 2006-07.  (Whiteside, at 9, 10.)

*Third*, none of Ahmed's examples involve a transnational terrorist group who moved into the insurgents' home country along with a significant number of foreign fighters to fuel the violence and chaos occurring in the country while at the same time conducting terrorist attacks in other countries.  Unlike the historical individuals Ahmed identifies, AQI and its foreign fighters established their base of operations in Iraq, and from there not only conducted violent attacks within Iraq but also conducted terrorist attacks around the region and beyond to further their agenda.  (Whiteside, at 5.)

AQI's role in the violent events occurring in Iraq in 2006 was much different than a single foreign individual or even a handful of foreign fighters joining an insurgency because they are sympathetic to the local indigenous insurgents' cause.  AQI's significant role and drastically different objective—one that was not intended to further the political objectives of indigenous Iraqis, but rather to steal land from indigenous Iraqis—does not meet *Quinn*'s definition of an "uprising."

**B. Ahmed Has Failed to Meet His Burden of Establishing that the Charged Offenses Were Committed "Incidental to" Any Indigenous Uprising that Existed in Iraq.**

This Court need not even address the issue of whether the violence in Iraq in 2006 constituted an indigenous "uprising" as defined by *Quinn* because, even if an "uprising" existed, Ahmed has failed to provide any evidence that meets his burden of proving by a preponderance of the evidence that the charged offenses were committed "incidental to" any such indigenous Iraqi uprising. *Cf. Barapind v. Enomoto*, 400 F.3d 744, 752 (9th Cir. 2005); *Ahmad v. Wigen*, 726 F. Supp. 389, 408 (E.D.N.Y. 1989). In support of his claim that the political-offense exception applies to the charged offenses, Ahmed relies entirely on the facts contained within Iraq's extradition request, which do not satisfy his burden.

1. The Facts Contained in the Extradition Request Do Not Support that Ahmed's Offenses Are "Incidental to" a Local Iraqi Uprising Such That They Are Political in Nature.

The United States agrees with Ahmed's position that "the Court need not resolve any 'battle of the experts'" to resolve whether the political-offense exception applies, (Doc. 200, at 10), albeit for different reasons. Expert opinions are unnecessary to resolve the issue because the following undisputed facts contained in the extradition request conclusively demonstrate that Ahmed has not met his burden of showing that the charged offenses were committed "incidental to" any local, indigenous Iraqi uprising:

- On October 3, 2006, during the holy month of Ramadan, Ahmed and his coconspirators conducted a violent premeditated murder in a public area. (Extrad. Req. at 00069, 00075, 00077, 00080.) On that date, Ahmed and his coconspirators pulled up in multiple vehicles, wearing masks, and armed with handguns and AK-47 rifles. (Extrad. Req. at 00063, 00069, 00075, 00077, 00080.) Ahmed and his coconspirators engaged in heavy fire, shooting and killing Khalid Ibrahim Mohammad ("Khalid"), a local Iraqi police officer. (Extrad. Req. at 00075, 00077.)

- Ahmed and his coconspirators had planned the attack on Khalid in advance, conducted surveillance, and executed the attack at a time of day when members of the public were "breaking fast" and out among public markets.  (Extrad. Req. at 00075, 00077, 00080.)  Ahmed had conducted surveillance of Khalid and knew he was sitting near two people at the time of the attack.  (Extrad. Req. at 00080.)  During the attack, Ahmed and his group not only murdered Khalid, but also killed these two other civilian bystanders near Khalid.  (Extrad. Req. at 00075 ("The people inside the car began opening fire on the victim . . . *and the people who were sitting with him in front of the stores*."); 00077 ("Shots were fired at him dropping him dead along with the people who were sitting with him which amounted to two people.  They were killed as a result of the heavy fire shot."); *see also*  Extrad. Req. at 00060, 00070, 00080, 00107.)[9]

- After Ahmed and his coconspirators successfully completed the murder, they were each paid 50,000 Iraqi Dinars for their role.  (Extrad Req. at 00077, 00080.)

- A few months earlier, on June 1, 2006, Ahmed and his coconspirators had conducted another premeditated killing of another police officer, Issam Ahmed Hussein ("Issam").  This attack also took place in a public area, at or near a store.  (Extrad. Req. at 00079, 00087, 00093, 00104.)  During the attack, Ahmed and his coconspirators pulled up in multiple vehicles, armed and wearing masks.  (Extrad. Req. at 00104.)  Ahmed and/or his coconspirators fired numerous shots at Issam, killing him.  (Extrad. Req. at 00104, 00105, 00109.)

---

[9] Notably, in Ahmed's Extradition Brief, he recognizes Judge Duniway's concurring opinion in *Quinn*, in which Judge Duniway supported the ultimate conclusion in that case, but urged that the political-offense exception should not apply to attacks on civilians.  (Doc. 200, at 9 [citing *Quinn*, 783 F.2d at 819].)  Ahmed claims that "[b]ecause the attacks at issue here did not target civilians," Judge Duniway's concurring opinion does not affect *Quinn*'s application in this case.  (Doc. 200, at 9.)  Based on the facts in the extradition request, which demonstrate that Ahmed's actions resulted in the murder of at least two civilian bystanders, this Court should consider Judge Duniway's concurring opinion.  This view has been adopted by other Circuits as well as advocated for in other more-recent concurring opinions in this Circuit.  *See, e.g., Ordinola v. Hackman*, 478 F.3d 588, 603 (4th Cir. 2007); *Barapind*, 400 F.3d at 756-57 (Rymer, J., concurring in part and dissenting in part); *Eain v. Wilkes*, 641 F.2d 504, 521 (7th Cir. 1981).

- Based on their investigation into the two murders, the Iraqi Government has assessed that Ahmed and his coconspirators were members of Al-Qaeda. (Extrad. Req. at 00028, 00052, 00055, 00101.)

- During the time of the charged crimes, multiple Iraqi witnesses and plaintiffs provided information and/or sworn statements that Ahmed was known in Fallujah, Iraq, as being a member, and possibly even the leader, of an armed militant group known for assassinating police officers. (Extrad. Req. at 00060, 00062, 00075, 00077, 00093, 00104, 00106.) One of the eyewitnesses identified Ahmed's group as associated with "the Islamic State." (Extrad. Req. at 00104.) One of Ahmed's coconspirators, Cooperator 1, identified Ahmed's group as an armed militant group in the "Al-Qaeda organization." (Extrad. Req. at 00079, 00106.)

These facts are not consistent with a political offense. Rather, the facts from the extradition request demonstrate that Ahmed and his coconspirators killed two police officers and at least two innocent civilian bystanders, and they did so either acting as mercenaries for AQI or conducting these attacks on behalf of AQI to cause terror among the local Iraqi populace in furtherance of AQI's objectives. Because these facts do not support that the charged offenses were "incidental to" any indigenous uprising among local Iraqis, the Court should decline to find that the political-offense exception applies.

   2.  The Evidence Provides Support that Ahmed Had Non-Political Motives for the Charged Offenses.

Ahmed acknowledges that the Court may consider evidence that he participated in the attacks for "any personal or otherwise non-political motive" as part of the "incidental to" analysis, but he ignores the evidence in the extradition request that indicates he committed the charged crimes for non-political motives. (Doc. 200, at 14.) This evidence undercuts Ahmed's arguments that the political-offense exception is applicable in this case.

Any evidence of a non-political motive behind the charged offenses severely undercuts a determination that a charged offense is "incidental to" an uprising. Even if an

- 14 -

"uprising" is found to exist, violent acts committed during the uprising are not automatically "incidental to" the uprising. "The political offense exception requires 'a direct link between the perpetrator of the offenses, a political organization's political goals, and the specific acts.'" *Venckiene v. United States*, 929 F.3d 843, 856 (7th Cir. 2019) (quoting *Eain*, 641 F.2d at 521) (internal alterations omitted). As a result, the charged offense has to be "causally or ideologically related to the uprising." *Quinn*, 783 F.2d at 809. The Ninth Circuit has emphasized that, for purposes of the "incidental to" analysis, "extradition courts should focus not on the types of acts alleged, but rather on the motivation for those acts." *Barapind*, 400 F.3d at 750. The political-offense exception does not apply to "common crimes connected but tenuously to a political disturbance . . . ." *Koskotas v. Roche*, 931 F.2d 169, 171-72 (1st Cir. 1991). "The [political offense] exception is not designed to protect mercenaries or others acting for nonpolitical motives." *Quinn*, 783 F.2d at 810.

Here, the extradition request includes uncontradicted evidence that Ahmed and his coconspirators committed at least one of the charged murders—the October 3, 2006, murder of Khalid—for monetary payment, *i.e.*, as paid killers, or mercenaries. As Cooperator 1 explains, after Ahmed and the group successfully killed Khalid, they returned to one of their coconspirator's homes, and were each paid 50,000 Iraqi Dinars for their role. (Extrad Req. at 00077, 00080.) This fact alone is sufficient for the Court to find that Ahmed has not met his burden of demonstrating that the charged offenses are subject to the political-offense exception.

