WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In the Matter of the Extradition of Ali Yousif Ahmed Al-Nouri a/k/a Ali Youssef Ahmed Al-Nouri, Ali Ahmed, Ali Yousif Ahmed Al Noori, Ali Yousif Ahmed Nouri, Ali Al-Daleme, Ali Yousif Ahmed Al-Mahmadi, Ali Yousif Ahmed, and Ali Yousif Nouri. | No. MJ-20-08033-PHX-MTM<br><br>**ORDER** |

Extradition proceedings have been initiated against Ali Yousif Ahmed Al-Nouri ("Ahmed").[1] The Magistrate Judge ordered him detained and denied a motion to reopen the detention hearing. (Docs. 110, 179.) Ahmed now moves this Court for *de novo* review of the Magistrate Judge's detention order and the order denying a rehearing. (Doc. 182.) The Motion will be denied for the following reasons.[2]

**I.  BACKGROUND**

Ahmed is 42 years old and was born in Iraq. (Doc. 14.) In the late 2000s, Ahmed entered Syria as a refugee. (*Id.*) While in Syria, Ahmed applied for admission to the United States, which was approved in 2009. (*Id.*) Ahmed immigrated to the United States and became a naturalized citizen in mid-2015. (*Id.*) Ahmed has thirteen brothers and sisters, who all reside in Ukraine, Austria, Turkey, or Iraq. (*Id.*) Ahmed traveled to Turkey in 2017 and occasionally travels to Mexico. (*Id.*) He is also married, has a son, and owns a house. (Doc. 207 at 15–16.)

---

[1] Several docket entries have been filed under seal. The Court will not, in this Order, disclose any sealed information.
[2] Both parties have fully briefed the issues and oral argument would not have aided the Court's decisional process. *See Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998); *see also* LRCiv 7.2(f); Fed. R. Civ. P. 78(b).

After immigrating to the United States, Ahmed assisted the Marine Corps, helping prepare military personnel headed to the Middle East by serving as a cultural advisor and engaging in role-playing exercises. (Doc. 14.) In 2017, Ahmed was approached by federal law enforcement officials to ask him about his time in Iraq and any possible connections that he may have with Al Qaeda or ISIS. (Doc. 182 at 2.) Ahmed spoke freely with these officials and explained that he had supported the United States military and that he did not support these terrorist organizations. (*Id.*)

The Republic of Iraq issued a warrant for Ahmed's arrest in May 2019. (Doc. 3-3 at 49.) In October 2019, pursuant to an extradition treaty, 49 Stat 3380 (Apr. 28, 1936), Iraqi officials submitted a request for Ahmed's extradition. (*Id.* at 2.) Ahmed has been charged with two counts of premeditated murder in violation of Article 406(1)(A) of the Iraqi Penal Code No. 111. These charges are punishable by life in prison or death.

According to the Extradition Complaint and its accompanying Exhibit B (Docs. 3, 3-3, 3-4), Ahmed is alleged to have been a leader of an Al-Qaeda terrorist group in Fallujah.[3] It is further alleged that, in 2006, his group planned and executed two separate operations to kill Iraqi police officers. An eyewitness to the first incident reported that, Ahmed approached an officer in the Fallujah Police Directorate with his gun drawn. Another member of the terrorist group told Ahmed to step back and shot the officer multiple times with an AK-47, killing him. The eyewitness identified Ahmed as the leader of the armed group.

Concerning the second operation, two eyewitnesses reported that Ahmed and other members of his group performed a drive-by shooting that killed another Fallujah Police Directorate officer and two bystanders. Two individuals witnessed the attack and identified Ahmed as one of the shooters. One of the witnesses identified Ahmed in a multi-photograph lineup.

In 2006, one of the members of Ahmed's alleged terrorist group was captured by coalition forces and turned over to the Iraqi police. This person admitted to being part of

---

[3] Ahmed objects to these facts and contends these are "unreliable, untrustworthy, and highly dubious allegations." (Doc. 207 at 7.)

the Al-Qaeda group that killed the two officers and identified Ahmed as the leader. He provided additional details about both operations including details concerning Ahmed's role.

