JON M. SANDS
Federal Public Defender
DANIEL L. KAPLAN, AZ Bar #021158
RUBEN IÑIGUEZ, CA Bar #145196
District of Arizona
850 W. Adams, Suite 201
Phoenix, Arizona 85007
Telephone: 602-382-2700
*Attorneys for the Relator*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In the Matter of the Extradition of<br>Ali Yousif Ahmed Al-Nouri. | No. MJ-20-08033-PHX-MTM<br><br>**RELATOR'S MOTION TO RECONSIDER RULING BARRING IMPEACHMENT OF EXPERT WITNESSES** |

The Relator, Ali Yousif Ahmed Al-Nouri (Mr. Al-Nouri), by and through undersigned counsel, respectfully moves this Court to reconsider its ruling, issued orally during the extradition hearing held on July 15, 2021, barring each party from impeaching the other's expert witness.

I.      **Factual Background**

As the Court is aware, the issues presented in this case involve complex questions requiring an understanding of matters outside of common knowledge, including the nature and status of Al Qaeda in Iraq (AQI) and its relationship to other uprising groups in 2006, as well as the structure and workings of Iraq's judicial and criminal justice systems. In light of the importance of these questions, each party retained an expert witness. The government retained U.S. Naval War College professor Craig Whiteside, and Mr. Al-Nouri retained University of Pittsburgh School of Law professor Haider Ala Hamoudi. (Docs. 199-2, 200-3.) The parties exchanged the

experts' reports before filing their extradition briefs. (Doc. 199 at 19 n.7.) The parties then attached the reports to, and cited them extensively in, their briefs. (Docs. 199, 199-2, 200, 200-2, 200-3.)

Among the opinions of Professor Whiteside that the government claims undermines the applicability of the "political offense" exception to extradition is his assertion that AQI "cannot in any level of accuracy be described as an 'indigenous group.'" (Doc. 199-2 at 6.) The government argues that Professor Whiteside's description of AQI as a non-indigenous group undermines the conclusion that an insurgency, as described in *Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986), was underway in Iraq in 2006. (Doc. 199 at 18-21.)

Professors Whiteside and Hamoudi were both present at the extradition hearing. Mr. Al-Nouri noticed Professor Hamoudi as his only witness (Doc. 260), while the government informed the Court at the beginning of the hearing that Professor Whiteside was present, but it had not decided whether it would call him to the stand.

At the outset of the hearing, the Court informed the parties that neither would be permitted to impeach the other's expert witness. The Court explained that its ruling was based on language from the Ninth Circuit's opinion in *Santos v. Thomas*, 830 F.3d 987 (9th Cir. 2016) (en banc). Counsel for Mr. Al-Nouri objected, arguing that the pertinent language from *Santos* related to the impeachment of fact witnesses, rather than expert witnesses. The Court disagreed, and adhered to its ruling.

The ruling apparently took both parties by surprise, as each came to the hearing prepared to impeach the other's expert. The government brought materials that it maintained undermined Professor Hamoudi's opinions – and presented some of them, until the Court sustained Mr. Al-Nouri's objection that this violated its ruling. Mr. Al-Nouri's counsel brought materials that might have been used to impeach Professor Whiteside, including video excerpts from his comments at a "Constructions of Terrorism" panel discussion held at the Stimson Center on April 27, 2016 (https://youtu.be/0-7M-UqaX98) (Stimson Center Panel), and his more recent

2

statements on a video podcast broadcast by the International Institute for Counter-Terrorism on May 2, 2021 (https://www.youtube.com/watch?v=bopLlAxtBjk) (ICT Podcast). The excerpts, which are being filed as exhibits herewith, include Professor Whiteside making the following statements:

1. By 2006, the Islamic State movement – which until the end of 2006 took the form of AQI – was "almost exclusively Iraqi" and a "completely Iraqi, indigenous and supported organization" (Stimson Center Panel at 14:33 – 14:54);

2. In reference to the Islamic State movement, "I promise you the group was Iraqi," and "it was somewhat popular, mostly through the connections of the Salafi underground movement prior to the fall of Saddam" (*id*. at 29:12 – 30:19);

3. The Islamic State was an overlapping group of networks comprised "mostly" of the "Salafi network" that "existed in Iraq prior to 2003" (*id*. at 30:47 – 31:03);

4. The Islamic State has been "incorrectly described as an ex-Ba'athist cabal that invaded Iraq from Syria," and that it is "better understood as a revolutionary movement" that has "deep roots in the population" (*id*. at 04:03 – 04:24); and

5. After Abu Mus'ab al-Zarqawi's death in 2006, "large numbers" of the leaders and mid-ranking personnel of other "jihadi resistance groups" in Iraq joined AQI (which was "soon to become the Islamic State") (ICT Podcast at 12:36 – 14:04).

The Court permitted Mr. Al-Nouri's counsel to play two clips from the Stimson Center panel, but only for the purpose of eliciting Professor Hamoudi's agreement with Professor Whiteside's statements. When the government subsequently elicited Professor Whiteside's testimony that he had changed his mind since making the statements

3

expressed in these clips, the Court's ruling barred Mr. Al-Nouri's counsel from cross-examining him as to this or any other matter. Professor Hamoudi likewise testified without undergoing any cross-examination by the government.

## II.     Argument

Mr. Al-Nouri respectfully asks the Court to reconsider its ruling regarding the impeachment of expert witnesses. Mr. Al-Nouri understands the Court's ruling to rest on a sentence in *Santos* which states that a relator in an extradition case "may not impeach government witnesses or produce witnesses whose testimony contradicts evidence already offered by the government." *Santos*, 830 F.3d at 993. As Mr. Al-Nouri's counsel indicated in objecting to the ruling, Mr. Al-Nouri believes that this statement is intended to refer to the impeachment of fact witnesses, rather than expert witnesses. Mr. Al-Nouri submits that this is evident from an examination of the context in which the sentence appears.

The sentence appears in a discussion of the principles governing the litigation of the factual portion of an extradition proceeding – *i.e.*, the extradition court's determination as to "whether there is evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or, in other words, whether there is probable cause." *Id*. at 991 (internal quotation marks omitted). The Ninth Circuit convened the en banc panel in *Santos* to address a question regarding the admissibility of a particular type of evidence in connection with this probable cause showing – specifically, "to determine the admissibility in an extradition hearing of evidence suggesting that other evidence presented in the hearing was obtained through coercion or torture." *Id*. at 990. The evidence in question consisted of statements by fact witnesses to the effect that their prior incriminating statements, which the government had offered in support of a probable cause finding, had been procured through torture or coercion. *See id*. at 997-99. Expert witnesses are not mentioned in the opinion.

In an introductory section captioned "The Extradition Process," the court describes the general principles that regulate the litigation of the probable cause

question. *Id*. at 990-93. These principles are generally designed to prevent the extradition case from becoming a mini-trial on the relator's factual guilt, which is to be determined in the requesting country's courts if he is extradited. *Id*. at 991-92. In the paragraph preceding the one in which the pertinent sentence appears, the court notes that one such principle permits the relator to introduce evidence that "*explain[s]* matters referred to by the witnesses for the government," but not evidence that "merely *contradict[s]* the testimony for the prosecution." *Id*. at 992 (emphases added, internal quotation marks omitted). The court cites an earlier opinion for the proposition that extradition courts do not "weigh conflicting evidence in making their probable cause determinations." *Id*. (internal quotation marks omitted).

The next paragraph, in which the pertinent sentence appears, addresses the distinction between "explanatory" and "contradictory" evidence. The court states that "explanatory" evidence "explains away or completely obliterates probable cause," whereas "contradictory" evidence "merely controverts the existence of probable cause, or raises a defense," and has been described as evidence "the credibility of which could not be assessed without a trial." *Id*. at 992-93 (internal quotation marks omitted). Thus, the court continued, "the accused may testify to things which might have explained ambiguities or doubtful elements in the government's case" – "But he may not impeach government witnesses or produce witnesses whose testimony contradicts evidence already offered by the government." *Id*. at 993. The next paragraph begins, "If the extradition court determines that there is probable cause to extradite, . . ." *Id*.

"[T]he language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979); *accord Hamad v. Gates*, 732 F.3d 990, 1000 (9th Cir. 2013) (internal quotation marks omitted) ("Unlike statutes, judicial opinions are not usually written with the knowledge or expectation that each and every word may be the subject of searching analysis."). Thus, where the "logic and context" of an opinion make clear that it is addressing a particular matter, its language should not be interpreted to reach more broadly. *Hamad*,

5

732 F.3d at 1000; *see also Reiter*, 442 U.S. at 341 (noting that passage from prior opinion should be "read on context").

Consistent with these principles, Mr. Al-Nouri respectfully submits that the context surrounding the "may not impeach" statement in *Santos* demonstrates that it relates to fact witnesses whose testimony goes to the probable cause question, and not to expert witnesses whose testimony goes to other matters. This is evident from the broader context outlined above, and also from the more immediate context of the sentence in question, in two respects.

First, interpreting the "may not impeach" statement as applicable to expert witnesses leads to illogical results. On its face, pursuant to this interpretation, the restriction would apply only to "the accused" – creating a protocol under which, even if both parties present expert testimony on an important question, only the relator's expert would be subject to impeachment. *Santos*, 830 F.3d at 993. Still more troublingly, this interpretation as applied to the second clause of the sentence would bar the relator from producing *any* expert testimony to counter a government expert, because the relator would be precluded from producing an expert witness "whose testimony contradicts" the government expert's testimony. *Id*. It is unlikely that the *Santos* court intended for such bizarre and lopsided restrictions to govern an extradition proceeding.

Second, related principles touched upon in the surrounding discussion in *Santos* also plainly do not apply to expert witnesses. It is unclear, for example, what it would mean for one expert's opinion to "explain away" or "completely obliterate" another expert's opinion, and extradition caselaw does not suggest that this is required in order for an expert's opinion to be admitted and considered. *Id*. at 992. Moreover, insofar as experts disagree on material points, the extradition court cannot avoid "weighing" their "conflicting" opinions, and there is no reason why this weighing cannot be conducted "without a trial." *Id*. at 992-93. Indeed, extradition courts can and must decide the political offense question without a trial where it is properly raised. *Quinn*, 783 F.2d at 787-90. And because the question typically involves matters outside the knowledge of

generalist judges, these courts commonly must receive and consider pertinent expert evidence in order to reach an informed decision. Extradition courts thus routinely admit, and give substantial consideration to, expert evidence. *See*, *e.g.*, *Barapind v. Amador*, No. 1:01-CV-06215 OWW, 2005 WL 2810540, at \*2, \*9-\*10 (E.D. Cal. Oct. 24, 2005); *Ahmad v. Wigen*, 726 F. Supp. 389, 395 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990). And in doing so, they have permitted cross-examination of these expert witnesses. *Barapind*, 2005 WL 2810540, at \*9 (describing experts' testimony "[o]n cross-examination").

The expert evidence is certainly important in the instant case, as it goes directly to important matters, outside the knowledge of the average layperson, that impact the key question of whether Mr. Al-Nouri's extradition is precluded by the extradition treaty's political-offense article. Because cross-examination is a crucial means of assessing such matters as an expert's "honesty, proficiency, and methodology" (*Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 321 (2009)), the Court's ruling has improperly hamstrung its ability to conduct a thorough and complete assessment of a crucial question presented in this case.

For these reasons, Mr. Al-Nouri believes the Court's ruling barring the impeachment of expert witnesses was erroneous, and highly prejudicial. Mr. Al-Nouri respectfully suggests that, if the Court agrees that the ruling was erroneous, it should convene a supplemental hearing at which each party will be permitted to present expert testimony and to cross-examine the other party's expert witness.

Respectfully submitted:    July 26, 2021

JON M. SANDS
Federal Public Defender

*s/Daniel L. Kaplan*
DANIEL L. KAPLAN
RUBEN IÑIGUEZ
*Assistant Federal Public Defenders*
*Attorneys for the Relator*

7

| | |
|---|---|
| 1 | Copy of the foregoing transmitted |
| | by ECF for filing July 26, 2021, to: |
| 2 | |
| 3 | CLERK'S OFFICE |
| | United States District Court |
| 4 | Sandra Day O'Connor Courthouse |
| | 401 W. Washington |
| 5 | Phoenix, Arizona 85003 |
| 6 | |
| 7 | TODD M. ALLISON |
| | Assistant United States Attorney |
| 8 | Two Renaissance Square |
| | 40 N. Central Ave., Suite 1800 |
| 9 | Phoenix, Arizona 85004 |
| 10 | |
| | s/ny |
| 11 | _ |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |