UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

—————————————

| | | |
|---|---|---|
| In the Matter of the | ) | |
| Extradition of | ) | No. MJ-20-8033-PHX-MTM |
| Ali Yousif Ahmed Al-Nouri, | ) | |
| | ) | Phoenix, Arizona |
| Defendant. | ) | July 15, 2021 |
| | ) | 10:00 a.m. |
| | ) | |

BEFORE:  THE HONORABLE MICHAEL T. MORRISSEY, MAGISTRATE JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

EXTRADITION HEARING

APPEARANCES:
For the Government:
         U.S. Attorney's Office
         By: TODD M. ALLISON, ESQ.
             DAVID A. PIMSNER, ESQ.
             RACHEL CRISTINA HERNANDEZ, ESQ.
         40 North Central Avenue, Suite 1800
         Phoenix, AZ  85004

         U.S. D.O.J. - Office of International Affairs
         By: REBECCA ANN HACISKI
         1301 New York Avenue NW
         Washington, DC  20530

For the Defendant:
         Federal Public Defender's Office
         By: JAMI SUZANNE JOHNSON, ESQ.
             DANIEL LEE KAPLAN, ESQ.
         850 West Adams, Suite 201
         Phoenix, AZ  85007

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

2

1                        INDEX OF WITNESSES

2    WITNESSES FOR THE        Direct    Cross    Redirect
     DEFENDANT:
3
     HAIDER ALA HAMOUDI          91
4
5    WITNESSES FOR THE        Direct    Cross    Redirect
     GOVERMENT:
6    CRAIG WHITESIDE           161

7

8                        INDEX OF EXHIBITS

9    EXHIBIT NO.:       DESCRIPTION:                 RECEIVED:

10      1    Extradition Request from the Government of
                 Iraq for Ali Yousif Ahmed Al-Nouri including
11               Declaration of Tom Heinemann, Department of
                 State, signed January 15, 2020              16
12      2    Expert Report of Professor Craig Whiteside      16
        3    Declaration of Tom Heinemann, Department of
13               State, signed July 1, 2021                  16
        4    Declaration of Tom Heinemann, Department of
14               State, signed July 1, 2021                  16
        5    Supplemental Extradition Documents from the
15               Government of Iraq                          16
        6    English translation of Supplemental Extradition
16               Documents from the Government of Iraq       16
        7    Declaration of Linguist Wafa Al-Karbouli
17               dated July 11, 2021                         16

18

19

20

21

22

23

24

25

                   UNITED STATES DISTRICT COURT

1          (Proceedings conducted through Deenatra Younan and Rima

2     Potres, interpreters.)

3               THE CLERK:  Case number 20-8033-MJ, United States of

4     America versus Ali Yousif Ahmed Al-Nouri, on for extradition

5     hearing.

6               MR. ALLISON:  Good morning, Your Honor.  Todd Allison,

7     Dave Pimsner, Rachel Hernandez, and Rebecca Haciski for the

8     United States.

9               THE COURT:  Good morning to all government counsel.

10              MS. JOHNSON:  Good morning, Your Honor.  Jami Johnson

11    and Daniel Kaplan for Ali Yousif Ahmed Al-Nouri, who is present

12    and in custody and is being assisted by an Arabic language

13    interpreter.

14              Also seated at counsel table is Renee Rivera-Thomas,

15    who is our paralegal and will be assisting with documents.

16              Before we begin, I was hoping -- I'd request that

17    Mr. Al-Nouri be unhandcuffed for this proceeding so that he can

18    take notes and work his earphones.  I talked to the government.

19    The government does not have an objection.  We would like

20    permission of the Court for Mr. Al-Nouri to be unhandcuffed.

21    He has no criminal history in the United States, no problems in

22    custody.  He's not a security threat.

23              THE COURT:  Have you run that request by the marshals?

24              MS. JOHNSON:  I have not.  My understanding is the

25    marshal's position is always that everybody has to be

1      handcuffed all the time, but --

2              THE COURT:  Mr. Marshal, I'm inclined to grant that.

3      Does that pose particular risks for you such that you would

4      have to change security for this hearing?

5              DEPUTY U.S. MARSHAL:  No, sir.

6              THE COURT:  Okay.  Then it's only the front handcuffs.

7      Is that correct, Ms. Johnson?

8              MS. JOHNSON:  That's fine.

9              THE COURT:  Okay.  Then let's go ahead and do that.

10     Okay.  With that, as I said, good morning to all counsel.

11             Are the parties ready to proceed?

12             MR. ALLISON:  The government is, Your Honor, yes.

13             MS. JOHNSON:  Your Honor, without asking the Court to

14     revisit the issue, because I understand the Court to have

15     represented that its position is firm, we would just like to

16     make clear for the record that we continue to object to holding

17     this proceeding on the grounds that we have not had an

18     opportunity to conduct an investigation because of the public

19     health situation.

20             THE COURT:  All right.  Well, your statement is in the

21     record.  Certainly we've had ample briefing on that issue, but

22     that accomplishes that purpose.

23             Let me ask, as a matter of housekeeping, the exhibits

24     to the complaint for extradition, there's a sealed version, and

25     there's an unredacted version.

1          In preparing for this, I can't recall did the defense
2     end up getting the unredacted version of those exhibits?
3          MR. ALLISON:  Yes, Your Honor.  That's a great
4     question.  The defense did get an unredacted version.  It is
5     black and white.  The original we've brought today has some
6     color to it.  But the defense did get an unredacted version --
7     I'm sorry I'm getting some feedback here -- pursuant to a
8     protective order that Your Honor issued.
9          I'll go over here, Your Honor.  Let's see if that's
10    better.
11         The United States was intending to, in its
12    presentation today, refer to the individuals in that packet not
13    by their names, by monikers that we've used in our briefing.
14    Eyewitness 1, Eyewitness 2, et cetera.
15         THE COURT:  That's fine.  Mr. Allison, let me tell you
16    the reason for my question.  In trying to determine the number
17    of witnesses that the government says it has for an event,
18    if -- I just want to make sure that I'm not double counting
19    witnesses or I understand how many people said what, because
20    some of them seem inconsistent -- if it's one witness making
21    different statements, maybe that's inconsistent -- if it's
22    separate witnesses.
23         So I'm going to need your help making sure I'm
24    tracking the number of witnesses to a particular event that the
25    government is relying on for probable cause.

1          MR. ALLISON:  I am very prepared to do that, Your

2    Honor.

3          THE COURT:  All right.  Ms. Johnson, you agree you've

4    seen the unredacted statements, so we can proceed without using

5    the names that you have access to, but we'll use the

6    terminology of Eyewitness 1 or Cooperator 1 or whatever it is?

7          MS. JOHNSON:  We have.  I have arranged our

8    presentation to avoid including material that is subject to the

9    protective order and also intend to refer to witnesses as

10   Witness 1, Witness 2.  I cannot promise that my system of

11   notation exactly mirrors the government's, but I will try to

12   track it, because I was not entirely sure who -- which number

13   the government had assigned to which witness.  But I will try

14   to follow and to adapt my own list so that we don't have the

15   government calling somebody Witness 1 and we're calling

16   somebody else Witness 1.

17         THE COURT:  All right.  Ms. Johnson, again I raise it

18   I don't want you confused either.  So I want all counsel to

19   speak up.  If we think we're talking about different witnesses

20   because we're using terminology, we need to straighten that out

21   so we have a record.

22         Ms. Johnson, you have one witness listed on your

23   witness list.  Is that correct?

24         MS. JOHNSON:  Yes.

25         THE COURT:  Okay.  And he's here -- he's here

1       physically in the courtroom, correct?

2                MS. JOHNSON:  He is.

3                THE COURT:  Okay.  That's fine.

4                And then, Mr. Allison, the government has one witness,

5       Mr. -- Professor Whiteside, and that's going to be by video

6       conference, correct?

7                MR. ALLISON:  Your Honor, I apologize we did not

8       update our exhibit list.  Mr. Whiteside is actually here in the

9       building.  We just aren't sure yet if we're going to actually

10      call him to the stand or if we're going to submit on his

11      report, but we will make that decision.

12               THE COURT:  Okay.  With that, are there any other

13      housekeeping issues, Mr. Allison?

14               MR. ALLISON:  Judge, I thought it might help just to

15      make sure at the beginning of this that we all know how the

16      Court wants us to proceed.  I did have a brief second to talk

17      to Mr. Kaplan and Ms. Johnson, but we didn't really technically

18      agree yet.

19               I don't know if it would help the Court to propose how

20      the government thinks it should proceed or -- because

21      there's -- there's stuff that's already attached to briefing.

22      There's exhibits from the government.  There's rebuttal.

23      There's affirmative defenses.  There's rebuttal to those

24      affirmative defenses.

25               So we had an idea how this should proceed, but I

1      didn't want to proceed that way unless the Court --

2               THE COURT:  Well, let's go ahead and hear your idea,

3      though one issue that's going to come up is how you want to

4      handle the political offense question, because if the defense

5      produces certain information on that, then the burden shifts

6      back to the government.  So I'm open to hearing how you'd like

7      to proceed.

8               MR. ALLISON:  Your Honor, our plan was to, if Your

9      Honor and Ms. Johnson approve, our plan is to start out this

10     hearing today just reiterating the requirements for certifying

11     extradition.  I think many of those can be touched on just

12     briefly.

13              And then I was going to -- I think it's important to

14     explain to the Court why we believe there's probable cause for

15     the crime laid out in the extradition packet.  So I was going

16     to give a presentation on that.

17              But as it says in our briefing, Your Honor, we believe

18     the other requirements have been met, and I can go through that

19     in a second.

20              But we would then propose that Ms. Johnson raise

21     whatever disagreements she has that those requirements have

22     been met as well as raise her affirmative defense of political

23     offense exception.  And then we would reserve time to respond

24     to those arguments to the certification requirements or

25     obviously the political offense exception.

1              THE COURT:  Okay.  Roughly that sounds fine.

2              Ms. Johnson.

3              MS. JOHNSON:  Your Honor, may I just have a moment to

4    confer?

5              THE COURT:  Sure.

6         (Defense counsel confer off the record.)

7              MS. JOHNSON:  Your Honor, we are mostly amenable to

8    the proposed order of proceeding.  We do have one concern,

9    though, regarding the witnesses, which is, as the Court is

10   aware, our witness has evidence that is relevant to whether the

11   things that the government has to produce in order to comply

12   with the treaty, comply with the requirements, have in fact

13   been met.

14             And so we think that the testimony from live witnesses

15   should, at least as regards those issues, should occur before

16   argument on those issues occurs.

17             If we want to have separate opportunity to present

18   evidence and witnesses regarding the political offense

19   exception later, that's fine.  The government has not noticed

20   any witnesses regarding the meeting of the treaty requirements,

21   but we have.  And so we would ask for an opportunity to present

22   that, especially since the government did in fact, after our

23   expert submitted his opinion, add more documents to the packet.

24             THE COURT:  So if I'm tracking, before we get into any

25   discussion about political question, you'd like to call your

```
 1   witness --
 2            MS. JOHNSON:  Yes.
 3            THE COURT:  -- at the conclusion of the government's
 4   primary presentation on the necessary elements for
 5   certification?  Is that correct?
 6            MS. JOHNSON:  Yes.  And if it's convenient to
 7   bifurcate his testimony so that he talks about political
 8   offense exception later, I'm happy to call him twice.  But we
 9   would like to have an opportunity for him to discuss the
10   non-political offense exception issues in his opinion before we
11   present argument on it.
12            THE COURT:  Mr. Allison.
13            MR. ALLISON:  I'm fine, Your Honor, I'm fine with
14   Ms. Johnson calling her expert before she makes her argument.
15   But I would like to reserve time for the government to respond
16   to that, because we believe the certification has been met on
17   most of the prongs other than probable cause pretty easily.
18   And I'd like to just touch on those.  Ms. Johnson's raised a
19   number of issues.  I'm not entirely sure what to focus on, or
20   we can focus on everything.
21            But for purposes of time, I thought it's important to
22   sort of understand what she's focusing on.
23            Another colleague of mine is going to address the
24   details of those treaty and charging arguments that are still
25   available for Ms. Johnson to argue.
```

1      That was my proposal.  So if I'm not being clear,

2  Judge, we are okay with a witness being called before

3  Ms. Johnson argues her rebuttal to our certification as long as

4  we could have time to sort of -- to respond to that.

5      THE COURT:  All right.  I think that's fine.  I think

6  planning this is actually harder than doing it.

7      All the testimony that the parties want to get in is

8  going to come in.  And so it's just a matter of the order in

9  which we do that.

10      And so with that, Mr. Allison, if you could start your

11  primary presentation.

12      I'm sorry.  One last point.

13      I do want to notify both parties that under the case

14  law, I do not believe that impeachment of government witnesses

15  is permitted.  And so while the experts -- the expert for the

16  government may testify or he may not -- they may rely on his

17  report -- and the expert for the defense will testify, I do not

18  intend to allow impeachment and cross-examination of the

19  defense expert.

20      MR. ALLISON:  Okay.  Could I have one minute on that,

21  Your Honor?

22      THE COURT:  Yes.

23      (Government counsel confer off the record.)

24      MR. ALLISON:  So, Your Honor, just so I'm clear on

25  that, Ms. Johnson puts up her witness.  We put up our witness.

1    No party gets to cross the other's witness?

2              THE COURT:  That's correct.

3              MR. ALLISON:  Okay.  One more minute.  That was

4    different than we thought.  One minute.

5         (Government counsel confer off the record.)

6              MR. ALLISON:  If that's Your Honor's ruling, generally

7    the government is okay with that, Your Honor.  If the -- Each

8    party has exchanged reports from these witnesses, and we've

9    been able to argue the reports in our briefing.

10             If a witness goes well beyond their report, is there

11   any room to discuss -- And if the answer's no, that's fine.  We

12   just -- You know, if a witness were to get up and go well

13   beyond the paragraph in their report, we haven't really had a

14   chance to discuss that in briefing, but --

15             THE COURT:  Well, we've had motions in limine --

16             MR. ALLISON:  Correct.

17             THE COURT:  -- on the reports and the expert reports

18   and the declarations.  So I'm not precluding you from argument.

19   But the case law is pretty clear on the nature of this type of

20   hearing.  It is not a mini trial.  And so you can make whatever

21   argument, probably sourced from your own expert, in rebuttal,

22   but I'm not going to have you or Ms. Johnson question each

23   other's expert witnesses.

24             MR. ALLISON:  Okay.

25             THE COURT:  Ms. Johnson.

UNITED STATES DISTRICT COURT

1          MS. JOHNSON:  Your Honor, we would object to being

2     deprived of an opportunity to cross-examine expert witnesses.

3     My understanding regarding the case law about impeachment

4     materials is that the Court has ruled that we are not allowed

5     to introduce extrinsic evidence to challenge fact witnesses,

6     contradictory evidence of fact witnesses.

7          I am unfamiliar with any law that says that we cannot

8     introduce evidence to contradict expert witnesses.

9          And we would ask for an opportunity to question

10    Professor Whiteside, whose report was submitted after our

11    expert's report, and we did not submit a reply report, nor was

12    there an opportunity in the schedule to do so.

13          THE COURT:  It's *Santos*, 830 F.3d at 993 that's pretty

14    clear that the defense may not impeach government witnesses.

15          I have no problem with you making whatever arguments

16    you wish to make in -- that dispute what the government

17    witnesses say.  But direct live cross-examination is not going

18    to occur.  And that is the Court's ruling.

19          Mr. Allison.

20          MR. ALLISON:  Thank you, Your Honor.  May I approach

21    and hand you a copy of a PowerPoint that I'm going to give?

22          THE COURT:  Yes.

23          MR. ALLISON:  And I'm also going to give one to

24    Ms. Johnson.

25          One last housekeeping point, Your Honor.

1        I just want to make sure the Court's okay if, while

2   I'm presenting, I lower my mask.  I have checked with everyone

3   at counsel table, and they're okay with me, Mr. Pimsner, and

4   Ms. Haciski not wearing a mask at this podium if the Court is

5   okay with that.

6        THE COURT:  You can lower the mask.  I wouldn't take

7   it completely off unless you're having trouble being

8   understood.

9        MR. ALLISON:  Okay.  Fair enough.

10       Okay.  Your Honor.  Good morning.  As I mentioned

11   earlier, there are -- and we've mentioned in our briefs and the

12   Court is well aware we are here on a certification of

13   extradition proposed by the government to your Court, to you,

14   the Court.

15       The requirements for certification of extradition are

16   very clear.  There are five of them.  The Court has authority

17   over the extradition proceeding.  The Court has jurisdiction

18   over the fugitive.  The applicable treaty is in full force and

19   effect.  The crimes for which surrender is requested are

20   covered under the treaty.  And there is sufficient evidence for

21   probable cause.

22       I'm going to walk through the first four pretty

23   quickly today, and then I can obviously respond to any

24   questions the Court has or raised by Ms. Johnson.  Depending on

25   the category of the question, I would ask for permission for my

| | |
|---|---|
| 1 | colleague, Ms. Haciski, to cover some of those questions, Your |
| 2 | Honor. |
| 3 | Number one, the Court has authority over this |
| 4 | proceeding.  Your Honor, it's very clear pursuant to 18 U.S.C. |
| 5 | 3184 as well as our district's local rule 57.6(d)(15) that that |
| 6 | authority exists.  There's been no objection to that authority. |
| 7 | The second one, Your Honor, is the Court has |
| 8 | jurisdiction over the fugitive in this case, Mr. Ahmed.  And as |
| 9 | the case law points out and as we've said in our briefing, that |
| 10 | is established by the fact that he was arrested in this |
| 11 | district in January of last year on this extradition complaint. |
| 12 | The third one is the treaty between the U.S. and Iraq |
| 13 | is in full force and effect.  And I know our briefs outline a |
| 14 | number of issues, Your Honor, and, like I asked this morning, |
| 15 | we will respond to anything the Court wants us to respond to. |
| 16 | But in our view it is fairly simple. |
| 17 | There are now three declarations.  Well, let me back |
| 18 | up, Your Honor, before I go there. |
| 19 | I would like to move to admit our seven exhibits at |
| 20 | this time in the exhibit list, and I can go through those and |
| 21 | before I get back to the treaty. |
| 22 | The seven exhibits, Your Honor, they're in a notebook |
| 23 | in front of you.  The originals are with the courtroom deputy. |
| 24 | THE COURT:  Ms. Johnson, any objection to the |
| 25 | admission of the government's exhibits? |

1          MS. JOHNSON:  Your Honor, I think they're already all

2     in the record.  I think they've all been filed on the docket.

3     So they are duplicative.  I don't have any substantive

4     objection to the contents which have already been filed with

5     the Court and are in the record.

6          THE COURT:  The exhibits are admitted.

7          MR. ALLISON:  Thank you, Your Honor.  I apologize for

8     on the cover sheet there, Your Honor, Exhibits 3 and 4 have the

9     same description.  It's actually accurate.  They are both

10    signed July 1st, 2021.  They are of different substance.  So I

11    will refer to the correct one when I'm talking about those

12    declarations of Mr. Heinemann, Your Honor.

13         So going back to the third requirement, Your Honor,

14    now that they have been admitted, there are now three

15    declarations of Mr. Heinemann, sworn declarations, who

16    represents the State Department, in the record.

17         The first one is as a part of the extradition request

18    itself attached to Exhibit 1.  The second one is Exhibit 3.

19    And the third one is Exhibit 4.

20         Based on those declarations, Your Honor, we would

21    argue and we take the position that this treaty between Iraq

22    and the United States is in full force and effect.  The

23    original declaration in Exhibit 1 says that.  The

24    representative of the -- Mr. Heinemann, the representative of

25    the State Department, says that it is in full force and effect.

1    And then again in his Exhibit No. 3 he also says it again in

2    response to some arguments that were raised.  He also includes

3    a document called "Treaties in Force" or pages from a document.

4    It is publicly available.  It lists treaties that are in full

5    force and effect.  Those pages reflect this treaty.  And the

6    copy of that document that Mr. Heinemann is talking about is

7    January 1st, 2020.

8              THE COURT:  And, counsel, that's Exhibit 3, correct?

9              MR. ALLISON:  Correct, Your Honor.

10             THE COURT:  All right.  Thank you.

11             MR. ALLISON:  So we would submit, Your Honor, that

12   that is enough to meet the requirement for certification of

13   extradition.

14             The fourth requirement is that the crime charged is

15   covered under the treaty.  And again I know Ms. Johnson has

16   some arguments as to this.  I would like to put forth our

17   arguments and then have a chance to respond to her arguments to

18   why we haven't met this.

19             The treaty covers the crime of murder.  The

20   extradition request includes authenticated documents now under

21   31 -- 18 U.S.C. 3190 that outline the crime of premeditated

22   murder in Iraq.  That is what Mr. Ahmed is charged with.  I

23   know Ms. Johnson disputes that, but that is what the documents

24   show he is charged with.

25             We also have another declaration from Mr. Heinemann,

1    Exhibit No. 4, which discusses that he has been charged with

2    that.

3            And we also have a supplement from the government of

4    Iraq, which is encompassed essentially by Exhibits 5, 6, and 7,

5    which Iraq has also responded and said he is charged with the

6    crime.

7            The United States would submit, Your Honor, that that

8    crime is covered under this treaty, and the only remaining

9    thing is -- to discuss is probable cause.

10           THE COURT:  Counsel, you made argument on this in your

11   motion to supplement, which was granted this week as well,

12   correct?

13           MR. ALLISON:  That is correct, Your Honor.

14           So without further ado, I would like to give a

15   presentation on probable cause.

16           And for the deputy, I'm going to use the HDMI cord

17   please.  I'd better ask if the Court is okay with me publishing

18   this.

19           THE COURT:  Yes.  Let me -- Let's see.  Let me ask,

20   Ms. Johnson, you've seen, I assume, the entirety of this

21   PowerPoint?

22           MR. ALLISON:  No.

23           MS. JOHNSON:  I have not.

24           MR. ALLISON:  Your Honor, I handed it to her this

25   morning.  I will just say that it only discusses pages in the

UNITED STATES DISTRICT COURT

1    extradition request.  So everything cited in here is from the

2    version, the redacted version actually, Your Honor, that has

3    been in this record for almost -- for over a year and a half.

4            THE COURT:  All right.  Let's give Ms. Johnson just a

5    second to flip through it and see if anything jumps out at her

6    as something that she would have an issue with.

7            And then let me ask Caryn:  Caryn, if counsel wants to

8    present his PowerPoint, can he publish, or do you have to

9    publish each individual page?

10           THE CLERK:  I just have to publish it to the gallery,

11   and then he will do the rest.

12           THE COURT:  Okay.  All right.

13           Mr. Allison, your point is all of this is already

14   contained elsewhere in the record?

15           MR. ALLISON:  Correct, Your Honor.

16           THE COURT:  Ms. Johnson, I'm inclined to allow him to

17   publish his Power Point as he goes along.

18           MS. JOHNSON:  Your Honor, it's very long.  I would

19   like to reserve the right to object as it goes along if

20   something comes up, but it's very long.  I'm not going to be

21   able to review it quickly.

22           THE COURT:  By saying he can publish -- that's a good

23   point -- I'm not trying to stop you from objecting if you see

24   something objectionable.  That's fine.

25           MS. JOHNSON:  Thank you.

1          THE COURT:  Okay.  Mr. Allison.

2          MR. ALLISON:  Thank you, Your Honor.  I know the Court

3   is aware.  It's been briefed.  I don't want to spend a lot of

4   time on this.  But I do want to talk for just a couple minutes

5   on some of the key legal principles that we're all looking at

6   here.

7          First one is probable cause.  I know Your Honor knows

8   probable cause.  You deal with this every day.  I'm not trying

9   to give any sort of lesson on probable cause.  But I think

10  there are a couple key things I'd like to just reiterate, and

11  these are on the slide in front of you.

12         The *Quinn v. Robinson* case from the Ninth Circuit, the

13  case all the parties and the Court have been talking about for

14  months now, says, "Probable cause is, by a somewhat liberal

15  extension, whether there was any evidence warranting the

16  finding that there was reasonable ground to believe the accused

17  guilty."

18         And probable cause, as Your Honor knows, is less than

19  a preponderance.  It's not even more likely than not.  That is

20  what Ms. Johnson has the burden of showing on her affirmative

21  defense.

22         "Probable cause is sufficient if a person of ordinary

23  prudence and caution can conscientiously entertain a reasonable

24  belief in the probable guilt of the accused," as that second

25  bullet point says.

1          And the last one says, Your Honor, "Evidence is

2     sufficient if a person of ordinary prudence believes the

3     suspect had committed or was committing an offense."

4          Your Honor, I think the top bullet point is a key one.

5     It's from *Santos v. Thomas*, the case you just cited.  You're

6     not a rubber stamp.  Just because probable cause is a fairly

7     low burden, that doesn't mean you're a rubber stamp.  It means

8     you have an important duty here today that we all understand.

9          Nonetheless, as the *Quinn* case says, "The country

10    seeking extradition is not required to produce all of its

11    evidence."  And in fact this bullet point isn't up there, Your

12    Honor, but the evidence coming in doesn't need to meet the

13    standards of admissibility in an American trial.

14         The third bullet point up there reflects that hearsay

15    is allowed.  And in fact, as this point from the First Circuit

16    shows, evidence may consistent entirely of hearsay.

17         And talking about hearsay, Your Honor, there's really

18    no requirement that sworn statements be in the packet.  Now,

19    here we do have sworn statements, and I will go through those

20    with Your Honor.

21         But presumably under the case law cited here, if we

22    had all sworn statements of witnesses from the requesting

23    country, and Your Honor felt those were sufficient together,

24    you could find probable cause for purposes of certifying

25    extradition.

1              And the last one, Your Honor, factual inconsistencies.

2    You mentioned earlier today you thought there might be some,

3    and there are some.  But typically, as this case indicates,

4    "Factual inconsistencies in witness statements are insufficient

5    to defeat probable cause."

6              Now, I know Ms. Johnson will get up here and tell you

7    differently and talk about if the inconsistencies are so

8    drastic, it might reach a level of that.  But the

9    United States' position is that has to be incredibly drastic,

10   and that is not what we have here.

11             So I'd like to just go through some of the categories

12   of the evidence in this request.  Your Honor talked about

13   different statements from different witnesses.  I'd like to

14   explain how I see -- the United States sees the evidence in the

15   authenticated request and that is now in the record.  And the

16   United States' position is every page in that record the Court

17   can look at.  Now, some will obviously hold more weight for the

18   Court, and that is the Court's job.  But the United States

19   believes you can look and take into account everything in that

20   packet.

21             So what I have up here, Your Honor, are -- and you and

22   Ms. Johnson have copies of the PowerPoint -- but what I have up

23   here are page numbers after each category.  And I'm going to

24   refer to these types of page numbers after my presentation.

25   They all start with a double or triple zero.  Those are the

1    page numbers, Your Honor, in the redacted packet in documents

2    3-3 and 3-4 filed with this Court.  I will warn the Court that

3    the original extradition packet that is now in the Court's

4    possession does not have those Bates numbers.  It came from the

5    requesting country.  We put those Bates numbers on, the Bates

6    numbers up here at the top and in the document in the record at

7    3-3 and 3-4.

8             So every page is in there and every page is generally

9    in the same section.  But it may require, if you're looking at

10   these Bates numbers, matching up.  The reason I'd like to use

11   these Bates numbers, Judge, is the original packet doesn't have

12   any Bates numbers.  It has no page numbers.

13            THE COURT:  It makes sense to me.

14            MR. ALLISON:  So summary of the types of documents we

15   have here in this case, Your Honor.  We have case summaries

16   signed by the investigative judge.  He's looked at the case.

17   He's made certain statements to Your Honor.  He's talked about

18   some of the things he's aware of in the case.  He's described

19   Mr. Ahmed.  He's described other things.  We believe Your Honor

20   can look at those.

21            Again, the requesting country doesn't have to send all

22   the evidence.  Obviously if Your Honor sees something in a case

23   summary, it probably doesn't hold as much weight as an eye

24   witness statement, but we believe you can look at them for

25   clarity.

1            The second bullet point is the arrest warrant, Your

2    Honor, signed by the investigative judge.

3            The third bullet point up here are similar summaries,

4    which are not signed by our investigative judge, Judge Jabbar

5    Husayn, but a local investigative court, Al-Karkh -- I'm not

6    sure how you pronounce it -- but an investigative court.

7            These are documents you can also look at, Your Honor.

8    These are contained in the extradition request.  The color

9    photos are from the original.  But these are things that the

10   investigative judge has put in here.  He has described the

11   fugitive.  And the pages are up there.  He's included photos --

12   or the country of Iraq has included photos.  What they say is a

13   2005 photo of the fugitive, a copy of the fugitive's passport,

14   photos from the fugitive's Arizona driving school Web site, and

15   a photo of the fugitive from his social media.

16           The country of Iraq has also included a report going

17   even more specifically to identification and talking about the

18   giving of a photo line-up by one of the eyewitnesses in this

19   case, Your Honor.

20           And I should just say, Your Honor, that there's been

21   no objection in the briefing to --

22           THE COURT:  Counsel, I don't think identity is

23   disputed at this point.

24           MR. ALLISON:  That's correct.  That's what I was just

25   going to say.  There's been no objection to identity.  I'm just

1    pointing this out.

2              So, Your Honor, here are the victims.

3              Officer Khalid Ibrahim Mohammad, the photo on the

4    left.  Officer Issam Ahmed Hussein, photo on the right.

5              Now, as Your Honor knows, the murder of Issam, as I'm

6    going to refer to him, was before the murder of Khalid.  The

7    murder of Issam was June of 2006.  The murder of Khalid was

8    October, 2006.  I'm going to start in reverse chronologically.

9    I'm going to start with the murder of Khalid.

10             So first I'd like to go through what we have for each

11   murder.  Then I'd like to talk about the substance of what we

12   have for each particular murder.

13             So here, for the murder of Khalid, Your Honor, we have

14   some categories that I think are very important for the Court

15   to look at.  The first bullet point is victim information and a

16   death certificate.

17             The second one is sworn and/or signed statements by

18   individuals that I'm going to refer to as Plaintiffs 1 and 2.

19   And those pages are there up on the PowerPoint.

20             And if there needs to be further clarification as to

21   who I mean by Plaintiff 1 and 2, I can do that.

22             There's a --

23             THE COURT:  Counsel, give me just one second.  I want

24   to see in your exhibits -- Okay.  And they're also referred to

25   as plaintiffs in your exhibits, so okay.  Go ahead.

1           MR. ALLISON:  Yeah.  Your Honor, the names were

2    redacted pursuant to the protective order, so that's why I'd

3    like to leave those out.

4           The third one is a diagram of the location of the

5    murder as pointed out by the Plaintiff 1, and the page number's

6    up there.

7           The fourth bullet point is, again, the investigative

8    judge's summary of the witness statements signed by the

9    investigative judge.

10           And now we get into the witness statements, Your

11   Honor.  Eyewitness 2 gave a statement February 18th of 2019,

12   which is sworn before the investigative judge on the face of

13   the statement.

14           THE COURT:  Counsel, regarding Eyewitness 2,

15   Eyewitness 2 refers to, in addition to Khalid being killed,

16   refers to two other individuals who were there.  Were those

17   other individuals civilians?

18           MR. ALLISON:  To the best of our knowledge, yes, Your

19   Honor.  The two civilians that were killed or shot?  Let

20   me pull that up, Your Honor.

21           THE COURT:  So at 72 it refers to the killing of

22   Khalid and killed him with two others who were present near

23   him.  That's a quote from Page 72.

24           MR. ALLISON:  And that is the investigative summary

25   from the judge, Your Honor, and that -- and our, to the best of

1    our knowledge, that is two civilians, yes.

2              MS. JOHNSON:  Your Honor, I would object to allowing

3    counsel to testify as to facts outside the packet.

4              THE COURT:  I don't think he's testifying, but I do

5    want to follow up.

6              Mr. Allison, the only information you have is that

7    which is on Page 72 on that issue; is that correct?

8              MR. ALLISON:  Your Honor, the only information I have

9    as far as the identity of those people.  But other witness

10   statements beyond the -- And maybe we're talking the same

11   thing.  The investigative summary by the judge summarizes

12   stuff.  There are various witness statements that say two other

13   people were killed.

14             THE COURT:  I understand that.  I'm trying to get at

15   whether or not the two other people who were killed are

16   considered civilians or were part of loosely the Iraqi

17   government as such a police officer might be considered.

18             MR. ALLISON:  The best answer I can give, Your Honor,

19   is there is nothing about the identity of those victims here

20   other than that they were sitting next to Mr. Khalid at the

21   time of the murder.

22             THE COURT:  Thank you.

23             MR. ALLISON:  And I'd better clarify, Your Honor, you

24   mentioned Eyewitness 2 talks about that.  I just want to make

25   sure the record is clear.  We are referring to Eyewitness 2 as

1    the individual who gave one statement on Page 00074.

2              THE COURT:  Let's do it the other way.  The individual

3    on Page 72, is that Eyewitness 3?  Who is that?

4              MR. ALLISON:  On Page -- Tell me the page again.  I'm

5    sorry, Your Honor.

6              THE COURT:  72.

7              MR. ALLISON:  That is the investigative summary of the

8    judge.  The reason I have it cited as a "see also", Your Honor,

9    is he talks about that statement being sworn.  So I'm sorry if

10   that's confusing.

11             THE COURT:  Okay.  Thank you.

12             MR. ALLISON:  Eyewitness 2, his only statement is on

13   Page 74.

14             THE COURT:  Thank you.

15             MR. ALLISON:  And then Eyewitness 3, only statement is

16   on Page 75.  Is that clear?

17             THE COURT:  Yes.  Thank you.

18             MR. ALLISON:  I apologize, Your Honor.

19             So, again, going back to what we're looking at here,

20   we have the one statement from Eyewitness 2, which is Page 74.

21   Again I cite to 72 because that's the judge saying this

22   statement was given sworn.

23             Eyewitness 3 gives a statement on Page 75.  Again I

24   cite to 72 as well, Your Honor, in this just to show that those

25   statements were sworn by the investigative judge.

1          Then we get to the person we refer to as Cooperator 1.

2     It's kind of a misnomer.  There's really only one cooperator

3     giving statements in this case, but we've called him

4     Cooperator 1 since the beginning of the case, so we'll stay

5     that.

6          Cooperator 1 has given various statements.  And the

7     confusing thing about the packet that was presented, Your

8     Honor, is there's statements under the section for Mr. Khalid's

9     murder by Cooperator 1, and then there's statements under

10    Issam's murder for Cooperator 1.  But they kind of both talk

11    about both murders.

12         And so I've tried to give Your Honor and Ms. Johnson a

13    list of where we've gone through and found the cooperator

14    talking about Khalid's murder on this slide.  It appears he

15    gave statements on two days, 11-5-06, which there are two

16    summaries of his statements.  That's what we have.  They are

17    different.  But we would argue generally the same, and we'll go

18    through that.

19         And then there are multiple summaries or multiple

20    statements.  I don't want to call them summaries.  They're

21    sworn statements or thumbprints or signed statements by the

22    cooperator but don't appear identical.  And so we're going to

23    talk about those as well.

24         Your Honor, I would argue at least some, if not all of

25    those statements by the cooperator are sworn statements.

1    They're referred to as testimony.

2              Also the investigative judge includes the cooperator

3    as a witness that was sworn before giving the statements.  So I

4    believe, the United States believes there's sufficient evidence

5    that all of your statements that you're looking at today are

6    sworn on the record.

7              So that was the murder of Khalid, Your Honor.  I want

8    to turn to the murder of Issam.  Similarly you have victim

9    information and a death certificate provided by the requesting

10   country.  You have sworn --

11             THE COURT:  I'm sorry, counsel.  Let me go back to

12   Khalid for just a moment.

13             The Khalid murder is the murder where the government

14   alleges that the -- that Mr. Ahmed and others were paid.  Is

15   that correct?

16             MR. ALLISON:  Correct.

17             THE COURT:  Okay.  Thank you.

18             MR. ALLISON:  So murder of Issam.  We talked about the

19   first bullet.

20             The second bullet is sworn and/or signed statements by

21   Plaintiffs 3 and 4.  Again, the pages are up there in case

22   there's any confusion of who I'm referring to by those names.

23             There is a similar summary of investigation by an

24   Office of Counterterrorism from 2008.

25             There is a similar investigative judge summary of the

1    statements for this murder.

2          And there are two statements that appear to be on that

3    same date potentially to different officers or sections of the

4    court, sections of the government in Iraq.  They're both dated

5    the same date.  And those are by who I'm going to refer to as

6    Eyewitness 1.  Those are listed up here.  They're on Page 104

7    and 105.  Again the "see also" cites up here, Your Honor, just

8    indicate where the Court has said those are sworn.

9          THE COURT:  Let me ask you about Eyewitness 1.  It

10   appears from the Court's reading that Eyewitness 1 says that

11   Mr. Ahmed was one of the individuals who got out of the car

12   while armed to commit this killing.  But then at Page 105

13   Eyewitness 1 appears to say that Mr. Ahmed tried to stop the

14   killing.  Am I reading those correctly?

15         MR. ALLISON:  I want to address the second point, and

16   I can do that in one second, Your Honor.  I just want to

17   clarify the first point, which is the statement about getting

18   out of the car.

19         THE COURT:  It's in the second paragraph on 101, "Six

20   armed men exited the vehicles and came towards them," and then

21   goes to say, "One of the armed men came and said to the others

22   that the victim was 1st Lieutenant Issam.  This armed person

23   that came in was Mr. Ahmed, the Emir of the group."

24         So the government's evidence, at least on that page,

25   is that Mr. Ahmed got out of the vehicle while armed with other

1   individuals.

2          Then if you turn to Page 105, the narrative seems to

3   be that Mr. Ahmed tried to stop the killing.

4          MR. ALLISON:  So I want to talk about that exactly

5   what you just said, Your Honor.  Let me just make sure -- I

6   want to touch on the first point first, which is the difference

7   in 101 and 105 about where Mr. Ahmed came from.

8          There seems to be a slight factual distinction there.

9   I mean, the eyewitness statement himself doesn't seem to say

10  Mr. Ahmed came out of the car.  It seems to say that he came in

11  with a handgun at the time this was ongoing and said what he

12  said.  And I'll discuss your second point in a second.

13         The summary does indicate that he was one of the armed

14  men, which seems to say he might have gotten out of the car.

15  But, you know, I think we should probably look at the witness

16  statement on that issue.

17         But again, Your Honor, it's -- it all can be taken

18  into account.  The only reason I would say that to Your Honor

19  is one is the sworn statement in front of you, and the other is

20  a summary.

21         Let me talk about Your Honor's concern about the

22  statements by Eyewitness 1, and then I'll get back to this.

23         And we haven't even gotten to Cooperator 1 yet and

24  what he said about this murder, but we'll get to that in a

25  second.  But Eyewitness 1 does, in two different sworn

1    statements -- And again, Your Honor, these are subject to

2    translation and things like that.  But on the face of the

3    English translation, Eyewitness 1 says that Mr. Ahmed came in

4    with a handgun and said what he said.  It's -- The quote is

5    different in the statements, but it's generally the same.

6            I think Your Honor has to take that into account.  And

7    I think that's something that needs to be thought about.  And

8    what I would say is, Your Honor, that -- and I'll get into this

9    later in my presentation -- but that statement can be looked at

10   a few different ways, and we have what we have.  And Your Honor

11   has to decide what you think that those -- that statement

12   means.

13           First, as I'll get into here in a minute, I think

14   you've got to look at it with Cooperator 1's statement as well

15   as the remaining statements of Eyewitness 1, which I'll get

16   into.

17           But Eyewitness 1 puts Mr. Ahmed there waving a handgun

18   and identifies him as part of this group.

19           Cooperator 1 says he was there when Ahmed made the

20   agreement to commit this murder and puts him there as well and

21   says that Ahmed comes back and tells the group -- comes back

22   and tells them things about the murder, which we'll get into.

23           Second, Your Honor, with the statement that you raised

24   by Eyewitness 1, there are explanations.  First of all, the

25   timing is a little suspect on this.  If you look at Page 104,

1    which is Eyewitness 1's statement, if you look through this,

2    Your Honor, I think I have a slide in here toward the end, and

3    I can readdress this when I get there, but I'd like to address

4    your question now.

5            "Shots were fired," on Page 104, "Shots were fired

6    from an AK-47 where it hit the victim.  Then Mr. Ahmed comes in

7    waving a gun and says," Page 104, "leave Issam; he's an officer

8    with the Fallujah police".  And they replied to Ali "Step back

9    and don't interfere with this matter."

10           Then the Eyewitness 1 goes on to say, "Knowing that

11   anyone who interferes with this is going to get killed."

12           Mr. Ahmed was not killed.

13           The timing of it on Page 104 is suspect to the

14   government, but we have what we have, Your Honor.

15           THE COURT:  Well, it's not just the timing.  It's the

16   sequence.  Under the narrative in 104, Mr. Issam is killed with

17   shots from an AK-47.  And only then does Mr. Ahmed come in and

18   say leave him alone.  But the victim has already been killed by

19   that point in the narrative.

20           MR. ALLISON:  According to that page.  Now, Your

21   Honor, I have a duty to be upfront with the Court, and I think

22   you need to turn to Page 105, which is another statement from

23   Eyewitness 1.

24           And in this one -- And I'm sorry.  I think I was

25   reading from 105 -- sorry about that -- to confuse the record.

1    My first statement was about 105.

2            THE COURT:  So let me, counsel, let me just ask you:

3    We can parse the different statements.  You appear to

4    acknowledge that some of the statements seem at least

5    internally inconsistent.  As I understand your argument,

6    though, there are multiple witnesses to this event, and that's

7    your argument that even if one witness has an inconsistency,

8    that there is still overall PC.  Am I tracking?

9            MR. ALLISON:  That is correct, Your Honor.  And I do

10   want to go through -- I have some slides specifically to that

11   point.  I just wanted to make sure and answer Your Honor's

12   question.

13           And just to clarify, yes, our position is that Page

14   104 and 105 have a slightly different version of the sequence.

15   But I think that's important.  We don't know which one is

16   accurate.  It's a translation.  It's two different statements.

17   We don't know if it was -- We don't know anything about how the

18   statements were given other than that they were sworn before

19   this judge and included in the packet.

20           I'm going to skip through this one quick.  This is

21   just a list of the cooperator statements for Your Honor and

22   Ms. Johnson that we think talk about the murder of Issam.

23           I did want to go through the charges just briefly,

24   Judge, and we've already started really getting into the weeds

25   on the facts.  But I'd like to take a second and do that, and

1       then I will go back and go through each one of these murders in

2       a little more detail.

3               The charges, Your Honor, in the packet are important

4       to keep in mind, especially with the issue we were just

5       discussing.

6               The arrest warrant refers to a violation of 406/1/A of

7       the Iraqi Penal Code.  That's up on the slide.  That's in the

8       packet.  It talks about a premeditated killing.  It defines

9       under Iraqi law what premeditated means.

10              It talks about how "Any person who participates in the

11      commission of an offense as a principal or accessory is

12      punishable by the penalty."

13              It defines a principal under Iraqi law.  "Any

14      principal who commits an offense by himself or with others."

15              And it defines an accessory, which includes "Any

16      person who conspires with others to commit an offense and that

17      offense is committed on the basis of such conspiracy."

18              It also has a statement of law, Your Honor, that says,

19      "An accessory is actually considered to be a principal if he's

20      also present during the commission of that offense or any act

21      contributing to that offense."

22              All things, I think, we need to think about as we talk

23      about the facts, especially the question you just had, because

24      our argument, Your Honor, is even if there's an issue with

25      something that happened according to Eyewitness 1, and Your

1     Honor doesn't find that Mr. Ahmed actually directly

2     participated in the shooting of Mr. Issam, Officer Issam,

3     Cooperator 1's statement gives you enough to find the

4     conspiracy.  He says he was there when the agreement was made.

5     And we'll talk about that in a second.

6              So let's just talk -- We've already kind of talked

7     about these, but let's just go through some of these that we

8     haven't talked about.

9              The evidence of the murder of Khalid, so going back to

10    the October, 2006 murder, Your Honor.  This is Eyewitness 2.

11    And these are -- Obviously the whole statement's important.

12    These are some of the keys I want to talk about.

13             He said he was standing near the location.  He talks

14    about an armed group that fired at the victim.  And he says,

15    sworn statement, he recognized Mr. Ali Yousif Ahmed Nouri after

16    his mask fell off his face during the October 2006 incident.

17             Let's look at Eyewitness 3.  Again, the entire

18    statement is important, Your Honor.  Some of the keys, though,

19    are here up on the slide.

20             He mentions an Opel, a specific brand, an Opel car

21    appeared, and the people inside the car began opening fire on

22    the victim.  And I believe this individual says he's across the

23    street.  Let me double check that before I --

24             Yes.  "I was on the other side of the road, which is

25    approximately 40 meters away."

1          Then he says he saw armed men, again just like

2    Eyewitness 2, armed men exited the Opel car, and one of them

3    continued firing on the victim.  And he recognized, Eyewitness

4    3, the person who continued firing as Ali Yousif Ahmed Nouri.

5          And he even gives you more.  He tells him how he knew

6    him.  He knew him from the neighborhood, and he said he was

7    well known in the area for conducting assassination operations

8    on most members of the police force.

9          Small bullet point at the bottom, Judge, he also says

10   he knew him from Mr. Al-Nouri's carpentry shop, which was on

11   Street 40, which is not the only time you'll see that in this

12   packet.

13         Now, Cooperator 1, multiple statements, different

14   things in the statements.  The United States acknowledges that.

15   The key, Your Honor, for this murder is the substance is

16   largely the same that is important for Your Honor to understand

17   Cooperator 1's statements.  And if you don't give much weight

18   to Cooperator 1 on Officer Khalid's murder, you still have two

19   more sworn eyewitnesses.

20         But let's talk about Cooperator 1.  He says he was

21   there when the group, including Mr. Ahmed, although it's

22   important he calls him by a different name -- he calls him Ali

23   Yousif -- or Ali Yousif Al-Mahmadi, I believe -- agreed ahead

24   of time to kill Officer Khalid.

25         He says that the group he was in was an armed militant

1    group of the Al Qaeda terrorist organization.  That's from

2    Cooperator 1.  He says he was a member of the group.

3              For Officer Khalid's murder, he singles out Mr. Ahmed

4    as one of the individuals who surveilled Khalid ahead of time.

5    Again, goes to premeditation, Your Honor.

6              He told -- Cooperator 1 says Mr. Ahmed told the group

7    they were going on an operation and where the victim was

8    located.  Again, premeditation of the murder.

9              Cooperator 1 says Mr. Ahmed was one of the people who

10   fired shots and that they killed Officer Khalid and two other

11   people.  There again is the two other people, Your Honor, that

12   you asked about earlier.  So it's brought up by the cooperator

13   on slide -- Page 80 or -- I'm sorry -- the slide and Page 80.

14             And the Cooperator 1 says after the killing of Khalid,

15   as you asked earlier, Your Honor, they returned to a

16   co-conspirator's house and received 50,000 Iraqi Dinars.

17             Now, again, these are not all the facts.  These are

18   just some of the keys for this presentation.  Your Honor has

19   the unredacted statements in the original extradition packet

20   and can go compare those.  And we've given you the pages.  And

21   we're going to go through some of the comparisons here in a

22   second.

23             Let's look briefly at the statements in the murder of

24   Issam, which we've already talked about.  Eyewitness 1.  And

25   this is from Page 104.  Said he was sitting next to the victim

near a store.  He also gives a very specific brand or model of
car.  A Daewoo Prince arrives with masked and armed men inside.
The men cornered the victim at the store, and shots were fired
at him.  The shots were fired from the AK-47 where it hit the
victim's body everywhere.  We talked about the sequence in Page
104 which slightly defers from Page 105.

          And this talks about what we talked about earlier,
Your Honor.  He does say, yes, "Ali Yousif Nouri entered the
store carrying a handgun," and he says these statements, and
they're up on the slide.

          On Page 104 the statement is worded as "Leave Issam;
he is an officer with the Fallujah police."  And the members of
the group replied back to him "Step back and don't interfere
with this matter."

          I do think it's important for Your Honor to take note,
though, that Eyewitness 1 did say first he recognized Mr. Ahmed
as part of that group from the neighborhood, as an Emir of the
group.  That's in the statement.

          He also says something along the lines of knowing at
any time any person who raises a weapon in the face of these
militants, they'd be killed, which, if Mr. Ahmed walked in with
a gun to presumably, as you said, stop the murder, he wasn't
killed.  There's no evidence he was shot.  There's no evidence
of anything that happened after that.

          The only evidence after that is that Eyewitness 1 says

1    I recognized him as a member of the group.

2         THE COURT:  So just to be clear, your point is the

3    fact that he raised, if you credit the statement, the fact that

4    he raised a weapon in front of these individuals in the Islamic

5    state and was not killed shows that he was affiliated with the

6    group?

7         MR. ALLISON:  I think that's right, Your Honor.  I

8    think I have -- There are other explanations for this, what

9    occurred, according to Eyewitness 1, and I'll proffer one to

10   you.

11        As the evidence in the packet shows, Mr. Ahmed was

12   from this neighborhood.  Multiple witnesses knew his carpentry

13   store.  Multiple witnesses identified him.  Multiple witnesses

14   knew he lived in that neighborhood.

15        It's not -- I know Ms. Johnson agrees in her brief and

16   talks about it.  But the government doesn't believe it's

17   unfathomable that this murder was occurring and Mr. Ahmed knows

18   people in the store and comes in and makes this statement to

19   make it look like he wasn't there.  We have what we have, Your

20   Honor.  We have the statements.

21        THE COURT:  Okay.

22        MR. ALLISON:  If Your Honor believes it's an

23   exculpatory statement, then that's your duty in this case, or

24   your -- You can do that.  But, again, it doesn't defeat PC for

25   the conspiracy for this murder.

1          We haven't talked a whole lot about Cooperator 1's
2     statements as to the murder of Issam, Your Honor, and I'd like
3     to do that just briefly.
4          Now, I want to explain some of these statements as
5     well.  But let's look at the statements up on the slide, and
6     then I'll talk about them.  The cooperator says he was at
7     defendant Ali Yousif's store, a wood shop -- there it is again,
8     same type of store -- located on Street 40, same location as
9     the other witness.  And Ali Yousif and others agreed to kill
10    1st Lieutenant Issam Hussein since that 1st lieutenant works in
11    the police force and lives in the same area as the accused.
12         Again, the cooperator is telling you Mr. Ahmed lives
13    in the same area as the accused.  It's not beyond belief that
14    he walked into that store and knew those people and they
15    would recognize -- or walked into that store at the time of the
16    murder and knew people would recognize him.
17         He says the agreement took place at Mr. Ahmed's shop.
18    He saw it.
19         Now, in one statement, Your Honor, the cooperator says
20    he did not participate in this incident, but then in another
21    statement he says, "I was with them, and they wanted me to
22    watch the road."
23         I believe Ms. Johnson is going to argue that these are
24    inconsistent statements about the cooperator's role.  I would
25    proffer they're not inconsistent.  We don't know what he meant

1    by participate.  We don't know if the cooperator meant that he

2    pulled the trigger.  We don't know if he just saw participation

3    as simply actually killing the guy or watching the road down

4    the street.

5              Combined with his other statements, he says that they

6    came back and told him the murder happened.  And he actually

7    says, the last bullet point up on the slide, that Ali Yousif

8    told him he pulled the trigger with a 9mm handgun.

9              Now, obviously with Eyewitness 1, that doesn't match

10   up.  Eyewitness 1 didn't see the fugitive pull the trigger.

11             Cooperator 1 says that's what he was told.

12             But, in any event, the United States doesn't think

13   these statements from Cooperator 1 on the murder of Issam are

14   inconsistent.  They just need to be read as they are and with

15   the translation and what he says.

16             Our position is that they're consistent because he

17   never said he pulled the trigger.

18             I'm almost done, Your Honor.  I'd like to go through

19   some key corroboration that, if Your Honor is questioning any

20   of these witnesses' sworn statements, the government thinks is

21   important.

22             So the first one.  And these cross over both murders,

23   Your Honor.

24             First one is the fugitive was known in the

25   neighborhood for police murders.

1          We have two different pages here, one from Eyewitness

2    3, which is an eyewitness from Officer Khalid's murder, one

3    from Cooperator 1.  The relevant portions are cited up here.

4    They both say the same thing about Mr. Ahmed.

5          The fugitive is known for terrorist ties.  We have

6    three pages up here, two of which are the plaintiffs.  Now,

7    Your Honor, the plaintiffs admit they were not eyewitnesses,

8    Plaintiff 3 and Plaintiff 1.  But they did give sworn

9    statements.  And they did say what they said about Mr. Ahmed.

10          And Your Honor can determine the weight to give that,

11   but Your Honor can definitely look those statements.

12          And those are up here as well as the statement of

13   Eyewitness 1, who we've talked about with Officer Issam.

14          Plaintiff 3, the aforementioned individuals,

15   including -- the part you can see up on this slide -- Ali

16   Yousif Ahmed Al-Nouri was known to work with the terrorist

17   groups and have taken part in several murder operations

18   targeting those who work with the security agencies.

19          Plaintiff 1, "Ali Yousif Nouri, since he was known in

20   the area for being part of an armed group."

21          Cooperator 1 or -- I'm sorry -- Eyewitness 1, "knowing

22   that the criminal Ali is a member of their group," and he says

23   that he's an Emir of the group, and he also in a slide that's

24   not -- Well, I guess it's on my next slide, Your Honor, so I'll

25   turn their next.

1          Not just terrorist ties but specifically ISIS and Al

2   Qaeda, AQI, Al Qaeda in Iraq -- let's be more specific --

3   which, as you'll see when we talk about it, the relationship

4   between those two groups, Your Honor.  I don't want to go into

5   that yet since it's not -- Well, I guess the reports are in the

6   record, so I can talk about the reports.

7          Our expert witness, Professor Whiteside, talks about

8   how Al Qaeda in Iraq became ISIS.

9          And so here you have more corroboration.

10  Eyewitness 1:  He's the Emir of the group.

11         And let me just check because it's not up here, Your

12  Honor.

13         And 104 also is the one that mentions Islamic state.

14  It's just not highlighted in that statement there, Your Honor.

15  This talks about his status as an Emir.  Sorry.  I skipped

16  ahead there.  And also Cooperator 1 refers to him as an Emir of

17  the group, a leader of the group.

18         Fugitive owns a carpentry store on Street 40.

19         Again, multiple witnesses recognizing this person

20  as -- with that association with that store with that location.

21         Let's talk about the murder of Officer Khalid.  Both

22  Eyewitness 3 and Cooperator 1 give you that this was committed

23  during the month of Ramadan, same time period, same time period

24  in 2006.

25         Both Eyewitness 3 and Cooperator 1 give you the same

1    location, a Street 40 -- In front of a Street 40 store is where

2    the murder happened, which is also supported by the plaintiffs,

3    Your Honor, in their statements about where the victim was

4    killed.

5              Near a water tank.  Plaintiff 1, who knew where this

6    individual was murdered, gave you that as well as Cooperator 1.

7              Near the Al-Hadrah mosque.  Plaintiff 1 talks about

8    where this individual was killed.  Cooperator 1 tells you where

9    he was killed.

10             Probably the most important:  The fugitive was the

11   shooter.  Three different sworn eyewitnesses, Your Honor, tell

12   you that regardless of any in -- any inconsistencies in the

13   facts that Ms. Johnson will get up here and tell you, three

14   people identified him as a shooter in Officer Khalid's murder.

15             Use of an Opel car.  It's a specific brand, Your

16   Honor.  Both Eyewitness 3 and Cooperator 1 mentioned this in

17   their statements.

18             Multiple victims, as Your Honor asked about.

19   Eyewitness 3 and Cooperator 1 both said not only Mr. --

20   Officer Khalid was shot, two other people there were shot as

21   well.

22             And now I want to talk about a few corroborating facts

23   in Officer Issam's murder.

24             Again, similar to the fact I just discussed with the

25   Opel car in Officer Khalid's murder, here we have two people

1    talking about a Daewoo Prince, very specific.

2            THE COURT:  One's black and one's white though.

3            MR. ALLISON:  That is correct, Your Honor.  That is

4    correct.  And I was going to acknowledge that.  That is

5    correct.

6            What I would offer you is one who says it's black says

7    it has white stripes.  The cooperator says it's white.  Are

8    black and white totally different colors?  Yes, they are.  They

9    say the same model.

10           Both witnesses say not only was there use of AK-47s

11   but also a handgun.  Again, we don't believe Cooperator 1 was

12   there, so this is based on what he was told or what he may have

13   seen, although that's not in the packet, so I shouldn't

14   probably go there.  What he was told.  But that matches what

15   Eyewitness 1 says.

16           Shots were fired from a handgun.  Another person came

17   in with an AK-47.  And Mr. Ahmed came in with a handgun, which

18   is interesting because Cooperator 1 also says Ahmed told me he

19   fired shots with his 9mm handgun or, yeah, with his 9mm

20   handgun, so --

21           Again, same as with Officer Khalid, Your Honor.  We

22   have the same location from different witnesses.  Eyewitness 1

23   and Cooperator 1 say the murder happened at the same place at a

24   store, Street 40.  Eyewitness 1 says it's a cigarette shop.

25   Cooperator 1 says it's in front of stores on Street 40.

1          And I think this one's important as well, Your Honor,

2    and this one you will have to go to the unredacted packet to

3    verify.  But this one's incredibly important to the government.

4    Eyewitness 1 and the co-conspirator named the same -- now, they

5    name a couple people who are different, but they do name the

6    same guy as a co-conspirator for Officer Issam's murder.  And

7    that is there, and it's redacted for purposes of this public

8    proceeding.  But that is on Page 105 and 108 if Your Honor is

9    to go back and look.

10          So, Your Honor, I can take any questions you have.  I

11   can take questions later.  But our argument for the probable

12   cause is there's more than enough for a probable cause standard

13   for both murders.

14          In the government's view, Officer Khalid's murder

15   isn't even close.  Three sworn statements putting Mr. Ahmed

16   there pulling the trigger.  Any small inconsistencies in facts

17   would not, in the government's view, defeat the burden of

18   probable cause on that murder.

19          Officer Issam's murder doesn't have as many

20   statements, Your Honor.  And as you've pointed out, Eyewitness

21   1 has a key statement that Your Honor is going to have to look

22   at and think about.

23          The government's point of view is even if you discount

24   that Mr. Ahmed actually was there and pulled the trigger, as

25   the cooperator says he told him he did, then the conspiracy is

1    still there.  And it's corroborated by both, Your Honor,

2    because the cooperator tells you he saw the agreement, and

3    Eyewitness 1 says he showed up.

4            And Eyewitness 1 wouldn't know about the conspiracy

5    agreement because he wasn't there.  He just knows who he saw,

6    and he recognized him as part of the group, the same group that

7    the cooperator says conspired to do it.

8            So, Your Honor, that's how the government believes we

9    meet the final prong for certification of extradition, and

10   probable cause has been established.

11           THE COURT:  All right.  Then with that, I believe it's

12   Ms. Johnson's turn.  And now we have to address the order in

13   which we're going to do this.

14           Ms. Johnson, how would you like to proceed?

15           MS. JOHNSON:  Your Honor, may I have a moment to

16   confer with Mr. Kaplan?

17           THE COURT:  Yes.

18       (Defense counsel confer off the record.)

19           THE COURT:  Is the interpreter okay if we were to go

20   to noon before taking a break?

21           THE INTERPRETER:  I'm fine.

22           THE COURT:  Okay.  Thank you.

23           Ms. Johnson, I'm sorry.  Let me pause.

24           Mr. Allison, that being your main presentation, is it

25   accurate that at this point the government is not going to call

1    Professor Whiteside?  Professor Whiteside's reports are already

2    in the record, but you don't intend to call him.  Is that

3    correct?

4            MR. ALLISON:  I would like to have a moment to talk to

5    my team before we make that decision, Your Honor.

6            THE COURT:  Okay.  And it may be too early to say that

7    in light of the relationship to the political question

8    doctrine.

9            MR. ALLISON:  Right.

10           THE COURT:  So never mind.  Let me park that question.

11   Okay.

12           Ms. Johnson, I had asked how you wanted to proceed.

13   Can you give me a road map of what you'd like to do now?

14           MS. JOHNSON:  Yes, Your Honor.  So I think that we are

15   going to address the issues in the reverse order from

16   Mr. Allison.  I'm going to start with probable cause.  My guess

17   is that that will take us through lunch or near to it.  And

18   then after lunch, we will address the other ways in which the

19   extradition packet is insufficient.

20           THE COURT:  Okay.  Let me ask you before you start

21   just as a general question:  Are there any of the requirements

22   for certification that you believe the government has met?

23           MS. JOHNSON:  Could we answer that question after

24   lunch?

25           THE COURT:  Yes.  Yes.  Go ahead.

1    MS. JOHNSON:  Okay.  Let's answer that question after

2  lunch.  Probably yes, but I want to confer, and I don't want to

3  take the time right now.

4    I would like to use the Elmo, which I believe is --

5    THE COURT:  Is it working?  If it's working.

6    MS. JOHNSON:  Yes.  I think that the courtroom deputy

7  has to switch, which is why I was asking.

8    THE COURT:  Ms. Johnson, can you make sure you pull

9  the microphone and speak at a certain volume.

10    MS. JOHNSON:  Yes.

11    So I would like to begin by correcting an error in the

12  government's presentation.  The government on its slide

13  referring to the standard for probable cause begins with a

14  quote from *Quinn versus Robinson* discussing whether there is

15  any evidence warranting the finding that there was a reasonable

16  ground to believe the accused guilty.

17    That is not the standard for probable cause in this

18  court.  That is the standard on habeas review for the district

19  court.  That is just an incorrect statement of the law, and we

20  ask the Court to disregard it.

21    I have the actual case here.  It says, "The scope of

22  the district court's review of a magistrate's extradition order

23  on a petition for a writ of habeas corpus is limited to

24  whether --" and then the quote cited by the government.

25    We -- The Court is very familiar with the ordinary

1    probable cause standard.  The ordinary probable cause standard

2    is whether a person of ordinary prudence would believe, upon

3    review of the evidence, that the defendant or in this case the

4    relator had probably committed the offense.

5            And we submit that a careful review of the documents

6    in their entirety and not just the selected portions identified

7    by the government and rearranged and taken out of sequence,

8    that upon a careful review of the documents, no reasonable

9    person would take these allegations seriously.

10           So what I would like to do is to go through the

11   statements chronologically, not as they're presented in the

12   packet, not as they were presented by Mr. Allison.  This is

13   allegedly an investigation that took place over 13 years.  And

14   I think the way that people's statements change over time is

15   instructive and is informative to the Court in terms of who

16   should be credited and who should not be credited, because, as

17   the Court has already observed -- and I think as Mr. Allison

18   would admit -- it is simply not possible to believe all

19   statements of all witnesses.

20           The earliest statement is a statement from 2006, and

21   this is from -- I have attempted to rename my -- or to

22   reorganize my identifiers for the witnesses so that I'm using

23   the same one the government is using.  But if I am not, I am

24   sure Mr. Allison will tell me.  I believe this is the

25   individual who the government refers to as Plaintiff 1.

1          THE COURT:  And then let me ask in your presentation

2     will we be able to track page numbers?  Because that would be

3     helpful.

4          MS. JOHNSON:  Yes.  My reference, because I was hoping

5     that it would be clearer for the record, I have used references

6     to the docket numbers in the file.

7          THE COURT:  That will work too.  We just need to know.

8          MS. JOHNSON:  Yes.  So the earliest statement is

9     Document 3-3 at 62.

10          We believe it's the earliest statement in the

11     investigation.  It says 2006.  There's no month or no day.

12          This is Plaintiff 1.  Plaintiff 1 says that "Khalid,"

13     who is actually the second victim, "was going to work as a

14     policeman, and a group of armed terrorists opened fire on him.

15     He was killed immediately."  This person is filing a complaint,

16     and this person doesn't have any other statements, which I

17     think is reasonably interpreted as a statement by this person

18     that they have told all they know at this point.  "Khalid was

19     killed.  I would like the person found and prosecuted."

20          The second statement similarly is from plaintiff, the

21     person that I believe the government was referring to as

22     Plaintiff 2, which is docket -- Document No. 3-3 at 63.

23          Also 2006 but with no month or day.

24          "On the day of the incident, I learned that Khalid

25     Ibrahim Mohammad was killed by terrorists while he was

1    attempting to report to duty.  He was wearing a uniform.  So

2    I'm filing a complaint and asking that -- and asking to be

3    compensated."  Again the statement "This is my statement, and I

4    don't have anything to add," which we believe a reasonable and

5    fair reading of that is this plaintiff knows nothing else other

6    than the information that has been provided.

7            Chronologically, according to the dates provided on

8    the documents, which, as the Court is about to see, are not

9    necessarily reliable, is a statement allegedly given or dated

10   June 6, 2006.  This is Document 3-3 at 67.  This is another

11   statement by Plaintiff 1.  Plaintiff 1 is the person who said

12   Khalid left for work; he was killed; I don't know anything

13   else.

14           The reason -- This date is not accurate and cannot be

15   accurate.  The reason is Khalid was killed in October.  This is

16   a statement allegedly from June.  So this person is allegedly

17   making a statement before the death of Khalid saying -- And we

18   can see the date here.  It's, as the Court has I'm sure already

19   observed, the month and date are flipped.  So in June of 2006,

20   this person is supposedly saying that in October of 2006, this

21   person was sitting in their house when they heard from a

22   relative that Khalid was killed.  And then it says, "After

23   awhile I learned from --" and this is redacted, but the Court

24   has the names -- "who are", with an explanation of who they

25   are, "that the accused --" And obviously we're not going to say

1    this person's name, but I do not believe that it is a violation

2    of the protective order to say this was not Mr. Ali Yousif

3    Ahmed Al-Nouri since his name is no where redacted in the

4    packet.  "So I learned that somebody's in custody, and I'm

5    asking that a complaint be filed against him and his group."

6         So this person has been informed by somebody -- this

7    is clearly not a personal knowledge statement -- that someone

8    has been arrested and is requesting that that person be

9    prosecuted.

10        The next statement again obviously erroneously dated

11   is from also again Plaintiff 1, the same person, purportedly

12   dated June 6, 2006, Document 3-3 at 70.  This person

13   apparently assists the government in -- the government of Iraq

14   or the police in Iraq of drawing a schematic of where the

15   person believes that the incident occurred, which is on Street

16   40 in front of some stores about a kilometer away from the

17   police station.

18        The next thing that happens in this investigation is,

19   again, Plaintiff 1, same person, there are two different dates

20   on this document.  This is Document 3-3, Page 64.  The document

21   up top says August 11th, 2006.  The bottom it says November 8,

22   2006.  Who knows?

23        And there is -- it again says, "The victim left the

24   house to go to the police directorate."

25        "I learned," I think implying this information was

1    gathered from others, "that when he got to Street 40, people in

2    a car appeared, and four masked men exited the car and were

3    carrying automatic weapons, opened fire on him and shot him

4    dead immediately.  He was gone to the hospital."

5         This person says they didn't witness the event.  "I

6    came to know that one of the perpetrators is someone who is not

7    Mr. Al-Nouri and that that person is in the custody and has

8    confessed along with a group of people that this person doesn't

9    know."

10        So this person is disclaiming all knowledge of the

11   people who did it apparently other than what this person has

12   been told or has learned.

13        THE COURT:  Ms. Johnson, let me see if I'm tracking

14   your argument.  I see that Mr. Ahmed is not named in this

15   document.  But isn't it possible that when the plaintiff refers

16   to the group of people that he does not know, that Mr. Ahmed is

17   one of those people?

18        MS. JOHNSON:  Well, the statement "a group of people I

19   do not know" would not preclude Mr. Ahmed Al-Nouri from being

20   one of those people.  The reason that I'm going through this is

21   that Plaintiff 1 submits a contradictory statement much later

22   that is in direct contradiction to these repeated statements

23   saying this Khalid was killed; I don't know who did it;

24   somebody told me it was this person who's not Mr. Al-Nouri.

25        THE COURT:  So at least in brief form your argument is

1    closer in time he doesn't name Mr. Ahmed, and later he does?

2           MS. JOHNSON:  Yes.  And closer in time he disclaims --

3    basically disclaims all knowledge other than what he's been

4    told.

5           THE COURT:  Okay.

6           MS. JOHNSON:  Changes his tune later on, which is a

7    theme.  And I apologize for going through this slowly, but I

8    think it's important to do it chronologically because so many

9    stories change, and they always change in exactly one

10   direction, which is, as the Court knows, a factor that the

11   Court can consider, is which statements were made nearest in

12   time.  How reliable when you have conflicting statements?

13   Which ones are motivated?  Which ones are not motivated?

14          So the next thing that happens is that Plaintiff 2

15   comes back, and this is at Document 3-3, January 29 or --

16   excuse me -- Page 65.  This is a document dated November, 2006,

17   from Plaintiff 2, who had similarly said that he or she did not

18   know anything.

19          It says, "On the date of the incident, I was sitting

20   in my house.  I heard from people in the area that Khalid had

21   been killed.  And I learned from someone that the accused --"

22   and the name under redaction here, obviously we're not going to

23   show the name, but it is Co-conspirator 1 or -- excuse me --

24   what are we calling him?  Conspirator --

25          MR. ALLISON:  Cooperator.

1      MS. JOHNSON:  The government's calling him cooperator.

2  I call him co-conspirator.  Those are the same things, C1.

3      THE COURT:  All right.  Thank you.

4      MS. JOHNSON:  "That C1 has been arrested with other

5  accused individuals, you know.  Please do something about

6  this."

7      Chronologically the next statement is the first

8  statement we get from the co-conspirator, which is Document 3-3

9  at 78, apparently continued on to 79, dated November 5th, 2006.

10      This is the first statement of the co-conspirator.

11      It says, "About a month and a half ago --" so this is

12  the beginning of November; a month and a half ago is the end of

13  September approximately -- "I met the so-called --" and it

14  names people -- "and that person introduced the co-conspirator

15  to a group of people, including somebody named Ali Yousif

16  Al-Mahmadi."

17      The government has submitted no evidence to show that

18  Mr. Ali Yousif Ahmed Al-Nouri ever went by or was known by the

19  name Ali Yousif Al-Mahmadi.

20      This is not demonstrably my client.

21      "They told me they were working on killing members of

22  the police.  I agreed to work with them.  Ali Yousif was their

23  leader."

24      And in this statement the co-conspirator says that

25  "Ali Yousif Al-Mahmadi was in a car that was providing

1    surveillance and support and that the co-conspirator was riding

2    in the car that actually did the killing."

3          So there are two cars, and Ali Yousif Al-Mahmadi was

4    driving a gray Opel Senator, and that car was providing

5    surveillance and support to the area.  And the other car was

6    the car where the shooting occurred.

7          Now, neither of these looks like a complete statement.

8    It says, "After the execution, we went to the area of Jubail."

9    This is where he says that they received 50,000 Dinars.  And

10   there was a gun that had been collected from the victim and

11   turned over to someone.

12          And after a period of time, the group was tasked to

13   kill a police officer by the name of Mohammad.

14          Now, there are a couple of references to being tasked

15   to kill Mohammad in this packet.  Who is Mohammad?  There's no

16   explanation provided.

17          Neither of the victims in this case is named Mohammad.

18   No information is provided about this.  And this statement cuts

19   off.  So this does not appear to be a complete statement.

20          The next page says, "followed to the statement of,"

21   but the Court can read it does not actually either

22   grammatically or logically follow the statement before.  It

23   appears to be an incomplete statement.

24          And it talks about having an agreement to attack

25   police at the checkpoint.

1          There is another statement made by C1 on ostensibly

2     the same date, November 5th, 2006.  This is Document 3-3 at 81,

3     continued on to 82.

4          And the timing in this statement is reasonably

5     consistent with the timing of the prior statement.  This person

6     says that about a month ago, he met up with a group of people

7     and started working to kill policemen with them.  About a month

8     ago would have been October.

9          He -- Again, there's something about agreeing to kill

10    a policeman Mohammad, who nobody ever explains who Mohammad is

11    or what's going on with Mohammad.  And it goes on to say that a

12    few days later -- so after they kill Khalid -- a few days

13    later, they go out up to the rooftop of one of the buildings

14    and start firing on police officers.

15         A few days later in the same year and a short period

16    of time after these operations, an agreement was made to attack

17    the checkpoint.  And apparently Ali Yousif, whichever Ali

18    Yousif he is referring to, participated in this checkpoint

19    attack.

20         Now, this is significant because, as the government

21    has conceded in its briefing on the detention memo and as I

22    don't believe has ever been in dispute in this case, Khalid is

23    killed on October 3rd.  Mr. Al-Nouri is shot -- and the

24    government has offered some theories about how they believe he

25    may have been shot that are speculative -- on October 4th, is

1    taken to a hospital, spends some time in the hospital,

2    ultimately goes to Syria, which the Court has heard about,

3    spends a number of years in Syria, and then travels to the

4    United States.

5              THE COURT:  Counsel --

6              MS. JOHNSON:  Yes.

7              THE COURT:  -- the specificity of the date on which

8    Mr. Ahmed was shot may be in the record, although sitting here

9    right now I don't recall it.  If you can make a note maybe

10   after lunch to give me the cite for where it shows in the

11   record that he was shot on exactly that day, because I thought

12   that was unclear in the record.  But if you know, then I'd

13   appreciate the cite.

14             MS. JOHNSON:  I will.  It was in the government's

15   extradition memo.  And we did not provide extrinsic evidence of

16   it because we agree with that date.  We do have a hospital

17   record that we are happy to provide.  Mr. Al-Nouri goes to the

18   hospital the day after as suffering from a gunshot wound.

19             THE COURT:  Okay.  Thank you.

20             MS. JOHNSON:  So Ali Yousif, a few days later, while

21   Mr. Al-Nouri is in the hospital, is on a street-top apparently

22   shooting at some police officers at a checkpoint.

23             THE COURT:  Counsel, just to be obvious, your point is

24   if Mr. Ahmed, your client, is in the hospital recovering from

25   gunshot wounds on October 4th, at least for the narrative of

1   this statement, he cannot be one of the individuals on the

2   rooftop in that time frame shooting at police checkpoints?

3           MS. JOHNSON:  Yes.  And he is given a different name

4   by the co-conspirator.  Ali Yousif is, I believe our expert

5   will testify, a very common name, not particularly identifying

6   as to my client.

7           So it's suggestive that it was actually somebody else.

8           Now, the next chronological statement that occurs is

9   actually about the first victim, Issam.  And this is made by --

10  and I would like the government to confirm that I'm using the

11  right moniker here -- someone I believe the government is

12  calling Plaintiff 4, who is -- This is Document 3-3 at 95.

13          It says, "About six months ago the victim Issam was

14  standing near one of the stores on Street 40, and two cars, one

15  of them an Opel Omega of an unknown color and the other one a

16  Prince, started firing from an AK-47 in the direction of" --

17  redacted -- "and killed him."

18          This is according to the claims of those who were

19  present at the crime scene.

20          Again, this appears to be a plaintiff who I'm

21  requesting that all procedures be taken against them, who has

22  no personal knowledge of the events and is simply reporting

23  what he or she has been told.

24          I'm only going to show it very briefly, because as far

25  as I can tell, it's a virtual duplicate of the last document.

1    Document 3-3, Page 97, also Plaintiff 4 makes the same

2    statement, no personal knowledge.

3           Now, the next statement -- And I apologize.  Both of

4    those statements were dated January 16th, 2007.

5           So we are now into the 2007 time period.

6           Six days later, on January 22nd, 2007, Plaintiff 4

7    provides an additional statement.

8           THE COURT:  Counsel, you went fast on the identifier.

9           MS. JOHNSON:  I apologize.  This is Plaintiff 4.

10          THE COURT:  And it's 3-3 at 98?

11          MS. JOHNSON:  3-3 at 98.

12          Again, someone just describing that Issam has been

13   killed, and this person has learned that one of the accomplices

14   in the crime was captured in addition to the group -- in

15   addition to a group that was there and is asking that a

16   complaint be filed.

17          And it's a little unclear, but I think it becomes

18   clear in subsequent documents that this person is saying that a

19   group was captured, not just the individual, who I believe is

20   the co-conspirator.

21          Now -- on, again with Plaintiff 4, on November 25th,

22   2008 -- and this is Document 3-3 at 96 -- this same plaintiff

23   says, "On June 1st, 2006, a group of militants killed Issam on

24   Street 40.  A group of people were captured.  A few of these

25   criminals were captured and confessed, and they were:"  And

1    then there's a list of names including Ali Yousif Ahmed.

2              Now, I think that it goes without saying Mr. Ali

3    Yousif Ahmed Al-Nouri was not under arrest in Iraq in 2008.

4    The government claims, I think, that he was being detained in

5    Syria in that time.

6              This person appears to believe that Ali Yousif Ahmed,

7    whoever they're calling Ali Yousif Ahmed, is in custody.  And

8    not only is he in custody, there's a disc of their confession,

9    so they have confessed, and apparently their confession has

10   been recorded, and it's attached to my complaint.

11             THE COURT:  Okay.  Counsel, on this one I'm not sure

12   I'm tracking.

13             MS. JOHNSON:  Yes.

14             THE COURT:  Where is it clear to you that the entire

15   group is in custody rather than a portion of the group?

16             MS. JOHNSON:  It is my understanding of what a colon

17   signifies followed by a list that the list refers to the

18   descriptor that precedes it.

19             THE COURT:  And you did make your argument about the

20   colon, but previous to that it says, "But later on, few of

21   these criminals were captured," which would imply less than the

22   whole group.  I can still take your argument.

23             MS. JOHNSON:  Yes.

24             THE COURT:  But you agree that cuts against that?

25             MS. JOHNSON:  The use of the number of people referred

1          to by the word few I think is culturally specific even within

2          the United States.

3                    I don't think that -- I don't know -- five or six,

4          however many people are here necessarily, not a few.

5                    But, you know, the Court can make its own

6          determination.  At any rate, we certainly don't have a disc of

7          anyone's confession despite the fact that the disc is allegedly

8          attached.  And that would be a very useful piece of information

9          to have, certainly better than written documents.  Certainly if

10         it was a confession made by Mr. Al-Nouri on video, we could all

11         just go home.  We wouldn't be here.  Where is this disc?  It's

12         missing.  And why is it missing?

13                    And then Plaintiff 4 makes Plaintiff 4's last

14         statement on the same day.  This is November 25th, 2008,

15         Document 3-3, Page 99.

16                    Again says, "I found out that some of the attackers

17         were captured, and they confessed, and their confessions were

18         registered, the criminals," again a list, "including somebody

19         named Ali Yousif Ahmed."  Where are these registered

20         confessions?

21                    It would be very helpful.  And, again, clearly Mr. --

22         you know, I don't know who they're calling Ali Yousif Ahmed,

23         but Mr. Ali Yousif Ahmed Al-Nouri was not captured in Iraq in

24         2008, and certainly there's been no registered confession

25         included in this file.

1          And the government is correct that Iraq does not have

2     to submit all of the evidence that it has, but I think that it

3     is fair for the Court to take note of what is missing,

4     especially when considering the relative value of what is

5     missing to what is present.

6          The next statement chronologically is from the

7     individual who I believe the government calls Witness 1, and

8     that is Document 3-4 at 6.

9          And these are the two statements that the government

10    discussed somewhat at length.  So there are two statements on

11    the same day by Witness 1 who is the person who was sitting

12    next to or with Issam when Issam was murdered.

13         And 3-4 at 6 identifies the witness as a commissioned

14    police officer.  So appears to be -- I don't know if it's a

15    co-worker of Issam.

16         This statement is signed, purportedly the original.

17    There is also the signature of a witness that has a date on it

18    of January 11th, 2009, which is the same date as on the

19    document that the statement is allegedly made.

20         And as the Court is aware -- we've already

21    talked about this statement -- we believe that this statement

22    is exculpatory as to Ali Yousif Ahmed Al-Nouri.

23         And we've talked about some of the differences in

24    this, in these statements.  The statement which I submit -- it

25    comes second in the packet at Page 6 -- that I submit is more

1   logically understood as coming prior to the other statement,

2   despite the fact that they have the same date on it, is the

3   statement where Ali Yousif enters the store, encounters an

4   attempted murder in progress, tells him leave him; that is 1st

5   Lieutenant Issam; he serves as a policeman; and somebody told

6   him step back, that it's none of your business.

7           This identifies Lieutenant Issam as being killed by an

8   AK-47 because the person who attempted to kill him with a

9   pistol misfired.

10          Now, why do I think that despite the fact that they

11  have the same date on them, that 3-4 at 5 is more likely made

12  subsequent to 3-4 at 6?  This statement is not signed.  It has

13  a thumbprint on it.  There is allegedly a witness signature,

14  but the witness signature doesn't have a date on it.

15          So we have no idea whether this statement was actually

16  witnessed on this day or whether this is an amendment to a

17  prior statement.  But this document is missing things that the

18  first document has.

19          And it also -- It does not make lot of sense.  As the

20  Court has already noted --

21          THE COURT:  I'm tracking your argument, but what makes

22  this subsequent though?

23          MS. JOHNSON:  Well, this document also, instead of

24  just saying Ali Yousif, says Ali Yousif Nouri, which is the

25  first time that the name Nouri appears in any of these

1   documents.

2           The first statement, what I'm calling the first

3   statement, Page 6, is a relatively coherent account of a

4   witness who saw his co-worker killed in front of him.

5           This statement has, as the Court has already noted,

6   Mr. Al-Nouri allegedly attempting to prevent the killing of

7   somebody who has already died.

8           Mr. Al-Nouri attempts to intercede.  It repeats the

9   story of Mr. Al-Nouri attempting to intercede, although it says

10  the police officer's already dead, and then just sort of tacks

11  on at the end, oh, and, by the way, this man is a criminal and

12  an Emir of the group.

13          That is not logically how people tell stories.  It

14  seems like information has been tacked on to the original

15  statement, which is a fairly coherent narrative, in order to

16  add incriminating information at a potentially unknown date.

17          And it does again repeat that there was a pistol, a

18  handgun, that misfired, and that ultimately Issam was killed by

19  an AK-47 being held by somebody else and that Ali Yousif or Ali

20  Yousif Nouri held neither of the guns.

21          THE COURT:  Counsel, it's about 11:53 or 11:54.  Just

22  for pacing, how much do you want to do in the next three

23  minutes before we break for lunch?

24          MS. JOHNSON:  I think that that is a good stopping

25  point, because the next is a series of six statements by the

1     co-conspirator all on the same date, so this is probably a good

2     stopping point.

3              THE COURT:  All right.  Thank you, counsel.  All

4     right.  We'll be in recess until 1:00 p.m.  I know that's a

5     somewhat quick lunch hour, but we have a lot more to cover.

6              So does either side have an issue with only having an

7     hour for lunch?

8              MR. ALLISON:  Not at all, Your Honor.

9              MS. JOHNSON:  No, Your Honor.

10             THE COURT:  Okay.  Then we'll reconvene at 1:00 p.m.

11    Thank you.

12        (Proceedings recessed from 11:54 a.m. until 1:01 p.m.)

13             THE CLERK:  Judge, we are back on the record.  We're

14    back on the record.

15             THE COURT:  Ms. Johnson, are you ready?

16             MS. JOHNSON:  Yes, Your Honor.  So before -- I'm

17    sorry.  Could I have the Elmo, use the Elmo.

18             So I'm returning to the last document briefly that we

19    were discussing before the break, which is 3-4 at 5, which is

20    the statement by Witness 1.  This is the statement that we

21    dispute or think is less reliable than the other statement.

22             But I did want to note that this statement at the end

23    says that there is a confession disc about all of the

24    accomplices, among them criminal Ali Yousif.

25             So this individual, to the extent he made the

1    statement, appears to believe that the confession disc, this

2    mysterious, missing confession disc, includes a statement by

3    somebody named Ali Yousif.  And we don't have that.

4            So that was January 11th, 2009.

5            The next thing that happens chronologically is that

6    there are a series of statements by the co-conspirator all

7    dated June 6, 2010.  So I've had to somewhat guess at the

8    order.  They all have the same date.  I'm going to start with

9    document 3-3 at 80.

10           And it's noted elsewhere in the packet the

11   co-conspirator is maybe still in custody today but was in

12   custody, I believe, as of the time that the extradition packet

13   was submitted.  So appears to have been continuously in custody

14   from whenever he or she was arrested.

15           THE COURT:  Counsel, just to make sure I track you, we

16   were dealing with witness one.  You've just finished that.  And

17   now you're talking about C1?

18           MS. JOHNSON:  Yes.  C1 -- 3-3 at 80 -- now

19   dramatically changes his story from the story that he was given

20   shortly after his arrest and says that in 2006 -- remember he

21   had previously said that he had only just met these people

22   recently, that Ali Yousif Al-Mahmadi was the driver of a

23   surveillance car, not the car that killed Khalid.  And now four

24   years later, approximately, three and a half years later, the

25   co-conspirator says in the year 2006 I was working with an

1    armed militant group.  The terrorist group consisted of, again,

2    Ali Yousif, no family name.

3          Now it says Ali Yousif, instead of being in an Opel

4    Senator, is in an Opel Vectra.  And it is Ali Yousif who

5    stepped out of the car and killed the police officer while he

6    was in the surveillance car.  And it says that he had -- Ali

7    Yousif had a pistol, and all the others had AK-47s.  And it

8    says Ali took the police officer's gun.  Previously somebody

9    else had taken the police officer's gun.

10         It invites question as to whether the previous

11   statement about somebody else taking the police officer's gun

12   was prepared in order to charge that person with murder.  This

13   is just completely inconsistent.

14         Now Ali Yousif is the person who shot him.  Ali Yousif

15   is driving the car.  No explanation for the inconsistency or

16   why the story's changed, none.

17         Another statement dated the same day, again by C1,

18   Document 3-3 at 85 and 86.  The co-conspirator is allegedly

19   taking, I guess, the police on a walk-through of the area where

20   the offense supposedly occurred.

21         And in this statement, this is when we hear for the

22   first time, at least on this date, that the co-conspirator was

23   allegedly present when an agreement took place to kill

24   Lieutenant Issam despite the fact that he previously denied

25   having known these people at the time when that murder took

1  place and had never, to our knowledge, previously mentioned it.

2  So this is inconsistent with his first statements, and it's

3  made three and a half years later.

4          There is another statement that day by C1, 3-3 at 80,

5  again dated June 6, 2010.  Again, more of the same.  He now

6  says that Ali Yousif was driving the car that killed Khalid,

7  and he's changed the kind of a car.  Ali Yousif is no longer in

8  an Opel Senator.  He's in an Opel Vectra.

9          We have another statement by the co-conspirator C1,

10 Document 3-4 at 7.  Again he contradicts his own statement

11 about when he previously met the group that he was involved in,

12 and now he's talking about the murder of Issam.  And he claims

13 that he was watching the road, and the victim was standing next

14 to one of the stores, and Ali Yousif Ahmed stepped out of the

15 car and fired shots at the victim using a 9mm handgun and

16 killed him.

17         This is inconsistent with his prior statements about

18 not having met them until just before the murder of Khalid.

19 This is also of course inconsistent with the eyewitness W1 who

20 says, among other things, they were inside a store, because,

21 remember, he says Ali Yousif entered the store.  It is entirely

22 unclear how somebody who's standing and watching the road can

23 observe something that happens inside a store.

24         This describes somebody named Ali Yousif just popping

25 out of a car and shooting, whereas the eyewitness describes a

1    fairly -- I'm not going to call it a lengthy interaction, but

2    you have a gun that jams.  You have an attempted intercession

3    by a bystander.  You have a second person who commits the

4    shooting.  He says that there's a prayer before the man passes

5    away.  I mean, this is not somebody popping out of a car and

6    shooting a few bullets and walking off.

7              And of course he also said that he was killed by an

8    AK-47.  And this says that he was killed by a 9mm handgun.

9              There are no autopsies.  Both of those things can't be

10   true.  These stories are just not similar enough that they can

11   be explained away by different people's perceptions or faded

12   memories.  These two people cannot both be telling the truth.

13   It is not possible.

14             There is another statement with the same date, 3-4 at

15   9, that I'm not going to go over because it is basically the

16   same as the one that I just -- It's duplicative of the one that

17   I just presented.

18             THE COURT:  And that's also by C1?

19             MS. JOHNSON:  By C1.

20             And then there is a statement by C1 at 3-4, same date,

21   June 6, 2010, 3-4 at 10 and 11.  In this statement, the C1 says

22   that he learned of the murder of Issam after the fact.  That is

23   inconsistent with his statement that he just saw it.  It is

24   inconsistent with his statement that he didn't know these

25   people until September or October.  And, again, there is no

1    explanation.

2            The government tried to say these were not

3    inconsistent.  There's no reasonable explanation for why Ali

4    Yousif would need to tell C1 that he had executed the operation

5    using a 9mm handgun if C1 had just witnessed it, because he'd

6    been told to watch the road.  It doesn't make any sense.

7            So C1's story has changed dramatically to become more

8    inculpatory as to whoever he's referring to as Ali Yousif as he

9    has been in custody.  I think it is fair -- we have cited it

10   repeatedly -- for the Court to take notice of how detainees,

11   particularly detainees in terrorism cases, are treated in Iraqi

12   prisons.

13           That is to say, they are habitually and routinely

14   tortured and forced to give false statements.  And that is from

15   the United States State Department report that we have cited

16   repeatedly in this case, and it is an admission by the

17   government.

18           MR. ALLISON:  Judge, I wasn't going to object until

19   she threw that last part in.  We're not admitting to that in

20   this hearing.  There's no evidence this cooperator was

21   tortured.  Your Honor's ruled that's an issue the experts can't

22   talk about.  We would object to that.

23           THE COURT:  I don't take it as an admission.

24   Ms. Johnson, the report -- the report is in the record,

25   although that portion of your expert's report has been ruled

1    inadmissible.

2         MS. JOHNSON:  Yes.  And we are, to be clear, we are

3    not claiming that there's evidence in this packet that this

4    co-conspirator was tortured.  We just believe that the

5    United States is on the record as saying generally there are

6    high rates of torture in -- for terrorism detainees in Iraqi

7    jails independent of anything our expert has said, which I

8    think is something the Court can consider when determining

9    which versions of events to believe, because the Court is going

10   to have to make some judgments.

11        So that's in 2010.  In -- and this is in the record

12   elsewhere -- in 2017 the FBI starts visiting Mr. Al-Nouri in

13   the United States and asking him questions about his time in

14   Iraq and asking him questions about or related to these events.

15        Omer Hameed in February of 2018 visits Mr. Al-Nouri's

16   family in Iraq and asks them for $40,000 to avoid these charges

17   being filed.

18        MR. ALLISON:  I would object to that, Judge.  I don't

19   think that's in the record by any document.

20        THE COURT:  Counsel, is it in your -- It's your motion

21   to compel makes that argument, correct?

22        MS. JOHNSON:  It does.

23        THE COURT:  You can argue it.  It's not an established

24   fact, but you can argue it.

25        MS. JOHNSON:  So after that happens, after the FBI

1    becomes involved in this -- And again at this point we have

2    exactly one statement that mentions the name Al-Nouri, and it

3    is the statement that we have serious questions about the

4    authenticity of just based on the face of the document or the

5    timing of it and its authenticity.

6            Now, in 2018, November 18th, 2018, Plaintiff 3 -- I

7    believe who the government refers to as Plaintiff 3 -- makes a

8    statement, Document 3-3 at 94.  And all of a sudden this

9    person, who is a person who does not profess personal

10   knowledge, this is a plaintiff.  This is one of those people

11   who says the victim was killed; I learned that; presumably from

12   being told by somebody else.  And now we have the perfect name

13   Ali Yousif Ahmed Al-Nouri and a whole bunch of other people.

14           "The aforementioned individuals are known to work with

15   terrorist groups and have taken part in several murder

16   operations targeting those who work with security agencies.  I

17   am filing a complaint against Ali Yousif Ahmed Al-Nouri."

18           No information about how this person knows this

19   information.  No information about who conveyed this

20   information, under what circumstances it was obtained.  This

21   does not appear to be a statement of personal knowledge.  This

22   appears to be somebody who has been told information by

23   somebody and does not report who.

24           But we now have a very clear name.  It's the first

25   time we have a clear name except for that one statement that

1    we've talked about earlier.

2          The next thing that happens, February 18th, 2019.  I

3    would also observe that statement in November, just as

4    argument, in November 18th, 2018, is made shortly after Omar

5    Ameen is arrested in Sacramento.  And his lawyers pop out the

6    first day he's arrested and say:  Hey, guys, there's been a

7    mistake.  He was in Turkey.  You've got the wrong guy.

8          Right after the case against Omar Ameen seems to fall

9    apart, all of a sudden there's activity on this case from 12

10   years ago.

11         THE COURT:  Counsel --

12         MS. JOHNSON:  Yes.

13         THE COURT:  -- if you have a direct allegation to

14   make, then make it.  But that type of argument is not

15   persuasive.  The Ameen case is an entirely or was an entirely

16   separate case.

17         MS. JOHNSON:  The -- The government has acknowledged

18   that the FBI became involved in investigating these

19   allegations, and it clearly happened around -- or at least no

20   later than 2017, because that's when they start visiting

21   Mr. Al-Nouri here in Phoenix and asking him questions about it.

22         So the next thing that happens, February 18, 2019,

23   this is Witness 2, I believe the government calls Witness 2,

24   Document 3-3, 75, this is one of the government's favorite

25   statements, and I understand why, because all of a sudden

1    everything gets very clear.  Again we have Ali Yousif Ahmed

2    Nouri.  "I was standing near the location.  I recognized him

3    because his mask fell off."

4              No explanation whatsoever about why this person waited

5    13 years to come forward.  I guess it was more like 12 and a

6    half years to come forward.

7              THE COURT:  What's the date of this statement?

8              MS. JOHNSON:  February 18th, 2019.

9              It is a very terse statement.  The redacted

10   information -- Among the information the government has

11   redacted is the relationships of all of the speakers to the

12   victims.  But obviously that is information that is available

13   to the Court and has been redacted from all of the documents,

14   not just this one.  I would ask the Court to consider why

15   someone who stands in the relationship identified in this

16   document in the unredacted version, why somebody who stands in

17   that relation to the victim would fail to notify Plaintiff 1

18   and Plaintiff 2 of what he knew, because Plaintiff 1 and

19   Plaintiff 2 made a number of statements saying I don't know who

20   did this, and then later somebody told me who did this.

21             Why did Witness 2 not tell Plaintiff 1 and Plaintiff 2

22   what he knew and instead come forward 12 and a half or 13 years

23   later?  Makes no sense.

24             Then March 20th, 2019, the government's other favorite

25   witness -- and I understand --

1          THE COURT:  Counsel, I understand argument, but they

2    haven't referenced their witnesses as their favorite.  They

3    haven't said the government really likes this document.  I

4    understand your approach to chronological pointing out the

5    inconsistencies, but I would caution you not to characterize

6    the government's arguments for them.

7          MS. JOHNSON:  The statement on which the government

8    appears to rely most heavily in arguing to the Court that

9    probable cause has been established is this statement by a

10   witness I believe they identified as Witness 3, which is

11   document 3-3 at 76.

12          Again, this witness actually identifies -- it does not

13   say Al-Nouri, but it says Ali Yousif Ahmed and refers to him as

14   a fugitive, which is of course a term of art in extradition

15   cases.  It is clear that this statement was presented in

16   anticipation of an extradition request.

17          THE COURT:  And this is still Witness 2?

18          MS. JOHNSON:  No.  This is Witness 3.

19          This is the other statement upon which the government

20   relies most heavily in addition to Witness 2 because it

21   provides a very clear statement.  And this statement, it's --

22   the stamp obscures it a little bit, but my belief is that this

23   is, trying to read behind the stamp, is that this is dated

24   March 20th, 2019.  If the government believes it has a

25   different date, I'm sure it will say so.

1          So, again, we're now 12 and a half, 13 years after the

2     events.  This person says that he or she was standing in a

3     crowded market 40 meters from where the killing took place.  He

4     saw a red Opel Omega appear.  That is neither the Vectra nor

5     the Senator that the co-conspirator talks about.  And he says

6     that he saw people in the car began to open fire on the victim.

7          So this witness sees people firing from inside a car.

8     There's no mention of a mask or a mask falling off.  And they

9     don't exit the car until after the victim is shot, according to

10    this account.  It contradicts the earlier in time statement by

11    the co-conspirator that it was the car that Ali Yousif

12    Al-Mahmadi was not in that actually did the killing.  And,

13    again, the identification of Ali Yousif Ahmed as a fugitive is

14    unusual and suspect and indicates that the witness was told the

15    purpose for which his statement was being made.

16          Also, no explanation for why this information was not

17    conveyed for 12 and a half or 13 years, where the witness has

18    been, what's going on with the witness.

19          And now we return to the final statement, which

20    actually has the same date, March 20th, 2019.  And it is back

21    to being Plaintiff 1, who made a series of statements, I'm sure

22    the Court will recall, saying somebody killed Khalid; please

23    find who did it.

24          Plaintiff 1, years after the fact --

25          THE COURT:  What's the cite?

1        MS. JOHNSON:  I'm sorry.  It's 3-3 at 61.

2        And recall Plaintiff 1 also said that Khalid was going

3   to work.  It's Plaintiff 1 now says, "Khalid left to go to a

4   store to buy food.  And after half an hour, I heard the sound

5   of gunfire.  I rushed out of the house to find the reason for

6   the gunfire, and I learned from others that the victim was

7   killed and that one of the armed men who fired was, again, the

8   fugitive Ali Yousif Ahmed."

9        Plaintiff 1 has repeatedly disclaimed knowledge of who

10  did this and now personally remembers hearing gunfire and being

11  told -- and again we have the name Ali Yousif Nouri.  This is

12  not a credible statement, and it points to a pattern of very

13  belated attempts to bolster a very, very flimsy record once the

14  idea of extradition apparently comes into the mind of the Iraqi

15  government.

16        These statements are not credible, and we submit that

17  no reasonable person looking at the totality of these

18  statements, the changes in the statements over time, the

19  inconsistencies, the missing apparently recorded confessions,

20  the lack of plausibility of the behaviors that would be

21  required for the people making the statements to not come

22  forward, to not tell other individuals who are interested in

23  the case what happened when they supposedly were eyewitnesses

24  to it.

25        This is not -- No reasonable person would believe that

1    Mr. Ali Yousif Ahmed Al-Nouri probably killed either -- or

2    participated in the killing of either Issam or Khalid based on

3    this record and the problems with it.

4           THE COURT:  Thank you, Ms. Johnson.

5           Ms. Johnson, do you want to -- Well, I guess I'll give

6    the government a little bit of time for argument on probable

7    cause now.  But I do want to get to any affirmative defense

8    case you'd like to make.  That would be the next thing in your

9    presentation?

10          MS. JOHNSON:  Your Honor, we were intending to briefly

11   call Professor Hamoudi.  And Mr. Kaplan has some arguments

12   about other elements that have not been satisfied legally.

13          THE COURT:  That's also fine.

14          Okay.  So then let's hear from the government on the

15   probable cause issue.  Mr. Allison, I don't think the Court

16   needs to hear necessarily point by point, but go ahead and make

17   any rebuttal.

18          MR. ALLISON:  I'll try to be quick, Your Honor.

19          Your Honor, Ms. Johnson started her presentation by

20   saying that one of our citations on our slide was incorrect

21   about probable cause.  I want to cite the Court to *Sainez*

22   *versus Venables*.  The cite is 588 F.3d 713, and the page number

23   is 717.  It's a Ninth Circuit case, 2009, still good law.  It

24   quotes right there "In an extradition proceeding, quote, the

25   magistrate's function is to determine whether there is any

1    evidence sufficient to establish reasonable or probable cause."

2            So Ms. Johnson said it had to do just with habeas, but

3    that's not what the Ninth Circuit said in 2009.

4            Yes, Your Honor, in light of your guidance not to go

5    point by point, I will just touch on a couple things.

6            The first one, I just want to, briefly, Judge -- I

7    know you've read *Santos*.  You've cited it in numerous orders.

8    I just want to read a line from *Santos*.  *Santos* at Page 993

9    says, "In practice this means that an individual contesting

10   extradition may not, for example, present alibi evidence, facts

11   contradicting the government's proof, or evidence of defenses

12   like insanity, as this tends to call into question the

13   credibility of the government's offer."

14           It also cites to a case on the previous page, 992,

15   cites to the *Eain v. Wilkes* case for the proposition that "An

16   accused in an extradition hearing has no right to contradict

17   the demanding country's proof or to pose questions of

18   credibility as in an ordinary trial."

19           THE COURT:  But, counsel, I think that Ms. Johnson's

20   argument isn't -- well, some of it went to credibility based on

21   timing, so I take that point.

22           But most of her argument was taking the packet that

23   the government itself submitted, the internal inconsistencies

24   of the statements by themselves make them fail to meet the

25   standard of probable cause.

1          MR. ALLISON:  I agree, Your Honor.  And I was just

2    going to follow up by saying for any of the arguments that, you

3    know, a witness is swayed by their relationship with someone or

4    the torture argument of the cooperator, all of those are, in

5    the government's view, credibility arguments.  I do acknowledge

6    she's pointing out inconsistencies in the packet, and we can

7    talk about any of those Your Honor has questions about.

8          As I said in my presentation, the government

9    acknowledges factual inconsistencies.  The government also

10   acknowledges multiple sworn witness statements for these

11   murders and, as I mentioned earlier, believes there's enough

12   corroboration that the Court can find that that meets a level

13   of probable cause.

14         I'll just touch on a couple of the things Ms. Johnson

15   said.

16         She talked about dates in the packet.  She pointed out

17   one that was June 6th of 2006.  She said that couldn't be

18   possible.  It's a translation.  People make mistakes.  I don't

19   think that -- you know, it was a date on a report.  The

20   government doesn't see that as something that undermines the

21   probable cause in that statement.

22         She also pointed out one says 11-8-06; the other one

23   says 8-11-06.  She said they were different dates.  Iraq, to my

24   understanding, Iraq uses the day, then the month.  Maybe in the

25   translation, the English translation, it got crossed over, Your

1    Honor.

2              Ms. Johnson harps a number of times on this confession

3    disc.  Your Honor, the packet has what it has.  Iraq, the

4    country of Iraq doesn't have to produce their whole packet.

5    There's a lot more in there too.  You know, the government in

6    Iraq talks about intelligence information that they have that

7    backs up some of this stuff.  That's in some of the

8    investigative summaries.  We don't have their whole case.  This

9    isn't a trial.  This is a probable cause standard.

10             I can get out all the documents, Your Honor, or I can

11   kind of just go briefly, and if you want me to stop and explain

12   it, I can.

13             You know, Ms. Johnson said something about there was a

14   statement by Cooperator 1 that he didn't join the group until I

15   think she said October of 2006; how could he have been with the

16   group in June?

17             Well, you recall the June statement or one of the June

18   statements we talk about he observed the agreement in June, is

19   what he said.  Maybe he doesn't see it as a part of the group.

20   He said I observed the agreement, and I watched the road.  You

21   know, I don't think him saying later that, oh, I met these guys

22   and joined the group in October undercuts the -- what he's

23   swearing to in the facts in those statements.

24             One second, Your Honor.  The big thing I wanted to

25   point Your Honor too -- I know Your Honor is looking at things

| | |
|---|---|
| 1 | that are already in the record and other filings -- as part of |
| 2 | our detention memo, document 48, we filed a number of sealed |
| 3 | documents in support of that.  Ms. Johnson has them.  The Court |
| 4 | has them. |
| 5 |         I would ask that the Court go back and look at some of |
| 6 | those documents because I believe they undercut some of what |
| 7 | Ms. Johnson's saying about the cooperator properly identifying |
| 8 | Mr. Al-Nouri. |
| 9 |         THE COURT:  Do you recall which exhibits in |
| 10 | particular? |
| 11 |         MR. ALLISON:  Yeah.  I'm going to give them to you, |
| 12 | Your Honor. |
| 13 |         So you'll recall that Cooperator 1, as Ms. Johnson |
| 14 | pointed out, called the person he was accusing of the crime Ali |
| 15 | Yousif and Ali Yousif or -- I'm sorry -- Ali -- I'd better pull |
| 16 | it up just to look, Your Honor.  Al-Mahmadi I think is what he |
| 17 | says. |
| 18 |         The cooperator also says they met and had an agreement |
| 19 | at Ali Yousif's carpentry shop on Street 40 in the al-Shurta |
| 20 | neighborhood.  So, Your Honor, Exhibit A, which, again, is a |
| 21 | sealed document, so I don't want to go into detail here other |
| 22 | than to say that it confirms some of those statements of what |
| 23 | the cooperator's saying. |
| 24 |         Exhibit A is a, I believe, a report with the FBI, an |
| 25 | interview of Mr. Al-Nouri himself.  He confirmed some of those |

1    facts that the cooperator is alleging of the fugitive.  So this

2    isn't just an Ali Yousif somewhere in Iraq.  This is now an Ali

3    Yousif who has a carpentry shop on Street 40.

4          And on the Al-Mahmadi, Your Honor, I think it's

5    important to point out, if you look through those exhibits on

6    our document 48, I'm going to point out both what supports my

7    argument and what supports Ms. Johnson's argument.

8          Document 48, Exhibit B, is another interview with the

9    FBI.  Mr. Al-Nouri says he does not go by the name Al-Mahmadi.

10   However, in Exhibit E, Doc 48, he says Al-Mihmadi (phonetic).

11   It's spelled with an A instead of I -- an I instead of an A, is

12   his tribal, is his tribe that he's from.

13         MS. JOHNSON:  I object to that.  It's -- Mihimdi is I

14   believe what it says, which is --

15         MR. ALLISON:  That's fine.  We'll submit on the

16   exhibits.  Your Honor can --

17         THE COURT:  So it's Exhibit E that the parties have a

18   disagreement on the exact name.  Okay.

19         MR. ALLISON:  Also on Exhibit E, Your Honor, I would

20   just note that Mr. Al-Nouri admits to the FBI he was in

21   Fallujah on 10-04-06.

22         THE COURT:  Oh, before lunch I had asked the question

23   does the government agree and is it in the record that the date

24   that Mr. Ahmed was shot was October 4th, 2006?  Is that a fact?

25         MR. ALLISON:  I don't know if it's in the record.

1    Ms. Johnson did talk to me about this, and we are willing to

2    stipulate to a medical record that we have both seen that

3    October 4th, 2006, is the date he was in the hospital with

4    gunshot wounds.

5            THE COURT:  Okay.  So let's see.  Well, hold on.  I

6    don't -- I don't think the Court has the medical record.

7    Ms. Johnson, do I have the medical record?

8            MS. JOHNSON:  Your Honor, we don't have -- No, because

9    we can't attest to the validity of the translation.  But they

10   use the same Arabic -- We use Arabic numerals, so the date is

11   obvious even if you don't read Arabic.  And I think the

12   government just stipulates that we have the same date.  And

13   that's the only reason for which it's important.

14           THE COURT:  Okay.  So the stipulation, as I understand

15   it, is on October 4th, 2006, Mr. Ahmed was in the hospital

16   being treated for gunshot wounds?

17           MS. JOHNSON:  Yes.

18           THE COURT:  Okay.  Mr. Allison, do you agree?

19           MR. ALLISON:  Yes, in a Fallujah hospital, yes.

20           THE COURT:  Okay.

21           MS. JOHNSON:  And, Your Honor, I did want to object

22   for the record.  The government has said over and over again

23   that we are not allowed to produce extrinsic evidence to

24   contradict information in the extradition packet.  I would

25   object to the government's attempt to use FBI records extrinsic

1    from the packet to bolster the records submitted by Iraq.  If

2    the government wants to do this on a closed record, we should

3    all be on a closed record.

4            THE COURT:  Well, I'll have to think about that,

5    because that argument is that even though it's before the Court

6    and it's in the record and even though the Court has to make

7    determinations on probable cause and credibility, that the

8    Court can't consider something that's already in the record?

9    I'm not sure I'm persuaded by that, but I note your objection.

10           MR. ALLISON:  And, Judge, going to the medical record

11   for -- that we just discussed, Ms. Johnson points to -- I just

12   want to get my page cites here correct.  She points to Page

13   00081 using the system that I was using, the Bates number, and

14   talks about the shooting that the cooperator says Mr. Ahmed was

15   at.  And that page says a few days later.  And I can pull that

16   up on the document camera.

17           THE COURT:  I have it right here.

18           MR. ALLISON:  Okay.  And Page 81 says a few days

19   later, which she says how could he be shooting somebody if the

20   next day, October 4th, he's in the hospital?

21           I would point out that the cooperator has given

22   multiple statements, and on Page 77 and 78, there is no such

23   thing as a few days later.  It's just -- And I'm paraphrasing

24   here, but I want to cite to the right pages for the Court.

25   It's we killed Khalid.  Then we went after this other person.

1    Then we went to the police checkpoint.

2              I know that's inconsistent.  But, Your Honor, given

3    that Ms. Johnson's arguing that he was in the hospital on

4    October 4th with gunshot wounds, I mean, the cooperator's

5    statement on Page 78 says when we were there -- and he names

6    Ali Yousif -- he says after that police patrols returned fire,

7    and we withdrew.

8              It's not beyond belief that that medical report

9    corroborates what the cooperator's saying if Mr. Ahmed's

10   gunshot wounds were from the police returning fire the next day

11   or, you know, according to the statement on 77 and 78 rather

12   than the statement on 80.

13             So, again, I think the Court should take that into

14   account.

15             THE COURT:  Counsel, is there a particular case that

16   you can point the Court to that deals with not attacks on

17   credibility of the packet but how the Court should handle

18   inconsistencies within the packet itself?  I think I've read

19   almost all the cases on extradition, but there's a lot of them.

20   And so I'm just wondering if there's a case that in particular

21   you think is useful for the Court to look at.  And,

22   Ms. Johnson, I'll make the same request to you.

23             And we can cover that at the end of the day because

24   that's a hard one to respond to right in the moment.

25             But there's been lot of talk about inconsistencies

1    within the packet.

2              MR. ALLISON:  Okay.  If I could defer on that, Your

3    Honor, I would like to.

4              THE COURT:  Yes.

5              MR. ALLISON:  If I could have one second, Your Honor?

6              THE COURT:  Yes.

7              MR. ALLISON:  Your Honor, unless you have specific

8    factual questions that I can address for the purpose of time, I

9    think we'll submit.

10             Again, Ms. Johnson's chronology, any inconsistencies

11   in there we would argue do not defeat probable cause, given all

12   the corroboration and the things we've shared.  And we will get

13   some cases if we have them for you on the other issue.

14             THE COURT:  All right.  Let me check my notes in terms

15   of questions.

16             Mr. Allison, is it the government's view -- Well, this

17   is going to come up.  This is going to come up in the political

18   question, so I'll hold that.

19             With that, Ms. Johnson, how would you like to proceed?

20             MS. JOHNSON:  Your Honor, we'd like to call

21   Professor Haider Ala Hamoudi.

22             HAIDER ALA HAMOUDI, DEFENDANT'S WITNESS, SWORN

23             THE COURT:  Ms. Johnson, is the Court correct that

24   Mr. -- or is it Professor Hamoudi?  Is that correct?

25             MS. JOHNSON:  Yes.

HAMOUDI - DIRECT                                    92

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  That Professor Hamoudi's report is in the

3   record at Document 200, Exhibit 3?

4          MS. JOHNSON:  It is.

5          THE COURT:  Okay.  And will your presentation track

6   the Court's motion in limine order?

7          MS. JOHNSON:  It will.  And we are actually not going

8   to try to -- we're not going to repeat material that's already

9   been in the record to the greatest extent possible for time.

10         THE COURT:  Okay.  Thank you.  Go ahead.

11         MS. JOHNSON:  And actually, with the Court's

12  permission and the government's permission, I would like to

13  skip over Professor Hamoudi's qualifications, which are in his

14  CV and in the report.

15         THE COURT:  That's fine.  And I -- Mr. Allison?

16         MR. ALLISON:  No objection.

17                         DIRECT EXAMINATION

18  BY MS. JOHNSON:

19  Q.  So, Professor Hamoudi, after you submitted your report in

20  this case, additional documents have been filed, so I wanted to

21  ask you about those documents.

22         THE COURT:  Ms. Johnson, when you say additional

23  documents, just this week there was the motion to supplement

24  that was unopposed.  Are those the documents you're referring

25  to?

UNITED STATES DISTRICT COURT

1          MS. JOHNSON:  Yes, and also Professor Whiteside's

2     report that was filed after his.

3          THE COURT:  Thanks.

4     Q.  (BY MS. JOHNSON)  So have you reviewed the supplement that

5     was filed this week by Judge Jabbar?

6     A.  I have.

7     Q.  Briefly, because I understand your report goes into a lot

8     of detail, could you remind the Court what the procedural

9     posture is of this case in Iraq based on your review of the

10    documents.

11    A.  Sure.  It's under active investigation.  Iraq is an

12    inquisitorial system, so the primary job of investigation to

13    determine whether or not a crime occurred occurs at the level

14    of an investigatory court.  That's usually done in the

15    United States by the police and by prosecutors to decide

16    whether or not to bring a charge.  This warrant for the arrest

17    was given -- I'm sorry.

18    Q.  Our investi -- excuse me -- our interpreter is asking you

19    to slow down just a little bit.

20    A.  Oh, I apologize.  This warrant for the arrest was given in

21    connection with that investigation.  It's part of Iraqi

22    criminal process to get a statement from the defendant to issue

23    a summons to seek the defendant's statement before deciding

24    whether or not to pursue charges.

25    Q.  In your opinion, has Mr. Ahmed Al-Nouri been charged with a

1    crime in Iraq?

2    A.  No.  The matter's under investigation.  So it would be a

3    summons to the accused, is the right term, to determine whether

4    or not -- to determine whether or not to make a charge.

5    Q.  And the supplement that you reviewed that was filed this

6    week, I understand that in your opinion you concluded that he

7    had not been -- your original opinion you concluded he had not

8    been charged.

9         How did the supplement affect your opinion that

10   Mr. Ahmed Al-Nouri has not been charged with a crime in Iraq?

11   A.  I agreed with a lot of what Judge Jabbar said with respect

12   to the procedural posture, not necessarily with everything, but

13   with respect to the procedural posture.  The summons was

14   issued.  They want to speak to the accused to determine whether

15   or not there's any exculpatory evidence.  After that, the

16   investigatory judge makes the determination about whether or

17   not to bring a charge and bring the matter to trial.

18   Q.  From the documents you have reviewed, has Iraq, the

19   government of Iraq, committed to prosecuting this case?

20   A.  No, they haven't.

21   Q.  Why not?

22   A.  Because they do want to get the statement from the accused,

23   is what it seems like.  They are allowed to.  They have issued

24   the summons.

25        THE COURT:  Well, hold on, Professor.

1              THE WITNESS:  I apologize.

2              THE COURT:  Counsel, the way that's phrased, I think

3    Professor Hamoudi can discuss why procedurally in the Iraqi

4    system, yet he does not believe there's been a commitment to

5    prosecute.  But I don't think he can answer based -- putting

6    himself in the shoes of the Iraqi officials.

7              So can we take the Court's question that way and see

8    what the answer is?

9    Q.  (BY MS. JOHNSON)  Yes.

10   A.  Sure.  There are two -- Let me just -- Let me phrase it

11   this way.  There are two -- The decision that an Iraqi court,

12   investigatory court, would make on whether or not to pursue a

13   charge at this point, it has one of two paths.  Once it seeks,

14   issues a summons for a defendant, if the defendant doesn't

15   appear, then as a matter of practice, course, and pretty much

16   always it issues a warrant for that person's arrest.

17             The Iraqi courts then make one of two decisions.

18   Either they choose to, as a general matter, they choose to

19   prosecute the case in absentia, so they make the charge, which

20   they're allowed to do under Iraqi procedural law, criminal

21   procedural law, having sought to secure the accused.  They can

22   still make the charge, and then they can try the defendant in

23   absentia.

24             Or they can just hold it very often with an open file

25   pending the location of the defendant.  And courts with

1    frequency do one of those two things.

2    Q.   I'm going to be skipping around a little bit so as not to

3    waste everyone's time to just get the information that I want

4    from you.

5             Who employs local police in Iraq?  Who is their

6    employer?

7    A.   The federal government.  It's a highly centralized system.

8    Q.   Are you familiar with Iraqi legal practice regarding

9    signatures versus fingerprints on documents?

10   A.   Yes.

11   Q.   What is Iraqi legal practice regarding the use of

12   signatures and fingerprints on documents?

13   A.   Invariably there's a very heavy emphasis on a signature and

14   a notarization of that signature for any document of any level,

15   of even submitting an invoice to the Iraqi government.  One

16   needs a physical original what's called a wet signature along

17   with a Notary's stamp.

18             A thumbprint is never taken in lieu of a signature

19   except in the very limited circumstances where the person isn't

20   able to sign.  That's usually because the defendant is

21   illiterate.  But it could also be a situation where I

22   believe -- I remember a case where someone had a relatively

23   advanced stage of Parkinson's disease, for example, and wasn't

24   able to write.  And so they were able to take a thumbprint in

25   that case as well.

HAMOUDI - DIRECT

1    Q.  Could you explain to the Court briefly naming conventions

2    in Iraq.  So we have Ali Yousif Ahmed Al-Nouri.  How would he

3    have obtained that name?

4    A.  Sure.  So within Iraq, the custom is to refer to one by

5    what's called the three names.  So that would be the father --

6    I'm sorry -- the person's given name, and then their father's

7    name, and then their grandfather's name.  One almost never

8    refers to someone by virtue of their tribal name or anything

9    else.  It's extremely rare.

10         So when you say Ali Yousif, in the same way that my

11   name is Haider Ala, for example, Ali Yousif would mean that his

12   name is Ali, and then his father's name is Yousif.  That's what

13   immediately comes to mind.

14   Q.  How common are the names Ali and Yousif?

15   A.  Extremely common.  Yousif is the name Joseph.  It's the

16   same story as exists in the Old Testament.  And there's a

17   chapter of the Quran named after Yousif.  It's a very common,

18   common name, as common, I would say, as Joseph in the

19   United States.  Ali is perhaps the most common name in Iraq or

20   it's the second most.  The other contender would be Mohammad.

21   Q.  When is the last time the area that is now Iraq was

22   governed by a caliphate, if you know?

23   A.  By a caliphate?  The Ottoman caliphate just before the end

24   of World War I.

25   Q.  How did that come to an end?

UNITED STATES DISTRICT COURT

1    A.   There was a revolt, an Arab revolt, Sunni led, and it was

2    allied with the British.   And so the British helped Faisal at

3    the time -- King Faisal at the time and then created a state

4    out of three of the Ottoman governorates of Mosul, Baghdad, and

5    Basra.

6    Q.   Did the country of Iraq, what we know now as the country of

7    Iraq, exist as a single political entity at any point before

8    that?

9    A.   No.   Iraq was -- In fact, king Faisal's biggest gripe was

10   that there was no sense of Iraqi national identity, that the

11   borders were arbitrarily drawn, and that people just didn't

12   have that sense of national identity.   Now, obviously, you

13   know, over decades these things can evolve, but prior to 1920,

14   there was no such thing.

15   Q.   And I apologize for the rudimentary question, but who is

16   King Faisal?

17   A.   I'm sorry?

18   Q.   Who is King Faisal, who you've been referring to?

19   A.   King Faisal is the first king of Iraq, and he helped lead

20   the Arab revolt against the Ottomans with British support.

21   Q.   Okay.   After you submitted your expert opinion,

22   Professor Whiteside also submitted an expert opinion for the

23   government.   Have you reviewed that opinion?

24   A.   I did review that opinion.

25   Q.   After you reviewed Professor Whiteside's opinion, did

1    you -- or since the first time you reviewed

2    Professor Whiteside's opinion, have you reviewed any additional

3    materials authored by Professor Whiteside or any presentations

4    made by Professor Whiteside?

5    A.   Yeah.  I had an opportunity to read through

6    Professor Whiteside's dissertation and view a couple of

7    publicly available presentations.

8              MS. JOHNSON:  Could I have permission to publish a

9    video clip?

10             THE COURT:  Well, what's on it?

11             MS. JOHNSON:  It is one of the presentations that

12   Professor Whiteside gave that I believe Professor Hamoudi has

13   reviewed or a clip from it.

14             THE COURT:  And this will be then foundation for

15   Professor Hamoudi to give an opinion on opinions that were

16   reached by Professor Whiteside?

17             MS. JOHNSON:  Yes.

18             THE COURT:  Yes, you can publish.

19             Hold on.  Mr. Allison.

20             MR. ALLISON:  I would just ask, Your Honor, how this

21   is different than cross-examining Professor Whiteside on

22   anything that he's said?  Will we be allowed to provide similar

23   things about Professor Hamoudi's work or prior work or anything

24   like that?

25             THE COURT:  Yes.

1              MS. JOHNSON:  It's not being published.  I think the

2       volume is not on.

3              THE CLERK:  It's being published.  It's on everything.

4          (Video played.)

5       Q.  (BY MS. JOHNSON)  Is that one of the clips you reviewed?

6       A.  Yes, it is.

7       Q.  How about B.

8              THE COURT:  Counsel, how many of these do you have?

9              MS. JOHNSON:  Two.

10         (Video played.)

11             THE COURT:  Counsel, what's the date of that clip?

12             MS. JOHNSON:  It is December, 2015.  I believe it was

13      a conference.  It was the -- I have the name over here.  The

14      name of the conference is "Constructions of Terrorism", and it

15      was at the Stimson Center.  I believe that was in December,

16      2015.  It was put on the Internet in April of 2016.

17      Q.  (BY MS. JOHNSON)  Do you agree with the opinions that

18      Professor Whiteside appears to be espousing in this clip with

19      respect to the composition of Al Qaeda in Iraq in 2006?

20      A.  Yes.  It was very much an Iraqi organization as

21      Professor Whiteside indicates.  I think at the beginning he

22      said very few foreign fighters at the top.  I think that's

23      true.  I would emphasize -- I think it was sort of mentioned in

24      the second clip -- that those few foreign fighters were mixed

25      in with Iraqi leadership as well.  Certainly immediately below

1    that and all the way down it was overwhelmingly almost

2    exclusively Iraqi.

3    Q.  Now, al-Zarqawi is not Iraqi, right?  Is that right?

4    A.  Correct.

5    Q.  So how does this become, in your opinion, how does this

6    organization transition from something that is founded by a

7    Jordanian into, in 2006, being an almost exclusively Iraqi

8    organization?

9    A.  So in 2002 is when Zarqawi went into Iraq, and Saddam

10   was -- the Saddam Hussein regime was focused more on the United

11   States than it was on, in particular, Sunni Islamists -- that

12   was just not something it paid a lot of attention to -- and was

13   able to build a network then.  Once the American invasion

14   occurred and the Sunni resistance began, the Sunni resistance

15   was overwhelmingly Iraqi, and it was effective because it was

16   extremely popular among Sunnis who were already resident in

17   Iraq.  Foreigners who sought to come in would be immediately

18   identified, very easy to see, very easy to know who they were.

19         So other than being, I mean, excuse the terminology,

20   but fodder for suicide bombs, there's not much that a foreigner

21   could do effectively.  So there was no choice in order to

22   render the organization effective but to turn to Iraqis that

23   were similarly minded and work closely with all the other Sunni

24   insurgent groups at the time of the -- in the -- at this

25   period, by 2005, 2006.

1   Q.  There's a reference in the clip to the underground Salafi

2   movement.  What is Salafism?

3   A.  Salafism is a very puritanical and rigid strain of Sunni

4   Islam.  Salaf refers to that generation immediately following

5   the Prophet Muhammad.  And so the feeling was that true Islam

6   was reflected then.  And so the attempt is to sort of do away

7   with a lot of the evolution of Islamic law that may have

8   occurred since then to try to go back to, if you will, the

9   period immediately following the Prophet Muhammad.  So that's

10  what Salafism refers to, this kind of puritanical strain within

11  Sunni Islam.

12  Q.  Is that associated with Al Qaeda or Al Qaeda in Iraq?

13  A.  It is.  It is.  I mean, it's broader than that, but yes.

14  Q.  And did Zarqawi import this ideology into Iraq when he came

15  in 2002, 2000 --

16  A.  No.  I mean, the --

17          THE COURT:  Counsel, let's get in the record your

18  Professor Hamoudi's opinion on Zarqawi.  You mentioned he was

19  Jordanian, what his title was within Al Qaeda in Iraq, if

20  that's the argument.  But if we're going to use the Zarqawi

21  name, let's provide a little more foundation.

22          MS. JOHNSON:  Okay.  For who Zarqawi is?

23          THE COURT:  Yeah.

24  Q.  (BY MS. JOHNSON)  Okay.  I apologize.  I'm trying to not

25  repeat stuff that's in the report.  Who's Zarqawi?

1    A.   Sure.   Abu Musab al-Zarqawi was a Jordanian who spent time

2    in Jordanian prison, had a history of association with

3    Jordanian underworld, including organized crime and drugs and

4    things of that nature.   Ultimately turned to Salafism as an

5    organizing ideology, spent some time in Afghanistan where

6    bin Laden and Zawahiri, the leaders of Al Qaeda, didn't really

7    want to have all that much to do with him, ended up going to

8    Iraq in 2002 to form an organization known as Tawhid wal Jihad,

9    which was designed to sort of promote Salafism.

10          And I believe you asked me whether or not Salafism was

11   something that Zarqawi brought to Iraq.   And the answer to that

12   is no.   Salafism was a part of Sunni Islamist strain that had

13   been -- that existed throughout the Islamic world.   Saddam

14   Hussein generally tended to view the Kurds and the Shias as the

15   greatest threats to his regime.   And so didn't really focus on

16   Salafism as being, it being Sunni, as being the same kind of

17   threat to him.

18   Q.   And what is al-Zarqawi's relationship to Al Qaeda in Iraq?

19   A.   So al-Zarqawi was the titular head of Al Qaeda in Iraq, but

20   certainly by 2000 -- after the American invasion with the --

21   with the ability of the United States to basically decimate top

22   leadership whenever it sort of appeared, Al Qaeda, like all the

23   other insurgent groups, its leaders went largely into hiding,

24   and it worked in a very decentralized, non-hierarchical

25   fashion.   And so it's not that Zarqawi wouldn't issue, you

1   know, missives or directives or whatever.  But he would have to

2   then hope that, you know, people would pay attention.

3          The insurgency itself was very effective and survived

4   the death of any number of its leaders, including Zarqawi,

5   because it was -- and proved so resilient partly because it was

6   so leaderless, and it sort of -- and there was so much bleeding

7   over, if you will, between the different groups.

8   Q.  Al Qaeda in Iraq, is that a Sunni organization?

9   A.  It is.

10  Q.  Did it have a position with respect to the Shia population

11  in Iraq?

12  A.  Zarqawi certainly viewed the Shia as an existential threat

13  to his project.  I hesitate to say Al Qaeda itself had a

14  position, because, as I say, it's diffuse, and you had

15  different people joining the insurgency for a variety of

16  different reasons, some nationalist, some Islamist.

17         But Zarqawi himself certainly had a very strong view

18  that the Shia posed an existential threat and that the way in

19  which to -- the way in which to proceed was to -- to foment a

20  sectarian war between Sunni and Shia.  And this was a point of

21  tension between him on the one hand and Al Qaeda central on the

22  other.

23  Q.  The tension that you've identified between the Sunni and

24  Shia populations in Iraq, did Zarqawi bring this to Iraq, or

25  did it exist before he arrived?

1    A.  Oh, no.  I mean, it's existed for generations.  I mean,

2    there are periods of co-existence, and then there are periods

3    of conflict.  So it's, you know, reductive to say they've hated

4    each other for 1400 years.  It's also reductive to say it's all

5    intermarriage.  There's different periods.

6             Certainly during the modern period, there's been some

7    tension because the state was created with Sunni elites that

8    were the elites during the Ottoman era because the Ottomans

9    didn't sort of allow the Shia into the state.  But Zarqawi

10   certainly didn't bring sectarian tension to Iraq.

11             MS. JOHNSON:  Your Honor, I may be done, but may I

12   have a moment to consult?

13             THE COURT:  Yes.

14        (Defense counsel confer off the record.)

15             MS. JOHNSON:  That is all I have for

16   Professor Hamoudi, and that is obviously by way of supplement

17   to his original opinion and not as a replacement.

18             THE COURT:  The Court has one question.

19             Professor, in your report you say that Al Qaeda and

20   Iraq was only nominally connected to the broader Al Qaeda

21   organization and that Zarqawi paid no attention at all to the

22   directions he received from Al Qaeda.  What's your basis for

23   that statement?

24             THE WITNESS:  The -- There were letters between

25   Zawahiri and Zarqawi, Zawahiri being the sort of the

1    operational head of Al Qaeda in Afghanistan at the time and

2    Zarqawi -- and Zawahiri continuing to tell Zarqawi that there's

3    no need to attack the Shia, that attacking the Shia itself is

4    strategically foolish and probably immoral.

5            You even have statements from bin Laden of the Sunni

6    collaborators who joined the police and who joined the security

7    forces are our enemies and our brothers who are from the south.

8    He didn't actually say Shia, but he says from the south, you

9    know, who joined in the resistance are our brothers.

10           And so you had a very clear distinction between what

11   bin Laden and Zawahiri were seeking to do and then what Zarqawi

12   was actually doing that created that kind of tension.

13           THE COURT:  Thank you.  Okay.  You can step down.

14           THE WITNESS:  Thank you, Your Honor.

15           THE COURT:  Ms. Johnson, at some point we need to get

16   to whether or not -- I gather you're ready to argue that you're

17   going to invoke the political offense exception?

18           MS. JOHNSON:  There are some brief arguments by

19   Mr. Kaplan about -- unless the Court would prefer not to hear

20   them because we have already briefed them -- about whether the

21   treaty is still in effect, whether the warrant requirement has

22   been satisfied.

23           And then I do have a brief argument about whether

24   there is a charge and whether there's been a commitment to

25   prosecute, and then we have the political offense exception.

1          THE COURT:  I'm prepared to hear from Mr. Kaplan on

2     all topics that he -- that are relevant that are not excluded

3     by the motion in limine, so, Mr. Kaplan.

4          MR. KAPLAN:  Thank you, Your Honor.

5          If I do at any point bring up a topic that is excluded

6     by your ruling on the motion in limine, obviously just let me

7     know, and I'll move on to something else.

8          Your Honor asked whether we agreed that the government

9     had satisfied any of the elements.  And my notes indicate that

10    Mr. Allison began noting that there was jurisdiction in this

11    court under Section 3184.  We don't dispute that.

12         And for number two, I believe he said that there was

13    jurisdiction over Mr. Al-Nouri.  Obviously, as you can see from

14    Ms. Johnson's presentation, we don't concede that Mr. Al-Nouri,

15    our client sitting here today, is the person mentioned in or

16    referred to in many of the statements that she's just gone

17    over.  However, he is the person who is here today.  Ali Yousif

18    Ahmed Al-Nouri is the person over whom this Court has personal

19    jurisdiction, so we don't dispute that.

20         As I recall, the third thing that he said was that the

21    treaty is in effect.  And that is the first argument, my

22    understanding is, not precluded by your ruling on the motion

23    in limine.  I would like to briefly lay out why we do not think

24    that's correct.

25         And I want to begin with the proposition I think will

1    not be controversial, which is that in this courtroom the

2    governing law is the law of the United States and that the

3    authoritative source of that law, the highest authoritative

4    source of that law is a published opinion of the United States

5    Supreme Court that has never been overruled, limited,

6    et cetera.  And that is *Karnuth versus United States*, decision

7    from 1929.  That decision lays out that there are different

8    types of treaties, some of which, because of their nature,

9    would be annulled, completely eradicated by war between the

10   treaty parties.

11            THE COURT:  Okay.  Mr. Kaplan, let me ask, because

12   this is well covered in your briefs.  And the government's

13   response is that one way you know the treaty is still in effect

14   is because the government of the United States and the

15   government of Iraq say it is.  And so I don't mean to cut you

16   off, but to the extent you're relying on the argument that war

17   or other events extinguish the treaty, could you respond to the

18   government's argument on that point.

19            MR. KAPLAN:  Absolutely.  The practice between the

20   parties is a relevant factor, and I'm not asking the Court to

21   ignore it.

22            The opinion expressed by an appropriate official

23   within the Department of State is a relevant factor.  I am not

24   asking the Court to ignore that.

25            However, the ultimate authority in a matter of law is

1    set by the Supreme Court of the United States.  So we

2    acknowledge that apparently there has been one extradition in

3    the other direction to Iraq.  There was an attempted

4    extradition with Ameen to this -- to this country.  I'm sorry.

5    I'm sorry.  There was an extradition in the other direction to

6    this country.  Ameen was an attempted extradition to Iraq.  It

7    didn't succeed.  And this is apparently the third.  To that

8    very limited extent, there appears to be practice between the

9    parties.

10          But the practice between the parties and -- I'm sorry.

11   The practice between the parties and the view taken by the

12   Department of State cannot override a question of law that is

13   addressed and controlled by a Supreme Court opinion.

14          So we would note that in the *Karnuth* opinion -- And in

15   terms of it being a question of law, I think it's important to

16   distinguish some cases the government relies on.

17          They refer to *Terlinden*, a Supreme Court case,

18   *Terlinden*, from 1902, a bunch of lower court decisions like

19   *Then*, *Sabatier*, *Hoxha*, *Arias Leiva*, saying these are all

20   opinions that have nothing to do with war between treaty

21   parties.  These are mostly opinions that have to do with

22   successor states, so, in other words, treaties made between the

23   United States and Prussia.  Prussia is absorbed into the German

24   empire.  Singapore goes from a British colony to independent

25   country, et cetera.

1              In that successor state context, the Supreme Court in

2    *Terlinden* in 1902 and other decisions later say that is a

3    political question.  How that affects validity of a treaty in

4    that context of successor states is a political question.

5              It's very notable that the Supreme Court said that in

6    that context in 1902 in *Terlinden*, and in 1929 in *Karnuth*,

7    dealing with the different context of war, not successor states

8    but a war between the parties, all the Supreme Court does in

9    respect to the government's position on whether the treaty is

10   still in effect is mention it in passing.

11             There's no discussion of of course we must defer to

12   them; this is a political question.  There is instead a mention

13   in passing and then a very elaborate and detailed discussion of

14   different types of treaties and which of them are annulled by

15   war.

16             THE COURT:  Counsel, isn't there discussion in the

17   briefs about, for example, extraditions with Germany following

18   World War II, and I think your argument is that the treaty with

19   Germany is a different type of treaty?  Is that accurate?

20             MR. KAPLAN:  I wouldn't put it that way, Your Honor.

21   There are a handful of decisions that do deal with the war

22   context.  So *Karnuth* obviously -- The main one appears to be --

23   *Karnuth* is not an extradition treaty.  The cases that actually

24   involve our situation of an extradition treaty followed by war

25   between the parties are *Argento*.  The main one is *Argento*, then

1    *Gallina*, *D'Amico*, and *Deaton*.

2            And it's important to note that in the *Argento*

3    opinion, which is -- it's a circuit opinion that's become the

4    leading authority on this question, there is a sort of brief,

5    in passing suggestion that an extradition treaty would fall

6    under the *Karnuth* type that isn't annulled with no explanation.

7            And then -- excuse me -- there is a discussion of the

8    fact that in that context, which was United States, Italy,

9    before World War II, what happened after World War II is that

10   there was a treaty of peace between the two parties that had

11   gone to war.  That treaty of peace was processed and ratified

12   according to the constitutional provisions set out in Article

13   II, Section 2.  And it was stipulated in that treaty of peace

14   that the treaties between the parties, that they wanted to have

15   basically take a new life after World War II.  They would give

16   each other notice, and if there was no objection, they would

17   take effect again.

18           So it was a key factor in *Argento* that there was a

19   specific provision in the treaty of peace after that war that

20   provided for, with senate's approval, that provided for that

21   treaty to be given new life.

22           In this case we have a statement from the Department

23   of State from Mr. Heinemann that gives no indication that there

24   was anything like a treaty of peace that was processed

25   according to Article II, Section 2, that created that

1    authority.

2         In fact, there's not even a suggestion that here, as

3    in the *Deaton* case, which involved Germany, there was even an

4    exchange of letters between the diplomats of the two countries.

5         So there's a very significant distinction between

6    *Argento* and the present situation, and *Gallina* and *D'Amico* and

7    *Deaton* really just follow *Argento* as the existing authority on

8    the question.

9         *Gallina* and *D'Amico* both also involve Italy, so they

10   both also address a situation in which there was an actual

11   treaty providing for the reawakened validity or vitality of

12   that treaty.  And *Deaton* deals with Germany but doesn't

13   arguably take proper notice of the absence -- apparent absence

14   of that kind of a situation or doesn't note that that

15   situation, that that kind of a post-war treaty existed, but

16   does at least talk about the fact that there was an exchange of

17   notes.  So --

18        THE COURT:  Okay.  But again we have the conduct of

19   the two nations, of the United States and Iraq, certainly

20   acting like the treaty is in force.

21        Do you have any case law where, despite the two

22   sovereign nations treating the matter as if the treaty was in

23   force, that a magistrate court, a district court, a court of

24   appeals did not accept the determination of the parties that

25   the treaty was in force and found that it was not?

1          MR. KAPLAN:  Not exactly.  However, in *Karnuth* the

2     Supreme Court noted that people had been passing back and forth

3     between America and Canada for many years after the War of 1812

4     despite the fact that the Court went on to hold that the

5     provision of the Jay Treaty that gave them that right really

6     was eradicated by the War of 1812.

7          To be fair, I think they indicated that that would be

8     a right that didn't necessarily need a treaty to be exercised.

9     But that is a case where the universal or accepted practice was

10    arguably inconsistent with what they later -- what they went on

11    to hold was the case with respect to that treaty.

12         THE COURT:  Okay.  Thank you.

13         MR. KAPLAN:  So our position is that *Karnuth* is the

14    governing authority and that under the *Karnuth* analysis, an

15    extradition treaty is nothing like, for example, the other part

16    of the Jay Treaty at issue or discussed in *Karnuth* was about

17    property holding.  That's something that creates permanent

18    rights that are vested and held by individuals.  And it's

19    logical not to think that they are eradicated by a war; they

20    can just take up as before, whereas the idea of cooperating to

21    extricate an accused criminal from the other country while

22    you're fighting a war is utterly inconsistent with the idea of

23    being in a state of war.  The idea that we would launch shock

24    and awe against Iraq and then the next day say, hey, there's a

25    bank robber we want to extradite is absurd.  So our position is

1    that under the *Karnuth* categories, this is a treaty which was

2    utterly eradicated by not one but two wars.  And as the Court

3    in *Karnuth* said many times, it can be brought back to life only

4    by a new treaty.  And that has not happened.  It's clear from

5    Mr. Heinemann's statement that has not happened.

6           If there aren't further questions on that, I can press

7    on to the question about the arrest warrant.  The treaty in

8    Article XI says that in the situation we're dealing with where

9    someone has not been convicted but is merely charged, the

10   requesting state has to produce a duly authenticated copy of

11   the warrant of arrest.

12          And we do have something captioned and formatted as an

13   arrest and investigation warrant from the magistrate court of

14   Al-Karkh, which, as many documents in the record indicate, is a

15   court that's specialized to deal with terrorism cases.

16          The *Sacirbey* opinion which is discussed in the

17   briefing makes clear that the point of that type of term in a

18   treaty, in an extradition treaty, is to provide some

19   confirmation that the relator is actually charged with

20   something that's extraditable under the treaty.

21          And in the situation we're dealing with here where all

22   we have is this thing captioned the arrest and investigation

23   warrant from the magistrate court of Al-Karkh, there is no

24   satisfaction of that requirement.  And it's not simply because,

25   as Professor Hamoudi points out, there was a very brazenly

1    inappropriate ping-ponging of the charge in the case between

2    various Iraqi courts.  It's also because what we're dealing

3    with, this purported arrest warrant, is purportedly from a

4    court that's specialized to terrorism cases, and yet the

5    government is telling us that there is a charge of murder, and

6    there's -- they're not saying that there's a charge of

7    terrorism.  And even if there were a charge of terrorism, which

8    some parts of the record suggest that there is, that is not an

9    extraditable offense under the treaty.

10           So consistent with *Sacirbey*, the record does not

11   provide anything like a warrant that can satisfy this function

12   of confirming that the relator is actually sought, is actually

13   charged with an extraditable offense.  And this is a reason

14   perhaps related to but a little bit separate from the reason

15   that Ms. Johnson is going to explain about the charging

16   requirement further on.

17           So the government cites some cases.  Two of them, *Grin*

18   and *Basic*, are dealing with situations where there was not any

19   problem because there was the requesting country's equivalent

20   of a warrant was produced.  That's not what we're dealing with

21   here.  They don't really undermine this point.  The other two,

22   *Skaftouros* and *Mathison*, are situations where they were very

23   picayune, technical defects, lack of a clerk's signature, the

24   type of checks references are wrong, very technical type stuff.

25   That's not what we're dealing with here.  We're dealing with

1     the fundamental requirement of the treaty to provide for

2     extraditability, which is to serve the function of showing the

3     person is charged with an extraditable offense.

4          So I would welcome any questions on that.

5          THE COURT:  Well, the case law -- You're talking about

6     technical violations, but the case law seems to support

7     tolerating a wide range of technical issues with arrest

8     warrants under the idea that it's not the function of this

9     court to get involved in the intricacies of the Iraqi legal

10    system.  What's your response to that?

11         MR. KAPLAN:  I would say that's true as far as it

12    goes, but it doesn't go as far as a level of deference or

13    non-involvement that would allow the requesting country to fail

14    to satisfy the treaty requirement of showing this person is

15    charged with an extraditable offense under the treaty, which is

16    essentially the problem in *Sacirbey*.

17         THE COURT:  Okay.  I get your argument on that.  Okay.

18         MR. KAPLAN:  If there are no further questions on

19    that, the last thing, apart from political offense, that I

20    would touch on -- and if this is barred by your ruling, just

21    tell me -- but there was an argument about extraditability of a

22    United States citizen under the treaty and under the *Valentine*

23    Supreme Court decision.

24         THE COURT:  That's not covered.  Go ahead.

25         MR. KAPLAN:  Okay.  So, as you know, Article VIII of

UNITED STATES DISTRICT COURT

1    the treaty says, "Under the stipulations of this treaty,

2    neither of the high contracting parties shall be bound to

3    deliver up its own citizens."

4         Mr. Al-Nouri is of course a citizen of the

5    United States for many years.

6         The Supreme Court's decision in *Valentine* held that,

7    with exactly that type of language, not only is there no

8    obligation to extradite a United States citizen, but there is

9    no power.

10        THE COURT:  But what about 18 U.S.C. 3196?

11        MR. KAPLAN:  Of course, you know, that opens the door

12   to the question of Section 3196.  And the fact is, as we have

13   argued and recognize and acknowledge, the Ninth Circuit's

14   *Knotek* decision is -- does appear to undermine this argument.

15        But in the *Gouveia* district court decision, it was

16   explained that the framers of the Constitution, the framers of

17   Article II, Section 2, the treaty power, explicitly rejected

18   the idea of Congress encroaching upon the President's treaty

19   making power.  And what is purportedly accomplished by Section

20   3196 represents a very serious arrogation by Congress to itself

21   of what the Constitution assigns to the President as the treaty

22   making power.

23        So there is some basis for distinguishing *Knotek*.

24   *Knotek* dealt with a treaty with Czechoslovakia that was from

25   1925.

1            The Second Circuit Learned Hand decision in *Valentine*,

2    which then went up and was affirmed by the Supreme Court, was

3    actually in 1926, and -- I'm sorry -- it was after -- The

4    Second Circuit decision came out before the Iraqi/U.S.

5    extradition treaty was ratified.

6            And so it was more clearly within the expectation of

7    the United States and Iraq in creating and ratifying that

8    treaty that citizens would not be extraditable because of that

9    Second Circuit opinion, which went on to be affirmed by the

10   Supreme Court.

11           So there are some grounds for distinguishing *Knotek*,

12   but we do acknowledge and register our disagreement with the

13   analysis in *Knotek*.

14           That's the issues I intended to address up to

15   political offense.  And there was one issue Ms. Johnson was

16   going to address apart from political offense.

17           So if we could turn to that.

18           THE COURT:  That's fine.

19           So when we get to political offense, who's going to

20   make the first argument on that?  You or Ms. Johnson?

21           MR. KAPLAN:  I will present the first argument.

22           THE COURT:  Okay.  But there's another argument

23   Ms. Johnson wants to make before we get there?

24           MR. KAPLAN:  Right.

25           THE COURT:  Okay.  Let's do it.  Mr. Allison.

1          MR. ALLISON:  I just wanted to make sure and forecast

2    for you, in case you want to take it into account, Ms. Haciski

3    is going to address the points Mr. Kaplan just raised, and then

4    I will address political offense on our end.

5          So I don't know if you want her to go next on those

6    same issues, and then we -- However you want to do it, Your

7    Honor.

8          THE COURT:  No.  That's okay, because we're kind of

9    rolling, and I may forget to give everybody a chance.  So I

10   think that makes a lot of sense.  So Ms. Johnson's going to

11   make a non-political offense discussion, and then

12   Ms. Haciski -- Is that how you say it?

13         MR. ALLISON:  Haciski, Your Honor.

14         THE COURT:  Haciski.  I'm sorry, counsel.

15         Okay.  Go ahead, Ms. Johnson.

16         MS. JOHNSON:  Yes, Your Honor.  We believe that the

17   government has not met the requirement of showing that

18   Mr. Ahmed has been charged with a crime as required by the

19   treaty.  The unrebutted opinion of Professor Hamoudi is that

20   this is an investigative warrant and not a warrant commanding

21   him for trial.

22         The treaty expressly contemplates that people may be

23   extradited only for offenses that they have been charged with

24   or convicted of.

25         And the government responds to this argument by citing

1   a bunch of cases from countries whose treaties are different.

2   I'm sure the Court has noticed this treaty is very antiquated.

3   It is a list treaty, which means that the United States and

4   Iraq negotiated and bargained for extradition for a trial or

5   upon conviction of only one of a very specifically enumerated

6   set of offenses.

7           Because Mr. Ahmed has not been charged with an

8   offense, the government also cannot satisfy the requirement

9   that the Iraqi government show that, one, that the offense for

10  which he has been charged is one of the enumerated offenses.

11          The extradition packet goes on at length about

12  terrorism, which is not an enumerated offense.

13          The government asked this Court to find earlier today

14  that at a minimum the government had established a case for

15  conspiracy to commit murder.  Conspiracy is not an enumerated

16  offense, nor is it a theory of liability cognizable under the

17  treaty.

18          The treaty enumerates its offenses and then at the end

19  says, "or accessory before or after the fact."  It could have

20  said and many treaties do say "or conspiracy to commit one of

21  the charged offenses."  It does not.  Conspiracy is not a

22  theory of liability that is allowed under the treaty.

23          So the cases the government cites are largely

24  inapposite.  And we think that the government's most recent

25  addition at Docket 254, its supplement that was filed earlier

1    this week, really confirms the extent to which there is no

2    charge in this case.

3            Looking at Paragraph 2 -- This is actually Page 4.

4    Paragraph 2 is a very long paragraph, and I'm talking about the

5    part that is on Page 4.

6            It says the government of Iraq wants Mr. Ahmed to be

7    sent over there if the court finds that -- it's, I guess, the

8    penultimate sentence in the second paragraph -- if the court

9    finds there is sufficient evidence upon his return -- that is

10   my parenthetical -- to prosecute the defendant.  A court

11   order --

12           THE COURT:  I'm sorry, counsel.  I lost you.  So you

13   referred to 254, which I have in front of me.  Then you said

14   Page 4.

15           MS. JOHNSON:  Excuse me.  254-2, Page 4.

16           THE COURT:  So the exhibit.

17           MS. JOHNSON:  Yes, the exhibit, which is the

18   declaration of Judge Jabbar.

19           THE COURT:  Okay.  Now I'm on 254-2.  And which --

20           MS. JOHNSON:  It's starting at the penultimate

21   sentence of Paragraph 2.  Paragraph 2 generally talks about

22   what will happen to Mr. Ahmed if he is returned to Iraq and the

23   procedures that will be undertaken.

24           THE COURT:  So where it says, "Therefore, after the

25   defendant has been extradited, he will be investigated."  Is

1    that the one?

2         MS. JOHNSON:  That sentence as well, but I'm actually

3    starting with the sentence "If the Court finds there's

4    sufficient evidence --"

5         THE COURT:  I don't see that.  Where?  In Paragraph 2?

6         MS. JOHNSON:  Paragraph 2 continues on to the second

7    page, so it spans two pages.

8         THE COURT:  Okay.  I finally have found it.  Thank

9    you.

10        MS. JOHNSON:  But, yes, the sentence the Court just

11   quoted also said he's going to be investigated when he returns,

12   not prosecuted.

13        "If the Court finds there's sufficient evidence to

14   prosecute the defendant, a court order will be made to refer

15   him to the relevant court.  However, if there is not sufficient

16   evidence to refer him, then an order will be issued for his

17   release, and the case will be temporarily dropped, including --

18   indicating the reasons for that."

19        This is a very clear statement by the court of Iraq

20   that Iraq has not yet made a determination about whether there

21   is sufficient evidence to prosecute Mr. Ahmed or not.

22        I understand the government has cited a lot of cases

23   where courts have rejected this argument under -- for different

24   treaties under different sets of circumstances.

25        But in relying on *Emami versus the Northern District*

1     *of California* where a similar argument was raised, what the

2     Ninth Circuit ultimately said is, you know, we in this

3     particular case, under the terms of this treaty, we are not

4     prepared to accept that argument, but we have reviewed the

5     totality of the evidence, we've reviewed the circumstances, and

6     we are satisfied -- we have satisfied ourselves that Germany is

7     committed to prosecuting the defendant.

8             The government is correct that every country has its

9     own criminal procedure system, its way of doing things.  The

10    government cited a number of treaties with countries, for

11    example, where it's not possible as a matter of law to charge

12    somebody in absentia.  And courts have said, well, we can't --

13    in this case we cannot hold that the absence of a formal

14    charging document is dispositive because that would effectively

15    nullify the treaty.

16            That's not the case here.  The judge admits and

17    Professor Hamoudi confirms Iraq could charge him in absentia.

18    They have chosen not to.  And they appear to have chosen not to

19    because they have not made a determination about whether

20    sufficient evidence exists, which is as clear a statement as I

21    can think of that the court in Iraq has not committed itself to

22    prosecute this case.  It has committed itself to investigating

23    this case.

24            That is not sufficient under the treaty, which

25    requires either a charge or a conviction.

UNITED STATES DISTRICT COURT

1          Thank you.  Unless the Court has questions, that is

2     all I have to say about the charged with requirement.

3          THE COURT:  Okay.  And we're going in order, so now I

4     wonder if we should take a short break until 3:00 p.m. to give

5     the court reporter a break and the translator, because,

6     Ms. Haciski, your argument could be a few minutes, correct?

7     You've got a fair amount of ground to cover.

8          MS. HACISKI:  Yes, Your Honor.

9          THE COURT:  All right.  Why don't we take a break

10    until 3:00 p.m., and that way you can make your argument

11    uninterrupted.  Okay.  Thank you.

12       (Proceedings recessed from 2:43 p.m. until 3:01 p.m.)

13          THE CLERK:  We are back on the record.

14          THE COURT:  Counsel.

15          MS. HACISKI:  Good afternoon, Your Honor.  I'd like to

16    respond to the arguments just made on behalf of Mr. Ahmed

17    regarding the compliance with the treaty.

18          I'll start with their argument that the treaty between

19    the United States and Iraq is not currently in force.  And I'll

20    start by saying that the government's aware of no case finding

21    that an extradition treaty is not in force when the State

22    Department says otherwise.  And Mr. Ahmed has pointed to no

23    such case.

24          As this Court noted in its order in the *Ricardo Fraser*

25    case, the State Department's determination as to the status of

1    an extradition treaty is entitled to deference.  And you

2    affirmed the same in your order on the motion in limine.  And

3    in this case the State Department has indicated its view as to

4    the force of the treaty in three ways.

5              We have two declarations from Mr. Heinemann, an

6    attorney advisor with the State Department.  We have his

7    citation to the publication of the treaty in "Treaties in

8    Force", which is the official publication of the State

9    Department regarding treaties that are currently in force.

10             And finally, as Your Honor has noted, we have our

11   practice with Iraq as described by the State Department.

12             And any one of these three would be controlling on the

13   issue as to whether the treaty's in force.

14             I'll just quickly touch on *Karnuth v. United States*.

15   That's not an extradition case, as defense counsel noted.  And

16   I would also note that in that case, the government itself took

17   the position that the treaty had been abrogated.  And there's

18   no case in the extradition context applying the categories

19   identified by Mr. Ahmed as being -- as including extradition

20   treaties as being of the kind that are automatically annulled

21   by the existence of hostilities between the parties.

22             And to the contrary, the *Argento* case from the Sixth

23   Circuit and others have rejected that theory.

24             Unless Your Honor has further questions, I'll move on.

25             THE COURT:  Not on that point.

1            MS. HACISKI:  So turning next to the argument

2      regarding the validity of the warrant, the treaty's documentary

3      requirements do include the production of a warrant.  That's

4      Article XI.

5            In this case Iraq produced a warrant that was issued

6      by Judge Jabbar, who authored the supplement in this case as

7      well as parts of the extradition request.

8            That warrant states that it authorizes law enforcement

9      to, quote, detain Ahmed, Mr. Ahmed, until he is presented to us

10     to respond to the charges against him.

11           And in the supplement from Judge Jabbar, he confirms

12     that the warrant is still, quote, in effect.  That's Paragraph

13     3 of the supplement.  And that's the view of the Iraqi

14     government, given that the supplement has been transmitted to

15     the United States under cover of diplomatic note.

16           Mr. Ahmed's argument on this topic is less about the

17     treaty's warrant validity or -- I'm sorry -- the treaty's

18     warrant requirement and more about just the procedures by which

19     the case against Mr. Ahmed has been handled in Iraq.  He's made

20     no argument that there's something facially wrong with the

21     document, and even his own expert has acknowledged that there's

22     a warrant outstanding against him in Iraq.

23           So there's no reason to think that the warrant

24     provided in the extradition package doesn't satisfy the

25     treaty's warrant requirement unless you delve further into the

1    procedural history of the case in Iraq.  But that's exactly the

2    sort of inquiry that the Ninth Circuit has precluded in a

3    number of cases.

4            I'll point just briefly to the case of *Theron v.*

5    *United States Marshal*, which is a Ninth Circuit case from 1987

6    where the fugitive sought an in-depth inquiry into South

7    African criminal procedure about whether South Africa had

8    improperly incorporated an original indictment into a

9    superseding indictment.  And the Court stated, quote, we

10   conclude that it would be inappropriate to engage in such an

11   inquiry into the formal procedure a country uses in instituting

12   prosecution and goes on to explain that the 1979 indictment,

13   the original indictment, was issued within the applicable

14   statute of limitation.  The later indictment incorporated that

15   original indictment, and therefore the operative indictment was

16   not barred by the statute of limitations in the Ninth Circuit's

17   view.  It did not go on to examine South Africa's compliance

18   with its own law.  And I'd submit that this Court should take a

19   similar approach in this case.

20           Mr. Ahmed's argument contesting the transfer of the

21   case against him regarding -- from one court to another, what

22   he refers to as a game of pinball, is really just another

23   example of Mr. Ahmed inviting the Court to conduct an inquiry

24   into the procedures that the Iraqi government has taken in the

25   case against him.

1          The only case he cites in support of his argument that

2     this Court should deny extradition on the basis of the warrant

3     is the *Sacirbey* case from the Second Circuit.  And that case is

4     readily distinguishable.  In that case the court that had

5     issued the warrant and the requesting country had been divested

6     of jurisdiction due to a change in the legal system there.  And

7     therefore it was not clear that the warrant was still

8     enforceable at the time the extradition request remained

9     pending.

10          And of course here the court that issued the warrant

11     still maintains jurisdiction over the court.  It's, as I said,

12     Judge Jabbar, who's still submitting supplements in support of

13     the extradition request.  And Mr. Ahmed's own expert has

14     presented no argument that the warrant is in fact invalidated.

15     It's simply his opinion that it should be invalidated.

16          And so while Mr. Ahmed may have arguments as to why

17     the Court does not have jurisdiction in Iraq as a matter of

18     Iraqi law, he does not have -- such arguments should be

19     reserved for consideration by an Iraqi court and not this

20     Court, much the same way that we would ask a foreign court to

21     reserve a decision raised by a U.S. defendant in a foreign

22     country who was asking for extradition to be declined on the

23     basis of improper venue if that issue had not been decided.

24          THE COURT:  Counsel, let's turn to, though, the issue

25     that Ms. Johnson puts pretty succinctly.  And she's referring

1    to Exhibit -- well, Document 254 at 2.  And she says, based on

2    that and other argument, that the Iraqi government has not

3    actually committed to prosecuting Mr. Ahmed and that that

4    therefore means that he's not charged.

5              And as I look at the declaration in Exhibit 2 to 254,

6    it looks like it can be read both ways, because, for one thing,

7    it talks about, in Paragraph 2, the investigative judge, if

8    there was enough evidence, would issue his referral.  But it

9    goes on to say, well, that they can't have the trial in

10   absentia, and because he's been arrested in the United States,

11   his testimony must be heard and a trial in his presence be

12   conducted.

13             So my question is has the government of Iraq truly

14   committed to charging Mr. Ahmed or not?

15             MS. HACISKI:  I direct Your Honor to the very last

16   sentence of the supplement, the end of Paragraph 5, where the

17   Iraqi government, through Judge Jabbar, states that specific

18   legal measures have been taken to extradite the defendant,

19   Mr. Ahmed, to bring him in front of the Iraqi courts in order

20   to prosecute him in accordance with the law.

21             I think that statement on its face indicates their

22   intention to prosecute Mr. Ahmed.  And there's other evidence

23   in the package itself indicating that, specifically the warrant

24   itself.  In the *Sacirbey* case from the Second Circuit that

25   Mr. Ahmed himself relies upon, the Court states that the

1    warrant is the document that demonstrates that the fugitive has

2    been charged for purposes of an extradition treaty.  And here

3    of course we have a warrant, and Iraq has affirmed that warrant

4    is still in effect.

5         But even taking Your Honor's position that perhaps the

6    supplement could be read both ways, in that event, Your Honor

7    should still certify the case for extradition with the Supreme

8    Court case *Factor v. Laubenheimer*, which says that to the

9    extent there's an ambiguity as to whether a certain treaty

10   condition has been met, the court must apply can --

11   construction requiring that extradition treaties be interpreted

12   liberally in favor of extradition, allowing the case to move

13   forward to the secretary's decision regarding surrender.

14        So even if there were some ambiguity as to whether

15   Mr. Ahmed had been charged in Iraq, under the Supreme Court

16   precedent, the Court should then therefore decide to proceed

17   with certification.

18        But even still there's further evidence that Mr. Ahmed

19   has been charged, and it's not only the view of the Iraqi

20   government but also the view of the U.S. Department of State.

21   And Your Honor has recognized in your order in the motion

22   in limine that courts will give weight to the statement of U.S.

23   Department of State regarding the interpretation of a treaty.

24        And here we also have a declaration from Mr. Heinemann

25   providing the State Department's view that Mr. Ahmed is charged

1        within the meaning of the treaty.  And he explains that the

2        term "charged with" in an extradition treaty applies to

3        individuals who are sought for prosecution.  And it's not

4        restricted to only those subjects that are set forth in a -- to

5        charges that are set forth in a formal charging document

6        analogous to U.S. indictment.

7                And this takes into account the fact that different

8        countries have different systems for instituting prosecutions.

9        So not all of them proceed by the filing of a criminal

10       complaint or the obtaining of an indictment as we do in the

11       United States.  And, you know, the Ninth Circuit and other

12       courts have recognized this.

13               And so, as a result, the case law that applies in this

14       case such as the *Emami* and other cases is in line with how the

15       State Department construes the term -- construes the term

16       "charged with" broadly.

17               And so if I could point the Court to the *Emami* case,

18       and I first remind the Court that we just heard

19       Professor Hamoudi state in his own words that Mr. Ahmed has

20       been accused in Iraq of a charge, and that's his analysis as to

21       the current status of the case there.

22               In *Emami*, the Court, referring to a Seventh Circuit

23       case, the *Assarsson* case says, "The Court reasoned that the

24       word 'charged' used as a verb in the generic sense only to

25       indicate accused could not be transmuted into the requirement

UNITED STATES DISTRICT COURT

1    that requires 'charges', a noun, to be filed."

2            So in this case, the *Emami* case, the Ninth Circuit

3    essentially equates the word "charged" with accused and finds

4    that that's all that's required for the "charged with"

5    requirement of an extradition treaty.

6            And as to Ms. Johnson's argument that the *Emami* case

7    is specific to the treaty at issue there and to the facts of

8    that case, a reading of that case does not so limit its

9    analysis.

10           THE COURT:  Why not?

11           MS. HACISKI:  Well, in particular it relies heavily on

12   the *Assarsson* case.  It simply sort of describes the holding in

13   that case and then says finally the same argument applies to

14   the language of the treaty in this case.

15           And so its entire analysis is based on the *Assarsson*

16   case, which involved a different treaty and of course different

17   facts.  The treaty at issue in *Assarsson* was a Swedish treaty.

18   So to the extent that Ms. Johnson thinks that the language in

19   the treaty, the German treaty that was at issue in *Emami*, you

20   know, there was other language in *Assarsson*, and the Court

21   wasn't parsing through the different terms of each different

22   treaty.  It was simply looking at the term "charged with".

23   Although one way in which it did look at the specific terms of

24   the treaty was to sort of along the lines of the *Sacirbey* case,

25   looking to the documentary requirements under the treaty.  And

1    the case in *Emami*, similar to the U.S./Iraq case, required only

2    the production of a warrant and not a charging document.

3            And the Ninth Circuit found that notable in finding

4    that we should read the term "charged with" not to have

5    required --

6            THE COURT:  Okay.  And, counsel, this is well briefed.

7    Let me ask you:  Ms. Johnson views the treaty as a list treaty.

8    Do you agree with that?

9            MS. HACISKI:  I do, Your Honor.

10           THE COURT:  And Ms. Johnson says that conspiracy is

11   not included among the charges listed.  Is that a problem for

12   the government's case?

13           MS. HACISKI:  It's not, Your Honor.  Mr. Ahmed is

14   clearly wanted for the charge of premeditated murder, not for

15   conspiracy.  The treaty in Article II, which contains the list

16   of extraditable offenses, lists murder, including willful

17   murder with premeditation, in item one.  And in item 25 it says

18   that "Extradition shall also take place for participation in

19   any of the aforesaid offenses as an accessory before or after

20   the fact, provided that such participation be punishable by

21   imprisonment by the laws of both high contracting parties."

22           The reason that my colleague raised conspiracy was

23   because under Iraqi law -- and I'll point Your Honor to Page

24   00025, a Bates stamped page, which contains Article 48 of the

25   Iraqi penal code.

1          THE COURT:  Hold on one second.  Let me get there.

2     Okay.

3          MS. JOHNSON:  Your Honor, I apologize for

4     interrupting, but our interpreter -- I think there's a request

5     to slow down a little bit.

6          MS. HACISKI:  I apologize.

7          MS. JOHNSON:  I apologize for interrupting.

8          THE COURT:  Thank you.

9          MS. HACISKI:  So Article 48 describes what it means

10    under Iraqi law to be an accessory to the offense.  And

11    subsection 2 explains that any person who conspires with others

12    to commit an offense and that offense is committed on the basis

13    of conspiracy.  So conspiracy is looped into the concept --

14         THE COURT:  It's subsumed within accessory, in your

15    view.

16         MS. HACISKI:  Exactly.  It's just a theory of

17    liability and therefore does not have to be separately covered

18    as a separate offense on the list of the treaty.

19         If Your Honor has no further questions, I'll just

20    touch briefly on the citizenship issue.

21         THE COURT:  Yes, please.

22         MS. HACISKI:  This Court in your order on the motion

23    in limine stated that the United States may extradite its own

24    citizens to other countries.  Given this and the plain language

25    of 3196 as it's been interpreted in the *Knotek* case and others

1    should allow this Court to readily find that Mr. Ahmed is

2    extraditable despite his citizenship.

3            But unless Your Honor had further questions, I'll stop

4    there.

5            THE COURT:  No.  That's fine.  All right.  Counsel,

6    you did cover a lot of ground fast, so thank you.

7            MS. HACISKI:  Thank you.

8            THE COURT:  Ms. Johnson, are you prepared to make your

9    next argument or Mr. Kaplan?

10           MR. KAPLAN:  Thank you, Your Honor.

11           So I can do a very, very quick rebuttal on those

12   points and then get into political offense, if that seems

13   appropriate?

14           THE COURT:  Yes.  Let's make it a quick rebuttal on

15   those points because they have been well presented.

16           MR. KAPLAN:  Okay.  As far as the question of war

17   between the parties, the fact is really the case law is all

18   just that *Argento* case and following the *Argento* case.  It's a

19   very small body of case law.  The *Gallina* case discusses the

20   idea of whether an extradition treaty could survive a war and

21   observes that it's out of the question that it would actually

22   be practiced and followed during a war.

23           THE COURT:  Okay.  Just to be precise, is your

24   argument can survive hostilities?  Because technically I don't

25   think the United States ever declared war on Iraq.

1              MR. KAPLAN:  Can survive hostilities, correct.

2              THE COURT:  Okay.

3              MR. KAPLAN:  And goes on to what is arguably in our

4     position a very illogical next conclusion that it would come

5     back to life after the war.

6              On the issue of the warrant, the declaration of

7     Mr. Heinemann says that what it would count as being charged

8     would be including sought for prosecution or wanted for

9     prosecution.  That's the way he describes it.

10             Taking arguendo that that is correct, the statement of

11    Judge Husayn makes it clear that Mr. Al-Nouri is not actually

12    sought or wanted for prosecution.  It says, "If" -- this is

13    Page 3 in the middle -- "If the court finds that there is

14    sufficient evidence to prosecute the defendant, a court order

15    will be made to refer him to the relevant court.  However, if

16    there is not sufficient evidence to refer him, then an order

17    will be issued for his release."

18             So he is wanted for the continuation of an

19    investigation, not at this point wanted for prosecution.

20             THE COURT:  But, counsel, then I read the language

21    that I read that seems to say that they want him for trial.

22    So, I mean, it may not be clear-cut, but there's -- there's

23    evidence in the record that they want him to prosecute him.

24             MR. KAPLAN:  Well, respectfully, we don't read it that

25    way.  I think there was a discussion of the possibility of a

1      trial in absentia as being provided for in Iraqi law, but we

2      understood that not as something that they were prepared or

3      able to do at this point in the investigation.

4              Okay.  As far as the declaration of Mr. Heinemann

5      about the treaty being in force, I would just note he makes no

6      attempt to justify it as a matter of United States law.  He

7      makes reference to international law and the Department of

8      State's opinion.  We still believe the Supreme Court

9      declaration of U.S. law should govern.

10             So if there are not additional questions on that, I am

11     prepared to turn to the political offense issue.

12             THE COURT:  All right.  Let's do that.

13             As an initial matter, on the political offense

14     doctrine, I've struggled with this a little bit in this case,

15     and I want to make sure I understand the formulation.

16             I believe it is the case that Mr. Ahmed does not need

17     to admit the offenses to invoke the political offense doctrine.

18     He can still take the position that the government must prove

19     probable cause that he committed the offenses.

20             But he does, if he wants to rely on this doctrine, he

21     does need to acknowledge membership in Al Qaeda of Iraq even if

22     his argument is I had nothing to do with these two particular

23     murders.  Do you agree with that?

24             MR. KAPLAN:  No, respectfully, Your Honor, we do not

25     agree with that.

1          And the fact is Mr. Al-Nouri does not admit factually

2     to any involvement or connection to Al Qaeda or Al Qaeda in

3     Iraq.

4          THE COURT:  So let me ask you how can he take

5     advantage of the doctrine then?  How does it apply to him?  If

6     his position is I had nothing to do with this, with these

7     specific murders and I had nothing to do with Al Qaeda in Iraq,

8     then why would the Court write or spend time in its order

9     dealing with something that he asserts has no relevance to him?

10    If it has no relevance to him -- and this is a fact intensive

11    inquiry -- because he didn't do it and he's not part of

12    Al Qaeda in Iraq, then what is the relevance?

13          MR. KAPLAN:  Well, Your Honor, he is entitled to the

14    benefit of the political offense doctrine without being

15    required to incriminate himself.  There is a discussion in

16    *Quinn* to the effect that a relator has Fifth Amendment rights

17    against self-incrimination, and because of that he cannot be

18    required to admit his membership in what may be an unlawful

19    organization that would be self-incriminating.

20          There is a reference in *Quinn* to it being an objective

21    test and proof of his motivation -- several references to proof

22    of his motivation not being required.  And the fact is *Quinn*

23    himself did not testify.

24          THE COURT:  But he readily acknowledged that he was a

25    member of the IRA.  The issue was whether he was a member of

1    the specific group that carried out the attacks, because there

2    was a subgroup.  And that's why I thought the formulation was

3    that Mr. Ahmed does not need to acknowledge participation in

4    these specific murders, but for it to be relevant, he must

5    acknowledge, as in *Quinn*, that these are his beliefs or that he

6    was part of the group that was part of the indigenous uprising.

7              MR. KAPLAN:  It's not my understanding, Your Honor.  I

8    understand what you're saying.  It's not my understanding.  The

9    group that was allegedly involved behind the crimes in *Quinn*

10   was not the IRA but the PIRA, the provisional IRA.  And the

11   Court made clear that he did not have to admit his

12   participation, and he didn't admit his participation or

13   involvement in the PIRA --

14             THE COURT:  I agree.

15             MR. KAPLAN:  -- or in the crimes.

16             And I don't believe -- Well, you know, he had been

17   adjudicated to have a connection to the IRA separately in Great

18   Britain.  Obviously we don't have anything of that nature here.

19             But when the court says this is an objective test, and

20   he doesn't have to prove his own motivation, and it says that

21   the test looks to all the circumstances on the evidence

22   presented, like as in *Quinn* --

23             THE COURT:  Where in *Quinn* does it talk about the

24   objective test?  Because *Quinn's* a long opinion.

25             MR. KAPLAN:  Right.  Give me just a moment.  Page 798

1    of the *Quinn* opinion.  Let me find it here.

2         So the paragraph that begins there are several

3    responses, three lines up from the bottom, any effort -- it's

4    discussing criticisms of the American incidence test.

5         And it's defending it and saying that if they were to

6    change the doctrine in some way to protect all crimes

7    politically motivated, it would require the abandonment of the

8    objective test for determining which offenses fall within the

9    exception, in our view a most undesirable result, and then it

10   goes on.

11        And we understand *Quinn* to conduct an objective review

12   of all the available evidence and, based on that evidence, to

13   reach the conclusion that but for the crimes having occurred in

14   England rather than Northern Ireland, that would have -- they

15   would have been under the political offense exception.

16        THE COURT:  So the Court -- if the Court uses that

17   analysis, then the Court is to say though Mr. Ahmed denies

18   being in Al Qaeda in Iraq and denies participation in these two

19   murders, the Court finds he is in Al Qaeda in Iraq and

20   therefore will use the analysis of the political offense

21   doctrine?

22        MR. KAPLAN:  The way I understand it is not exactly

23   like that.  It would be more like the Court acknowledges that

24   the relator does not admit or concede his committing the crimes

25   or his membership in that organization.  However, conducting

1   the objective review of the evidence that's described in *Quinn*,

2   the Court finds that the evidence establishes a political -- a

3   political offense, that it satisfies the initial burden of the

4   relator to identify the elements of the political offense, and

5   that the government has not come back, as in this case, the

6   government has not produced any additional evidence relevant to

7   political offense since we have raised the defense.  The

8   government has not come back and overcome or refuted that

9   showing.  That would be the analysis.

10          THE COURT:  Okay.  I understand the argument.  And as

11  I said, there's a lot in *Quinn*.  So I interrupted you at the

12  start, so you can go back to wherever you wanted to start.

13          MR. KAPLAN:  Thank you, Your Honor.  So I would like

14  to jump right into how I understand *Quinn*, the governing law in

15  this circuit, to define the test.

16          Before I do that, briefly I just want to highlight a

17  statement in the government's extradition brief, Page 21, which

18  is taken directly out of the report of its expert,

19  Professor Whiteside.

20          There is no question that in the time period leading

21  up to the charged murders, AQI was just one of dozens of

22  militant groups opposed to the American coalition forces and

23  the sitting Iraqi government.

24          There is a lot of acknowledgments in that one

25  statement that really are also permeating through the

1    government's briefing, which essentially concedes everything

2    the Court needs to find to find that objective test satisfied.

3    They're acknowledging that there was dozens of different

4    groups, that they were involved in an uprising against the

5    existing government, and that AQI was just one of those dozens,

6    and that uprising was happening.

7            THE COURT:  But it also raises whether or not it was

8    an indigenous uprising, because if, as the government contends,

9    the uprising is essentially rooted in at least direction by

10   foreign nationals, not Iraqis, and Iraqis are participating,

11   that would not qualify under *Quinn* as I understand it.

12           MR. KAPLAN:  Arguably it would not.  And we think it's

13   clear on all of the evidence and really not disputed that

14   that's not what was going on here.

15           Let me get into that.  That I believe goes to the

16   first prong of the incidence test, which is the uprising prong

17   was there an uprising as defined in *Quinn*, which would be

18   indigenous people rising up to try to change the government

19   over that territory.

20           The consensus between the experts as in that quotation

21   and all of the evidence is that there was a very intense, very

22   aggressive insurgency going on, particularly in that period of

23   time in 2006, particularly in Fallujah.

24           That there is no dispute that as these dozens of

25   groups that are referred to, they were native Iraqi

1      organizations except to the extent the government is making the

2      case or suggesting that AQI was not.

3              So in terms of whether there is an uprising, the fact

4      that one group that has these characteristics the government is

5      highlighting was part of these dozens, these dozens, doesn't

6      make the insurgency disappear.

7              The fact is it should be clear and we don't think

8      there's a serious dispute that step one of the incidence test

9      is satisfied because the uprising was much more than this one

10     group, whatever this group's characteristics may have been.

11             THE COURT:  But it has to be, again, it has to be an

12     indigenous uprising of Iraqis seeking to change their own

13     government.  The fact that there are multiple groups that are

14     involved in an uprising then leads to the question what are the

15     natures of those groups.  And if they're not indigenous, then

16     you actually fail the incidence test.

17             MR. KAPLAN:  Right.  And we don't think it's disputed

18     between Professors Hamoudi and Whiteside and really the

19     government's briefing that there is no suggestion that all of

20     those dozens of other groups were not native indigenous groups.

21     And all of the evidence bears that out.

22             THE COURT:  Sure.  But the government's theory is that

23     Mr. Ahmed was part of Al Qaeda of Iraq.  So isn't that --

24     doesn't that narrow the inquiry?

25             MR. KAPLAN:  At this first stage, no, Your Honor, and

1      that's because step one is was there an uprising?

2              Step one is taking a step back and saying at the time

3      this violence occurred, was there an uprising in the place

4      where the crimes allegedly happened?

5              THE COURT:  Okay.

6              MR. KAPLAN:  If there's dozens of groups and all but

7      one of them are clearly indigenous -- And importantly here you

8      made a reference to the idea of things being directed by a

9      foreign group.  There's no suggestion that Al Qaeda in Iraq

10     started this uprising, that they ever really controlled the

11     uprising, that they directed all of these dozens of other

12     groups.

13             There's just them becoming involved in -- I'm sorry --

14     them becoming involved in something that happens within Iraq

15     among Iraqis.

16             THE COURT:  Okay.  But I take your point that the --

17     if there is in fact enough proof of an indigenous uprising,

18     then we would go to the second prong for some of the issues the

19     Court is raising?  Okay.

20             MR. KAPLAN:  Exactly.  And maybe -- if this is not

21     necessary to do -- but I would like to touch on the reasons the

22     government tries to leverage into an argument that there really

23     wasn't an uprising -- even though this group was just one of

24     dozens -- by looking at AQI's characteristics.

25             So one of the characteristics is, as the Court has

1    heard, that there were foreigners involved in, some in

2    prominent positions, within AQI.  And we don't dispute that.

3    We have heard today from effectively from both experts,

4    Mr. Whiteside by video and Professor Hamoudi in person, that as

5    you go down from that upper level of the organization into the

6    lower levels, it quickly becomes a completely Iraqi

7    organization.

8              And Professor Whiteside was quite emphatic really --

9              THE COURT:  Well, let's be clear.  You played that

10   clip not for substantive evidence but for foundation for

11   Professor Hamoudi to give his opinion.  So I don't think it's

12   clear that -- and that was a short clip -- possibly is out of

13   context.

14             So if you want to argue that it's undisputed because

15   that's also in Professor Whiteside's report, you can do that.

16   But you should not rely on the impeachment clips.

17             MR. KAPLAN:  Okay.  I would correct that then to say

18   Professor Hamoudi expressed his agreement with what was said on

19   those clips.

20             The idea that some foreigners are involved in an

21   uprising does not nullify the fact or the indigenous nature of

22   an uprising.  We've mentioned the example of the Marquis de

23   Lafayette, the American Revolution.  And it's not just

24   individuals like the Marquis de Lafayette.  It's also countries

25   and entities.  The country of France was heavily involved in

1     the American Revolution, really crucial to the final victory at

2     Yorktown.

3              The country of Pakistan, it's noted in the *Singh*

4     opinion, which was *Barapind* on appeal, the country of Pakistan

5     became involved in the Khalistan/Sikh separatist movement in

6     India.  And there's many, many examples I could give.

7              But the idea the government seems to be relying on

8     that any uprising that sort of becomes contaminated or tainted

9     by foreigners or foreign governments or foreign-based groups or

10    foreign-founded groups ceases to be an indigenous uprising is

11    fundamentally contrary to all this case law and experience and

12    in contrast with the reality that uprisings typically are not

13    hermetically sealed off and neat and tidy as they're

14    suggesting.

15             THE COURT:  Well, I'm not persuaded that that reading

16    of *Quinn*, that *Quinn* goes quite that far, that *Quinn* is

17    concerned with whether or not the uprising was truly

18    indigenous.  And you seemed to be just dismissing that Al Qaeda

19    of Iraq had foreign influences in it and may not have been

20    indigenous.  I'm not sure how you can dismiss that under *Quinn*.

21             MR. KAPLAN:  Well, Your Honor, I'm sorry.  I don't

22    mean to dismiss it at all actually.  I'm accepting it and

23    trying to indicate that it's not inconsistent with an

24    indigenous uprising.

25             *Quinn* refers to one of the foundations for the whole

1    concept of political offense being the American Revolution that

2    was an uprising which very significantly involved foreign

3    people and foreign governments.

4           *Singh*, which deals with the same uprising that was

5    reviewed and found to be potentially within the political

6    offense doctrine in *Barapind*, *Singh* notes that Pakistan was

7    involved in that uprising.

8           So I don't mean to dismiss or downplay the involvement

9    of foreigners and foreign groups in this uprising or to ask the

10   Court to ignore the involvement of foreigners in AQI.

11          I'm simply saying that their presence and involvement

12   doesn't change the degree to which this uprising fits within

13   *Quinn's* definition.

14          And, you know, if it were to do that, if any

15   involvement of a foreigner or a foreign government were to

16   actually nullify the existence of an uprising for *Quinn*

17   purposes and kill a political offense claim at step one, the

18   doctrine would essentially cease to have any function, because

19   the reality of the world is foreigners do get involved; foreign

20   entities and countries do get involved.

21          There's a number of references in the government's

22   briefing to the idea of stealing, that AQI's actual agenda was

23   to steal land or to seize land.  Mostly they seem to be

24   connected to the idea of the agenda of a caliphate.  It's not

25   entirely clear what it means to seize or steal land.  You know,

1    to the extent they're involved in an uprising which will change

2    the form of government that has jurisdiction over that

3    territory -- that's the definition of an uprising under

4    *Quinn* -- it's meaningless; it doesn't add anything.

5         In terms of, well, it's because they have this agenda

6    of creating a caliphate that would not respect the existing

7    national boundaries of Iraq, again, that does not comport with

8    the governing case law, not just *Quinn*.  *Quinn* involved a

9    movement to try to change the existing boundaries of north and

10   south Ireland and create a Catholic unified Ireland.  That was

11   not seen as in any way impeding the application of the

12   political offense doctrine.

13        The Khalistan movement which underlies *Singh* appealed

14   to be *Barapind* was, as you know, a movement to create you might

15   say a Sikh caliphate but a new religion-based national entity

16   that would be carved out of the state of India.

17        So, you know, this idea that the goal of creating a

18   caliphate somehow nullifies the applicability of the political

19   offense doctrine really can't get past the governing case law

20   in *Quinn* and *Barapind* where that was not seen as any kind of a

21   hindrance to the doctrine.

22        In addition, on sort of a more practical level, you

23   know, the idea of turning Iraq or parts of Iraq into parts of a

24   new caliphate obviously couldn't happen until the existing

25   authority over whatever territory that was going to be was

1    toppled.  And so AQI was involving itself in this indigenous

2    insurgency along with, as the record shows and the government

3    acknowledges, I believe, many Iraqis who shared this caliphate

4    ambition, to topple the government and get the Americans to

5    leave so that they could advance to this next step.  But, you

6    know, it's not inconsistent -- in fact, it's perfectly

7    consistent -- with the definition of a *Quinn* uprising to want

8    to do something with this territory after you've kicked out the

9    existing government as in *Quinn*, as in *Barapind*, et cetera.

10        The government also focuses on the fact that AQI was

11   involved in terrorism, again, as a way of trying to explain why

12   its involvement nullified the existence of an uprising.

13        On Page 10 of Professor Whiteside's opinion, he says,

14   "Almost all insurgencies use terrorism and assassination as

15   tactics to defeat incumbent governments."

16        So the basic idea that repeating the concept that AQI

17   was a terrorist group, that they were conducting terrorist

18   attacks by their own expert's statement, which we don't

19   dispute, is again perfectly consistent with being part of an

20   uprising.

21        Obviously, as the Court is aware, the *Quinn* decision

22   draws an important distinction between domestic -- or terrorism

23   involving an indigenous insurgency and an international act of

24   terrorism, and they discuss the incident in the Seventh

25   Circuit's *Eain* case which involved a PLO member who crosses

1    over into Israel and conducts an attack.  That's international

2    terrorism.  Somebody crossed from one country into another and

3    conducted an attack in a place where there was no uprising.

4         So these alleged crimes here, if they happened as

5    described, involved indigenous Iraqis conducting an attack

6    within not only their own home country of Iraq but their own

7    home city against local police officers on a street in their

8    home city.

9         So the type of terrorism that would tend to undermine

10   the political offense test doctrine is not the type that these

11   crimes have any relation to.

12        And there's agreement between the experts and on the

13   evidence that AQI, although it had been connected earlier to

14   international terrorist attacks in other countries, was also

15   heavily involved in the indigenous insurgency in Iraq.

16        So the fact that they had also done these things that

17   wouldn't qualify under the political offense doctrine doesn't

18   undermine the fact that assuming they were involved in this and

19   assuming Mr. Al-Nouri was involved with them in this is fully

20   consistent with the definition of a political offense because

21   it was an attack that fit the profile of an act under the

22   indigenous insurgency.

23        THE COURT:  Well, why is it self-evident that killing

24   police officers is an act that is necessarily a political act?

25   I'm not sure I follow that.

1          MR. KAPLAN:  I apologize.  I don't mean to suggest

2     that it's self-evident at all.  I point to the statements of

3     both experts, Professor Hamoudi says it's something like a

4     classic tactic of the insurgency to attack police and that the

5     purpose of it was to push back against the United States trying

6     to win hearts and minds by showing Iraqis, look, this new

7     government, this U.S. allied government can't protect you

8     because police officers are being killed.

9          So -- and he makes the point that it's a classic

10    tactic of the insurgency.  And Professor Whiteside essentially

11    says the same thing.

12         THE COURT:  Well, he says it's also a classic tactic

13    of Al Qaeda to intimidate the local population, which then

14    imports back in the actions by foreigners.  I mean, it's

15    Al Qaeda of Iraq.  They had to brand it as of Iraq because

16    Al Qaeda is not necessarily indigenous to Iraq.

17         MR. KAPLAN:  True.  The -- What Professor Whiteside

18    says, as you have paraphrased it, is -- was it attacks on

19    police were practiced by Al Qaeda in Iraq.  And I don't think

20    he disputes that other groups did as well.  But I certainly

21    accept the idea that AQI did a lot of it.

22         He said it was to terrorize the local population and

23    warn them, as I recall, warn them away from cooperating with

24    the government.  So the phrasing is different but not very

25    different from what Professor Hamoudi says.  Essentially it's

1    another way to undermine the authority and the allegiance of

2    the existing government, the new U.S.-supported government of

3    Iraq.

4            If you phrase it as show them they can't protect you

5    or if you phrase it as warning them away from cooperating with

6    this government, either way, it's not a fundamental difference.

7    It's still a tactic of an insurgency.  It's a tactic of an

8    indigenous insurgency.  And, you know, Your Honor referred to

9    it as a tactic of AQI, which, again, obviously had some foreign

10   people in it.  But they were participating in an indigenous

11   insurgency using a classic tactic.

12           So certainly I don't mean to suggest that it's

13   self-evident.  I'm relying on the expert evidence that these

14   types of attacks were a very common strategy of insurgency.

15   And there is a report from the Department of Defense that says

16   they were also a very large part of the type of attacks that

17   were carried out by the insurgency.

18           THE COURT:  Counsel, let me ask specifically for the

19   description of these murders.  The Court had that question that

20   in the killing of Officer Khalid, were the two others present

21   civilians.  And you all put up the Document 3-3 at 80, which

22   does refer to the killing of two civilians along with

23   Officer Khalid.

24           Does that defeat the applicability of the political

25   offense doctrine?

1      MR. KAPLAN:  No, Your Honor, it doesn't.  The first

2    reason it doesn't is that *Quinn* says that attacks on civilians

3    are perfectly consistent with an uprising.  And the government

4    has noted that the Seventh Circuit took a different position.

5    And the government has noted that Judge Duniway in *Quinn* took a

6    different position.  And I think the government has noted that

7    Judge Rymer in a dissent in *Barapind* took a different position.

8        Judge Fletcher, Judge Betty Fletcher, expressly agreed

9    with that portion of the majority opinion in *Quinn*, and that is

10   the law of the circuit.

11       The law of the circuit is that the fact that attacks

12   involve civilians is not inconsistent with -- in fact it's

13   perfectly consistent with an attack being part of an indigenous

14   uprising.  And in *Quinn* itself, several of the crimes involved

15   were letter bombs, letter bombs left at a burger shop, at a

16   railway station, et cetera.  Obviously those were endangering

17   civilians, not seen as a hindrance to the political offense

18   doctrine.

19       But aside from the fact that *Quinn* governs that,

20   there's also the fact that, first of all, the killing of those

21   two bystanders, whether they're civilians or not, is not part

22   of the charges in this case.  Those are not charged against

23   Mr. Al-Nouri.

24       And, secondly, the what we're calling C1, the

25   cooperator, he describes the bystanders as being killed

1   essentially because they were in the wrong place at the wrong

2   time.  I think his words are they were killed because of the

3   heavy fire shot in one instance and a similar statement at

4   another point.  So clearly they were not targeted.

5           THE COURT:  Counsel, let me point out, just to dive

6   back to the objective issue for one second, at 794 of *Quinn* it

7   talks about "because politically motivated and directed acts

8   may injure private as well as state rights, the objective test

9   fails to satisfy the various purposes of the political offense

10  exception."  So maybe we'll have some post-briefing on

11  objectivity in *Quinn*.

12          But let me also raise with you I'm having trouble

13  finding any limiting principle for your analysis of the

14  political offense doctrine, because if any domestic or any

15  attack within Iraq that targeted police, as long as there were

16  uprisings, they're all covered by the political offense

17  exception?

18          MR. KAPLAN:  No, certainly not, Your Honor.

19          Interestingly, the government makes an argument in its

20  final brief that we have not identified anything specific about

21  these two police victims.  And they're representing that that

22  undermines the political offense applicability.

23          The reality is the opposite.  If there were evidence

24  indicating something specific about these two police victims,

25  if the evidence suggested that Mr. Al-Nouri had some personal

1     reason to want to attack either of these two police officers,

2     it would look less like a political offense.

3            THE COURT:  That's the personal motivation analysis?

4            MR. KAPLAN:  It would be a personal motivation, if

5     there was some beef between them, if there was some family

6     friction between them, anything like that.

7            And *Quinn* does note the absence of evidence as well as

8     the presence of evidence.  *Quinn* notes the absence of evidence

9     that Mr. *Quinn* had any personal reason to carry out these

10     attacks.

11            So what the Court is directed to do by *Quinn* is to

12     look at all of the evidence and see if the initial showing

13     required to shift the burden has been made.  And, as in *Quinn*,

14     everything really just fits into the profile of a political

15     offense, and nothing significant seems to really push back

16     against that.

17            In *Quinn* the court made an observation that the use of

18     bombs like this by the PIRA as a political tactic was well

19     documented.

20            So, you know, if the offense involved some type of

21     crime as to which there was no well-documented reason to

22     conclude, in combination with everything else, that it fit the

23     profile of a political offense that was part of that uprising

24     at that place and time, then the Court would not be able to

25     find a political offense.

1           So a lot of planets have to align for the political

2      offense doctrine to be applicable.  It can't just be a crime

3      took place when there was an uprising going on.  It has to be a

4      particular type of crime.  There has to be -- probably has to

5      be expert evidence, as we have here, saying this particular

6      type of crime was a classic, a well-documented type of crime

7      that was part of this insurgency.  And ideally you would have

8      some specific evidence in the record connecting the relator to

9      a particular group that was known for being part of this

10     insurgency and using that type of crime.  And we have that.

11          THE COURT:  But, okay.  Wait.  You just said that

12     ideally you would have some specific evidence connecting the

13     relator to that type of crime.  Well, I guess that type of

14     evidence can come from the government.  It need not come from

15     the defense.  I guess that --

16          MR. KAPLAN:  Exactly.

17          THE COURT:  That's your argument.  Okay.  I

18     understand.

19          MR. KAPLAN:  So those are the primary points.  Oh, one

20     other thing, in terms of prong one, whether there was an

21     uprising, there are some references and in the end of

22     Professor Whiteside's report there's a reference to the idea

23     that we are trying to show or Professor Hamoudi is trying to

24     show that AQI was, quote, just another uprising group, that

25     they really can't be effectively distinguished in any

1    significant way from the other uprising groups.  And we are

2    not trying to show that.  We have no reason to try to show

3    that.

4            We acknowledge that AQI was different.  We acknowledge

5    that AQI had some foreigners involved.  We acknowledge that AQI

6    had done things that would not, clearly would not.  If the

7    evidence indicated that AQI sent our client off to Jordan to

8    attack a hotel, we wouldn't have the argument we have here, and

9    the political offense doctrine wouldn't apply.

10           We don't dispute that AQI was different.  The

11   important point for purposes of applying the test is that

12   whatever else they were doing and however they might have been

13   distinguishable in some respects at the top levels in a small

14   group of leaders, they were heavily involved in an indigenous

15   uprising.

16           This attack, by all descriptions and all available

17   evidence, fit the profile of a part of that indigenous

18   uprising.  And the evidence taken at face value links our

19   client to that attack within that uprising.

20           And it's very similar, really, but for the location of

21   the attack and *Quinn* being the wrong place, very similar to

22   *Quinn* in all those respects.

23           I can turn to the second prong of the test unless --

24           THE COURT:  Whoa, we've wandered into the second

25   prong.

1        MR. KAPLAN:  We've wandered into portions of the

2   second prong.

3        THE COURT:  I want to make sure the government has

4   time today.  How much further do you have on the second prong?

5        MR. KAPLAN:  Well, I'll try to wrap it up.  I think I

6   have covered probably a fair amount of this.

7        As the Court is aware in *Quinn*, they say a couple

8   of times once you get past the first prong, it's

9   essentially downhill to the second prong.  It's a rather

10  liberal test.

11       The evidence indicates Mr. Hamoudi's membership in

12  what qualifies as an uprising group.  There is very

13  explicit --

14       THE COURT:  Just to clarify, you said Hamoudi.

15  Mr. Ahmed.

16       MR. KAPLAN:  Mr. Ahmed.  Mr. Ahmed or Mr. Al-Nouri, my

17  client.  There's very clear evidence from the cooperator or C1

18  of a hierarchy of that group being integrally involved, because

19  he describes reporting back to a house, handing over the gun to

20  some operator, getting money back, getting paid by this

21  hierarchy of this uprising group, and then getting tasked

22  to go and do something else to attack police in another

23  location.

24       The government seems to sort of change position midway

25  through the briefing.  Initially they favored tagging this as a

1    terrorist attack or AQI being involved in terrorism, and then

2    later they seem to want to back away from that and say, well,

3    he wasn't charged under the terrorism statute.  Iraq has

4    terrorism statutes, as Professor Hamoudi pointed out, and they

5    didn't charge that.

6          Well, the fact is there are several references in the

7    charging -- in the materials submitted that describe this as an

8    act of killing by an armed terrorist group or organized murder

9    by an armed terrorist group.  And it was assigned to a court,

10   for whatever reason, that specializes in terrorism cases.

11         So remembering what Professor Whiteside said that

12   terrorism tends to be an integral part of an uprising, that

13   really all tends to support the applicability of the political

14   offense doctrine here.

15         I do believe I have covered the essential points I

16   wanted to make, so if I can sit down for a moment?

17         THE COURT:  Thank you, Mr. Kaplan.

18         MR. ALLISON:  Your Honor, our intent -- We do not

19   believe that Mr. Ahmed has met his burden under the political

20   offense exception.  So we would like to call Mr. Whiteside just

21   to clear up what was shown to him today.

22         We're not calling because we think the burden has

23   shifted.  And I can articulate that.

24         That was our intent.  We do -- Let's see.  It is 4:00.

25   And I'll defer to what Your Honor wants to do.  I'm prepared to

1   argue political offense exception as well.  We had not seen

2   those materials before and think he maybe should have a chance

3   to explain.

4            THE COURT:  Well, as I said, we have switched around

5   the order.  But everybody was going to get to put in what they

6   wanted to put in.

7            If you want to call Professor Whiteside, that's fine.

8            I would not take the approach, though, that because

9   you believe that the defense has not met its burden, that

10  you're not going to address the political offense exception.  I

11  wouldn't take that approach.

12           MR. ALLISON:  Oh, no, that's not what I meant.  I'm

13  fully prepared to address the political offense exception.  I

14  just meant I didn't want the calling of the witness sort of to

15  be seen as us having to put in more evidence because the burden

16  has shifted.  That was what I was trying to articulate.

17           THE COURT:  All right.  Fine.

18           MR. PIMSNER:  Your Honor, the government would call

19  Dr. Craig Whiteside.

20           THE CLERK:  Your first name was Craig?

21           THE WITNESS:  Craig.

22           THE CLERK:  C-r-a-i-g?

23           THE WITNESS:  Yes, ma'am.

24           THE CLERK:  And Whiteside spelled the way it sounds?

25           THE WITNESS:  Yes, ma'am.

1          CRAIG WHITESIDE, GOVERNMENT'S WITNESS, SWORN

2                      DIRECT EXAMINATION

3    BY MR. PIMSNER:

4    Q.   Please state your name for the record.

5    A.   Craig Whiteside.

6    Q.   Sir, did you prepare a report in connection with this

7    matter that's been marked and admitted as Exhibit 2?

8    A.   I did.

9    Q.   And do you stand by the contents of your report?

10   A.   I do.

11   Q.   There was a clip that was played earlier today.  Did you

12   see that clip?

13   A.   I did.

14   Q.   And do you know when that clip was from?

15   A.   It's 2015.

16   Q.   And what was the topic of your presentation that you were

17   giving in that clip?

18   A.   Briefly, it was the Islamic state of Iraq's assassination

19   campaign against Sunni tribal awakenings that happened 2007 to

20   2013.

21   Q.   So you weren't referencing the time when AQI was in

22   existence then?

23   A.   All of the events that took place even in that clip

24   happened after the killings of this -- in 2006 in Fallujah,

25   both killings.

1    Q.  Now, there was a suggestion that -- Oh, and since 2015 have

2    you learned more about the structure of Al Qaeda and Al Qaeda

3    in Iraq?

4    A.  Published a book and probably eight peer-reviewed articles

5    on this group examining a lot of the issues we've talked about

6    today.

7    Q.  Have you seen new information that wasn't available to you

8    back in 2015?

9    A.  Absolutely.  Government documents, capture documents, U.S.

10   Government shared documents with me about interrogation reports

11   of very high leaders of the Islamic state of Iraq in 2007 on.

12   Q.  It was suggested that Zarqawi was just in name only.

13            THE COURT:  I'm sorry, counsel.  I took

14   Professor Whiteside's last answer, though, when you talked

15   about updated information, as referencing from 2007 onward?

16   Q.  (BY MR. PIMSNER)  It was new information that was -- you've

17   learned of since 2015, correct?

18   A.  Correct.

19            THE COURT:  Okay.  But what I'm confused about is does

20   the new information affect his opinion as to events in 2006?

21   Because that's when the murders that are in the complaint took

22   place.

23   Q.  (BY MR. PIMSNER)  Can you answer that?

24   A.  Yes.  So to correct my testimony, through even before 2003,

25   so probably -- all the way back to 1999 where the group's

WHITESIDE - DIRECT

1    origin's in Afghanistan, so that's correct.

2    Q.   Now, there was a suggestion that Zarqawi did not listen to

3    AQI, and it was -- his affiliation was in name only.  Do you

4    agree with that?

5    A.   No, I do not.

6    Q.   And why not?

7    A.   There's more evidence that he listened to the instructions

8    of his Al Qaeda leadership in Pakistan on numerous occasions to

9    include after the Jordanian bombing in Amman where both

10   Zawahiri and Saif al-Adel wrote to him and told him to stop

11   external attacks.  He stopped external attacks.

12   Q.   And there's also suggestion that Al Qaeda wanted nothing to

13   do with Zarqawi while he was in Afghanistan.  Do you have

14   information that's contrary to that?

15   A.   As I wrote in my report and cited, that's one version of

16   what happened.  There are other versions to include Saif

17   al-Adel's own personal primary account that said he was

18   recruiting Zarqawi for Al Qaeda because of his Lavon

19   connections, his connections to Syria, Jordan, Lebanon, and

20   that area.

21   Q.   And there was a question that you -- or that

22   Professor Hamoudi was asked about the police.  Do the local

23   police, are they -- could you describe the local -- the primary

24   duties of the local police?

25   A.   In my experience in Iraq at the time working with and

WHITESIDE - DIRECT

1    partnering training police, it's mostly local issues, peace

2    enforcement, law and order.  There are counterterrorism units.

3    There's a federal police.  There's border police.  There are

4    all types of different policing that have different functions

5    and roles in counterterrorism as we understand it.  But for

6    local police, it's much like our local police.  Even though

7    they have a different reporting structure to a federal --

8    they're federalized, but they do have an affiliation to the

9    local -- the local leadership.

10   Q.  And the affiliation, is that -- are they just administrated

11   by the national government?

12   A.  Largely administrative, but as you can see in both of the

13   cases of the victims, they were both local Fallujans who went

14   to training in Baghdad under the national police training and

15   then returned to their home town where they served as police

16   officers.  It's not unusual.

17          THE COURT:  Mr. Pimsner, just so I'm tracking, the

18   point of those last few questions, do they go to whether or not

19   police officers as targets would not necessarily be considered

20   targets for purposes of a political offense?  Is that what

21   you're getting at?

22          MR. PIMSNER:  Our belief is that in order for the

23   political exception to apply, the defense is required to show

24   something about the nature of the victim and not just some

25   ordinary cop, that this was done for a political reason.

1          Was this a police officer who was engaged in, you

2    know, the groups -- the other groups that were conducting

3    counterterrorism measures?  No.  This was a local cop, dealt

4    with local issues.

5          Your Honor, I just wanted to clear up some of those

6    statements.  As to the rest, we're going to stand on the

7    report.

8              THE COURT:  Okay.

9              MR. PIMSNER:  Thank you.

10             THE COURT:  Thank you, Mr. Pimsner.  Thank you,

11   Professor.

12             MR. ALLISON:  Judge, how I would like to proceed is I

13   definitely want to explain our view of the political offense

14   exception and answer any questions you have.

15             I would like to take the first part of my presentation

16   on this and talk about what the United States believes is the

17   incompleteness of Professor Hamoudi's report.

18             And so what I intended to do, I have some books that

19   he cited to, and I have some excerpts that I'd like to show you

20   on the document camera, one or two, because we think his view,

21   his expert opinion is overly broad, and he's left out things

22   from the same sources he's cited that are important to the

23   analysis.  That's what I would like to start with first.

24             THE COURT:  How many of these do you have?

25             MR. ALLISON:  I can do two, Your Honor.

1          THE COURT:  All right.

2          MS. JOHNSON:  Your Honor, I would object to any of

3   this being considered for purposes of impeachment.  I'm not

4   sure the purpose for which it's being offered, but --

5          THE COURT:  The exact same purpose for which you

6   offered clips of whatever context relating to

7   Professor Whiteside.  It's no different.

8          MS. JOHNSON:  I understood the Court to be saying that

9   was being considered as foundation for our expert's opinion.

10  I'm not sure how that works in this particular case.

11         THE COURT:  The objection's overruled.

12         MR. ALLISON:  I'd like to start and if I could use the

13  document camera please.

14         THE CLERK:  It's on.

15         MR. ALLISON:  I'd like to start with a book that is

16  right here.  Your Honor, it's a library book, so I can't give

17  it to the Court for evidence, but I have made copies.  It's

18  called "Aftermath" by Nir Rosen.  The cover is here on the

19  document camera.

20         Now, Professor Hamoudi in Paragraph 111 of his report,

21  he cites this book, Your Honor, for the proposition that

22  Al Qaeda in Iraq and the Sunni insurgency were essentially the

23  same.  And he actually quotes the head of the Association of

24  Muslim Scholars in a quote that says -- that Professor Hamoudi

25  says on Paragraph 111 is "We are from Al Qaeda, and they are

1    from us."

2             That quote, Your Honor, is on the document camera

3    here.  I'm circling it in red on Page 58.  First of all, it

4    says allegedly, Your Honor, and Professor Hamoudi left that out

5    of his report.

6             But it does say that.  You can see the quote "We are

7    from Al Qaeda, and they are from us."  Importantly, Your Honor,

8    on the very page before in the same book, Page 57, it talks

9    about another viewpoint around the same time -- I'm sorry, Your

10   Honor -- it starts on Page 57 but actually goes on to Page 58.

11            Sorry about that.  Down at the bottom here.

12            And it talks about after a speech, at the bottom here,

13   Your Honor, after a speech on September 14th, 2005, The

14   Association of Muslim Scholars announced that Iraq Shiites were

15   not responsible for the crimes the government was committing

16   and that they were innocent of the attacks.  No religious

17   principle allowed one to seek revenge on an innocent person,

18   they said, and accused Zarqawi of colluding in the Americans'

19   plan to create civil war in Iraq.

20            From the same association of the individual

21   Professor Hamoudi quoted from at the same time the association

22   is distancing theirself from Zarqawi.

23            Also, Your Honor, it goes on to talk about this

24   statement here.

25            "Meanwhile, five resistance groups, the Army of

1    Muhammad, the Al Qaqa --" I don't know how you say that, Your

2    Honor, Q-a-q-a -- "Battalions, the Islamic Army of Iraq,

3    et cetera, condemns Zarqawi's statements as well, calling them

4    'a fire burning the Iraqi people' and explaining that they only

5    attacked the occupiers and those who assisted them, and did not

6    base their attacks on sectarian or ethnic criteria."

7            These same groups -- some of these same groups are

8    cited by Professor Hamoudi in his report as representative of

9    the Sunni insurgency.

10           So the point of me showing you this, Your Honor, is

11   that same page Professor Hamoudi's citing to, he says Al Qaeda,

12   we're one in the same; we are them; they're us, the

13   representative Sunni insurgency groups here around the same

14   time are saying that's not the case; we're distancing ourselves

15   from Zarqawi.

16           Another page out of the same book, Your Honor, but not

17   the same page --

18           THE COURT:  Counsel, show me your next example,

19   because I am concerned this is getting into impeachment of

20   Professor Hamoudi rather than supporting why you believe

21   Professor Whiteside's opinion.

22           So I'm not sure we're going down a path here that is

23   productive.

24           MR. ALLISON:  I can do this, Your Honor.  I can just

25   tell you the articles I was planning on showing you are

1    statements from the same sources Professor Hamoudi cites to.

2    But in the government's view he cherrypicks what fits his

3    report.

4            If Your Honor doesn't want me to go through that, I

5    don't want to waste Your Honor's time.  I will tell you the

6    point of this as well.  I have a Westlaw cite.  I also have an

7    order of a time that Professor Hamoudi was found by a court to

8    be submitting an expert report that was not complete and did

9    not have the information necessary that the court expected to

10   be in it.  It's a published opinion.  I think it's important.

11   It's the submission of an expert report in another case.

12           And, Your Honor, our position here is that

13   Professor Hamoudi's report is very broad, takes liberties with

14   what his own sources say.

15           And that's why we would argue that our expert's

16   opinion is something the Court should look at closer.

17           But I don't need to do that if the Court doesn't want

18   me to do that.

19           THE COURT:  Well, it's, again, it's not a mini trial

20   for the defense.  It's not a mini trial for the government

21   either.

22           And I take the government's representation that

23   Professor Whiteside stands by his report, and the government

24   was allowed to put into evidence those facts or reasons why he

25   stands by his report and why they may be different than the

1    clips in 2015.  So I think we have covered this.

2            MR. ALLISON:  Okay.  We'll move on.

3            Okay.  Your Honor, with that, then, I will just move

4    directly into the political offense exception and let you stop

5    me if you have questions.

6            I'll start with this, and I think it's something Your

7    Honor essentially asked Mr. Kaplan.  If Your Honor applies the

8    political offense exception in this case, it would essentially

9    be doing the following and shielding the following from

10   extradition:

11           Violent activity occurring in a home country;

12           International terrorist group -- which

13   Professor Hamoudi says in his report AQI is an international

14   terrorist group -- international terrorist group moving into

15   the country with different objectives and different goals and

16   taking advantage of the chaos in that country; and

17           Local individual joining up with international

18   terrorist group and committing violent acts on behalf of the

19   terrorist group in furtherance of its goals.

20           That's what a ruling of the application of the

21   political offense in this case would allow.  And you asked

22   Mr. Kaplan that.  Where do you draw the line?  If political

23   offense exception applies here, that's what you're allowing.

24   And so I want to start with that.

25           It would also do another thing, Your Honor.  It would

1    allow the political offense exception to apply based solely an

2    extradition packet that has no evidence of any -- any tie

3    between the act and a political -- and the goals of a local

4    indigenous insurgency.

5          THE COURT:  Except it is broadly accurate that both

6    professors identify the tactic of killing police officers as an

7    insurgent tactic.

8          MR. ALLISON:  Your Honor, they identify that

9    insurgencies and terrorist groups did kill police, yes.  They

10   did say that.  But it's Mr. Ahmed's burden to prove to you that

11   this attack was incidental to any local insurgency that you

12   found existed.  Now, the government's position is that that did

13   not -- that was not what was going on here for the uprising

14   prong.  And, more importantly, the government's position is

15   there's no way that, if you accept the facts in the extradition

16   packet that this was done on behalf of AQI, there's no way that

17   that is incidental to any potential local uprising that existed

18   here.  I'd like to start, if I may, Your Honor, with the

19   "incidental to" prong, because I have a case that I think

20   really helps with this.

21          Mr. Kaplan cited to *Barapind*, and this is cited

22   throughout the briefing.

23          I would like to cite to the Court I think it's in our

24   briefing, but, if not, it's the remand opinion after *Barapind*

25   was addressed at the Ninth Circuit.  It was sent back down, and

1    it was remanded for a few things.  But one of the things was

2    for the magis -- or the district court to look at one of the

3    offenses that was sent back down.  It's referred to as FIR34.

4            And the Ninth Circuit remanded it because they said

5    the district court didn't pay enough attention to *Quinn*.  They

6    have to do the "incidental to" analysis.

7            So if you read the district court, which is 2005

8    Westlaw 2810540.

9            THE COURT:  Counsel, can you give that again.

10           MR. ALLISON:  Sure, Your Honor.  2005 Westlaw 2810540.

11           Now, when it went back down, the district court looked

12   at it in light of what *Barapind*, the Ninth Circuit said that it

13   had to do.  The ultimate conclusion is the district court found

14   that this offense was not a political offense.  And I want to

15   talk about the offense that was sent back down.

16           FIR34 -- Let me back up, Your Honor.

17           The Ninth Circuit in the case law in *Barapind* had

18   already found local indigenous uprising by the Indians in India

19   and especially in the Punjab state.  They also found that the

20   fugitive was a part of a group, the All India Sikh Federation,

21   that likely did things in furtherance of the local insurgency.

22           And I just want to point out that it was the All India

23   Student Federation -- Sikh Student Federation.  It was

24   apparently all Indian nationals.

25           And some of the offenses that this individual

UNITED STATES DISTRICT COURT

1    committed on behalf of this group were found to be political

2    offenses.  But the one that came back down, Your Honor, to the

3    district court, FIR34, involved these facts:

4         The fugitive and three other armed men ambushed a

5    vehicle with AK-47s and killed all four occupants.

6         Those four occupants were, one, a former member of

7    India's legislature;

8         Two, a member of a Deputy Commissioner Office of

9    Jahander, also a government official; and

10        Three, two police, two constables.

11        The fugitive and the other people involved shot all

12   four of them, took their weapons, and ran off.  Now, that was

13   the evidence in the case.

14        When that came back down, Your Honor, despite all the

15   holdings in *Barapind* and the findings about the existence of a

16   local indigenous uprising and the findings that, yes, some

17   offenses this group commits may be or were political.  For

18   example, there was a killing, Your Honor, that actually was

19   found to be a political offense.

20        And what happened in that killing -- same group, same

21   defendant, or same fugitive -- they killed some people, and

22   they ran off yelling long live the federation.  And the court

23   found that that fact was enough to meet the burden.

24        But on this case, Your Honor, when it was sent back

25   down, the district court said there's not enough here.  The

1    burden hasn't been met to show me that this is incidental to

2    the uprising.

3          There was no connection -- or any connection, however

4    attenuated, between these murders and the Sikh/Khalistan

5    movement will not suffice.  The killings must bear some causal

6    or ideological relationship to the uprising.  It is the

7    fugitive who must produce the evidence that shows some

8    actual -- I'm sorry -- factual nexus between the murders and

9    the Sikh independence movement.

10         Let me tell you some of the things the court said the

11   fugitive didn't show that would have -- that might have changed

12   the analysis.

13         Petitioner provided no evidence why the attacks were

14   perpetrated.

15         Petitioner provided no evidence whether the specific

16   victims were anti-Sikh or in any way involved in the insurgency

17   nor as to the purpose of where the victims were going or what

18   they were doing at the time.

19         The petitioner provided no evidence that the member of

20   the Deputy Commissioner's Office for Jahander had any

21   connection with this insurgency, even though he was a

22   government official, Your Honor.

23         Nothing is known about the former legislator's stance

24   on the insurgency that was killed.

25         Nothing is known about the specific affiliate --

1      political affiliations of the other suspects that conducted

2      this with the fugitive.

3              Nor is any information provided whether the two

4      constables had any role in counter-insurgency efforts.

5              And the court said, "Without evidence of any reason

6      why the crimes were committed, the court is left to speculate

7      about whether the murders had any connection with or relation

8      to the insurgency."

9              Your Honor, on the "incidental to" prong, I'm happy to

10     answer any questions you have.

11             THE COURT:  Yeah.  The point of that case and what

12     you said, that goes to the "connected to" prong, correct?

13             MR. ALLISON:  That's why I said I'd like to start with

14     that prong, Your Honor, yes, because in that case they found an

15     uprising; they found that this fugitive had committed acts on

16     behalf of that -- in furtherance of that uprising.  But here

17     the killing of these people with nothing more, there's -- the

18     fugitive hasn't met their burden.  And that's our position

19     here, Your Honor.

20             We can talk about uprising, and I will talk to you

21     about it all you want today.  But even if we lose, even if we

22     lose on an uprising and Your Honor finds that, yes, there was a

23     local indigenous uprising and Al Qaeda's involvement with all

24     the different things we're arguing about, even if that exists,

25     there's nothing in the packet and there's nothing that's been

1    added about this specific case or anything that hints at this

2    specific case.

3                Let me give you some examples.

4                There's nothing about the victims in this case that

5    tells us that they were counter-insurgency.  In fact, I don't

6    have the page in front of me -- I can get it -- but I think one

7    of the victims in one of the sheets that it talks about their

8    career background, it says he was -- had only been a cop for a

9    year.  It doesn't list that he was in some sort of

10   counter-insurgency group.  As Professor Whiteside just

11   testified today, he could have been a local beat cop.  We don't

12   know.  We don't know why the killing took place of him.

13               THE COURT:  So political offense doctrine is not

14   supposed to apply to common offenses that don't bear a relation

15   to a political insurgent goal.  Is that the argument you're

16   making?

17               MR. ALLISON:  That is an accurate statement, Your

18   Honor.  In fact, murder, we can start with the proposition that

19   murder, *Meza v. Attorney General*, 11th Circuit, 2012, says

20   generally the crime of murder is not considered a political

21   crime but a common crime.  We can start there.

22               We have two murders here.  It's defendant's burden to

23   show us why these are incidental to any uprising, if Your Honor

24   finds an uprising.

25               THE COURT:  Well, then, let's talk about the uprising.

1           The government seems to agree that there were -- there

2      was an indigenous uprising at least by some indigenous people

3      in Iraq, whether you want to call them Sunni insurgents or

4      what.  But then the government seems to say that Al Qaeda in

5      Iraq doesn't qualify as being part of the uprising because they

6      were foreign influenced and not part of any indigenous

7      uprising.  Am I tracking your argument?

8           MR. ALLISON:  Essentially.  Let me just make sure I

9      agree with you.

10          The United States agrees that in Iraq local Iraqis

11     were involved in activity to take back their government.  The

12     United States agrees with that.

13          THE COURT:  Or change the nature of their government.

14          MR. ALLISON:  Or change the nature of their

15     government.

16          The United States' position is that in this case,

17     given the warnings of *Quinn* that this is not intended to shield

18     terrorism; this is intended to protect in situations involving

19     a local indigenous uprising when a group like Al Qaeda that was

20     as well known and involved as they were comes in from across a

21     border to take advantage of what I would essentially call chaos

22     going on in the country and uses that -- and coming in with

23     their foreign fighters.  I know there's a difference of

24     opinion.  We believe, based on Professor Whiteside's report,

25     that there were significant numbers of foreign fighters.

1          We both agree that -- Both parties agree that AQI had

2    foreign leadership and was aligned with another international

3    terrorist group, Al Qaeda.  Our position is that this changed

4    the face of an uprising as required by *Quinn*.

5          Now, you know, the briefing gets into what's an

6    insurgency, and people call things insurgency.  Judge, I think

7    we've got to look at what *Quinn* is talking about.

8          If you were to ask me was there some sort of an

9    insurgency by local Iraqis, given which dictionary we're

10   looking at, it might fit.  But here what happened is AQI came

11   over, played a significant role in this, did not have the same

12   goals.  Their goal was to, as Mr. Kaplan said, take land.  I

13   think he said we said it was seize land.  That is our position.

14   They didn't -- They didn't -- They came in to seize a section

15   of land to create a caliphate.  And they didn't come in to help

16   the Iraqis take back their government.  There was no giving

17   anything back to the Iraqis.  There was no --

18        THE COURT:  Let me ask:  It seems like they're not

19   mutually exclusive.  As I understand your argument, there can

20   be an uprising but not an uprising within the meaning of *Quinn*

21   if you apply it to Al Qaeda of Iraq.

22        MR. ALLISON:  I would slightly tweak that, which is

23   within the meaning of *Quinn*, if you are looking at what is

24   going on in Iraq at the time of these murders, under *Quinn*,

25   once Al Qaeda's come in and played a significant role, I

|   | |
|---|---|
| 1 | disagree with Mr. Kaplan that this type of organization coming |
| 2 | into this country -- Mr. Kaplan I think said that can't be |
| 3 | possible, because any time anybody comes into an insurgency, it |
| 4 | would knock it out.  This case, I think that is the case.  When |
| 5 | Al Qaeda came in -- |
| 6 | THE COURT:  Well, that's what I'm struggling with. |
| 7 | Now I can't find the limiting principle in your argument. |
| 8 | If several foreign fighters or several foreign |
| 9 | directors get involved in another country, that negates the |
| 10 | political offense doctrine? |
| 11 | MR. ALLISON:  No.  No, Your Honor, and there has to be |
| 12 | a line.  You're right.  I would not say that -- I think Ahmed |
| 13 | in his extradition brief, his responsive brief, talks about, |
| 14 | you know, single foreign fighters going and taking part in |
| 15 | other world conflicts.  That would not be our position as well. |
| 16 | I think it has to be something that Your Honor would |
| 17 | find is something so -- something so obvious to that situation. |
| 18 | I mean, we're not talking about a couple people here.  We're |
| 19 | talking about a major group who's coming in and not only |
| 20 | bringing foreign fighters in but also recruiting local Iraqis |
| 21 | to their terrorist and caliphate cause. |
| 22 | So I would argue that it is factual.  I would not say |
| 23 | that one or two or ten or twenty foreign fighters coming in to |
| 24 | help, Your Honor, to help -- I guess here's the limiting |
| 25 | principle. |

1          Coming in to help the local group take back their

2     country or change their country would -- I would argue is not

3     the same situation.  That's not what this major group was

4     doing.  This major group was not trying to do what they do to

5     further the goals of the Sunni insurgency, i.e., improve Sunni

6     representation in Iraqi government.

7          THE COURT:  The Westlaw cite you gave for the -- after

8     the remand in *Barapind*, what happened after that?  Was that

9     ever appealed?

10          MR. ALLISON:  I believe the case was done, Your Honor.

11     And I do believe -- I don't want to be quoted on this -- but I

12     do believe Mr. Barapind was extradited.

13          Your Honor, I'm just flipping through my notes here

14     because I really don't want to just rehash stuff in our

15     briefing.

16          Your Honor, I'll touch on a few things you asked about

17     from Mr. Kaplan, and then if Your Honor has any questions, I'm

18     happy to answer them.  But I'd submit on our pleadings on the

19     other issues.

20          You talked with Mr. Kaplan about does the fugitive

21     need to acknowledge membership to invoke offenses.  And I would

22     agree with Mr. Kaplan that to invoke it, he doesn't have to

23     admit to membership in the group.

24          However, I think where the United States feels the

25     case law and especially, like, the phrase from *Quinn* that you

1    cited, and there's another case called *Venckiene* from the

2    Seventh Circuit that talks about there's a subjective component

3    to this.  I think where this comes down is it's the

4    defendant -- it's the fugitive's burden to show both prongs, to

5    show the "incidental to" prong as well as the uprising prong.

6    And without any idea of his subjective intent, it's hard to

7    make that call whether it was -- whether it was incidental just

8    based on the objective nature of the packet.

9            And so I think -- I guess the United States' position

10   would be that if there was evidence of his subjective intent or

11   if he was able to offer that he was a member in the group but,

12   no, we were doing this for this purpose, then that could play

13   into the "incidental to" test.  But without any facts like we

14   have here, we don't think that --

15           THE COURT:  Wouldn't that be the "connected to" prong?

16           MR. ALLISON:  The "incidental to" prong, yes, the

17   "connected to" prong, Your Honor, yes.

18           Your Honor, I will just touch briefly -- and you asked

19   Mr. Kaplan this as well -- which is if we take their position

20   and more importantly we take their expert's position that on

21   the face of this packet -- Because that's what both experts are

22   talking about.  They're talking about the history and some of

23   the things they can tell you from academia and things like

24   that.  But at the end of the day we have this packet.  And at

25   the end of the day Professor Hamoudi says any targeted killing

1    like that outlined in the packet, given what was going on, is a

2    political offense.

3              And that, Your Honor, the United States would submit

4    that just can't be right.  I mean, that just can't be right.  I

5    know we have no evidence of this, but what if there was other

6    motives?  I mean, what if there was a personal animus?  What if

7    it was purely -- What if it was a revenge attack?  What if it

8    was a killing a witness?  What if it was a -- What if it was a

9    robbery?  What if it was a robbery?

10             I mean, there can't be a situation where just killing

11   a police officer during something that's found to be an

12   uprising based on the facts in the packet as we have here --

13             THE COURT:  Well, you make the argument that payment

14   renders the political offense doctrine inapplicable for one of

15   the murders.

16             MR. ALLISON:  What I argued, Judge, is it's enough to

17   at least defeat any sort of case by the fugitive that they're

18   meeting their burden.  I mean, we do have some facts here that

19   should give the Court pause.  I mean, there's a payment here

20   for a killing.

21             Now, Ms. Johnson raises the issue that it was only

22   about 30 or 40 dollars, I think, in American money.  There's no

23   evidence in the record about what the going rate for that type

24   of -- you know, for a killing was in Iraq at that time.

25             But I think it raises doubt.  It raises doubt that

1      this murder was a political offense.

2                  There's no statements in this packet that make it seem

3      like a political offense by any one of the witnesses, by the

4      cooperator.   There's payment, which gives you another incentive

5      to commit this.   There's nothing about the victims.

6                  The things I talked about at the beginning of my

7      presentation I think are really important.

8                  If I could just have one second, Your Honor.

9                  And sorry, Your Honor.   You also brought up with

10     Mr. Kaplan not only the payment -- You brought up the payment

11     with me.   You also brought up with him civilians.

12                 And civilians don't take it out of the political

13     realm, but I think it can be looked at here.   I think it can be

14     analyzed.

15                 If this was a political attack just that was totally

16     incidental to the mission of a local indigenous insurgency

17     group, I think the killing of civilians also cuts against that.

18     It doesn't defeat it, but I think it cuts against it.

19                 Unless the Court has any questions, I will sit down.

20     I did, before I do, Your Honor, we do have some cases

21     responsive to your question earlier in the day about how to

22     analyze factual inconsistencies.   We can submit that as

23     post-hearing briefs, or I can give some cites today, whatever

24     you would like.

25                 THE COURT:   Let's take the cites now.

1          MR. ALLISON:  Okay.

2          I have a couple.  The first one is *Sakaguchi*,

3    S-a-k-a-g-u-c-h-i.  It is a Ninth Circuit case from 1975.  It

4    is 520 F.2d 726 at 728.

5          There is the *Vargas* case *In Re Extradition of Vargas*,

6    which is a Southern District of Texas case, 2013, which is

7    978 F.Supp.2d 734 at 748.

8          And I'll give you one other one, Your Honor, which is

9    *Rodriguez Ortiz*, which is a Northern District of Illinois case

10   out of 2006.  And it's 444 F.Supp.2d.  I need to get the page

11   number for you, though, Your Honor.  I didn't write it down on

12   accident.  So I can get that for you.  And that case is

13   important because it cites to a number of cases about factual

14   inconsistencies.  Now, I don't know if this gives you what you

15   asked for, the laid-out process of how I address it, but they

16   all talk about when that is an issue.

17         THE COURT:  Thank you, counsel.

18         MR. ALLISON:  Thank you.

19         MS. JOHNSON:  Your Honor, we also have a cite about

20   inconsistencies.

21         THE COURT:  Oh, thank you, counsel.

22         MS. JOHNSON:  This is actually cited in our

23   extradition brief, Document 200 at Page 4.  It's the *In Re*

24   *Mazur* case, 2007 Westlaw 2122401, Northern District of

25   Illinois.  And it says that a court may examine the complaint

1    to determine whether it is so, quote, internally inconsistent,

2    end quote, and, quote, patently unreliable, end quote, as to

3    obliterate probable cause, quote, all on its own, end quote.

4            And I also, just as a housekeeping matter, for the

5    record, I understand the Court's ruling.  I would like to place

6    on the record that we have numerous prior statements by

7    Professor Whiteside not just from 2015, as recently as this

8    year.  He is very well established on the record in writing and

9    in speaking about the indigenous nature of Al Qaeda in Iraq.

10   And we object to our lack of opportunity to impeach him and

11   object to a factual finding being made without

12   cross-examination.

13           I'm sure that the government has many statements that

14   they wanted to ask Professor Hamoudi about as well.

15           THE COURT:  Well, we refer back to *Santos*, and both

16   parties were allowed to present their experts and to place

17   their expert's report in the most persuasive and -- context

18   that they could.  And that's where we drew the line.

19           So your objection is noted.

20           Mr. Allison.

21           MR. ALLISON:  Your Honor, I'd like to clarify one of

22   my cites.  I'm sorry.  I misread my notes.  And I don't want to

23   be -- I don't want to send you in the wrong direction.  The

24   *Rodriguez Ortiz* case, what I actually meant to tell you was the

25   *Martinelli Berrocal* case, which has been briefed in this case

```
1     before, but it's 2017 Westlaw 3776953.  And that's the case

2     that lists a number of other cases, Your Honor.

3               THE COURT:  Thank you, counsel.

4               MR. ALLISON:  Thank you.

5               THE COURT:  All right.

6          Ms. Johnson, if you want, certainly we've had plenty

7     of argument, but if you want five minutes to just to respond to

8     Mr. Allison's comments, I'll give you that time.  Otherwise I

9     believe -- or Mr. Kaplan.

10              MS. JOHNSON:  May we confer?

11         (Defense counsel confer off the record.)

12              MR. KAPLAN:  Thank you, Your Honor.

13              MS. JOHNSON:  Mr. Kaplan will respond briefly.

14              THE COURT:  Thank you.

15              MR. KAPLAN:  Mr. Allison put a lot of emphasis on the

16    remand in *Barapind*, and I think it's very significant what he

17    highlighted about that crime, that charge, and why it wasn't

18    part of the political offense, because you can check all those

19    boxes and show we have evidence of all that stuff in this case.

20         So it's very helpful that he says, well, there's no

21    evidence in *Barapind* about why those victims were selected.

22         In this case we have a statement by C1, who was

23    explaining that we chose that victim.  Now I'm looking at

24    Document 3 dash -- excuse me.  He says that we selected the

25    victim because he's a police officer.
```

1          And there's a couple of places where he talks about

2    meeting with the group and selecting the victim because he's a

3    police officer.

4          Now, as we discussed, we have experts on the record

5    agreeing --

6          THE COURT:  Counsel, what's your cite for that?  You

7    said 3 dash --

8          MR. KAPLAN:  I'm sorry.  I thought I had highlighted

9    this -- let me just confirm -- that page number.

10         Okay.  Document 3-4, Page 10:

11         "The cooperator:  The mentioned people agreed to kill

12   1st Lieutenant Issam Hussein since the aforementioned 1st

13   lieutenant works in the police force and lives in the same area

14   as the accused mentioned above."

15         The point being, as we've discussed, we have experts

16   saying that the uprising used killing police officers solely

17   for no other reason than that they are police officers as an

18   uprising tactic, so one respect in which we have evidence here

19   that they didn't have in *Barapind*.

20         In *Barapind* there was apparently no evidence, as we

21   have here, mostly from that same individual, C1, the

22   cooperator, that the people who carried out the attack were

23   directed to carry out the attack by an uprising group.  There

24   was no evidence of them being sent there to do that.  There was

25   no evidence of them afterwards reporting back to a hierarchy of

1    an uprising group and handing over guns that were taken from

2    the people killed.

3           There's no evidence that they were paid by a

4    hierarchy, by an uprising group, by somebody in that hierarchy

5    of the uprising group.

6           And there was no evidence of, after all that

7    happening, those attackers being tasked by the hierarchy in the

8    uprising group to go carry out more attacks, which also were

9    consistent with the strategy of the uprising.

10          So *Barapind* is an excellent an example of what we have

11   here they didn't have there.

12          I'd like to mention something about the idea that the

13   government many times has made the statement what if?  What if

14   there was actually some personal motive?  What if there was

15   some other reason for this?

16          The *Pitawanakwat* opinion describes a burden shifting

17   mode of analysis.  If we have met our burden of showing that

18   what we have in the record is all highly consistent with an

19   attack carried out as part of an indigenous uprising very much

20   like in *Quinn*, then the political offense -- we have met our

21   burden.

22          For them to come back and say we carry our burden by

23   open, blatant speculation, that's not carrying a burden.  There

24   is no burden in United States law, as far as I know, that can

25   be satisfied by outright speculation and saying what if, what

1   if, what if is the definition of outright speculation.

2          Your Honor mentioned a passage in *Quinn* about an

3   objective test.  I have looked at that just briefly, Your

4   Honor, so this is not a fully developed analysis.  But I

5   understand the context of what you cited as a discussion of the

6   French objective test, not the concept in general of an

7   objective test, but the particular test that was developed in

8   France which only recognized I think they call absolute

9   political offenses, not offenses that would be common crimes

10  except for the circumstances.

11         So I think that is -- I understand that as a statement

12  not about an objective test in general but about the particular

13  French test, which is not the American incidence test.

14         Another thing the government has done in its

15  response --

16     (Reporter interrupts.)

17         MR. KAPLAN:  Okay.  This is the last thing, and I'll

18  be open to questions.  But another thing the government does in

19  its response is uses verbiage of, well, the problem is AQI had

20  different objectives, they came in with different objectives,

21  and they weren't helping the Iraqis accomplish something the

22  Iraqis in the uprising wanted to do.

23         Well, that's not correct.  There's nothing in the

24  record that undermines the very fundamental notion that what

25  AQI was doing in carrying out acts like this, according to all

1    the experts and all the evidence, was participating in the

2    uprising trying to topple the existing government of Iraq and

3    basically expel the American forces that supported it.

4         So the idea that they came in with some kind of

5    different objective is fundamentally inconsistent with

6    everything that's on the record.  Again, they're talking about

7    this caliphate idea as part of what makes their objective

8    different.

9         Well, the defense report and I believe the experts all

10   agree that it wasn't just foreigners who dreamed of a

11   caliphate.  It was also Iraqis.  But even if that were not the

12   case, having that caliphate ambition did not change the fact

13   that they were trying to topple the existing government.  There

14   were many, many groups, dozens of groups, by all agreement,

15   involved in this uprising.  There were no doubt many different

16   agendas.

17        And it's not inconsistent with an uprising -- it's in

18   fact very typical of an uprising -- to have many groups with

19   many different agendas that come together.  You know, if one

20   looks to the French Revolution, as soon as they toppled the

21   king, they were all killing each other.  There were many

22   different agendas that are maybe suppressed for a time as they

23   join in the initial objective of toppling the existing

24   government.

25        If you discount any insurgency that's not uniform in

1    terms of its agenda and its objective and its philosophy,

2    again, you'll nullify the entire political offense doctrine.

3           I'd be happy to take any questions.

4           THE COURT:  I don't think I have any.  We've had a lot

5    of briefing and a lot of argument.

6           So with that, the matter is submitted, and I will take

7    it under advisement.  Thank you.

8       (Proceedings recessed at 4:46 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                    **C E R T I F I C A T E**

2

3              I, LINDA SCHROEDER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6              I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11             DATED at Phoenix, Arizona, this 21st day of July,

12   2021.

13

14

15                                   s/Linda Schroeder
                                     _____
16                                   Linda Schroeder, RDR, CRR

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**