**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

In the Matter of the Extradition of Ali Yousif Ahmed Al-Nouri a/k/a Ali Youssef Ahmed Al-Nouri, Ali Ahmed, Ali Yousif Ahmed Al Noori, Ali Yousif Ahmed Nouri, Ali Al-Daleme, Ali Yousif Ahmed, Al-Mahmadi, Ali Yousif Ahmed, and Ali Yousif Nouri.

No. MJ-20-08033-PHX-MTM

**ORDER CERTIFYING EXTRADITION**

In June 2006, Lieutenant Issam Hussein of the Fallujah police in Iraq was murdered when a group of men emerged from their vehicles and fired pistols and automatic weapons at him. Several months later in October 2006, Officer Khalid Mohammed was murdered in similar fashion.

The government of Iraq asserts these murders were carried out by al-Qaeda of Iraq ("AQI"), the transnational affiliate of al-Qaeda operating in Iraq. In particular, Iraq asserts Relator Ali Yousif Ahmed Al-Nouri was a local AQI leader involved in planning and executing Lieutenant Hussein's and Officer Mohammed's murders.

On behalf of the government of Iraq, the United States filed a Complaint seeking Relator's extradition pursuant to the Extradition Treaty between Iraq and the United States. Doc. 3. After reviewing the evidence presented, the Court certifies Relator is extraditable under 18 U.S.C. § 3184 for the offenses described in the Complaint.

//

# I.    EXTRADITION CERTIFICATION

To certify extradition under 18 U.S.C. § 3184, the Court must find: (1) subject matter jurisdiction; (2) personal jurisdiction over the relator; (3) an extradition treaty in force and effect; (4) offenses covered by the treaty; and (5) competent evidence that the relator committed those offenses. *Santos v. Thomas*, 830 F.3d 987, 991 (9th Cir. 2016) (en banc).

## A.    SUBJECT MATTER JURISDICTION AND PERSONAL JURISDICTION

The parties acknowledge the Court has subject matter and personal jurisdiction in this matter. Doc. 273 at 107. In the District of Arizona, the Local Rules of Criminal Procedure delegate the responsibility of conducting extradition proceedings to United States Magistrate Judges. *See* 18 U.S.C. § 3184 (permitting "any magistrate judge authorized so to do by a court of the United States" to conduct extradition proceedings); LRCrim 57.6(d)(15); *In re Extradition of Madrid*, No. MJ-09-01603, 2013 WL 265205 at *1 (D. Ariz. Jan. 18, 2013). The Court has personal jurisdiction because Relator is present in the District of Arizona. *In re Extradition of Mathison*, 974 F. Supp. 2d 1296, 1311 (D. Or. 2013). Relator was arrested in Arizona and detained in Arizona. Docs. 11, 239.

## B.    APPLICABLE EXTRADITION TREATY

The Extradition Treaty ("Treaty") between the United States and Iraq was ratified in 1934. Doc. 3-3 at 7–14. Relator asserts the Treaty was annulled by hostilities between the United States and Iraq in 1991 and 2003, and the United States and Iraq did not negotiate a new treaty after those hostilities. Doc. 200 at 42–44 (citing *Karnuth v. United States*, 279 U.S. 231, 239 (1929)).

This Court should not "easily disregard the determination of the Executive Branch" that an extradition treaty remains in effect. *Then v. Melendez*, 92 F.3d 851, 854 (9th Cir. 1996). In *Then*, the Court concluded a 1932 extradition treaty between the United States and the United Kingdom, which included the United Kingdom's "dominions overseas," was a valid extradition treaty between the United States and Singapore—despite Singapore becoming a separate state after its independence from the United Kingdom in 1965. *Id.* at

853. The *Then* Court advised "federal courts are not as well equipped as the Executive to determine when the emergence of a new country brings changes that terminate old treaty obligations." *Id*. at 854. Other courts have observed "it is extremely doubtful that war ipso facto abrogates a treaty of extradition" and concluded that "controlling importance" must be given to how governments have acted in relation to a treaty. *Argento v. Horn*, 241 F.2d 258, 262 (6th Cir. 1957) (quoting *Terlinden v. Ames*, 184 U.S. 270, 285 (1902)).

The Court finds the governments of the United States and Iraq have maintained the Treaty's force and effect by their conduct. Declarations by the Office of the Legal Adviser for the United States Department of State and the Iraqi Ministry of Foreign Affairs declare the Treaty is in force. Doc. 3-3 at 2, 6. Further, the Department of State's official Treaties in Force publication lists the Treaty as in effect as of January 1, 2020, before Relator was arrested. *See* U.S. Dep't of State, *Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 2020*, at 215 (2020). Accordingly, the Court concludes the Treaty between the United States and Iraq was in force and effect at all relevant times.

### C.   OFFENSES COVERED BY TREATY

The Court must determine whether the offense: (1) is listed as an extraditable crime; (2) whether the alleged conduct is criminalized in both countries; and (3) whether the offenses in both countries are "substantially analogous." *United States v. Knotek*, 925 F.3d 1118, 1128–29 (9th Cir. 2019).

#### 1.   Extraditable Crime

The "Arrest and Investigation Warrant" issued by the Magistrate Court of Al-Karkh accuses Relator of committing two murders as defined by Article 406/1/A of the Iraqi Penal Code. *See* doc. 3-3 at 49-51 (specifying "Type of Crime: Murder"). The parties agree the Treaty is a "list treaty," listing certain defined crimes as subject to extradition. Doc. 226 at 22–24; Doc. 273, Tr. 133:7–9. Article II of the Treaty lists, as an extraditable offense, "[m]urder, including parricide, assassination," and willful murder with premeditation. Doc. 3-3 at 9. Accordingly, the Court finds that the offenses alleged are listed in the Treaty.

## 2. Whether Criminalized in Both Countries

The conduct alleged is criminalized in both the United States and Iraq. Article 406/1/A of the Iraqi Penal Code prohibits murder, including premeditated murder. In the United States, 18 U.S.C. § 1111 prohibits murder, including willful and premeditated killing.

## 3. Whether the Offenses are Substantially Analogous

In deciding whether the offenses are "substantially analogous," the Court considers whether "[t]he essential character of the transaction is the same, and made criminal by both statutes." *Knotek*, 925 F.3d 1131 (internal citations omitted). To be "substantially analogous," statutes need only be "directed to the same basic evil." *Id.* (quoting *Clarey v. Gregg*, 138 F.3d 764, 766 (9th Cir. 1998)). The criminal codes in the United States and Iraq punish the deliberate killing of another by an individual without lawful authority to do so. Accordingly, both statutes are "directed to the same basic evil" and are substantially analogous. *Knotek,* 925 F.3d at 1132. The offenses for which Relator's extradition is sought are covered by the Treaty.

### D. COMPETENT EVIDENCE

Certification of extradition requires a showing of probable cause that the relator committed the offense for which extradition is sought. Probable cause for extradition is assessed according to the standard for probable cause in American courts. *Santos v. Thomas*, 830 F.3d 987 at 1006. "Simply because evidence has been authenticated does not mean any evidence the government submits is sufficient to satisfy probable cause. Were that the case, the judiciary's role in the extradition process would be meaningless." *Id*. This Court must "determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether evidence is sufficient to justify a conviction." *Barapind v. Enomoto*, 400 F.3d 744, 752 (9th Cir. 2005) (en banc) (internal quotation marks omitted). The Court "does not weigh conflicting evidence and make factual determinations but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." *Quinn v. Robinson*, 783

F.2d 776, 815 (9th Cir. 1986); *see also United States ex rel. Sakaguchi v. Kaulukulkui*, 520 F.2d 726, 730 (9th Cir. 1975) ("The magistrate's function is to determine whether there is 'any' evidence sufficient to establish reasonable or probable cause."). The relator's evidence is "limited to that which explains the requesting country's proof and excludes contradictory or impeaching evidence." *In re Extradition of Handanovic*, 826 F. Supp. 2d 1237, 1239 (D. Or. 2011).

Iraq alleges Relator was a leader in AQI in 2006 and, as part of AQI, planned and carried out the murders of Iraqi police officers in Fallujah, Iraq. Doc. 3 at 2–5. Lieutenant Hussein was murdered on or about June 1, 2006; Officer Mohammed was murdered on or about October 3, 2006. Doc. 3 at 2–3.

A cooperator provided statements admitting that, while "working with an armed militant group of al-Qaeda terrorist organization," he, Relator, and others planned and carried out the murders of Lieutenant Hussein and Officer Mohammed; the cooperator named Relator as Emir of the al-Qaeda organization. Docs. 3-3 at 80; 3-4 at 7. A different individual said Relator was present at the murder of Lieutenant Hussein and identified Relator as Emir of a group of militants in the "Islamic State." Doc. 3-4 at 5.

### 1. Murder of Lieutenant Hussein

On or about June 1, 2006, Lieutenant Hussein was killed in Fallujah, Iraq by persons who emerged from two cars and fired automatic weapons and pistols at him. Doc. 3-3 at 86, 88.

### a. *Evidence*

#### i. Cooperator

On June 6, 2010, the cooperator gave testimony to investigative courts and statements to counterterrorism officers in Iraq.

*Testimony and Statements Before Investigative Courts*

In a document bearing the stamp "Karkh Investigative Court, terrorism matters," the cooperator testified he, Relator, and others met at Relator's carpentry store on street 40 in Fallujah, Iraq and agreed kill Lieutenant Hussein. Doc. 3-4 at 7. The cooperator stated:

> I was with them and they wanted me to watch the road. Indeed they headed towards street 40 where the victim was standing next to one of the stores and the defendant Ali Yousif Ahmed stepped out of the car and fired shots at the victim using his 9mm hand gun and killed him. Afterwards we fled the crime scene.

*Id.*

In a document dated June 6, 2010, bearing the stamp "Al-Fallujah Investigative Court," the cooperator testified that he and Relator, also called Ali Yousif, and three other individuals agreed to kill Lieutenant Hussein and "agreed on how to kill" him. Doc. 3-4 at 10. The cooperator testified that he did *not* participate in the killing but "the accused Ali Yousif was the one who told me he executed the operation using a 9mm hand gun that he was carrying." Doc. 3-4 at 10. The cooperator signed this document by his thumb print. Doc. 3-4 at 11.

A second statement made to the Al-Fallujah Investigative Court on June 6, 2010, contains the cooperator's statements during a court ordered walk-through of the location of the murder:

> In compliance to the decision of the Fallujah Investigative Judge dated 6/6/2010, which include a walk through by the accused who confessed….
>
> [a]nd the accused [redacted] indicated that [redacted] was present when the agreement took place to kill the victim, 1st Lieutenant Issam Hussein by the defendant Ali Yousif, [redacted], and [redacted]while they were at the defendant Ali Yousif's shop, specialized in wood sales and located on Street 40 near the road leading to Al-Fallujah Police Directorate. [Redacted] pointed with [redacted] hand to the location of the shop and indicated that he had learned that Ali Yousif, [redacted], and [redacted] killed the victim 1st Lieutenant Issam Hussein on Street 40 in Al-Fallujah and they used a white Daewoo Prince belonging to the defendant Ali Yousif and they used automatic weapons and pistols. The walk through coincided exactly to the accused confession and therefore the hearing was closed…

Doc. 3-3 at 85–86. This document contains the cooperator's signature by thumb print; it is also signed by a judicial investigator and officers from the Counterterrorism Office. *Id.*

//

*Statements to Office of Counter Terrorism*

In two statements dated June 6, 2010, both referenced as "Follow up" statements to the "Office of Counter Terrorism," the cooperator stated that he was present when the agreement was made to kill Lieutenant Hussein; the cooperator asserted that he "did not participate in this incident" and "did not go out with them." Docs. 3-3 at 80; 3-4 at 9. Both statements named Relator and two other individuals as having killed Lieutenant Hussein.

ii.    Eyewitness

*Testimony to Investigative Court, Fallujah*

In a document dated November 1, 2009, bearing the stamp "Investigative Court, Fallujah," an eyewitness testified that he was sitting with Lieutenant Hussein[1] at a cigarette store on Street 40, when "masked militants" emerged from two cars and surrounded the eyewitness and Lieutenant Hussein. Doc. 3-4 at 6. The eyewitness recognized a gunman (not Relator) who put a gun to his head and threatened to blow his head off. *Id*. The eyewitness stated Relator was at the scene of the murder and stated that one gunman fired his pistol at Lieutenant Hussein, but the pistol misfired, and Lieutenant Hussein was then killed by shots from an AK47. *Id*.

*Statement to Office of Counter Terrorism*

In a statement also dated November 1, 2009, the eyewitness related to the Office of Counterterrorism that he was sitting with Lieutenant Hussein when masked men put a gun to his head and attempted to shoot Lieutenant Hussein with a handgun that misfired; then "another armed person with an AK47 came" and "shots were fired from the AK47 where it hit the victim's body everywhere," killing him. The eyewitness stated Relator was at the scene of the murder. Doc. 3-4 at 5.

**b.    *Probable Cause Analysis for Murder of Lieutenant Hussein***

For the murder of Lieutenant Hussein on June 1, 2006, both the cooperator and the eyewitness place Relator at the scene while holding a handgun. The cooperator also asserts

---

[1] The eyewitness refers to Lieutenant Issam Hussein as "1st Lieutenant Issam Ahmed"; Lieutenant Hussein's full name is Issam Ahmed Hussein. Doc. 3 at 6; Doc. 3-4 at 2.

Relator admitted to him that Relator "executed the operation using" a handgun. Doc. 3-4 at 10. Further, according to the cooperator, the cooperator, Relator, and others had planned the murder in advance while meeting at Relator's shop in Fallujah.

The Court is mindful that the cooperator's statements contain at least one significant inconsistency—whether the cooperator was near the scene "to watch the road," and able to see Relator's actions, and "fled the crime" with the other assailants (doc. 3-4 at 7), or instead "did not go out with them" (doc. 3-4 at 9) or participate in the killing (doc. 3-3 at 80). Despite this inconsistency as to whether the cooperator personally witnessed the killing or instead was told about it by Relator, the cooperator's five statements are consistent in many other significant details. The cooperator's statements are consistent as to who participated with the cooperator and Relator in planning the murder; as to where the murder was planned, which the cooperator says was at Relator's wood or carpentry shop in Fallujah (doc. 3-4 at 7, 10); and as to the murder's location, manner, and weapons used, which the cooperator identifies as AK47s and pistols (docs. 3-4 at 7, 10; 3-3 at 85-6). Accordingly, recognizing the cooperator would be subject to impeachment at a trial regarding a significant inconsistency in the statements, the Court does not view the cooperator's statements, taken as a whole, to be so contradictory as to be unreliable to support probable cause. *See, e.g.*, *Zanazanian v. United States,* 729 F.2d 627, 628 (9th Cir. 1984) (rejecting relator's argument in extradition case that accomplice's statements were "too unreliable to establish probable cause" because "[t]he fact that [the statements] were given to the police and incriminated the speakers themselves sufficiently indicate[d] their reliability"); *In re Extradition of Rodriguez Ortiz*, 444 F. Supp. 2d 876, 893 (N.D. Ill. 2006) ("[P]roviding an air-tight narrative of the events surrounding a crime is not a precondition for granting extradition."). Further, the Ninth Circuit and other courts have concluded that in an extradition proceeding, "the testimony of an accomplice is, next to the confession of the defendant, the most satisfactory kind of evidence that can be produced as to the guilt of the defendant." *Currieri v. Vice*, 77 F.2d 130, 132 (9th Cir. 1935); *see, e.g.*, *Zanazanian*, 729 F.2d at 627; *Eain v. Wilkes*, 641 F.2d 504, 510 (7th Cir. 1981); *Matter of Extradition*

*of Tang Yee-Chun*, 674 F. Supp. 1058, 1062 (S.D.N.Y. 1987).

The Court also views as a significant corroborating detail that the eyewitness and the cooperator, whose statements were given well after the 2006 murder, in 2009 and 2010 respectively, both identify the same individual[2] as involved with Relator in the murder. The eyewitness names the individual who put a gun to his head as a person he knew by his voice and appearance because the gunman was from the eyewitness's area (doc. 3-4 at 6); the cooperator names the same individual in various statements as having planned and participated in the murder with Relator (docs. 3-4 at 7, 9, 10; 3-3 at 80, 85–86). *See Eain*, 641 F.2d at 504 ("Where an accomplice's testimony is corroborated by further facts there is sufficient evidence to find probable cause.").

The statements by the eyewitness are consistent in their core details—that the eyewitness recognized Relator, who was armed with a gun and not masked, when Relator entered the cigarette shop where the murder took place. Nevertheless, one statement by the eyewitness may be read as cutting against probable cause. In his statement to the Investigative Court, the eyewitness portrayed Relator as seemingly intervening in an effort to *stop* the killing. In particular, the eyewitness stated that after a gunman had fired his pistol at Lieutenant Hussein:

> the gun would not fire twice and three times, then he started to cuss God Almighty. At that time another person called Ali Yousif came our way, and he was not masked and Ali pulled his gun [IL] and started shouting at them. I remembered Ali's words "leave him, this is 1st Lieutenant Issam and he serves as a policeman" and another accused told Ali "Ali step back, it is not your business" and afterwards one of the masked people who was carrying an AK47 fired in the direction of 1st Lieutenant Issam and hit him with multiple shots where he dropped to the ground and passed away.

Doc. 3-4 at 6. However, the eyewitness's other statement, *given the same day*, provides a contrary narrative that diminishes any inference that Relator tried to stop the killing. To the Office of Counterterrorism, the eyewitness's narrative is that Relator only spoke against

---

[2] See sealed statements of the eyewitness, Doc. 3-1 at 106; the cooperator, Doc. 3-1 at 85-6, 110 and investigative summary of the Fallujah Investigative Judge, Doc. 3-1 at 112, at Doc. 3-1, Ex. A.

the killing *after Lieutenant Hussein had already been murdered*:

> the gun did not fire on three attempts; then another armed person with an AK47 came…..shots were fired from the AK47 where it hit the victim's body everywhere. Immediately, the victim recited prayer before he passed away. Then the so called Ali Yousif Nouri entered the store carrying a handgun in his hand and spoke to the militants saying "leave Issam, he is an officer with the Fallujah police" and they replied "step back and don't interfere with this matter," knowing that at the time any person who raises a weapon in the face of these militants that they claimed to be in the Islamic State would be killed, and also knowing that the criminal [Ali] is a member of their group…and that the criminal Ali Yousif is the Emir of their group.

Doc. 3-4 at 5. This statement casts Relator's armed presence at the scene, and his intervention *after* Lieutenant Hussein had been killed, in a different light—it portrays Relator as the leader of the group carrying out the killing, and as one who would have been killed if not in accord with the killers. The Court is mindful it "does not weigh conflicting evidence and make factual determinations but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." *Quinn*, 783 F.2d at 815. On the record before it, the Court does not make a factual determination as to the correct inference to be drawn from the eyewitness's different narratives as to when Relator appeared at the scene of Lieutenant Hussein's murder. *See id.* ("[I]t is not our role to determine whether there is sufficient evidence to convict the accused."). In this Court's limited role, the Court finds that the contrary inferences that may be drawn from the eyewitness's statements—that Relator appeared just before or just after the killing—do not destroy probable cause. *See In Re Extradition of Luna-Ruiz*, No. CV 13-5059, 2014 WL 1089134, at *8 (C.D. Cal. Mar. 19, 2014) (inconsistencies within statements of witnesses and between witnesses do not necessarily destroy or negate a showing of probable cause).

As noted previously, Relator is accused of committing premeditated murder as defined Article 406/1/A of the Iraqi Penal Code. Doc. 3-3 at 24, 49-51. Under the Iraqi Code, a person may be guilty of a premeditated killing if they participate as a principal or an accessory. An accessory includes any person "who conspires with others to commit an

offense and that offense is committed on the basis of such conspiracy;" an accessory is considered to be a principal if they are "present during the commission of that offense or any act contributing to that offense." Doc. 3-3 at 26. Here, the Court finds Relator's conduct in meeting in advance with others to plan Lieutenant Hussein's murder and his armed presence at the scene of the murder constitutes competent evidence under a probable cause standard of Relator's guilt as an accessory or co-conspirator. *See Barapind*, 400 F.3d at 752 (fugitive's presence at murder scene while accomplices killed victim was competent evidence of probable cause as accomplice or co-conspirator in killing).

Under the totality of circumstances, including the testimony of the cooperator and the eyewitness, the Court concludes there is competent evidence to find probable cause that Relator committed or was an accessory or co-conspirator in the murder of Lieutenant Hussein.

### 2. Murder of Officer Mohammed

On October 3, 2006, Police Officer Khalid Ibrahim Mohammad was killed by gunfire in Fallujah by gunmen who emerged from two cars. Doc. 3-3 at 55. In support of probable cause, Iraq provided statements and testimony from two eyewitnesses and the same cooperator who provided information on the murder of Lieutenant Hussein.

#### a. *Evidence*

##### i. Eyewitness 3

In 2019, an eyewitness provided a sworn statement to a Judge in Iraq relating that during Ramadan in 2006, while at the market on Street 40 in Fallujah, the eyewitness saw Officer Mohammad with a group of people in front of a store. A "red Opel Omega car" appeared with four people inside." Doc. 3-3 at 76. Shots were fired from the red car and:

> [t]hen the armed men exited the Opel car and one of them continued firing on the victim (Khalid Ibrahim Mohammad) and they withdrew from the area. Upon fleeing the area, I recognized the person who got out of the car and fired on the victim. He was the fugitive (Ali Yousif Ahmed Nouri) since I knew him from where he lived near our house and since he was well known in the area for conducting assassination operations on most members of the Police force.

Doc. 3-3 at 76. The statement also notes the eyewitness identified Relator from a group of photos presented to the eyewitness by the Iraqi Judge, and that the eyewitness also knew Relator from Relator's work as a carpenter in Relator's store on Street 40 in Fallujah. Doc. 3-3 at 76.

### ii. Eyewitness 2

On February 2, 2019, an eyewitness provided a sworn statement to the Al-Karkh Investigative Court stating that in 2006 the eyewitness was "standing near the location" where Officer Mohammad was killed. The eyewitness stated that "[a]mong those who fired shots and killed the plaintiff's son a person that I recognized after his mask fell off his face and he was Ali Yousif Ahmed Nouri, and this is my statement." Doc. 3-3 at 75.

### iii. Cooperator

*Statements in 2006*

On November 5, 2006, the cooperator provided statements to the Al-Fallujah Justice Court and to the "Office of important crimes." Doc. 3-3 at 81–82, 78. The cooperator told the Al-Fallujah Investigative Court that he had joined a group, met Relator and others, and agreed with them to kill "the policeman by the name of (Khalid Ibrahim Mohammad)." Doc. 3-3 at 81. The cooperator stated that "in the month of Ramadan" Relator led a surveillance team to locate Officer Mohammad:

> [u]pon our arrival, the so called Ali Yousif told us that the above mentioned policeman was near the stores on Street 40 and two people were sitting with him. Ali Yousif was surveilling the area, then we departed where shots were fired at him and he was killed with two other people because of the intensity of the shots by [redacted] who was carrying a hand gun while the rest had AK47s.

Doc. 3-3 at 81. The cooperator stated two cars were used in the attack; the cooperator drove an Opel:

> [in] the second car was Ali Yousif and [redacted] and [redacted] where we headed towards the market. I was carrying a hand gun while the rest had AK47s and they fired at the victim, so called Mohammad and they killed him.

- 12 -

Doc. 3-3 at 82. To the "Office of important crimes," the cooperator provided a similar narrative, naming Relator as one of the leaders and that Relator "provided protection to the car that we drove; which is the car that executed the job…." Doc. 3-3 at 78.

*Statements in 2010*

As noted previously in the discussion of Lieutenant Hussein's murder, on June 6, 2010, the Al-Fallujah Investigative Court ordered a "walk-through" by the cooperator. As to Officer Mohammad, the cooperator stated:

> [w]hile the other accused Ali Yousif [and redacted names] were in an Opel Vectra and they carried automatic weapons and a pistol carried by Ali Yousif [IL], from the car and started to shoot in the direction of Khalid Ibrahim who was standing near the mentioned shops. The incident took place quickly and the victim was killed.

Doc. 3-3 at 85. The statement indicates "those who executed the killing fled in the Opel Vectra." *Id*. The cooperator signed this statement with a thumb print.

The cooperator made two other statements on June 6, 2010, to the Office of Counterterrorism. The first statement said:

> the first car, type Vectra which was used by the accused Ali Yousif and his group, stopped suddenly next to the victim and Ali Yousif who was carrying a 9mm pistol stepped out of it with [redacted] and [redacted] who were carrying Ak47s. Then Ali Yousif fired towards the victim and with him [redacted] and each using their gun they hit and killed the victim.

Doc. 3-4 at 8. The cooperator acknowledged that "civilians were shot as well." Doc. 3-4 at 8. In the second statement, referenced as "follow up testimony," the cooperator stated:

> Ali Yousif told us that [IL] on a mission and when we arrived to Street 40 next to the water tank and near one of the stores, we saw the policeman Khalid Ibrahim standing and with him two civilians; where Ali Yousif ordered us to surround the area. Ali Yousif stepped out of the Vectra car and with him was [redacted] and they proceeded to kill the policeman Khalid Ibrahim, while we were surrounding the area. We carried Ak47s and Ali Yousif had a 9mm pistol.

Doc. 3-4 at 9.

//

- 13 -

b. ***Probable Cause Analysis for Murder of Officer Mohammad***

Relator acknowledges that he was in Fallujah on October 4, 2006—the day after Officer Mohammad's murder. Doc. 273, Tr. 87–88. Two eyewitnesses, one of whom knew Relator because Relator "lived near our house" (doc. 3-3 at 76), identify Relator as having personally fired shots at Officer Mohammad. Eyewitness 3 and the cooperator are consistent as to when—during Ramadan—and where the murder occurred—the market at Street 40 in Fallujah. Doc. 3-3 at 76, 81.

The overall narrative from the eyewitnesses and cooperator is consistent: Relator agreed with others to kill Officer Mohammad; the conspirators drove down Street 40 to find him sitting outside a store, and Relator and others shot and killed Officer Mohammad. This narrative did not meaningfully change over time—the cooperator gave two statements in 2006 and three statements in 2010, while the two eyewitnesses provided statements in 2019. Nonetheless, there are some inconsistencies in the descriptions of the vehicles used and whether Relator was armed with a pistol or an automatic weapon. *Compare* doc. 3-3 at 81–82, 78 (cooperator's 2006 statements referencing Relator having an AK47, not a pistol) *with* doc. 3-3 at 85 *and* doc. 3-4 at 8–9 (cooperator's 2010 statements referencing Relator having a pistol); *compare* doc. 3-3 at 76 (eyewitness saw a red Opel Omega car) *with* doc. 3-3 at 78, 85 (cooperator describing "greyish" Opel Senator or Vectra).

At the extradition hearing, Relator asserted eyewitness 3's statement (doc. 3-3 at 76) is not credible because in referring to Relator as a fugitive, a "term of art in extradition cases," the statement must have been "presented in anticipation of an extradition request." Doc. 273, Tr. 79:7–16. However, even assuming eyewitness 3 did not personally originate every phrase in the statement—signed by a thumbprint—that does not by itself call into question the statement's credibility.  By analogy, in legal proceedings in the United States, counsel frequently draft affidavits for witnesses, who subsequently review and attest to the affidavit's veracity. *See, e.g.*, *Ideal Elec. Co. v. Flowserve Corp.*, 230 F.R.D. 603, 605–06 (D. Nev. 2005).

As to eyewitness 2, Relator asserts the statement is less credible because it was made

in February 2019, approximately twelve years after murder. Doc. 273, Tr. 77–78. In the absence of any other fact casting doubt on the veracity of the statement, this Court does not find that the delay between the date of the murder and the date of the witness's statement undermines the statement's credibility. *In re Extradition of Mazur*, which Relator cites (doc. 273, Tr. 184:22–185:3), involved issues of credibility far more substantial than the inconsistencies in the witness statements in this case. In *Mazur*, the primary witness in support of extradition admitted *in the statements introduced at the extradition proceeding* that he lied under oath, made up the connection between the relator and the victim of the crime, and was providing information to the Polish government about the relator in exchange for a lighter prison sentence. 2007 WL 2122401, at *22.

Considering the testimony of two eyewitnesses and the cooperator, all identifying Relator as having fired shots at Officer Mohammad (docs. 3-4 at 8–9; 3-3 at 85, 82), the Court finds that there is probable cause that Relator participated in the murder, and that the inconsistencies among the statements are not of a sufficient magnitude to undermine probable cause. *See Luna-Ruiz*, 2014 WL 1089134, at *8 (inconsistencies within statements of witnesses and between witnesses do not necessarily destroy or negate a showing of probable cause).

## II.  ADDITIONAL CHALLENGES TO THE EXTRADITION PACKET

### A.  SUFFICIENCY OF THE ARREST WARRANT

The Certificate of Authentication from the United States Department of State (doc. 3-3 at 15) and the arrest warrant issued by the Magistrate Court of Al-Karkh (doc. 3-3 at 49–51) state Relator is charged with murder, an offense covered by the Treaty. Relator asserts that because the Iraqi arrest warrant was issued by an Iraqi "investigative court" rather than a trial court, there has been no determination that a formal charge has been filed. Doc. 200 at 27. Relator maintains that in Iraq his case was "subjected to a 'series of jurisdiction transfers' from one investigative court to another that 'constitue[d] a brazen violation of Iraqi criminal process and the Iraqi Criminal Procedure Code.'" Doc. 200 at 32–33 (citing doc. 200-3, Ex. B at 21–22).

In *Grin v. Shine*, the Supreme Court declined to address whether, under Russian law, Russian courts had properly issued an arrest warrant for a relator. 187 U.S. 181, 190 (1902). Following *Grin*, courts have not probed deeply into questions of foreign procedural law. *See Emami v. U.S. Dist. Court for the N. Dist. of Cal.*, 834 F.2d 1444, 1449 (9th Cir. 1987) ("We refrain from interpreting the requirements of German criminal procedure both out of respect for German sovereignty and because we recognize the chance of erroneous interpretation is much greater when we try to construe the law of a country whose legal system is not based on common law principles."); *see also Skaftouros v. United States*, 667 F.3d 144, 159–60 (2d Cir. 2011) ("[T]he question of whether an arrest warrant is in technical compliance with the law of the demanding country is not to be decided by U.S. courts.").

Relator cites *Sacirbey v. Guccione*, 589 F.3d 52 (2d Cir. 2009), in contending that the Iraqi arrest warrant is invalid. *See* docs. 200 at 32–33; 226 at 31–33. *Sacirbey*, however, is not persuasive because it must be read in light of *Skaftouros*, in which the Court stated "*Sacirbey* stands for the unexceptional proposition that a foreign arrest warrant cannot suffice to show that a fugitive is currently charged with an offense, as required by most extradition treaties, where the court that issued the warrant no longer has the power to enforce it." 667 F.3d at 160. "To the extent . . . *Sacirbey* [had] engendered confusion" the Court clarified a "'valid arrest warrant' is one that is 'duly authenticated' as required by [18 U.S.C.] § 3190 and the applicable treaty, and sufficient to show that the fugitive is *currently charged* with an offense recognized by the treaty." *Id.* The arrest warrant must merely "show that the fugitive is in fact 'prosecutable' upon extradition to the demanding country." *Id.* (alteration omitted).

As the Seventh Circuit recognized, the *Skaftouros* Court "emphasized that its 'analysis in *Sacirbey* was limited to determining whether the requirements of the extradition were met; the majority opinion did not engage in questions of Bosnian law.'" *Noeller v. Wojdylo*, 922 F.3d 797, 806 (7th Cir. 2019). In *Noeller*, an arrest warrant for the relator had been issued by a Mexican court. *Id.* at 805. Prior to the extradition proceedings

in the United States, the relator initiated an *amparo* proceeding in Mexico, a proceeding similar to a habeas corpus proceeding in the United States. *Id.* at 802. The relator in *Noeller* asserted that the *amparo* proceeding resulted in the "suspension of his arrest warrant." *Id.* The *Noeller* court concluded that, even assuming the relator was correct, the warrant presented by the Mexican government was sufficient documentary proof that the relator was charged with a crime under the extradition treaty. *Id.* at 805. The *Noeller* Court noted "[m]ore fundamentally, extradition proceedings are not vehicles for United States federal courts to interpret and opine on foreign law." *Id.* The *Noeller* Court also observed it "is simply not our job" to "adjudicate the validity of the warrant," which would require the Court "to decide what legal conclusion a Mexican court reached based on its analysis of Mexican law and criminal procedure." *Id.* at 806. "If [the relator] thinks later developments in the Mexican courts have rendered his arrest warrant invalid, that challenge belongs in a Mexican court." *Id.*

Here, in light of the documentary evidence Iraq submitted showing Relator is sought for an extraditable crime, this Court will not decide whether the Iraqi arrest warrant is in technical compliance with all aspects of Iraqi law. That issue is best decided by an Iraqi court. *Emami*, 834 F.2d at 1449; *Skaftourous*, 667 F.3d at 159–60.

### B. NECESSITY OF CHARGING INSTRUMENT

Relator asserts even if the arrest warrant is valid, it demonstrates Iraqi authorities merely intend to continue investigating crimes, and that Relator has not yet been "charged" with a crime. Doc. 200 at 23; doc. 273, Tr. 123:16–23. Relator relies on Exhibit 2, paragraph 2 of Doc. 254-2, which is a translation of a statement by Judge Hussain of Iraq:

> [Relator]'s testimony must to be [sic] heard, and his arguments and defenses considered, and a trial in his presence be conducted. Therefore, after the defendant has been extradited, he will be investigated according to due process and he will be questioned regarding the charge that he is facing and his statement recorded in this regards while documenting whatever evidence he presents to deny it.

Doc. 254-2, Ex. 2 at 3.

Read in its totality, Exhibit 2 does not support a conclusion that Relator has not been charged with a crime. Paragraph five of Exhibit 2 states that the Iraqi government requested extradition "to bring [Relator] in front of the Iraqi courts *in order to prosecute him in accordance with the law*." Doc. 254-2, Ex. 2 at 5 (emphasis added). Further, the Iraqi arrest warrant states that all law enforcement personnel in Iraq are "empowered and tasked to arrest" Relator (doc. 3-3 at 49); and Judge Hussain attests to the existence of an "arrest warrant" against Relator. Doc. 254-2, Ex. 2 at 5. Accordingly, Relator's case is not like *Sacirbey*, where the Bosnian authorities merely represented that "'[t]here is an ongoing criminal investigation against Sacirbey' and that the Bosnian government sought extradition to further that investigation." 589 F.3d at 67. Here, the documentary evidence is sufficient to conclude the Iraqi government seeks extradition so it may prosecute Relator for crimes.

Article XI of the Treaty states "a duly authenticated copy of the warrant of arrest in the country where the crime was committed, and copies of the depositions upon which such warrant may have been issued, shall be produced with such other evidence or proof as may be deemed competent in this case." Doc. 3-3 at 12. Relator asserts that an arrest warrant is insufficient; he contends the Iraqi government must present a formal charging instrument, such as an indictment. Docs. 200 at 23–25; 226 at 30.

In *Matter of Assarsson*, the Seventh Circuit considered whether a formal indictment was required under an extradition treaty between the United States and Sweden. 635 F.2d 1237 (7th Cir. 1980). That treaty required extradition of persons "who have been charged with or convicted of any of the offenses" listed in that treaty's Article II. *Id.* at 1242. Article II of the Treaty in this case contains the same language. *Compare id.* at 1241–42 ("The requested State shall, subject to the provisions of this Convention, extradite a person *charged with or convicted of* any offense enumerated in Article II[.]" (emphasis added)) *with* doc. 3-3 at 9 ("Persons shall be delivered up according to the provisions of this Treaty, who shall have been *charged with or convicted of* any of the following crimes if they are punishable by the laws of both countries" (emphasis added)). The *Assarsson* Court

concluded "[t]he filing of formal charges is not stated anywhere as a prerequisite to extradition;" the treaty only required production of a "duly certified or authenticated copy of the warrant of arrest or other order of detention." 635 F.2d at 1242–43.

In *Emami*, the Ninth Circuit adopted *Assarsson*'s reasoning in finding that the extradition treaty between the United States and Germany did not require the filing of formal charges. 834 F.2d at 1448 ("In *Assarsson* the Seventh Circuit held that the existence of formal charges can be reviewable only if the treaty itself conditions extradition on the existence of formal charges. The Seventh Circuit's reasoning demonstrates that grafting such a requirement as *Emami* proposes on to the treaty in the instant case is inadvisable.").

Relator's attempt to distinguish *Emami* is not persuasive. Relator states the treaty in *Emami* was broader than the Treaty in this case, as the extradition treaty with Germany merely required the requesting state to seek extradition "for prosecution" rather than for a person "charged with or convicted of" an offense. Docs. 200 at 25; 226 at 27. However, the *Emami* Court noted the extradition treaty with Germany "limits the application of the [t]reaty to persons 'who have been charged with an offense or are wanted by the other Contracting Party for the enforcement of a judicially pronounced penalty or detention order." 834 F.2d at 1448. Moreover, in concluding that a formal charge was not necessary for extradition, the *Emami* Court did not rely on the broader language of the treaty with Germany. Rather, it adopted *Assarsson*'s reasoning, which interpreted a treaty that *did* include the "charged with or convicted of" language present in the Treaty in this case. *Id.* ("The [*Assarsson*] court reasoned that the word 'charged,' used as a verb in the generic sense only to indicate 'accused,' could not be transmuted into a requirement that 'charges,' a noun, be filed." (citation omitted)).

Following *Emami*, the Court concludes the language "charged with or convicted of" in Article II of the Treaty does not require the filing of formal charges as a prerequisite to extradition.

## C.   ENFORCEABILITY OF ARTICLE IV

Relator asserts interpreting Article II of the Treaty to not require a formal charge

prior to extradition would render Article IV effectively unenforceable because Article IV requires the requesting state to try a relator only for a crime for which he was initially extradited. Docs. 200 at 25–26; 226 at 23–24. Relator's argument relies on the "Rule of Specialty." *See, e.g.*, *In re Extradition of Handanovic*, 829 F. Supp. 2d, 979, 991 (D. Or. 2011).

"A person extradited may raise whatever objections the extraditing country would have been entitled to raise." *United States v. Cuevas*, 847 F.2d 1417, 1426 (9th Cir. 1988). However, the treaty in *Cuevas* stated only that "[n]o person surrendered by either of the Contracting States to the other shall be prosecuted or punished for any offense, committed before the demand for extradition, other than that for which the extradition is granted." *Id*. In contrast, the Treaty in this case expressly reserves the right to object under the Rule of Specialty to the "surrendering High Contracting Party." Doc. 3-3 at 11.

Here, in asserting that a formal charge is a prerequisite to extradition, Relator overstates the restrictiveness of Article IV of the Treaty. Article IV states that "[n]o person surrendered shall be tried for any crime other than that for which he was surrendered *without the consent of the surrendering High Contracting Party*." Doc. 3-3 at 11 (emphasis added). As applied here, the plain language of Article IV means that Iraq *can* try Relator for crimes other than the crime for which Iraq initially sought extradition, so long as the United States, as the surrendering country, consents. *See United States v. Georgiadis*, 819 F.3d 4, 9 (1st Cir. 2016) ("Because the doctrine of specialty is concerned with comity rather than the rights of the defendant, it exists only to the extent that the surrendering country wishes." (alterations omitted) (quoting *United States v. Tse*, 135 F.3d 200, 204 (1st Cir. 1998))).

The Court concludes the materials submitted in the extradition packet establish Relator has been "charged with" an extraditable crime under the Treaty. The Court also concludes the arrest warrant submitted is sufficient to satisfy Article XI of the Treaty, and that the lack of charging instrument does not render Article IV unenforceable.

//

## III.    DEFENSES TO EXTRADITION

Having concluded that there is probable cause that Relator committed the offenses described in the extradition request, and that the Iraqi government has produced sufficient documentation to comply with the terms of the Treaty, the Court considers various defenses Relator raises.

### A.    IRAQI CRIMINAL JUSTICE SYSTEM

Relator argues the Court should decline certification because of the "abusive and arbitrary procedures he would face in the Iraqi criminal justice system." Doc. 200 at 33. However, as the Court previously noted in its May 20, 2021 Order:

> Under the rule of non-inquiry, an extradition court "does not inquire into the penal system of a requesting nation, or try to determine whether an extraditee is likely to be treated humanely if extradited, leaving such determinations to the Secretary of State." *Garcia v. Benov*, 715 F. Supp. 2d 974, 981-82 (C.D. Cal. 2009), citing *Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005). The extraditing court "lacks discretion to inquire into the conditions that might await a fugitive upon return to the requesting country." *Prasoprat*, 421 F.3d at 1016.

Doc. 238 at 2–3. To the extent Relator raises concerns about the fairness and efficacy of the Iraqi criminal justice system, those considerations are reserved for the Secretary of State. *Garcia*, 715 F. Supp. 2d at 981-82.

Relator asserts, notwithstanding the rule of non-inquiry, an unspoken "humanitarian exception" prohibits extradition. Doc. 226 at 33–34. However, the Ninth Circuit has declined to establish a humanitarian exception to extradition. *See Prasoprat*, 421 F.3d at 1016–17; *Mainero v. Gregg*, 164 F.3d 1199, 1210 (9th Cir. 1999); *Emami*, 834 F.2d at 1452-53; *Arnbjornsdottir-Mendler v. United States*, 721 F.2d 679, 683 (9th Cir. 1983). *But see Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960) (stating a humanitarian exception may exist in "situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of [the general principle upholding extradition]."). This Court will not deviate from the principle—which the Ninth Circuit has consistently re-affirmed—that

humanitarian justifications to refuse extradition are for the Secretary of State to decide, not the courts. *Santos*, 830 F.3d at 1007 n.9; *Prasoprat*, 421 F.3d at 1016.

## B. APPLICATION OF THE DEATH PENALTY

Relator asserts he cannot be extradited because "he is exempt from punishment for the one treaty-enumerated crime mentioned in the complaint." Doc. 200 at 30. Specifically, Relator argues that death is the only punishment under Iraqi law for premeditated murder, which in Relator's view is the only conceivable charge the Iraqi government could theoretically press against him. Doc. 200 at 31 (citing doc. 3-3, Ex. B at 22).

As the Court also explained in its May 20, 2021 Order:

> The Ninth Circuit in *Prasoprat* held that it was not an abuse of discretion for the extradition court to exclude expert witness testimony regarding use of the death penalty in Thailand. *Prasoprat*, 421 F.3d at 1014-15. The Ninth Circuit reasoned that "[t]he only purpose of the extradition hearing is for the magistrate judge to determine whether the crime is extraditable and whether there is probable cause to support the charge." *Id*. at 1014. Therefore, information as to how Thailand imposes the death penalty "would not be relevant to the magistrate judge's decision regarding whether to certify Prasoprat as extraditable." *Id*. at 1015.

Doc. 238 at 3. To the extent Relator's argument concerns how Iraq imposes the death penalty, that argument is foreclosed by the rule of non-inquiry. Further, as the United States observes, Coalition Provisional Authority Order Number 7, Section 3(1) states that "[c]apital punishment is suspended. In each case where the death penalty is the only available penalty prescribed for an offense, the court may substitute the lesser penalty of life imprisonment, or such other lesser penalty as provided for in the Penal Code." Doc. 200-3, Ex. B-3 at 62. In the United States's Supplemental Exhibits, Judge Hussain states Order Number 7 applies to Relator under "Article 2 of the Amended Iraqi Penal Code, 111 for 1969." Doc. 254-2, Ex. 2 at 4–5. According to Judge Hussain, because the crimes occurred while the death penalty was suspended in Iraq, the death penalty would not be an available punishment if Relator was convicted. Doc. 254-2, Ex. 2 at 4–5. Accordingly, the Court is not persuaded that Relator is exempt from punishment under Iraqi law and not

extraditable on that basis.

### C.    CONVENTION AGAINST TORTURE

Relator asserts certifying extradition would violate the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment (CAT). Doc. 200 at 39. This Court is not the correct forum for that argument. In *Trinidad y Garcia v. Thomas*, the Court noted that "the *Secretary of State* must make a torture determination before surrendering an extraditee who makes a CAT claim." *Id.* 683 F.3d 952, 957 (9th Cir. 2012) (emphasis added). Further, *Trinidad y Garcia* suggests the Secretary of State's determination may be issued after a magistrate judge has certified extradition. *Id.* ("The Secretary must consider an extraditee's torture claim and find it not 'more likely than not' that the extraditee will face torture before extradition can occur." (citing 22 C.F.R. § 95.2)). Although the Ninth Circuit is clear that a CAT certification is mandatory prior to *extradition*, the posture of *Trinidad y Garcia* strongly suggests CAT certification is not required prior to *certification*.

### D.    UNITED STATES CITIZEN

Relator reads *Valentine v. United States ex rel. Neidecker*, as prohibiting his extradition absent authorization in the Treaty because he is a United States citizen. 299 U.S. 5, 7–18 (1936). Relator argues the Treaty between the United States and Iraq does not provide that authorization, as it does not compel the United States or Iraq to extradite its own citizens. Doc. 200 at 45–46.

18 U.S.C. § 3196 provides:

> If the applicable treaty or convention does not obligate the United States to extradite its citizens to a foreign country, the Secretary of State may, nevertheless, order the surrender to that country of a United States citizen whose extradition has been requested by that country if the other requirements of that treaty or convention are met.

The Treaty states "[u]nder the stipulations of this Treaty, neither of the High Contracting Parties shall be bound to deliver up its own citizens." Doc. 3-3 at 11. *Knotek* addressed comparable language in an extradition treaty between the United States and the Czech

Republic and concluded Section 3196 "fill[ed] a void" between what the United States was *permitted* to do versus what it was *prohibited* from doing under the terms of the extradition treaty in that case. "In other words, the Treaty states that there is no obligation to extradite a U.S. citizen, while section 3196 grants the U.S. government discretion to do so. 'There is a vast difference between not being bound to do an act and being forbidden to do it.'" *Knotek*, 925 F.3d at 1126–27 (alteration omitted) (quoting *Bašić v. Steck*, 819 F.3d 897, 900 (6th Cir. 2016)). Because Section 3196 similarly "fills a void" in the Treaty here, the United States may extradite a United States citizen even if not obligated by the Treaty to do so.

Relator asserts both Section 3196 and *Knotek* are inapplicable. First, Relator asserts the government "has forfeited any ability to rely on Section 3196 by failing to include or specifically reference it in its extradition complaint." Doc. 200 at 47. Relator relies on *Faretta v. California*, 422 U.S. 806, 818 (1975), which holds that criminal defendants in the United States are entitled to "notice, confrontation, and compulsory process," and cites *Quinn*'s instruction that a magistrate judge should order discovery procedures "as law and justice require." *Quinn*, 783 F.3d at 817 n.41.

An extradition proceeding is not a criminal proceeding. *Matter of Extradition of Mainero*, 990 F. Supp. 1208, 1218 (S.D. Cal. 1997). "The person whose return is sought is not entitled to the rights available in a criminal trial at common law." *Id.* (citing *Neely v. Henkel*, 180 U.S. 109 (1901)). Moreover, Relator's general argument regarding fair notice is unfounded; Relator himself raised the Section 3196 issue in his initial extradition brief. Doc. 200 at 47. An additional round of briefing followed (doc. 226) and the extradition hearing was held several months later. Relator had ample notice that Section 3196 might apply to him. Further, as the United States notes, the United States also did not mention Section 3196 in the complaint in *Knotek*, in which the Ninth Circuit upheld the certification of extradition. Doc. 228 at 36 n.16 (citing *United States v. Knotek*, No. 2:13-mj-02421, Doc. 1 (C.D. Cal. Aug. 30, 2013)).

Relator also distinguishes *Knotek* by arguing the Treaty, unlike the treaty at issue in

*Knotek*, was ratified prior to Section 3196's enactment and argues Section 3196 does not apply retroactively. Doc. 200 at 49–50. However, the Sixth Circuit in *Bašić* applied Section 3196 to an extradition treaty ratified in 1902. 819 F.3d at 898–99. The Ninth Circuit followed *Bašić* in *Knotek*. 925 F.3d at 1123 ("We agree with the Sixth Circuit and nearly every district court that has considered the applicability of 18 U.S.C. § 3196 that, in the absence of a treaty authorization or prohibition, the statute confers discretion on the U.S. Department of State to seek extradition of U.S. citizens.").

### E.    POLITICAL OFFENSE EXCEPTION

Relator asserts that even if probable cause exists, the offenses alleged were non-extraditable political offenses.

For a court to apply the political offense exception, a relator must prove: "(1) the occurrence of an uprising or other violent political disturbance at the time of the charged offense, and (2) a charged offense that is 'incidental to' 'in the course of,' or 'in furtherance of' the uprising." *Quinn*, 783 F.2d at 797 (internal citations omitted). The test is ideologically neutral: "[i]t is the fact that the insurgents are seeking to change their governments that makes the political offense exception applicable, not their reasons for wishing to do so or the nature of the acts by which they hope to accomplish that goal." *Id.* at 804–05.

### 1.    The United States's Evidence Regarding AQI's Role in Violence in Iraq

Professor Whiteside is a professor of national security affairs with the United States Naval War College. In 2006 he served as a United States Army officer in Iraq conducting counterinsurgency operations against insurgent groups, "including the group the United States called 'al-Qaeda in Iraq.'" Doc. 199-2, Ex. 2 at 1.

Whiteside's Report described AQI's origins: it began as "Tawhid wal-Jihad." Upon pledging its allegiance to Osama Bin Laden in 2004, the group's leader, Abu Musab al-Zarqawi, changed its name to "al-Qaeda's Base of Jihad in the Land of Two Rivers," though the United States referred to the group as "al Qaeda in Iraq" or "AQI." Doc. 199-2

at 4–5. Al-Zarqawi was Jordanian. Under his leadership:

> [f]rom October 2004 to October 2006 the group would operate in the region as an official al-Qaeda franchise dedicated to preparing the groundwork for a caliphate that would allow implementation of Sharia in lands liberated from both U.S. and allied forces and Iraq's neighboring 'apostate' governments.

Doc. 199-2 at 5. According to Whiteside, AQI's leadership was drawn heavily from non-Iraqis, who maintained continuous ties with external terror groups such as the main al-Qaeda group. The leader of AQI after Zarqawi's death in June 2006 was Abu Hamza al-Muhajir, an Egyptian. Doc. 199-2 at 7.

Whiteside notes that AQI's regional commanders in Iraq were not Iraqi natives. When Relator allegedly killed Lieutenant Hussein and Officer Mohammed—between June to October 2006—AQI's leader in Fallujah was Jarrah al-Shami, a native Syrian. Doc. 199-2 at 8. Whiteside states AQI was not an "indigenous group" as it was "led by non-Iraqis whose objectives were global" and "were responsive to higher-level leaders in Pakistan." Doc. 199-2 at 5.

Whiteside explains that AQI did not engage in violence on behalf of Iraqis to change the government of Iraq. AQI's goal was to establish a caliphate in the Levant region, a region that would include part of Iraq, Kuwait, Syria, and Turkey. Doc. 199-2 at 9. AQI was a "transnational terrorist group which operated and conducted terror attacks around the region and beyond in the pursuit of its global jihadist agenda." Doc. 199-2 at 6. AQI "planned attacks and struck targets in Jordan, Israel, and Turkey." Doc. 199-2 at 6. Rather than committing violent acts in a domestic struggle to change the form of the Iraqi government, AQI sought to replace international borders and establish a "pan-Islamic state that transcended current borders and aligned with the borders of the Islamic Empire at its greatest extent." Doc. 199-2 at 9. Emphasizing AQI's goal of destroying the Iraqi state to subsume it within parts of Iraq, Kuwait, Syria, and Turkey, Whiteside notes that AQI's Arabic name for itself—"al-Qaeda's Base of Jihad in the Land of Two Rivers":

> referr[ed] to the Euphrates and Tigris. None of the logos of the movement that ultimately became the Islamic State—not Tawhid wal-Jihad (2003-2004), AQI (2004-2006), Mujahidin Shura Council (2006), Islamic State of

Iraq (2006-2013) —have ever included an image of the borders of Iraq. Doc. 199-2 at 9.

Whiteside states AQI conducted a "campaign to assassinate police officers for allegedly publicly apostatizing and working for a democratic government." Doc. 199-2 at 5. He notes that during his tour in Iraq as an officer in the United States Army, AQI in 2006 and 2007 claimed responsibility for a suicide attack on an Iraqi police station as well as the capture and summary execution of an Iraqi police chief and his security detail. Doc. 199-2 at 12. As an example of AQI not being part of a domestic Sunni insurgency, Whiteside notes AQI repeatedly targeted "Sunni Iraqis who joined or negotiated with the [Iraqi] government" and "openly targeted civilians and Iraqis who joined police, military, or government jobs." Doc. 199-2 at 10. Whiteside notes that under Jarrah al-Shami, the Syrian who led AQI in Fallujah in 2006, "[a]ll local AQI amirs in Fallujah" followed al-Shami's "instructions and guidance, especially directives to kill Iraqi policemen." Doc. 199-2 at 8.

### 2. Relator's Expert

Professor Hamoudi is a Professor of Law at the University of Pittsburgh School of Law. In Hamoudi's view, AQI was "part of the insurgency" in Iraq. Doc. 200-3 at 31, ¶ 111. As to Zarqawi's and AQI's public pledge of allegiance to Osama Bin Laden, Hamoudi states "while there was a formal affiliation between Zarqawi as nominal head of AQI and Bin Laden and Al Qaeda, this affiliation was in name only." Doc. 200-3 at 31, ¶ 113. Hamoudi states the two groups "did not even share the same basic strategic or tactical goals." Doc. 200-3 at 31, ¶ 113.

As to attacks on police officers, Hamoudi states "there *was* international terrorism in Iraq at the time of the insurgency, and Zarqawi *was* leading much of it." Doc. 200-3 at 34, ¶ 127. But "neither Zarqawi nor international terrorists engaged in the meticulous targeting of ranked police officers in the new Iraqi state," because they lacked the skill, experience, and operational capacity to do so. Doc. 200-3 at 34, ¶ 128. Instead, attacks on police officers "were classic features of the Sunni insurgency." Doc. 200-3 at 34, ¶ 129. In disputing that AQI was capable of carrying out murders of police officers, Hamoudi writes

- 27 -

"[i]t is possible that the alleged killings, if they took place, were carried out by members of the Army of Omar and were misattributed to AQI." Doc. 200-3 at 34 ¶ 130. Hamoudi asserts "[w]hat *is* important is to focus on the relevant act—the targeted assassination of police officers—and not on who committed it." Doc. 200-3 at 34 ¶ 130.

At the extradition hearing, Relator argued that even assuming AQI was "involved in this and assuming Mr. Al-Nouri was involved with them in this is fully consistent with the definition of a political offense because it was an attack that fit the profile of an act under the indigenous conspiracy." Doc. 273, Tr. 150:18–22. Relator asserted he was not downplaying "the involvement of foreigners and foreign groups in this uprising" or asking "the Court to ignore the involvement of foreigners in AQI" but "their presence and involvement doesn't change the degree to which this uprising fits within *Quinn*'s definition." Doc. 273, Tr. 147:8–13.

### 3.   The Analysis Under *Quinn*

A relator does not need to "prove membership in the uprising group" to invoke the political offense exception. *Quinn*, 783 F.2d at 811. In applying the test, the Court will assume that the murders were committed by individuals acting on behalf of AQI, as no competent evidence suggests that any group other than AQI committed the murders. In particular, the Court finds no basis in the record to support Professor Hamoudi's speculation that the murders were misattributed to AQI.

Under *Quinn*, it matters *who the insurgents were* who carried out the murders of Lieutenant Hussein and Officer Mohammad, as "not all politically motivated violence undertaken by dispersed forces and directed at civilians is international terrorism." *Id*. at 805. International terrorism is categorically excluded from the "protection afforded by the exception." *Id*. As the *Quinn* Court explained:

> [t]he exception was designed, in part, to protect against foreign intervention in internal struggles for self-determination. When we extradite an individual accused of international terrorism, we are not interfering with any *internal* struggle; rather it is the international terrorist who has interfered with the rights of others to exist peacefully under their chosen form of government.

*Id.* at 806.

The Court in *Quinn* was clear that under the test for the political offense exception, the Court does *not* analyze *"the nature of the acts"* by which insurgents seek to change their government. 783 F.2d at 805. "[T]he tactics that are used in such internal political struggles are simply irrelevant" to the analysis. *Id.* Accordingly, following *Quinn*, the Court does not adopt Relator's view that the identity of the murderers is irrelevant so long as the murders "fit the profile of an act under the indigenous conspiracy." Docs. 273, Tr. 150; doc. 200-3 at 34, ¶ 130. To the contrary, under *Quinn* the crucial question is not the nature of the act but whether the act was incidental to or in furtherance of an *indigenous* uprising.

The parties agree that there was a violent Sunni insurgency in Iraq in 2006; the Sunni insurgency opposed the Iraqi government and the United States. *See* doc. 199-2, Ex. 2 at 10 (Report of Professor Whiteside for the United States); doc. 200-3, Ex. B at 30 ¶ 106 (Report of Professor Hamoudi for Relator); doc. 273, Tr. 142:20–23. Based on the existence of a Sunni insurgency, Relator asserts he satisfies the first prong of the political offense exception, even if the many groups involved in the violence had disparate characteristics. Doc. 273, Tr. 142–44. According to Relator, even assuming he was involved with AQI and following "orders to fire at policeman in Fallujah," the murders are protected under the political offense exception because "insurgencies have never been hermetically sealed off from the rest of the world." Doc. 200 at 21.

The Court credits the ample evidence in the Whiteside Report that AQI was an international and transnational terrorist group committing violence in multiple nations besides Iraq, and that AQI often stood in violent opposition to other Sunni insurgent groups in Iraq. Indeed, the violent conflict towards the end of 2006 known as "the Awakening," during which the "local grassroots movement" groups violently opposed AQI's attempt to dominate the domestic insurgency and impose AQI's goals, supports the conclusion that AQI was in opposition to indigenous Sunni groups, and not part of a domestic insurgency. *See* doc. 199-2 at 1, 4, 10.

In illustrating the differences between AQI and indigenous groups, Whiteside identifies AQI's targeting of Iraqi police forces—the subject of the Complaint seeking Extradition—as one cause of the armed resistance Sunni militant groups conducted against AQI. For some Sunni tribes, jobs in the Iraqi police force were an important source of revenue and employment at a time of widespread unemployment. Doc. 199-2 at 11. AQI favored attacks on police officers for its goals; *the indigenous Sunni insurgency did not*, as "local Iraqi police had a negligible influence on insurgent activity and focused more on their roles as community arbiters of citizen behavior." Doc. 199-2 at 12.

In discussing the armed resistance to AQI in 2006 and 2007, Whiteside summarizes how AQI differed from the domestic insurgency:

> many felt that the group's [AQI's] killing of Iraqis that joined the government as soldiers and police, largely to earn a living, was an affront to the cultural, tribal, and societal norms of Anbar province and many other Sunni dominated areas. In many cases, these rival resistance members and tribal auxiliaries joined together to fight with the same U.S. and Iraqi government forces they were recently fighting against. This massive shift alone should speak to the bitter feelings that the extremists of AQI engendered among the very people they were trying to govern, or more accurately, coerce on their way to establishing a cross-boundary caliphate. It is a categorical error to paint AQI as just another Iraqi resistance group during this time period.

Doc. 199-2 at 13. This description—of rival resistance groups fighting *against* AQI, and *with* "the same U.S. and Iraqi government forces"—supports the inapplicability of the political offense exception to acts committed on behalf of AQI, an international and transnational terrorist group.

This Court finds AQI in 2006 was not part of an internal "uprising or other violent political disturbance" within the meaning of the first prong of the political offense exception defined in *Quinn*. Here, the cooperator named Relator as Emir of the al-Qaeda organization (doc. 3-4 at 7), and an eyewitness identified Relator as Emir of a group of militants in the Islamic State (doc. 3-4 at 5). Relator acknowledges AQI was present in Iraq and conducted acts of international terrorism in Iraq. Docs. 200-3 at 34, ¶ 127; 273, Tr.

147–48. On the evidence presented, the Court finds that the murders were acts of international terrorism constituting "foreign intervention in internal struggles for self-determination." *Quinn*, 783 F.3d at 806. As the *Quinn* Court stated repeatedly, international terrorism is not protected by the political offense exception. *Id*. at 805. "Acts of international terrorism do not meet the incidence test and are thus not covered by the political offense exception." *Id*. at 817.

Additionally, in light of the evidence that, in contrast to AQI, indigenous insurgents did not target police officers, the murders of Lieutenant Hussein and Officer Mohammed were not in furtherance of, or incidental to, any domestic uprising. In *Barapind,* the Court noted that the Relator "has the burden of showing a factual nexus between the crime and the political goal." 400 F.3d at 751. Here, in relying on the "nature of the act" of murdering police officers, Relator has not met his burden of showing the acts were "causally or ideologically related" to an indigenous political uprising. *Id*. at 752 (quoting *Quinn*, 783 F.2d at 809).

Relator argues against characterizing the acts as *international* terrorism, pointing out that if he was involved in these acts at the behest of a foreign organization, he was still a native of Iraq at the time of the two murders, and did not travel into Iraq from a foreign country to commit any act. Doc. 273, Tr. 149–50. In Relator's view, declining to apply the political offense exception here would cause it to "cease to have any function, because the reality of the world is foreigners do get involved; foreign entities and countries do get involved." Doc. 273, Tr. 148:14–20. To the contrary, in this Court's view, *Quinn* supports declining to apply the political offense exception under these circumstances in which an international terrorist group, with its own foreign command structure in place in Iraq, employed an Iraqi national to carry out its foreign intervention as it attempted to obliterate the government of Iraq as a sovereign entity and subsume the Iraqi nation within a caliphate. Exportation of violence is not protected by the political offense exception. *See Quinn*, 783 at 813. Indeed, the Court in *Quinn* anticipated the scenario of violence exported by foreign entities when it noted the political offense exception does not bar extradition of

an international terrorist who "has interfered with the rights of others to exist peacefully under their chosen form of government." *Quinn*, 783 F.2d at 806. Relator's alleged acts of murder, on behalf of AQI and in service of destroying the Iraqi government from without as opposed to supporting a domestic political struggle from within, fit squarely within the category of foreign intervention in internal struggles that *Quinn* excluded from the protection of the political offense exception.

## IV.  CERTIFICATION OF EXTRADITABILITY AND ORDER

Under 18 U.S.C. § 3184, the Court finds and certifies to the Secretary of State that Ali Yousif Ahmed Al-Nouri is extraditable for both offenses described in the Complaint seeking extradition.

**IT IS ORDERED** the Clerk of the Court is directed to transmit this Order Certifying Extradition to the Office of the Legal Advisor for the United States Department of State.

Dated this 31st day of March, 2022.

Michael T. Morrissey

Honorable Michael T. Morrissey
United States Magistrate Judge