Unable to provide any evidence to contradict the fact that he was paid for at least one of the offenses in the extradition request, Ahmed claims that this fact "tends to refute, rather than to support, the notion that the motive for the attacks was non-political." (Doc. 200, at 14.) Without any factual support, Ahmed asks the Court to overlook this important fact and claims that "[p]rivate assassins hired to conduct a murder-for-hire would obviously demand more than this token amount . . . ." (Doc. 200, at 14-15.) Not only is Ahmed's claim entirely speculative, but it asks the Court to disregard evidence contained in the

extradition request that is highly relevant to the "incidental to" prong and to disregard *Quinn*'s guidance that the exception should not be used "to protect mercenaries or others acting for nonpolitical motives." *Quinn*, 783 F.2d at 810.

Should the Court agree with Ahmed that the evidence of a 50,000 Iraqi-Dinar payment does not preclude a finding that Ahmed's charged offenses were "incidental to" any Iraqi uprising, the fact that Ahmed committed the charged offenses as part of his role in an AQI-affiliated group, a terrorist organization, independently precludes a finding that he acted for political reasons. The extradition request includes evidence that, although Ahmed was paid for the killings, he committed them through his role in an AQI-aligned terrorist group. The extradition request characterizes AQI as a terrorist organization known for committing murders and assassinations. (Extrad. Req. at 00028, 00052, 00075, 00079.) Moreover, as discussed herein and supported by the Government's expert, Professor Whiteside, as well as Ahmed's expert, Professor Hamoudi, (Hamoudi, ¶ 127), and the DoD Report cited by Ahmed in his Extradition Brief, AQI was considered an international terrorist organization involving foreign fighters and local Iraqis at the time of the charged offenses. Importantly, AQI's goals and objectives through their violent acts in Iraq in 2006 were not ultimately aligned with any local Iraqi insurgency groups. Although AQI conducted violent attacks against Coalition forces and the local Iraqi government, they did so to terrorize the community and oust the Coalition forces, so that they could take over Iraqi land and form a transnational caliphate. This motivation is not political in nature or in furtherance of any local Iraqi insurgency that was ongoing in 2006. Because the extradition request contains evidence—that is factually uncontroverted by Ahmed—that Ahmed committed the charged offenses on behalf of AQI, such evidence provides evidence of a separate non-political motive for the charged offenses.

Ahmed suggests that any notion that the charged offenses were motivated by AQI's goal of creating a transnational caliphate amounts solely to "speculation" by Professor Whiteside because there is no specific evidence to suggest that Ahmed himself committed the charged offenses in furtherance of pursuing a transnational caliphate. (Doc. 200, at 18-

19.) Despite Ahmed's claim, however, it is far from speculation, as the extradition request includes evidence that Ahmed committed the acts on behalf of AQI, and the DoD Report from November 2006, of which Ahmed asks the Court to take judicial notice, identifies AQI's goal as seeking to create a caliphate in Iraq. Additionally, Ahmed's position that the "incidental to" prong cannot be analyzed by solely looking at the motivation behind the group for which the accused commits the charged offenses, but instead requires evidence of the accused's actual direct motivation is inconsistent with Ninth Circuit case law. *See, e.g.*, *Quinn*, 783 F.2d at 811 ("The incidence test has never required that an accused prove his political motivations directly . . . .").

> 3. The "Circumstances" Ahmed Raises in Support of the Applicability of the Political-Offense Exception Are Insufficient for Ahmed to Meet His Initial Burden.

Ahmed points to specific "circumstances" that he alleges "strongly support" that he has met his burden of showing that the charged offenses are "incidental to" any local Iraqi uprising occurring in 2006. (Doc. 200, at 12-13.) A closer analysis of Ahmed's "circumstances," however, demonstrate that they do not satisfy Ahmed's burden.

*First*, Ahmed relies on his "purported membership in an uprising group," which he identifies as "a local cell affiliated with AQI . . . ," to support that the charged offenses are "incidental to" any local Iraqi uprising occurring in 2006. (Doc. 200, at 12.) However, as already discussed by the United States, even if the events occurring in Iraq in 2006 constituted a local, indigenous Iraqi uprising, AQI cannot be considered an "uprising group" for purposes of the political-offense exception based on the group's status as an international terrorist organization, foreign leadership and membership of experienced foreign fighters traveling to Iraq to commit violence, objectives of terrorizing the local Iraqi population, and objective of ousting Coalition forces to facilitate the group's takeover of Iraqi land to create a transnational caliphate. *See supra* Pages 7-11; *see also* Doc. 199, at 18-25; and DoD Report, at 18. Because AQI was not an "uprising group," Ahmed's membership in AQI actually cuts against his claim that the charged offenses were "incidental to" the political objectives of a local Iraqi uprising.

For these reasons, many of the other circumstances Ahmed offers in support of a finding that the charged offenses were "incidental to" an uprising fail to support his claim. Ahmed suggests that the "similarity of the charged offense[s] to other acts committed by the uprising group" and "the degree of control over [Ahmed's alleged] acts by some hierarchy within the group," also support the "incidental to" prong. (Doc. 200, at 13.) However, if AQI was not engaged in criminal conduct with a direct link to the goals and objectives of the local, indigenous Iraqi uprising, the fact that Ahmed's charged offenses were similar to AQI's attacks and/or AQI leadership had some level of control over Ahmed's acts further precludes a finding that the offenses were "incidental to" a political uprising.

*Second*, Ahmed's contention that "the selection of Iraqi police officers as the victims" supports that his charged offenses were "incidental to" the local Iraqi uprising, (Doc. 200, at 13), is incorrect and highlights Ahmed's failure to provide sufficient evidence to meet his burden.

As an initial matter, Ahmed is unable to point to anything in the Extradition Request and has failed to provide any supplemental factual evidence that offers this Court any guidance as to why the killings of these two particular police officers were political in nature. Ahmed has not alleged that anything specific about the two officers made the crimes "political." He has not provided any information about the two specific police officer victims, their role in any sectarian conflict, or what role they played in any counter-insurgency efforts. He has also failed to provide any specific evidence as to the city of Fallujah's local police force, and whether they were known to work hand-in-hand with Coalition forces and the Iraqi government, or whether they focused on local law enforcement issues.

Instead, Ahmed's argument mirrors the overbroad conclusion of his expert, Professor Hamoudi, who suggests that this Court should conclude that, regardless of which group actually committed the two charged murders of Iraqi police officers and the actual motivation behind the murders, any killing of an Iraqi police officer in 2006 was "certainly

not a feature of any international terrorist movement and [was] instead a core tactic of the popular Sunni insurgency designed to achieve a real political end . . . ." (Hamoudi, ¶ 130.) But, it is inaccurate for Ahmed (and his expert) to point generally to any and all murders of local Iraqi police officers during that time and say that all such crimes are "incidental to" a local Iraqi insurgency. Importantly, as the United States' expert, Professor Whiteside, points out, the "rigid application" of targeting local police officers was actually "unpopular" among many Sunni insurgency groups. (Whiteside, at 10.) As Sunnis joined the ranks of local police forces, "AQI's targeting of police forces brought the group into conflict with others quite frequently." (Whiteside, at 10.) Moreover, given the fact that the city of Fallujah was predominantly Sunni, "it is almost certain by the hiring practices of the day that both victims were local Sunni Iraqis." (Whiteside, at 11; *see also* Hamoudi, ¶ 95 (acknowledging that the city of Fallujah, where the charged offenses occurred, was a "center of Sunni nationalist pride.").)

For these reasons, the limited information about the police officer victims in the extradition request, without additional facts or explanation, is insufficient to support Ahmed's claim that the charged premeditated murders of the two victims were "incidental to" an indigenous "uprising" for political reasons.

*Third*, Ahmed claims that because the Iraqi authorities described Ahmed and his group as an "armed terrorist group" and assigned Ahmed's case to an Iraqi court specializing in "terrorism cases," the circumstances support that Ahmed's charged offenses are political in nature. (Doc. 200, at 14.)

In doing so, Ahmed cites to limited language from the Ninth Circuit in *Barapind*, (Doc. 200, at 14 (citing *Barapind*, 400 F.3d at 753)), which when applied to Ahmed's facts, does not support his argument. In *Barapind*, the Ninth Circuit had remanded an extradition matter back to the extradition court to apply *Quinn*'s interpretation of the political-offense exception. 400 F.3d at 753. In doing so, the Ninth Circuit suggested, "there is at least some evidence, including the affiliation of the victims with the Indian government and India's charging of TADA [Terrorist and Disruptive Activities Act] violations, *that might*

*suggest* the crimes were political offenses." *Id.* at 753 (emphasis added). Below, the extradition court had noted that TADA was a statute with a "political purpose" and allowed the Government of India to criminalize "speech or actions that disrupt or challenge the sovereignty of territorial integrity of India." *In re Extradition of Singh*, 170 F. Supp. 2d 982, 1030-31 (E.D. Cal. 2001), *rev'd in part sub nom. Barapind*, 400 F.3d 744.

In Ahmed's case, however, he is not charged with a "terrorism" statute or any other statute that is arguably political in nature. Rather, Iraq has charged Ahmed with two counts of premeditated murder. Extrad. Req. at 00018-00026. Ahmed apparently acknowledges that had Iraq wanted to charge him with anti-terrorism charges, they easily could have. Ahmed's own expert recognizes that Iraq has "robust, and highly controversial, anti terrorist legal infrastructure, and in particular the 2005 Antiterrorism Law." (Hamoudi, ¶ 53.) Although Ahmed's expert indicates that Iraq generally makes "liberal use" of such anti-terrorism laws, Ahmed is not charged with such laws, nor are they referenced in the extradition request. (*Id.*) The fact that Ahmed has been charged with two counts of premeditated murder under Iraqi law, despite the apparent availability of many other available anti-terrorism charges, supports rather than undercuts that Ahmed's charged offenses are not political in nature. Ahmed fails to point to any facts that actually demonstrate that, if an indigenous "uprising" existed in Iraq in 2006, the charged offenses were committed "incidental to" the "uprising." As a result, the Court should find that Ahmed has failed to meet his burden of showing that the charged offenses are non-extraditable based on the political-offense exception, and alternatively, that the United States has successfully rebutted any such argument.

## II.   AHMED IS "CHARGED WITH" A CRIME AS REQUIRED UNDER THE TREATY.

Ahmed argues that he is not "charged with" a crime as required under the Treaty, despite the view of the U.S. Department of State, as well as Supreme Court and Ninth Circuit precedent providing otherwise, as the government previously explained (Doc. 199, at 34-38). Although Ahmed attempts to liken his case to one with no "pending criminal

action" against him (Doc. 200, at 24), that is not so. Iraq seeks Ahmed's extradition to respond to charges of premeditated murder, which are currently pending before an Iraqi court.

Contrary to Ahmed's contention (Doc. 200, at 25-26), the Ninth Circuit in *Emami v. U.S. Dist. Court for Northern Dist. of California* held that extradition is proper under such circumstances. 834 F.2d 1444, 1448-1449 (9th Cir. 1987). In that case, the court adopted the view of the Seventh Circuit in *In re Assarsson*, 635 F.2d 1237, 1240-42 (7th Cir. 1980), that language limiting the application of an extradition treaty to fugitives who are "charged with" a crime "impose[s] no requirement that formal charges be filed." *Emami*, 834 F.2d at 1448. Similarly to Ahmed, the fugitive in *Emami* argued that Germany, the country that sought his extradition, "is not yet committed to prosecuting him but instead has requested his extradition only for 'detention for investigation.'" *Id.* at 1449. The court "refuse[d] to entangle itself in the present parties' arguments concerning the procedural requirements of German law" and construed the term "charged with" broadly, finding that it was satisfied where Germany "intend[ed] to prosecute" the fugitive. *Id.*; *cf. In re Extradition of Chapman*, No. CIV07-00365SOM/BMK, 2007 WL 3254880, at *3 (D. Haw. Nov. 5, 2007) (cited in Doc. 200, at 24) (denying extradition where foreign court had "'order[ed] the dismissal of the . . . action'" against the fugitives and "'canceled'" the warrant for their arrest).

Ahmed's attempt to distinguish *Emami* is unavailing. In particular, his argument (Doc. 200, at 25) that the treaty at issue in *Emami* contained broader language than that at issue here is beside the point. Although the U.S.-Germany treaty authorized the extradition of persons "who have been charged with an offense or are wanted by the other Contracting Party for enforcement of a judicially pronounced penalty or detention order," the Ninth Circuit specifically analyzed the treaty's "charged with" language. *See Emami*, 834 F.2d at 1448 (quoting treaty, and addressing fugitive's argument that he was not "charged"). Moreover, the *Emami* court relied on "[t]he Seventh Circuit's reasoning" in *Assarsson*— which involved a treaty containing the same "charged with or convicted of" language as in

the Treaty at issue here, 635 F.2d at 1241-42—to reject the fugitive's attempt to graft a requirement of formal charges into the U.S.-Germany treaty. *Emami*, 834 F.2d at 1448 ("The *Assarsson* court noted that the word 'charged' was used only in contrast to 'convicted' so as to define the two classes of extraditees that the treaty covered. The court reasoned that the word 'charged,' used as a verb in the generic sense only to indicate 'accused,' could not be transmuted into a requirement that 'charges,' a noun, be filed. The same argument applies directly to the language of article 1(1) of the treaty in the instant case.") (citations omitted).[10] Thus, *Emami*'s analysis applies in this case.

In any event, contrary to Ahmed's suggestion (Doc. 200, at 25), the definition of the term "charged" in the instant Treaty is no different than that in other treaties. As a general matter, the term "charged" appears in most extradition treaties (*see* Doc. 199-3, ¶ 4), and it would be illogical to think that its meaning varies depending on the other specific terms of each treaty. *Cf., e.g.*, *Martinez v. United States*, 828 F.3d 451, 460-62 (6th Cir. 2016) (en banc) (looking to other extradition treaties' provisions on "lapse of time" when interpreting that provision in the U.S.-Mexico treaty); *In re Gambino*, 421 F. Supp. 2d 283, 306 (D. Mass. 2006) (discussing "'[s]tandard' United States extradition treaty practice with respect to *non bis in idem* clauses" when interpreting the U.S.-Italy treaty).

Furthermore, Ahmed is incorrect that Articles II and IV of the Treaty dictate that the provision in Article I regarding "person[s] charged with or convicted of any of the crimes specified in Article II" requires the existence of formal charges (Doc. 200, at 24-25). Article II of the Treaty does not create a "charging" requirement separate from that of Article I, but rather simply repeats the language in that article and then specifies which crimes are extraditable. *See* Treaty, Art. II ("Persons shall be delivered up according to the

---

[10] The fact that the *Emami* treaty also contained a more detailed rule-of-specialty provision than the Treaty at issue here is similarly irrelevant, contrary to Ahmed's contention (Doc. 200, at 26). The *Emami* court did not rely on, or even discuss, that treaty language. Moreover, the language does not address whether a fugitive has been charged, formally or otherwise, but rather whether "the offense for which the person sought was extradited is legally altered" such that it has a "new legal description." Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, art. 22(3), U.S.-F.R.G., June 20, 1978, T.I.A.S. No. 9785 (cited in Doc. 200, at 26).

provisions of this Treaty, who shall have been *charged with or convicted of* any of the following crimes if they are punishable by the laws of both countries . . . .") (emphasis added). Article IV of the Treaty creates a requirement known as the rule of specialty, which is common in most extradition treaties, that a fugitive may not be "tried for any crime other than that for which he was surrendered" (barring certain exceptions).[11] This requirement does not depend on whether the fugitive is being investigated or whether he has been formally charged with the crime underlying the request for his extradition. Indeed, this requirement does not prohibit a fugitive from being charged with crimes following his surrender, contrary to Ahmed's suggestion (Doc. 200, at 25, 28). *Cf., e.g.*, *United States v. Andonian*, 29 F.3d 1432, 1439 (9th Cir. 1994) (no specialty violation where fugitive was tried and convicted based on a superseding indictment returned *after* his extradition to the United States from Uruguay that added charges).[12]

Ahmed's argument regarding Iraq's purported "fail[ure] to supply the documentation necessary for this Court to confirm that Ahmed is charged with one or more of the 25 extraditable offenses," instead of demonstrating a deficiency in the request, in fact only further underscores the fact that the Treaty does not require the existence of formal charges against a fugitive. Unlike some other extradition treaties, the Treaty here does not require the requesting country to provide a charging document in support of its

---

[11] Indeed, a similar rule-of-specialty provision appears in the treaty at issue in *Assarsson*, 635 F.2d 1237. *See* Convention on Extradition Between the United States of America and Sweden, art. IX, U.S.-Swed., Oct. 24, 1961, 14 U.S.T. 1845 ("[a] person extradited by virtue of this Convention may not be tried or punished by the requesting State for any offense prior to his extradition, other than that which gave rise to the request . . ." absent consent by the requested country or release of the fugitive).

[12] Ahmed's claim that the Treaty's specialty provision "specifically provides that the criminal action(s) pending against a relator may not be modified, augmented, or expanded after the relator is rendered to the nation that is seeking his return" (Doc. 200, at 28) is thus incorrect. The treaty at issue in *Andonian* contains a similar specialty provision to that in the U.S.-Iraq Treaty. *See* 29 F.3d at 1435 ("A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting Party for an offense other than that for which extradition has been granted . . . unless . . . the requested Party has manifested its consent to his detention, trial or punishment for an offense other than that for which extradition was granted . . . .") (quoting relevant treaty; omissions in original).

extradition request. (*See* Doc. 199-3, ¶ 5.) Rather, Article XI of the Treaty provides that, for fugitives "charged with a crime," the requesting country must produce only "a duly authenticated copy of the warrant of arrest in the country where the crime was committed, and copies of the depositions upon which such warrant may have been issued, . . . with such other evidence or proof as may be deemed competent in the case." Iraq has provided these documents, and Ahmed does not argue otherwise. The fact that the Treaty did not require Iraq to provide a formal charging document further suggests that it allows for extradition even in the absence of formal charges.

Furthermore, the Ninth Circuit in *Emami* declined to adopt such an extratextual documentary requirement for a charging document, as Ahmed urges. Rather, it noted the reasoning in *Assarsson*, 635 F.2d at 1243, that "the parties had not intended to require such a document [containing formal charges] because the parties could have specifically included such a requirement but had not," and concluded that Germany had provided "all the documents that the treaty with Germany required," even though it did not provide a charging document. *See* 834 F.2d at 1448 & n.3. *Emami* aligns with the Ninth Circuit's conclusion in another case that "for the purpose of a civil proceeding such as an extradition, a [foreign] arrest warrant is the equivalent of a United States indictment . . . ." *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) (relying on Mexican warrant to toll the U.S. statute of limitations for purposes of the relevant treaty's lapse of time provision). Iraq needs to provide nothing more than an arrest warrant to demonstrate that Ahmed is "charged" with offenses, as required under Article I of the Treaty. *See id.*; *cf. also, e.g.*, *In re Extradition of Sarellano*, 142 F. Supp. 3d 1182, 1186 n.2 (W.D. Okla. 2015) (finding that a Mexican "arrest warrant is a 'charging document' . . . [and] establishes that [the fugitive] has been properly 'charged with' the offense of aggravated homicide as required by Article I of the Extradition Treaty") (citation omitted); *United States v. Nolan*, 651 F. Supp. 2d 784, 796 (N.D. Ill. 2009) (Costa Rican arrest warrant satisfied the relevant treaty's requirement that the requesting country provide "[a] copy of the charging document, or an equivalent document issued by a judge or judicial authority").

Ahmed's narrow interpretation of "charged" as requiring the existence of formal charges conflicts with the well-established canon of interpretation articulated in *Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933), as the government previously discussed (Doc. 200, at 6), which requires that, to the extent the Court finds that Article I is ambiguous, it must construe the Treaty liberally so as to allow Ahmed's extradition. 290 U.S. at 298. In other words, to defeat extradition based on Article I of the Treaty, Ahmed must show that the Treaty unambiguously means that Iraq must have filed formal charges against him. This he has failed to do.

Thus, the view of the U.S. Department of State that Ahmed is "charged" as required in Article I of the Treaty, along with the relevant case law, is reason alone to end the inquiry. (*See* Doc. 199, at 35 (detailing Department of State view).) However, adopting that view is particularly appropriate here for the additional reason that Iraq concurs with it. In particular, as set forth in a supplement to the request for Ahmed's extradition, the government of Iraq has explained that "the appropriate legal procedures have been taken" in Iraq to allow for Ahmed's extradition pursuant to the Treaty. (*See* English translation of statement provided by Judge Jabbar Husayn 'Aliwi, ¶ 5 [hereafter, "Supp. Extrad. Req."], attached hereto as Exhibit 2.)[13] It has further confirmed that his extradition is sought "so that he may be tried in accordance with the law," noting that the warrant for Ahmed's arrest identifies the relevant criminal statute, Article 406(1)(A) of the Iraqi Penal Code No. 111 of 1969, for the charge of premeditated murder. (*See id.*) In its supplement, Iraq also details its procedure for carrying out the criminal proceedings against Ahmed, which are currently pending before an investigative judge, and will continue before a trial

---

[13] On May 5, 2021, the government of Iraq sent to the United States an advance copy of a supplement to its request for Ahmed's extradition, which is attached hereto as Exhibit 3, in which Judge Jabbar Husayn 'Aliwi responds to arguments concerning Iraqi law raised in Ahmed's April 16, 2021, Extradition Brief, (Doc. 200). That document is in Arabic; accordingly, the United States obtained a translation of the supplement prepared by the FBI's Language Services Section, which appears at Exhibit 2. The United States understands that Iraq is in the process of submitting the original version of the supplement, along with a translation, through the diplomatic channel. The United States intends to file the official version of the supplement, with translation, upon receipt, and has listed these documents on its updated Exhibit List.

judge only after Ahmed has been afforded certain rights upon his return to Iraq, including the opportunity to provide a statement responding to the charges against him. (*See* Exh. 2, Supp. Extrad. Req., ¶ 2.) It is thus apparent that Iraq shares the view of the U.S. Department of State that Ahmed is "charged" within the meaning of Article I of the Treaty.

Given this, the Court should refuse to question the manner in which Ahmed is being prosecuted in Iraq. Indeed, U.S. courts generally defer to a foreign government's interpretation of its own law in extradition proceedings. *See Grin v. Shine*, 187 U.S. 181, 185, 190 (1902). Particularly with respect to issues of foreign criminal procedure, such deference is great, as extradition courts routinely decline to opine on a foreign government's technical compliance with its criminal procedure law altogether, reserving that determination for the courts in the requesting country following the fugitive's surrender. *See, e.g., id.*; *Emami*, 834 F.2d at 1449 ("refrain[ing] from interpreting the requirements of German criminal procedure"); *Theron v. U.S. Marshal*, 832 F.2d 492, 499-500 (9th Cir. 1987), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482 (1997) ("conclud[ing] that it would be inappropriate to engage in . . . an inquiry into the formal procedure a country uses in instituting prosecution"); *Basic v. Steck*, 819 F.3d 897, 901 (6th Cir. 2016) (stating that "[w]e will not second guess th[e] determination" by the Government of Bosnia that a "[d]irective to find and arrest" the fugitive constituted the "arrest warrant" required under the applicable extradition treaty); *Skaftouros v. United States*, 667 F.3d 144, 160 (2d Cir. 2011) (stating that "the question of whether an arrest warrant is in technical compliance with the law of the demanding country is not to be decided by U.S. courts"); *Assarsson*, 635 F.2d at 1244 ("refus[ing] to review [Sweden's] compliance with [its] criminal procedure"); *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 129-30 (E.D.N.Y. 2001) (relying on "principles that American courts cannot become enmeshed in the technicalities of foreign criminal processes" to reject fugitive's argument that he was not properly charged with a crime); *Demjanjuk v. Petrovsky*, 612 F. Supp. 571, 578 (N.D. Ohio 1985) (an extradition court need not "review compliance with foreign criminal procedure"), *aff'd*, 776 F.2d 571 (6th Cir. 1985), *rev'd on other grounds*, 10 F.3d 388 (6th

Cir. 1993).

Such deference is commensurate with the "comity considerations that lurk beneath the surface of all extradition cases." *See Martinez*, 828 F.3d at 463; *see also Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court*, 482 U.S. 522, 546 (1987) ("[W]e have long recognized the demands of comity in suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation."); *Koskotas*, 931 F.2d at 174 ("Extradition proceedings are grounded in principles of international comity, which would be ill-served by requiring foreign governments to submit their purposes and procedures to the scrutiny of United States courts."). Indeed, refusing to give credence to the statements of one of the United States' treaty partners frustrates one of the principal purposes of an extradition treaty, that is, to establish a reciprocal relationship built on trust and good faith. *See, e.g.*, *Factor*, 290 U.S. at 293-94 ("Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them.").

Deference also makes practical sense, as "[a]mong the most logical sources for [a] court to look to in its determination of foreign law are the [relevant] foreign officials," who are familiar with the context and the nuances of the foreign legal system. *United States v. McNab*, 331 F.3d 1228, 1241 (11th Cir. 2003), *cert. denied*, 540 U.S. 1177 (2004). It thus avoids the significant risk that a U.S. court might erroneously interpret the law of a foreign country. *See, e.g.*, *Sainez*, 588 F.3d at 717 ("[W]e have declined to rule on the procedural requirements of foreign law out of respect for other nations' sovereignty and because we recognize the chance of erroneous interpretation is much greater when we try to construe the law of a country whose legal system is not based on common law principles.") (citation and internal quotation marks omitted); *Assarsson*, 635 F.2d at 1244 ("We often have difficulty discerning the laws of neighboring States, which operate under the same legal system as we do; the chance of error is much greater when we try to construe the law of a country whose legal system is much different from our own. The possibility of error warns

us to be even more cautious of expanding judicial power over extradition matters."). Accordingly, the Court should reject Ahmed's argument that he is not sufficiently "charged" with a crime as required under the Treaty.

### III.   ARTICLE V OF THE TREATY DOES NOT BAR AHMED'S EXTRADITION BECAUSE HE IS NOT EXEMPT FROM PUNISHMENT IN IRAQ.

Ahmed propounds (Doc. 200, at 30) that Article V of the Treaty bars his extradition because he is "exempt from . . . punishment for the crime for which [his] surrender is asked" under Iraqi law.  In essence, he argues that, because he cannot be subject to the death penalty under the Iraqi constitution's *ex post facto* prohibition, he cannot be subject to any penalty whatsoever and can thereby evade extradition to Iraq.  The Court should reject this argument because it is not supported by Ahmed's own expert's analysis, and in any event, it is contrary to the Iraqi government's interpretation of its law.

As an initial matter, even under Professor Hamoudi's own analysis, sentencing someone convicted of committing premeditated murder in 2006 to the death penalty would not constitute an *ex post facto* violation.  Professor Hamoudi argues only that "Iraq had not *fully* reinstated the death penalty in 2006," and not that the death penalty was unavailable, when the murders for which Ahmed's extradition is sought were committed.  (Doc. 200-3, at 22 (emphasis added).)  In particular, Professor Hamoudi claims that the death penalty, though suspended in 2003, was reinstated in 2004[14]; whereas the procedures for implementing the death penalty were suspended in 2004, and not reinstated until 2007, at which point they were declared to be effective as of 2004.  (Doc. 200-3, ¶¶ 73-80.)  Although he notes that the Iraqi constitution's *ex post facto* clause prohibits only the retroactive imposition of "a harsher punishment" than that available when an offense was committed, he presents the bald conclusion that the retroactive reinstatement of death

---

[14] It appears that, even when the death penalty was suspended, under the law Professor Hamoudi relies upon, defendants could still be convicted of death penalty crimes because "the court may substitute the lesser penalty of life imprisonment, or such other lesser penalty as provided for in the Penal Code."  (Doc. 200-2, Ex. B (Coalition Provisional Authority Order No. 7), § 3(1).)

penalty procedures somehow violates that prohibition.  (Doc. 200-3, ¶¶ 78, 81.)  This conclusion—which would illogically mean that there is impunity for committing premediated murder (and other death penalty crimes) in Iraq from 2004 to 2007—is insufficient to demonstrate that Ahmed was "exempt from . . . punishment" so as to prevent his extradition under Article V of the Treaty.[15]

Furthermore, the government of Iraq has affirmed in the supplement to its extradition request that Ahmed in fact remains subject to punishment if convicted. According to Iraq, under Iraqi law, because Ahmed is alleged to have committed the charged murders at a time when the death penalty was suspended, it is likely that he will face life imprisonment instead of the death penalty.  (*See* Exh. 2, Supp. Extrad. Req., ¶ 4.) For the reasons explained above, the Court should defer to Iraq's view of its law in this regard.  *See supra* Pages 26-27.

## IV.  THE WARRANT FOR AHMED'S ARREST IS VALID AND ENFORCEABLE.

Article XI of the Treaty requires, in relevant part, that Iraq must produce "a duly authenticated copy of the warrant of arrest" in support of its request for Ahmed's extradition.  It is well settled that such a warrant requirement, which is common to many extradition treaties, "do[es] nothing more than to help the judicial officer in the requested country to confirm that there are in fact charges properly pending against the relator in the

---

[15] Ahmed argues (Doc. 200, at 30) that only the "ex post facto principles enshrined in Article 19(2) of the Iraqi constitution" exempt him from punishment.  Professor Hamoudi also attempts to rely (Doc. 200-3, ¶¶ 77, 79) on Article 15 of the Iraqi constitution, by opining that "[i]t is difficult to see how a death penalty can be carried out 'in accordance with the law,'" as required under that article; and Law 193 of 1970, which similarly requires the imposition of penalty "'in accordance with the law at the time of the commission of the crime.'"  However, he has no support for how these general statements would prohibit the imposition of the death penalty in Ahmed's case.  To the contrary, one of his supporting documents questions only whether the retroactive reinstatement of death penalty procedures rendered the application of the death penalty illegal in 2004 to 2007; it does not similarly question the application of the death penalty since that time.  (*See* Doc. 200-8, at 8 ("It thus appears that, between the re-instatement of the death penalty on 8 August 2004 by IIG Order No. 3 and the coming into effect of Law No. 13 of 2007, there was no lawfully prescribed means of implementing death sentences.  Thus, any execution carried out during this period may have been unlawful").)

requested country, and that the relator is actually the person sought." *United States v. Kin-Hong*, 110 F.3d 103, 114 (1st Cir. 1997). Therefore, an extradition treaty's warrant requirement is satisfied where the requesting state provides a warrant "show[ing] that the fugitive is in fact "prosecutab[le]" upon extradition to the demanding country." *Skaftouros*, 667 F.3d at 160 (brackets and emphasis in original). Iraq so complied with Article XI by producing the warrant issued by Judge Jabbar Hussein of the Magistrate Court of Al-Karkh, which "authorize[s]" law enforcement "to detain [Ahmed] until he is presented to us to respond to the charges against him." (Extrad. Req. at 00048.)

When examining whether a treaty's warrant requirement has been satisfied, courts do not consider possible procedural or technical deficiencies with the warrant. As the Supreme Court stated, "a technical noncompliance with some formality of criminal procedure should not be allowed to stand in the way of a faithful discharge of our obligations." *Grin*, 187 U.S. at 185. Such a practice comports with U.S. courts' approach of limiting their inquiry into foreign criminal procedure, as explained previously (Doc. 199, at 38-39). As an example, the Second Circuit in *Skaftouros* rejected a fugitive's argument that he could not be extradited because the warrant provided by Greece in support of its request for his extradition was "'fatally defective'" due to the lack of a clerk's signature, a sufficient description of his face, and other noncompliance with Greek criminal procedure law. 667 F.3d at 151. The court concluded that, regardless, the warrant satisfied the applicable treaty requirement because it demonstrated that the fugitive was "prosecutable," given that the alleged defects were "not jurisdictional" in nature. *Id.* at 160-61; *see also, e.g.*, *In re Extradition of Mathison*, 974 F. Supp. 2d 1296, 1309, 1315-16 (D. Or. 2013) (certifying a fugitive as extraditable to Mexico, despite the fact that he had filed an *amparo* proceeding in Mexico "challeng[ing] the Mexican warrant's compliance with technical or procedural requirements of Mexican law"). *See generally Basic*, 819 F.3d at 900-01 (holding that the U.S.-Bosnia extradition treaty's warrant requirement was satisfied where Bosnia had submitted a document containing a probable-cause finding and an order that the fugitive be detained).

- 30 -

Ahmed argues that Iraq failed to comply with Article XI because of the transfer of his criminal case from one court to another, purportedly in violation of Iraqi criminal procedure law, and "the resulting invalidity of the proffered warrant for Ahmed's arrest." (Doc. 200, at 33.) However, Ahmed's own expert does not in fact argue that transferring the case invalidated the warrant against Ahmed, or that the claimed "procedural irregularities" otherwise prevent Ahmed from being prosecuted for the offenses for which his extradition is sought. While Professor Hamoudi notes that Iraqi criminal cases may be transferred "on the basis of specified conditions set forth in Article 55 of the Criminal Procedure Code," he does not assert that those conditions were not met in Ahmed's case. (Doc. 200-3, ¶ 71.) Instead, he argues that "[t]here is no explanation for why th[e] highly unusual transfer was undertaken [in Ahmed's case], nor is there a suggestion anywhere that the conditions required by law were followed in the transferring of these cases"—nothing further. (*Id.*) That is insufficient to demonstrate that the Treaty's warrant requirement has not been met.

Even if Iraqi courts failed to follow the proper procedure for transferring the case, it is not the role of this Court to determine whether such a transfer is fatal as a matter of Iraqi law. Ahmed's attempt (Doc. 200, at 31-32) to rely on *Sacirbey v. Guccione*, 589 F.3d 52, 67 (2d Cir. 2009), is unavailing. In that case, which involved a Bosnian extradition request, the Bosnian court that had issued the warrant provided in support of the request "subsequently lost jurisdiction over the case owing to a constitutional reorganization [when Bosnia's legal system changed from a civil law system to a common law system]" and therefore "no longer ha[d] any power to enforce the arrest warrant." *Id.* at 67, 69 (internal quotation marks omitted). Accordingly, even though the government argued that another court could assume jurisdiction over the case, the Second Circuit concluded that no criminal proceedings were then pending against the fugitive and that Bosnia had therefore failed to "satisfy the Treaty's requirement that [it] demonstrate a 'charge' by producing a valid arrest warrant." *Id.* at 67-69. Here, by contrast, the same court that currently has jurisdiction over Ahmed's case issued the warrant contained in the extradition request.

And even Professor Hamoudi does not state that the court has been "ousted of jurisdiction" such that it is "no longer able to enforce" the warrant included in the extradition request, as in *Sacirbey*. *Cf. id.* at 67. Moreover, unlike in *Sacirbey*, criminal proceedings unequivocally remain pending in court against Ahmed in Iraq.

Indeed, the supplement to Iraq's extradition request—which was authored by the judge currently presiding over the case against Ahmed—establishes that, in accordance with Iraqi law, "[t]he arrest warrant issued against [Ahmed] will remain in force until [he] is arrested." (*See* Exh. 2, Supp. Extrad. Req., ¶ 3.) The judge explains that the case against Ahmed that was initially before the Investigative Court of Al-Anbar was properly transferred to him pursuant to Article 54(A) of the Iraqi Penal Code No. 23 of 1971, which expressly requires the consolidation of multiple cases pending against one defendant. (*See* Exh. 2, Supp. Extrad. Req., ¶ 1.) This Court should thus give due deference to Iraq's explanation of its criminal process, and reject Ahmed's claim that the warrant for his arrest suffers from procedural irregularities. *See supra* Pages 26-27 (explaining that U.S. extradition courts defer to the views of a foreign government on its own law).

In any event, as discussed above, courts have interpreted extradition treaties' documentary requirements broadly. *Factor*, 290 U.S. at 298. As the Supreme Court has explained, "it can hardly be expected of us that we should become conversant with the criminal laws of [a requesting state], or with the forms of warrants of arrest used for the apprehension of criminals." *Grin*, 187 U.S. at 190 (holding that the U.S.-Russia treaty's warrant requirement was satisfied by a document that was "evidently designed to secure the apprehension of the accused, and his production before an examining magistrate," even though it did not resemble a U.S. arrest warrant); *see also Fernandez v. Phillips*, 268 U.S. 311, 312 (1925) (rejecting the notion that "every technical detail [must] be proved beyond a reasonable doubt"). This Court should likewise refuse to entertain Ahmed's technical challenge to Iraq's compliance with its criminal procedure law.

**V. BY ENACTING 18 U.S.C. § 3196, CONGRESS EMPOWERED THE UNITED STATES TO EXTRADITE U.S. CITIZENS SUCH AS AHMED.**

Ahmed's argument (Doc. 200, at 45) that the Treaty does not empower the United States to extradite its citizens such as himself is beside the point. That is so because, as the Ninth Circuit has held, "We agree with the Sixth Circuit and nearly every district court that has considered the applicability of 18 U.S.C. § 3196 that, in the absence of a treaty authorization or prohibition, the statute confers discretion on the U.S. Department of State to seek extradition of U.S. citizens." *United States v. Knotek*, 925 F.3d 1118, 1123 (9th Cir. 2019).

Article VIII of the Treaty contains the same language as was at issue in *Knotek*: "Under the stipulations of this Treaty, neither of the High Contracting Parties shall be bound to deliver up its own citizens." *See* 925 F.3d at 1125 (quoting relevant treaty language). When considering materially the same language in the U.S.-France extradition treaty, the Supreme Court concluded that it operates as a "denial of any obligation to surrender citizens," and does not grant the Executive Branch "power to surrender a citizen of the United States." *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 10 (1936). The Court then held that "in the absence of statute conferring an independent power" and with no express grant of authority in the treaty, the Executive Branch "is without power to surrender [U.S. citizens]." *Id.* at 18. Thus, as in *Knotek*, "[i]n light of *Valentine*, if we were dealing solely with the Treaty in this case, the federal government would lack authority to extradite [Ahmed]. We do not, however, apply the Treaty in isolation." 925 F.3d at 1126.

To remedy the issue identified in *Valentine*, in 1990, Congress enacted 18 U.S.C. § 3196, which provides:

> If the applicable treaty or convention does not obligate the United States to extradite its citizens to a foreign country, the Secretary of State may, nevertheless, order the surrender to that country of a United States citizen whose extradition has been requested by that country if the other requirements of that treaty or convention are met.

*See, e.g.*, 136 Cong. Rec. S6586, S6598 (May 18, 1990) (statement of Sen. Dole) (Section 3196 was intended to "deal[] with a problem that arises under some of [the country's] older extradition treaties that fail to include specific authority to extradite United States nationals who are charged with crimes in the country seeking extradition" and "contains the necessary positive grant of authority to the Executive to extradite United States citizens"); *accord* 136 Cong. Rec. H10975, H10981 (Oct. 22, 1990) (statement of Rep. Fascell). Thus, Section 3196 supplies the necessary authority for the Secretary of State to extradite U.S. citizens such as Ahmed.

None of Ahmed's arguments for why the United States cannot rely on Section 3196 in this case is availing.

*First*, Ahmed's argument (Doc. 200, at 47) that the government "forfeited any ability to rely on Section 3196" by not referring to it in the complaint in this case is misplaced. Section 3196 supplies the authority for the Secretary of State to "order the surrender" of a fugitive and not the authority for the Court to certify an extradition request. And regardless, the complaint in an extradition proceeding allows for the issuance of a warrant for a fugitive's arrest, *see* 18 U.S.C. § 3184; it does not bear on the ultimate extraditability of the fugitive. Thus, an alleged deficiency in the complaint does not in and of itself prevent the entry of a certification of extraditability, which depends simply upon the five required findings based on the submitted evidence. *See, e.g.*, *Yordi v. Nolte*, 215 U.S. 227, 232 (1909) (affirming denial of habeas corpus petition filed by fugitive who had been certified for extradition, and noting that "the evidence produced at the hearing justified the detention of the [fugitive] and corrected any irregularity in the complaint"); *Shapiro v. Ferrandina*, 478 F.2d 894, 899 (2d Cir. 1973) (concluding that fugitive was extraditable to Israel despite the omission in the complaint of a statement that he may be "found" within the district); *In the Matter of the Extradition of Tang Yee-Chun*, 674 F. Supp. 1058, 1069 (S.D.N.Y. 1987) (rejecting fugitive's argument that extradition complaint was deficient because the "existence of a treaty, not proper reference to it, is the

statutory requirement").[16]

*Second*, as Ahmed himself recognizes (Doc. 200, at 47), Section 3196 does not provide an independent basis on which to deny extradition; it simply applies only when "the other requirements of that treaty or convention are met." As explained herein and in the United States' Memorandum in Support of Extradition (Doc. 199), those requirements have been met, and Ahmed's arguments to the contrary are unavailing.

*Third*, as Ahmed also recognizes (Doc. 200, at 49), the Ninth Circuit held in *Knotek* that Section 3196 is constitutional and does not improperly usurp the Executive's Article II treaty-making power. 925 F.3d at 1125. As the *Knotek* court explained, "there is no constitutional problem because section 3196 does not amend the terms of the Treaty. Rather, it fills a void." *Id.* at 1126. While Ahmed tries to distinguish *Knotek* based on the fact that, unlike the Treaty here, the treaty at issue in that case was amended after the enactment of Section 3196, those amendments did not affect the treaty's provision regarding citizens, and the Court did not rely on them in reaching its decision.[17] To the contrary, the Court rejected the fugitive's argument that the amendments postdating Section 3196 indicated the parties' intent to prohibit the extradition of nationals and were controlling because they were later-in-time. *Id.* at 1128.[18] Moreover, in deciding to uphold the constitutionality of Section 3196, the *Knotek* court followed a number of other

_____

[16] Indeed, the United States did not reference Section 3196 in the complaint underlying *Knotek*. *See United States v. Knotek*, No. 2:13-mj-02421, Dkt. 1 (C.D. Cal. Aug. 30, 2013).

[17] Ahmed urges this Court (Doc. 200, at 49) to adopt the reasoning in *Gouveia v. Vokes*, 800 F. Supp. 241 (E.D. Pa. 1992), instead of following *Knotek*. However, *Knotek* is binding in this case, and in its decision, the Ninth Circuit expressly declined to "adopt the *Gouveia* line of reasoning that section 3196 impermissibly amends the extradition treaty" because doing so is "not supported by the text of the Treaty and statute, or law concerning extradition." *Knotek*, 925 F.3d at 1126.

[18] Ahmed suggests (Doc. 200, at 49) that the United States and Iraq's failure to amend their treaty to authorize the extradition of citizens evidences their intent specifically to deprive the parties of that authority. However, the drafters of Section 3196 "recognize[d] the reality that it is not feasible to address th[e] situation [created by *Valentine*] on a piecemeal basis by renegotiating all the pre-*Valentine* treaties." 136 Cong. Rec. at S6598; 136 Cong. Rec. at H10981.

decisions involving never-amended extradition treaties predating the U.S.-Iraq Treaty (and Section 3196). *See id.* at 1127 (citing *Basic*, 819 F.3d at 899-900 (1901 U.S.-Bosnia treaty); *In re Extradition of Crismatt*, No. 2:16-MC-29-FTM-CM, 2017 WL 2348714, *3-5 (M.D. Fla. May 30, 2017) (1904 U.S.-Panama treaty); *Ravelo Monegro v. Rosa*, No. C98-1414 FMS, 1999 WL 38906, *2 (N.D. Cal. Jan. 28, 1999) (1910 U.S.-Dominican Republic treaty); *Hilario v. United States*, 854 F. Supp. 165, 169-79 (E.D.N.Y. 1994) (1908 U.S.-Portugal treaty)).

The United States' authority to extradite Ahmed is no different than its authority to extradite other U.S. citizens pursuant to treaties, like the Treaty here, that do not themselves create the authority to extradite nationals and were not amended following the enactment of Section 3196. To find otherwise would be tantamount to establishing that the United States has acted *ultra vires* every other time it extradited a U.S. citizen pursuant to its authority under Section 3196. This the Court should not do.

## VI.  THE COURT SHOULD REJECT AHMED'S INVITATION TO VIOLATE THE RULE OF NON-INQUIRY.

### A.  The Court Should Not Be the First to Violate the Rule of Non-Inquiry By Applying a Purported "Humanitarian Exception."

Ahmed requests that this Court deny Iraq's request for his extradition based on his claims about the state of the Iraqi legal system and the treatment he will face in Iraq. (Doc. 200, at 33-42.) But, as the government previously discussed (Doc. 199, at 39-40), doing so would require the Court to exceed its limited role in the extradition process and, moreover, would conflict with over a century of Supreme Court and other precedent reserving consideration of such claims for the Secretary of State.[19]

Extradition is a two-step process in which the Court first determines whether "there is probable cause to extradite" based on the relevant legal requirements, and then the

---

[19] Contrary to Ahmed's suggestion (Doc. 200, at 36), the government does not concede that Professor Hamoudi's observations regarding Iraq are correct. Rather, in accordance with established precedent and practice, it reserves addressing such claims to the Secretary of State. The government similarly does not concur with Ahmed's unsupported speculation (*see* Doc. 200, at 35) that the materials contained in Iraq's request for his extradition confirm his claims.

Secretary of State "decides whether to surrender the individual to the requesting state." *Santos v. Thomas*, 830 F.3d 987, 993 (9th Cir. 2016). This division is reflected in the statutory framework for extradition: 18 U.S.C. § 3184 charges the judiciary with determining whether there is "evidence sufficient to sustain the charge under the provisions of the proper treaty or convention," and thereafter 18 U.S.C. § 3186 authorizes the Secretary of State to make the discretionary decision of whether the fugitive "may . . . be delivered" to the requesting country. Such discretion is properly placed in the hands of the Secretary given "the Executive's powers to conduct foreign affairs," which include the ability to "make confidential diplomatic inquiries and receive confidential diplomatic assurances about the treatment of an extraditee." *Trinidad y Garcia v. Thomas*, 683 F.3d 952, 961 (2012) (en banc) (per curiam) (Thomas, J., concurring). Ahmed thus misapprehends this process by suggesting (Doc. 200, at 36) that the Court would "ratify" his return to Iraq by issuing a certification order in this case.

Questions about what treatment a fugitive may face upon his return to the requesting country may be considered only by the Secretary at the second, discretionary step of the process. *See, e.g.*, *Kin-Hong*, 110 F.3d at 109 (following the court's certification decision, "[i]t is then within the Secretary of State's sole discretion to determine whether or not the relator should actually be extradited" based on, *inter alia*, "humanitarian and foreign policy considerations"); *cf. Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005) ("The magistrate judge has no discretionary decision to make.") (internal quotation marks and citation omitted). Such questions are not yet ripe for review by an extradition court, before the Secretary of State has decided whether to surrender the fugitive to the requesting country. *See, e.g.*, 18 U.S.C. § 3186; *Meza v. U.S. Atty. Gen.*, 693 F.3d 1350, 1356 (11th Cir. 2012) ("There is nothing in the record to suggest that the Secretary has decided whether to surrender Yacaman. Yacaman's claim about torture is not ripe."); *Hoxha*, 465 F.3d at 565 (declining to address Albanian fugitive's claim that he would be tortured and possibly killed by Albanian authorities on ripeness grounds). Indeed, a decision by the Secretary

not to surrender the fugitive would moot any concerns about his return to the requesting country.

Regardless, the Supreme Court, the Ninth Circuit, and myriad other courts have established that, under the rule of non-inquiry, questions concerning the treatment a fugitive may face in the requesting country lie beyond the limited purview of the judiciary in extradition matters. The Supreme Court in *Munaf v. Geren* re-affirmed that it is appropriate for only the Secretary of State to assess practices in the requesting country and the likelihood of an individual being tortured after his transfer there. 553 U.S. 674, 700-01 (2008) (citing *Neely v. Henkel*, 180 U.S. 109, 123 (1901)). In that case, which involved a Due Process challenge to the transfer of U.S. citizens detained by U.S. military officials within Iraq to Iraqi officials for prosecution, the Court specifically rejected the detainees' argument that principles of non-inquiry were overcome by their allegations that they would likely be tortured if transferred to Iraq. *Id.* at 700. "Such allegations are of course matters of serious concern, but . . . that concern is to be addressed by the political branches, not the judiciary." *Id.*

According to the Court, "[t]he Judiciary is not suited to second guess [determinations by the State Department regarding the likelihood that those transferred to the custody of a foreign government would be tortured]—determinations that would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area." *Id.* at 702. The Court stressed that, "[i]n contrast, the political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is." *Id.*

The Ninth Circuit has "long adhered to the rule of non-inquiry," concluding that "it is the role of the Secretary of State, not the courts, to determine whether extradition should be denied on humanitarian grounds or on account of the treatment that the fugitive is likely to receive upon his return to the requesting state." *Prasoprat*, 421 F.3d at 1016. Ahmed's attempt (Doc. 200, at 36-39) to circumvent the unequivocal holding by the Ninth Circuit

in *Prasoprat*, 421 F.3d 1016, that a "magistrate judge does not have any discretion" to deny extradition on humanitarian grounds is unavailing. The notion that courts may make an exception to the rule of non-inquiry for particularly egregious humanitarian concerns is based entirely on dictum from a decision by the Second Circuit in 1960—dictum that posits the theoretical possibility of an exception that has never in fact been used to deny extradition, and which the Second Circuit itself has since disavowed. *See Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960) ("We can imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of the principle" that an extraditing court will not inquire into the procedures awaiting a surrendered fugitive in the requesting country). *But see Sindona v. Grant*, 619 F.2d 167, 175 (2d Cir. 1980) ("The fact that *Gallina* also added the caveat that some situations were imaginable in which a federal court might wish to reexamine the principle of exclusive executive discretion falls well short of a command to do so here.") (citation omitted).

The *Prasoprat* court noted that "we have never actually 'relied on [the posited possibility] to create' such an exception." 421 F.3d at 1016 (citation omitted). Although the court cited to cases in which the underlying facts did not warrant application of the exception, it did so simply to underscore that it has never adopted the exception, not to suggest that it might. *See id.* Indeed, the court did not assess whatsoever whether the particular facts of the underlying case in *Prasoprat* might warrant making an exception. Moreover, contrary to Ahmed's suggestion (Doc. 200, at 38), the fact that the court noted that the relevant treaty in that case contained express references to the discretion of the Executive was not germane to its decision, given that it did so when also noting that such references are "in accordance with the generally established principle" that the Secretary of State exercises discretion to refuse to extradite a fugitive." *See id.* (quotation mark omitted).

Moreover, cogent reasons exist for refusing to implement the theoretical "humanitarian exception," particularly in this case, given that in *Munaf* the Court

specifically declined to make an exception for the Iraqi criminal justice system and allegations of torture in Iraq. The *Gallina* dictum runs contrary to the broad principle that "[w]e are bound by the existence of an extradition treaty to assume that the trial will be fair." *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911). Adopting a "humanitarian exception" would require courts to pronounce not on the *legality* of extradition—which is their traditional and exclusive function—but on the wisdom or virtue of it. The exception would also require extensive judicial exploration of the conditions in a foreign country. Neither inquiry is consistent with the narrowly circumscribed judicial role in extradition matters. In general, judicial officers are not accustomed to considering, and are not well-equipped to consider, whether judicial and penal standards in a foreign country comport with some general notion of fairness or decency not based on the U.S. Constitution. *See, e.g.*, *Kin-Hong*, 110 F.3d at 110 (noting that "extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch"); *Spatola v. United States*, 741 F. Supp. 362, 371 (E.D.N.Y. 1990) ("[S]ince comity—*i.e.*, respect and cooperation between sovereign nations—is at the very heart of extradition, a judicial proceeding in extradition is not the proper vehicle for challenging or questioning the fairness of another country's criminal justice system"), *aff'd*, 925 F.2d 615 (2d Cir. 1991).

Thus, the Court should uphold the rule of non-inquiry and leave the humanitarian issues raised by Ahmed to be resolved by the Secretary of State. The Secretary, who can draw on his ambassadors and all the other resources of the State Department, is better equipped than the judiciary to decide the likelihood of torture, and the Secretary alone has the power to impose conditions on surrender in order to protect an extraditee. *See* 22 C.F.R. § 95.3(b) ("Based on . . . analysis of relevant information, the Secretary may decide to surrender the fugitive to the requesting State, to deny surrender of the fugitive, or to surrender the fugitive subject to conditions."); *Kin-Hong*, 110 F.3d at 110 (noting that "[t]he State Department alone, and not the judiciary, has the power to attach conditions to

an order of extradition" and recognizing that the Secretary "may also elect to use diplomatic methods to obtain fair treatment for the relator"); *In re Extradition of Mujagic*, 990 F. Supp. 2d 207, 214 (N.D.N.Y. 2013) ("[T]he Secretary may decline to extradite on a variety of grounds, including humanitarian or foreign policy considerations. Additionally, in the event the Secretary orders extradition, he may attach conditions to the order, or he may elect to use diplomatic methods to obtain fair treatment for the [fugitive].") (internal citations and quotation marks omitted); *Garcia v. Benov*, 715 F. Supp. 2d 974, 979 (C.D. Cal. 2009) ("The Secretary may decide to extradite, not to extradite, or to extradite with conditions. The Secretary's decision may be based on a variety of grounds, ranging from individual circumstances, to foreign policy concerns, to political exigencies.") (internal citations and quotation marks omitted).

## B. Applicable U.S. Law Reserves Ahmed's Torture Allegations for Consideration Solely by the Secretary of State.

Contrary to Ahmed's suggestion (Doc. 200, at 39), the Convention Against Torture (the "CAT")[20] does not provide a backdoor around the rule of non-inquiry. Against the historical backdrop in which the rule of non-inquiry has been consistently applied in extradition cases, the United States undertook an obligation under Article 3 of the CAT not to "extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." This undertaking did not alter the longstanding rule of non-inquiry because, in giving its advice and consent to the CAT, the Senate declared that "Articles 1 through 16 of the Convention are not self-executing," 136 Cong. Rec. 36,198 (1990), meaning that they do not give rise to rights that are judicially enforceable, *see Medellin v. Texas*, 552 U.S. 491, 505 n.2 (2008); S. Exec. Rep. No. 101-30, at 17-18 (1990) ("Because the Convention is not self-executing, the determinations of [whether there are substantial grounds for believing that a person would

---

[20] The full name and citation of the CAT is the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 20, 100th Cong., 2d Sess. (1988), 1465 U.N.T.S. 85.

be in danger of being subjected to torture under Article 3] will not be subject to judicial review in domestic courts.").

The CAT's implementing legislation, the Foreign Affairs Reform and Restructuring Act of 1998 (the "FARR Act)",[21] as well as the REAL ID Act of 2005,[22] confirms that federal courts lack jurisdiction to review CAT claims except in the immigration context. While the FARR Act articulates the "policy of the United States not to . . . extradite any person" on the grounds set forth in Article 3 of the CAT, it expressly clarifies that "nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the [CAT] or this section . . . except as part of the review of a final order of removal" entered in an immigration case. FARR Act § 2242(d), 112 Stat. 2681-822 (8 U.S.C. § 1231 note). Thus, the FARR Act does not create jurisdiction for extradition courts to review conditions in the requesting country. *See, e.g.*, *Omar v. McHugh*, 646 F.3d 13, 17-18 (D.C. Cir. 2011); *Mironescu v. Costner*, 480 F.3d 664, 674 (4th Cir. 2007); *Hoxha*, 465 F.3d at 564 & n.15.[23]  The REAL ID Act reinforces this rule, making clear that, "[n]otwithstanding any other provision of law," a petition for review in specified immigration—and not extradition—proceedings "shall be the sole and exclusive means for judicial review of any cause or claim under the [CAT]." 8 U.S.C. § 1252(a)(4); *see also, e.g.*, *Omar*, 646 F.3d at 18 ("The REAL ID Act states that only immigration transferees have a right to judicial review of conditions in the receiving country, during a court's review of a final order of removal.").

Thus, the CAT did not displace the rule of non-inquiry; if anything, its implementing legislation cemented the fact that federal courts may not consider CAT claims in extradition

---

[21]  Pub. L. No. 105-277, Div. G, subdiv. B, title XXII, § 2242, 112 Stat. 2681-822 (8 U.S.C. § 1231 note).

[22]  Pub. L. No. 109-13, Div. B, Tit. I, § 106(a), 119 Stat. 231, 310.

[23]  The regulations implementing Article 3 of the CAT expressly provide that the Secretary's surrender decisions are "matters of executive discretion not subject to judicial review," and that the provisions in the FARR Act authorizing judicial review in the context of immigration removal proceedings are "not applicable to extradition proceedings." 22 C.F.R. § 95.4.

- 42 -

proceedings. Indeed, in a case involving a *habeas* challenge to an extradition certification decision, the Ninth Circuit concluded that the CAT and its implementing legislation require "*the Secretary of State* [to] make a torture determination before surrendering an extraditee who makes a CAT claim," and "[t]he "doctrine of separation of powers and the rule of non-inquiry block any inquiry into the substance of the Secretary's declaration." *Trinidad y Garcia*, 683 F.3d at 957 (emphasis added). Similarly, separation-of-powers concerns and the rule of non-inquiry also block any inquiry into the substance of a fugitive's CAT claim prior to the certification of his extradition. Ahmed's allegation that he will be tortured if surrendered to Iraq is not properly before this Court. Instead, it is a matter for the Secretary of State to assess.[24]

## VII. THE SUPREME COURT'S BAR ON CONTRADICTORY EVIDENCE APPLIES IN THIS CASE, AS IT DOES IN ALL EXTRADITION CASES.

Although Ahmed does not offer or describe any evidence to contest that which was submitted by Iraq to establish probable cause that he committed the charged murders, he still argues (Doc. 200, at 50) that the Court should set aside what he describes as a "judicially created concept" of non-contradiction, *i.e.*, the limitation on a fugitive's ability to utilize evidence contradicting that in an extradition request. This rule was articulated by the Supreme Court over a century ago:

> The distinction between evidence properly admitted in behalf of the defendant and that improperly admitted is drawn in *Charlton v. Kelly*, [229 U.S. at 461] between evidence rebutting probable cause and evidence in defense. The court there said: "To have witnesses produced to contradict the testimony for the prosecution is obviously a very different thing from hearing witnesses for the purpose of explaining matters referred to by the witnesses for the government."

---

[24] Ahmed's citation to an out-of-circuit decision denying certification when the fugitive had been granted asylum in the United States (Doc. 200, at 41-42) does not establish otherwise. In *United States v. Porumb*, the court concluded—incorrectly—that mandatory language in the Refugee Act, that "the Attorney General shall not remove or return [an] alien [granted asylum under the Act] to the alien's country of nationality," prohibits such an alien's extradition to that country. 420 F. Supp. 3d 517, 524 (W.D. La. 2019). Notably, the Refugee Act does not prohibit the Secretary of State from returning an asylee. But even if *Porumb* were rightly decided, no similar federal law prohibits the return of a refugee like Ahmed who has not been granted asylum.

*Collins v. Loisel*, 259 U.S. 309, 316-17 (1922). Ahmed claims (Doc. 200, at 51-53) that this rule infringes on (1) his right to due process and (2) his liberty interest against non-refoulement. He is incorrect.

*First*, given the limited scope and nature of an extradition proceeding (*see* Doc. 211, at 1-2), a fugitive sought for extradition is not entitled to the rights available in a criminal trial. *Neely*, 180 U.S. at 123; *accord Charlton*, 229 U.S. at 461. While a fugitive has certain due process rights in an extradition proceeding, those rights are highly circumscribed. *See, e.g.*, *Neely*, 180 U.S. at 122; *Jhirad v. Ferradina*, 526 F.3d 478, 482 (2d Cir. 1976). In particular, the federal extradition statute, 18 U.S.C. § 3184, provides the process to which a fugitive facing potential extradition is entitled: notice in the form of a "complaint made under oath, charging [him or her] . . . with having committed [foreign crimes covered by the applicable treaty]," as well as a hearing at which "evidence of criminality may be heard and considered" to determine whether such evidence is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see Escobedo v. United States*, 623 F.2d 1098, 1105 (5th Cir. 1980) ("These statutory provisions [set forth in 18 U.S.C. § 3184] safeguard the fugitive's due process rights."); *In re Extradition of McMullen*, 989 F.2d 603, 612 (1993) ("Before [a] determination [regarding surrender] is made, [a fugitive] is entitled to the due process protections of an extradition proceeding, including notice in the form of a 'complaint . . .' as well as a hearing at which 'evidence of criminality may be heard and considered.'") (quoting 18 U.S.C. § 3184).

Thus, a fugitive has no due process right to present contradictory evidence at his extradition hearing. For this reason, an extradition court has "discretion" whether to admit evidence offered by a fugitive. *Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir. 1978). And even the "wrongful exclusion of specific pieces of evidence, however important, does not render [a fugitive's] detention illegal." *Collins*, 259 U.S. at 316; *see also Charlton*, 229 U.S. at 457 ("Mere errors in the rejection of evidence are not subject to review by a writ of habeas corpus.").

*Second*, Ahmed fails to explain why the protection against non-refoulement under

- 44 -

1967 United Nations Protocol Relating to the Status of Refugees (the "Protocol")[25] guarantees him the right to present certain evidence at an extradition hearing. But even if it did, the obligations under the Protocol are not self-executing and thus are not judicially enforceable. *See, e.g.*, *Barapind v. Reno*, 225 F.3d 1100, 1107 (9th Cir. 2000) ("[T]he Protocol was not intended to be self-executing, and serves only as a useful guide in determining congressional intent in enacting the Refugee Act."); *Haitian Refugee Ctr. v. Baker*, 949 F.2d 1109, 1110 (11th Cir. 1991) ("The language of the Protocol and the history of the United States' accession to it leads to the conclusion that Article 33 is not self-executing and thus provides no enforceable rights to the Haitian plaintiffs in this case.").

Accordingly, the Court should follow the mandate of the Supreme Court to exclude any contradictory evidence that may be offered by Ahmed.

## VIII. **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court certify Ahmed's extradition to the Secretary of State for possible surrender to Iraq.

RESPECTFULLY SUBMITTED this 14th day of May, 2021.

GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

*s/ Todd M. Allison*
TODD M. ALLISON
DAVID A. PIMSNER
RACHEL C. HERNANDEZ
DIMITRA H. SAMPSON
Assistant United States Attorneys

---

[25] *See* Convention Relating to the Status of Refugees, art. 33(1), July 28, 1951, 189 U.N.T.S. 137 ("No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.").

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing documents, and sent the attached document to the following registrant(s):

Jami Johnson
Dan Kaplan
*Counsel for Ali Yousif Ahmed Al-Nouri*

*s/ Norma Hernandez*
United States Attorney's Office