## II. PROCEDURAL HISTORY

In January 2020, the United States filed a complaint under 18 U.S.C. § 3184 requesting a warrant for Ahmed's arrest. (Doc. 3.) An arrest warrant was issued and Ahmed was taken into custody. The United States then asked for an order detaining Ahmed pending the resolution of the extradition proceedings. (Docs. 4, 11, 48, 59.) United States Pretrial Services recommended that Ahmed be detained as a flight risk and a danger to the community. (Doc. 14.)

The Magistrate Judge ordered Ahmed detained until the conclusion of the extradition proceedings. He declined to find any special circumstances that warranted his release. (Doc. 110.) Ahmed filed a notice of appeal to the Ninth Circuit and the United States moved to dismiss the appeal for lack of jurisdiction. (Docs. 112, 117, 175.) While the appeal was pending, Ahmed filed an Emergency Motion to Reopen Detention, which the Magistrate Judge denied. (Doc. 179.) The Ninth Circuit dismissed Ahmed's appeal for lack of jurisdiction. *See United States v. Al-Nouri*, 983 F.3d 1096 (9th Cir. 2020). Ahmed then filed the instant Motion.

## III. LEGAL STANDARD

This Court reviews the Magistrate Judge's detention order *de novo*. *Al-Nouri*, 983 F.3d at 1098. Extraditions are not criminal matters and the familiar standards of the Bail Reform Act, 18 U.S.C. § 3141, do not govern. *See Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir. 1984) (stating that there is a different standard for bail in extradition cases than in federal criminal cases); *In the Matter of the Extradition of Garcia*, 761 F. Supp. 2d 468, 470 (S.D. Tex. 2010) (noting that bail in extradition cases is governed by federal common law). Instead, there is a strong presumption against bail and the burden is on the relator[4] to prove both: (1) that he is neither a flight risk nor a danger to the community; and

---
[4] The term "relator" refers to the individual sought to be extradited. *See Munaf v. Geren*, 553 U.S. 674, 700 (2008).

(2) that there are "special circumstances [that] justify release on bail." *United States v. Castaneda–Castillo*, 739 F. Supp. 2d 49, 55 (D. Mass. 2010); *see also United States v. Kin–Hong*, 83 F.3d 523, 524 (1st Cir. 1996); *Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989). This presumption exists and the burden rests on the relator because of the United States' important interest in complying with its treaty obligations. "If the United States were to release a foreign fugitive pending extradition and the relator absconded, the resulting diplomatic embarrassment would have an effect on foreign relations and the ability of the United States to obtain extradition of its fugitives." *In re Extradition of Molnar*, 182 F. Supp. 2d 684, 687 (N.D. Ill. 2002).

"The term 'special circumstances' has never been precisely defined and courts have addressed on a case by case basis particularly sufficient circumstances that would reverse the strong presumption against bail." *Matter of Extradition of Maniero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996). Special circumstances include, for example, "the raising of substantial claims upon which the appellant has a high probability of success, a serious deterioration of health while incarcerated, and unusual delay in the appeal process." *Salerno*, 878 F.2d at 317 (citations omitted). Additionally, the combination of several factors can constitute special circumstances that justify bail pending extradition proceedings. *In re Matter of Extradition of Morales I*, 906 F. Supp. 1368, 1373 (S.D. Cal. 1995); *Nacif-Borge*, 829 F. Supp. at 1216. The party seeking release must establish that special circumstances exist, at a minimum, by a preponderance of the evidence.[5] *Santos v. Thomas*, No. CV 11-06330 MMM, 2012 WL 12964319, at *2 (C.D. Cal. June 29, 2012).

Whether the relator is a flight risk or is a danger to the community are separate questions from whether special circumstances exist. *Salerno*, 878 F.2d at 318; *Matter of Extradition of Carr*, No. 20 CR 370, 2020 WL 4816052, at *2 (N.D. Ill. Aug. 18, 2020).

---

[5] The standard by which a relator must establish "special circumstances" is not entirely clear. Many courts have required clear and convincing evidence. *See, e.g.*, *United States v. Ramnath*, 533 F. Supp. 2d 662, 671 (E. D. Tex. 2008); *Maniero*, 950 F. Supp. at 294–95; *Nacif–Borge*, 829 F. Supp. at 1214–15. Other cases have required only a preponderance of the evidence. *See, e.g.*, *In re Extradition of Santos*, 473 F. Supp. 2d 1030, 1036 n.4 (C. D. Cal. 2006); *Garcia v. Benov*, No. CV 08-07719 MMM, 2009 WL 6498194, at *3 (C.D. Cal. Apr. 13, 2009). This Court need not resolve that disagreement because, as analyzed below, Ahmed cannot satisfy his burden under either standard.

"Indeed, courts have observed that *any* risk of flight is too significant a risk." *In re Extradition of Nezirovic*, No. 7:12 MC39, 2012 WL 5842945, at *4 (W.D. Va. Nov. 19, 2012) (citations omitted). Thus, even if Ahmed can show special circumstances, he must also show that the he is not a flight risk or a danger to the community.

## IV. DISCUSSION

Ahmed first challenges his detainment by arguing that the special circumstances requirement violates the Due Process of the Fifth Amendment. (Doc. 182.) If he cannot succeed on that ground, Ahmed must satisfy the test applied in *Salerno*. He advances five special circumstances: (1) an extreme delay in Iraq's prosecution and request for extradition; (2) the likelihood of success on the extradition's merits; (3) Ahmed's assistance to the United States military; (4) the protracted duration of the litigation; and (5) the COVID-19 pandemic. (*Id.*) Finally, even if Ahmed proves special circumstances, he must also show that he is not a flight risk or a danger to the community. Ahmed contends he satisfies both parts of that final step. (*Id.*) The government opposes each of these grounds and contends that Ahmed should remain detained. (Doc. 190.) The Court will first address the due process argument.

### A. Due Process

To support his contention that the special circumstances requirement violates due process, Ahmed relies solely on a withdrawn Ninth Circuit opinion, *Parretti v. United States*. 122 F.3d 758 (9th Cir. 1997), *withdrawn on reh'g en banc*, 143 F.3d 508 (9th Cir. 1998) (en banc). *Parretti* found the special circumstance requirement to be unconstitutional because a "Fifth Amendment liberty interest trumps the government's treaty interest unless the government proves to the satisfaction of the district court that [the relator] is a flight risk." *Id.* at 780. An en banc Ninth Circuit court, however, withdrew this opinion and the dismissed the relator's appeal on other grounds.[6] *See Parretti*, 143 F.3d at 508. Thus, *Parretti*'s initial finding that the special circumstance requirement violates due process is not binding law on this Court.

---

[6] The irony is not lost on this Court that, once released on bail, the relator absconded. *See Parretti*, 143 F.3d at 510–11.

Ahmed has not pointed to a single case in which a court has found a due process violation of this nature. To the contrary, Ninth Circuit cases that remain good law have found that a relator must prove special circumstances to be released on bail. *See, e.g.*, *In re Extradition of Kirby*, 106 F.3d 855, 858 (9th Cir. 1996); *Salerno*, 878 F.2d at 317. This requirement derives from the United States Supreme Court's decision in *Wright v. Henkel*, which first recognized the presumption against bail in extraditions and that only "special circumstances" will justify bail. 190 U.S. 40, 63 (1903). This Court therefore follows binding Ninth Circuit precedent, as well with every single decision decided after *Parretti*, that requires a relator to have the burden of proving special circumstances.

Even if this Court were to accept *Parretti*'s conclusion that requiring a showing of special circumstances violates due process, that holding would not impact this case. *Parretti* specified that there would be due process issues "unless the government proves to the satisfaction of the district court that [the relator] is a flight risk." 122 F.3d at 780. As analyzed below, *see infra*, Section IV.C, Ahmed poses a flight risk. Accordingly, the Court declines to hold that requiring Ahmed to show special circumstances violates due process.

    **B.**    **Special Circumstances**

        **1.**    **Extreme Delay**

Ahmed first contends that Iraq's fourteen-year delay in filing its extradition request qualifies as a special circumstance. (Doc. 182 at 6–7.) He relies heavily on *Wroclawski v. United States*. 634 F. Supp. 2d 1003 (D. Ariz. 2009). There, in 1994, Polish authorities charged Wroclawski with bank fraud and theft. *Id.* at 1008. The Polish government, however, "did not seek his extradition until 2006." *Id.* The court found this "unexplained" eleven-year delay between Poland's charging and the extradition request to be a special circumstance. *Id.* That is not the case here. The appropriate timeframe begins when Iraq first charged Ahmed and issued an arrest warrant. That happened in May 2019. (Doc. 3-3 at 49.) Five months later, in October 2019, Iraq submitted its extradition request. (*Id.* at 2.) This five-month period between Ahmed's charging and the extradition request is not comparable to *Wroclawski*'s eleven-year delay. *Wroclawski* is therefore inapposite.

What Ahmed seems to argue is that the delay between the offense in 2006 and his charging in 2019 constitutes a special circumstance. (Doc. 182 at 6.) That argument is unpersuasive. *See In the Matter of the Extradition of Drumm*, 150 F. Supp. 3d 92, 99 (D. Mass. 2015) (rejecting delay as a special circumstance where the crime was actively investigated and it was not clear that the requesting country had a lack of urgency in charging the relator). Iraq began the investigation in 2006. (*See, e.g.*, Doc. 3-3 at 81–82, 91.) The record indicates that Iraqi authorities actively investigated the killings through 2010. (*See, e.g.*, *id.* at 95–100; Doc. 3-4 at 4–5.) In 2010, one of the cooperators performed a "walk through" with authorities to talk about the killings and other aspects related to the ongoing investigation. (*See, e.g.*, Doc. 3-3 at 85–86.) The record does not contain much information on law enforcement activity from 2010 through 2018. But, in 2019, the record shows that witnesses came forward to further identify Ahmed as a party involved in the murders. (Doc. 88 at 79–81.) The Court also agrees with the Magistrate Judge's finding that Ahmed's decision to relocate to Syria and the United States could have impacted any delay issuing an arrest warrant and an extradition request. *See Drumm*, 150 F. Supp. 3d at 99. Ahmed has not provided any evidence that Iraqi authorities idled away fourteen years after the alleged offenses. Courts consistently decline to find a special circumstance in situations like this. *See Carr*, 2020 WL 4816052, at *4–5 (collecting cases). Considering the evidence, the Court does not find that Ahmed has met his burden to prove this special circumstance.

### 2. Likelihood of Success

A relator's "high probability of success" on the merits can be a special circumstance. *Salerno*, 878 F.2d at 317. Article III of the treaty between Iraq and the United States bars the extradition of an individual "for crimes of a political character." (Doc. 3-3 at 16.) This appears to be a common feature of many treaties; thus, a body of case law has developed the "political offense" exception to extradition. *See Quinn v. Robinson*, 783 F.2d 776, 792–804 (9th Cir. 1986). Ahmed argues that he is likely to succeed quashing the extradition request under the political offense exception. (Doc. 182 at 7–9.) Ahmed criticizes the

Magistrate Judge for declining to address the merits of this argument because he considered this "not relevant to the detention issue." (*Id.* at 9.) The Magistrate Judge correctly recognized that given the political offense exception is highly factual, courts caution addressing the merits of this defense before the extradition hearing. *See, e.g.*, *United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 63 (D. Mass. 2010) ("The viability of this defense cannot be determined absent a fact-specific inquiry which, like the probable cause analysis described above, must await further development of the record."). Although the Magistrate Judge did not provide a detailed merits analysis, he noted that he reviewed the entire record before finding that Ahmed could not meet his burden to show a likelihood of success. (Doc. 110 at 6.) In any event, this Court reviews this issue *de novo* and agrees with Ahmed that a more detailed analysis is needed to determine whether he has proven a high probability of success on the political offense exception.

Courts evaluate the political offense argument under a two-pronged test. The first part requires that at the time and place of the charged offense "there be an 'uprising,' 'rebellion,' or 'revolution.'" *Quinn*, 783 F.2d at 806. Under the second prong, the relator must show that the charged conduct be "in the course of," "connected to," or "in furtherance of" the uprising. *Id.* at 809. The relator has "the burden of showing a factual nexus between the crime and the political goal." *Barapind v. Enomoto*, 400 F.3d 744, 751 (9th Cir. 2005) (en banc). Although this exception is a mixed question of law and fact, *Quinn*, 783 F.2d at 791, the determination is fairly fact intensive. *See, e.g.*, *Venckiene v. United States*, 929 F.3d 843, 850, 854 (7th Cir. 2019).

As to the first prong, Ahmed argues that the charged homicides took place when "there was an active 'uprising' or 'rebellion' against the 'occupying power' in Iraq." (Doc. 182 at 8.) *Quinn* specified that this prong "does not cover terrorism or other criminal conduct exported to other locations" nor can it "be based on violence committed by persons who do not reside in the country or territory in which the violence occurs." 783 F.2d at 813–14. The report that Ahmed relies on reveals that Al Qaeda is a transnational organization that is comprised of foreign fighters. (Doc. 182 at 8 n.2.) It also notes that Al

1  Qaeda urged "Muslims across the globe to travel to Iraq to fight." (*Id.*) That Ahmed's alleged terrorist group was likely comprised of foreign fighters undercuts his contention that Al Qaeda's involvement satisfies the first prong.

For the second requirement, he contends that there was a sufficient nexus between the crime and the political goal because he was the supposed leader of an Al Qaeda group that specifically targeted police officers.[7] (*Id.* at 8–9.) First, it is not clear whether a terrorist group's killings of police officers would be the kind of act needed to satisfy this test. Ahmed has not met his burden to prove that Al Qaeda's goals and objectives are political in nature or that the killings were incidental to a political uprising at the time of the offenses. (Doc. 190 at 16–17.) There is also not enough evidence in the record to show that Ahmed had the necessary motive. *See, e.g.*, *Barapind*, 400 F.3d at 752. In fact, as the United States notes, there is evidence that each conspirator received 50,000 Iraqi Dinar for their role in the first shooting, which cuts against a finding that the crime related to a political goal. (Doc. 3-3 at 78, 81.) These issues show that Ahmed cannot meet his burden to prove a high probability of success on this exception.

To the extent that Ahmed argues that the evidence against him fails to meet the probable cause standard, the Court also does not find that persuasive. As noted above, the evidence includes multiple eyewitnesses and corroborators that were part of the same Al-Qaeda group allegedly involving Ahmed. The Court therefore finds that Ahmed has not met his burden to show a likelihood of success on his extradition claims.

### 3. Military Assistance

Ahmed has provided occasional assistance to the United States military. (Doc. 182 at 9.) He served as a cultural advisor to Marines deploying to the Middle East. He also participated in role-playing exercises to support military members' assimilation in foreign territories. As proof of his conduct, Ahmed offers a letter of commendation from a military officer who observed his conduct. (Doc. 60 at 18, 31.)

---

[7] Ahmed clarifies that he does not admit to any of these allegations but argues the political offense exception applies assuming "the truth of the allegations set forth in the complaint." (Doc. 182 at 8.)

Ahmed again points to *Wroclawski* on this issue. *Wroclawski* is one of the few cases that finds aiding military and law enforcement personnel can establish a special circumstance. 634 F. Supp. 2d at 1007–08. The court there found that a relator's unique wrestling skills offered military and law enforcement "specific and unequaled assistance." *Id.* at 1007. That assistance, preparing the officers and soldiers for hand-to-hand combat, was a unique circumstance that was not shared by all individuals facing extradition. *Id.* at 1008.

The Court agrees that Ahmed's assistance was a selfless act, however, it was not the kind of unique circumstances presented in *Wroclawski*. First, Ahmed's assistance did not involve the kind of "specific and unequaled assistance," like the experienced wrestler's combat assistance in *Wroclawski*. (*See* Doc. 190-1 (sealed).) Next, accepting any assistance that is somewhat unique to a relator would dilute beyond efficacy the value of what constitutes a special circumstance. The Court does not consider Ahmed's help trivial or inconsequential, but it does not agree that it is a special circumstance.

### 4. Duration of the Litigation

Ahmed next argues that "[t]he fact that the litigation of the extradition matter is likely to continue for a protracted period of time may be a 'special circumstance.'" (Doc. 182 at 10.) He advances two reasons. First, Ahmed contends that COVID-19 has impaired his legal team's ability to conduct an adequate investigation in Iraq, which would include interviewing witnesses and gathering other relevant information. (*Id.* at 10–12.) Second, he argues that given the complexity of this case, the litigation process, including habeas petitions and appeals, would potentially take years to complete. (*Id.* at 12–13.)

As to his first argument, courts have recognized that gathering evidence and conferring with witnesses are circumstances common to all relator's situations. *See In re Extradition of Smyth*, 976 F.2d 1535, 1535–36 (9th Cir. 1992); *Matter of Extradition of Blasko*, No. 1:17-mc-00067-DAD-SAB, 2018 WL 3691859, at *6 (E.D. Cal. Aug. 1, 2018). The Ninth Circuit has found that, "although important," the need to conduct a foreign investigation is not a special circumstance because "all incarcerated defendants

need to do these things." *Smyth*, 976 F.2d at 1535–36. Further, any delay that this investigation might cause would be attributed to Ahmed's "own tactical actions," which "do not amount to a special circumstance." *Blasko*, 2018 WL 3691859, at *6.

Ahmed's next argument is equally ineffective. To date, nothing in these proceedings suggest that the litigation has been, or will be, protracted in an unordinary way. The Magistrate Judge was quick to schedule a bail hearing and expedite the proceedings. Nor is there any reason to conclude that the governments of Iraq or the United States have protracted this litigation. *See United States v. Risner*, No. 3:18-mj-765-BN, 2018 WL 6809796, at *18 (N.D. Tex. Dec. 27, 2018). Ahmed's argument that future proceedings—habeas corpus and appeals—will continue this action for years and therefore provides a special circumstance is without merit. The "normal passage of time inherent in the litigation process," even in complex cases, does not constitute a special circumstance. *Matter of the Extradition of Budrys*, No. 19 M 179, 2019 WL 1958566, at *3 (N.D. Ill. May 2, 2019). It is Ahmed's right to exhaust all possible remedies if he is found extraditable but following the normal course of litigation does not satisfy his burden to prove a special circumstance. The Court therefore finds that Ahmed has not satisfied his burden to show that these proceedings will be protracted in an unordinary way.

### 5. COVID-19 Pandemic and Health Concerns

The final alleged special circumstance relates to Ahmed's personal health issues and the COVID-19 pandemic. (Doc. 182 at 13–16.) There is no dispute between the parties that Ahmed has health issues that puts him in a high-risk category for contracting COVID-19. Ahmed also notes that he "was infected with COVID-19 at the facility and ultimately recovered." (Doc. 182 at 15.) Ahmed now worries about potential variants coming into the facility. (*Id.*) The government and CoreCivic officials have outlined the facilities' attempts to best deal with the pandemic, including screening protocols, visitation changes, and other ways to limit inmate's risk of infection. (*See, e.g.*, Doc. 88 at 20, 48.) As Ahmed notes, CoreCivic is currently administering vaccinations. (Doc. 207 at 15.)

The Court agrees with the Magistrate Judge's conclusion that the general risk of

COVID-19 to all individuals in detention weighs against a finding of special circumstances. *See Valentino v. U.S. Marshal*, No. 4:20-CV-304, 2020 WL 1950765, at *2 (S.D. Tex. Apr. 15, 2020) (finding a lack of evidence of immediate danger to the relator supports finding that COVID-19 is not a special circumstance). This Court has very carefully considered Ahmed's personal health issues as they relate to the pandemic, but merely being susceptible to contracting this virus does not constitute a special circumstance. *See Risner v. Fowler*, 458 F. Supp. 3d 495, 500–05 (N.D. Tex. 2020) (concluding that risk of contracting virus was not a "special circumstance" even for defendant with underlying health conditions). Courts, generally, have declined to find COVID-19 a special circumstance. *See, e.g.*, *In the Matter of the Extradition of Joseph Anthony Bell*, No. 21-MC-80533-UNA, 2021 WL 1616127, at *6 (S.D. Fla. Apr. 26, 2021); *Matter of Extradition of Mednard*, No. 21-MJ-39 (RER), 2021 WL 1264260, at *3 (E.D.N.Y. Apr. 5, 2021). This Court agrees.[8]

### 6. Circumstances as a Whole

If no single reason can justify a special circumstance, some courts look at the circumstances as a whole to determine whether that would meet the required threshold. *See, e.g.*, *Carr*, 2020 WL 4816052, at *7. Weighing Ahmed's burden to show special circumstances, along with the government's significant interest in fulfilling its treaty obligations, the Court is not persuaded that any single reason, nor a combination of those reasons, would constitute a special circumstance.

### C. Flight Risk and Danger to the Community

Although Ahmed's Motion fails without a special circumstance, the Court will independently assess the flight risk and danger to the community factors. Assuming that Ahmed did show special circumstances, or a combination thereof, he still has the burden to prove that he is not a flight risk or a danger to the community. In evaluating risk of flight in the extradition context, courts have considered a defendant's foreign connections, age, financial means, and the seriousness of the offenses. *See Matter of Extradition of Ricardo*

---

[8] Ahmed also asks that this Court consider the risk from "the collateral consequences to his health [from] CoreCivic's ongoing denial of routine medical care." (Doc. 207 at 15.) The Court finds that Ahmed has failed to provide specific evidence to overcome his burden on this issue.

*Alberto Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1304 (S.D. Fla. 2017).

Ahmed has substantial foreign connections. He was born in Iraq and lived there for many years. He resided in Syria before he relocated to the United States. Ahmed has thirteen brothers and sisters, who all reside in Ukraine, Austria, Turkey, or Iraq. (Doc. 14.) Ahmed traveled to Turkey in 2017 and occasionally travels to Mexico. (*Id.*) Ahmed, who is in his mid-forties, now faces life in prison and possibly death if the allegations against him are proven. His familiarity with international travel, foreign connections, and ability to engage in international travel weigh in favor of finding that he poses a flight risk.

There are some facts supporting Ahmed's contention that he is not a flight risk. For example, he has lived in the United States for many years and has "been on notice for years that he was under investigation." (Doc. 182 at 16.) He also has strong community ties, is married, and has a child. (*Id.* at 17.) Courts, however, have found that similar situations do not mitigate risk of flight. *See Berrocal*, 263 F. Supp. 3d at 1305 (finding that a relator with very strong community ties, connections with foreign countries, and who is facing serious charges someone who poses a flight risk); *United States v. Snyder*, No. 13-7082-MJ, 2013 WL 1364275, at *1 (D. Ariz. Apr. 3, 2013) (holding that the relator's ties to the community, including owning a home, and caring for her eleven-year-old step daughter, were not enough to overcome her risk of flight). The Court is also aware of the government's argument that when Ahmed came to the United States, he apparently made several false statements to immigration and law enforcement. (Doc. 88 at 113–14.) Considering the severity of the offenses, his foreign connections, and the other circumstances, the Court concludes that Ahmed poses a risk of flight. *See Bell*, 2021 WL 1616127, at *7 (finding the relator, a United States citizen, to be a flight risk after considering the severity of his charges, significant foreign ties, and that he left the country where the offense took place shortly after the incident).

Ahmed contends that he is not a danger to the community. (Doc. 182 at 17.) He notes that he has lived in the United States for eleven years without committing a crime and has numerous people attesting "to his peaceful and law-abiding nature." (*Id.*) This

- 13 -

Court understands these arguments but cannot overlook that Ahmed is alleged to have killed two law enforcement officials while affiliated with a terrorist organization. Ahmed's lack of criminal history in this country "does not outweigh the seriousness of the allegation." *See Bell*, 2021 WL 1616127, at *7 (citations omitted). The government has also noted that, through Ahmed's own admission, he spent time in Syrian prison after he left Iraq for unknown reasons. (Doc. 88 at 103–04.) The Court agrees that this arrest and other circumstances around this time add to the risk of danger. (*See* Doc. 59, Exs. B–E (sealed).) Although Ahmed has lived in the United States without engaging in criminal activity, other facts and the allegations against him lead this Court to conclude that Ahmed is a danger to the community.

*    *    *

Ahmed has not satisfied his burden on all three independent grounds that he must establish for bail—special circumstances, flight risk, and danger to the community. Even if he were to satisfy one or two of those categories, he cannot provide the necessary showing for all three. The Court understands Ahmed's sympathetic positions and arguments that the Iraq government has fabricated this entire story, however, at this stage of the proceedings, the Court finds that he should continue to be detained.

## V. CONCLUSION

Accordingly,

**IT IS ORDERED** denying Ahmed's Motion to Revoke Detention Order (Doc. 182) and ordering that he continue to be detained during extradition proceedings.

Dated this 20th day of May, 2021.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge